J783KID1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          18 CR 872 (VM)

 5   LLOYD KIDD,

 6              Defendant.

 7   ------------------------------x

 8                                          New York, N.Y.
                                            July 8, 2019
 9                                          9:30 a.m.

10
     Before:
11
                        HON. VICTOR MARRERO,
12
                                          District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     MOLLIE BRACEWELL
17   ELINOR TARLOW
     JACOB GUTWILLIG
18   SAGAR RAVI
          Assistant United States Attorneys
19
     ZACHARY MARGULIS-OHNUMA
20   VICTORIA MEDLEY
          Attorneys for Defendant
21
     ALSO PRESENT:  USAO Paralegal Specialist Hannah Harney
22   Defense Paralegal Specialist Sophia Lattanzio
     Special Agent Brian G. Gander, FBI
23

24

25
```

J783KID1

1             (In open court)

2             THE COURT:  This is a proceeding in the matter of

3    United States v. Kidd.  It's Docket No. 18 CR 0872.

4             Counsel, please enter your appearances for the record.

5             MS. BRACEWELL:  Good morning, your Honor.  Mollie

6    Bracewell for the government.  And joining me at counsel table

7    is AUSAs Elinor Tarlow, Jacob Gutwillig, Sagar Ravi.  We're

8    also joined by our paralegal Hannah Harney, and Special Agent

9    Brian Gander of the FBI.

10            THE COURT:  Good morning and welcome.

11            MR. MARGULIS-OHNUMA:  Good morning, your Honor.

12   Zachary Margulis-Ohnuma, 260 Madison Avenue for the defendant

13   Lloyd Kidd.  I'm joined at counsel table to my immediate right

14   by my associate Victoria Medley, Mr. Kidd is in the middle, our

15   law student intern Lisa Taapken is to his right, and at the end

16   is our paralegal, Sophia Lattanzio.

17            THE COURT:  Good morning.  Welcome.  The Court

18   scheduled this proceeding as the commencement of the jury trial

19   on this matter.

20            There has been a significant amount of correspondence

21   between the parties and the Court on a number of issues that

22   need to be addressed and must be resolved in one form or

23   another before we actually commence the trial by calling the

24   jury in.

25            Let me just note for the record the correspondence

J783KID1

1    that the Court has received, and make sure we have everything

2    that the parties have submitted.  I begin with a letter from

3    the government dated July 3, 2019, in which the government

4    indicates that it will seek the self-authentication of certain

5    records that it obtained by a subpoena from Facebook, Pinger

6    Inc., and Google Inc., which the government indicates or argues

7    are self-authenticating under the new Federal Rule of Evidence

8    902(13) which went into effect in December 2017.

9         I have the response from the defendant to the

10   government's letter which is dated July 6, 2019, in which the

11   defendant challenges the application of Rule 902(13) to the

12   government's request for self-authentication of those records.

13        I have a further letter from defendant dated July 6,

14   2019, in which the defendant seeks to circumscribe the expert

15   testimony of Dr. Sharon Cooper so as to preclude her making

16   certain kinds of references which the defendant indicates

17   Dr. Cooper has made in her testimony in similar cases such as

18   this.  So, that is merely a matter of ensuring that

19   Dr. Cooper's testimony does not contain any excessively

20   prejudicial or irrelevant references to the defendant or to

21   others who may then be indirectly linked to the defendant.

22        Finally, I have a letter from the government dated

23   July 7, 2019, in which the government calls to the Court's

24   attention circumstances indicating that somebody speaking on

25   behalf of the defendant or with the defendant also present

J783KID1

1    called one of the victims in this case, Victim-4, and asked to

2    speak to Victim-4.  A further attempt, according to the

3    government's letter, was made to contact yet another victim,

4    one designated by the government's letter as SM, and the

5    government indicates that SM was contacted by the cell number

6    which was the same as the number used to contact Victim-4.

7           The government's letter points out that, somehow, the

8    caller obtained the victims' contact numbers, and that the only

9    way in which that could have occurred was for the caller to

10   have had access to 3500 material which had been turned over by

11   the government to defense counsel several weeks ago, and that

12   if that information from the material was obtained by a third

13   party, it may have occurred in violation of the court-ordered

14   protective order that is in effect in this case.

15          So, those are the letters that I've obtained.  Let me

16   first ask the government whether they are aware of any other

17   correspondence that they may have submitted which I have not

18   referenced?

19          MS. BRACEWELL:  No, your Honor.

20          THE COURT:  Mr. Margulis, is there any correspondence

21   initiated by the defendant, beyond the ones that I have just

22   indicated?

23          MR. MARGULIS-OHNUMA:  No, your Honor.

24          THE COURT:  My sense is that in order, not only of

25   importance but of logical sequence, the first matter that the

J783KID1

1    Court should address is the government's July 7, 2019, letter,

2    because the implications of that letter and the information

3    contained in it are significantly serious and potentially could

4    affect proceeding with the trial.

5           Ms. Bracewell, is there anything else that the

6    government may wish to add to what is already in that letter,

7    which the Court will docket?

8           MS. BRACEWELL:  Yes, your Honor.  We spoke with Adam

9    Johnson at the MCC this morning, and we were informed that

10   there were no visits to the defendant at the MCC yesterday.  In

11   our view, it doesn't change the substance of the communication

12   that the victim received, Victim-4.  However, we wanted to

13   bring that to your attention, that additional information.

14          THE COURT:  Did you have any further information as to

15   the origin of the call from that number, 1684, and to whose

16   account that number corresponds?

17          MS. BRACEWELL:  Yes, we did not put this in the letter

18   but the number belongs to a Nelson Lassalle who is an

19   investigator whose office is in Manhattan.  The records show it

20   to belong to him.

21          THE COURT:  All right.  Anything else?

22          MS. BRACEWELL:  Nothing at this time.

23          THE COURT:  All right.  Mr. Margulis, did you wish to

24   respond to the government's letter and what the government has

25   said today?

J783KID1

1          MR. MARGULIS-OHNUMA:  Yes.

2          THE COURT:  Concerning Mr. Lassalle?  And please be

3     aware that I may need, beyond your explanations to these

4     circumstances, to call Mr. Lassalle in and question him on the

5     record concerning these matters.

6          MR. MARGULIS-OHNUMA:  Mr. Lassalle is -- the Court is

7     aware but the government is not until now -- is our defense

8     investigator.  And I have quite a bit more to say about our

9     investigation that I prefer not to the say in front of the

10    government, so I would ask to be heard ex parte with respect to

11    the substance of those conversations.

12         THE COURT:  What is there about the substance of the

13    conversations that requires ex parte discussion?

14         MR. MARGULIS-OHNUMA:  They're work product,

15    privileged, and they reveal significant defense strategy that I

16    prefer not to reveal at this time.  And I have no obligation to

17    reveal.

18         THE COURT:  Mr. Margulis, the issue is whether it is

19    proper defense strategy for a representative of the defendant

20    to contact a government witness on the eve of trial.

21         MR. MARGULIS-OHNUMA:  Well, there is no question not

22    only is that proper defense strategy, I have an ethical

23    obligation to do that.  I mean the contact -- the contact is

24    not the issue.  The issue is -- and I prefer not --

25         THE COURT:  The issue is whether the contact was made

J783KID1

 1    in a proper manner.

 2              MR. MARGULIS-OHNUMA:  Correct.  And --

 3              THE COURT:  Let's first set down the ground rules.

 4    Let me ask the government, what is the government's

 5    understanding of what would be the appropriate procedure in the

 6    event defense counsel needed to contact Victim-4?

 7              MS. BRACEWELL:  Your Honor, we don't think it is

 8    appropriate -- there are a few issues with the communication

 9    here.  One, the disclosure of confidential telephone

10    information, personal contact information that was disclosed on

11    an attorney's eyes only basis.  Additionally, this contact was

12    made on the eve of trial, on the Sunday before these witnesses

13    were expected to testify on a Monday.

14              But most troubling is the nature of the

15    communications.  The implication that the defendant was present

16    and anxious to speak to these victims, who, as is made very

17    clear in the 3500 material, have been victimized, are

18    vulnerable.  That implication is terrifying to the victims,

19    which is the most troubling is the substance of the

20    communications.

21              If defense counsel or the defense investigator wanted

22    to reach out through a permissible means of communication, not

23    a phone number that was provided to them on an attorney's eyes

24    only basis, we would not have an objection as long as the

25    defense investigator made clear that the victim could choose

J783KID1

1   whether or not to speak to the defense.  Our understanding is

2   that's not what transpired here.  And that's what we object to,

3   all of those characteristics of these particular

4   communications.

5           THE COURT:  Thank you.  Mr. Margulis.

6           MR. MARGULIS-OHNUMA:  I would ask them to call a

7   witness to substantiate that allegation, which is false.  And

8   I'd like to cross-examine that witness.  And I have -- again, I

9   wanted to do this ex parte but I can see that you don't seem to

10  be inclined to do that.  I have compelling evidence that those

11  allegations are false.  And by the way, I mean, without --

12          THE COURT:  Mr. Margulis, let me finish.  How did

13  Mr. Lassalle obtain the numbers of these witnesses?

14          MR. MARGULIS-OHNUMA:  Our office provided them to him.

15          THE COURT:  In providing that information, did you

16  have any sense that that was in violation of the protective

17  order?

18          MR. MARGULIS-OHNUMA:  We did not.  I've since, after

19  seeing Ms. Bracewell's letter, rereviewed the protective order,

20  and I think it's somewhat ambiguous.  I think in an abundance

21  of caution, had I -- by the way, we received these phone

22  numbers Wednesday or -- we received the -- I think it was

23  Friday evening if I'm not mistaken.  So, and we've been dealing

24  with quite a lot of things, and I didn't read the protective

25  order as carefully as I would have liked to.

J783KID1

1          I wouldn't have agreed though, your Honor, to a

2     protective order that said you can't have your -- you can't

3     provide the phone numbers to your investigator so he can reach

4     out to witnesses.  That's not the purpose of the protective

5     order.  The protective order is to protect the witnesses from

6     the defendants or people close to the defendants who are not

7     constrained by the rules of the Court.  And we have absolutely

8     scrupulously complied with that aspect of it.  We totally

9     understand that.

10          But there's no purpose in a protective order that

11     stymies the investigation.  And the reason that the government

12     turned over the phone numbers is because they had an obligation

13     to do so under 3500.

14          So, I mean, I just don't, I don't think -- I think we

15     could have been more cautious in how we handled that by getting

16     the protective order amended before providing the numbers.  I

17     don't think we violated the letter of the protective order, and

18     we certainly had no intention to do that.

19          THE COURT:  The government indicates that your

20     investigator represented to Victim-4 that the defendant was

21     sitting with him and available to talk to her.

22          MR. MARGULIS-OHNUMA:  That's a lie by Victim-4 to the

23     government.  That didn't happen.  And I can prove it, and I'd

24     prefer not to offer the proof now.  I'd prefer to offer it on

25     cross-examination of Victim-4.

J783KID1

| | |
|---|---|
| 1 | THE COURT:  I think before we get to examination of |
| 2 | Victim-4, we need to have an examination of Mr. Lassalle. |
| 3 | MR. MARGULIS-OHNUMA:  I would think the burden would |
| 4 | be on the government to prove their allegations before calling |
| 5 | in Mr. Lassalle.  All right, I'll -- could I be heard -- |
| 6 | THE COURT:  Why can't the government prove or seek to |
| 7 | prove the allegation by asking Mr. Lassalle? |
| 8 | MR. MARGULIS-OHNUMA:  I've spoken to him and I'll |
| 9 | prove he absolutely did not. |
| 10 | THE COURT:  That's your word. |
| 11 | MR. MARGULIS-OHNUMA:  Can I tell you ex parte my |
| 12 | proof? |
| 13 | THE COURT:  My view is that Mr. Lassalle should come |
| 14 | here under oath and testify to what the government has |
| 15 | indicated Mr. Lassalle may have done, including when and how he |
| 16 | obtained the numbers. |
| 17 | MR. MARGULIS-OHNUMA:  Judge, if you're declining my |
| 18 | request to be heard ex parte, there is one other thing that I |
| 19 | need to say.  I'd rather do it ex parte.  If you are saying no |
| 20 | to that then I will say it publicly. |
| 21 | THE COURT:  You may.  You may say it publicly. |
| 22 | MR. MARGULIS-OHNUMA:  So you won't grant me ex parte |
| 23 | communications? |
| 24 | THE COURT:  No. |
| 25 | MR. MARGULIS-OHNUMA:  So Mr. Lassalle taped the |

J783KID1

1    interactions.  I have the tapes.  I can play them for the Court

2    right now.

3            THE COURT:  All right.  Ms. Bracewell?

4            MS. BRACEWELL:  That's incredibly inappropriate, and I

5    am shocked that defense counsel did not agree to discuss with

6    us any of this yesterday.  He declined our opportunity to give

7    an explanation.  He declined to tell us or acknowledge that he

8    violated the terms of the protective order.  If indeed

9    conversations were recorded with a victim, after defense

10   counsel disclosed her phone number in violation of the terms of

11   the protective order, we would really question whether that was

12   admissible evidence.  But in any event, he should come and

13   explain the context of the communications, and we would like to

14   hear them in the first instance.  This is news to us, but of

15   course we'd like to hear that.

16           MR. MARGULIS-OHNUMA:  Your Honor, I see this a little

17   differently.  I think this is a naked attempt by the government

18   to stymy the defense investigation, and to gain tactical

19   advantage as they've done all along to get information about

20   our investigation so that they can prepare their witnesses for

21   it.  I can play the tape.  Mr. Lassalle did not say anything

22   like what the government is claiming their witness says.

23           THE COURT:  We have a factual dispute, a very

24   substantial factual dispute, Mr. Margulis, and it may require

25   the Court to hear Mr. Lassalle, and, if necessary, to hear

J783KID1

1    Victim-4 and give you an opportunity to cross-examine based on

2    what's coming out of the testimony of the two witnesses.

3    Whether or not the tape is admissible we can defer.

4         One question there is did Mr. Lassalle inform the

5    Victim-4 that she was being taped and whether that also was

6    appropriate?

7         MR. MARGULIS-OHNUMA:  He did not inform her that she

8    was being taped.

9         THE COURT:  Was that appropriate?

10        MR. MARGULIS-OHNUMA:  Yes.  Absolutely.  It's done

11   routinely.  This is a one-party state in New York.  There is no

12   limitation on taping your own conversations.  These are phone

13   conversations, by the way.  And I can play the tape right now.

14   I think that conclusively resolves it, if you'd like to hear

15   it.

16        THE COURT:  Let's hear Mr. Lassalle.  Is he available?

17        MR. MARGULIS-OHNUMA:  I don't know but we can find

18   him.  We talked -- he answers his phone.  I can try to find

19   him.

20        THE COURT:  Why don't you see if you can find his

21   whereabouts and when he might be able to available to come to

22   court.

23        MR. MARGULIS-OHNUMA:  Respectfully, I would request we

24   hear from Arielle Palopolo, the victim, first.  I think the

25   burden is on them to prove something went wrong.  Not on us.

J783KID1

1           MS. BRACEWELL:  Your Honor, respectfully, we just

2     disagree with that.  Defense counsel already acknowledged they

3     violated the terms of the protective order.  They contacted

4     Victim-4 on the eve of trial, when she's already undergoing a

5     significant amount of stress.  They recorded the call

6     unbeknownst to her.  I think we proffered enough to raise a

7     serious factual dispute about the appropriateness of the

8     conduct that was clearly undertaken at defense counsel's

9     direction.

10          It's appropriate for the person who recorded the calls

11    to come and explain the context of the recordings, when they

12    were made, if there were other recordings, at what point he

13    started recording.

14          There's many factual questions that can't be answered

15    from the recordings on their own, and we'd like to put all

16    those questions to the investigator.

17          THE COURT:  All right.  Mr. Margulis, let us know when

18    Mr. Lassalle will be available to come to the court for this

19    hearing.

20          MR. MARGULIS-OHNUMA:  Ms. Medley will step outside and

21    call him right now.

22          THE COURT:  All right.

23          MR. MARGULIS-OHNUMA:  Just for the record, the

24    government said I acknowledged violating the protective order.

25    I did not acknowledge violating the protective order.  I think

J783KID1

1    the protective order is totally ambiguous.  I was saying best

2    practice might have been to highlight this in less of a hurry.

3    I also realize we got the phone number late.  I think I

4    misspoke on this.  Late on July 5 in the evening.  We didn't

5    realize we had until the 6th and the contact was made on the

6    8th.  Sorry.  On the 7th.  Sorry.

7             I wanted to note one other thing for the record, which

8    is these witnesses are not represented by counsel.  We had

9    asked several times in the course of the litigation, I think

10   most recently at the beginning of last week, if they had

11   obtained counsel.  This doesn't come up very much in this

12   district because routinely the Southern District U.S.

13   Attorney's Office finds counsel for witnesses to prevent this

14   kind of issue and we go through counsel.  So that's another

15   issue.  And I think at this point it probably -- I would

16   request that Ms. Palopolo and the other witnesses the

17   government intends to call who are not law enforcement be

18   appointed counsel and we won't have this problem going forward.

19             THE COURT:  Ms. Bracewell, do you have any response to

20   Mr. Margulis's suggestion?

21             MS. BRACEWELL:  The victim was not appointed counsel.

22   She was unavailable on occasions where it was suggested she get

23   counsel.  In our view, she doesn't have exposure so there is

24   not a need for counsel.  But we would be happy to have counsel

25   appointed at this time, to the extent it is helpful going

J783KID1

1      forward.

2              We would note this is separate and apart from the

3      issue here.  And at no point has defense counsel asked for

4      contact information.  We produced on Friday evening

5      communications between agents and the victims that included the

6      phone numbers because it was impossible to redact those

7      documents, which is why they were designated as confidential.

8      But, we would note that there was no earlier request that was

9      ignored or in any fashion overlooked for their contact

10     information.

11             THE COURT:  You may want to reach out to the witness

12     to find out if the witness wishes to have counsel appointed.

13     The witness did not know until presumably yesterday that this

14     might be an issue.

15             MS. BRACEWELL:  We can reach out.  We had offered her

16     to have an attorney appointed and she had not been interested

17     in an earlier occasion.  We can make her aware of the

18     opportunity again and suggest that she take advantage of it.

19             THE COURT:  All right.

20             MR. MARGULIS-OHNUMA:  Judge, to make sure you

21     understand the context, this is the same witness who blew off

22     the subpoena for the hearing that they -- she was informed of

23     the hearing and she didn't show up.  We didn't make a stink

24     about it at the time, but I think part of the problem may be

25     the availability generally of the witness.  Not the

J783KID1

1    availability of her to obtain counsel.

2              THE COURT:  Thank you.

3              MS. MEDLEY:  Your Honor, I did speak to Nelson

4    Lassalle.  And he can be here by 1 o'clock.

5              THE COURT:  All right.  If that is the earliest he

6    could be here, then we will put the issue aside for the time

7    being.  Perhaps we can turn to other items that are still open.

8              MS. BRACEWELL:  If I may just briefly, we would

9    request that defense counsel make available to us the

10   recordings that he referenced earlier and said he had available

11   so we can review them over the lunch break and be prepared to

12   question Mr. Lassalle when he takes the stand.

13             THE COURT:  Thank you.  Mr. Margulis.

14             MR. MARGULIS-OHNUMA:  I object to that.  We're not

15   offering them in our case in chief.  They are impeachment.  I

16   don't want them to play them for their witness ahead of time.

17   They're privileged work product.  There is no reason we have to

18   turn over our work product to them.  We are not calling that

19   witness.  That's their witness.

20             MS. BRACEWELL:  In light of the fact that the Court

21   has asked the defense to produce that witness and the propriety

22   of the recordings themself is an issue, it is entirely

23   appropriate for those recordings to be given to us.  They are

24   going to be played in open court a short time later.  This is

25   not an opportunity to sort of delay the big reveal.  It is an

J783KID1

1    opportunity to get to the bottom of what transpired.

2              THE COURT:  Mr. Margulis, this issue has a number of

3    dimensions, one of which is the Court's interest in finding out

4    what occurred and why, and whether or not there are violations

5    of the protective order and violations of other standards.  In

6    light of those dimensions, I think it would be appropriate for

7    not only the government but the Court to have access to that

8    tape before Mr. Lassalle comes in.

9              MR. MARGULIS-OHNUMA:  We'll e-mail them at a break to

10   all the parties or we'll need to get someone in our office to

11   do it.

12             THE COURT:  Thank you.  Let's then turn to

13   Mr. Margulis's other correspondence dealing with the testimony

14   of Dr. Cooper.

15             Does the government have any response to

16   Mr. Margulis's objections to Dr. Cooper's testimony to the

17   extent there is a potential for it, including prejudicial

18   references to the defendant?

19             MS. BRACEWELL:  Yes, we would just -- we've reviewed

20   the defendant's letter.  We have no intention of eliciting any

21   testimony from Dr. Cooper about gorilla trafficking, gorilla

22   traffickers, any kind of racist testimony, or any legal

23   definitions.  So we have no plan to do any of the things set

24   forth in the letter.

25             THE COURT:  Thank you.  Mr. Margulis, do you have

J783KID1

1  anything further?

2          MR. MARGULIS-OHNUMA:  That resolves the bulk of it.  I

3  guess there was testimony in other trials about horrible,

4  horrible things that other people did to other victims.  And

5  those specific acts of other people I don't think should be

6  mentioned either.  Things like locking them in the closet.

7  Unless there is evidence that my client did that to somebody,

8  it's just completely irrelevant and highly prejudicial and

9  inflammatory and unnecessary.  I can object as it comes in, if

10 it's not something they're planning to do anyway.

11         THE COURT:  There is only so much we can do by way of

12 filtering testimony that we don't really have in front of us.

13 So why don't we just be aware that there may be that potential,

14 and of course the government and the Court will be vigilant to

15 make sure that irrelevant or prejudice excessively prejudicial

16 material does not come in.

17         MR. MARGULIS-OHNUMA:  Thank you, Judge.

18         THE COURT:  Next is the government's letter of July 3

19 and the defense counsel's response to line six concerning the

20 self-authentication of certain electronic records.

21         Ms. Bracewell.

22         MR. GUTWILLIG:  Your Honor, the government believes

23 that those records are self-authenticating, substantially for

24 the reasons set forth in the that letter.  We would note that

25 at this time we no longer intend to offer Facebook records.

J783KID1

But the Google and Pinger records, the certifications appended to that exhibit are sufficient, in the government's view, under Federal Rule of Evidence 902(13) to authenticate those documents for that limited purpose.

We would note that defense counsel's position or argument with respect to the confrontation clause does not apply.  Certifications are not testimonial.  They are not going to any element of the offense.  It is just for authentication purposes.

Additionally, on the topic of custodians and authentication, we would note that the government will also need to call two different agents to authenticate items seized from the defendant's apartment.

And also, with respect to YouTube videos that were posted to a publicly available website, also we'll need to call witnesses to authenticate those documents, to the extent that defense counsel is not willing to stipulate to the authenticity of those either.

THE COURT:  The defendant indicates in his response that some of the records that may have been produced not directly by the electronic source, but that he alleges may have been produced or modified by the FBI.  What's the government's response to that?

MR. GUTWILLIG:  Yes, your Honor.  I think that there the defendant is referring to the Facebook records, which the

J783KID1

government does not intend to offer.  With respect to the

Facebook records, we produced a set of identified data to the

defendant which was a report generated by the FBI from search

warrant returns provided by Facebook.  That search has been

completed.  It's the government's view that for purposes of

review of that material, the government is no longer in

possession of that.  The search has been completed, we've

identified the relevant data, and we've turned that over to the

defense.  But in any event, the government is not seeking to

offer that evidence at trial.

THE COURT:  All right.  One last question before I ask

Mr. Margulis's response.  Rule 902(13), the government

indicates in its letter, is relatively new.  Is the government

aware of other cases, in this court or elsewhere, where records

identical to those that you seek to self-authenticate from

Google and Pinger were authenticated under Rule 902(13)?

(Continued on next page)

J78TKID2

1          MR. GUTWILLIG:  Your Honor, the government at this

2    particular moment is not aware of specific cases admitting

3    Google and Pinger records.  The government has cited in our

4    letter some authority for the proposition that these records

5    can be admitted, *United States v. Vayner*, 769 F.3d 125, which

6    was a Second Circuit case.

7          THE COURT:  Thank you.

8          Mr. Margulis-Ohnuma, any further response on your end

9    to this matter?

10          MR. MARGULIS-OHNUMA:  Yeah, briefly, your Honor.  So

11    Facebook records are off the table, as I understand it.  I

12    would have a lot to say about those, but I won't because they

13    won't offer them, so that's good.  That narrows it.

14          There's the Pinger records which charts Mr. Kidd's

15    movements for a year and a half, I think, and all his calls

16    during that time period.  I believe the government is going to

17    say in order to -- and then there's the Google account

18    ownership records, so that's what's in issue.

19          I don't think that those records speak for themselves

20    in terms of what they mean.  I think a custodian from the

21    relative companies is needed to authenticate them in the sense

22    of saying well, this means that.  It's not like bank records or

23    simpler, more familiar records, or even old-fashioned telephone

24    records without these IP addresses where you can tell from the

25    face of the record what it is saying.  And for that reason,

J78TKID2

1   there's really a violation of the confrontation clause to let

2   them in.  I can't cross-examine a naked record, and once it's

3   in, the government can say whatever it wants about it.

4           So for those reasons, although I'm not disputing that

5   they actually came from the relevant companies, and the witness

6   for that would be the government attorneys who obtained them,

7   I'm disputing that they mean what the government is going to be

8   able to say they mean without having a chance to cross-examine.

9           THE COURT:  Thank you.

10          Mr. Gutwillig?

11          MR. GUTWILLIG:  Your Honor, just briefly.  Defense

12   counsel just mentioned it showed the location of the defendant.

13   I think we have been through this.

14          THE COURT:  We have indeed.

15          MR. GUTWILLIG:  I know the Court considered this issue

16   carefully already.

17          The Pinger records includes subscriber information,

18   call detail records and IP information.  The Google records

19   show the subscriber information for the particular email

20   address.  It seems unnecessary, from the government's

21   perspective, to call custodians simply to authenticate what

22   they have already authenticated by certification, which is

23   provided for under a federal rule of evidence to admit without

24   that testimony.

25          THE COURT:  Thank you.

J78TKID2

1              MR. MARGULIS-OHNUMA:  So with the Pinger records, for

2    example, there's a customer information sheet they want to put

3    in.  It says "name" and then it says "Red."  We don't know

4    where that came from.  We don't know how that was created.  We

5    don't know what that's a record of.  Did he type in "Red," did

6    someone else type in "Red?"

7              And Pinger is a complex system.  It's not a phone

8    company letting you make a call from one landline to another

9    landline, it's an app that you use with your phone.  And I

10   don't know how the numbers get in there or don't get in there.

11   And these are all questions that I would have for the records

12   custodian before consenting to their authenticity.

13             THE COURT:  Let's take your example just now,

14   Mr. Margulis, and the practicality of what you're suggesting.

15   You say you don't know how "Red" got into the record.  Does

16   that mean then that you are going to insist that the person who

17   actually wrote "Red" on the application for Pinger service has

18   to be brought in here?

19             MR. MARGULIS-OHNUMA:  Of course not.

20             THE COURT:  So if the government simply wants to bring

21   in a record to indicate that the defendant was known as "Red,"

22   and that Pinger document says "Red," where else, other than the

23   defendant, could it have come from?

24             MR. MARGULIS-OHNUMA:  Anyone else who uses the name

25   Red.  We need to know the process.

J78TKID2

1      THE COURT:  If the records say that the account is in

2  the name of Mr. Lloyd Kidd at a particular address and it says

3  a/k/a Red, and the company certifies that that record is what

4  is it, I don't understand what more you need if that is all the

5  government seeks to use the documents for.

6      MR. MARGULIS-OHNUMA:  We need evidence of the routine

7  practice of the business that leads to these records being

8  generated.  Where did this record come from and how was it

9  generated?

10     So the example you give, there's a unique address but

11  it's an email address.  Mr. Kidd's name -- I'm looking at, I

12  don't have an exhibit number, but it's SDNY_002912 that was in

13  the discovery, the Pinger customer information sheet, that

14  document has a bunch of information, but it's impossible to

15  discern from it where it came from or how Pinger works or even

16  what Pinger is.

17     Standing alone without a witness to tell us is

18  meaningless.  And what I'm concerned about is they will have a

19  law enforcement witness or they will just make it up in closing

20  and say look, you have the records and this is what it means.

21  And they can't do that.  Maybe they use Pinger themselves.

22  Maybe they experimented with it.  They need a witness to tell

23  us what is Pinger and where did these records come from.

24  Otherwise, they're irrelevant.  That was my point in the letter

25  was that authenticity really is a question of relevance.  This

J78TKID2

1  is only relevant if it was actually created by

2  redchaos826@gmail.com, which is the address indicated.

3          We need to know -- and it says the word "verified"

4  Y/N.  How is it verified?  Is the government going to make it

5  up?  Are they going to tell us it's verified, look at this,

6  it's verified.  And this could help them, too, I don't know how

7  this is going to go, but I need a chance to confront the

8  witness who will tell us where that address came from and how

9  it was verified.  And that's just one example in the plethora

10  of documents that they provided to us Wednesday night with this

11  application.

12          THE COURT:  Thank you.

13          Mr. Gutwillig, one last question, that is, what is the

14  government's contemplation for the use of the Google and Pinger

15  records that it seeks to introduce?  What is the purpose of the

16  introduction of that evidence?

17          MR. GUTWILLIG:  Your Honor, the purpose I think, as

18  the Court has suggested with Red or with these other records,

19  is to use them in conjunction with other evidence that we seek

20  to admit to argue in fact that the defendant was connected to

21  certain things, such as Backpage ads and other things.  These

22  are records that would be corroborative of other evidence.

23          And with respect to defense counsel's point of the

24  authenticity of these records, which is what the custodians

25  would testify to and what they already set out in their

J78TKID2

1    certifications, goes to weight and not admissibility, and

2    relevance is a separate issue from that.

3            THE COURT:  Thank you.  I think I heard enough on this

4    point and I read the correspondence and the documents attached

5    to the correspondence and the authorities that are referenced.

6    On the basis of my review, I am persuaded that these documents

7    that the government seeks to introduce from Google and Pinger

8    are sufficiently self certifying under Rule 902.13 such that it

9    should not be necessary to call in a witness from these

10   companies essentially to do nothing more than corroborate the

11   facts contained in the document.

12           Mr. Margulis, I think that there's a difference

13   between a witness coming in and saying that a record contains

14   the following information and the witness gives or reads the

15   facts that are contained in that record, again, as simply a

16   recitation of the facts and information, as opposed to the

17   witness, as you characterize it, stating what the document

18   means.  What the witness's thoughts are about what the document

19   means I rule are irrelevant.  The important thing is that the

20   witness obtained the document, reviewed it, and that the

21   witness saw in that document the following factual information

22   that the Court will find admissible and relevant under Federal

23   Rule of Evidence 902.13.

24           Is there anything else at this point from the

25   government?

J78TKID2

1          MR. GUTWILLIG:  Your Honor, we would just briefly note

2      also that we intend to call effectively custodians to

3      authenticate the seizure of phones from the defendant's

4      apartment and also YouTube videos and the extractions from

5      those electronic devices that were seized.  We wanted to note

6      that for the Court.  That has not been stipulated to.

7          MR. MARGULIS-OHNUMA:  We're willing to stipulate to

8      the authenticity only, not the admissibility of the YouTube

9      videos.  Those were publicly available and no one denies

10     they're from YouTube.  That's not an issue.

11         THE COURT:  Thank you.  Going back to the earlier

12     discussion concerning Mr. Lassalle, again, there seems to be a

13     factual dispute on the record of this moment as to whether or

14     not Mr. Lassalle said what he is quoted as having said in the

15     government's letter.  The government's source, of course, was

16     Victim-4, and it may be necessary for Victim-4 to also appear

17     and address the question of exactly what Mr. Lassalle may have

18     said to her and what she may have said to Mr. Lassalle, to the

19     extent that what is on the record now seems to be

20     contradictory.

21         MS. MEDLEY:  Your Honor, Mr. Lassalle says he can come

22     at noon if you need.

23         THE COURT:  That's even better.  Ms. Bracewell, what

24     about availability of Victim-4?

25         MS. BRACEWELL:  We can reach out to Victim-4 at the

J78TKID2

1  break and find out her availability.  I would note for the

2  record that yesterday she was distraught.  We were going to

3  bring to your attention before her testimony that she suffers

4  from anxiety, which is also documented in the 3500.  She

5  suffers from anxiety attacks, and yesterday was relatively

6  distraught.  So to the extent that she is calm and available,

7  we will discuss that with her, but we just flag that now

8  because I am not sure what her state of mind is today.

9          THE COURT:  All right.  Well, indicate that the Court

10  has directed that she appear and she could testify after

11  Mr. Lassalle's testimony and cross-examination are completed.

12          MS. BRACEWELL:  Understood.

13          THE COURT:  So we will adjourn until 12:00 and hear

14  Mr. Lassalle.

15          MR. MARGULIS-OHNUMA:  I have a number of other

16  outstanding issues that I would like to address, if I may.

17          THE COURT:  Yes.

18          MR. MARGULIS-OHNUMA:  The first thing is as we seek --

19  we're emailing the recordings to your law clerk --

20          THE COURT:  Thank you.

21          MR. MARGULIS-OHNUMA:  -- and to the government.

22  Sorry, we're just giving you the one recording of Victim-4.

23          THE COURT:  Was there more than one?

24          MR. MARGULIS-OHNUMA:  That's the only one of Victim-4.

25  There's been an extensive investigation.  That's the one at

J78TKID2

| | |
|---|---|
| 1 | issue.  There's no factual dispute with respect to any of the |
| 2 | other contacts. |
| 3 | THE COURT:  Not at this point. |
| 4 | MR. MARGULIS-OHNUMA:  Not at this point. |
| 5 | THE COURT:  What about the contact of the SM victim? |
| 6 | MR. MARGULIS-OHNUMA:  That's a witness, and they |
| 7 | accurately set forth the nature of the contacts.  We don't |
| 8 | dispute what they're saying about the contact.  He contacted |
| 9 | her, he said that he would work for us, he gave his name -- he |
| 10 | gave his name on the tape.  Before I speak out of turn, let me |
| 11 | make sure that I characterize it correctly. |
| 12 | The caller identified himself as someone working with |
| 13 | the defense, that's correct, after SMS asked the caller whether |
| 14 | she should speak with him, and the caller told SM she did not |
| 15 | have to speak with him, SM terminated the call. |
| 16 | So we don't dispute anything there.  There's a little |
| 17 | more that happened.  I would rather not turn it over at this |
| 18 | point, but if the Court wants to see it, of course we will. |
| 19 | THE COURT:  Ms. Bracewell, does the government have |
| 20 | any view on this matter? |
| 21 | MS. BRACEWELL:  Yes, I can add additional context.  SM |
| 22 | received a call.  She believed the caller identified himself |
| 23 | and gave a name.  She did not catch the name or recall the |
| 24 | name.  So I do believe he identified himself. |
| 25 | With respect to the numerous recordings, we would just |

J78TKID2

1    note that it seems appropriate that if there were multiple

2    communications being made, the characteristics of those calls

3    could also bear on what was said and what was done at the

4    direction of the defendant.

5         We just also request one additional caveat with

6    respect to Victim-4.  We would like to consider after hearing

7    the recording whether we continue to press the issue.  If the

8    recording is as clear as defense counsel says it is, and

9    Mr. Lassalle's testimony resolves the dispute, we would ask

10   that Victim-4 not be called today in light of the fact that she

11   is going to be in trial testimony in a matter of days.

12        THE COURT:  Thank you.

13        MR. MARGULIS-OHNUMA:  Your Honor, I object to that.

14   That's litigation strategy to find out about our investigation

15   and not reveal theirs.  I think if Mr. Lassalle has to come in

16   then the witness who made these false allegations has to come

17   in as well.

18        MS. BRACEWELL:  Your Honor, I think --

19        MR. MARGULIS-OHNUMA:  And she should go first, too.

20        MS. BRACEWELL:  Your Honor, this is just false.  We

21   produced all of our 3500 materials of the victim, we produced

22   the notes we received yesterday about our call, including

23   bringing it to the attention of the defense.  She's a

24   government witness.  Nothing she said to us has been held back.

25   It's not a strategy.  We brought to the Court's attention what

J78TKID2

1    seems to us to be serious conduct we're trying to get to the

2    bottom of.

3              We're not trying to investigate the defense strategy,

4    what they do is their business, but how they contact our

5    witnesses, and if they do so in an inappropriate way, that's

6    the Court's business.  So we have no desire to intrude upon the

7    defense strategy.  We want to verify any communications that

8    were made were appropriate.  That's the only point of our

9    inquiry.

10             THE COURT:  Thank you.  Let's adjourn until noon.

11             MR. MARGULIS-OHNUMA:  Your Honor, I have a number --

12             THE COURT:  Anything else?

13             MR. MARGULIS-OHNUMA:  I have a number of other issues

14   we wanted to raise.

15             First of all, to be clear, the other recordings are of

16   other people.  I don't really think there's a meaningful

17   dispute at all about the SM call, so we prefer to just send you

18   the one in dispute, the Palopolo call.  Is that what you would

19   like?

20             THE COURT:  At this point let us leave open the

21   possibility that during the course of Mr. Lassalle's testimony

22   other potentially relevant matters may come up, and we'll deal

23   with that as they arise.

24             MR. MARGULIS-OHNUMA:  So we're sending you now -- we

25   have sent you the Palopolo call.

J78TKID2

1          THE COURT:  Thank you.

2          MR. MARGULIS-OHNUMA:  Thank you.  So a couple of other

3    things that we wanted to call to your attention.  Ms. Medley

4    will do a couple, I will do a few of them.

5          There's an issue -- the YouTubes videos, there's no

6    authenticity issue, there's rule of completeness issue.  The

7    government has provided us with the excerpts and transcripts

8    they intend to offer, and we're and going to be making some

9    suggestions, and, if necessary, ask the Court's intervention to

10   make sure those are placed in appropriate context.  I haven't

11   gotten to it yet, I apologize, it's been quite a busy week, but

12   we'll try to do that as quickly as possible.  If the government

13   could let me know when they're planning to offer them, that

14   would be helpful for planning purposes.

15         THE COURT:  Ms. Bracewell?

16         MS. BRACEWELL:  Your Honor, we expect for the

17   witnesses' testimony on our side to go relatively fast.  If the

18   YouTube videos -- if he's willing to stipulate to the

19   authenticity of those videos, we might offer them as soon as

20   Tuesday.  So we're happy to consider alternate time stamps, we

21   just ask for that information as soon as possible so we do

22   adjust, as necessary, the recordings.

23         MR. MARGULIS-OHNUMA:  We'll try to get something out

24   by midnight.

25         THE COURT:  Thank you.

J78TKID2

1          MR. MARGULIS-OHNUMA:  Next we have an ongoing -- we

2    have narrowed it substantially, but we have a dispute about

3    these Backpage reconstructions that were ruled admissible.

4    Ms. Lattanzio has spent a lot of time going through them and

5    making sure they accurately summarize -- they're based on

6    spreadsheets and photos that the government turned over and

7    marked as exhibits, and she went through them to make sure they

8    accurately summarize the spreadsheets and photos.  For the most

9    part, they do.  There were a few errors that we called to the

10   government's attention and the government has changed, so we

11   are working well together on that.

12          There's one live dispute that I think is substantive

13   and important, which is there's a column in the spreadsheet for

14   age, so each ad contains the age of the person depicted in the

15   ad.  And I don't know if you have had a chance to look at the

16   reconstructions or the summary charts to know what I'm talking

17   about, but it's basically text that comes from the spreadsheet,

18   identifiers, posting time, IP address, user, those are all

19   fields from the spreadsheet, and then the pictures are put in

20   their arrayed -- I will hold that up to the Court -- the

21   pictures are arrayed and the text from the spreadsheet is

22   there, and that is a valid summary chart, so we withdraw the

23   objection on that ground.  It's not a reconstruction, it's a

24   summary of the data from chart, so that's fine.

25          The problem we have is there's a column for each ad

J78TKID2

that indicates the poster's age that ranges from 18 on up, and

we feel that in order for these to be accurate summary charts

and withdraw our objection on that ground that it should

contain a field for age.  Mr. Gutwillig has told me in no

uncertain terms that the government is unwilling to do that.

The remedy, of course, will be when the person who

prepared the government chart testifies I will have to go

through the spreadsheet with them and point out the age of each

one, which seems a terrible waste of the jury's time.  So I ask

the Court to encourage the government to add the age column and

these things will get in very, very quickly.

THE COURT:  Thank you.

Mr. Gutwillig.

MR. GUTWILLIG:  Your Honor, as defense counsel

indicated, these are summary charts.  They're compiled from

spreadsheets, images, underlying data.  Not every piece of data

in the spreadsheet or every image is reflected in those charts,

just certain of the information, the title of the

advertisement, the images, the text for the advertisement.

In the government's view, age is not relevant and is

potentially misleading as part of these charts.  Age is a known

quantity of an individual who appears in an advertisement.

Then if, for example, that person is 16 or 17 and the age

column in the data says 18 or 19, putting that on the

advertisement is irrelevant, and with respect to the sex

J78TKID2

1    trafficking of minors charges, it veers into not knowing -- it

2    basically veers into an argument that because an individual

3    thought an age was this, that somehow helps in some way as

4    opposed to having reasonable opportunity to observe, as is

5    required by the statute.

6              So the government's view is that age is not relevant,

7    is potentially misleading, and that not every piece of

8    information in the underlying data need to be reflected in the

9    summary chart, as it is in fact a summary chart.

10             THE COURT:  Thank you.

11             MR. MARGULIS-OHNUMA:  The age is going to be -- the

12   age listed in the ad is going to be before the jury in a

13   government exhibit anyway, but it will not summarized in a

14   convenient form.  I have to argue within the bounds of the law,

15   of course, but the information is on the government exhibit, as

16   it should be.  And I'm just saying it would be a lot more

17   convenient to have it on the summaries, which is what everyone

18   is going to be looking at.

19             By the way, the summaries are supposed to be accurate

20   summaries, it's not that in closing they can put up whatever

21   they want in PowerPoint, but these are supposed to accurately

22   reflect the underlying data.  And in order to do so, I

23   withdrawal all other objections, but I think the age field

24   should be on there.

25             THE COURT:  Mr. Gutwillig.

J78TKID2

1          MR. GUTWILLIG:  Your Honor, on the accuracy point, the

2    age in the column is inaccurate for certain of the

3    advertisements, and it lists 18 or 19 for an individual we know

4    to be under that age.  So the argument that the charts are

5    inaccurate without the age column is in fact incorrect.

6          THE COURT:  Is the information likely to be obtained

7    from asking the witness?

8          MR. GUTWILLIG:  The information from the age column,

9    your Honor?

10          THE COURT:  Yes.

11          MR. GUTWILLIG:  We can elicit that on direct and ask

12    what that column represents and where the information came

13    from, if that would be helpful to the Court to resolve this.

14          THE COURT:  My question is if it is going to come in

15    in any event, through the testimony of the witness either on

16    direct or cross-examination, then what is the problem with

17    having it on the chart?  If there's something in the chart that

18    may be misleading or inaccurate, focus on that, but to the

19    extent that it's not misleading or inaccurate, leave the chart

20    in.

21          MR. GUTWILLIG:  I think that the age is in fact

22    inaccurate and misleading in certain instances.  It would make

23    the summary chart incorrect.  Our understanding is that age is

24    a self-entered field by the person populating the text of the

25    advertisement as opposed to an automatically generated field

J78TKID2

1    like posting date or creation time or something like that, and

2    putting the age on certain of these advertisements would make

3    the summary charts inaccurate because that is not in fact the

4    age of the individuals depicted there.

5          THE COURT:  Thank you.

6          MR. MARGULIS-OHNUMA:  Judge, I'm sure you get this,

7    but I'm saying they have to accurately reflect the underlying

8    data, not -- if the underlying data is wrong then the chart --

9    which it is in lots of ways, then the charts' inaccuracies are

10   part of their argument.  But the chart has to be a summary of

11   data, so it's not inaccurate in that sense.  The inaccuracy

12   that counsel is claiming based on their proof, some of which we

13   dispute, is the underlying data.

14         THE COURT:  All right.  I will reserve judgment on

15   this until I have an opportunity to look at the chart more

16   closely.

17         Anything else?

18         MR. MARGULIS-OHNUMA:  Yeah, a couple of other things.

19         There's a few -- let me talk the subpoena first.  We

20   just discussed this.  I don't know if there's a dispute on it,

21   but we'll be asking -- the government turned over in discovery

22   some records from ACS that show the movements of the alleged

23   victims when they were -- AWOL is the term used -- being absent

24   and when they were at the group home or the home they were

25   assigned to, we want to offer those.

J78TKID2

1      The government has declined our invitation to

2  stipulate to their business record authenticity, although they

3  turned them over, so I think we're going to need a subpoena to

4  the agency which we'll prepare -- I was a little surprised they

5  won't stipulate to it because it sorts of help both sides

6  narrow the issues but they don't so, so I will submit a

7  subpoena, a so-ordered subpoena to the agency that they bring

8  in a witness to authenticate and explain those exhibits.  I

9  just wanted to let the Court know that that's coming and we

10  need to work as quickly as we can to get someone -- the agency

11  is not easy to work with if you're not law enforcement, and the

12  government declined to assist us with that, so I guess we're on

13  the our own with the Court's assistance.

14      THE COURT:  Thank you.  Does the government wish to

15  say anything further on that?

16      MS. BRACEWELL:  The records that the defense counsel

17  are referring to we obtained from ACS.  We're happy to pass

18  along the contact information with the person that we spoke

19  with.  Our understanding is the ACS retrieves the records from

20  a state-wide data, but the underlying entries that we believe

21  are of interest to the defense are entered by individual

22  placement facilities.  So, for example, a particular Manhattan

23  facility where one of the children were staying would enter

24  when the minor left the facility and when they came back.

25      Our concern is that this data also reflects when that

J78TKID2

1    information was entered.  In many instances it's entered two or

2    three weeks later, so that just throws into question the

3    reliability of the records which are otherwise in doubt for

4    other reasons separate and apart from the records themselves,

5    but because of that issue of reliability, we believe it's

6    appropriate for a person from either the facility or the

7    state-wide -- the state system to explain how and when the data

8    is generated.  It seems to us to just not be sufficiently

9    reliable on their face to come in on their own, but we are

10   happy to facilitate contact information or what we can do so

11   the defense can subpoena whatever witness they need.

12             THE COURT:  Thank you.

13             Next, Mr. Margulis-Ohnuma?

14             MR. MARGULIS-OHNUMA:  So we have been heard on that.

15   We signed a subpoena without a letter or an additional

16   argument.  Do we need to be heard on that?

17             THE COURT:  The government said they would cooperate

18   with you in finding the appropriate person to subpoena.

19             MR. MARGULIS-OHNUMA:  Okay.  Thank you.  So we'll get

20   that out as soon as we can.

21             So there's a few open discovery Giglio 3500 issues

22   that we have tried to resolve but have not been able to,

23   unfortunately.

24             So the first is that we asked for full criminal

25   records from the NYPD and the FBI for all of the non-law

J78TKID2

enforcement government witnesses, the alleged victims.  We have

received some very cursory records indicating, for example,

that one of the government witnesses has an open state case but

I couldn't find the case, but probably because it was initiated

when she was a minor.  But I think it's pretty clear that we're

entitled to whatever the NYPD has, because they're one of the

investigating agencies, as far as criminal records of the

witnesses who intend to testify.  So again, I don't know that

you can order Giglio material, but perhaps you could encourage

the government to understand their obligations in that regard.

          MS. BRACEWELL:  Yes, your Honor.  Just to respond

briefly, there are certain sealed records, juvenile sealed

records that we do not have access to.  Everything we have

regarding criminal history of the minor victims we expect to

testify we have turned over.

          We sought additional records from the NYPD and we have

been told that they cannot provide them outside of the NYPD for

any sealed records or any information about those records.  So

we have discussed internally, we provided sufficient

information, we believe, to defense to cross these victims, but

what we intend to to do is provide your Honor with an unsealing

application and order today so we can then serve that on the

NYPD to obtain the records that are being referenced.  But to

make very clear, we have no additional access to the records

beyond that which we have provided to the defense.

J78TKID2

1          THE COURT:  Thank you.

2          MR. MARGULIS-OHNUMA:  That resolves it.  If there's an

3     unsealing order, that's great.  Thank you.

4          So there's also outstanding a large amount of

5     outstanding Rule 16 discovery and an issue over *Touhy* notice

6     that I would like Ms. Medley to address, and then I have one

7     more application after that.

8          MS. MEDLEY:  Hello, your Honor.  So this just some of

9     the electronic devices that were seized we still haven't

10    received extractions from all these devices.  And we have sent

11    an email with a list of what is still outstanding to the

12    government, but we haven't received a response regarding when

13    we can expect those items to be produced.

14         I'm happy to put on the record what we haven't

15    received, if you want me to list them.  That's up to your

16    Honor.

17         THE COURT:  Ms. Bracewell?

18         MS. BRACEWELL:  I would seek clarification.  We made a

19    very large production to the defense last week in the middle of

20    the week.  I think the most recent inventory they provided us

21    was prior to that production.  We provided something like nine

22    devices, either analyses or extractions for those devices on I

23    believe Tuesday or Wednesday of last week, so I'm not aware of

24    what inventory they provided us that takes account of our most

25    recent production.  And in the first instance I had wonder if

J78TKID2

1    we might have this conversation with them off the record.  It

2    seems that we might be able to resolve it.

3          THE COURT:  Ms. Medley, I think it would be more

4    productive if the parties sit down and go over the list of what

5    you have and the list of the documents that the government

6    turned over, and perhaps we can obviate any further dispute.

7          MS. MEDLEY:  And we'll discuss the *Touhy* notice.  I'll

8    just to put on record that we did subpoena FBI Special Agent

9    Brian Gander and NYPD Detective Rosemary Muckenthaler.

10         MS. BRACEWELL:  We provided a response to defense.

11   Their *Touhy* notice is insufficient, which we let them know.  It

12   did not provide a written statement of the testimony they

13   sought.  It provided very loosely a description of what the

14   purported relevance was.  We responded to let them know what

15   their *Touhy* notice needed to include so that we can go through

16   the proper agency approvals.  That's to allow us to potentially

17   object to relevance, which, based on what they set forth as to

18   why they intend to call these witnesses, seems to be very much

19   in question.

20         So we provided them we think with sufficient

21   information to supplement their *Touhy* notice so can move

22   forward with that.

23         THE COURT:  That might perhaps be an additional issue

24   that the parties can confer and see if they can resolve between

25   themselves.

J78TKID2

1          Mr. Margulis?

2          MR. MARGULIS-OHNUMA:  Finally, your Honor, so it's

3     July 8.  Mr. Kidd was arrested on December 12 of last year.

4     It's been eight months, just almost eight months, and we have

5     pushed hard to get to trial.  We received an enormous dump of

6     discovery on Wednesday.  We have received 3500.  We have

7     received marked exhibits.  The issues are narrowing.

8          We have not looked at all the discovery, and I want

9     that to be clearly put on the record.  I want Mr. Kidd to hear

10    that.  We consulted with Mr. Kidd extensively about the timing

11    of this trial.  We told him that we are willing to request an

12    adjournment.  And we have had that discussion, and I'm making a

13    reasoned strategic decision, in consultation with Mr. Kidd, to

14    go forward with the trial today.

15         I want to make sure that -- sorry, one other point

16    about that.  We have relied -- we asked extensively for Giglio

17    material from the government.  They have repeatedly assured us

18    they have given us and highlighted any potential impeachment

19    material, so it's something like 12 or 13 terabytes of data

20    which they provided on Wednesday, much of which we have not

21    looked at.  We're relying on them to point out anything that

22    contradicts their case or impeaches any of their witnesses.

23    They have assured us that they have done that.

24         But I wanted to make sure that it's clear to Mr. Kidd

25    and to the Court that the decision not to look at everything is

J78TKID2

1    a matter of strategy, it's not a matter of -- and declining to

2    ask for an adjournment of the trial.  So as we go forward, I

3    just want to make sure that's clear, and I think it might be a

4    good idea to allocute Mr. Kidd on our joint decision to go

5    forward with the trial today.

6              THE COURT:  Well, actually, there is an open item that

7    I wanted to address.  Perhaps this might be a good opportunity

8    to do so, since you mention allocution of Mr. Kidd.

9              Ms. Bracewell, did the government make an offer of a

10   plea agreement and communicated that offer to the defendant?

11             MS. BRACEWELL:  We did not make a formal plea offer in

12   this case.

13             THE COURT:  Thank you.  Next I ask the government for

14   any response to what the defense has just indicated concerning

15   the strategy not to examine all of the material that has been

16   turned over and to proceed with the trial today.

17             MS. BRACEWELL:  Yes, your Honor.  We appreciate

18   defense counsel's representation on the record.  We have tried

19   to stress as well that we are continuing to investigate this

20   case, and we ourselves have been provided with a vast amount of

21   data that we are reviewing and providing to defense counsel as

22   rapidly as we are physically able to do.

23             We would just note that we have pointed out those

24   items that we're aware of, Giglio material and other items, we

25   provided our exhibit list, but we are still reviewing and

J78TKID2

receiving information.  So we have at every point indicated

that we would consent to an adjournment to allow the defense

additional time to review the extensive amount of material

provided, but our understanding is the defendant prefers to

move forward today, so an allocution on that would be very

helpful.

          THE COURT:  Let's proceed to address that point.

          Mr. Kidd, please rise.

          Mr. Kidd, your attorney has made a representation to

the government and to the Court with regards to the material

that the government has turned over to the defense and

indicated that because of a timing of the trial and your desire

to proceed as early as possible and the volume of the material

that has been turned over, that counsel and yourself have not

actually reviewed all of that material, but that nonetheless,

your desire is to proceed with the trial today.  Is that

correct?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  Now assuming that to be the case,

Mr. Kidd, the Court would also caution that should you decide

to -- assuming for the moment that the result of the trial is

not favorable to you and you decide to appeal any verdict

against you, it would be appropriate for there to be on the

record a statement that you would not use this ground as a

basis for an appeal or a charge that counsel was ineffective

J78TKID2

| | |
|---|---|
| 1 | because he did not review all of the material that is on |
| 2 | record.  Do you understand that? |
| 3 | THE DEFENDANT:  Yes, sir. |
| 4 | THE COURT:  And do you agree that if you were to |
| 5 | appeal a verdict against you, you would not use these grounds |
| 6 | as a basis for appeal? |
| 7 | THE DEFENDANT:  Yes, sir. |
| 8 | THE COURT:  Thank you. |
| 9 | Anything else from the government? |
| 10 | MS. BRACEWELL:  Your Honor, we did want to put on the |
| 11 | record our calculation of the guidelines if the defendant is |
| 12 | convicted at trial.  For example, if the defendant is convicted |
| 13 | of Count One, which is a 1591(b)(1) count, it carries a 15-year |
| 14 | mandatory minimum.  And our calculation of the guidelines is |
| 15 | that the defendant would be facing on that count alone 324 |
| 16 | months to 405 months, but we would like to note that each of |
| 17 | the five counts with which the defendant is charged carries |
| 18 | either a 10- or 15-year mandatory minimum, so the defendant is |
| 19 | aware of the consequences of taking this to trial. |
| 20 | THE COURT:  These guidelines ranges, do they contain |
| 21 | any consecutive element to them? |
| 22 | MS. BRACEWELL:  No, I believe it's in the Court's |
| 23 | discretion whether the minimums run consecutively or |
| 24 | concurrently. |
| 25 | THE COURT:  Thank you.  One last item from our |

J78TKID2

1    housekeeping list.  The Court has received the binders

2    containing the exhibits the government has submitted.  Have the

3    parties conferred to determine which of these documents are not

4    in dispute?

5           Please consult the Court's individual practices to

6    apprise yourself of my procedure of asking the parties to

7    produce a list of all the exhibits that are not in dispute and

8    that may be admitted without objection, and that such a list

9    would be read into the record before the trial so as to avoid

10   having each document be introduced individually and then

11   subject to a determination at that point whether or not it is

12   in dispute.  That procedure should enable us to save enormous

13   amount of time, as is the practice of this Court.

14          Anything else?  If not, we will adjourn until

15   12 o'clock here.

16          MS. BRACEWELL:  Thank you.

17          MR. MARGULIS-OHNUMA:  Nothing from the defense, your

18   Honor.

19          (Recess taken)

20          (Continued on next page)

21

22

23

24

25

J783KID3

1          (In open court)

2          THE COURT:  We're here to resume the discussion of the

3     proceeding this morning concerning the circumstances relating

4     to the events described in the government's letter dated

5     July 7, 2019, that the government indicates or alleges were

6     inappropriate contact made by the defense with one of the

7     government witnesses.  The government's allegations is that

8     this contact was made with Victim-4, at some point yesterday,

9     from a telephone number that has been traced to Mr. Lassalle

10    who is the defense investigator.

11         The Court indicated that appearance of Mr. Lassalle

12    was appropriate, and there are several dimensions of this

13    question.  One critical item is whether or not there was any

14    violation of the protective order, and the circumstances and

15    timing of the call to Victim-4, what was said there that may

16    have suggested inappropriate contact with the victim.

17         First let me ask Mr. Margulis-Ohnuma whether

18    Mr. Lassalle has been located and present?

19         MR. MARGULIS-OHNUMA:  Yes, he's here.

20         THE COURT:  Let me ask the government whether it has

21    any further response to the matter, and also whether the

22    government has contacted Victim-4, in the event her testimony

23    is also needed.

24         MS. BRACEWELL:  Yes, your Honor.  We've not been able

25    to reach Victim-4.  Her phone is off.  We have sent an agent to

J783KID3

1    her address to see if they can locate her in person.

2            We spoke with defense counsel prior to this, prior to

3    this hearing right now.  Having listened to the recording, we

4    don't believe there is a need for a hearing at this point.  We

5    think, based on the nature of the recording, it in our view

6    verifies what defense counsel had said, that there was not a

7    representation that the defendant was present.

8            While we haven't had an opportunity to discuss with

9    Victim-4 what she heard or what happened, we can surmise that

10   she might have misheard or become frazzled.  The connection

11   seemed to be poor.

12           But based on all of this, we think the question really

13   before your Honor is the violation of the protective order, how

14   the information came to be with the investigator, rather than

15   the substance of what the investigator said to Victim-4.  And

16   we don't believe that any testimony is necessary to resolve

17   that dispute based on what was said this morning.

18           THE COURT:  What is the government's view now as to

19   whether or not there was or may have been a violation of the

20   protective order?

21           MS. BRACEWELL:  So our view remains that there was a

22   violation of the protective order.  That the phone numbers that

23   were used by the investigator should not have been given to

24   him, that they were provided on an attorney's eyes only basis

25   and couldn't be made use of for this purpose.  And so, we

J783KID3

1    submit that the recording with Victim-4 and any other

2    recordings made with victims based on that information are

3    clearly in violation of the protective order.

4         The protective order is very clear.  The confidential

5    category is limited.  It's for personal identifying information

6    of victims.  There is another category, the sensitive

7    designation, which we use for many more items.  It limits the

8    defendant's access to such items.  And those sensitive

9    materials can be shared with investigative staff, consultants,

10   a whole category of people that are designated under the

11   protective order's designated persons.

12        So the protective order is clear on its face as to who

13   can be given confidential information, and that is exclusively

14   the attorneys, paralegals, or their staff.

15        So understanding that defense counsel had not, it

16   sounds, read it closely or familiarized himself with provisions

17   of "confidential," it doesn't change the fact at all that these

18   phone numbers were limited in dissemination to his staff, and

19   defense counsel's providing it to the investigator was a

20   violation of an order.

21        THE COURT:  The defense counsel's theory or defense

22   this morning was the language is ambiguous.  In the

23   government's view, is it not ambiguous?

24        MS. BRACEWELL:  Yes.  Absolutely it is not ambiguous.

25   I think specifically when you read it in its entirety, the

J783KID3

provisions for sensitive disclosure material make very clear
that there is a broader universe of people who can be given
sensitive material, and that specifically identifies
investigative staff.

By contrast, the confidential designation, which is
much more narrowly used, and has provisions that defense
counsel can challenge that designation in a process for review
of the appropriateness of a confidential designation, limits
the universe of people to exclusively attorney's eyes only as
it says in the confidential designation.

So, in our view, there's no ambiguity.  This doesn't
fall on the line of what may or may not be inappropriate use.
It is very clearly in contravention of the protective order.

THE COURT:  Two more questions.  One is, assuming the
government is correct that there was a violation, is it your
view that that violation was deliberate?  And second, what is
the government's view concerning what might be the appropriate
response, if the Court finds that there was a violation?

MS. BRACEWELL:  We would defer, obviously, to your
Honor on an appropriate response.  We would note that the phone
calls, the recorded phone calls that are a direct result of the
misuse of the confidential information should, in our view, be
not used and not put to the victims.  This is exactly sort of
the danger of providing personal identifying information about
victims without notice to the victims or fair warning.

J783KID3

So, to us, the obvious and clear response seems to be that, at least the immediate evidence that we are aware of derived from this misuse of confidential information should be effectively suppressed.

And I think with respect to defense counsel's awareness, I would never -- I wouldn't want to cast dispersions.  We reached out yesterday to understand what had led to the conduct.  We in good faith believed it possible that this was a misunderstanding.  Defense counsel declined to comment, but I would understand what -- I would want to hear from him as to the deliberateness of the violation.

THE COURT:  Mr. Margulis-Ohnuma?

MR. MARGULIS-OHNUMA:  Well, I guess, you know, I'm not quite sure how to proceed.  I got an e-mail yesterday accusing me and my team of obstruction and witness tampering from a federal assistant United States attorney.  So, my reaction to that was to shut down.

I don't know -- I certainly think -- so the issue here, and I'd like the government to say it on the record, that their witness materially lied to them about the content of that call.  And if there's any question or doubt about that, I would like to call Mr. Lassalle who is here and play the tape in open court so it's totally clear that they were lied to by the witness.  It is very important to us to bring that out because this witness's credibility is absolutely central to Count Four.

J783KID3

1          I don't know of any reverse suppression doctrine.

2     There was nothing, I don't think that there was a -- so, if the

3     relief sought is that we can't use the tape that we obtained,

4     that's one question.  If she's asking for my disbarment because

5     I did this deliberately, then I don't want to say more and I've

6     got to pull out.  So I think we need to clarify the relief

7     sought first before I can say anything more about the

8     circumstances of us providing the numbers to Mr. Lassalle.

9          THE COURT:  Ms. Bracewell?

10          MS. BRACEWELL:  We can't make any representations

11     about what Victim-4 thought or knew at the time.  We haven't

12     spoken to her.  We haven't played her the tape.  I can say we

13     spoke with her yesterday.  She did not make any affidavits or

14     submissions to the Court.  She reported it to us very soon

15     after it had happened, and she was distraught.

16          So, understanding the defense counsel wants us to make

17     a representation that she lied, I just don't think, one, we

18     can't possibly do that.  But in addition, it's really separate

19     and apart from what's at issue here.  The victim will come to

20     the stand and testify about the events at issue, the offense

21     conduct, and defense will have the opportunity to cross her on

22     her credibility.  There is no cause to just call her today to

23     sort of have a separate voir dire on her credibility.

24          I think we're not trying to accuse defense counsel of

25     intentionally violating the terms of the protective order.

J783KID3

1   What we are saying is the phone numbers were given in violation

2   of protective order.  And whether that was done accidently, or,

3   as he suggested earlier, unaware of the strictures of the

4   confidential designation, we would submit that what's come out

5   of this, what's resulted from that violation, is what's

6   important.  And that should not be used in the trial.

7          THE COURT:  Thank you.

8          MR. MARGULIS-OHNUMA:  Just I think the fair resolution

9   then would be that the government needs to return to us the

10  tape that was part of our defense investigation now that

11  they've satisfied their concern.  They can't play it for the

12  witness.  The witness doesn't haven't to testify, Mr. Lassalle

13  doesn't have to testify.  And we'll be able to use the tape to

14  impeach her at trial, without having her seen it ahead of time,

15  which would be the normal course if not for this untrue

16  allegation being raised.

17         MS. BRACEWELL:  So, just in response briefly.  I don't

18  think that our letter -- had we known there was a recording and

19  had an opportunity to speak about the substance of the call,

20  our letter might have been different.  But we still would have

21  brought to the Court's attention that the telephone numbers of

22  the victims were provided in contravention of the protective

23  order.  So it still returns back to the original point which

24  we're stressing, which is regardless of the substance of the

25  call, the investigator should not have been using those phone

J783KID3

1    numbers to make those calls yesterday on the eve of trial.

2    That's the issue.

3              THE COURT:  All right.  Thank you.  First, as a

4    threshold matter, having listened to the arguments and read the

5    correspondence, I'm not persuaded that this case rises to one

6    warranting disbarment of Mr. Margulis-Ohnuma.

7              MR. MARGULIS-OHNUMA:  I appreciate that.

8              THE COURT:  I could see there might be grounds for

9    perhaps Mr. Margulis-Ohnuma having exercised greater diligence

10   in examining the protective order before he gave the telephone

11   numbers to Mr. Lassalle.  But I believe there's no sufficient

12   record here that it was done with sufficient deliberateness to

13   flout the protective order.

14             I accept the resolution that under the circumstances,

15   Mr. Lassalle would not have to appear for any further

16   testimony.

17             To the extent a violation did occur, even if it may

18   have been careless or inadvertent, I'm persuaded that the

19   fruits of that violation of the protective order should not be

20   used.  Therefore, Mr. Margulis-Ohnuma, the tape should be

21   returned to you.

22             I'm not persuaded, however, that it should be used for

23   purposes of impeachment of the victim, because we have a kind

24   of a Catch-22.  If the tape was not obtained properly because

25   of the violation of the protective order, then it should not be

J783KID3

1    used for any purpose.

2            Of greater concern is that to try to introduce the

3    tape at trial for an impeachment of the victim, essentially

4    would create a sideshow in which potentially we would have to

5    lay the foundation for the making of the tape, and the

6    testimony of what the victim allegedly said to Mr. Lassalle,

7    and Mr. Lassalle coming back and saying the victim did or did

8    not say that.  It could turn into a totally different course

9    that would be wasteful of the Court and the jury's time.

10           All right.  Anything else on this issue?

11           MS. BRACEWELL:  Your Honor, just to seek clarification

12   on one point.  We've spoken at length about the tape that was

13   recorded of Victim-4.  But there was a reference earlier to

14   multiple tapes being created.  We would just note that the same

15   issue applies to the other recordings that were also generated

16   with the confidential phone numbers.

17           So to the extent there are other recordings, obviously

18   we are not aware of them, but we would ask that those, too, be

19   treated in the same way.

20           THE COURT:  All right.  Thank you.

21           We told the jury pool that the jury panel or pool

22   should be sent up by around 12:30.  It's now 12:30.  Are the

23   parties prepared to proceed?  Government?

24           MS. BRACEWELL:  We're ready to proceed.

25           THE COURT:  Mr. Margulis-Ohnuma?

J783KID3

1          MR. MARGULIS-OHNUMA:  Yes, your Honor.

2          THE COURT:  All right.  Why don't we ask the jury pool

3     to be sent up.  It will probably take a few minutes so we'll

4     just recess until they arrive.

5          MS. BRACEWELL:  Just one additional thing.  If the

6     investigator could return the phone numbers, if he could

7     confirm he no longer has the confidential phone numbers in his

8     possession and make no further contact with the victims.

9          MR. MARGULIS-OHNUMA:  Your Honor, I respectfully

10    object to that.  In fact, I would apply to amend the protective

11    order so that the investigator also is permitted to have access

12    to this information.

13          This information is Giglio that we are entitled to.

14    And I understand that your concerns that I wasn't diligent

15    enough prior.  But we were given this information, just hours,

16    I mean, just on Wednesday night.  In the midst of terabytes of

17    data that were coming.  We're all under terrible time pressure,

18    and we're entitled to it.  If we had asked permission, we would

19    have made an application to the Court, I think we would have

20    been granted.  We are entitled to do a defense investigation.

21    I don't think that he needs to return it.  And I would ask that

22    the protective order be amended to clarify -- and I don't think

23    I violated it so I don't think it needs to be changed -- but it

24    should be amended to clarify that Mr. Nelson Lassalle, the

25    court-appointed private investigator, may also share with all

J783KID3

1    of the information provided to the defense team.  I don't see

2    why can it go to a paralegal or a lawyer but not the

3    investigator.

4              MS. BRACEWELL:  We would note we have no opposition to

5    a defense investigation.  They are able and willing to pursue

6    any avenues that they would like to pursue.  Our objection is

7    to the misuse of the protective designation of confidential

8    material.  So, they're able to ascertain victim phone numbers

9    by any number of methods.  We'd simply ask they can't pursue

10   based on the confidentially provided phone numbers.

11             THE COURT:  The protective order is what it is at the

12   moment.  The parties negotiated that protective order.  So to

13   that extent, it was a stipulated document.  If there are

14   changes in the order that are indicated by the circumstances,

15   the parties should sit down and see if they can work out

16   agreed-upon terms.  I do not believe it would be appropriate

17   for the Court to impose on the parties its version of what

18   should be protected and not protected.

19             So we'll recess until the jury pool comes in within

20   the next few minutes.

21             (Recess)

22             (Jury selection under separate cover)

23             (Continued on next page)

24

25

J78TKID4

1          (Jury twelve and two alternates impaneled and sworn)

2          THE COURT:  Thank you.  I will adjourn the proceedings

3     until tomorrow morning at 9 o'clock.  I will ask that you do

4     your outmost to allow sufficient time in the morning to get

5     here, because we cannot begin until all of you are present.

6          As soon as we convene and begin the proceedings, I

7     will give some preliminary instructions essentially reminding

8     the jury of what your functions are, the functions of the Court

9     and the various other procedural matters that may come up

10    during the course of your deliberations and the trial, certain

11    definitions such as what is evidence, the standards of the

12    evidence that the government must meet in order for to you

13    render a verdict, all of those matters.  And then after those

14    preliminary instructions, I will ask the parties to present

15    their opening arguments and then we will begin with the

16    presentation of the evidence.

17         So I thank you again for your patience.  You may leave

18    the questionnaires behind if you have not already done so.  I

19    will remind you, as I will during the course of the trial

20    multiple times that you should not discuss anything that you

21    heard about this case as you go home, not with anyone,

22    including your fellow jurors or members of your family or

23    people involved in the trial.  If anyone tries to talk to you

24    about the case, I direct you not to talk and to inform me

25    immediately of any approach by anyone to you concerning this

J78TKID4

1    case.

2            Before you leave, the clerk will provide you with a

3    plastic placard that you can use to present to the court

4    security in the morning so that you can go through the

5    screening expeditiously, and that will make the process flow

6    more smoothly and expeditiously.  Even with these placards, be

7    sure that you arrive with enough time promptly before 9:00 or

8    promptly so you're here in this courtroom before 9:00.  There

9    are times in which security lines can be long and delay things

10   if you don't allow enough time to flow through the process.

11           Again, thank you, have a good evening, and we will see

12   you tomorrow at 9:00.  When you come to come tomorrow at 9:00,

13   don't come to the courtroom, go to the jury room which the

14   clerk will show you now.

15           (Jury not present)

16           THE COURT:  Thank you, be seated.

17           Two matters of housekeeping:  One, have the parties

18   had an opportunity to go through the exhibits and determine the

19   exhibits that are not going to present any objections and have

20   the lists of those exhibits read into the record before the

21   presentation of the evidence?

22           MS. TARLOW:  Your Honor, the parties are in the

23   process doing that but have not yet reached any kind of

24   agreement, so we would ask that your Honor give us until

25   tomorrow.

J78TKID4

1        MR. MARGULIS-OHNUMA:  I'm sorry, your Honor, I can

2   tell you right now there's just a very small handful that we're

3   not objecting to.  We're pretty much objecting to evidence.  We

4   have to see what the foundations are.

5        The only ones -- and I don't mind reading in the ones

6   we're not objecting to, and the government can certainly try to

7   convince me not to make objections, but I doubt they will be

8   able to on other things, unless they set down with their

9   witnesses what they're going to to.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J783KID5

1          THE COURT:  All right.  Mr. Margulis-Ohnuma, I

2     understand your professional obligations to be as zealous an

3     advocate as possible.  But, bear in mind that there are times

4     in which that kind of zealousness can be carried to extreme,

5     and to say that, among a list of let's say 100 exhibits, that

6     all 100 of them or 95 of them are objectionable, I think might

7     be.

8          MR. MARGULIS-OHNUMA:  No, I'm not saying that.  There

9     are some that are not objectionable, and I'm happy to highlight

10    those now.  But, there's a lot that are objectionable.

11         THE COURT:  Well, that's my point.  That sometimes

12    objections can be raised when perhaps they may be excessive.

13         MR. MARGULIS-OHNUMA:  Respectfully, your Honor, I

14    mean, the list of exhibits can be seen as a bit excessive.  I

15    don't know that they need 15 excerpts from YouTube.

16         THE COURT:  That raises a different point.

17         MR. MARGULIS-OHNUMA:  Right.

18         THE COURT:  Which I will raise with the government,

19    that to the extent there are exhibits or presentations that are

20    cumulative and excessive, I will equally be watchful for that,

21    and make sure that we don't prolong the trial unnecessarily by

22    excessive cumulative evidence.  And by the same token, by

23    perhaps excessive objections to exhibits that really should not

24    be the subject of exceptions or objections.  And perhaps we can

25    deal with those as they arise, but I urge you to go through it

J783KID5

1   closely, and make sure that if you do have objections, it is

2   well founded and not something that isn't.

3           MR. MARGULIS-OHNUMA:  Your Honor, I have not

4   interviewed their witnesses so I don't have any idea how

5   they're going to authenticate the Backpage material.  I don't

6   know how they're going to bring in the material from the

7   search.  I don't know how they're going to bring in individual

8   files from computers they found in the search.  If they do it

9   properly, I won't object.  If there a reason for an objection,

10  I am not going to waive that prior to trial.  I can't, and I

11  won't.  There's a few uncontroversial exhibits that I won't be

12  objecting to.  But the vast bulk of the government's case I am

13  going to be challenging, as I'm required to.

14          THE COURT:  All right.  Well, you've heard what my

15  concern is.  And to the extent that you posit that there are

16  exhibits that are not objectionable and you won't be raising

17  unnecessary delays or objections that cause delays, we'll deal

18  with that on an individual basis.

19          MR. MARGULIS-OHNUMA:  You want me to let you know now?

20          THE COURT:  No.  I want the parties to sit down and in

21  good faith determine whether or not there are exhibits that

22  should not be in dispute, and those you should then list and

23  you will read that list to the jury.

24          MR. MARGULIS-OHNUMA:  Yes, your Honor.

25          THE COURT:  Anything else?

J783KID5

1              MR. MARGULIS-OHNUMA:  Not from defense.  Oh, yes.

2              MS. TARLOW:  With respect to a different issue.  Your

3      Honor has reserved on ruling with respect to the admissibility

4      of certain evidence under Rule 412.  And we would ask that the

5      defense be precluded from referring to any prior sexual

6      conduct, including prostitution, of our victims, in his

7      opening.

8              THE COURT:  The parties know what the Court's ruling

9      were on the motions in limine, and we will be vigilant to make

10     sure the parties don't exceed the parameters of what the Court

11     has determined is not admissible.

12             Let me raise one other, one last point on my end,

13     which is to get an indication from the government of the

14     witnesses that the government contemplates bringing tomorrow,

15     and what the approximate time would be for the government's

16     direct.

17             MS. TARLOW:  Yes, your Honor.  The first witness that

18     the government intends to put on the stand is Kaira Brown who

19     is one of the victims.  The direct examination of Ms. Brown

20     will take approximately one hour.  The government also intends

21     to call agent Judah Burk from the FBI as well as Agent Kris

22     Serra.  Those direct examinations should take no more than 20

23     to 30 minutes, your Honor.  Then those will just be to

24     authenticate certain physical evidence that was seized at the

25     time of the defendant's arrest.  The government also intends to

J783KID5

call Erik Uitto who will testify about the summary charts

concerning the Backpage reconstructions.  The direct

examination of Mr. Uitto is expected to take approximately 30

minutes.

MR. MARGULIS-OHNUMA:  Can I just inquire about that?

So will Mr. Uitto be testifying relating to the authenticity of

the underlying Backpage exhibits or just how the charts were

made from the exhibits?

MS. TARLOW:  He'll testify about how the data was

obtained and how the summary charts were created based on the

data that was obtained from the Backpage servers that were

seized.

MR. MARGULIS-OHNUMA:  So, I mean, we'll address this

after we hear the evidence, but it seems hard for me to

understand how an FBI agent, without personal knowledge, is

going to be able to testify that these things came from

Backpage unless he was involved in the actual seizures from

Backpage.  I don't know.  If he was, then that will be fine.

But it seems to me there's two different witnesses, one about

the reconstructions and one to tell us what was seized from

Backpage and what this means.  But I'm not sure if -- if Erik

Uitto -- if the agent will be -- I would like to know if the

agent will be testifying subject to connection or if this is it

for the Backpage material.

THE COURT:  Ms. Tarlow?

J783KID5

1          MS. TARLOW:  Your Honor, he did not participate in the

2    actual seizure of the Backpage server.  However, he has

3    knowledge of their seizure and receipt of that data from the

4    servers.

5          MR. MARGULIS-OHNUMA:  That's hearsay.  That's going to

6    draw an objection.

7          MS. TARLOW:  It's seized evidence that he has

8    knowledge of how it was seized, when it was seized, and he has

9    reviewed that data and used it to reconstruct certain summary

10   charts.

11         MR. MARGULIS-OHNUMA:  So I need to know how he

12   knows -- to lay a foundation they would have to establish the

13   basis of knowledge, and the knowledge can't be based on "Well,

14   another agent told me."

15         MS. TARLOW:  Your Honor, we think it would be far

16   outside the scope of any relevant testimony to have witnesses

17   discuss about the shutdown of Backpage, and specifics about the

18   seizure of that evidence.  This witness can testify to the fact

19   that evidence was seized, his knowledge of that seizure, and

20   can then use that data to reconstruct the Backpage ads.

21         THE COURT:  Is Mr. Uitto the agent or the witness who

22   prepared the summary charts?

23         MS. TARLOW:  Yes, your Honor.

24         THE COURT:  So, presumably, he can testify as to the

25   process by which he made the summary chart, the charts, and how

J783KID5

he obtained the information from which he prepared the charts.

MS. TARLOW:  Yes, your Honor.  To be clear, he generated the spreadsheets that contained data that were used to create the reconstructions of the Backpage ads.

MR. MARGULIS-OHNUMA:  What I'm highlighting is the underlying data that was the basis for the charts is not admissible unless there is a witness with personal knowledge who can admit them.  I don't know where he got these charts from.  He is going to say, well, someone gave them to me.  That doesn't do it.  They have to say --

MS. TARLOW:  Your Honor, he generated the underlying data that was created to create the Backpage reconstructions, and he also confirmed that the Backpage reconstructions contained the underlying data.

MR. MARGULIS-OHNUMA:  That's not in issue.  We've vetted that.  We've been given that.  The issue is the underlying data is not admissible without a witness.  It is not admissible based on the fact that another law enforcement officer told him this is really from Backpage.  We need someone from Backpage, someone with knowledge.

THE COURT:  Does the government propose bringing in an agent who actually obtained the data by whatever means?

MS. TARLOW:  No, your Honor.

THE COURT:  What would be wrong with doing that?

MS. TARLOW:  Your Honor, I don't know if he is

J783KID5

1    available at this time to come and testify.

2              MR. MARGULIS-OHNUMA:  Sorry.

3              MS. TARLOW:  The point is a representative of the FBI

4    who has knowledge of the seizures of the data from the Backpage

5    servers is available to testify.  He has reviewed that

6    underlying data and has used that data to generate

7    reconstructions.

8              THE COURT:  All right.  I'll allow Mr. Uitto to

9    testify as to exactly what process and methods he used to

10   develop the summary charts, including how he came on the data.

11   If the method by which he became to possess the data was that

12   he received it from seizures that he knows were conducted by

13   the FBI, he can testify that that's how he obtained the data.

14   All right?

15             Ms. Tarlow, you gave four witnesses and the total

16   amount of time that you indicated there was roughly two hours.

17             MS. TARLOW:  Yes, your Honor.

18             THE COURT:  Can you fill the rest of the day.

19             MS. TARLOW:  We also intend to call Porsche Brown who

20   is an IT specialist with the FBI who performed extractions of

21   the devices that were seized from the defendant on the date of

22   his arrest.  We approximate that that direct examination will

23   take approximately 30 to 45 minutes as well.

24             If there is remaining time, then we have two

25   additional victim witnesses, Aisha Goncalves and Dana McLeod.

J783KID5

1    We anticipate that the direct examination of Ms. Goncalves will

2    take approximately 30 to 45 minutes.  And the direct

3    examination of Ms. McLeod will take approximately an hour to an

4    hour and a half.

5              THE COURT:  All right.  So, with this, counting

6    cross-examination, we should be able to fill most of tomorrow

7    if not all.  In terms of the opening arguments, what is the

8    government's proposal?

9              MS. TARLOW:  Approximately 15 minutes.

10             THE COURT:  Mr. Margulis-Ohnuma, does the defense

11   propose an opening argument?

12             MS. MEDLEY:  Yes, your Honor.  We expect it will take

13   about 15 minutes.

14             THE COURT:  The Court's preliminary instructions

15   should take not more than about 20 minutes.  So, on that

16   schedule, we should be concluding at least preliminary matters

17   by around 10 a.m. roughly.  And then you can anticipate the

18   flow of the balance based on the government's schedule.

19   Anything else?  Ms. Tarlow?

20             MS. TARLOW:  Not from the government, your Honor.

21             MR. MARGULIS-OHNUMA:  Not from the defense.  Thank you

22   very much.

23             THE COURT:  Thank you.  Have a good day and a good

24   evening.  See you tomorrow.

25             (Adjourned until July 9, 2019, at 9 a.m.)