J79TKID1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          18 CR 872 (VM)

LLOYD KIDD,

                Defendant.

------------------------------x

                                    New York, N.Y.
                                    July 9, 2019
                                    9:05 a.m.

Before:

                    HON. VICTOR MARRERO,

                                    District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MOLLIE BRACEWELL
ELINOR TARLOW
JACOB GUTWILLIG
SAGAR RAVI
     Assistant United States Attorneys

ZACHARY MARGULIS-OHNUMA
VICTORIA MEDLEY
     Attorneys for Defendant

ALSO PRESENT:  USAO Paralegal Specialist Hannah Harney
Defense Paralegal Specialist Sophia Lattanzio
Special Agent Brian G. Gander, FBI

J79TKID1

1              (Jury not present)

2              THE COURT:  I am informed there's still a couple of

3    jurors who have not arrived, but while we are awaiting their

4    arrival, perhaps we can take up open items or questions that

5    the parties may wish to raise at this point.

6              We did leave one question open yesterday concerning

7    the summary exhibit and the issue of whether or not the age

8    column should be reflected in the summary.  I indicated I would

9    hold that in abeyance.  Perhaps we can address that a little

10   bit more here.

11             One question that I had in reviewing the exhibit list

12   that pertains to that issue is that there may be as many as 20

13   or more of those exhibits, and I wondered whether the

14   government has any indication at this point of how many of

15   those 20 or so exhibits are going to be introduced, because it

16   appeared from my reviewing them that 20 essentially the same

17   type of document seems somewhat cumulative and excessive, and

18   perhaps the controversy over whether or not the age should we

19   reflected might be minimized if we had fewer of those exhibits

20   at issue.

21             MR. GUTWILLIG:  With respect to exhibits, your Honor,

22   the government's position is that we seek to admit each of

23   them, each of the reconstructions, Exhibits 400 through 422.

24   We believe that they are not cumulative.  They reflect

25   different postings we believe by the defendant.  They represent

J79TKID1

1    different victims.  We believe they're sufficiently different,

2    even though the images may be the same or the substance may be

3    the same, it goes to amount of postings and the times they were

4    posted, and the government would seek to admit each of those

5    exhibits.  The dates and times are different and the victims on

6    certain of the exhibits are different from one another.

7          THE COURT:  Mr. Gutwillig, you're talking about 22

8    items essentially making the same point.  It doesn't matter

9    whether the dates are different, whether the victim -- whether

10   the people, the victims are different, the fact is they go to

11   the same point, which is that you charged this defendant as

12   having engaged in certain illegal activities.  But whether the

13   jury needs to see 22 acts, as I say, of essentially the same

14   thing seems to me excessive.

15         Is there not a way in which the government might be

16   able to indicate here are let's say five or six, but in fact

17   there were 22 exhibits essentially showing the same thing?

18         MR. GUTWILLIG:  Your Honor, so the government's

19   understanding is that the dates of certain of the postings or

20   the defendant's activity of the alleged conduct are in dispute,

21   the connection to certain victims we understand may be in

22   dispute, and the summary charts are going to prove different

23   victims and different times on the charts.  So understanding

24   that they are all of postings of backpage.com advertising for

25   sex, and taking your Honor's point they are similar, they are

J79TKID1

1    different in time and victim and individual, and for that

2    reason is why the government would seek to introduce them.

3              THE COURT:  The fact that the times may have been

4    different with other exhibits or the victims, the people

5    depicted in them different, could the witness who is going to

6    be testifying to this testify that information to those that

7    you have already shown and admitted, there are a number of

8    others of like import, but showing different dates?  And

9    perhaps you can even indicate what those dates may be, assuming

10   of course we don't have an objection from the defendant.

11             MR. GUTWILLIG:  Yes, your Honor.  I would note that

12   the witness could testify that there are in fact other

13   reconstructions that were made.  Certainly with respect to the

14   timing issue in particular we believe it's important for the

15   minor, who we believe was posted at that time, for that ad, and

16   also there are other items that we understand have more than

17   one victim on them or victims in different poses or clothing or

18   things like that.  Certainly we could have someone testify that

19   there are other reconstructions, but the government in the

20   first instance would seek to admit all of them.

21             THE COURT:  Mr. Margulis-Ohnuma, do you wish to

22   address this question at this point?

23             MR. MARGULIS-OHNUMA:  No, only to inform the Court my

24   biggest concern is having the age in as opposed to the

25   cumulativeness.  It would save us a lot of time to put the age

J79TKID1

1    on the reconstructions.  They can in closing use charts however

2    they want, but for this it is supposed to be a neutral summary

3    chart of underlying data, it should have the age on it,

4    otherwise we'll have to add it on with the witness on the

5    stand, which will waste more time.  If there's 22, it's even

6    more time.

7              THE COURT:  That's my point, Mr. Margulis-Ohnuma, I'm

8    trying to see if we could find a reasonable way with your

9    concern and the government's.  If you believe the age should be

10   there, whoever is testifying could indicate the age was there,

11   but we could have that controversy over much less than 22

12   exhibits.

13             MR. GUTWILLIG:  Your Honor, I note that with respect

14   to expected testimony from the individual who extracted the

15   data from the BackPage server, the government doesn't intend to

16   publish each of the 22 exhibits.  We seek to admit them, and

17   then when certain witnesses are on the stand, we'd show each of

18   the exhibits as relevant, not march through each of the 22

19   exhibits.

20             MR. MARGULIS-OHNUMA:  Your Honor, I will be marching

21   through each of them if the age isn't there.

22             THE COURT:  Let's then put this issue aside until --

23   perhaps we can let it percolate a little more and find ways of

24   moving matters along that achieves a fundamental purpose and

25   not focus on the difficulties that we're raising here.  Bear in

J79TKID1

1    mind, both sides, that we said we would have this trial

2    concluded within two weeks.  I remind you there were numerous

3    jurors who said that more than two weeks is going to cause

4    problems for them, so that we have to find reasonable ways of

5    achieving the purpose of getting evidence in, avoiding

6    cumulativeness, but also avoiding, where possible, hyper

7    technicalities that don't go to the substance of what's charged

8    here.

9              MR. MARGULIS-OHNUMA:  I have good news on that front.

10   I took your comments to heart yesterday and identified around

11   100 of the government exhibits that there really is no

12   objection to.  And we prepared a list.  If your intention is to

13   read this to the jury, I guess I would like to put on the

14   record a few nuances of my not objecting.  If you would like, I

15   could do that now.

16             THE COURT:  Is this list agreed upon by the

17   government?

18             MS. TARLOW:  Yes, your Honor.

19             THE COURT:  Put whatever reservations or concerns you

20   have on the record now, but when the jury is ready, we will

21   simply read this list on the record, and when those exhibits

22   are reached in the course of a trial, we do not need to make

23   specific reference to them for admissibility purposes.

24             MR. MARGULIS-OHNUMA:  Yes, your Honor.  With respect

25   to Exhibit 1, 2, 2A, 3, 3A, 6 and 7, the defendant has no

J79TKID1

1    objection.  With is response to exhibit -- and those are all

2    face plate photographs of various individuals.

3         With respect to 100 through 115, which were items

4    seized from the safe, we preserve our objection on prejudice

5    grounds with respect to Exhibit 100 through 104, which are the

6    guns, which we don't think should be in, but you ruled on it

7    already so there's no additional objection to those.

8         And there's no objection at all to 105 through 115

9    except to note that -- and 117, sorry, no objection to 117 --

10   certain of those exhibits, though, are electronic items, so

11   what we're not objecting to is the container going in.  The

12   content, of course, is infinite and subject to all kinds of

13   objections, and but we have no objection to them bringing in

14   the containers so the jury could see the physical item.

15        Does that make sense?

16        THE COURT:  Understood.

17        MR. MARGULIS-OHNUMA:  So with that same caveat we have

18   no objection to 150 to 162, which are other electronic devices.

19        We have no objection to the photographs, which are

20   Government Exhibit 200 to 256, although I urge the government

21   to cut them down a little bit, which I'm sure they will.

22        With respect to Government Exhibits 500 through 522

23   and 600 through 604, that's data derived from Google and Kick

24   as well as Pinger, so we have briefed the objection -- well,

25   this gets a little complicated.  With respect to Google and

J79TKID1

Pinger, which are Government Exhibits 500 through 510 is

Google, and 600 through 604 is Pinger, that's been briefed, you

ruled.  We have no additional objection beyond what you ruled

on, but we preserve the authentication issues with that.

With respect to Kick, those are new, that's 520

through 522, and it's precisely the same issue, your Honor.  So

if you want to -- if you are going to rule those are authentic,

I don't have anything to add on that, then there's no

additional objection to those exhibits, 520 through 522.

Shall I continue with the rest?

THE COURT:  Yes.

MR. MARGULIS-OHNUMA:  With respect to the Exhibits 700

through 703, after very persuasive argument from the

government, I have agreed that there's no objection to the

birth certificates coming in.

With respect to 1000 and 1001, evidence collection

logs, we agreed with respect to 1002 that's some forms he

filled out when Mr. Kidd was arrested.  They require some

redactions, and I'm not sure if we settled on that.

MS. TARLOW:  The government will only admit those for

the purposes of statements made by the defendant, which the

government understands and the defense does not object to.

MR. MARGULIS-OHNUMA:  Correct, but there's other

information that is prejudicial that needs to be redacted.  So

I think it's safe, considering how well we have gotten along,

J79TKID1

```
1   to tell the jury that it will be admitted.  It will not be
2   published until we're agreed on redactions, which I'm sure we
3   will be able to reach agreement on that.
4           With respect to Exhibits 1100 through 1103L, that's
5   material gathered from Target, we have no objection to any of
6   that.
7           THE COURT:  All right.  Does the government have any
8   further views on this matter?
9           MS. TARLOW:  No, your Honor.
10          THE COURT:  All right.  I indicated yesterday, based
11  on the discussion concerning the documents from Google and
12  Pinger, that I felt persuaded that those documents were
13  self-authenticated under rule 902.13, so I reaffirm the ruling
14  as to all the documents in question.
15          MS. TARLOW:  Your Honor, before the jury enters, do
16  you mind if we move the podium?
17          THE COURT:  Not at all.
18          (Jury present)
19          THE COURT:  Good morning.  Welcome.  You may be
20  seated.
21          Let me first observe that we scheduled the trial to
22  commence at 9 o'clock.  It is now 9:30.  To some extent that
23  was caused by a couple of jurors not being in place at the
24  designated time.  A little bit of delay was also on us, but let
25  me remind you the caution I gave about being here on time
```

J79TKID1

1    because we cannot start until all of you are present.

2            I remind you also that during the selection yesterday

3    a number of you indicated that two weeks is the maximum that

4    you may be able to serve, and that for some of you, if we go

5    beyond two weeks, it might cause difficulty, hardship, or other

6    problems.  So it is critical that if there's any delay it not

7    be on your shoulders, and if it's on ours, I will find some way

8    of making up the time.

9            If we are running late as the trial proceeds, I may

10   have to try to make up any delays by extending the day after

11   5 o'clock or even starting earlier in the morning as

12   appropriate.  It's very critical that we meet that schedule,

13   not just for us, but more really for you.

14           Now at this point I'm going to give you some remarks

15   that are intended to serve as your introduction to the trial.

16   These comments are not a substitute for the detailed

17   instructions on the law and the evidence that I will give you

18   at the conclusion of the case before you retire from your

19   deliberations, rather these remarks are a simple explanation of

20   your duties and responsibilities and the basic principles of

21   law which are likely to be involved in this case.

22           As a preliminary matter, I would like to review the

23   trial schedule with you, and I have already said that the case

24   is scheduled to last approximately two weeks.  We begin each

25   day at 9 o'clock sharp and continue until approximately

J79TKID1

5:00 p.m, except for Fridays, where, if we are making good

time, I may adjourn at around lunchtime, but again, it depends

upon how quickly we're moving through.  It is extremely

important to allow sufficient time in the morning for the

reason I just indicated.  The trial cannot start until all of

you are present, and the delays could cause our having to stay

later.

        We will have a lunch break at approximately 1 o'clock

for about an hour, and we'll have two ten-minute breaks, one in

the morning around 10:45 or 11:00 and one in the afternoon

around 3:00 or 3:15.  If at any time any of you wants a brief

recess, please raise your hand and let me know, and we'll take

a five-minute recess at that point, no questions asked.

        Your purpose as jurors is to find and determine the

facts.  The jury is the sole judge of the facts in the case.

Your task is to decide the factual issues in the case based on

the evidence presented and then apply the facts as you find

them to the law as contained in my instructions to you at the

conclusion of the trial.  As I mentioned during the jury

selection process, the question of punishment is for the Court

alone to determine, and it must not enter into your

deliberations on the guilt or innocence of the defendant.

        You may not speculates as to the potential punishment

or sentence that the defendant may face in connection with each

charge brought against them by the government, nor may you can

J79TKID1

1    consider the question of punishment when you apply the facts to

2    the law during your deliberations.

3            While you're the sole judge of the facts, the Court is

4    the sole judge of the law.  In other words, it's my role to

5    preside at the trial, to rule on the various legal issues that

6    may come up during the trial, and to instruct you on the legal

7    principles that you are to apply to the facts as you find them.

8    The law as given by of the Court constitutes the only law for

9    your guidance, and it is your duty to follow the law as I give

10   it to you.

11           You're to determine the facts in this case solely from

12   the evidence, which consists of (1), the sworn testimony of

13   witnesses regardless of which party may have called them (2),

14   any video recordings, audio recordings, documents and physical

15   things that have been received in evidence regardless of who

16   may have produced them, (3) all facts which may be judicially

17   noticed, and (4), all facts to which the parties have

18   stipulated and I instruct you to take as true for the purposes

19   of this case.

20           Evidence is a very specific limited concept.  Not

21   everything that you see or hear in a courtroom is evidence.

22   For instance, what I say now or later is not evidence.  Also,

23   what lawyers say in their opening statements and closing

24   arguments is not evidence.  To put it affirmatively, evidence

25   consists of the answers given by the witnesses from the witness

J79TKID1

1    stand.  It is the answer that is the evidence, not the question

2    or how the question is asked.  Obviously to evaluate the

3    answer, you have to consider the question in which it is a

4    response.

5              As I mentioned, statements and arguments of counsel

6    are not evidence in the case unless made as an admission or

7    stipulation, which means that the attorneys agreed to a certain

8    fact.  When the attorneys on both sides stipulate or agree to

9    the existence of a fact, I will instruct you that you must

10   accept that stipulation as evidence and regard the fact as

11   proved.  On occasion I may tell you that I am taking judicial

12   notice of certain facts or events.  You may, but are not

13   required to, accept as conclusive any fact judicially noticed.

14             You're to consider only the evidence in the case, but

15   in your consideration of the evidence you are not limited only

16   to statements of the witnesses.  In other words, you are not

17   limited solely to what you see and hear as the witnesses

18   testify, you're permitted to draw from the facts which you find

19   to have been proved such reasonable inferences as you feel

20   justified in light of your experience.

21             Your decision on the facts of the case should not be

22   determined by the number of witnesses testifying for or against

23   a party.  You should consider all of the facts and

24   circumstances in evidence to determine which of the witnesses

25   you choose to believe or not believe.  You may find that the

J79TKID1

testimony of a smaller number of witnesses on one side is more

credible than the testimony of a greater number of witnesses on

the other side.  Finally, keep in mind that you must not

consider anything that you may have read or heard about the

case outside the courtroom as evidence, whether before or

during the trial.

          I would like to mention a few more principles about

evidence which I think will help you as we proceed.  Some

evidence is admitted for a limited purpose only.  If I instruct

you that an item of evidence has been admitted for a limited

purpose, you must consider it only for that limited purpose and

no other.

          You may have heard the terms direct evidence and

circumstantial evidence.  Direct evidence is simply evidence

like the testimony of a witness which, if you believe it,

directly proves a fact.  If a witness testified, for example,

that he saw it raining outside and you believed that witness,

that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that

indirectly prove a fact.  If someone walked into the courtroom

wearing a raincoat covered with drops of water and carrying a

wet umbrella, that could be circumstantial evidence from which

you could conclude it was raining.

          It is your job to decide how much weight to the direct

evidence and the circumstantial evidence.  The law does not

J79TKID1

make a distinction between the weight that you should give to
either one and does not say that any one is better evidence
than the other.  You should consider all of the evidence, both
direct and circumstantial, and give the evidence whatever
weight you believe it deserves.

        Part of your job as jurors, while determining the
facts, is to decide how credible or believable each witness is.
This is your job, not mine.  It is up to you to decide if the
witness's testimony is believable and how much weight you think
it deserves.  You're free to believe everything that a witness
says or only part of it or none of it at all, but you should
act reasonably and carefully in making your decisions.

        Let me suggest some things that you may consider in
evaluating the testimony of each witness.  Ask yourself if the
witness was able to see or hear the events in a clear manner.
Sometimes even an honest person, an honest witness, may not
have been able to see or hear what was happening and may make a
mistake.  Ask yourselves how good the witness's memory seems to
be.  Does the witness seem able to remember accurately what
happened?  Ask yourself if there's anything else that may have
impeded with the witness's ability to perceive or remember the
events.

        Ask yourself about how the witness acts while
testifying.  Does the witness appear honest or does the witness
appear to be evasive?  Ask yourself if the witness has any

J79TKID1

relationship to the government or to the defendant or anything
to gain or lose from the case that might influence the
witness's testimony.  Ask yourself if the witness has any bias,
prejudice, or reason for testifying that might cause a witness
to slant testimony in favor or against one side.

Ask yourself whether the witness testified
inconsistently while on the witness stand or if the witness
said or did something at any other time that is inconsistent
with what the witness said while testifying.  If you believe
that the witness is inconsistent, ask yourself if this makes
the witness's testimony less believable.  Sometimes it may,
sometimes it may not.

Consider whether the inconsistency is about something
important or about some unimportant detail.  Ask yourself if it
seems like an innocent mistake or if it seems deliberate.  Ask
yourself how believable the witness's testimony is in light of
all of the other evidence admitted in the case.  Is the
witness's testimony supported or contradicted by other evidence
that you find believable?

If you believe that a witness's testimony is
contradicted by other evidence, remember that people sometimes
forget things, and even two honest people who witness the same
event may not describe it exactly the same way.

These are only some of the things that that you may
consider in deciding how and believable each witness is.  You

J79TKID1

1    may also consider other things that you think shed light on

2    some of the witnesses' credibility.  Use your common sense and

3    your everyday experience in dealing other people and then

4    decide what testimony to believe and how much weight you think

5    it deserves.

6              No statement or ruling or remark or comment that I

7    make during the course of the trial is intended to indicate my

8    opinion as to how you should decide the case or to influence

9    you in any way in your determination of the facts.

10             At times I may ask questions of witnesses.  If I do,

11   it will be to clarify a matter and should not be viewed in any

12   way to indicate my opinion about the facts or to indicate the

13   weight I believe or I feel that you should give the testimony

14   of that witness.  Remember that you as jurors are at liberty to

15   disregard all comments of the Court in arriving at your

16   findings of fact.  Also, at times I may take notes.  Keep in

17   mind whether I am taking notes at a particular time should not

18   affect you or lead you to think that one piece of information

19   is more noteworthy than another.

20             During the trial it may be necessary for me to confer

21   with the parties from time to time out of your hearing

22   concerning questions of law and procedure that require

23   consideration by the Court alone.  On occasions you may be

24   excused from the courtroom as a convenience to you and to us

25   while I discuss such matters with the lawyers.  These occasions

J79TKID1

1    will be kept to a minimum.

2              I will meet with the lawyers in the morning before we

3    get started and in the afternoons after you are sent home in

4    order to avoid, to the extent possible, interruptions while you

5    are here, but you should remember at all times the importance

6    of the matter that you're here to determine and please remember

7    to remain patient.

8              The parties may sometimes present objections to some

9    of the testimony or other evidence.  You should not be

10   prejudiced in any way against a lawyer or a party who makes

11   objections.  At times I may sustain the objections and you may

12   hear no answer to the question, or where an answer has already

13   been made, let me instruct you that the answer should be

14   stricken and removed from the record, and I may direct you to

15   disregard certain testimony or evidence.  You must not consider

16   any evidence to which an objection has been sustained or any

17   evidence to which I have asked you to disregard.

18             The law requires that your decision be made solely

19   upon the evidence before you.  The testimony or evidence that I

20   exclude from your consideration will be excluded because it is

21   not legally admissible.  In reaching your decision, you must

22   not draw any inference or conclusion from any unanswered

23   question, and you must not consider any testimony which has

24   been stricken from the record.

25             To remind you, if I sustain an objection, it means

J79TKID1

1    that I have found the objection to be legally correct and the

2    information it to which it pertains should not be considered by

3    you.  If I overrule an objection, it means that I have found

4    the objection to be incorrect as a matter of law, so the

5    information to which the objection pertains may be considered

6    by you as you determine the facts.

7              Now as you already know, this is a criminal case.

8    There are three basic rules in a criminal case that you must

9    keep in mind.  First, the defendant, Mr. Kidd, is presumed

10   innocent until proven guilty.  The indictment against Mr. Kidd

11   brought by the government is only an accusation, nothing more.

12   It is not proof of guilt or anything else.  He therefore starts

13   out with a clean slate.

14             Second, the burden of proof is on the government

15   throughout the case.  Mr. Kidd has no burden to prove his

16   innocence nor to present any evidence or to testify.  Since a

17   defendant has the right to remain silent, the law prohibits you

18   from arriving at your verdict from considering that a defendant

19   may not have testified.

20             Third, the government must prove Mr. Kidd's guilt with

21   respect to each charge in the indictment beyond a reasonable

22   doubt.  I will give you further instructions on this point

23   later, but bear in mind in this respect a criminal case is

24   different from a civil case.  As I mentioned, at the end of the

25   trial I will give you detailed instructions on the law, and

J79TKID1

those instructions will control your deliberations and

decision, but in order to help you follow the evidence, I will

now give you a brief summary of the offenses that the

government must prove beyond a reasonable doubt to make its

case with respect to each particular charge.

After you have heard and seen all the evidence in the

case, I will ask you to deliberate carefully, according to my

instructions, and ultimately render a decision regarding

Mr. Kidd's guilt or innocence.  Ultimately, the verdict of

guilty or not guilty for Mr. Kidd will have to be based solely

on the evidence about the defendant.

I will summarize the indictment.  You will later

receive a copy of the indictment, so don't worry about

remembering everything that I tell you now.

Count One charges that in or about the spring of 2015,

Lloyd Kidd, the defendant, engaged in sex trafficking of a

minor victim, identified as Victim-1, by force, threats of

force, fraud, coercion or a combination of such means.

Count Two charges that in or about the summer of 2017,

Lloyd Kidd engaged in sex trafficking of another minor victim,

identified as Victim-2.

Count Three charges that from in or around

February 2017, and up to and including at least in or about

December 2018, Mr. Kidd engaged in sex trafficking of an adult

victim identified as Victim-3 by force, threats or force,

J79TKID1

fraud, coercion, or a combination of such means.

          Count Four charges that from in or about August 2018,
up to and including at least in or about December 2018,
Mr. Kidd engaged in sex trafficking with another adult victim,
identified as Victim-4, by force, threats, threats of force,
fraud, coercion or a combination of such means.

          Count Five charges that in or about February 2017
Mr. Kidd recorded images and videos of Victim-1, who was a
minor at that time, engaging in sexually explicit conduct.

          Again, it is the government's burden to prove every
element of each of these offenses that I just described beyond
a reasonable doubt.  I will give you more specific instructions
and descriptions related to the elements of the offenses after
you have seen and heard all of the evidence in the case and
before you begin your deliberations.

          Now to abide by your conduct as jurors, as I
explained, your role is to consider all the evidence properly
before you in order to decide the facts.  You must endeavor not
to decide any issue or form any opinion on this case until you
have heard all of the evidence and you have been instructed by
me on the law and retired to the jury room to deliberate.
Until the case is submitted to you, which means that at the end
of the trial, you're not to discuss the case with anyone, not
even your fellow jurors.  Likewise, it would be improper for
you to allow anyone to discuss the case in your presence.  In

J79TKID1

1    addition, you must not talk to parties or witnesses under any

2    circumstances.

3         Sometimes jurors have difficulty understanding why it

4    is that they are not allowed to discuss the case with each

5    other.  We ask that you not discuss the case because we want

6    you to keep an open mind until you have heard all of the

7    evidence and my instructions regarding the law.  Therefore, we

8    ask you to avoid discussing the case with anyone until you

9    begin your deliberations.

10        It is very important that you strictly observe the

11   rules that must govern you during the recess or break in the

12   trial.  So as to assure the parties a fair trial and by not

13   allowing any outside information to influence your decision in

14   the outcome of case, first, as I mentioned, do not discuss the

15   case with yourselves, among yourselves or with anyone in the

16   course of the trial.

17        Do not permit anyone to discuss the case with you or

18   in your presence.  I realize this may be difficult to do

19   because it may include family members, spouses, close friends

20   and other associates, but it is the only way for the parties to

21   be assured of the absolute impartiality that they're entitled

22   to expect from you as jurors.

23        I know that many of you use cell phones, iPhones, the

24   internet and other tools of technology.  You also must not talk

25   to anyone at any time about the case or use any of these tools

J79TKID1

1   to communicate electronically with anyone about the case at any

2   time.  This includes your family or friends.  You may not

3   communicate with anyone about the case on your cell phone,

4   through email, iPhone, text messaging or Twitter, through any

5   blog or website, including Facebook, LinkedIn or YouTube.  You

6   may not use similar technology or social media, even if I have

7   not specifically mentioned it here.  Until you retire to the

8   jury room at the end of the case to deliberate, you simply

9   should not talk about the case.

10         Secondly, the attorneys and parties in this case, as

11  in any case, are instructed not to make any comment or to

12  communicate with you in any way.  If you should happen to see

13  any of the attorneys or their assistants in the hall or anyone

14  else anywhere else during the trial and they do not greet you

15  or exchange pleasantry, please understand that they are not

16  being rude, they are simply following instructions from the

17  Court which are given to them in every case.

18         Third, it is important that you not read any newspaper

19  articles or listen to any radio or television broadcasts about

20  the case, if there are any.  Media accounts may be inaccurate

21  and may contain information which is not proper evidence for

22  your consideration.  If there are any media reports about the

23  case, please avoid reading or watching them.

24         Fourth, please do not do any research or investigation

25  of the case on your own.  You should not consult dictionaries

J79TKID1

or reference materials, search the internet, websites, blogs or
any other electronic tools to obtain information about the case
or to help you decide the case.  Please do not try to find out
information from any other source outside the confines of this
courtroom.

          Fifth, if anyone should try to talk to you about the
case, you must bring that to my attention immediately, and do
not discuss it with your fellow jurors.  Likewise, should you
inadvertently read, see, or hear anything concerning the case,
you should immediately inform me.

          And finally, do not attempt to form an opinion until
after all of the evidence has been presented.  In fairness to
the parties to the lawsuit, you should keep an open mind
throughout the trial and reach your conclusion only during your
deliberations after all of the evidence is in and you have
heard the attorneys' closing arguments, my instructions to you
on the law, and then only after an interchange of views with
other members of the jury, and that way each party's evidence
will receive equal consideration from you.

          If you want to take notes during the course of the
trial, you may do so.  However, it is difficult to take
detailed notes and pay attention to what is the witnesses say
at the same time.  If you do take notes, be sure that your note
taking does not interfere with your listening to and
considering all of the evidence.

J79TKID1

1          If you take notes, do not discuss your notes with

2    anyone before you begin your deliberations.  Please keep in

3    mind that you will not be allowed to take any of the notes with

4    you at break time at the end of the day or the end of the

5    trial.  The notepads that we will give you for note taking, if

6    you wish to take notes, should be left in your chairs in the

7    courtroom during the breaks, at lunch and at the end of each

8    day.

9          Whether or not you choose to make notes, remember that

10   it is your own individual responsibility to listen carefully to

11   the evidence.  You cannot give this responsibility to anyone

12   else who is taking notes.  Notes should be used only to refresh

13   the recollection of the juror who took the notes.  You should

14   not use any notes in jury deliberations to prove to other

15   jurors that your notes are in fact what a witness actually

16   said.  Your notes reflect only your impression of what a

17   witness said.  We depend on the judgment of all members of the

18   jury, and you're all responsible for remembering the evidence

19   in the case.  Remember that notes are only aids to memory and

20   should not be given precedence over your own independent

21   recollection of the facts.  You should not allow note taking to

22   distract your attention from the proceedings.

23         You will notice that we have an official court

24   reporter making a record of this trial.  Although you will not

25   have a typewritten transcript of the trial made available to

J79TKID1

you for your use during your deliberations in the case, if you

have any questions about any portion or excerpt of testimony,

it may be possible to have an excerpt read back to you.  That

said, keep in mind that if you do ask for excerpts to be read,

be very specific as to what testimony you seek, and be patient,

because at that point we have to identify the evidence in the

transcript, review it, make sure that it is appropriate for you

to hear back.

          Finally, let me take a minute to discuss the order of

the trial.  The trial proceeds as follows:  After these

preliminary instructions, the government will present an

opening statement, which is simply an outline to give you a

frame of reference and help you understand the evidence as it

comes in.  Next Mr. Kidd's counsel may, but does not have to,

make an opening statement.  What is said during the opening

statement by either counsel is not evidence.  The government

will then present its witnesses, and counsel for the defendant

may cross-examine them.  Following the government's case, the

defendant may, if he wishes, present witnesses whom the

government may cross-examine.

          After all the evidence is in, the attorneys will

present their closing arguments to summarize and interpret the

evidence for you from their individual and respective

perspectives.  What is said during closing arguments is not

evidence, just as what is it said in opening statements is not

J79TKID1                      Opening - Ms. Tarlow

evidence.  The closing arguments are designed to present to you

what the parties believe the evidence has shown and what

inferences they believe may reasonably be drawn by you from

that evidence.  After you have heard the closing arguments, I

will instruct you on the applicable law, and you will then be

allowed to retire to to the jury room to deliberate together on

the verdict.  Keep in mind that during your deliberations you

will be permitted to see the exhibits that have been admitted

into evidence during the trial and to have witness testimony

read back to you if you so request.

           At this point we will proceed to the next point, which

is the parties' opening statements, opening arguments.

           The government.

           MS. TARLOW:  Thank you, your Honor.

           He told Kaira to take off her clothes and pose on his

bed.  He took photos of her with her genitals exposed.  He

directed her to touch herself and he recorded her.  He used

those images of Kaira lying naked and exposed to advertise her

online, to sell her to customers for sex, to make money.  He

sold her to hundreds of men.

           (Continued on next page)

J793KID2                         Opening - Ms. Tarlow

 1            MS. TARLOW:  (Continuing) Kaira was 17 years old.  She

 2   was in the foster care system.  And the man who sold Kaira to

 3   strangers for sex is that man, the defendant, Lloyd Kidd.

 4            Kaira was not the defendant's only victim.  Far from

 5   it.  For years, he prostituted girls and women for a living,

 6   and he taught those girls and women that they had to do what he

 7   wanted.  He decided when they would see clients.  He decided

 8   what sexual services they would provide.  He decided what

 9   prices they would charge.  If he wanted them to work, they

10   would work.  If they disobeyed him, he would blackmail them,

11   humiliate them, and use brute force to show them that he was

12   the one in control.  Not them.

13            That is why we're here today.

14            The defendant has been charged with sex trafficking

15   minor girls and women, including by using force, fraud, and

16   coercion to cause some of them to engage in sex acts.  He's

17   also been charged with producing child pornography.  At the end

18   of this trial, once you have seen and heard all of the

19   evidence, we will ask you to find the defendant guilty of these

20   federal crimes.

21            This opening statement is the government's chance to

22   give you a brief overview of the case, explain what the

23   evidence at trial will show, and describe how the government

24   will prove that the defendant committed these crimes beyond a

25   reasonable doubt.

1          So, first, what will the evidence show?  The evidence

2     will show that for years, from 2015 until his arrest in 2018,

3     the defendant sold minors and women for sex.  He prostituted

4     girls who were as young as 14 years old.  The defendant found

5     his victims in many ways:  He posted advertisements online, he

6     recruited them as sex workers, he lured them into romantic

7     relationships and then forced them to engage in prostitution,

8     and he had girls who worked for him find others to join his

9     enterprise.

10          When they arrived at his apartment, he set rules for

11    them.  First, they had to have unprotected sex with him to

12    prove their worth so that he could test the product before he

13    sold them to other men.  If they passed that test, they had to

14    pose in lingerie or completely naked for advertisements that he

15    posted online, advertisements selling them for sex.  They had

16    to see customers at any time of day or night.  They had to see

17    customers when they were sick.  They had to perform whatever

18    sexual service in whatever manner that the defendant listed in

19    their advertisement.  Anal sex, oral sex, unprotected sex, sex

20    that customers could record.  And they had to immediately turn

21    over all of the money from a customer to the defendant.  He

22    took that money, and he locked it up in his safe out of their

23    reach.

24          You will hear again and again that he decided when

25    they could get money, how much they could get, and what they

could spend it on.  You'll hear that if they challenged him, if

they refused to give a customer what he wanted, he threatened

them with a baseball bat, he bent their fingers back until they

gave in, and he punched them.  They had to do all of this, even

if they didn't want to, because the defendant said so.  He

taught them if they weren't obedient, they had to pay the

price.  So you'll hear that the minor girls and women working

for the defendant learned to follow his rules, to do what he

said.  They learned to be submissive like the defendant

demanded.

        You'll hear about some specific victims of the

defendant, the way that he exploited those victims for money,

and the way that he trained and conditioned them to make sure

that they would never challenge him.

        You already heard about Kaira who was living at a

foster care facility when she worked for the defendant.  You'll

learn that she first met him when she was only 16 years old.

He immediately posted her online for sex.  She saw customers

that first night, and she was in so much pain, and was so

tired, that she told him she wanted to stop.  She just wanted

to go to bed.  He told her that she was not allowed to sleep,

that those were her working hours.  You'll hear that one time

Kaira forgot one of the defendant's rules, she didn't hand over

the client's money when the client immediately arrived.  What

did the defendant do?  He choked her.  He grabbed her by the

J793KID2                    Opening - Ms. Tarlow

1   neck and he lifted her off the ground.  He made her give him

2   that money.

3           You'll hear about Jessica, a 14 year old who also was

4   living at a foster care facility.  You will learn that she and

5   her three friends went to the defendant's apartment.  They were

6   all minors.  They all lived in foster care.  He led them, one

7   by one, into his bedroom, and he had unprotected sex with each

8   of them.  When he had had his fill, he posted the girls online

9   to sell them for sex, to make money.  You'll hear that Jessica

10  saw a client in the defendant's apartment, while her three

11  friends waited in another room, while they waited until the

12  defendant told them it was their turn.

13          You'll hear about Arielle, a mother who started

14  working for the defendant because she needed money to support

15  her daughter.  But you'll hear that over time, he controlled

16  her financially and psychologically.  When she saw customers,

17  he took her money.  He locked it up in his safe.  That meant

18  she could never leave him without becoming penniless.  He

19  threatened her with physical force, and when she upset him, he

20  threatened her with the one thing that mattered to her the

21  most:  Her daughter.  He told her that his friends would march

22  into court and tell a judge about what she did for a living, so

23  that she could never see her daughter again.

24          And you'll hear about Dana, a woman who was visiting

25  the United States from Guyana.  You'll learn that the defendant

J793KID2                    Opening - Ms. Tarlow

1    secretly recorded the two of them having sex, that he showed

2    her the video, and that he told her he would post that video

3    publicly unless she engaged in prostitution for him.  He had

4    Dana seeing customers within hours.

5            You'll learn that nearly a year later, he married

6    Dana, so she would stay in the country with him.  And that

7    hours after they were married, he continued to sell her to

8    customers for sex.

9            That's what the evidence in this case will show.  That

10   the defendant participated in sex trafficking of multiple

11   women, both minors and adults, and that he forced fraud and

12   coercion to cause some of the victims to engage in sex acts.

13           So how will the government prove that the defendant

14   committed these crimes?  The types of evidence that you are

15   going to see and hear over the next few days will fall into a

16   few broad categories.  First, you will hear from the victims

17   themselves.  These victims will take that stand and tell you

18   about how the defendant recruited them into sex work.  They

19   will tell you about how the defendant sold them to strangers

20   for sex.  They'll tell you about how the defendant always

21   controlled the money that they earned, and only sometimes give

22   them a portion.  And they will tell you about the things the

23   defendant did to keep them under his control, the ways that he

24   humiliated them and blackmailed them.  The times that he hit

25   them, choked them, and raped them.

J793KID2                       Opening - Ms. Tarlow

1           You'll hear testimony from other witnesses.  You'll

2    hear from law enforcement witnesses who arrested the defendant

3    at his apartment on the day of his arrest, who found victims in

4    the defendant's apartment, and who recovered more than 20

5    electronic devices, including phones, computers, and hard

6    drives.

7           You will see and hear a few different types of

8    physical evidence.  You will see the electronic devices that

9    were seized on the day of the defendant's arrest.  You will

10   learn that several of those devices contained the pornographic

11   images of videos of Kaira, that the defendant recorded when

12   Kaira was a minor.  You will see those images and that video.

13   You will also see text messages with customers describing where

14   customers would meet the girls, what the prices were, and what

15   kinds of sexual acts they would perform.  You will see the

16   advertisements that the defendant posted online to recruit

17   girls and women to work for him, and the advertisements that he

18   posted of the victims selling them to strangers for sex.  The

19   advertisements that included naked photographs of Kaira and

20   other underaged girls who worked for him.  You will learn that,

21   over the years, the defendant posted hundreds of advertisements

22   selling girls and women for sex.

23          You will see the safe where the defendant stored the

24   victims' money that they made after seeing customers.  The safe

25   that none of the victims could access.

1          And you'll hear in the defendant's own words how he

2     viewed women, how he treated women.  You'll watch videos in

3     which he brags that he only likes women who are submissive.

4     That he hits women.  That in order to be a pimp you have to be,

5     as he says, "ruthless with the women who work for you."

6          All of this evidence will point to one conclusion:

7     That the defendant sexually exploited minors and adult women

8     for his own profit.  He made them commodities for his own gain.

9          At the end of this trial, after you've seen all of the

10    evidence, we will have the opportunity to speak with you about

11    how the evidence proves each of the charges against the

12    defendant.  But between now and then, I'm going to ask you to

13    do three things.  First, pay close attention to the evidence.

14    Second, follow Judge Marrero's instructions on the law.  And

15    third, use your common sense.  The same common sense and good

16    judgment that you use in your everyday lives.  If you do those

17    three things, you will reach the only verdict consistent with

18    the evidence, the law, and your common sense.  That the

19    defendant is guilty.

20          THE COURT:  Will you introduce yourself to the jury.

21          MS. TARLOW:  Yes, your Honor.  I'm Elinor Tarlow.  I'm

22    one of the assistant United States attorneys.

23          MS. MEDLEY:  On December 12, 2018, at 6 in the

24    morning, officers banged on the door of a Brooklyn apartment.

25    There wasn't any answer, so they banged harder and they yelled.

J793KID2                      Opening - Ms. Medley

And when Lloyd Kidd woke up, and he groggily answered the door
in his pajama pants, officers swarmed in, guns drawn.  They
dragged him into the hallway, they handcuffed him, they
immediately brought him downstairs, and threw him into a police
vehicle.

        But the officers, they stayed.  They opened drawers,
moved boxes, searched closets, looked under beds.  They seized
every electronic device in Mr. Kidd's apartment:  Phones,
computers, hard drives, even his music players.  They got a
search warrant for two safes and they broke into them and they
seized everything in there as well.

        You're going to see all of that evidence from
Mr. Kidd's apartment.  But it still won't be enough.  The
government will not be able to prove beyond a reasonable doubt
that Lloyd Kidd committed any crime.

        Ladies and gentlemen, my name is Victoria Medley, and
today, I have the distinct honor of representing Lloyd Kidd in
this federal criminal trial.  I'm joined at counsel table by
lead counsel Zachary Margulis-Ohnuma, by our legal law student
intern Lisa Taapken, by our paralegal Sophia Lattanzio, and
together, we represent this man, Lloyd Kidd.

        Now, during this trial you're going to learn a lot
about Mr. Kidd and the life that he led, and you may not
approve of that lifestyle.  A lot of you told us that you do
not think that prostitution should be legal, but Mr. Kidd is

J793KID2                    Opening - Ms. Medley

1   not charged with promoting prostitution.  That's not a federal

2   crime.  And you're going to learn that Mr. Kidd was involved in

3   prostitution.  He ran what's called an in call spot in

4   Brooklyn.  Yes, he allowed adult women to use the spare bedroom

5   of his apartment to see customers.  He provided the space, and

6   he kept an ear out in case any of the customers became too much

7   to handle.  And in exchange, the women would give him part of

8   the proceeds.

9           As the government mentioned, Mr. Kidd also had a

10  YouTube channel, Chris Kidd's World, an online channel.  He

11  does clown around about many topics that many people take very

12  seriously, such as sex, virginity, and relationships between

13  men and women, and you may not like a lot of things he has to

14  say on those topic.  But it's important to remember that Chris

15  Kidd of Chris Kidd's World is a persona.  It is a fictional

16  character created by Mr. Kidd for YouTube.

17          It is shocking.  It's supposed to be shocking.  It's

18  provocative.  It's supposed to be controversial.  Because the

19  channel is about monetization, it's about clicks, it's about

20  likes.  And it has a lot of followers.

21          But it has nothing to do with Mr. Kidd's in call spot.

22  The YouTube videos are not real.  They're entertainment.  Don't

23  let them distract you.  You cannot convict Mr. Kidd because he

24  acts like a clown on YouTube.

25          So the important thing to remember is this:  Everyone

J793KID2                        Opening - Ms. Medley

1    in this room right now agrees that Lloyd Kidd, as he sits here

2    today, has not been convicted of any crime.  He is innocent.

3    The government has not presented any evidence against him.

4            Now, you just heard the government say that he has

5    been accused of terrible, terrible crimes.  But Mr. Margulis

6    and I submit to you that the government will not be able to

7    prove that he actually committed those crimes.  And that's

8    because our system is designed to make it hard to prove that

9    someone committed a crime.

10           I mentioned in the beginning that the government

11   cannot prove its case beyond a reasonable doubt.  We've all

12   heard that phrase before, beyond a reasonable doubt, in movies,

13   and TV shows.  But what does it mean?  Beyond a reasonable

14   doubt.  It means that Mr. Kidd is presumed to be innocent.  It

15   means the government -- never the defense -- has to prove its

16   case.  If they cannot prove their case beyond a reasonable

17   doubt, then you have to acquit Mr. Kidd.  If, after looking at

18   all the evidence -- ours and theirs -- you are not convinced

19   and you have a doubt, you have to acquit.  It's as simple as

20   that.

21           But, these are complex crimes the government has

22   accused Mr. Kidd of committing.  They have multiple elements,

23   things the government has to prove.  And as Judge Marrero will

24   explain at the end of the trial, the government has to prove

25   each of those elements beyond a reasonable doubt.  So let's

1    break that down.  I'm going to tell you the elements the

2    government cannot prove beyond a reasonable doubt and what the

3    evidence will not show.

4             As to Counts One and Three and Four, all allege that

5    Mr. Kidd caused the alleged victims to engage in commercial sex

6    acts through force, fraud, or coercion.  The government can't

7    prove that because it simply isn't true.  The alleged victims

8    engaged in commercial sex acts on their own.  No one forced

9    them to do anything.  They wanted money.  If they testify that

10   they were forced or coerced, they're not being truthful.  And

11   why would they not be telling the truth?  Well, each so-called

12   victim has her own reasons for accusing Mr. Kidd.  So, listen

13   to their testimony very carefully.  Are they trying to avoid

14   being prosecuted?  Are they trying to get favors from

15   government agents like new clothes, free cigarettes?  Are they

16   trying to get immigration benefits?

17            Now, Counts One and Two are different from Counts

18   Three and Four.  Counts One and Two claim that the alleged

19   victims were under 18 when they worked out of Mr. Kidd's

20   apartment in March of 2017.  Count Two involves a woman named

21   Jessica.  She does not claim that she was forced or coerced.

22   So for Count Two, the government must prove that she was under

23   18, and that Mr. Kidd acted with knowledge that she would be

24   caused to engage in a commercial sex act.

25            Let me pause right there and explain what the evidence

1    will show about Counts One, Two and Five, the underage counts.

2    Count Two is about Jessica; Counts One and Five are about the

3    victim the government spoke about, Kaira.  As to these counts,

4    the government has to prove that the alleged victims were under

5    18 at the time.  But the evidence will show that Mr. Kidd was

6    very, very careful to make sure that any women who worked out

7    of his apartment were over 18.  You will see numerous ads that

8    say only females over the age of 18 should apply.

9              Two last things the government cannot prove that Judge

10   Marrero will instruct you about at the end of trial.  First,

11   the government can't prove that anything Mr. Kidd did was in or

12   affecting interstate commerce.  That's also a necessary element

13   of Counts One through Four.  Second, everything in this case

14   took place in Brooklyn, not in the Southern District of New

15   York.  The government will not be able to prove venue, meaning

16   that any of the crimes took place in Manhattan or Westchester

17   or in some other part of the Southern District of New York.

18             You're going to hear a lot of evidence.  Some of it

19   will be very sad.  Some of it will be revolting.  A lot of it

20   will be very difficult to hear.  In the end, you may not like

21   Mr. Kidd.  You may not like the government witnesses.  You may

22   not like the alleged victim witnesses.  But don't get

23   distracted.  At the end, your verdict must be based on the

24   evidence, not on empathy.  And that evidence has to be beyond a

25   reasonable doubt.  That evidence won't be there.  Mr. Kidd will

J793KID2

remain an innocent man.  And at the end of the trial, we will

ask for your verdict of not guilty.  Thank you.

        THE COURT:  Is the government prepared to proceed with

its first witness?

        MS. TARLOW:  Yes, your Honor.  Before we do, may we

have a brief sidebar with your Honor?

        THE COURT:  Yes.

        (Continued on next page)

J793KID2

<pre>
 1              (At the sidebar)

 2              MS. TARLOW:  Your Honor, in defense's opening they

 3     said the defendant has to have knowledge that the victims are

 4     under 18.  That's not our understanding of the law.  It's not

 5     what the jury instruction state.

 6              MR. MARGULIS-OHNUMA:  We didn't say that.

 7              THE COURT:  Start again.

 8              MS. TARLOW:  We heard defense counsel in their opening

 9     state that in order to convict the defendant on the counts that

10     concern minor victims, the defendant must know that they are

11     under 18.

12              MS. MEDLEY:  No, I said that he must have knowledge to

13     cause her --

14              MR. MARGULIS-OHNUMA:  -- that she would be caused

15     to --

16              MS. MEDLEY:  -- knowledge she would be caused to

17     engage --

18              MR. MARGULIS-OHNUMA:  In a commercial sex act.

19              MS. TARLOW:  We would request that your Honor remind

20     the jury that your description of the law controls, and any

21     description of law in the defense opening --

22              MR. MARGULIS-OHNUMA:  Or in the government's opening.

23              MS. TARLOW:  I don't think there was any.

24              THE COURT:  I will make that instruction.

25              MS. TARLOW:  Thank you.
</pre>

J793KID2

1          THE COURT:  Which will also be given as the regular

2    final instructions.

3          MS. TARLOW:  One other matter is that the first

4    witness will be putting into evidence certain images that

5    constitute child pornography.  We would ask that the public

6    monitors be turned off so that members in the audience cannot

7    view the child pornography.

8          THE COURT:  All right.  Anything else?

9          MS. TARLOW:  That's all.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J793KID2                          Brown - Direct

1              (In open court)

2              MS. TARLOW:  The government calls its first witness,

3    Kaira Brown.

4              THE COURT:  Before we proceed with the first witness

5    let me come back to a point that I made during the preliminary

6    instructions and that I will give you with great emphasis in

7    the final instructions.  The arguments that the parties have

8    just made, both the government and the defense, are not

9    evidence.  Any statement that they may have made concerning the

10   law is not the law that governs this case.  The only law that

11   you should consider in your deliberations is that which is in

12   my instructions.  And you are to disregard any statement

13   concerning legal matters that may have come up during the

14   opening arguments of the government and the defendant.

15             Ms. Tarlow.

16             MS. TARLOW:  Yes, your Honor.  The government calls

17   its first witness, Kaira Brown.

18    KAIRA BROWN,

19         called as a witness by the Government,

20         having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MS. BRACEWELL:

23   Q.  Good morning, Ms. Brown.

24   A.  Good morning.

25   Q.  How old are you today?

J793KID2                          Brown - Direct

1    A.  20 years old.

2    Q.  In what borough do you presently live?

3    A.  Manhattan, New York.

4    Q.  What is the month and year of your birth?

5    A.  March 22, 1999.

6    Q.  Where were you born?

7    A.  Virginia Beach, Virginia.

8             MS. BRACEWELL:  Ms. Harney, will you display for the

9    witness what's been marked for identification as Government

10   Exhibit 701.

11            THE COURT:  Let me ask the witness to please speak a

12   little louder.  It may be difficult for jurors to hear you.

13   Your voice does not project.  Just speak a little louder.

14            THE WITNESS:  No problem.

15   Q.  Ms. Brown, do you recognize this document?

16   A.  Yes.

17   Q.  What is it?

18   A.  My birth certificate.

19   Q.  Is that your birth date on the document?

20   A.  Yes.

21            MS. BRACEWELL:  Your Honor, the government offers

22   Government Exhibit 701.

23            MR. MARGULIS-OHNUMA:  No objection.

24            THE COURT:  Admitted without objection.

25            (Government's Exhibit 701 received in evidence)

J793KID2                       Brown - Direct

1          MS. BRACEWELL:  May we publish?

2          THE COURT:  Yes.  I'm sorry.  There is a matter of

3    housekeeping that we said we would turn to before we started

4    the trial, which is to read the list of exhibits that are not

5    in dispute.  Is the defense going to read that list?

6          MR. MARGULIS-OHNUMA:  Yes, I can read it, thank you.

7    So, any dispute with respect to these exhibits has been

8    resolved by the Court, and therefore they are admissible.

9          That's Exhibits 1, 2, 2A, 3, 3A, 6, 7, 100 through

10   115, 117, 150 to 162, 200 to 256, 500 to 522, 600 to 604, 700

11   to 703, 1000, 1001, redacted version of 1002, and 1100 through

12   1103L.

13         THE COURT:  Thank you.  Received.  So Ms. Bracewell,

14   when any of these undisputed documents come becomes relevant,

15   just indicate that this is a non-disputed document.

16         MS. BRACEWELL:  Understood.

17         (Government's Exhibit 1, 2, 2A, 3, 3A, 6, 7 received

18   in evidence)

19         (Government's Exhibit 100 to 115, 117, 150 to 162, 200

20   to 256 received in evidence)

21         (Government's Exhibit 500 to 522, 600 to 604, 700 to

22   703 received in evidence)

23         (Government's Exhibit 1000, 1001, redacted 1002

24   received in evidence)

25         (Government's Exhibit 1100 through 1103L received in

J793KID2                        Brown - Direct

1    evidence)

2               MS. BRACEWELL:  Ms. Harney, can you display for the

3    witness what's been marked as Government Exhibit 6.

4    Q.  Ms. Brown, who is depicted in this photograph?

5    A.  Me.

6    Q.  Roughly when was this photograph taken?

7    A.  Around February 2017.

8               MS. BRACEWELL:  The government offers Government

9    Exhibit 6.  I do not believe that's an exhibit that's in

10   dispute.  We would offer it and ask to publish it.

11              THE COURT:  You may.

12   Q.  Ms. Brown, how far did you go in school?

13   A.  Up to 11th grade.

14   Q.  How old were you when you stopped attending school?

15   A.  I was 16 years old.

16   Q.  Are you currently employed today?

17   A.  Yes.

18   Q.  Generally, what kind of work do you do?

19   A.  I work in a restaurant.

20              MS. BRACEWELL:  Ms. Harney, you can take down Exhibit

21   6.

22   Q.  So I'd like to direct your attention to the period

23   beginning in the spring and summer of 2015.  Did you have sex

24   for money during that time?

25   A.  Yes.

J793KID2                          Brown - Direct

1    Q.  Did you work for anyone during that time?

2    A.  Yes.

3    Q.  Who did you work for?

4    A.  The defendant.

5    Q.  What name did you use for him?

6    A.  Red.

7    Q.  Did you know him by any other names?

8    A.  Chris Kidd.

9    Q.  Any other names besides Chris Kidd?

10   A.  Lloyd.

11   Q.  Until roughly when did you work for the defendant?

12   A.  Approximately until the end of 2017.

13   Q.  Looking around the courtroom today, do you see Mr. Kidd in

14   the courtroom?

15   A.  Yes.

16   Q.  Can you please describe where he's sitting and describe an

17   item of clothing that he's wearing.

18   A.  Over to my left side in the blue shirt.

19           MS. BRACEWELL:  Your Honor, can we let the record

20   reflect that the victim -- that the witness has identified

21   Mr. Kidd.

22           THE COURT:  Noted.

23           MS. BRACEWELL:  Ms. Harney, can you show Ms. Brown

24   what's been marked for identification as Government Exhibit 1.

25   Q.  Ms. Brown, do you recognize who appears in this photograph?

J793KID2                        Brown - Direct

1    A.  Yes.

2    Q.  Who is depicted in this photograph?

3    A.  The defendant.

4              MS. BRACEWELL:  The government offers Exhibit 1, also

5    not in dispute.  May we publish?

6              THE COURT:  Yes.

7    Q.  Ms. Brown, how did you first come into contact with the

8    defendant?

9    A.  It was a text message in response to a Backpage ad that was

10   posted of me.

11   Q.  What is Backpage?

12   A.  Backpage is a website that advertises sex.

13   Q.  Approximately when did you receive this communication from

14   the defendant?

15   A.  In like the spring of 2015.

16   Q.  How old were you in the spring of 2015?

17   A.  16 years old.

18   Q.  So, you mentioned a moment ago that you received a text

19   message.  Did you subsequently have any discussion with the

20   defendant?

21   A.  Yes.

22   Q.  What did you discuss in that conversation?

23   A.  The text message stated that the defendant had a room

24   available to work from.

25   Q.  Did the defendant describe anything about his business?

J793KID2                         Brown - Direct

1   A.  Yes, everything was supposed to be 50-50.  Other than that,

2   no.

3   Q.  In this conversation, what, if anything, did you tell him

4   about yourself?

5   A.  I told him that I would be coming from Manhattan.

6   Q.  Where were you living at that time?

7   A.  I was living in a group home.

8   Q.  And that group home was located where?

9   A.  On 17th Street between First and Second Avenue.

10  Q.  Did you discuss meeting the defendant in person?

11  A.  Yes.

12  Q.  Did you in fact meet?

13  A.  Yes, we did.

14  Q.  Where did you meet?

15  A.  At a train station in Brooklyn, on Flatbush Avenue.

16  Q.  How did you get there?

17  A.  I took the 2 train.

18  Q.  Where were you coming from on that particular day?

19  A.  I was coming from the group home.

20  Q.  Where did you go after the subway station?

21  A.  I met the defendant at his car.

22  Q.  Where did you go with the defendant?

23  A.  We went to his apartment.

24  Q.  Who else was at the defendant's apartment?

25  A.  It was me and another young lady that I was with.

J793KID2                              Brown - Direct

1    Q.  Anyone else at the time that you arrived?

2    A.  At the time I arrived, it was just me and the young lady

3    there.

4    Q.  What happened once you were at the defendant's apartment?

5    A.  When we were at the defendant's apartment, we discussed

6    what business was going to take place and what the procedure

7    was.

8    Q.  What did the defendant tell you about the business?

9    A.  Basically, what was sent through text message.  There is a

10   room available, everything is 50-50, and he had to take

11   pictures so that way he can post them on to the website.

12   Q.  You mentioned procedures a moment ago.  What kind of

13   procedures did he describe?

14   A.  I was referring to the pictures, and, you know, the posting

15   and stuff.

16   Q.  Did you have sex with the defendant on that first day?

17   A.  Yes.

18   Q.  Why did you have sex with Mr. Kidd?

19   A.  The defendant offered me $100.

20   Q.  Did he say anything about having sex before you worked?

21   A.  Yes, this was before I worked.

22   Q.  Did the defendant in fact take any photographs of you?

23   A.  Yes.

24   Q.  What did the defendant say the photographs were for?

25   A.  He said -- at first he said the pictures that he was taking

J793KID2                         Brown - Direct

1    were to post.  And then he said some of them were for his own

2    use.

3    Q.  When the defendant said they were to post, what did you

4    understand that to mean?

5    A.  I understood it to mean he was going to post them on

6    Backpage.com.

7    Q.  On that first day, did you begin seeing clients?

8    A.  Yes.

9    Q.  How many customers did you see that first day?

10   A.  Roughly five.

11   Q.  To be clear, those five customers you're referring to, were

12   they customers for commercial sex?

13   A.  Yes.

14   Q.  Did there come a time on that first night when you tried to

15   stop meeting customers?

16   A.  Not really.

17   Q.  Did you just ever describe anything to the defendant about

18   how you were feeling that night?

19   A.  Later on in the night, like morning time, I told him that I

20   was a little sleepy.

21   Q.  How did he respond?

22   A.  He told me that if you are going to sleep all day, then we

23   didn't need to work out of his house.

24   Q.  Ms. Brown, do you mind pulling microphone to you.

25   A.  Yeah.

1   Q.  That's perfect.

2          When he said that, that if you were going to be

3   sleeping all day you didn't have to stay there, what did you

4   understand that to mean?

5   A.  I understood that to mean that if me or any girl would

6   sleep, that we couldn't work at the location.

7   Q.  On this visit, how long did you stay at the defendant's

8   apartment?

9   A.  Just overnight.

10  Q.  Did you return to the defendant's apartment on any other

11  occasions after this first visit?

12  A.  Yes.

13  Q.  How often?

14  A.  Very frequently.

15  Q.  Generally, how long did you stay at the defendant's

16  apartment at a time?

17  A.  The shortest amount of time was two days, and the longest

18  amount of time being almost two weeks.

19  Q.  Where did you go when you left the defendant's apartment?

20  A.  Back to the group home.

21  Q.  What did you tell the defendant about where you were going

22  when you left?

23  A.  I didn't tell him that it was a group home.  But I did tell

24  him that I was living in a facility.

25  Q.  Did you describe where the facility was?

J793KID2                        Brown - Direct

1   A.  I just told him Manhattan.

2   Q.  When you visited the apartment, what work, if any, did you

3   do?

4   A.  At the defendant's apartment?

5   Q.  Yes.

6   A.  I would see clients.  I would have sex with them for money.

7   Q.  To be clear, was that every time you visited or just some

8   of the time?

9   A.  Every time.

10  Q.  Did there come a time when you told the defendant how old

11  you were?

12  A.  Yes.

13  Q.  Approximately how long after you met him did you tell him

14  how old you were?

15  A.  Maybe a few months after I met him.

16  Q.  Do you recall that conversation?

17  A.  Yes.

18  Q.  Can you describe the conversation.

19  A.  I was sitting with the other female that I showed up with

20  the first time.  And we were joking about, you know, going to

21  the liquor store and stuff.  And we were, like, laughing with

22  him and stuff.  I was like, yeah, I'm 16.  And the defendant

23  was like, you're lying.  And I was like, no, I'm not.  And he

24  kind of left the conversation after that, like, awkward pause.

25  Q.  Where did that conversation take place?

J793KID2                          Brown - Direct

1    A.   In the living room of the defendant's apartment.

2    Q.   Did you continue to work for the defendant after that?

3    A.   Yes.

4    Q.   To confirm, did you continue to see customers to engage in

5    commercial sex after that conversation?

6    A.   Yes.

7    Q.   Where did the defendant live while you worked for him?

8    A.   On Nostrand Avenue, between -- Nostrand between Avenue J

9    and Avenue K.

10            MS. BRACEWELL:  Ms. Harney, if you can pull up what's

11   marked for identification as Government Exhibit 253.

12   Q.   Ms. Brown, what's depicted in this photograph?

13   A.   This is the front of the apartment along with the dry

14   cleaning that's next door and the Chinese restaurant.

15   Q.   And this, when you refer to the apartment, you're referring

16   to the defendant's apartment?

17   A.   Yes.

18   Q.   Is this a fair and accurate representation of the building

19   where the apartment was located?

20   A.   Yes.

21            MS. BRACEWELL:  The government offers 253.  It's not

22   in dispute.  May we publish?

23            THE COURT:  Yes.

24   Q.   I'm going to refer to the defendant's apartment as the

25   Nostrand apartment.  Does that make sense?

J793KID2                          Brown - Direct

1    A.  Yes.

2    Q.  Can you describe where in the photograph the defendant's

3    apartment is located.

4    A.  Where the green awning is, where the laundromat is like

5    right underneath on the -- on my right-hand side from this

6    side.  It's like right there.

7    Q.  So, just to clarify, you're describing the green laundromat

8    awning?

9    A.  Yes.  Right underneath behind that first pole that's there.

10   Q.  That's the entrance to the building or the apartment?

11   A.  The entrance to the building.  Like to, you know, go

12   upstairs.  Not into the apartment, no.

13   Q.  Where in this building was the apartment located?

14   A.  Up the first flight of steps, the first floor right there,

15   when you get up the flight.

16   Q.  Was it on the street side or the back of the building?

17   A.  On the back of the building.

18   Q.  Ms. Brown, if we can talk briefly about what the work

19   looked like in the apartment's defendant.  Are you familiar

20   with the term "in call"?

21   A.  Yes.

22   Q.  What is an in call?

23   A.  An in call is when a client comes to you.

24   Q.  Where did you meet customers while you were working for the

25   defendant?

J793KID2                          Brown - Direct

1    A.  I would meet them at the front door of the Nostrand

2    apartment.

3    Q.  Did the defendant give you any instructions about what to

4    do when a customer came to his apartment?

5    A.  He told me that I had to meet them downstairs outside, at

6    the outside door, and I would have to check them first.  Like,

7    make sure they don't have any weapons or, you know, pat them

8    down.  And then I can ultimately bring them upstairs to the

9    apartment.

10   Q.  And what were you supposed to do when you brought them back

11   to the apartment?

12   A.  I would have sex with them for money.

13   Q.  Did the defendant give you any instructions about where to

14   take the customer in the apartment?

15   A.  There was a room that most of the time we would take the

16   clients all the way in the back of the apartment.

17   Q.  Did the defendant give you any instructions about when you

18   were supposed to get the money from the customer?

19   A.  I was supposed to get the money when I got in the room.

20   Q.  What were you supposed to do with that money once you got

21   it from the customer?

22   A.  There was -- the defendant's room was connected to the room

23   that I would bring the clients to, so I would have to bring him

24   the money first.

25   Q.  Did you ever see what the defendant did with the money you

J793KID2                        Brown - Direct

1    handed him?

2    A.  No.

3    Q.  What happened if you did not give the defendant the money

4    first?

5    A.  He would be upset.

6    Q.  Did that ever happen, that you forgot to give the defendant

7    the money first?

8    A.  Yes.

9    Q.  Can you describe what happened on one of those occasions?

10   A.  Well, I brought the client upstairs.  I brought him in the

11   room.  And then I started the date with the client.  I

12   collected the money, I started the date, and I forgot to give

13   the money to the defendant.  So the defendant started banging

14   on the door like really hard.  And so I told him give me one

15   minute.  I was naked.  And the defendant banged the door so

16   hard that it bust open.  And the defendant grab me by my neck,

17   and was just basically telling me, you know, I gave you simple

18   instructions.  You know.  And when he let go, he was like

19   where's the money.  Give me the money.  So I gave him the

20   money, and then I had to finish the date.

21   Q.  Why did you have to finish the date?  Did the defendant

22   give you any instructions about finishing the date?

23   A.  Yes.  The client had already paid.  So, I kind of just had

24   to finish what I started.

25   Q.  How long was the defendant choking you?

J793KID2                         Brown - Direct

1    A.  For a couple seconds, maybe -- 10 seconds.

2    Q.  I'm sorry.  Say it again?

3    A.  A couple seconds, maybe like 10 seconds or so.

4    Q.  Were you able to breathe while he was choking you?

5    A.  No.

6    Q.  What happened later that same night?

7    A.  I was speaking to the client, and the client told me that

8    that was not the first time that had happened before.

9               MR. MARGULIS-OHNUMA:  Objection.

10              THE COURT:  Sustained.  Hearsay.

11              MR. MARGULIS-OHNUMA:  Move to strike.

12              THE COURT:  Sustained.

13   Q.  Ms. Brown, directing you to later that night to any

14   conversation you had with the defendant.  Can you explain what

15   happened that night.

16   A.  I told the defendant I was mad because he had choked me.

17   Q.  Did you try to leave the apartment?

18   A.  Yes.

19   Q.  Did you ask for any money to leave?

20   A.  Yes, I did.  I asked him for the half that I was promised

21   from the money that I got from the client.

22   Q.  How did the defendant respond?

23   A.  The defendant told me I wasn't getting anything.

24   Q.  How did you respond to that?

25   A.  I got upset.  So I packed my stuff and I left.

J793KID2                     Brown - Direct

1   Q.  Ms. Brown, how did you feel when the defendant choked you
2   that night?
3   A.  I was scared.
4   Q.  Generally, what hours were you supposed to meet customers?
5   A.  There was really no hours that I was specifically supposed
6   to meet customers.  Just if they texted me and I was available,
7   then I was going to invite them to the apartment.
8   Q.  Did you ever tell the defendant you were too tired to meet
9   a customer?
10  A.  Yes.
11  Q.  How did the defendant respond?
12  A.  At the time I was smoking a cigarette, so he tried to,
13  like, he was like -- we were like yelling at each other.  And
14  then eventually he got closer and tried to smack the cigarette
15  out of my hand, and it fell on my leg and burnt my leg.
16  Q.  Were you required to meet customers while you were
17  sleeping?
18  A.  If a customer was -- too many customers texted while I was
19  sleeping, I would be wakened up, yes.
20  Q.  How would the defendant wake you up?
21  A.  If there was another female there, he would tell the other
22  female to wake me up.  If not, he would wake me up hisself.
23          THE COURT:  Ms. Bracewell, how much longer do you
24  expect with this witness?
25          MS. BRACEWELL:  I have about 15 or 20 minutes.

J793KID2                           Brown – Direct

1            THE COURT:  I'm going to recess at this point.  10

2    minutes.

3            MS. BRACEWELL:  Thank you.

4            THE COURT:  Let me remind the jury, since this is the

5    first opportunity of many, many to remind you about the

6    discussion the instructions I gave earlier.  Do not discuss

7    anything about the case during the break among yourselves or

8    anyone else.  10 minutes.

9            (Recess)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2                THE COURT:  Thank you.  Welcome back.

3          Ms. Bracewell.

4                MS. BRACEWELL:  Thank you.

5    BY MS. BRACEWELL:

6    Q.  After the first time you arrived at the defendant's

7    apartment, you said a moment ago that he posted for you.  Do

8    you recall that testimony?

9    A.  Yes.

10   Q.  Did you ever see any of the postings?

11   A.  Yes.

12   Q.  On what websites were they posted?

13   A.  On backpage.com.

14   Q.  And did you see the advertisements when they were on

15   backpage.com?

16   A.  Yes.

17   Q.  What contact information was included in the

18   advertisements?

19   A.  The name that was given to me at the time, a number, and a

20   photograph of myself.

21   Q.  Whose number was included?

22   A.  It was my number.

23   Q.  And who communicated with customers that responded to the

24   ads?

25   A.  I did.

1    Q.  Did it ever happen that you missed a call or a text from a

2    customer?

3    A.  Yeah.

4    Q.  What happened in that situation?

5    A.  The defendant would ask me why I was not answering my phone

6    if my ad was paid for it to be posted.

7    Q.  Did the defendant ever find out you missed a call or text?

8    A.  Yes.

9    Q.  And what did he do when he found out?

10   A.  He was upset.

11   Q.  When you say the defendant was upset, how did you know he

12   was upset?

13   A.  The way he acted, he would -- while asking me why aren't I

14   answering your phone and stuff.  He would raise his voice and

15   stuff like that, so I could tell he was upset.

16   Q.  What kinds of things did the defendant say when he was

17   upset?

18   A.  He used very vulgar language.

19   Q.  Can you describe examples of what kind of vulgar language

20   he used?

21   A.  Like bitch, ho, slut, things of that nature.

22   Q.  Did the defendant ever threaten you?

23   A.  Indirectly, yes.

24   Q.  What do you mean when you say indirectly?

25   A.  The defendant and I would get into an argument of a sort,

J79TKID3                          Brown - Direct

1    or fighting match.  The defendant would make direct threats,

2    such as like those are the things that get people beat up or

3    those are the things that get people shot or those are the

4    things that bitches die because of.

5    Q.  In those indirect threats, did the defendant ever reference

6    violence?

7    A.  Yes.

8    Q.  Did you ever see the defendant threaten any other person?

9    A.  No, not to my knowledge.

10   Q.  Returning briefly to advertisements, the postings you

11   described, what names did the defendant post you under?

12   A.  I was posted as Pearlene and I was posted as Egypt.

13   Q.  Any other names you recall?

14   A.  Nikki.  My posting was Nikki.

15   Q.  How did the defendant describe you in those advertisements?

16   A.  He would say things like Dominican, thick, juicy, young,

17   hot, stuff like that.

18   Q.  Who choose those names you described?

19   A.  I choose the first name.

20   Q.  Who choose the second two?

21   A.  The second two the defendant chose.

22   Q.  Did he tell you why he chose those names?

23   A.  No.

24   Q.  And what inputs did you have on those names?

25   A.  Like can you rephrase the question?

1  Q.  Sure.  Did he ask you if you could use those names?

2  A.  No.

3  Q.  What device did the defendant use to post those

4  advertisements?

5  A.  A desktop computer in the living room of the apartment.

6  Q.  Did any of the photographs -- did any of the postings have

7  photographs?

8  A.  Yes.

9  Q.  Can you describe the photographs?

10  A.  Sometimes they would be naked photographs, sometimes they

11  would be photographs with, you know, very little to no clothing

12  on at all.

13  Q.  Who took those photographs?

14  A.  The defendant.

15  Q.  And what instructions, if any, were you given about what to

16  wear in the photographs?

17  A.  Sometimes I was told to wear nothing because it would make

18  the client see a realistic outlook on my body and myself on

19  what they would be purchasing, and sometimes I would wear --

20  try to wear something, you know, like lingerie or something

21  like that to look appealing in the photos.

22  Q.  Did the defendant have any input on what you wore in those

23  instances?

24  A.  No.

25  Q.  Who told you what to wear on instances where he decided?

1    A.  Most of the time he would tell me to be naked for the same

2    reason that I gave you, so that the client could see everything

3    about my body.

4    Q.  And did he say anything about how to pose?

5    A.  Sometimes he would direct me on how to pose, sometimes I

6    would pose by myself.  He would say things like bend over, open

7    your legs, stand up straight, stuff like that.

8    Q.  And when he told you those things, how did you respond?

9    A.  I did them so he could take the photos.

10   Q.  We're going to go through a few series of photographs.

11              MS. BRACEWELL:  Your Honor, if I may approach.

12              THE COURT:  Yes.

13   Q.  Ms. Brown, in front of you are folders.  If you could look

14   at the top folder, which contains what had been marked for

15   identification as Government Exhibit 1212 through 1222.

16              In the first folder on top it contains what's been

17   marked for identification as Government Exhibit 1212 through

18   1222.  If you could take a look at those photographs and look

19   up when you had a chance to look at them.

20              Ms. Brown, do you recognize these photographs?

21   A.  Yes.

22   Q.  Who is depicted in these photographs?

23   A.  Me.

24   Q.  Who took these photographs?

25   A.  The defendant.

J79TKID3                          Brown – Direct

1   Q.  I'm sorry, who took them?

2   A.  The defendant.

3   Q.  Where did he take these photographs?

4   A.  In the living room of his apartment and also the bedroom of

5   his apartment.

6           MS. BRACEWELL:  Your Honor, the government offers

7   Exhibits 1212 through 1222.

8           MR. MARGULIS-OHNUMA:  Could I have a very brief voir

9   dire, your Honor?

10          THE COURT:  Yes.

11  BY MR. MARGULIS-OHNUMA:

12  Q.  Ms. Brown, did you see those photos posted after they were

13  taken.

14          THE WITNESS:  Yes.

15          MR. MARGULIS-OHNUMA:  No objection, your Honor.

16          THE COURT:  Admitted without objection.

17          (Government's Exhibits 1212 to 1222 received in

18  evidence)

19          MS. BRACEWELL:  If we could publish Government

20  Exhibit 1214.

21  Q.  Ms. Brown, who is depicted here?

22  A.  Me.

23  Q.  Who took this photo?

24  A.  The defendant.

25  Q.  Who, if anyone, told you to pose in that way?

1   A.  The defendant.

2   Q.  Where did he take this photo?

3   A.  In the living room of his apartment.

4   Q.  The name Nikki on the photograph, what significance does

5   that have?

6   A.  That was the name I was posted under.

7   Q.  What gave you that name, if anyone?

8   A.  The defendant.

9   Q.  What did you understand this photograph to be taken for?

10  A.  To seek clients, have sex with them.

11  Q.  Where did you understand the photo would be posted?

12  A.  On backpage.com.

13  Q.  And whose contact information is listed?

14  A.  Mine.

15  Q.  What instructions, if any, did the defendant give you about

16  how to respond to customers who talked to you on the phone?

17  A.  I was told that if I got a message from a customer that I

18  would automatically ask him if they are affiliated with law

19  enforcement.

20  Q.  And what were you supposed to do next?

21  A.  Then I would discuss the prices and the time that I was

22  given by the defendant.

23  Q.  When you say "given by the defendant," are you referring to

24  the times or the prices?

25  A.  The prices and the time.

J79TKID3                        Brown - Direct

```
 1   Q.  And what did he convey to you about the prices or the
 2   times?
 3   A.  He told me that a short stay was $50, a half an hour is
 4   $100, and an hour is 150.
 5   Q.  You mentioned a short stay.  What is a short stay?
 6   A.  Like 15 minutes, ten minutes.
 7   Q.  And how did he set those prices?  Did he tell you?
 8   A.  No, he just gave me the prices to give to the customers.
 9   Q.  Did you have any input on those prices?
10   A.  No.
11   Q.  If you could take a look at the next folder of exhibits
12   marked for identification as 1223 through 1225.  Do you
13   recognize these photographs?
14   A.  Yes.
15   Q.  Who is depicted in these photographs?
16   A.  Me.
17   Q.  Who took these photographs?
18   A.  The first photo I took, the second two were taken by
19   someone else.
20   Q.  And did you ever provide these photographs to the
21   defendant?
22   A.  Yes.
23   Q.  When you provided --
24            MS. BRACEWELL:  Your Honor, let me pause here and
25   offer Government Exhibits 1223 through 1225.
```

J79TKID3                        Brown - Direct

1           THE COURT:  Mr. Margulis-Ohnuma?

2           MR. MARGULIS-OHNUMA:  Just one moment, your Honor.

3           Voir dire again, your Honor?

4           THE COURT:  Yes.

5    BY MR. MARGULIS-OHNUMA:

6    Q.  Before Court today, Ms. Brown, did you ever see these

7    photos, 1223 to 1225?

8    A.  Yes.

9    Q.  Where was that?

10   A.  They were posted online.

11          MR. MARGULIS-OHNUMA:  No objection, your Honor.

12          THE COURT:  Admitted without objection.

13          (Government's Exhibits 1223 through 1225 received in

14   evidence)

15          MS. BRACEWELL:  May we publish Government

16   Exhibit 1223?

17          THE COURT:  Yes.

18   BY MS. BRACEWELL:

19   Q.  Is this the photograph that you said that you took?

20   A.  Yes.

21   Q.  And did you provide this photograph to the defendant?

22   A.  Yes.

23   Q.  When you provided the photograph to the defendant, what did

24   he say about what he would do with it, if anything?

25   A.  He said that he would use it to post for now, but later we

J79TKID3                          Brown - Direct

 1   would have to take better pictures.

 2   Q.  What is the name on the photograph?

 3   A.  Pearlene.

 4   Q.  Again, does this have any significance to you?

 5   A.  Yes, that was the name I was using.

 6   Q.  And you said you saw these images posted on advertisements

 7   by the defendant?

 8   A.  Yes.

 9   Q.  Where were they posted?

10   A.  Backpage.com.

11   Q.  If you could look at the third folder beside you containing

12   what's been marked for identification as 1204 through 1206.

13          Who is depicted in these photographs?

14   A.  Me.

15   Q.  Who took these photographs?

16   A.  The defendant.

17          MS. BRACEWELL:  Your Honor, the government would offer

18   1204 through 1206.

19          MR. MARGULIS-OHNUMA:  Voir dire, your Honor?

20          THE COURT:  Yes.

21   BY MR. MARGULIS-OHNUMA:

22   Q.  Again, have you seen those photographs after they were

23   taken but before court?

24   A.  Yes.

25   Q.  Where did you see them?

J79TKID3                           Brown - Direct

1    A.  I seen them on the camera phone of the defendant, but I

2    never seen them on the -- online.

3    Q.  When you saw them on the camera phone of the defendant, who

4    were you with?

5    A.  I was by myself.  I was with the defendant.

6    Q.  That was the same phone they were taken with?

7    A.  Yeah.

8            MR. MARGULIS-OHNUMA:  No objection, your Honor.

9            THE COURT:  Admitted without objection.

10            (Government's Exhibits1204 through 1206 received in

11    evidence)

12            MS. BRACEWELL:  Briefly, may we publish Government

13    Exhibit 1204?

14            THE COURT:  Yes.

15    BY MS. BRACEWELL:

16    Q.  Ms. Brown, if you could take a look at 1204.

17            You testified a moment ago that you were the

18    individual in this photograph.

19    A.  Yes.

20    Q.  How were you able to identify yourself in this photograph?

21    A.  I recognize the tattoo on my left arm.

22    Q.  Do you have that tattoo today?

23    A.  Yes.

24    Q.  Can you show your arm?  Can you raise your arm so that we

25    can see it?

J79TKID3                          Brown - Direct

1    A.  (Indicating)

2    Q.  Are there any other identifying marks that you see in the

3    photographs that you recognize?

4    A.  No.

5    Q.  Do you recognize any particular skin discolorations or

6    anything like that?

7    A.  Yes.

8    Q.  What do you identify?

9    A.  The little marks that are underneath my stomach area on the

10   first picture here, I still have those marks.

11   Q.  You said that the defendant took these photographs.

12   A.  Yes.

13   Q.  Where were these taken?

14   A.  In the bedroom of the defendant's apartment.

15   Q.  And when were they taken, roughly?

16   A.  Not sure exactly when, but a few months after I started

17   working for the defendant.

18   Q.  Did the defendant tell you where to pose?

19   A.  Just to lay down on the bed.

20   Q.  And did he tell you how to pose?

21   A.  Not really in particular.

22   Q.  Did he tell you what to wear in the photographs?

23   A.  Yes, he told me I should be naked.

24   Q.  On this particular visit, how long had you been at the

25   defendant's apartment when he asked you to pose for these?

J79TKID3                     Brown - Direct

1   A.   A couple of days, maybe five to seven, roughly a week.

2   Q.   And what did the defendant tell you these photos were for?

3   A.   The defendant told me these photos were for him and his

4   personal use.

5   Q.   What did you understand "his personal use" to mean?

6   A.   Just for him to look at, use for himself.

7   Q.   You said that a moment ago that you were otherwise living

8   in Manhattan when you were in the defendant's apartment.  Do

9   you recall that testimony?

10  A.   Yes.

11  Q.   On this particular occasion where had you come from?

12  A.   I come from the group home in Manhattan, New York.

13  Q.   And prior to going to the defendant's apartment, did you

14  communicate with him from the group home?

15  A.   Yes.

16  Q.   And for what purpose did you do that?

17  A.   If I was planning on coming to the defendant's apartment

18  and I was at my group home, I would have to text him first to

19  see if there was space for me there to work.

20  Q.   And would he respond prior to you leaving?

21  A.   Yes, he would say no, there was no space and I couldn't go,

22  or he would say yeah, you can come, there's space for you to

23  work.

24  Q.   If we could look briefly at 1205 and 1206 if we could

25  publish them together briefly.

J79TKID3                          Brown - Direct

1           Ms. Brown, is this you in the photograph?

2    A.   Yes.

3    Q.   And how are you able to identify yourself?

4    A.   There is discoloration on my thighs.

5    Q.   When were these taken relative to the first photos?

6    A.   The same time.

7    Q.   Did the defendant instruct you how to pose for these

8    photographs?

9    A.   Yeah.

10   Q.   What did he say?

11   A.   For the first one here he asked if I could open my legs,

12   and for the second one he told me to bend over.

13   Q.   We're going to briefly show you a video that has been

14   marked as 1207.

15           Ms. Brown, do you recognize the video?

16   A.   Yes.

17   Q.   Who is depicted in the video?

18   A.   Me.

19   Q.   Who filmed this video?

20   A.   The defendant.

21           MS. BRACEWELL:  Your Honor, the government offers

22   1207.

23           MR. MARGULIS-OHNUMA:  Voir dire, your Honor?

24           THE COURT:  Yes.

25   BY MR. MARGULIS-OHNUMA:

J79TKID3                          Brown - Direct

1    Q.   Prior to today, had you seen that video?

2    A.   Yes.

3    Q.   Where did you see it played?

4    A.   On the phone, the same phone that I told you from before

5    with the pictures.

6    Q.   When was that?

7    A.   You said when was that?

8    Q.   Yeah.

9    A.   That was the same day that I took the picture that was just

10   shown previously.

11              MR. MARGULIS-OHNUMA:  No objection, your Honor.

12              THE COURT:  Admitted without objection.

13              (Government's Exhibit 1207 received in evidence)

14              MS. BRACEWELL:  If we could play to the jury just the

15   first two seconds of the video.

16              (Video recording played)

17              MS. BRACEWELL:  Stop, please.

18   Q.   Ms. Brown, who recorded this video?

19   A.   The defendant.

20   Q.   What instructions did the defendant give you when he filmed

21   the video?

22   A.   He told me to play with myself.

23   Q.   Where was it recorded?

24   A.   On the bed in the bedroom of the defendant's apartment.

25   Q.   Relative to the photos you have just described for us, 1204

1    to 1206, when was this video recorded?

2    A.  At the same time.

3    Q.  And what did he tell you about what this video was for?

4    A.  He told me it was just for him.

5         MS. BRACEWELL:  We can take the video down.

6    Q.  Ms. Brown, remind us the month and year of your birth.

7    A.  March 1999.

8    Q.  How old were you in February of 2017?

9    A.  I was 16 years old.

10        17.  Sorry, 17 years old.

11   Q.  Turning to the content of the advertisements we have been

12   going through, who was responsible for creating the content of

13   the ads?

14        MR. MARGULIS-OHNUMA:  Objection.

15        THE COURT:  Rephrase the question.

16   Q.  Who created the content of the ads?

17   A.  As in the pictures?

18   Q.  Who created the text of the ad?

19   A.  The defendant created the text of the ad.

20   Q.  And what particular sexual acts, if any, were advertised?

21   A.  Sometimes it would just be to come over for in calls, and

22   then there was one instance where a client had told me I was

23   posted for --

24        MR. MARGULIS-OHNUMA:  Objection.

25        THE COURT:  Sustained.

J79TKID3                          Brown - Direct

1    Q.  Did the defendant discuss with you what types of sex acts

2    would be advertised?

3    A.  I was told I would be posted just so I could get clients in

4    the door.

5    Q.  And were any particular sexual acts discussed with you?

6                MR. MARGULIS-OHNUMA:  Objection, asked and answered.

7                THE COURT:  Overruled.

8    Q.  Were any particular sexual acts discussed with you?

9    A.  There would just be -- like I said, there would just be ads

10   for the clients through the door.  Sometimes he would ask if I

11   offered BBJ for extra money, but I told him no.

12   Q.  What is a BBJ?

13   A.  A bare blowjob.

14   Q.  And what does "bare" mean in that context?

15   A.  Bare means without protection or condom.

16   Q.  Had you discussed providing -- or strike that.

17               Can you describe that conversation with the defendant.

18   A.  The defendant was sitting at the computer typing, he just

19   simply looked back and asked me:  Do you offer BBJ?  And I

20   said:  Ew, no, never.

21   Q.  How was the money from the customers supposed to be split?

22   A.  Down the middle, 50/50.

23   Q.  After you gave the defendant the money from a customer,

24   what portion did you receive?

25   A.  Half of the money.  Or whatever the money was, I would

1    receive half of that total.

2    Q.  How did you know it was half?

3    A.  I would discuss with the client before they got there the

4    prices and the times, and when they got there and gave me the

5    money I would give it to the defendant.

6    Q.  So did you give half the money to the defendant or all of

7    the money to the defendant?

8    A.  No, I would have to give all the money to defendant, and

9    then after my date he would give it back to me like the

10   50 percent.

11   Q.  And what happened -- how did you get your portion?  Did you

12   ask for it or did he provide it automatically?

13   A.  Sometimes I asked for it, sometimes he provided it

14   automatically.

15   Q.  What happened on the instances when you asked for the

16   money?

17   A.  He would be like oh, I forgot, then he would give it to me.

18   Q.  Did you have any way of verifying that you got half the

19   money?

20   A.  Well, when I like collected the money from the client I

21   would already know how much it was, so I would like do my own

22   math before I gave it to the defendant.  And then once I got

23   the money back, I would count it and make sure that it was like

24   the same as my end.

25   Q.  And was it always the same?

J79TKID3                        Brown - Direct

1   A.  Sometimes, sometimes not.

2   Q.  Did you ever ask the defendant when it was not the same?

3   A.  Yes.

4   Q.  And what did he say?

5   A.  That that was the 50 percent.

6   Q.  Did those conversations ever end up in fights?

7   A.  Yes, we would scream at each other and, you know, mostly

8   raise our voice at each other, get in each other's faces.

9   Q.  After those fights, did he ever give you more money?

10  A.  No.

11  Q.  Did the defendant ever provide you with drugs?

12  A.  Yes.

13  Q.  What drugs?

14  A.  I bought marijuana off the defendant and I also bought

15  cocaine off the defendant.

16  Q.  You said you bought those drugs from the defendant?

17  A.  Yes.

18  Q.  How did you know he sold those drugs?

19  A.  When me and the other young lady I was with first got to

20  the house, he let us know that he has those two things

21  available if we needed it while we're working.

22  Q.  And how did you respond?

23  A.  I just said okay, no problem, I'll let you know, and

24  eventually I bought some from the defendant.

25  Q.  Did he explain why you would need it while you were

J79TKID3                          Brown - Direct

1    working?

2                 MR. MARGULIS-OHNUMA:  Objection, leading.

3                 THE COURT:  Sustained.

4    Q.  What explanation -- or what did you understand him to mean

5    when he first told you he had drugs?

6    A.  Well, I was under the impression that he was selling it

7    because that's what I was told.

8    Q.  And for what purpose was he selling it to you or offering

9    it to you and the other young lady?

10                MR. MARGULIS-OHNUMA:  Objection.

11                THE COURT:  Overruled.

12   Q.  You may answer.

13   A.  Like could you say the question again.

14   Q.  For what purpose was he offering --

15                MS. BRACEWELL:  Do you mind repeating the question?

16                THE COURT:  Reporter, read back the question.

17                (Record read)

18   A.  The cocaine was -- we were told it's a party drug and it

19   would help us stay up and, you know, be able to interact with

20   other clients who also used that drug.  And the weed was just

21   like, you know, if you wanted to mellow out, chill out, smoke

22   weed.

23   Q.  Why did you need to stay up?

24   A.  So that I could take more clients and he could make more

25   money.

J79TKID3                        Brown - Direct

1    Q.   And who told you that?

2    A.   The defendant.

3    Q.   Can you describe that conversation?

4    A.   He told me that, you know, party dates -- there is

5    something called party dates, they do coke, they do X, they --

6    you know, they like to spend a lot of money.  So he told me

7    that if we do it with the client, they will, you know, always

8    start spending more money on us, start spending more money

9    because we would be partying with the client.

10   Q.   When did the defendant first tell you that he had marijuana

11   and cocaine available?

12   A.   The first night that I went to the defendant.

13   Q.   How often did you use drugs after you met the defendant?

14   A.   Almost every day.

15   Q.   When did you use cocaine for the first time?

16   A.   Roughly a year after I begun working for the defendant.

17   Q.   Why did you start using it?

18   A.   Well, I heard from the defendant that it was good for the

19   party dates, but also another girl told me that that

20   information was accurate, that she's able to stay up all night

21   and make a lot of money, so I just gave it a try.

22   Q.   Why were you trying to stay up all night?

23   A.   So I could make more money.

24   Q.   And what, if anything, had you discussed with the defendant

25   about staying up all night?

1   A.  It was never really a discussion unless I fell asleep, and

2   when I fell asleep, I already told you he would ask me why am I

3   falling asleep if there's a post up.

4   Q.  Ms. Brown, while you stayed at the defendant's house, did

5   you have sex with the defendant?

6   A.  Yes.

7   Q.  Did you want to have sex with the defendant?

8   A.  No.

9   Q.  Why did you have sex with him?

10  A.  The first time I had sex with the defendant he offered me

11  money, so that's why I did it.

12  Q.  On later occasions?

13  A.  Sometimes the defendant wouldn't even ask, sometimes I

14  would just wake up and he would be behind me trying to

15  penetrate me.

16  Q.  How often did that happen?

17  A.  Frequently.

18  Q.  When you say "frequently," do you mean every time you were

19  there?

20  A.  Almost every time I was there, not every time though.

21  Q.  Would he use a condom?

22  A.  No.

23  Q.  How often did he initiate sex when you were sleeping?

24  A.  Maybe three or four times every time I came over.

25  Q.  What would he say if you didn't want to have sex?

1    A.  If I woke up and was like no, I don't think, I have to work

2    and stuff, the defendant would like, you know, plead and beg,

3    sometimes offer money.

4    Q.  Could you stay in the defendant's apartment if you weren't

5    having sex with him?

6    A.  No.

7    Q.  How did the defendant tell you that?

8    A.  Well, he kind of made a joke about it, but I knew he was

9    serious.  We were sitting in the room one day, in his bedroom,

10   and he was like if you don't want to give it up, you got to go,

11   like laughing about it.

12   Q.  Could you repeat that?

13   A.  We were sitting in the room, in the defendant's bedroom,

14   and he kind of made like a joke about it, oh, you're not trying

15   to give it up, you can go, like laughing and making a joke.

16   Q.  You said you understood him to be serious?

17   A.  Yeah, for the most part.

18   Q.  What made you think he was serious?

19   A.  Because there had been instances where I didn't want to

20   have sex with the defendant and the defendant would ask me:  Do

21   you want to stay here in my apartment?

22   Q.  How often had that happened?

23   A.  A couple of times, maybe like three times.

24   Q.  After he said that, how did you respond?

25   A.  I would say yeah, I do want to stay.

J79TKID3                         Brown - Direct

1    Q.  Could you stay in the defendant's apartment if you weren't

2    having sex with customers?

3    A.  No.

4    Q.  How did he communicate that?

5    A.  Well, there were times that I would like fall asleep, the

6    defendant would ask me, you know:  You're posted up, why are

7    you falling asleep?  If you don't want to work, there's no

8    point in being here.

9    Q.  What did you think would happen if -- strike that.

10             What did you understand that to mean?

11   A.  That if I was not working to get clients or having sex with

12   the defendant, I would not be able to stay at the house.

13   Q.  Did you meet customers on those occasions when you were

14   tired or sleeping?

15   A.  Not sleeping, but when I was tired, yes.

16   Q.  When you had been woken up, would you meet customers after

17   that?

18   A.  Yes.

19   Q.  You testified earlier you were scared, for example, after

20   the choking incident.  Why did you return to defendant's

21   apartment after that?

22   A.  At the time I did not like the situation that I was in, my

23   living situation, I did not feel safe at my group home, and I

24   just wanted to be somewhere else.  And I couldn't go home to my

25   mom, and the defendant's house was another place that I could

1   go to.

2   Q.  Did you ever see a firearm at the defendant's residence?

3   A.  Yes.

4   Q.  Where did you see it?

5   A.  Under the bed in his bedroom.

6   Q.  And what circumstances were you looking under the bed?

7   A.  I was looking for a jar full of condoms while the defendant

8   was out at the store.

9   Q.  Ms. Brown, can you pull the microphone ever so slightly

10  down.

11  A.  Better?

12  Q.  And you said you were looking for a jar of condoms?

13  A.  Yes.

14  Q.  Was that always located there or was it placed there for a

15  particular reason?

16  A.  The jar?

17  Q.  Yes.

18  A.  Yes, it was always located in his bedroom.

19  Q.  How did you feel knowing that the defendant had a gun?

20  A.  I felt a little unsafe because I never actually been around

21  a real gun at the time.

22  Q.  Did you remember seeing any other weapons in the

23  defendant's home?

24  A.  There was a bat.

25  Q.  What kind of bat?

1    A.   Like metal bat.

2    Q.   And where did you see the bat?

3    A.   In the defendant's room.

4    Q.   Did the defendant ever mention the bat?

5    A.   No, but I heard about the bat from the other girls that

6    were working there.

7              MR. MARGULIS-OHNUMA:  Objection.

8              THE COURT:  Sustained.

9              MR. MARGULIS-OHNUMA:  Move to strike.

10             MS. BRACEWELL:  Your Honor, could we -- we wouldn't be

11   offering it for the truth, we would be offering it for the

12   effect on the listener.

13             THE COURT:  What is the "it"?

14             MR. MARGULIS-OHNUMA:  Let's do that at sidebar, your

15   Honor.

16             THE COURT:  Yes.

17             (Continued on next page)

18

19

20

21

22

23

24

25

J79TKID3                           Brown - Direct

1                (At sidebar)

2                MS. BRACEWELL:  Your Honor, I expect the witness is

3     going to testify that she heard about threats that the

4     defendant made to use the bat with other women in the home.  So

5     we would proffer that that is relevant to force, fraud and

6     coercion she experienced, that it would be a threat of force or

7     that it would make her fearful of the defendant.

8                MR. MARGULIS-OHNUMA:  I think that's right, with a

9     limiting instruction that they can't use it for its truth and

10    solely to show the state of mind of the listener.

11               MS. BRACEWELL:  To the extent when he clarifies that

12    when she herself heard the threats, obviously it wouldn't be

13    hearsay, it would be the defendant's statement.  So I think she

14    might have been mixed up.

15               THE COURT:  Let's see if you could elicit anything on

16    direct that she may have heard, then we'll get into the other.

17               (Continued on next page)

18

19

20

21

22

23

24

25

J79TKID3                          Brown - Direct

1                (In open court)

2      BY MS. BRACEWELL:

3      Q.  Ms. Brown, you were just describing the bat.  In what

4      context had you heard mention of the bat?

5                MR. MARGULIS-OHNUMA:  Objection.

6      Q.  What had you heard about the bat?

7                MR. MARGULIS-OHNUMA:  Objection.

8                THE COURT:  Sustained.

9                MS. BRACEWELL:  If I could have one moment, your

10     Honor.

11               THE COURT:  Yes.

12               (Pause)

13     Q.  Did you ever hear the defendant mention the bat?

14     A.  No.

15     Q.  Did you ever hear any girls mention the bat?

16               MR. MARGULIS-OHNUMA:  Objection.

17               MS. BRACEWELL:  This is not offered for the truth,

18     offered for the effect, as discussed.

19               THE COURT:  Overruled.

20     Q.  Did you ever hear other girls mention the bat?

21     A.  Yes.

22     Q.  What did they say?

23     A.  They said that the defendant almost used the bat on one of

24     the clients because one of the clients poked a hole in the

25     condom that was used on the girl.

J79TKID3                          Brown - Direct

1           THE COURT:  Let me caution the jury that the Court

2   allowed this statement to be made not for the truth of the

3   statement but for its effect on the witness.

4   Q.  So you just mentioned another female.  Was that a female

5   that you met in the defendant's apartment?

6   A.  Yes.

7   Q.  Did you ever meet any other females working for the

8   defendant?

9   A.  Yes.

10  Q.  Approximately how many women did you meet at the

11  defendant's apartment during your visits?

12  A.  There's like too many to count, too much to count, like 30,

13  40.

14  Q.  And what were those women doing for the defendant?

15  A.  They were also there working.

16  Q.  And working -- when you say "working," what do you mean?

17  A.  Having sex for money.

18  Q.  Did you ever see or hear the defendant get angry with any

19  of those women?

20  A.  Not to my knowledge.

21  Q.  Did you ever hear any loud noises or anything from the

22  defendant's bedroom?

23  A.  Yes.

24  Q.  Can you describe what you heard?

25  A.  Sometimes he would have sex with the other girls or

J79TKID3                         Brown - Direct

1    sometimes they just being in there talking or whatever they

2    were doing.

3    Q.  And when you say you heard talking, did it ever sound

4    heated or was it normal tones?

5    A.  Sometimes not enough to start a fight like really loud, but

6    you could tell there was tension between the two people having

7    conversation in the room.

8    Q.  Did there come a time when you stopped working for the

9    defendant?

10   A.  Yes.

11   Q.  What happened?

12   A.  Me and the defendant got into an argument in the car, the

13   defendant's car.  I had to get out of the car to cross the

14   street, and the defendant jerked the car forward as if he was

15   going to hit me with the car.

16   Q.  And what happened immediately after that incident?  Where

17   did you go?

18   A.  I was yelling at him and then I ended up going to the

19   store, going back to the house, and a little time after that I

20   just packed my stuff and was like I'll be back, and I just

21   left.

22           MS. BRACEWELL:  Your Honor, if I may have one moment.

23           (Pause)

24           MS. BRACEWELL:  Nothing further, your Honor.

25           MR. MARGULIS-OHNUMA:  Could we have a brief sidebar?

J79TKID3                          Brown – Direct

1              THE COURT:  Yes.  The witness asked for a minute to

2    use the restroom.  We'll take a five-minute recess.  If any

3    juror wishes to use the restroom, they could also do so at this

4    point.

5              (Continued on next page)

J79TKID3                         Brown - Direct

1          (At sidebar)

2          MR. MARGULIS-OHNUMA:  Two things.  First of all, I

3      wanted to point out for the record I didn't reiterate my

4      objection to the mention of the drug sales and drug use.  I do

5      have an ongoing objection, but I understood that you ruled on

6      it.  I didn't want to interrupt the flow.  So the record is

7      clear on that.

8          THE COURT:  I made that ruling already on the motions

9      in limine.

10         MR. MARGULIS-OHNUMA:  I do a fair amount of appellate

11     work, so I'm very conscious of the record.

12          Second thing is I want to make sure I understand the

13     government's position and the Court's position on another

14     topic, which is that, if permitted to do so, I would examine

15     this witness with respect to other prostitution that she

16     engaged in immediately before that led her to this defendant

17     and during the three-year period that she described

18     intermittently.  I think that goes to whether the force caused

19     her to engage in the prostitution or not, the allegations of

20     force.  I'm not going to ask about obviously any specific sex

21     acts or talk about sex at all, but I'm going to talk about

22     whether she was working for other people during this time

23     period, and I wanted to make sure I don't draw objections on

24     that.

25         MS. BRACEWELL:  Your Honor, we think that's precluded

1    by Rule 412.  I mean very narrowly she described how she met

2    him in the context of a posted advertisement.  I concede that

3    that particular meeting is fair game, but to the extent that he

4    is arguing that her engaging in prostitution for other

5    individuals at all bears on the force, the use of force by this

6    defendant.  I argue the case law is very clear that Rule 412

7    preclude description of other prostitution activity as at all

8    relevant to that inquiry.

9             MR. MARGULIS-OHNUMA:  It would show that she was free

10   to come and go and engaged in prostitution of her own free

11   will.  It goes to the coercion.

12            MS. BRACEWELL:  I think twofold, with respect to the

13   force, the use of force to cause this defendant -- this victim

14   to engage in prostitution for this defendant is totally

15   separate and apart to what she was doing in other periods of

16   time.  There's no sort of consent defense to force.

17            With respect to coercion, it's equally irrelevant.

18   The argument would have to be that she somehow consented to the

19   coercion and that that is at all sort of relevant inquiries.

20   It should be clear that her ability to leave the apartment is

21   not at all precluded by Rule 412, but other prostitution

22   activity she was engaging in during that time period

23   transgresses the line.

24            THE COURT:  To the extent, Mr. Margulis-Ohnuma, you

25   are seeking to bring in evidence of other acts for the purposes

1   of the coercion by this defendant against this victim, I think

2   that would not be permissible by the rules.

3         MR. MARGULIS-OHNUMA:  So I can't ask anything about

4   any other prostitution activity during the three years that she

5   worked for them?

6         THE COURT:  I think you can ask whether she did engage

7   in other acts with other individuals, not this defendant, but

8   that's it.

9         MR. MARGULIS-OHNUMA:  Okay.

10        MS. BRACEWELL:  Your Honor, we would --

11        MR. MARGULIS-OHNUMA:  That's all I wanted to ask.

12        MS. BRACEWELL:  I think that's precisely what we're

13  objecting to.  The reference to other prosecution activity is

14  incredibly prejudicial to the jury, but in addition it's

15  irrelevant to inquiry as to how this defendant interacted with

16  this victim.

17        THE COURT:  But I'm agreeing with you on that to the

18  extent that it does not bear on the question of whether this

19  defendant used force against this witness.

20        MS. BRACEWELL:  Right.  So to the extent this defense

21  cross-examination intends to go into periods of time when she

22  was not at the defendant's home and was engaging in commercial

23  sex acts while working for other individuals is just irrelevant

24  to this particular inquiry.

25        MR. MARGULIS-OHNUMA:  But that's what I want to ask

1    about.

2              MS. BRACEWELL:  It's essentially propensity evidence,

3    which is prohibited anyway, but particularly prohibited by Rule

4    412.

5              MR. MARGULIS-OHNUMA:  It's not propensity.  They put

6    in lots of evidence, none of which I objected to, about her

7    state of mind, her fear, the things he did to cause her fear

8    and to coerce her.  And to meet that evidence I need to bring

9    in other evidence about her activities during this time period

10   that she was working for him.

11             And in case it's not clear, according to the 3500, she

12   came to work for him after working for someone else, according

13   to the 3500.  I'm not sure I accept it as true.  And then she

14   would work for him on and off and she would work for at least

15   one or two or three other pimps on and off during the same time

16   period.  For her to say that she lived in fear of him when

17   actually she was seeking refuge, there is evidence that I need

18   to meet by talking about her other activities with the other

19   pimps.

20             THE COURT:  I'm not going to allow anything that would

21   suggest to the jury that this defendant was violent to her and

22   so there were other people who also were violent to her.  I

23   don't see that there's any relevance.

24             MS. MEDLEY:  We're talking about the innately coercive

25   nature of the relationship.

1          THE COURT:  This relationship, and this relationship

2    is determined by what she said she did or did not do with this

3    defendant.

4          MS. BRACEWELL:  And specifically I would note that

5    Rule 412 sets out a notice of provision that if they're trying

6    to use it for this delineated purpose they should have provided

7    notice two weeks ago.  And this was all briefed in our motions

8    in limine, so we submit that this has not been set forth and

9    briefed.  But in any event, it's clearly prohibited by Rule

10   412.

11         MR. MARGULIS-OHNUMA:  I think they had adequate

12   notice.  I don't think I screwed up by not giving you notice, I

13   think I had no idea what she was going to testify to until 3500

14   came in during the holiday week.  There's no way I could have

15   given notice 14 days in advance.  I reject that argument?

16         MS. BRACEWELL:  In any event, your Honor, I think it's

17   very clear that the inquiry for the jury is whether this

18   defendant used coercion and whether this defendant used force.

19   And the idea that her activity with other individuals who are

20   forcing her to engage in prostitution during the same period at

21   all bears on that inquiry is prejudicial, it's character

22   evidence, and it's precluded by Rule 412.  Her ability to leave

23   the residence freely was elicited on direct and is fair game,

24   but that's very different from going into the details of this

25   other sexual activity.

J79TKID3                         Brown - Direct

1             THE COURT:  All right.  Again, I will permit you,

2      Mr. Margulis-Ohnuma, to ask her whether she engaged in other

3      activities not related to this defendant, but that's the entire

4      scope of it.

5             MR. MARGULIS-OHNUMA:  When you say "other activities,"

6      you mean other prostitution?

7             THE COURT:  Prostitution with other men not provided

8      by this defendant, period.

9             MS. BRACEWELL:  Other customers.

10            THE COURT:  Right, other customers unrelated to this

11     defendant.

12            MR. MARGULIS-OHNUMA:  Right.  So you are allowing

13     that.

14            THE COURT:  That's the scope of what I will allow.

15            MS. BRACEWELL:  For clarification, he is saying only

16     customers provided by this defendant can be inquired about, not

17     other customers she may have had.

18            MR. MARGULIS-OHNUMA:  That's not what I just heard.

19            THE COURT:  I am saying I will allow him to ask

20     whether she had other customers not provided by this defendant,

21     full scope.

22            MS. BRACEWELL:  That particular question.

23            THE COURT:  Yes.

24            MS. BRACEWELL:  Okay.

25            MR. MARGULIS-OHNUMA:  And then so it's one question.

J79TKID3                         Brown - Direct

1              THE COURT:  One question.

2              MR. MARGULIS-OHNUMA:  And I want to be clear, any

3     other questions about other people she worked for, other

4     activities in that three-year period --

5              THE COURT:  Are not permissible.

6              MR. MARGULIS-OHNUMA:  -- are not permissible?

7              THE COURT:  No.

8              MR. MARGULIS-OHNUMA:  Understood.  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J793KID4                         Brown - Cross

1              (In open court)

2              MR. MARGULIS-OHNUMA:  May I inquire, your Honor?

3              THE COURT:  You may.

4    CROSS-EXAMINATION

5    BY MR. MARGULIS-OHNUMA:

6    Q.  Good afternoon, Ms. Brown.  How are you?

7    A.  I'm okay.  How are you?

8    Q.  Good.  I'm Zach Margulis-Ohnuma.  I represent Mr. Kidd.

9    I'm going to be asking you some questions today.  I would ask

10   if you don't understand any of my questions, can you promise me

11   that you won't answer it, you'll just ask me to clarify it?

12   A.  No problem.

13   Q.  I want to acknowledge upfront, this stuff is very difficult

14   to talk about.  If you need a break at any reason for any time,

15   just let us know and we'll have that, okay?

16   A.  Okay.

17   Q.  Thank you.  Have you and I ever met before?

18   A.  You and I?  No.

19   Q.  You told us you were -- where did you tell us you were

20   born?

21   A.  Virginia Beach.

22   Q.  How long did you live there?

23   A.  Not long enough.  I don't really remember living there,

24   first of all.

25   Q.  Where -- did there come a time when you moved from Virginia

J793KID4                          Brown - Cross

1    Beach to New York?

2    A.  Yes.

3    Q.  Approximately how old were you at that time?

4    A.  Like four or five.

5    Q.  There came a time when you moved into the group home that

6    you described?

7    A.  Yes.

8    Q.  When was that?

9    A.  About when I turned 14, 13.

10   Q.  Before that, had you been living with your mother?

11   A.  Yes.

12   Q.  You've used a number -- withdrawn.

13            MR. MARGULIS-OHNUMA:  One moment.  We're just pulling

14   out the birth certificate exhibit I'm going to ask you about.

15            THE COURT:  The birth certificate was admitted in

16   evidence.

17            MR. MARGULIS-OHNUMA:  Yes.

18            THE COURT:  Why don't we just publish it.

19            MR. MARGULIS-OHNUMA:  If Ms. Harney could do that,

20   that would be great.

21   Q.  Thank you.  So, you told us this was your birth

22   certificate; is that right?

23   A.  Yes.

24   Q.  When -- when was the last time before court that you saw

25   this birth certificate?

J793KID4                         Brown - Cross

1   A.  Before court?

2   Q.  Right.

3   A.  Like, January some time.

4   Q.  In what context was that?

5   A.  I had to go to DMV to get a new ID, so I had to bring this

6   along with my Social Security card.

7   Q.  Where did you -- withdrawn.

8           Look at the bottom of the exhibit where it says date

9   issued.  Do you see that date?

10  A.  Uh-huh.

11  Q.  Can you read it to us?

12  A.  June 27, 2018.

13  Q.  So, was the birth certificate that you brought with you to

14  the DMV, was that the same one, was that the same as this one?

15          MS. BRACEWELL:  Your Honor, objection.  The

16  defendant -- the defense counsel is referring to this specific

17  birth certificate.  I think it's misleading since she referred

18  to a birth certificate generally.

19          MR. MARGULIS-OHNUMA:  Your Honor, I'll clarify.

20          THE COURT:  Clarify.

21  Q.  So, my question was, if this particular -- this is

22  Government Exhibit 701 you have in front of you, right?

23  A.  Yes.

24  Q.  Was it this specific document that you took to the DMV or

25  was there a different birth certificate you took to DMV?

1    A.  It's a different piece of paper, but it is the same birth

2    certificate.

3    Q.  It had the same content, right?

4    A.  Except for the date at the bottom.

5    Q.  Where did you get that birth certificate from?

6    A.  I had to order it online, and it was sent to me through the

7    mail.

8    Q.  You've used several different names in your life, right?

9    A.  Yeah.

10   Q.  Tell us what names have you used.

11   A.  My name, Pearlene for working, I've used Nikki for working,

12   I've used Egypt for working.  Other than that, I don't have any

13   other names.

14   Q.  When you met Mr. Kidd, you introduced yourself as Pearlene;

15   is that right?

16   A.  Yes.

17   Q.  Actually when you met Mr. Kidd, you initially told him you

18   were 18 years old, right?

19   A.  No.

20   Q.  So, in this -- in this case, you've met with the government

21   a few times; is that right?

22   A.  Yes.

23   Q.  And you've gone over the story with them.  Withdrawn.

24           How many times have you met with them?

25   A.  Roughly three or four times.

J793KID4                          Brown - Cross

1    Q.  And that started back -- when did that start?

2    A.  I don't have an exact date for you.

3    Q.  Well, back last November.  Is that right?

4    A.  Yes, sounds about right.

5    Q.  And you actually had a good relationship with someone

6    working with them named Rosemary Muckenthaler, right?

7    A.  Yes, that's a detective, right?

8    Q.  Right.  So, what was Detective Muckenthaler's role in the

9    investigation?

10   A.  She told me that she was a detective that was assigned to

11   pick me up or drop me off.

12          MS. BRACEWELL:  Objection, hearsay.

13          THE COURT:  Sustained.

14          MR. MARGULIS-OHNUMA:  I'm sorry.  What was the

15   objection?

16          MS. BRACEWELL:  Hearsay.

17   Q.  Well, was she the detective that was assigned to pick you

18   up and drop you off?

19   A.  Yes.

20   Q.  So you observed that with your own eyes, right?

21   A.  Yes.

22   Q.  And she would drive you to go meet with the government on

23   occasion, right?

24   A.  Yes.

25   Q.  Go meet with the FBI on occasion, right?

J793KID4                      Brown - Cross

1  A.  Yes.

2  Q.  And you had some meetings, more meetings in the month or

3  two before the trial?

4  A.  Yes.

5  Q.  On June 11 of 2019, you had a meeting with Ms. Tarlow,

6  Ms. Bracewell, Detective Muckenthaler, and another FBI agent.

7  Do you remember that?

8  A.  Yes.

9  Q.  In that meeting, they asked you lots of questions about

10  your relationship with Mr. Kidd, right?

11  A.  Yes.

12  Q.  And sorry, I offered the wrong date.  I'm actually talking

13  about a meeting on June 6 of 2019.  But around that time,

14  right?

15  A.  Hmm-hmm.

16  Q.  In that meeting, isn't it a fact that you told them that

17  you originally told -- withdrawn.

18          Mr. Kidd you knew as Red, right?

19  A.  Yes.

20  Q.  Isn't it a fact that in that meeting you told the

21  government that you originally told Red that you were 18 years

22  old?

23  A.  No.

24  Q.  You never told them that in a meeting?

25  A.  No.

J793KID4                          Brown - Cross

1   Q.  Okay.  You always told them that the first time you talked
2   about age was when you were -- when you told him months later
3   you were 16.  Is that what you told the government?
4           MS. BRACEWELL:  Objection.  Hearsay.
5           THE COURT:  Sustained.
6           MR. MARGULIS-OHNUMA:  I'm sorry.  Let me see if I can
7   rephrase and understand that.
8   Q.  I'm trying to get out what you told the government before
9   and make sure we're totally clear on it.
10          MS. BRACEWELL:  Objection.
11          MR. MARGULIS-OHNUMA:  That's a prior inconsistent
12  statement, your Honor.
13          THE COURT:  Sustained.
14          MR. MARGULIS-OHNUMA:  I'm sorry.  So I'm offering
15  evidence of a prior inconsistent statement.  Can we have a
16  sidebar?
17          THE COURT:  No.  Let's proceed.
18  Q.  So, tell us again.  When you first met Mr. Kidd, you said
19  you were, you were posting -- withdrawn.
20          I think you said you were posting an ad.  Is that
21  right?
22  A.  I was posted as an ad, yes.  I didn't post that ad myself.
23  Q.  What do you mean you were posted?
24  A.  Someone else posted that ad for me.
25  Q.  For prostitution; is that right?

J793KID4                          Brown - Cross

1   A.  Yes.

2   Q.  Who was that other person?

3          MS. BRACEWELL:  Objection.

4          THE COURT:  Overruled.

5   A.  The other person was another person that I knew that was

6   also working.  A woman, a girl.

7   Q.  Someone else you were working with?

8   A.  I wasn't necessarily working with her.  But, she knew what

9   I did and she also did, so she offered to post me if I paid

10  her.

11  Q.  And what space were you using for that work?

12  A.  What space?

13  Q.  Yeah.  Where were you working out of for that posting?

14  A.  Oh, I would be doing out calls.  I would be going to the

15  client.

16  Q.  Then you said that Mr. Kidd reached out to you at the

17  number posted in that ad.  Is that right?

18  A.  Yes.

19  Q.  What did he say when he reached out to you?

20  A.  It was like a mass text, kind of, like a paragraph.  And it

21  said basically there is a room in Flatbush and Nostrand close

22  by train, close by food.  He had a room available to work from.

23  And everything was 50-50 split.

24  Q.  Didn't it say you had to be over 18?

25  A.  Yeah.

J793KID4                         Brown - Cross

1   Q.  It did?  It said that right in that original text?

2   A.  Yes, it said 18 plus.  So I am assuming, yes.

3   Q.  In your ad that you posted before it said 18 plus, too,

4   right?

5           I'm sorry.  It said whatever age you gave, the person

6   put in the ad before, it said -- withdrawn.

7           Did the ad that had been posted for you before say

8   your age?

9   A.  No.

10  Q.  It didn't say anything either way about the age?

11  A.  No.

12  Q.  By the way, do you have that ad?  Is it on your phone or

13  anywhere else?

14  A.  No, I don't.

15  Q.  Has it been deleted, as far as you know?

16  A.  As far as I know, Backpage.com was taken down.  So, that,

17  whatever posting was there I assume got taken down as well.

18  Q.  So it was on Backpage.com?

19  A.  Yes.

20  Q.  So you told us that after receiving this text from

21  Mr. Kidd, you went to go -- you took the train and he met you

22  at the train; is that right?

23  A.  Yeah, after receiving the text, we spoke about where I

24  would be coming from, in terms of the borough.  And then I told

25  him I was near the 2 train.  And he told me that he was also

J793KID4                          Brown - Cross

1    near the 2 train, that he could meet me at the last stop.

2    Q.  Okay.  And that was, sorry, what subway stop was that?

3    A.  Flatbush Avenue.

4    Q.  On the 2 line, right?

5    A.  Yes.

6    Q.  And then that wasn't too far from his spot on Nostrand,

7    right?

8    A.  No.

9    Q.  And the spot on Nostrand you told us was between Avenue J

10   and Avenue K, right?

11   A.  Yes.

12   Q.  You even showed us a picture of it, right?

13   A.  Yes.

14   Q.  How far was it from the train to the spot on Nostrand?

15   A.  About, it was a couple of blocks.  Like, driving distance,

16   like five minutes out.

17   Q.  In all the time that you work for him, or with him, it was

18   only out of that spot on Nostrand; is that right?

19   A.  Yes.

20   Q.  You never engaged in any commercial sex activity for

21   Mr. Kidd anywhere except for that spot on Nostrand, correct?

22   A.  Yes.

23   Q.  When you said "yes," that's correct what I said?

24   A.  Yeah, it's correct.

25   Q.  Thank you.  So, I think you said that first day that you

1    met Mr. Kidd was the first time he posted for you; is that

2    right?

3    A.  Yes.

4    Q.  Just to be clear, the post or the pictures that you showed

5    us on your direct testimony, was any of those in that first

6    posting?

7    A.  Yes.

8    Q.  If you could identify by exhibit number which one was that.

9    Or do you have the folders in front of you?

10   A.  Yes.  Exhibit number 1221, and Exhibit Number 1222.

11          MR. MARGULIS-OHNUMA:  Can we publish those, please.

12   Q.  We're looking at Exhibit 1221 and am I correct --

13   withdrawn.  You saw that published on Backpage, right?

14   A.  Yes.

15   Q.  How long after he took it did you see it published on

16   Backpage?

17   A.  Not too long.  About like an hour or two hours.

18   Q.  Same day?

19   A.  Yeah, same day.

20   Q.  That day was the first day you ever went to go see him,

21   right?

22   A.  Yes.

23          MR. MARGULIS-OHNUMA:  You can take that down.  Thanks.

24   Q.  All these pictures that we looked at, the government

25   exhibits that we looked at that were taken of you and the

J793KID4                              Brown - Cross

1    video, what kind of device were those taken with?

2    A.   A cell phone.

3    Q.   What kind of cell phone was it?

4    A.   I'm not sure the make or model, but it was a smart phone.

5    Q.   I think you told us one of the pictures, though, was taken

6    by someone else?  If you could tell me the exhibit number.

7             MR. MARGULIS-OHNUMA:  If we can put up Exhibit 1226,

8    please, Ms. Harney.  Thanks.

9             1225, please, Ms. Harney.  Thanks.

10   Q.   You said someone else took this picture?

11   A.   Yes.

12   Q.   Who took this picture?

13            MS. BRACEWELL:  Objection.  It was discussed at

14   sidebar.  It is beyond the scope.

15            THE COURT:  Sustained.

16   Q.   When was this picture taken?

17   A.   I'm not exactly sure of the timeframe.  But, it was before

18   I met the defendant.

19   Q.   Was this the picture that was in the post that you say he

20   responded to?

21   A.   Yes.

22   Q.   There came a time -- withdrawn.

23            How long did you tell us you worked out of Mr. Kidd's

24   spot on Nostrand?

25   A.   Roughly two years.

J793KID4                          Brown - Cross

1    Q.  During -- and that was 2015 to 2017.  Is that what you

2    said?

3    A.  Yeah, two years.

4              THE COURT:  Mr. Margulis, do you need the exhibit on

5    the --

6              MR. MARGULIS-OHNUMA:  No, we can take that down.  I'm

7    sorry.

8    Q.  So, and during that time, you would stay -- you sometimes

9    stayed the night at the spot on Nostrand; is that right?

10   A.  Yes.

11   Q.  Did you bring your stuff with you when you stayed the

12   night?  Did you bring an overnight bag?

13   A.  Yeah.

14   Q.  Where were you living generally during that time period?

15   A.  In the group home in Manhattan, New York.

16   Q.  Were your other belongings in the group home?

17   A.  Yes.

18   Q.  Tell us what was the procedure -- withdrawn.

19              Were you going to school at that time, during that

20   two-year period?

21   A.  Yeah.

22   Q.  Where were you going to school?

23   A.  High School of Fashion Industries.

24   Q.  When you got home from school, did you have to check in or

25   check out with the group home?

J793KID4                         Brown - Cross

1    A.  Yes.

2    Q.  How did that work?

3    A.  When we got home from school, they would just ask us how

4    was our day.  They would mark us as being there, and we would

5    just go to our room.

6    Q.  Do you know if you didn't show up, did they keep track of

7    that?

8    A.  Yes.  They would mark you as AWOL, and then after four days

9    of not being there, they said they would file an MPR.

10   Q.  What's an MPR?

11   A.  A missing person's report.  But I don't know if they

12   actually did it or if they were just telling us that.

13   Q.  But did you see them keep track when you came and left,

14   right?

15   A.  Yes.

16   Q.  So, was there a curfew, like some time at night you would

17   have to be back at night in order not to be considered AWOL?

18   A.  11 p.m.

19   Q.  If you were back after 11, you would be considered AWOL; is

20   that right?

21   A.  Until you showed up, yeah.

22   Q.  So, would you agree with me that from the time period of

23   December 30, 2016, to February 4, 2017, you were not AWOL?  You

24   were coming back to sleep every night at the group home.  Is

25   that right?

J793KID4                           Brown - Cross

1    A.  No, not every night.

2    Q.  During that time period -- again, I am saying just from the

3    end of 2016 until the beginning of February 2017 -- where were

4    you spending nights?

5    A.  Sometimes I was in the group home.  Sometimes I was

6    spending it at a friend's house.  I didn't really want to be at

7    the group home, so wherever I could go.

8    Q.  What about during February of 2017?  Where were you

9    spending the nights?

10   A.  At the defendant's house.

11   Q.  But then, isn't it a fact that you came back to the group

12   home on February 13, 2017?

13   A.  I don't know the date.

14          MR. MARGULIS-OHNUMA:  I'll mark this as Defense

15   Exhibit A for identification only, and I'm handing a copy to

16   the government.  And with your Honor's permission, I'd like to

17   approach the witness and hand her a copy to refresh her

18   recollection.

19          THE COURT:  Yes.

20          MR. MARGULIS-OHNUMA:  And also for the record it's

21   marked SDNY_ 003487, it is a six-page document, 47 through 52.

22   Q.  Just have a look at that.  I call your attention,

23   Ms. Brown, to the page three out of six.  The third page of the

24   document.  And see if that refreshes your recollection that you

25   returned to the group home on the date of February 13, 2017.

J793KID4                          Brown - Cross

1    A.  Yes, I see it here written.

2    Q.  Is that consistent with your recollection now?

3    A.  Yes.

4    Q.  Is that when you returned?

5            Sorry?

6    A.  Yeah.

7    Q.  Would you agree with me then that you stayed at the group

8    home for a couple of days and then were AWOL again on

9    February 15, 2017.  Is that right?

10   A.  Where do you see --

11   Q.  Just looking at page two of the document at the bottom.

12   A.  Yes.  A couple of days.  You said page two at the bottom?

13   Sorry.

14   Q.  Yeah, you were back for a couple of days in February.

15           MS. BRACEWELL:  Your Honor, objection.  This is not in

16   evidence.  She's now being asking to read the document.

17           MR. MARGULIS-OHNUMA:  I'm not asking her to read.  I'm

18   asking for her recollection.

19   A.  Even though you're showing me this, I still don't remember.

20   Q.  Okay.  Fair to say, just generally, in February 2017, based

21   only on your recollection, not on the document, that you did go

22   back to the group home during that time period.  Is that right?

23   A.  Yeah.

24   Q.  Now, there came a time in February 2017 -- withdrawn.

25           MR. MARGULIS-OHNUMA:  Just one moment, your Honor.

J793KID4                        Brown - Cross

1          Just a few more questions, your Honor.

2   Q.  So, Ms. Brown, since the end of November of last year,

3   you've been kept pretty much in close touch with Detective

4   Muckenthaler, right?

5   A.  Yes.

6   Q.  Texted her every few days, right?

7   A.  Yeah.

8   Q.  Back and forth?

9   A.  Yes.

10  Q.  And she, fair to say, was very enthusiastic about

11  prosecuting this case; isn't that right?

12          MS. BRACEWELL:  Objection.

13          THE COURT:  Sustained.

14  Q.  Well, she did you some favors since last November, right?

15  A.  She did a few thing for me, yes.  She gave me a few

16  resources.

17  Q.  She gave you some clothes, right?

18  A.  Yes.

19  Q.  She gave you some shoes?

20  A.  Yeah.

21  Q.  Last night the government put you up in a hotel; is that

22  right?

23  A.  Yes.

24  Q.  Anything else that they gave or did for you?

25  A.  They connected me to resources so that way I can find a

1    second job and also move into a bigger apartment.

2             MR. MARGULIS-OHNUMA:  If I may consult for one moment,

3    your Honor.

4             (Pause)

5    Q.  So Ms. Brown, how did you communicate with Mr. Kidd after

6    that first text message?

7    A.  After the first text -- like the very first text message?

8    Q.  Just starting from then going on until when you left.

9    A.  It would be calls, mostly calls.

10   Q.  And what phone number did he use; do you remember?

11   A.  I don't remember the number off the top of my head, no.

12   Q.  If we gave it to you, would you remember?

13   A.  Not really, because I programmed it in my phone, so I never

14   really had to, like, look at the physical number.

15   Q.  Was it always just this one phone number though?

16   A.  Yes.

17   Q.  He never changed numbers while you knew him?

18   A.  No.  The only other way he communicated with me was through

19   an app named Kik.

20   Q.  The Kik app?

21   A.  Yes.

22   Q.  Do you have any of those messages or texts on your phone or

23   anywhere else?

24   A.  No.

25   Q.  Did you turn over any messages like that between you and

J793KID4                              Brown - Cross

1    him to the government?

2    A.   No.

3    Q.   Did he ever contact you through Facebook or Google

4    Messenger or any other service like that?

5    A.   No.

6    Q.   Just Kik and through his phone, right?

7    A.   Kik and through the phone number, yes.

8    Q.   So, during the couple of years you worked for Mr. Kidd,

9    that you worked out of Mr. Kidd's spot, did you have other

10   customers that were totally unrelated to Mr. Kidd?

11   A.   No.  Like as in?

12   Q.   Did you --

13   A.   Like in the house?

14   Q.   No.  Were there other spots you worked out of?

15   A.   No.  Before I met the defendant, I was doing out calls,

16   which I told you was when I go to the client's house.

17   Q.   But, during the time that you worked for him, did you also

18   work for other pimps?

19   A.   Yes.

20             MS. BRACEWELL:  Objection.

21             MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

22             THE COURT:  Overruled.

23             Ms. Bracewell.

24             MS. BRACEWELL:  Your Honor, one moment.

25   REDIRECT EXAMINATION

J793KID4                        Brown - Recross

1    BY MS. BRACEWELL:

2    Q.  Ms. Brown, you were shown a document marked Defense Exhibit

3    A to refresh your recollection.  Do you recall that?

4    A.  May I hold it up to -- is that this here?

5    Q.  Yes.  That document.

6    A.  Yes.

7    Q.  Were you involved in creating any of those records?

8    A.  No.

9    Q.  Have you ever seen that document before?

10   A.  No.

11   Q.  You were asked some specific questions about particular

12   dates in February 2017.  Do you know where you were on each

13   night of February 2017?

14   A.  No.

15   Q.  Other than what you just looked at in a document, do you

16   have an independent recollection of where you were in

17   February 2017 night by night?

18   A.  I know sometimes I would be at the group home, and

19   sometimes I would be at the defendant's house.  But I don't

20   have an exact recollection of the dates.

21          MS. BRACEWELL:  Nothing further.

22          MR. MARGULIS-OHNUMA:  Just very briefly, your Honor.

23   RECROSS EXAMINATION

24   BY MR. MARGULIS-OHNUMA:

25   Q.  You just testified that you've never seen that document

J793KID4                         Brown - Recross

1    before.  Is that right?

2    A.  Before today, no.

3    Q.  Right.  So, but when you met with the government, you did

4    go over other documents, just not that one, right?

5              MS. BRACEWELL:  Objection.  Beyond the scope.

6              THE COURT:  Sustained.

7              MR. MARGULIS-OHNUMA:  Nothing further.

8              THE COURT:  Thank you.  You may step down.  You are

9    excused.

10             (Witness excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J793KID4

<pre>
 1          THE COURT:  I think that this might be a good moment
 2    to break for a lunch break.  When we resume, do you have your
 3    next witness ready, Ms. Bracewell?
 4          MS. BRACEWELL:  Yes.  The government will call Erik
 5    Uitto.
 6          THE COURT:  Thank you.  We'll adjourn for one hour.
 7    Let me remind you once again do not discuss the case among
 8    yourselves or with anyone on the outside.  And if any of these
 9    things occur, I direct you to inform the Court immediately and
10    not discuss it among yourselves.  Thank you.
11          MR. MARGULIS-OHNUMA:  Your Honor, can we have a brief
12    conference after the jury's --
13          THE COURT:  Sure.
14          (Jury excused)
15          THE COURT:  Mr. Margulis-Ohnuma.
16          MR. MARGULIS-OHNUMA:  Against my advice, Mr. Kidd
17    would like to address the Court personally.  I don't know if I
18    need -- I don't think he should.  But that's what he wants to
19    do.  I think I have to give him an opportunity, or it's up to
20    you.
21          THE COURT:  Well, let me warn Mr. Kidd that you're on
22    the public record here.  There's a stenographer taking down
23    anything that you say.  If there's anything that you say that
24    is prejudicial to you, it could be used against you by the
25    government.  So, bear in mind that especially you're acting
</pre>

J793KID4

1    against the advice of counsel.  What you say could seemingly

2    could be incriminating.  Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  All right.  So you may make your statement

5    with that understanding.

6              THE DEFENDANT:  Okay.  Well, for starters, I

7    appreciate everything that counsel's been doing for me.  It's

8    just that, because I personally know the people involved, I

9    know what actually took place, and nobody could just, you know,

10   I know what did and didn't happen.  I feel like nobody would be

11   in my best interest more than me, and I would like to have them

12   as side counsel if possible.  Because the questions that I

13   would like to ask, you know, I guess me and counsel aren't in

14   agreeance, but I feel these are very important questions.  And

15   there's -- I feel like there's a lot of things should have been

16   objected to that -- should have been objections that weren't.

17             And I'm definitely not trying to tell anybody how to

18   do their job.  But this is my freedom at stake, and this is

19   very serious, and I'm not trying to discredit anybody.  They've

20   been great.  But I have a lot at stake here, and I feel like

21   there is a lot that hasn't been brought to the Court's

22   attention.  It's just a lot that I don't feel comfortable at

23   this point gambling, you know.  I listened to counsel, there's

24   been multiple times when I've wanted to speak.  I've listened

25   to counsel telling me it's not a good idea, and I ended up

J793KID4

1    regretting it after.  Like at the suppression hearing when I

2    was going to initially speak, I didn't get to.  It didn't work

3    in my favor.  And I feel like if I had spoken, your ruling

4    might have been different, because I know how I keep my things,

5    I know what I've done, I know what I haven't done, and I know

6    details.  And of course, you know, even if I tell counsel

7    details over and over, they can only remember so much.  I get

8    it.  There's a lot of -- they have a lot of cases to deal with,

9    a lot of paperwork.  And I know I'm not a top priority for

10   them.  But for me I'm the top priority, because this is, once

11   again, my freedom at stake here, and I would really feel

12   comfortable having them side counsel.  And me, you know, asking

13   questions, cross-examining these people, because I know them,

14   they know me, and I just would feel more comfortable.

15         You know, some might say I'm throwing my life away.

16   I'd rather do it.  I'd rather throw my own life away rather

17   than have somebody else do it, with all due respect.

18         THE COURT:  Mr. Kidd, the law is that if a defendant

19   wishes to represent himself, you have that prerogative and you

20   have that right.  The Court cannot insist that you not proceed

21   representing yourself, if that is your wish.

22         I'm not sure exactly what you're saying.  Are you

23   saying you would like to essentially replace

24   Mr. Margulis-Ohnuma at this point and represent yourself?

25         THE DEFENDANT:  How does side counsel work, your

J793KID4

1    Honor?  I've heard of that term before.  I'm not too familiar

2    with it.  The way it was explained to me was it's where -- I'm

3    sorry.  Standby counsel.

4              THE COURT:  Standby counsel essentially means you

5    represent yourself.  You're pro se.  But you have counsel who

6    would be appointed by the Court to be essentially someone you

7    consult during the course of your representing yourself.

8              Bear in mind, again, that there are enormous risks to

9    you in your proceeding on your own behalf, especially at this

10   point when the trial has already begun.  But, I come back to

11   the point then if you are not satisfied with the representation

12   of counsel, and you wish to represent yourself, you have that

13   prerogative.  I'm not going to, at this point, start this trial

14   all over again.

15             MR. MARGULIS-OHNUMA:  Judge, if he's asking to do

16   that, I would ask to be excused.  I think it's not in his

17   interest, and if he's going to be pro se, he can do that

18   himself with another CJA lawyer.  I'm not willing to indulge

19   that.

20             THE COURT:  I understand that.  I can understand under

21   these circumstances, given how far we've gone, if the defendant

22   wishes to proceed pro se, that it would not be with

23   Mr. Margulis-Ohnuma as the standby counsel.

24             MR. MARGULIS-OHNUMA:  May I say one other thing that

25   may be helpful.  I think Mr. Kidd is frustrated, and I've

J793KID4

1    explained this to him.  Maybe hearing it from the Court will be

2    helpful.  He will get his chance to talk.  He has an absolute

3    right to testify.  I am happy to prepare his testimony with him

4    and lead him through that.

5         I think he's frustrated because he would like to

6    testify today and be heard today before hearing other

7    witnesses.  And that's just not how it works.  And I've

8    explained that to him.  Maybe if the Court explains that to him

9    he will be satisfied with the assurance he will have the

10   ability to testify at the end of the case.

11        THE DEFENDANT:  Your Honor, that's not the issue.  The

12   issue is just the things I would like counsel to ask, as far as

13   cross-examination, if I'm only allowed -- if he is not asking

14   the things that are very important, then I feel like what's

15   going to happen is that the jury will forget a lot of details

16   about every witness as time goes on, so, contradictions they

17   might not remember because it is -- I don't get to speak until

18   at the end or these points aren't made until at the end.

19   Whereas if it's immediately, the jurors can process it better.

20   So for instance, if the witness is saying red and they get

21   called out that they said blue originally, and on the same day,

22   then the jury will get that and say, okay, well, something's

23   not right here.  But if it's days later or maybe a week later,

24   then the jury might forget or it might not be an important

25   detail, and these details definitely matter, which is why I

J793KID4

been adamant about certain questions I've been asking counsel
to ask and certain things to point out, and he hasn't done it.
And he keeps saying these things will be brought up at the end
of -- at the end in closing.  Meaning by when trial is supposed
to be over, but it will be too late then.  And I just don't
feel comfortable doing that.

          And once again, this is no disrespect to Mr. Margulis
or Ms. Medley or anybody, they've been very helpful.  I am not
trying to discredit anybody in any way, shape or form.  I just
feel like we just have two different -- just two totally
different places.  And I feel like -- I honestly believe that
my way, as far as this, would be better, more in my best
interests versus his way, and I've tried to compromise and
everything, but I feel like the more I try to compromise, I'm
not going to be comfortable.

          Like I say, I'd rather throw my own life away than
have it done at the hands of somebody else, if that's what's
going to happen, God forbid.

          THE COURT:  Well, again, Mr. Kidd, you can't have it
both ways.  Either you have counsel, and the counsel is the one
you've had or some other counsel on your behalf who represents
you to the best of his or her ability, or you can represent
yourself.

          But if you're not happy with the representation you've
had from counsel to date, and somehow you wish to have your

J793KID4

1    questions and your strategy pursued and Mr. Margulis-Ohnuma in

2    his professional judgment does not agree that what you think

3    may be the proper strategy is potentially not in your

4    interests, you have the option of asking that

5    Mr. Margulis-Ohnuma leave, and you represent yourself.  And the

6    Court at that point will appoint standby counsel, but that's

7    not going to happen without some delay in the trial.

8           Bear in mind as well that one of the reasons why we're

9    here is that it was your insistence on proceeding to trial at

10   this time, rather than allowing for more time for you and

11   counsel to review all of the evidence.  So, again, to some

12   extent, this is something that you had control over.

13          THE DEFENDANT:  Would I be able to have access to the

14   3500 material and things of that nature?

15          THE COURT:  You have had access to the 3500 materials

16   from the day that the government turned them over to counsel.

17          THE DEFENDANT:  Yeah, but I was told by counsel that

18   there was a lot of -- that I wasn't allowed to have it in my

19   possession.  That I was only allowed to look at it when they

20   came to visit.  Which, you know.

21          THE COURT:  That's the way that the bureau of prisons

22   operates.

23          THE DEFENDANT:  No.

24          MR. MARGULIS-OHNUMA:  Pursuant to the protective order

25   we agreed to.

J793KID4

1          THE COURT:  Right.

2          THE DEFENDANT:  So my thing is, so, if some of the

3   stuff is attorney's eyes only, if I'm acting as my own attorney

4   would I --

5          THE COURT:  If you are acting as your own attorney,

6   then you have access to the 3500 material.  But, subject to the

7   protective order.

8          THE DEFENDANT:  What does that mean?

9          THE COURT:  It means that there is a protective order

10  that protects the confidentiality of certain documents in order

11  to protect some individuals or to make sure that personal

12  information about some individuals is not made public.

13         THE DEFENDANT:  Oh yeah, that's not a problem.  My

14  next issue would be how would I go about having access to these

15  things?  Since I'm, you know, currently a prisoner.  So would I

16  be able to bring these things back with me?  Like, how would I

17  be able to go over this?

18         THE COURT:  If you're representing yourself, you're

19  your own counsel and you have the material with you, again,

20  subject to certain protections for third parties and security

21  concerns.  But, you then would have the ability to use the

22  material in your defense as you think appropriate.  But bear in

23  mind that the way you think may be appropriate may not be

24  consistent with the rules of evidence and the law.  And what

25  you think should be brought out or particular questions that

J793KID4

1    should be asked that does not necessarily mean that you would

2    be able to do that and to ask those questions if those

3    questions are not appropriate under the rules of evidence.

4                THE DEFENDANT:  Okay.  Oh.  I would be able to

5    cross-examine the witnesses, right?

6                THE COURT:  If you're representing yourself, you can

7    do the cross-examination.

8                THE DEFENDANT:  Okay.  Last, but not least, like I

9    said, I mean, I would prefer standby counsel as far as

10   Mr. Margulis, but I don't know but if he's -- he doesn't want

11   to do that or -- I'm sure if he is not, then I assume

12   Ms. Medley, so, I guess they're severing ties with me.  But --

13               MR. MARGULIS-OHNUMA:  Let me be clear.  I wouldn't do

14   it because I don't think it's in the client's best interest.  I

15   think it would be totally self-destructive and I think he's

16   going down a self-destructive path here.  So I'm agreeing with

17   him on his objectives, but as a tactic, I think conducting his

18   examinations himself would be a terrible mistake and I don't

19   want to be involved in that.

20               THE DEFENDANT:  Well, is there any way where I can be

21   a part of my own defense where --

22               THE COURT:  You can't have it both ways.

23               THE DEFENDANT:  That's what I want to say.

24               THE COURT:  Either you have counsel who is your lead

25   counsel, or if you want to represent yourself, you can

J793KID4

1    represent yourself.  The Court in that event can appoint

2    standby counsel.  Under these circumstances, I cannot see how

3    Mr. Margulis-Ohnuma can in good faith be your standby counsel

4    and see you go down the road that he believes, as he says, may

5    be self-destructive.

6          But, also bear in mind that if you proceed, you may

7    not be able to do so at this point without some delay in the

8    proceedings, and jeopardizing the time frame that the Court set

9    for this trial to be concluded in two weeks.  Because standby

10   counsel is not going to be in a position to assist you very

11   effectively in a matter of hours.

12         MR. MARGULIS-OHNUMA:  Judge, may be it would be

13   helpful if we took a recess so we could talk to Mr. Kidd now

14   that he's heard from the Court what his options are.

15         MS. BRACEWELL:  If we could, we would like to submit a

16   proposed allocution to the defendant to ensure his waiver of

17   the right to counsel is both knowing and voluntary.  There are

18   a number of questions that we request be put to him in the

19   first instance.

20         THE COURT:  Yes, that would be standard operating

21   procedure.

22         MR. MARGULIS-OHNUMA:  Before we do that, I think if I

23   could have a couple minutes with Mr. Kidd.

24         THE COURT:  Well, we adjourned for the lunch hour half

25   an hour ago.  So, we still have another 35 minutes.  All right.

J79TKID5

1           MR. MARGULIS-OHNUMA:   Thank you, your Honor.  May we

2   ask the marshals to keep him up here for 10 minutes?

3           THE COURT:  You may.

4           (Recess)

5           (Continued on next page)

J79TKID5

<div align="center">AFTERNOON SESSION</div>

<div align="center">(1:40 p.m.)</div>

1    (Jury not present)

2    THE COURT:  Mr. Margulis, do you have a report for us?

3    MR. MARGULIS-OHNUMA:  Let me check with the defendant.

4  I think we're good to go forward with us representing the

5  defendant.

6    THE COURT:  Let's proceed.  I don't want to keep the

7  jury waiting any longer.

8    Mr. Margulis?

9    MR. MARGULIS-OHNUMA:  Judge, I think there's just one

10  issue with the next witness, which is that I understand from --

11    MR. RAVI:  Should we address --

12    MR. MARGULIS-OHNUMA:  We talked to Mr. Kidd, he's

13  content with us going forward.

14    THE COURT:  If that decision is made, I want that to

15  be confirmed on the record by an allocution.

16    Mr. Kidd?

17    THE DEFENDANT:  Yes, your Honor.

18    THE COURT:  What is your wish at this point?

19    THE DEFENDANT:  That Mr. Margulis and Ms. Medley

20  continue to represent me.

21    THE COURT:  You are making this decision knowingly and

22  willingly?

23    THE DEFENDANT:  Yes, sir.

J79TKID5

1          THE COURT:  And you understand the risks that the

2     Court indicated earlier of your proceeding on your own if you

3     were to choose to do that?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  All right.  Thank you.  The jury is ready.

6          Mr. Margulis, do you have any questions?

7          MR. MARGULIS-OHNUMA:  I think there's an evidentiary

8     issue, it goes to -- we discussed it, portions of it before.  I

9     understand from the government that they intend to establish

10    the preliminary admissibility under Rule 104 of evidence

11    derived from BackPage based on hearsay testimony.  It wouldn't

12    go to the jury, but that would be usable under 104 to establish

13    the admissibility.  So I think my suggestion is that in order

14    to avoid a lot of hearsay objections that wouldn't be well

15    founded, just for the purpose of Rule 104 we should probably

16    have that initial part of the testimony outside the hearing of

17    the jury.

18         THE COURT:  Mr. Gutwillig?

19         MR. GUTWILLIG:  Your Honor, what the witness will

20    testify to is not just hearsay, he will testify that these

21    servers that the data was extracted from has been provided to

22    defense and forms the basis of these reconstructed images.  The

23    servers are in fact the ones seized by the FBI.  The servers

24    have indications on them from the FBI that they are in fact the

25    servers that were seized from BackPage.  The servers from which

J79TKID5

1   this data was extracted were ones that were seized from the

2   Netherlands and went to the FBI, that the witness has looked at

3   specific information provided by BackPage showing IP addresses

4   associated with these servers, that he is able to look at the

5   IP address, look at the server, and verify that these are in

6   fact the same server.

7          So with respect to the hearsay, I suppose he is not

8   the seizing agent, but the fact that he is aware that BackPage

9   was shut down, he is aware that these servers were seized, and

10  that since then he has pulled from these servers and is

11  familiar with them and knows they're from BackPage from his own

12  personal interaction with the servers the government believes

13  is enough to admit them.

14         I also note for the record we just -- I don't mean to

15  surprise defense counsel with this, we have been talking about

16  the ages on the charts, the government will add the age from

17  the column with the underlying date to the summary witness

18  instructions.  I understand that defense counsel has not yet

19  had a chance to look at those, but we will provide them for his

20  review.

21         MR. MARGULIS-OHNUMA:  I haven't been provided them.  I

22  think it's up to to them how to proceed, if they want to

23  proceed in front of the jury, but I think if they don't

24  establish personal knowledge or if it's hearsay, I'm objecting.

25         THE COURT:  We'll proceed and I'll rule as it develops

J79TKID5

1    as to whether or not what is it testified to is hearsay or an

2    exception to hearsay or something else.

3           Let me remind the parties that we are way behind, so

4    far as the amount of time that we spent in the morning on one

5    witness.  So we will need to find some way of trimming and

6    streamlining so that we continue to honor our word to the jury

7    that this case is not going to be tried for more than two

8    weeks.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J79TKID5                          Uitto - Direct

1          (Jury present)

2              THE COURT:  Welcome back, be seated.

3              Government, call the next witness.

4              MR. GUTWILLIG:  Your Honor, the government calls Erik

5    Uitto.

6     ERIK JUHANI UITTO,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. GUTWILLIG:

11   Q.  Good afternoon, Mr. Uitto.  Where do you work?

12   A.  I work for the Federal Bureau of Investigation.

13   Q.  And what is your position at the FBI?

14   A.  I'm an information technology specialist forensic examiner.

15   Q.  And in general, what are your responsibilities as forensic

16   examiner?

17   A.  So I'm a support employee and support the agents by helping

18   them with additional evidence, so we help identify the

19   evidence, preserve it, analyze it, and report on it.

20   Q.  And for approximately how long have you worked for the FBI?

21   A.  It's been a little over ten years.

22   Q.  And what is your educational background?

23   A.  I have a bachelor's degree in information and computer

24   science as well as a master's degree in computer science.

25   Q.  And you testified a moment ago about your responsibilities

J79TKID5                        Uitto - Direct

1    assisting agents.  In particular, what do you do as a forensic
2    examiner with the media and devices?
3    A.   So as I mentioned, we will help the agents to identify it
4    and analyze it, preserve it, and report on it.
5    Q.   And in what format do you typically generate reports?
6    A.   It's common to make digital reports on optical media, so
7    copies of files, that sort of thing will be put on CDs, DVDs.
8    Q.   Would you mind raising the microphone a tiny bit?
9         Thanks very much.
10        And when what kind of devices do you typically work
11   with?
12   A.   So there can be cell phones, laptops, desktop computers,
13   sever computers.
14   Q.   And what type of training have you received in connection
15   with this work?
16   A.   So I received training in both computer forensics and in
17   the area of computer security.
18   Q.   And approximately how many investigations have you worked
19   on?
20   A.   I would say over 200, under 500, somewhere around there.
21   Q.   And you testified that you analyzed and created reports
22   from devices.  Just a ballpark, any estimate of how many of
23   those you have done?
24   A.   Total devices, it may be upwards of a thousand.
25   Q.   And those devices include servers that you analyzed?

J79TKID5                          Uitto - Direct

1    A.  Yes.

2    Q.  During the course of your duties with the FBI, did you

3    become involved in an investigation of the website

4    backpage.com?

5    A.  Yes.

6    Q.  And during the course of your involvement in that

7    investigation, did you learn what kind of content was available

8    on backpage.com when it was operational?

9    A.  I spent a lot of time reviewing data and I noticed it's a

10   lot of advertisements for escort services typically.

11   Q.  What kind of data is available on those advertisements?

12   A.  So there's all sorts of data that was on the servers that I

13   analyzed.  It could include information about specific

14   advertisements, who posted the ad, as well as other details of

15   information.

16   Q.  Did there come a time when the FBI seized BackPage servers

17   pursuant to a court order?

18           MR. MARGULIS-OHNUMA:  Objection, based on knowledge.

19   A.  Yes.

20           THE COURT:  Lay the foundation.

21   Q.  Mr. Uitto, what is your understanding -- where are the

22   BackPage server located now?

23           MR. MARGULIS-OHNUMA:  Objection, basis of knowledge.

24           THE COURT:  Lay a better foundation for his knowledge

25   of this matter.

J79TKID5                        Uitto - Direct

1    Q.  Mr. Uitto, where do you work?

2             Where are you based?

3    A.  I am based at Pocatello, Idaho.

4    Q.  And in Pocatello, Idaho, is there certain evidence located

5    there?

6    A.  Yes.

7    Q.  And what kind of evidence that has been seized by the FBI

8    is located in Pocatello, Idaho?

9    A.  Servers that have been seized from backpage.com.

10   Q.  And approximately when were the servers seized?

11   A.  Spring of 2018.

12   Q.  And you testified that those servers are located in

13   Pocatello, Idaho, is that correct?

14   A.  Yes.

15   Q.  And has the data been preserved by the FBI since their

16   seizure?

17   A.  Yes.

18             MR. MARGULIS-OHNUMA:  Objection, personal knowledge.

19             THE COURT:  Overruled.

20   Q.  Has the data been preserved by the FBI since their seizure?

21   A.  Yes.

22   Q.  And before we go any further, can you explain in general

23   terms what a sever is?

24   A.  So a server is a computer and it provides services to

25   clients on a computer network.  So a common server that most of

J79TKID5                           Uitto - Direct

1    us interact with every day is a web server to browse the

2    internet that may connect up to a remote server from a client,

3    which may be a phone or laptop or desktop.

4    Q.  Is there data contained on these BackPage servers?

5    A.  Yes.

6    Q.  In general, ballpark, do you have an estimate of the amount

7    of data?

8    A.  The two servers that I examined have about 30 terabytes of

9    data.

10   Q.  And just for frame of reference, how much is a terabyte?

11   A.  So a terabyte -- most smartphones may be between commonly

12   64 gigabytes to 128 gig, maybe ten to 20 times the amount of

13   data in one smartphone is one terabyte.

14   Q.  And do you still have access to these BackPage servers?

15   A.  Yes.

16   Q.  Are you able to conduct searches through those servers?

17   A.  Yes.

18   Q.  And when you do that, in general, how do you identify the

19   server to search?

20   A.  So we identify the server to search -- when the server was

21   seized it was given a unique identifier.

22   Q.  And when you conduct searches, you go to the server with

23   the identifier you understand contains the data, is that

24   correct?

25   A.  Yes, these servers were specifically on a closed network

1    where they were the only servers that are available.

2    Q.  And so is your access now in a closed network?

3    A.  Yes.

4    Q.  And what does that mean generally?

5    A.  So there's no internet connection.  No other server is

6    being hosted there besides the data for backpage.com.

7    Q.  And in preparation for today's testimony, did you conduct

8    certain searches from the BackPage servers?

9    A.  Yes.

10   Q.  And have you seen a BackPage advertisement as it appeared

11   on backpage.com?

12   A.  I have seen the underlying data, so I answer that no -- or

13   actually yes, I have, so I have seen the requests that have

14   come in.

15   Q.  And by requests that come in, what do you mean by that?

16   A.  So since the FBI seized backpage.com we have received

17   requests from law enforcement requesting data that we have in

18   our location in Pocatello.

19   Q.  When you say requests from law enforcement for information,

20   what does law enforcement send you?

21   A.  So they will usually send us written communication, and

22   they may also sometimes include a printout or PDF copy of an

23   advertisement that they're looking for information about.

24   Q.  And what are you asked to do with those advertisements that

25   it sent?

J79TKID5                          Uitto - Direct

1    A.  Often it requires us to identify unique identifiers to

2    search for, and use those to find more information in the data

3    that we have.

4    Q.  Could you provide an example of a unique identifier?

5    A.  So a unique identifier could be anything like an email

6    address or a telephone number.

7    Q.  And from the underlying data are you able to reconstruct

8    what an advertisement could have looked like on backpage.com?

9    A.  Yes.

10   Q.  And does BackPage data available to you now contain

11   information that would have appeared on those advertisements?

12   A.  Yes.

13            MR. MARGULIS-OHNUMA:  Objection.

14            THE COURT:  Overruled.

15   Q.  I believe you testified that yes, is that correct?

16   A.  Yes, that's correct.

17   Q.  And what kinds of things, what types of data?

18   A.  So what types of data are stored on servers?

19   Q.  What are the underlying types of data available to you?

20   A.  Specifically there's picture data usually with ads, then

21   the database server itself, it had ad information, so that

22   information about ads listed by users, also information about

23   users themselves or the accounts that the users set up.

24            MR. GUTWILLIG:  Your Honor, may I approach?

25            THE COURT:  Yes.

J79TKID5                          Uitto - Direct

1          MR. GUTWILLIG:  Your Honor, may I have a moment,

2     please?

3          THE COURT:  Yes.

4          (Pause)

5     Q.  I'm showing you a CD marked for identification as

6     Government Exhibit 450 which contains exhibits marked

7     Government Exhibit 400A, 400B and -- 450A, 450B, and 450C.

8          Do you recognize this CD?

9     A.  Yes.

10    Q.  And what is it?

11    A.  So this contains copies of data that I exported from the

12    server.

13    Q.  And how do you recognize that CD?

14    A.  So I initialed it under the government exhibit label.

15    Q.  And Mr. Uitto, have you reviewed the records on the CD

16    before you testified today?

17    A.  Yes.

18    Q.  And said they have underlying data, is that correct?

19    A.  That's correct.

20    Q.  Could you please describe the process by which you

21    extracted the data?

22    A.  So I have these two servers, I connect up to the servers

23    and run search queries similar to if you're doing a Google

24    search, I use unique identifiers that the agents provided,

25    address, telephone number, and I will use those to perform a

J79TKID5                          Uitto - Direct

1    search of the data that's available to me.

2    Q.  And are the records that you searched voluminous?

3    A.  Yes.

4              MR. GUTWILLIG:  Your Honor, at this time the

5    government offers Government Exhibits 450A, B and C as well as

6    the disk marked 450.

7              MR. MARGULIS-OHNUMA:  Let me put on the record the

8    government advises --

9              MR. GUTWILLIG:  Sidebar, your Honor?

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J79TKID5                        Uitto - Direct

1           (At sidebar)

2           MR. MARGULIS-OHNUMA:  A housekeeping point, which I'm

3    sure -- I take the government's representation.  I have never

4    seen that actual disk, but they sent to me prior to trial

5    computer files 450A 450B and 450C, so if we could put on the

6    record those are identical, that's not an issue.

7           MR. GUTWILLIG:  We can put that on the record.

8           MR. MARGULIS-OHNUMA:  I guess I don't have voir dire,

9    I just want to reiterate my objection to this that I don't

10   think that the witness has sufficient personal knowledge of

11   what these are, how they were obtained, and on that basis, I

12   object.

13          THE COURT:  Mr. Gutwillig?

14          MR. GUTWILLIG:  Can you clarify what you mean by what

15   these are, what we're talking about?

16          MR. MARGULIS-OHNUMA:  I don't think that he knows they

17   came from BackPage.  That's based on secondhand information.

18          MR. GUTWILLIG:  In response to that objection, I state

19   what we said earlier, which is the fact that he does have

20   personal knowledge that these are BackPage servers because he

21   conducts the extraction, he lives in Pocatello, Idaho, and has

22   the server and identifiers matching them up from backpage.com.

23          THE COURT:  The objection is overruled.  The witness

24   testified that he has seen these BackPage documents.  I think

25   he would qualify as a lay expert on these matters, so he would

J79TKID5                      Uitto - Direct

1    have familiarity with the data that was extracted from these

2    servers.

3              MR. MARGULIS-OHNUMA:   Thank you, your Honor.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J79TKID5                          Uitto - Direct

1           (In open court)

2           MR. GUTWILLIG:  Your Honor, I can't recall whether the

3     government formally requested to offer in Government Exhibits

4     450A, 450B, 450C and the disk 450 which they are on.

5           THE COURT:  Yes, you made such a request.

6           Mr. Margulis, do you want to record any view on this?

7           MR. MARGULIS-OHNUMA:  Nothing further than what I said

8     at sidebar, your Honor.

9           THE COURT:  Thank you, the request is granted, the

10    documents admitted.

11          (Government's Exhibits 450, 450A, 450B and 450C

12    received in evidence)

13    Q.  You testified earlier about reconstructing advertisements

14    as they appear on backpage.com.  Let's talk about that for a

15    minute.

16          MR. GUTWILLIG:  Ms. Harney, could you please publish

17    what is marked Government Exhibit 450A.

18    Q.  Do you see that on your screen?

19    A.  Yes.

20    Q.  And what is this document?

21    A.  This is data that I exported from the servers, and IT

22    specifically contains information about that?

23    Q.  And on this, I'll refer to it as a spreadsheet, what does

24    each row represent?

25    A.  Each advertisement posted by the user.

J79TKID5                        Uitto - Direct

1    Q.  What does column A represent?

2    A.  That's labeled as the OBJID.  That is a unique identifier

3    for the advertisement.

4    Q.  And so for each row consisting of an ad there would be a

5    unique identifier, is that correct?

6    A.  Yes.

7    Q.  And is that advertisement -- that unique identifier is

8    associated with the advertisement?

9    A.  Yes.

10        MR. GUTWILLIG:  Ms. Harney, please highlight column R.

11   Q.  And Mr. Uitto, what does column R represent?

12   A.  That's user, and that represents the user that posted the

13   ad.

14   Q.  And is that the user associated with a single account, to

15   your understanding, of the BackPage servers?

16        MR. MARGULIS-OHNUMA:  Objection, basis of knowledge.

17        THE COURT:  Lay the foundation for knowledge about

18   this row.

19   Q.  Mr. Uitto, included in your review of BackPage servers,

20   have you reviewed data relating to user?

21   A.  Yes.

22   Q.  And based on your observations of that, have you determined

23   that a user -- there's a user assigned to each account?

24        MR. MARGULIS-OHNUMA:  Objection.

25        THE COURT:  Overruled.

J79TKID5                        Uitto - Direct

1    A.   Yes.

2    Q.   So could you just -- sorry, if we have gone over this, but

3    please summarize what column R represents.

4    A.   So the column R represents the user that posted that

5    advertisement.

6    Q.   And user, from your observation, is a unique user?

7    A.   Yes.

8              MR. GUTWILLIG:  Ms. Harney, could you please highlight

9    column AB.

10   Q.   And Mr. Uitto, what does column AB represent?

11   A.   That's the actual content, the body of the advertisement

12   that was posted.

13   Q.   And who generates that content?

14             MR. MARGULIS-OHNUMA:  Objection.

15             THE COURT:  Overruled.

16   A.   So from my observations it is the user that posted the ad.

17   Q.   And please highlight column B.

18             And Mr. Uitto, what does this column represent?

19   A.   So that's a date time stamp and it represents the time that

20   the ad was first created.

21             MR. MARGULIS-OHNUMA:  Objection, move to strike.

22             THE COURT:  Overruled.

23   Q.   And Mr. Uitto, on the next column, column C, what does what

24   column represent?

25   A.   So from my observations it appears that the ads can be

J79TKID5                          Uitto - Direct

1    reposted after they're initially posted, and so if a user edits

2    an ad after it's been posted or reposted, that last modified

3    date may be updated.

4    Q.   And from your review of this data, does this spreadsheet

5    reflect necessarily how many times an ad was posted?

6    A.   I have not identified anything that shows how many times

7    the ad has been posted.

8            MR. GUTWILLIG:   And Ms. Harney, if you could highlight

9    column AJ.

10   Q.   Mr. Uitto, what does this column represent?

11   A.   Titled age, and it appears to be the age of the -- or the

12   information that is the reported age of the user posting the

13   advertisement.

14   Q.   Mr. Uitto, have you reviewed data relating to age on the

15   BackPage servers?

16   A.   Not in great detail.

17   Q.   From your observations of that data, how is that field

18   generated or populated?

19   A.   So that would be user generated.

20   Q.   Mr. Uitto, using the underlying data, are you also able to

21   determine whether any images are associated with a particular

22   advertisement?

23   A.   Yes.

24   Q.   And does each image have -- sorry, does each -- strike

25   that.

1          Does each advertisement have an image associated with

2     it?

3     A.  Not in every case.

4     Q.  Can an advertisement have more than one image associated

5     with it?

6     A.  Yes.

7          MR. GUTWILLIG:  Ms. Harney, please publish what is in

8     evidence as Government Exhibit 450B.

9     Q.  Mr. Uitto, what is this spreadsheet?

10    A.  This is data that I extracted from the backpage.com

11    servers, and it specifically contains information about the

12    user, a single user account.

13    Q.  And which column represents the single user account

14    identifier here?

15    A.  Spread out the G column, and then -- it's E, sorry.

16    Q.  Focusing your attention on column E, what does that column

17    represent?

18    A.  So that was labeled email, and it appears to be an email

19    address.

20    Q.  Is that email associated with a specific user ID number

21    that you testified about earlier?

22    A.  Yes.

23    Q.  And are you then able to link advertisements to a specific

24    users?

25    A.  Yes.

1          MR. GUTWILLIG:  Ms. Harney, could you please pull up

2     what is in evidence as Government Exhibit 450C.

3     Q.  Same question here, Mr. Uitto, what does this spreadsheet

4     represent?

5     A.  So this is data that I extracted from the backpage.com

6     servers and specifically contains information about a single

7     user.

8     Q.  And that user -- what does column A represent, Mr. Uitto?

9     A.  That's the unique user ID.

10    Q.  And column E?

11    A.  Column E is the email address.

12    Q.  What is the email address there?

13    A.  So the email address reads redchaos826.gmail.com.

14    Q.  And that email address is associated with a particular user

15    account ID?

16    A.  Yes.

17    Q.  Which can then be associated to advertisements, particular

18    advertisements?

19    A.  Yes.

20    Q.  You've testified, Mr. Uitto, that from the underlying

21    information you're able to reconstruct what advertisements may

22    have looked like.  Have you participated in doing that in

23    preparation for today's testimony?

24    A.  Yes.

25          MR. GUTWILLIG:  Your Honor, may I have a quick moment?

J79TKID5                              Uitto - Direct

1                  THE COURT:  Yes.

2                  (Pause)

3                  MR. GUTWILLIG:  May I approach, your Honor?

4                  THE COURT:  Yes.

5      BY MR. GUTWILLIG:

6      Q.  Mr. Uitto, I'm showing you a CD that's been marked for

7      identification.  Do you recognize this CD?

8      A.  Yes.

9      Q.  How do you recognize it?

10     A.  So I initialed in the same location as the other one under

11     the government exhibit label.

12     Q.  And have you reviewed the records on this CD in preparation

13     for your testimony here today?

14     A.  Yes.

15     Q.  And what do the records on the CD contain?

16     A.  Contains representations of the advertisements to include

17     pictures as well.

18     Q.  The representations of the advertisements based on the

19     underlying data, is that correct?

20     A.  Yes.

21                 MR. GUTWILLIG:  Please publish just for the witness,

22     Court and counsel, what's marked as Government Exhibit 421.

23     Q.  Mr. Uitto, is this also a reconstruction that you

24     participated in assembling?

25     A.  Yes.

J79TKID5                          Uitto - Direct

1           MR. GUTWILLIG:  Please show the witness, Court and

2     counsel Government Exhibit 422.

3     Q.  Same question, is this a reconstruction that you

4     participated in putting together?

5     A.  Yes.

6           MR. GUTWILLIG:  Your Honor, at this time the

7     government would offer Government Exhibits 400 through 422.

8           MR. MARGULIS-OHNUMA:  Voir dire, your Honor?

9           THE COURT:  Yes.

10    BY MR. MARGULIS-OHNUMA:

11    Q.  So in the Exhibits 400 through 422, there's pictures, is

12    that right?

13    A.  There's picture data contained on it, yes.

14    Q.  So is that picture data something that we have already

15    looked at in evidence today?

16    A.  It's data that I extracted and provided from backpage.com.

17    Q.  How did you get the picture data?

18    A.  So the picture data was stored on one of the servers that I

19    have access to in Idaho.

20          MR. MARGULIS-OHNUMA:  I need a sidebar, your Honor.

21          (Continued on next page)

22

23

24

25

1          (At sidebar)

2          MR. MARGULIS-OHNUMA:  We have all seen summary charts

3     before and they contain pictures, but the pictures are not in

4     evidence, so they're not summary charts because they're not

5     summarizing evidence that's been admitted.  There's no way to

6     go back and verify that these -- we have had access to them, I

7     am not saying we haven't had discovery on them, but there's no

8     way on this trial record to say these are pictures that go with

9     these ads.  And this is critical to the determination of the

10    outcome of this because the content of those pictures is what

11    identifies the individual victim and the child pornography and

12    everything else.  So I don't see how they can do this without

13    laying a much better foundation and offering the pictures that

14    are used in those ads as evidence.

15         By the way, these are not the photographs that the

16    witness this morning identified.  They may be identical, but

17    she didn't work for BackPage, they came from totally different

18    sources, which I think is their point.

19         MR. GUTWILLIG:  Your Honor, I think the government

20    briefed this in the motions in limine.  The briefing set forth

21    how we intended to enter the summary charts.  It is not a

22    requirement under 1006 that the summary -- that the underlying

23    evidence be admitted in order for the summary chart to be

24    admitted.  The underlying evidence was provided to defense

25    counsel well in advance of this with time to inspect.  It has

J79TKID5                          Uitto - Direct

1    been made available.  The witness is testifying about the

2    summary charts, and the government will have all the underlying

3    data in evidence.  We have put into evidence the advertisement

4    and spreadsheets, and we're candidly trying to put this in

5    efficiently, recognizing that it's a somewhat complicated topic

6    with the servers.

7              THE COURT:  Thank you.  Overruled.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J79TKID5                          Uitto - Direct

1                    (In open court)

2                    THE COURT:  Mr. Gutwillig.

3                    MR. GUTWILLIG:  Yes, your Honor.  At this time the

4          government moves to admit Government Exhibits 400 through 422.

5                    MR. MARGULIS-OHNUMA:  The objection as stated at

6          sidebar.

7                    THE COURT:  All right.  Admitted over objection.

8                    (Government's Exhibits 400 through 422 received in

9          evidence)

10                   MR. GUTWILLIG:  Could you please pull up Government

11         Exhibit 400 and also Government Exhibit 400A.

12                   How about Government Exhibit 401?  And also if we're

13         able to -- Government Exhibit 450A, put them side by side?  No?

14         Q.  Mr. Uitto, do you recognize this document?

15         A.  Yes.

16         Q.  And could you please just describe and point out on the

17         screen where the -- which data of the underlying data is on

18         here and how you identified the underlying data?

19         A.  So if you recall the original exhibit we had at first,

20         450A, I believe it is, there's different columns, and one of

21         the column's title -- I don't remember what letter it was, but

22         that's where the --

23                   Could I touch the screen?  Will it show a line?

24         Q.  It should.

25         A.  The highlighting kind of crossed it out, but it's that

J79TKID5                      Uitto - Direct

1    title on there.  Let me clear it.

2    Q.  Just to kind of direct your attention to the other I, do

3    you see object id on there?

4    A.  Yes, that was the unique identifier for the advertisement,

5    if you recall from 450A.

6    Q.  It says here that the object ID is 94069583, is that

7    correct.

8    A.  Yes.

9             MR. GUTWILLIG:  Please pull up Government

10   Exhibit 450A.  If you could go to the row that has the object

11   at the 94069583.

12   Q.  And Mr. Uitto, is this the object ID that matches what is

13   on Government Exhibit 401?

14   A.  Yes.

15            MR. GUTWILLIG:  Ms. Harney, please go the user column

16   for this.

17   Q.  And that user, is that the unique user associated with who

18   posted that advertisement?

19   A.  Yes.

20            MR. GUTWILLIG:  Ms. Harney, please pull up Government

21   Exhibit 450B.

22   Q.  And Mr. Uitto, looking at the spreadsheet, what is the

23   email address associated with this account?

24   A.  Email address listed in column E is keyonadoll@gmail.com.

25   Q.  And that's the one associated with the ticker right on the

1   left?

2   A.  Yes, 92370005.

3   Q.  Have you followed this process to identify users and

4   advertisement IDs on each of the reconstructed BackPage ads?

5   A.  Yes.

6         MR. GUTWILLIG:  And Ms. Harney, please publish

7   Government Exhibit 409.

8   Q.  Do you recognize this, Mr. Uitto?

9   A.  Yes.

10  Q.  And if you wouldn't mind, would you please walk through the

11  different categories of underlying data that you pulled for

12  this advertisement?

13  A.  So as you mentioned, there's the object ID in the lower

14  right corner, and in the upper right corner there's information

15  about the IP address from which the ad was posted, age, the

16  user, posting date, the title of the advertisement, as well as

17  the actual ad column which contains kind of the body or the

18  actual details of the advertisement.

19  Q.  And could you please read the user number there?

20  A.  In this specific one it is 96015941.

21  Q.  And the object ID, please?

22  A.  Object ID is 97781943.

23  Q.  And Ms. Harney, please pull up Government Exhibit 450A.

24        And directing your attention to row 11, please read

25  the --

J79TKID5                         Uitto - Direct

1    A.  Column 3?

2    Q.  Yes, if you please read that.

3    A.  The object ID for column --

4          MR. GUTWILLIG:  Sorry, Ms. Harney, could you pull up

5    409, please.

6    Q.  And the object ID there, if you could read it again?

7    A.  97781943.

8          MR. GUTWILLIG:  Please pull up Government

9    Exhibit 450A.

10   Q.  And directing your attention to row 3, what is the on the

11   ID in column A?

12   A.  It's the same number, 97781943.

13   Q.  And going over to the user column --

14   A.  That number also matches the user number 96015941.

15         MR. GUTWILLIG:  And Ms. Harney, if you could please

16   pull up Government Exhibit 450C.

17         (Continued on next page)

18

19

20

21

22

23

24

25

J793KID6                              Uitto - Direct

1   Q.  Mr. Uitto, do you recognize the object ID in column A?

2   A.  Yes.

3   Q.  Is that the specific user account that posted that

4   advertisement?

5   A.  Yes.

6   Q.  What is the e-mail address associated with that user

7   account?

8   A.  E-mail address in column A is listed as

9   redchaos826@gmail.com.

10          MR. GUTWILLIG:  Ms. Harney, if you can publish for the

11  Court, the witness and counsel what's marked for identification

12  as Government Exhibit 500.

13          Your Honor, I believe this is one that the Court ruled

14  on authenticity of this one.

15          THE COURT:  Is this one of the Google documents?

16          MR. GUTWILLIG:  Yes, your Honor.

17          THE COURT:  You may proceed.

18  Q.  Mr. Uitto, could you please read the e-mail address on the

19  third line down.

20  A.  It's listed as redchaos826@gmail.com.

21  Q.  Is that the same e-mail address you testified about earlier

22  in the Backpage advertisements?

23  A.  Yes.

24          MR. GUTWILLIG:  The government offers Government

25  Exhibit 500.

J793KID6                        Uitto - Direct

1           THE COURT:  Mr. Margulis?

2           MR. MARGULIS-OHNUMA:  No objection other than that

3    already stated, your Honor.

4           THE COURT:  Admitted.

5           (Government's Exhibit 500 received in evidence)

6           MR. GUTWILLIG:  Ms. Harney, if you can please publish

7    for the Court, the witness, and counsel what's marked as

8    Government Exhibit 601.

9    Q.  Mr. Uitto, I'd ask you to read the e-mail address there on

10   the bottom row.

11   A.  That's listed as redchaos826@gmail.com.

12   Q.  Is that the same e-mail address you identified earlier in

13   the Backpage ads?

14   A.  Yes.

15          MR. GUTWILLIG:  Your Honor, the government offers

16   Exhibit 601.

17          MR. MARGULIS-OHNUMA:  Same response, your Honor.

18          THE COURT:  Admitted.  Objection noted.

19          (Government's Exhibit 601 received in evidence)

20          MR. GUTWILLIG:  Ms. Harney, one more, Government

21   Exhibit 604.

22   Q.  Mr. Uitto, do you recognize what this document is?

23   A.  This appears to be a list of IP addresses.

24   Q.  What generally is an IP address?

25   A.  So it's a number that's used to uniquely identify a host

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

J793KID6                          Uitto - Cross

1   network.  A host can be anything like a tablet, mobile phone,

2   server, a home router.

3   Q.  So a host could be an individual device; is that correct?

4   A.  Yes.

5   Q.  It could also be a group of devices together; is that

6   correct?

7   A.  Yes.

8   Q.  It is a unique identifier for the host?

9   A.  Yes.

10          MR. GUTWILLIG:  The government offers Government

11  Exhibit 604.

12          MR. MARGULIS-OHNUMA:  Same response, your Honor.

13          THE COURT:  Admitted.  Objection noted.

14          (Government's Exhibit 604 received in evidence)

15          MR. GUTWILLIG:  If I could just have a moment please,

16  your Honor.

17          THE COURT:  Yes.

18          MR. GUTWILLIG:  No further questions, your Honor.

19  Thank you.

20          THE COURT:  Mr. Margulis.

21          MR. MARGULIS-OHNUMA:  Thank you, your Honor.

22  CROSS-EXAMINATION

23  BY MR. MARGULIS-OHNUMA:

24  Q.  Good afternoon.  Mr. Uitto, how are you?

25  A.  Good.

J793KID6                          Uitto - Cross

1    Q.   Have you and I ever met before?

2    A.   I don't believe we have.

3    Q.   Now, you work for the FBI, right?

4    A.   Yes.

5    Q.   And you don't work for Backpage, right?

6    A.   That's correct.

7    Q.   You never worked for Backpage, right?

8              MR. GUTWILLIG:  Objection.

9              THE COURT:  Overruled.

10   A.   Sorry.  I never worked for Backpage.com.

11   Q.   You've never interviewed anyone from Backpage.com, have

12   you?

13   A.   I have not.

14   Q.   So, your observations about this is only strictly based on

15   what you were able to glean from looking at the data itself,

16   right?

17   A.   Yes.

18             MR. MARGULIS-OHNUMA:  Ms. Harney, can we put up

19   Government Exhibit 412 in evidence, please.

20             Before we do -- I'm sorry, take that down.

21   Q.   Explain to us again -- withdrawn.

22             Each of these I think you called reconstructions.  Is

23   that what you called them?

24   A.   Yes.

25   Q.   Each of these reconstructions contains one or more

J793KID6                          Uitto - Cross

1    pictures, right?

2    A.  Yes.

3    Q.  Explain to us again how you figured out which pictures go

4    with which ad text and other information?

5    A.  So, there is, as we mentioned, a unique identifier

6    associated with each advertisement.

7           MR. MARGULIS-OHNUMA:  Ms. Harney, can we put up

8    Government Exhibit 450A.

9    Q.  If you can walk us through from the spreadsheet how the --

10   A.  So if you move the -- move it over to the left all the way

11   to show column A.  There is the object ID column that has the

12   first unique identifier, there is another table actually that

13   we would need to bring up in order to get information about the

14   pictures so it's not shown on the screen.

15          But do you happen to have Government Exhibit 4, the

16   tables that contain image data?

17   Q.  I don't have it.  Do you have it?

18   A.  So they were provided, I believe.  I believe they should be

19   with discovery materials.

20   Q.  Okay.  So let me just ask you.  So, you have another table

21   that you didn't tell us about that had the image data; is that

22   right?

23   A.  Yes.  There is another table that I referenced to get more

24   information, more metadata about the images.

25   Q.  Metadata about the images or which images that go with

1   which object ID?

2   A.  So it is both.

3   Q.  Okay.  So, that was another search that you did, right?

4   A.  Yes.

5   Q.  To create that table you just talked about?

6   A.  I'd say it's all part of the same search.  There's

7   different tables in the database that I had to reference in

8   order to identify the pictures.

9   Q.  And that table had -- withdrawn.

10          So based on Government Exhibit 450A, there's no way to

11  know which picture goes in these ads, right?

12  A.  So by this one screen, that's correct.  You can't identify

13  pictures based upon this single spreadsheet that's shown in

14  front of you.

15          MR. MARGULIS-OHNUMA:  Now if we could, Ms. Harney,

16  let's go to put up Government Exhibit 412.

17  Q.  I'll ask the question, which is there's these so-called

18  reconstructions don't actually look like Backpage ads, right?

19          MR. GUTWILLIG:  Objection, your Honor.

20          MR. MARGULIS-OHNUMA:  Withdrawn.  I'll lay a

21  foundation, you're right.

22  Q.  You've looked at Backpage ads in your service as an FBI

23  employee, right?

24  A.  I have seen ads come in with arrests.

25  Q.  Those were ads the way they looked on the internet before

J793KID6                          Uitto - Cross

1    you guys took it down in the spring of 2018, right?

2    A.   Yes.

3    Q.   Those don't look anything like, for example, Government

4    Exhibit 412, right?

5            MR. GUTWILLIG:  Objection.

6            THE COURT:  Overruled.

7            MR. MARGULIS-OHNUMA:  If we can put up 412 now, I'm

8    sorry.

9    A.   So they could differ in how they look, that's correct.

10   Q.   Or they could differ.  Withdrawn.

11           The format that Backpage uses is nothing like this

12   format, right?

13   A.   It's -- this is presented differently, that's correct.

14   Q.   For example, the Backpage ad wouldn't tell you IP address,

15   would it?

16   A.   The Backpage ad would not to the public users.

17   Q.   The Backpage ad to public users would not show the user ID

18   that you have on the upper-left-hand corner there, right?

19   A.   I do not believe it would.

20   Q.   When you said it wouldn't, you qualified your answer about

21   the IP address showing to the public users.  Would it show to

22   any users?

23   A.   So, my understanding is the subpoena returns law

24   enforcement would commonly get information that would contain a

25   lot of the data shown on the screen so basically what an

J793KID6                          Uitto - Cross

1  administrator --

2  Q.  I am just asking you about what was -- fine.  I'm sorry.

3  Good answer.  Withdrawn.  I think you've answered that

4  question.

5          So the question I have though, is when a person --

6  when for the public -- the text wouldn't look like this with

7  these wacky characters, right?

8  A.  So the wacky characters would look differently in a web

9  browser.  If viewed in a web browser, the data would present

10  differently than when you are in a spreadsheet like we're in.

11  Q.  It would for a user looking at this, there would actually

12  be emoji?

13  A.  There might be emoji, yes.

14  Q.  For a public user it wouldn't say the posted date, would

15  it?

16  A.  It may not display that; that's correct.

17  Q.  But it would display the age, right?

18  A.  I believe it would.

19  Q.  Typically Backpage ads have one or two or three pictures,

20  right?

21  A.  In the ones that I've seen the requests come in, yeah.

22  I've seen the ones that have several pictures, one or two or

23  three.

24  Q.  This one has something like 70 pictures, right?  And I'm

25  referring specifically to Government Exhibit 412.

J793KID6                          Uitto - Cross

1    A.   Yes.

2    Q.   So, that's not how it would look at all on Backpage, right?

3    A.   I have to look at specifics for this advertisement, but it

4    may be if there's reposts or edits that the underlying data

5    remains on the servers, but it may not all be shown at once, if

6    that makes sense.  It may be from historical content that many

7    of the images --

8    Q.   I thought you told us that each object ID represented a

9    unique advertisement.  Isn't that right?

10   A.   That's correct.

11   Q.   So, how could there be reposts or historical data if it's

12   unique?

13   A.   As we mentioned that an ad from my observations can be

14   reposted and modified or edited.  So, from my observations, it

15   also appears that Backpage was keeping those edits and reposts,

16   information about them.

17   Q.   But again -- we can take at that down, please.

18            But again, that's based on your looking at data, not

19   on anything that came from Backpage policies, right?

20   A.   Yes, that's based on my observations of the underlying

21   data.

22   Q.   So, if ads can be reposted, there would be several

23   different dates on which they would be posted, right?

24   A.   Yes.

25   Q.   Based on your data you've shown us, they didn't record or

J793KID6                        Uitto - Cross

1   you don't have access to multiple dates for the government

2   exhibits you have shown us, right?

3   A.   There was a modified date I believe in the Government

4   Exhibit 450A.

5          MR. MARGULIS-OHNUMA:  Let's pull that up if we could,

6   Ms. Harney.   450A.

7   Q.   Do you recall which column that was?

8   A.   So it's last modified.   Column C.

9   Q.   And you concluded, based on looking at the data, that that

10   last modified date was what?

11   A.   So you want to know about a specific ad.   First you would

12   take column four.   Object ID 117834513.   So if I bring your

13   attention to column B, creation date, that's back in July 16 of

14   2017.   But then you'll notice the column over to the right

15   which is labeled last modified.   That's all the way in

16   November.

17   Q.   So actually, if we could toggle back and forth.   Do you

18   know which government exhibit that one goes with?   We can try

19   to find it.   So I think that was Government Exhibit 412 we were

20   just looking at.

21          MR. MARGULIS-OHNUMA:  Ms. Harney, can you pull up

22   Government Exhibit 412 and just determine that.

23   Q.   Mr. Uitto, can you confirm that that fourth row matches the

24   underlying data for Government Exhibit 412.   Is that correct?

25   A.   Can you bring up 412 on the screen?

J793KID6                          Uitto - Cross

1    Q.  We're working on it.

2    A.  I believe it ended in 513.  So that object ID does match

3    there.

4    Q.  So, if we could go back to 450A.  What you're saying is

5    based on the creation date and the last modified date being

6    spread apart by a few months, there could have been any number

7    of changes to the ad during that time period.  Is that right?

8    A.  Yes.

9    Q.  And you don't have that data, right?

10   A.  I do not have the that data.

11   Q.  And the pictures, but what you did in your reconstruction

12   is you took all the pictures that may or may not have been

13   published from that time, they're associated with that object

14   ID, and you put them in the reconstruction, right?

15   A.  So my request from Agent Gander specifically asked for any

16   and all records.

17   Q.  Associated with what?

18   A.  With the search terms that they provided.

19   Q.  Okay.  My point is you don't know if Backpage actually

20   published these pictures with this -- with this text and this

21   data, do you?

22   A.  I know that they -- I do not know that.

23   Q.  So let's go back.  You are saying that certain of this

24   information you concluded came from the users -- we can keep

25   that up, Ms. Harney.

1          What was your basis -- I think you said the age

2     information came from users, right?  Which column was that?  If

3     we could go over to column AJ.

4          Again, since you never worked at Backpage or

5     interviewed anyone from Backpage, you don't actually know where

6     that information came from, right?

7     A.   These ads were posted by users, so the information for each

8     ad is either entered by the user or collected about the user

9     when they put the ad in.

10    Q.   Well, if you look at column T, SMS enable, that's not

11    entered by the user, is it?

12    A.   It's metadata about the user.

13    Q.   Right.  But the user doesn't enter that, right?

14    A.   Probably not; that's correct.

15    Q.   But again, you don't really know, right?

16    A.   That's correct.

17    Q.   So, and with respect to column AJ, your best guess is

18    that's coming from the user, right?

19    A.   So AJ --

20    Q.   The age column.

21    A.   That's just my observations of what I've seen in the data.

22    It appears to be user edited.

23    Q.   You don't know whether or not Backpage would go out and

24    verify the user's age, do you?

25    A.   I do not know that.

J793KID6                          Uitto - Cross

1          MR. MARGULIS-OHNUMA:  Ms. Harney, can we please pull

2     up Government Exhibit 500.  It was just admitted.

3     Q.  Sir, I think you told us that the e-mail address on

4     Government Exhibit 500 matched some of the e-mail addresses in

5     the spreadsheet, Government Exhibit 450A.  Is that right?

6     A.  Yes.

7     Q.  Can you read us the name on Google subscriber information

8     Government Exhibit 500.

9     A.  The name is Red Chaos, Red space Chaos.

10    Q.  By the way, have you ever met Lloyd Kidd before today?

11    A.  I have not.

12    Q.  You never seen him before today, right?

13    A.  No.

14    Q.  So, would you agree with me that the name Lloyd Kidd is

15    nowhere to be found on Government Exhibit 500, right?

16    A.  That's correct.

17         MR. MARGULIS-OHNUMA:  So, if we could go to,

18    Ms. Harney, can we please publish Government Exhibit 601 in

19    evidence.

20    Q.  So Mr. Uitto, you pointed out to us this was the same

21    e-mail -- withdrawn.  How did you say this was connected to the

22    spreadsheet?

23    A.  So the last line there, there is an e-mail address listed

24    redchaos826@gmail.com.

25    Q.  You don't work for Pinger, right?

J793KID6                          Uitto - Cross

1    A.  I do not.

2    Q.  Are you familiar with the Pinger service?

3    A.  I am not.

4    Q.  So, can you read for us what the name is on this customer

5    information sheet?

6    A.  The name listed as Red.

7    Q.  You would agree with me that the name Lloyd Kidd does not

8    appear anywhere on Government Exhibit 601, right?

9    A.  That's correct.

10          MR. MARGULIS-OHNUMA:  Just a moment, your Honor.

11          (Pause)

12   Q.  Sorry about that.

13          MR. MARGULIS-OHNUMA:  Ms. Harney, can you bring up

14   Government Exhibit 450B one more time.

15   Q.  So, you told us this was information about a particular

16   Backpage user, right?

17   A.  Yes.

18   Q.  There is an e-mail address in column E associated with

19   that, right?

20   A.  Yes.

21   Q.  By the way, have you seen this Keyonnadoll e-mail address

22   anywhere else?

23   A.  It may have shown up in a referrer column in another

24   spreadsheet.

25   Q.  But not --

J793KID6                      Uitto - Cross

1    A.  So in the ad information I believe there was a column that

2    may have contained a string refer, and it had that e-mail

3    address as well.

4    Q.  But, you don't know one way or another?  Do you whether

5    that e-mail address can be changed by the user?

6    A.  I don't know the answer to that.

7    Q.  The e-mail address is as of when the server was seized in

8    March 2018, right?

9    A.  Yes, somewhere around there.

10   Q.  There's really no way to know what the e-mail address on

11   this account was back in 2017, is there?

12   A.  I have just the data that was available when we seized it.

13   Q.  And nothing in that data tells us what the e-mail address

14   was in 2017, does it?

15   A.  There is an e-mail validation date.  But I did not come

16   across anything related to edits of the e-mail address.

17   Q.  You don't know anything about the process Backpage used to

18   do e-mail validation, do you?

19   A.  I do not.

20   Q.  So that, for all you know, that could be a user column,

21   too, right?

22   A.  Yeah, the e-mail column is something that is provided by

23   the user, yes.

24   Q.  For all we know, based on just the data, the e-mail

25   validation may be something provided by the user, too.  We just

J793KID6                          Uitto - Cross

1    don't know, do we, based on this data?

2    A.  Based on this data, that's correct.

3              MR. MARGULIS-OHNUMA:  If we could go back, Ms. Harney,

4    one more time to Government Exhibit 412.  That was the one with

5    a lot of overlapping images in it.

6    Q.  Do you recall or would you agree with me it was upwards of

7    70 photographs that were associated with that?  Is that right?

8    A.  Yes, that's my estimate.

9    Q.  As is it fair to say that those probably were not all

10   posted at the same time, right?

11   A.  Probably not.

12   Q.  In fact, just based on this data, we can't tell whether any

13   of them were actually ever posted publicly, right?

14   A.  I don't know the answer to that.

15   Q.  You don't know whether or not they were publicly posted,

16   correct?

17   A.  I know they were stored on the server.  I mean, we have the

18   post dates, the post information, so there's references to the

19   ad being posted.

20   Q.  But the post date doesn't tell you which photos were

21   posted, if any, does it?

22   A.  So, once again, I probably would -- if we could view the

23   other image metadata that was provided in discovery, I may be

24   able to answer more about that.

25   Q.  You mean there may be more information in the servers.  As

J793KID6                          Uitto - Redirect

1   you sit here today, you don't know, right?

2   A.  With the spreadsheets that are before me, I wouldn't be

3   able to answer that question.  But I may be able to if I had

4   access to the other spreadsheets that contained image metadata

5   that had more information about pictures.

6   Q.  As you sit here now -- when did you get assigned this case?

7   A.  So I've been doing extractions from the servers since April

8   of -- several months.

9   Q.  So, as you sit here now, having prepared for several

10  months, you can't tell one way or another whether any of these

11  pictures were ever actually posted, correct?

12  A.  With the data in front of me, that's correct.

13         MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

14  Thank you very much.

15         THE COURT:  Thank you.  Mr. Gutwillig?

16  REDIRECT EXAMINATION

17  BY MR. GUTWILLIG:

18  Q.  Mr. Uitto, you are familiar with Backpage through your work

19  with the FBI; is that right?

20  A.  Yes.

21  Q.  What generally is Backpage?

22         MR. MARGULIS-OHNUMA:  Objection, asked and answered.

23         THE COURT:  Overruled.

24  Q.  What generally is Backpage?

25  A.  So based upon my observations and the work I've done, it is

J793KID6                    Uitto - Redirect

1    an advertisement service for escort services.

2    Q.  Based on the underlying data you have, who posts

3    advertisements on Backpage?

4    A.  Users.

5              MR. MARGULIS-OHNUMA:  Objection.

6              THE COURT:  Overruled.

7    Q.  Can you please repeat who posts advertisements on Backpage?

8    A.  Users post the information.

9    Q.  We talked about reconstructions and the difference between

10   a reconstructions and advertisement as appeared on Backpage.

11   Is the underlying data different?

12   A.  It is not.

13   Q.  The underlying data is the same; is that correct?

14   A.  That's correct.

15   Q.  So, the difference is in formatting; is that right?

16   A.  That's correct.

17   Q.  So even if an advertisement in a reconstruction is not in

18   the format in which it appeared on Backpage, does it contain

19   the underlying data?

20   A.  Yes.

21   Q.  So, is it fair to say the differences are template?

22   A.  Yeah, template or style.

23   Q.  So, just briefly on the photographs.  Are you able,

24   let's -- you testified earlier that each advertisement has a

25   unique identifier; is that right?

J793KID6                          Uitto - Redirect

1    A.  Yes.

2    Q.  Could you please explain how you identify any photographs

3    related to that advertisement.

4    A.  So as I mentioned during the cross-examination, there's

5    some additional spreadsheets or additional data that I

6    extracted out.  And that specifically contains what I call

7    image metadata.  It's data about all pictures that were

8    uploaded for advertisements.  If I have access to those, as I

9    mentioned during the cross-examination, I can answer more about

10   it.  But I do not have those in front of me.

11   Q.  When you were requested to extract Backpage data, did you

12   in fact extract the data that you're discussing regarding

13   images?

14   A.  Yes.

15   Q.  From that data, are you able to identify with a specific

16   advertisement the images associated with it?

17   A.  Yes.

18   Q.  From the information in the servers?

19   A.  Yes.

20   Q.  Is the information in the servers all from Backpage.com?

21   A.  Yes.

22   Q.  So all of the data you discussed today and data in the

23   reconstructions, was that from Backpage.com?

24   A.  Yes.

25            MR. GUTWILLIG:  One moment, please, your Honor.

1    Q.  Mr. Uitto, by all the underlying data was from Backpage in

2    the reconstructions, does that include the images?

3    A.  Yes.

4    Q.  And advertising content?

5    A.  Yes.

6    Q.  And the IP address?

7    A.  Yes.

8    Q.  And the object ID?

9    A.  Yes.

10   Q.  And the user ID?

11   A.  Yes.

12   Q.  And the e-mail associated with the account?

13   A.  That's correct.

14   Q.  That all comes from the Backpage servers, correct?

15   A.  Yes.

16   Q.  So everything in those reconstructions that you looked at

17   came from the Backpage servers?

18   A.  That's correct.

19        MR. GUTWILLIG:  Thank you, your Honor.  Nothing

20   further.

21        MR. MARGULIS-OHNUMA:  Very briefly, your Honor.

22   RECROSS EXAMINATION

23   BY MR. MARGULIS-OHNUMA:

24   Q.  Just a couple.  So, you described Backpage as being a

25   website for escort ads, right?

J793KID6                         Uitto - Recross

```
1   A.  Yes.

2   Q.  How long was it in existence for?

3   A.  I do not know the answer to that.

4   Q.  Would you agree with me it had lots of content that had

5   nothing to do with sexual services in addition, right?

6   A.  So based upon my observations of the data I've reviewed,

7   most of it appears to be escort service related or massage

8   parlors or these sorts of things.

9   Q.  I think you told them when they seized it, it was like 20

10  terabytes of data, right?

11  A.  So, yeah, the two servers I looked at was totaling about 30

12  terabytes.  With the picture data and the one with the under --

13  the data that's contained in the spreadsheet, that's about 10

14  terabytes.

15  Q.  So, sorry, 40 terabytes?

16  A.  30 terabytes.

17  Q.  Huge amount of data, right?

18  A.  That is a lot of data.

19  Q.  You haven't looked at it all?

20  A.  No.

21  Q.  You have only looked at a tiny fraction based on targeted

22  searches?

23  A.  When I was trying to familiarize myself with the data, I

24  was kind of paging through, pulling up a large volume of the

25  listings and browsing through them to familiarize myself with
```

J793KID6                         Uitto - Recross

1    what's in them.

2    Q.  Didn't you see in there that there's classified ads like

3    used to run in the Village Voice, right?

4              MR. GUTWILLIG:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  Sorry.  There's content with things that are non-sexual

7    services, right?

8    A.  I have come across a few of those, yes.

9              MR. MARGULIS-OHNUMA:  Nothing further.  Thank you very

10   much.

11             THE COURT:  Thank you.  You may step down.  You are

12   excused.

13             (Witness excused)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J793KID6

<div style="line-height: 2;">

1     THE COURT:  We're going to take the afternoon

2     10-minute break at this point.

3          (Recess)

4          (In open court; jury not present)

5     THE COURT:  Who is the government's next witness?

6     MR. GUTWILLIG:  The government calls Judah Burk, your

7     Honor.  We were hoping to call the next witness with the

8     Court's indulgence this afternoon.  She is here and can testify

9     today and has limited availability.  We expect Agent Burk's

10    testimony shouldn't be more than hopefully 20 minutes.  And we

11    would hope to put on the second witness after that.

12    THE COURT:  After?

13    MR. GUTWILLIG:  After Agent Burk; yes, your Honor.

14    THE COURT:  All right.  Well the list that I had from

15    yesterday you indicated you would have Porsche Brown, Aisha,

16    and Ms. McLeod.

17    MR. GUTWILLIG:  Aisha, your Honor.

18    THE COURT:  All right.  So, do you need to take Judah

19    Burk first necessarily?

20    MR. GUTWILLIG:  We would prefer to do that, if the

21    Court allows, your Honor.

22    THE COURT:  It's your case, so whatever you feel

23    comfortable with.  All right.

24          (Continued on next page)

25

</div>

J79TKID7                        Burk – Direct

 1              (Jury present)

 2              THE COURT:   Thank you.   Welcome back.

 3    JUDAH BURK,

 4         called as a witness by the Government,

 5         having been duly sworn, testified as follows:

 6    DIRECT EXAMINATION

 7    BY MS. BRACEWELL:

 8    Q.   Good afternoon, Agent Burk.

 9    A.   Good afternoon.

10    Q.   Where do you work?

11    A.   The Federal Bureau of Investigation.

12    Q.   What is your title?

13    A.   Special agent.

14    Q.   How long have you been a special agent with the FBI?

15    A.   Approximately two years.

16    Q.   Are you assigned to any particular unit?

17    A.   I am.

18    Q.   What unit is that?

19    A.   It's transnational organized crime, specifically

20    international crimes.

21    Q.   Directing your attention to December 12, 2018, were you

22    involved in a arrest on that date?

23    A.   I was.

24    Q.   Who was arrested?

25    A.   Mr. Lloyd Kidd.

J79TKID7                           Burk - Direct

1    Q.  Where was Kidd arrested?

2    A.  In his residence.

3    Q.  And where was his residence?

4    A.  In Brooklyn.

5    Q.  Do you recall the address?

6    A.  Not specifically.

7            MS. BRACEWELL:  May I approach, your Honor?

8            THE COURT:  Yes.

9    Q.  I handed the witness when what's been marked for

10   identification as Government Exhibit 1000.

11           Agent Burk, if you could take a look at that, do you

12   recognize that document?

13   A.  I do.

14   Q.  Is that document one that you worked on or partially

15   completed on December 12, 2018.

16   A.  Yes, it is.

17   Q.  Looking at that document, does that refresh your

18   recollection as to where the arrest took place?

19   A.  Yes, it does.

20   Q.  And where did the arrest take place?

21   A.  9529 Church Avenue, Apartment 2A.

22   Q.  Approximately what time was the arrest made?

23   A.  Approximately 6:00 a.m.

24   Q.  And can you describe for the jury, what did you see?

25   A.  What did I see?

J79TKID7                           Burk - Direct

1    Q.   At the time of the arrest.

2    A.   So the time of the arrest the group of officers and agents

3    lined up in what we call a stack.   Then we knock on the door

4    and announce and enter the apartment.

5    Q.   While you all were getting at the door in a stack, did

6    Mr. Kidd come to the door?

7    A.   Yes, he did.

8    Q.   What happened next?

9    A.   The individuals at the front of the stack took him in

10   custody and searched him and did the things -- arrested him,

11   and then the rest of us went into the apartment.

12   Q.   Did you yourself enter the apartment?

13   A.   Yes, I did.

14   Q.   And for what purpose did you enter the apartment?

15   A.   To do what we call a safety sweep.

16   Q.   Let me pause here before we move on.   Can you describe

17   generally what was the layout of the apartment?

18   A.   So when you came up the stairs and entered into the

19   apartment there was a large living room area, and directly off

20   the living room area were two bedrooms, one to the right and

21   one to the left, and a little to the back was a kitchen area

22   and I believe another bedroom, but I didn't enter that part of

23   the premises.

24   Q.   How long were you in the defendant's apartment on

25   December 12, 2018?

J79TKID7                    Burk - Direct

1    A.  Approximately one hour.

2    Q.  Were any other individuals located in the apartment?

3    A.  Yes, there were.

4    Q.  And how many other individuals?

5    A.  There were two women later identified as victims and then

6    one other individual, one lady who was identified as his wife.

7    Q.  What was your role with respect to the arrest?

8    A.  I was responsible for evidence collection.

9    Q.  And within your role collecting evidence, what did you do

10   while you were in the apartment?

11   A.  I took photos of items that were of potential evidentiary

12   value, where they were located in the apartment.  Once they

13   were determined of potential evidentiary value, I collected

14   them, did the proper paperwork, and officially seized them with

15   me and took them back to the office to finish our evidence

16   collection.

17   Q.  And generally speaking, what items of potential evidentiary

18   value, as you said, were found in the apartment?

19   A.  The drugs.

20   Q.  You mentioned earlier that you took photographs during

21   December 12, 2018.

22          MS. BRACEWELL:  Your Honor, may I approach?

23          THE COURT:  Yes.

24   Q.  So I just handed you a folder which contains exhibits

25   marked as Government Exhibit 200 to 219.  Do you recognize this

J79TKID7                              Burk - Direct

1    folder?

2    A.  Yes, I do.

3    Q.  And how are you able to recognize it?

4    A.  That's my signature on the front of the folder.

5    Q.  And you reviewed its contents prior to your testimony

6    today?

7    A.  I did.

8    Q.  What is contained in the folder?

9    A.  Photos that I took.

10   Q.  And when did you take these photographs?

11   A.  The day of the arrest.

12   Q.  And what is depicted in the photographs?

13   A.  It's the layout of the apartment and items of evidentiary

14   value.

15          MS. BRACEWELL:  At this time the government offers

16   Exhibits 200 through 219.  These exhibits are not in dispute.

17          THE COURT:  All right.

18   Q.  Turning to the morning of the arrest, where did you first

19   go in the defendant's apartment?

20   A.  Initially into the large living room and directly to the

21   bedroom to right.

22          MS. BRACEWELL:  If you could publish what's in

23   evidence as Government Exhibit 211.

24   Q.  Agent Burk, what room is depicted here?

25   A.  That's the room that we discussed to the right.

J79TKID7                          Burk - Direct

1    Q.  Is this how you encountered the room?

2    A.  Yes, it was.

3    Q.  Based on your sweep of the room, did you find evidence

4    indicating whose room it was?

5    A.  Yes, it was identified as Mr. Kidd's room.

6    Q.  Can you describe what evidence that you found that led you

7    to believe it was the defendant's room?

8    A.  I'm not exactly sure who determined that it was his room

9    initially.  That's how we labeled it at the beginning.

10   Q.  Looking closest to the camera, could you describe what is

11   on the dresser closest to the person taking the photograph?

12   A.  Directly closest to -- is it the two Chucky dolls?

13   Q.  Yes, if that's what they are.

14   A.  Yes, they are Chucky dolls.

15           MS. BRACEWELL:  Ms. Harney, could you publish what's

16   in evidence as Government Exhibit 212.

17   Q.  Agent Burk, what room appears in this photograph?

18   A.  That same room to right, Mr. Kidd's room.

19   Q.  What is depicted in this photograph?

20   A.  It's a jar of condoms.

21   Q.  And where was this item located relative to the photograph

22   we were just viewing?

23   A.  It's directly under the bed closest to the wall.

24   Q.  The far wall?

25   A.  The back wall towards where the window was.

J79TKID7                          Burk - Direct

1              MS. BRACEWELL:  Ms. Harney, if you could publish

2      what's in evidence as 219.

3      Q.  Agent Burk, again what room is this photograph taken in?

4      A.  The same room.

5      Q.  Could you describe what appears here?

6      A.  There are several items of lingerie, a television,

7      telephone.

8      Q.  And where are those items of lingerie located in

9      defendant's bedroom?

10     A.  Exactly where they are on the photo.

11     Q.  What is this photograph showing?

12     A.  It is a piece of furniture, a dresser that has a TV stand.

13     Q.  And approximately how many items of lingerie were on the TV

14     stand?

15     A.  Several pairs, a couple of bras and panties.

16     Q.  You testified a moment ago that you found electronic

17     devices in the defendant's apartment.  Do you recall that?

18     A.  Yes, I do.

19     Q.  Starting with the defendant's bedroom, what devices were

20     located here?

21     A.  There was a cell phone, a couple computers -- or one

22     computer.

23     Q.  Do you recall sitting here today specific items that were

24     found there?

25     A.  Sorry?

Burk - Direct

1    Q.  Sitting here today, do you recall the specific items that

2    were found in the defendant's bedroom?

3    A.  Not off the top of my head.

4    Q.  Is there any document that would refresh your recollection?

5    A.  Yes, there is.

6           MS. BRACEWELL:  Your Honor, if I could direct the

7    witness to Government Exhibit 100.

8           THE COURT:  Yes.

9    Q.  Describe what this document is.

10   A.  It is our evidence recovery log.  It's a log that we write

11   items that we think are of evidentiary value, where they're

12   found, two people could speak to where they were found.

13   Q.  Were you involved in the preparation of this log?

14   A.  Yes, I was.

15   Q.  What was your role in preparing the log?

16   A.  I prepared it.

17   Q.  When did you write it relative to the arrest you're

18   describing?

19   A.  The majority I filled out in the hour while at the

20   apartment, and the others I filled out while back at my office.

21   Q.  So when you were filling the section about where the items

22   were located, did you do so while you knew where the items were

23   located while that information was fresh in your mind?

24   A.  Yes, I did.

25          MS. BRACEWELL:  So your Honor, we would under 803.5

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J79TKID7                          Burk - Direct

1   direct the witness to read from that document to describe what

2   items were found in defendant's bedroom.

3             MR. MARGULIS-OHNUMA:  No objection.

4             THE COURT:  Proceed.

5   Q.  So looking at the log in front of you, can you describe

6   what items were found in the defendant's bedroom?

7   A.  Yes, there was one iPhone, it was found in the back right

8   bedroom, Mr. Kidd's bedroom on the TV stand, one silver colored

9   Apple computer in the back right bedroom inside the closet,

10  there was one Alcatel phone on the back bedroom on top of a

11  safe.

12  Q.  So three total?

13  A.  Three devices, correct.

14  Q.  Did you seize all three of those items?

15  A.  Yes, I did.

16  Q.  So returning to the morning of the arrest, what room was

17  adjacent to the defendant's bedroom?

18  A.  So there was the living room directly adjacent, then the

19  other bedroom to the left of the living room.

20            MS. BRACEWELL:  Starting with the living room,

21  Ms. Harney, if you could publish what's in evidence as 213.

22  Q.  Agent Burk, what room is depicted here?

23  A.  That large living room area.

24            MS. BRACEWELL:  And Ms. Harney, if you could now

25  publish Government Exhibit 214.

1    Q.   What room is depicted here?

2    A.   Also that large living room area.  It's a close up of the

3    desk.

4    Q.   So this 214 is part of 213 that we were just viewing?

5    A.   That's correct.

6    Q.   The living room?

7    A.   Yes.

8    Q.   Generally speaking, what items did you observe on this

9    desk?

10   A.   There's another Apple computer, there are things -- a

11   couple of back-up or hard drives.

12   Q.   And directing your attention to the bottom right corner of

13   the computer screen depicted here, the small item partially

14   obscured by the corner of the monitor, could you describe what

15   that item is?

16   A.   Appears to be a webcam.

17   Q.   And what items were found in the living room?

18   A.   There was one external hard drive labeled "movies" that was

19   in the living room area on top of a DVD player, one black

20   external hard drive labeled "CK Time," and that was in the

21   living room area computer desk, one silver-colored Apple

22   computer, living room area computer desk, one SD card black,

23   living room area plugged into the computer, one black thumb

24   drive on TV stand, another black thumb drive on the TV stand,

25   one black Seagate back-up plus, living area computer desk.

J79TKID7                        Burk - Direct

1   Q.  How many items in total were found in the living room?

2   A.  Seven.

3   Q.  Over than the defendant's bedroom, were there any other

4   bedrooms adjacent to the living room?

5   A.  Yes.

6        MS. BRACEWELL:  Could you publish Government

7   Exhibit 200.

8   Q.  Agent Burk what room appears here?

9   A.  That bedroom to the left.

10  Q.  And where is this room relative to the living room we were

11  just looking in?

12  A.  Directly off of it.

13  Q.  And who is in this room when you entered it on the morning

14  of the arrest?

15  A.  The two women victims.

16  Q.  And what, if anything, did you observe about their demeanor

17  on that morning?

18  A.  They seemed shaken.

19  Q.  Whose belongings did you see in the room?

20  A.  I believe it was the women's, but I'm not sure.

21  Q.  Did those belongings appear to belong to men or women?

22  A.  They appeared to belong to women.

23  Q.  And directing your attention to Government Exhibit 206 --

24        MS. BRACEWELL:  If you could publish that.

25  Q.  -- where was this photograph taken?

J79TKID7                      Burk - Direct

1   A.  In the bedroom.

2   Q.  And this was, to be clear, the same room we have just been

3   describing where the women were located?

4   A.  Correct.

5   Q.  And what is depicted here in this photograph?

6   A.  A drawer full of condoms.

7   Q.  Do you recall what items -- what specific items were found

8   in the second bedroom?

9   A.  Two cell phones.

10  Q.  And would it refresh your recollection to look at

11  Government Exhibit 1000?

12  A.  Yes, it would.

13  Q.  If I could direct your attention there, could you describe

14  the specific devices that were found in that second bedroom?

15  A.  Yes, there was one black ZTE flip phone in the back left

16  bedroom inside of a pink basket, and one black Samsung in the

17  same back bedroom inside the pink basket.

18  Q.  In front of you in the courtroom is a cart containing

19  various devices.  Did you inspect this cart before testifying

20  today?

21  A.  Yes, I did.

22  Q.  Did you familiar yourself with the items of that cart?

23  A.  Yes, I did.

24  Q.  And what items are on the cart?

25  A.  The items I seized the morning of the arrest.

J79TKID7                          Burk - Direct

1    Q.  Were those items in generally the same condition as they

2    were on the date of the arrest?

3    A.  Yes, they were.

4    Q.  Are there labels on each of the items in the box?

5    A.  Yes, there are.

6    Q.  And generally speaking, what information is on those

7    labels?

8    A.  It's labeled with the numbers that correspond with my

9    evidence log, also on there is a short description of what

10   those items are, and then roughly where they were found; kind

11   of a mirror to what is on the log.

12   Q.  And to be clear, how would you log the items that you

13   seized on that date?  What was the number and format that you

14   used?

15   A.  I did one through twelve.

16           MS. BRACEWELL:  So your Honor, if I may approach?

17           THE COURT:  Yes.

18   Q.  I handed you what's been marked as Government Exhibit 155.

19   Could you describe what this item is.

20   A.  Yes, it's one black external hard drive labeled "CK Time

21   Machine."

22   Q.  What evidence number that you logged is associated with

23   Government Exhibit 155?

24   A.  So there are two numbers, there's item number 3, which is

25   directly in our log, and 1B3, which directly corresponds to it

J79TKID7                            Burk - Direct

1    in our system in the computer.

2              MS. BRACEWELL:  Your Honor, at this time the

3    government would offer Government Exhibits 150 to 162.  I do

4    not believe those are in dispute.

5              THE COURT:  Proceed.

6    Q.  Focusing your attention on Government Exhibit 155, could

7    you please remove the item from the bag.  Based on your

8    inspection of the device, are there any markings or

9    designations as to where this device was made or manufactured?

10   A.  Yes, it says product of Malaysia.

11   Q.  And what is the 1B number associated with this device?

12   A.  Number 31B3.

13   Q.  Could you explain what is the significance of the 1B3

14   number?

15   A.  It just logs what the item number is in our evidence

16   system, in our computer system.

17   Q.  When you say "our system," are you referring to the FBI

18   system?

19   A.  Yes, the FBI's evidence system.

20   Q.  Also beside you at the witness box is an exhibit that's in

21   evidence as 161.  Could you please take that device out of the

22   bag.

23   A.  Okay.

24   Q.  And are there any markings or designations to where this

25   item was made?

J79TKID7                              Burk - Direct

1   A.   Yes, it says product of Thailand, assembled in Thailand.

2   Q.   And what is the 1B number associated with this device?

3   A.   1B9.

4            MS. BRACEWELL:  Your Honor, if I could have one

5   minute.

6            (Pause)

7   BY MS. BRACEWELL:

8   Q.   Agent Burk, in a process of logging Government Exhibits 150

9   to 162 into the FBI log, can you describe what notations, if

10  any, you made on the packaging?

11  A.   Yes.  So on the packaging we usually put the location that

12  the arrest or search happened, which would be in this case 9529

13  Church Avenue, the case number that's associated with the item

14  number associated with the log, and then the general

15  description of what it is, and the two agents who could speak

16  to where that item was found.

17  Q.   And the 1B number that you referenced, does that appear on

18  the packaging anywhere?

19  A.   Yes, it does.

20  Q.   On each of the Government Exhibits 150 to 162, is there a

21  visible 1B number?

22  A.   It says 1B, yes.

23  Q.   And specifies which particular 1B number?

24  A.   Yes, that's correct.

25            MS. BRACEWELL:  Nothing further.

J79TKID7                         Burk – Cross

1              THE COURT:  Mr. Margulis.

2              MR. MARGULIS-OHNUMA:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. MARGULIS-OHNUMA:

5    Q.  Good afternoon, Agent Burk.

6    A.  Good afternoon.

7    Q.  You and I have met before, haven't we?

8    A.  Yes, we have.

9    Q.  So on the morning of December 12, you went in to arrest my

10   client, Lloyd Kidd, right?

11   A.  That is correct.

12   Q.  And tell us the location again of that arrest?

13   A.  It's 9529 Church Avenue.

14   Q.  What time in the morning was it?

15   A.  Approximately 6:00 a.m.

16   Q.  Neighborhood was pretty quiet at the time, right?

17   A.  I don't recall specifically.

18   Q.  Well, it's a residential neighborhood, right?

19   A.  Yes.

20   Q.  There were no loud noises in the background, right?

21   A.  Not that I recall.

22   Q.  And you went outside his apartment which floor?

23   A.  Directly one staircase, it's Apartment 2A.

24   Q.  How many agents were with you?

25   A.  Approximately ten to twelve.

1   Q.  Some were NYPD, right?

2   A.  That's correct.

3   Q.  Some were FBI, correct?

4   A.  That's correct.

5   Q.  Any other agencies?

6   A.  I don't know off the top of my head, but I can't say

7   specifically.

8   Q.  Everyone was in protective gear?

9   A.  That's correct.

10  Q.  Ballistics vests, right?

11  A.  Yes.

12  Q.  Did anyone have shields, ballistics shields?

13  A.  I don't recall specifically.

14  Q.  There was a stack formation outside his door, right?

15  A.  That is correct.

16  Q.  And there were ten to twelve agents lined up in that stack,

17  right?

18  A.  That is correct.

19  Q.  And the people at the front of the stack had what's

20  colloquially known as a battering ram, right?

21  A.  I don't know specifically what kind of device they had in

22  the stack.

23  Q.  Well, somebody had something, specific or general, to break

24  down the door if they had to, right?

25          MS. BRACEWELL:  Objection, your Honor, relevance.

J79TKID7                          Burk - Cross

1          THE COURT:  Sustained.

2   Q.  Well, you testified on direct about the arrest, right?

3   A.  That's correct.

4   Q.  And to get in, he didn't come to the door right away,

5   right?

6   A.  It took a few seconds for him to come to the door.

7   Q.  You heard some loud banging on the door?

8   A.  I recall them banging on the door announcing our presence,

9   but whether or not they banged any louder, I don't recall.

10  Q.  And then he came and opened up, right?

11  A.  That is correct.

12  Q.  And he was immediately taken out?

13  A.  He was immediately moved to side, that's correct.

14  Q.  You guys all went in, right?

15  A.  That is correct.

16  Q.  And you went in and you did what you called a safety sweep,

17  right?

18  A.  That is correct.

19  Q.  You were making sure there was nothing there that might

20  hurt you?

21  A.  No individuals, no items that could hurt the officers.

22  Q.  But you did find a few individuals, right?

23  A.  Yes, we did.

24  Q.  Three adult women, right?

25  A.  That is correct.

J79TKID7                          Burk - Cross

1    Q.  But they didn't pose any threat once you started talking to

2    them, right?

3    A.  It was determined later they weren't a threat, that is

4    correct.

5    Q.  But nonetheless, you start going around and looking around

6    the apartment, right?

7                MS. BRACEWELL:  Objection.

8                THE COURT:  Sustained.

9                MR. MARGULIS-OHNUMA:  I don't understand.

10               I will rephrase.

11   Q.  So you conducted your safety sweep, right?

12   A.  That is correct.

13   Q.  And that entailed looking under the bed, right?

14   A.  That is correct.

15   Q.  And looking in the closet, right?

16   A.  Yes.

17   Q.  And making sure you had every corner of closet?

18   A.  That's correct.

19   Q.  You opened some drawers up, right?

20   A.  I didn't open any drawers.

21   Q.  But your team did, right?

22   A.  I can't speak to what my team did or didn't do.

23               MR. MARGULIS-OHNUMA:  Ms. Harney, if we could please

24   open -- sorry, publish -- start with Government Exhibit 211.

25   Q.  That's the defendant's bedroom, right?

J79TKID7                         Burk - Cross

1    A.  That's correct.

2    Q.  And there is a little pink thing sort of right in the

3    middle of the picture, right?

4    A.  I'm sorry, where.

5    Q.  Well, there's a video screen that's on, correct?

6    A.  Correct.

7    Q.  Do you know how that screen got turned on?

8    A.  I don't know.

9    Q.  It was already turned on?

10   A.  It was turned on in the photo, that's all I remember.

11   Q.  You don't know if someone on your team turned it on?

12   A.  I can't speak to what they did.

13   Q.  That wouldn't be part of the safety sweep, right, turning

14   it on?

15            MS. BRACEWELL:  Objection.

16            THE COURT:  Sustained.

17   Q.  And below there there's some drawers in that desk that the

18   computer is on, right?

19   A.  I can't tell from this photo.

20   Q.  So let's look at Government Exhibit 219 in evidence,

21   please.

22            The lower left of the photograph you see an open

23   drawer, right?

24   A.  Does appear to be.

25   Q.  And that's the same video screen in that picture as seen in

J79TKID7                          Burk - Cross

1   Government Exhibit 211, would you agree with that?

2   A.  Yes, it is.

3   Q.  So that's a drawer right below there.  And would you agree

4   with me that it's closed in Government Exhibit 211 and it's

5   open in Government Exhibit 219, right?

6   A.  I don't believe you can actually see a difference between

7   the two.

8          MR. MARGULIS-OHNUMA:  Could we go back to 211?

9   Q.  Now that we have located the drawer on 219, can you

10  identify where that is on 211?

11         MS. BRACEWELL:  Objection, relevance.

12         THE COURT:  Sustained.

13         MR. MARGULIS-OHNUMA:  I'll move on.

14         Could we please put up Government Exhibit 214.

15  Q.  That's a picture of the desk in the living room, correct?

16  A.  That's correct.

17  Q.  You took that picture, right?

18  A.  Yes, I did.

19  Q.  And just to the right of the computer lying on its side is

20  a video camera, right?

21  A.  That appears to be a webcam.

22  Q.  Was that webcam seized?

23  A.  It was not.

24  Q.  And how did that webcam get on its side?

25  A.  I don't know.

1    MR. MARGULIS-OHNUMA:  Ms. Harney, please put up

2    Government Exhibit 207.

3    Q.  You took this picture, is that right?

4    A.  Yes, I did.

5    Q.  How did that drawer get opened?

6    A.  I can't recall.

7    Q.  That wasn't part of your safety sweep, right?

8         MS. BRACEWELL:  Objection.

9         THE COURT:  Sustained.

10        MR. MARGULIS-OHNUMA:  Please put up Government

11   Exhibit 206.

12   Q.  That's a drawer full of condoms, right?

13   A.  Yes, it is.

14   Q.  And you took a picture of that drawer?

15   A.  Yes, I did.

16   Q.  Was that drawer already open when you took the picture?

17   A.  Yes, it was.

18   Q.  You don't know how it got opened, right?

19   A.  No, I don't.

20        MR. MARGULIS-OHNUMA:  If we put up Government

21   Exhibit 212, please, Ms. Harney.

22        That's a picture of condoms under a bed, right?

23   A.  Yes, it is.

24   Q.  There's no gun in that picture, is there?

25   A.  No, there's not.

J79TKID5                         Goncalves – Direct

1              MR. MARGULIS-OHNUMA:  No further questions, your

2     Honor.

3              THE COURT:  Ms. Bracewell?

4              MS. BRACEWELL:  Nothing further from the government.

5              THE COURT:  Thank you, you're excused.  You may step

6     down.

7              THE WITNESS:  Thank you, your Honor.

8              MS. BRACEWELL:  The government will call Ms. Aisha

9     Goncalves.

10     AISHA GONCALVES,

11          called as a witness by the Government,

12          having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. GUTWILLIG:

15    Q.  Good afternoon.

16    A.  Good afternoon.

17    Q.  Starting off with some background questions, how old are

18    you today?

19    A.  18.

20    Q.  And what month were you born?

21    A.  October.

22    Q.  And what year were you born?

23    A.  2000.

24    Q.  And where did you grow up?

25    A.  I grew up in both Florida and the Bronx.

J79TKID5                          Goncalves - Direct

1   Q.  About when did you move to the Bronx?

2   A.  When I was six years old.

3   Q.  And have you been in the Bronx since then?

4   A.  Yes.

5          MR. GUTWILLIG:  Ms. Harney, if we could please pull up

6   for the witness what's been marked for identification as

7   Government Exhibits 702R.

8   Q.  Do you recognize this document?

9   A.  Yes.

10  Q.  Would you please tell me what it is?

11  A.  My birth certificate.

12         MR. GUTWILLIG:  Your Honor, the government would offer

13  Exhibit 702R, and it's undisputed.

14         THE COURT:  All right.

15  Q.  And just to note, could you please read your date of birth?

16  A.  10/16/2000.

17  Q.  Directing your attention to May of 2017, where were you

18  living at that time?

19  A.  In Hawthorne Cedar Knolls.

20  Q.  What is Hawthorne Cedar Knolls?

21  A.  It's a residential treatment center.

22  Q.  And what types of people are in the residential treatment

23  center?

24  A.  Both boys and girls.

25  Q.  And is Hawthorne part of the foster care system?

J79TKID5                        Goncalves - Direct

1    A.   Yes.

2    Q.   If you wouldn't mind moving the microphone a touch closer.

3              And where is Hawthorne located?

4    A.   Hawthorne, New York.

5    Q.   Do you know in what county Hawthorne, New York is?

6    A.   Westchester County.

7    Q.   And prior to entering Hawthorne, had you been in a

8    different group home in foster care?

9    A.   Yes.

10   Q.   About how old were you when you entered the home in foster

11   care?

12   A.   I was about 13 years old.

13   Q.   Including Hawthorne, approximately how many facilities have

14   you lived in?

15   A.   I would say about two or three.

16   Q.   In around May of 2017, did you have sex in exchange for

17   money?

18   A.   Yes.

19   Q.   And how old were you at that time?

20   A.   I was 16 years old.

21   Q.   And who, if anyone, did you work for during that time?

22   A.   Chris.

23   Q.   And what -- do you know Chris by any other names?

24   A.   Red.

25   Q.   Do you see that person in the courtroom today?

1    A.  Yes.

2    Q.  Could you please identify that person by indicating an

3    article of clothing that person is wearing?

4    A.  A light blue shirt.

5              MR. GUTWILLIG:  Your Honor, I request that the record

6    reflect that the witness identified the defendant.

7              THE COURT:  Noted.

8    Q.  So as I ask you questions I'm going to refer to Chris as

9    the defendant, is that okay?

10   A.  Yes.

11   Q.  So let's talk about how you met the defendant.

12             MS. MEDLEY:  Your Honor, can we have a brief sidebar?

13             THE COURT:  What's the problem?

14             MS. MEDLEY:  An issue that we already discussed with

15   the government and they agreed to have a sidebar over.

16             THE COURT:  All right.

17             (Continued on next page)

18

19

20

21

22

23

24

25

J79TKID5                           Goncalves - Direct

1            (At sidebar)

2            MS. MEDLEY:  Your Honor, sorry for not bringing it

3    before the witness was called, but we want the jury reminded

4    this is not Victim-2 from the indictment, that she's testifying

5    that she was prostituted for Mr. Kidd while she was underage,

6    that she should not be confused with Victim-2, who is

7    testifying.  Just to clarify.

8            MR. GUTWILLIG:  It would be clear in the instructions

9    and in the indictment at the end.

10           MS. MEDLEY:  We agreed we could give a clarifying

11   instruction while they're taking notes that she's not Victim-2.

12           MR. RAVI:  Your Honor, I don't think we object to

13   there being an instruction that she's not one of the identified

14   victims in the indictment.

15           MS. MEDLEY:  That's all we're asking for, so they

16   could keep clear notes.

17           MR. MARGULIS-OHNUMA:  We should have asked in the

18   beginning, we apologize.

19           MR. RAVI:  I prefer it happen maybe at the end.

20           MR. MARGULIS-OHNUMA:  No, because if there was

21   testimony they will think she's Victim-2.  That's what it

22   sounds like now.

23           MR. GUTWILLIG:  She's not familiar with the charges

24   and she's going to identify the Victim-2 by name.

25           MS. MEDLEY:  There's a lot of names going around.  We

1    want, while they're taking notes and hearing testimony, to be

2    able to understand the context of the testimony she's giving,

3    which in this case she's not Victim-2.  She's not one of the

4    charged victims.  We think it would be helpful to clarify she's

5    not one of the victims in the indictment.

6              MR. GUTWILLIG:  At this point it would be more

7    confusing to doing it -- we have no objection to doing it, it

8    just seems like now it seems like an odd time to do it to

9    confuse the jury to have called this witness and have her

10   identify the defendant and say she had sex for money and say

11   this is not one of the victims in the indictment, which we are

12   okay with doing.

13             MS. MEDLEY:  I think all it would do is clarify.  I

14   don't see how it could be more confusing to make sure they

15   understand this isn't Victim-2.

16             MR. GUTWILLIG:  And also not in the presence of the

17   witness, who has no knowledge.

18             THE COURT:  I will ask the witness to step down for a

19   moment.

20             MS. MEDLEY:  Thank you, Judge.

21             MR. MARGULIS-OHNUMA:  Thank you, your Honor.

22             (Continued on next page)

23

24

25

J79TKID5                          Goncalves – Direct

1          (In open court)

2          THE COURT:  Ms. Goncalves, I ask that you step down

3    for one moment while we clarify an issue.  So just step down

4    and go into the room in the back.  It will not take long.

5          (Witness not present)

6          THE COURT:  I called this brief recess in the

7    testimony to clarify a matter that has been brought to the

8    Court's attention by the parties that Ms. Goncalves is not the

9    Victim-2 that is referred to in the indictment.

10         All right?

11         MS. MEDLEY:  Thank you, your Honor.

12         THE COURT:  Bring her back in.

13         (Witness present)

14         THE COURT:  Mr. Gutwillig, please resume.

15         MR. GUTWILLIG:  Yes, your Honor.

16   BY MR. GUTWILLIG:

17   Q.  Where we left off we were talking about how you met the

18   defendant.

19         Approximately when did you first meet the defendant?

20   A.  Around 2017.

21   Q.  And how old were you at the time that you met the

22   defendant?

23   A.  I was like 16 years old.

24   Q.  And if you say like 16 years old, how do you recall that

25   you were 16 years old?

J79TKID5                        Goncalves – Direct

1   A.  I had first got a tattoo when I was 16.

2   Q.  Do you still have that tattoo?

3   A.  Yes.

4   Q.  Where is it, if you don't mind?

5   A.  Right here.

6        MR. GUTWILLIG:  The record could reflect the witness

7   is identifying a tattoo on her left arm, please.

8        THE COURT:  All right.

9   Q.  And how did you come to meet the defendant?

10  A.  Through Jessica.

11  Q.  And do you know Jessica's full name?

12  A.  Jessica Bonilla.

13       MR. GUTWILLIG:  Please pull up for the witness what is

14  marked as Government Exhibit 4.

15  A.  Yes.

16  Q.  Do you recognize the individual in this photograph?

17  A.  Yes.

18  Q.  And who is it?

19  A.  Jessica Bonilla.

20       MR. GUTWILLIG:  Your Honor, the government offers

21  Government Exhibit 4, which I believe there's an objection.

22       MS. MEDLEY:  No objection.

23       MR. GUTWILLIG:  The government offers Government

24  Exhibit 4.

25       THE COURT:  It's been admitted.

1          (Government's Exhibit 4 received in evidence)

2          THE COURT:  If it's not disputed, it's part of the

3  list you gave this morning, you need not make reference to

4  this, just proceed.

5  BY MR. GUTWILLIG:

6  Q.  How did you know Ms. Bonilla?

7  A.  I met her through Hawthorne.

8  Q.  Were you living there at the same time?

9  A.  Yeah, she was in my unit.

10  Q.  At that time did you know how old she was?

11  A.  She told me she was 16 years old.

12  Q.  When you say she told you she was 16 years old, are you

13  aware that she was a different age at that time?

14  A.  No, not really.

15  Q.  So could you please tell me -- you met the defendant

16  through Jessica, is that correct?

17  A.  Yes.

18  Q.  How did that happen?

19  A.  How did it happen?  He came up to Hawthorne, we got in the

20  car and we went to his house.

21  Q.  Ms. Gonzalez, if you wouldn't mind moving a little

22  closer --

23          THE COURT:  You can also speak a little louder,

24  please.

25  A.  He had picked me up Jessica at Hawthorne in the car, and

J79TKID5                           Goncalves - Direct

1   then we went to his house after that.

2   Q.  When you say he picked you and Jessica up, did he drive to

3   Hawthorne?

4   A.  Yes.

5   Q.  Do you recall what type of car?

6   A.  It was a black four door.

7   Q.  How did you know you would meet the defendant?

8   A.  Jessica had came up to me, she was like we going to go hang

9   out, and we went to the front of the campus and he was there.

10  Q.  And what did you understand Jessica to mean by "hang out?"

11  A.  To my reference, I was thinking about, you know, just

12  smoking, chilling, talking, laughing.

13  Q.  And so you testified that the defendant came to pick you

14  up, is that correct?

15  A.  Yes.

16  Q.  And where, if anywhere, did you all drive after that?

17  A.  To Brooklyn.

18  Q.  And when you arrived, who, if anyone, was there?

19  A.  It was two other girls there.

20  Q.  Two other girls at the apartment?

21  A.  Yeah.

22  Q.  So you and Ms. Bonilla and the defendant and two other

23  girls?

24  A.  No, it was me, Jessica, the defendant, and one of the other

25  girls, but there was two girls in the house.

J79TKID5                          Goncalves – Direct

1    Q.  And one of the other girls, do you recall that girl's name?

2    A.  Tanisha.

3    Q.  How did you know her?

4    A.  She was inside the campus, too, she lives on campus.

5    Q.  On the campus at Hawthorne?

6    A.  Yes.

7    Q.  And you said there were two other girls there as well, is

8    that correct?

9    A.  Yes.

10   Q.  Do you know their names?

11   A.  No.

12   Q.  Do you recall about how old they were?

13   A.  They were like older than me.

14   Q.  And what did the apartment look like, do you recall?

15   A.  It looked like a two-story building, like a two-family

16   house building.  It was like a normal apartment, it had a bed

17   there, it had kitchen, it had a closet, it had rooms.

18   Q.  Could you please pull up what is marked as Government

19   Exhibit 256.  Sorry, 255.

20          When you arrived at the apartment, Ms. Gonzalez, what

21   happened next?

22   A.  Me, Jessica, and Tanisha was hanging out with Chris, and

23   then Jessica and Chris was talking and they brought up the fact

24   do I want to be posted on BackPage, and Jessica took pictures

25   of me and sent it to Chris.

1   Q.  When you say "posted on BackPage," what did you understand

2   that to mean?

3   A.  To have taken pictures, taking pictures and posting on

4   BackPage and just being a prostitute.

5   Q.  And were there pictures taken of you?

6   A.  Yes.

7   Q.  And who took pictures?

8   A.  Jessica.

9   Q.  And what happened with those pictures?

10  A.  She sent it to Chris.

11  Q.  And how do you know that?

12  A.  Because I seen it.

13  Q.  You saw Jessica send pictures to Chris, is that right?

14  A.  Yes.

15  Q.  And what happened with the pictures after that?

16  A.  He was editing the pictures and he posted on BackPage.

17  Q.  When you say "editing the pictures," can you explain what

18  you mean by that?

19  A.  He was cropping my face out.

20  Q.  And do you recall the type of device he was using to do

21  that?

22  A.  A computer.

23  Q.  And how do you know that?

24  A.  It was right next to the couch.

25  Q.  So you were watching him crop the pictures?

J79TKID5                          Goncalves – Direct

1   A.  Yeah.

2   Q.  And how long after that were those pictures posted on

3   BackPage?

4   A.  I would say like two hours after.

5   Q.  And did you see those images posted on BackPage?

6   A.  Yeah.

7   Q.  Did you see them in advertisements posted on BackPage?

8   A.  Yes.

9           MR. GUTWILLIG:  And Ms. Harney, if you could pull up

10  Government Exhibit 253, please.

11  Q.  Do you recognize this picture, Ms. Gonzalez?

12  A.  Yes.

13  Q.  And what is it?

14  A.  Chris' building.

15  Q.  And this is the apartment?

16  A.  Yes.

17          MR. GUTWILLIG:  Ms. Harney, please pull up what's been

18  marked as Government Exhibit 422.

19  Q.  Do you recognize any of these images, Ms. Gonzalez?

20  A.  Yes.

21  Q.  I'm sorry?

22  A.  Yes.

23  Q.  And do you recognize any of the people in these images?

24  A.  Yes.

25  Q.  Who, if anyone, do you recognize?

J79TKID5                          Goncalves - Direct

1    A.  At the bottom that's Tanisha.

2    Q.  That's Tanisha?

3    A.  Yes.

4    Q.  Do you recognize anyone else in these images?

5    A.  Myself.

6    Q.  And could you please identify if there's a name with the

7    images that are yours?

8    A.  Lizzy.

9    Q.  Do you recognize those as the pictures that you testified

10   about earlier?

11   A.  Yes.

12        MR. GUTWILLIG:  Ms. Harney, please pull up what is in

13   evidence's Government Exhibit 421.

14   Q.  And Ms. Gonzalez, do you recognize anyone in these images?

15   A.  Yes.

16   Q.  And who do you recognize?

17   A.  Jessica.

18   Q.  Can you identify if there's a name or a number of the

19   images with Jessica?

20   A.  Domo.

21   Q.  And could you indicate just by the images with Domo, are

22   those the ones you're referring to?

23   A.  Yes.

24   Q.  And those were images of Ms. Bonilla?

25   A.  Yeah.

J79TKID5                        Goncalves - Direct

1    Q.  For approximately how long were you at the defendant's

2    apartment?

3    A.  I was there for two days.

4    Q.  And during those two days, did Jessica see customers during

5    that time?

6    A.  Yes.

7    Q.  And how do you know that?

8    A.  Because I had to go to the room.

9    Q.  When you say you had to go to the room, could you explain a

10   little bit about what that means?

11   A.  So basically she did whatever she had to do with the

12   customer in the living room, and I had to go to a different

13   room so I could be in the same room that she was in.

14   Q.  And when you say "whatever she had to do," could you

15   explain what that means?

16   A.  Having sex for money with a customer.

17   Q.  And when you say you had to go to the other room, what does

18   that mean?

19   A.  I had went to a different room.

20   Q.  And after that, did you see Jessica with money?

21   A.  Yes.

22   Q.  And what did she do with that money?

23   A.  She gave it to Chris.

24   Q.  And did you see that happen?

25   A.  Yes.

J79TKID5                        Goncalves - Direct

1  Q.  Did Tanisha see customers during at that time?
2  A.  Yes.
3  Q.  And how do you know?
4  A.  I had to go to a different room.
5  Q.  When you say "a different room," you're referring to the
6  way the apartment was laid out, is that correct?
7  A.  Yes.
8  Q.  So when someone would see a customer, would you go to a
9  different room?
10  A.  Yeah, because there was a living room.
11  Q.  And when you say it was in the living room, was that where
12  people would see customers?
13  A.  Yeah.
14  Q.  And you said that you saw Tanisha see customers during that
15  time.  Did you see Tanisha after she saw customers?
16  A.  Yes.
17  Q.  Did you see her with money?
18  A.  Yes.
19  Q.  What did you see her do with that money?
20  A.  I seen her give all the money to Chris.
21  Q.  And Ms. Gonzalez, did you see customers during that time?
22  A.  Yes.
23  Q.  And approximately how many?
24  A.  I would say approximately like two or three.
25  Q.  And when you did that, were you in the living room?

J79TKID5                          Goncalves - Direct

1   A.  Yes.

2   Q.  And did the other girls go to the other room?

3   A.  Yes.

4   Q.  And did you receive money in exchange for sex?

5   A.  Yes.

6   Q.  And what did you do with that money?

7   A.  I gave Chris half of the money.

8   Q.  And you kept half?

9   A.  Yes.

10  Q.  After that time, when you testified that you were at the

11  defendant's apartment for a period of time, where did you go

12  when you left?

13  A.  I went to go to my best friend's house.

14  Q.  And where is your best friend located?

15  A.  She's located in Manhattan.

16  Q.  And about how long were you there?

17  A.  For like an hour or two.

18  Q.  And after that, where did you go?

19  A.  Back to Hawthorne.

20  Q.  And did you see Jessica back at Hawthorne?

21  A.  Yes.

22  Q.  Approximately about how long after, if you recall?

23  A.  Later on, three hours after.

24  Q.  So the same day you saw Jessica back at Hawthorne?

25  A.  Yes.

J79TKID5                          Goncalves – Direct

1   Q.  And did there come a time that you saw the defendant after

2   that?

3   A.  Yes.

4   Q.  And approximately how long after was it?

5   A.  A couple days after.

6   Q.  And how did that come about?

7   A.  Me, Jessica, and Sabrina went to 125th Street, because we

8   had gotten on Metro-North to go to 125th Street, and he --

9            MR. MARGULIS-OHNUMA:  Could you repeat the answer?

10  A.  Could you repeat the question?

11  Q.  How did that come about that you saw the defendant for the

12  second time?

13  A.  Me, Jessica, and Sabrina went to 125th Street, because we

14  had to take the Metro-North to go back to the city, so we went

15  to 125th Street, and he picked us up from 125th, and we went to

16  Brooklyn from there.

17  Q.  And you mentioned Jessica, is that the same Jessica that

18  you referred to earlier?

19  A.  Yes.

20  Q.  And you also mentioned someone named Sabrina, is that

21  right?

22  A.  Yes.

23  Q.  And you left from -- the three of you left from Hawthorne,

24  is that correct?

25  A.  Yes.

J79TKID5                        Goncalves – Direct

1   Q.  You testified earlier that Hawthorne is in Westchester
2   County.
3   A.  Yes.
4   Q.  You say 125th Street, what are you referring to?
5   A.  The Metro-North, Harlem 125th, because you have to take
6   Metro-North to 125th or 42nd Street.
7   Q.  When you arrived -- when you took the Metro-North from
8   Westchester to 125th Street, you testified that you saw the
9   defendant?
10  A.  Yes.
11  Q.  And how did you see the defendant?
12  A.  He picked us up from 125th.
13  Q.  How did he pick you up?  In a car?
14  A.  Yeah.
15  Q.  Was it the same car?
16  A.  Yes.
17  Q.  And where did you go after that?
18  A.  We went to Brooklyn.
19  Q.  To the same apartment you identified earlier?
20  A.  Yes.
21  Q.  And who, if anyone, was there when you arrived?
22  A.  Brielle.
23  Q.  Brielle?
24  A.  Yes.
25  Q.  And so Brielle was there, and how did you know Brielle?

J79TKID5                          Goncalves - Direct

1   A.  She was in Hawthorne, too.  She was in the other unit as

2   me.

3   Q.  So at that point you met Brielle there, you and Jessica and

4   Sabrina, is that correct?

5   A.  Yes.

6   Q.  And who, if anyone else, was there in the apartment?

7   A.  One of his friends.

8   Q.  And when you arrived at the defendant's apartment, what, if

9   anything, happened after that?

10  A.  We was hanging out, smoking, and then he wanted to post us

11  again on BackPage.

12  Q.  About smoking, do you mean -- smoking what?

13  A.  Marijuana.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J793KID8                         Goncalves - Direct

1   Q.  Did there come a time that you had a physical contact with

2   the defendant?

3   A.  Yes.

4   Q.  What happened?

5   A.  He called me to his room because he wanted to talk to me.

6   And he asked me if he wanted to have sex with me.  And he did.

7   Q.  Did you want to have sex with him?

8   A.  No.

9   Q.  Did you tell him that?

10  A.  Yes.

11  Q.  What, if anything, did he do?

12  A.  He grabbed my wrist, and he was like come on.  And like, he

13  gestured with his hand, and he had sex with me.

14  Q.  Did he use a condom when he had sex?

15  A.  No.

16  Q.  After you went into his room, did he call any of the other

17  girls in his room?

18  A.  Sabrina.

19  Q.  After Sabrina was in his room, did you speak with Sabrina?

20  A.  Yes.

21  Q.  What happened with Sabrina and the defendant?

22  A.  She told me that she had sex.  She told me that they had

23  sex.

24  Q.  During the second time you were at the defendant's

25  apartment, for approximately how long were you there?

J793KID8                        Goncalves - Direct

1    A.   For a night.

2    Q.   During that time, did Jessica see customers?

3    A.   Yes.

4    Q.   How do you know?

5    A.   We had to go to a different room.

6    Q.   The same room you were talking about before?

7    A.   Yes.

8    Q.   So was it normal for when a customer came, whoever wasn't

9    seeing the customer would go to a different room?

10   A.   Yes.

11   Q.   Whoever was seeing the customer would stay in the living

12   room?

13   A.   Yes.

14   Q.   After Jessica saw customers. did you see her with money?

15   A.   Yes.

16   Q.   What did she do with the money?

17   A.   She gave it to Chris.

18   Q.   How do you know that?

19   A.   Because I seen her give it to him.

20   Q.   Did Sabrina see customers during that time?

21   A.   Yes.

22   Q.   How do you know?

23   A.   She had told me, and I seen her give him the money.

24   Q.   When you said you saw her give him money, who is the "he"

25   you're referring to?

J793KID8                          Goncalves – Direct

1    A.  Chris.

2    Q.  The defendant?

3    A.  Yes.

4    Q.  Did you see customers during that time?

5    A.  Yes.

6    Q.  Approximately how many?

7    A.  About two.

8    Q.  What did you do with the money?

9    A.  I gave it to Chris.

10   Q.  When I say "seeing customers," were you having sex with

11   customers?

12   A.  Yes.

13   Q.  Was Jessica having sex with customers?

14   A.  Yes.

15   Q.  Was Sabrina having sex with customers?

16   A.  Yes.

17   Q.  You saw each of them with money afterward?

18   A.  Yes.

19          THE COURT:  Asked and answered.

20   Q.  Approximately how long did you stay at the apartment?

21   A.  For a night.

22   Q.  Why did you leave?

23   A.  Because I didn't want to be there no more.

24   Q.  Where did you go next?

25   A.  Me, Sabrina, Brielle, and Jessica had went to Target.

J793KID8                     Goncalves - Direct

1   Q.  And by Target, are you referring to the store?

2   A.  Yes.

3   Q.  About how long did it take you to get to Target?

4   A.  I don't recall how long it took, but it took like I would

5   say about 30 minutes.

6   Q.  Was it a walk or a drive?

7   A.  We took a bus there.

8   Q.  You took a bus?  Okay.

9            MR. GUTWILLIG:  If we can show the witness what's been

10  marked for identification as Government Exhibit 259.  May I

11  approach, your Honor?

12           THE COURT:  Yes.

13  Q.  Ms. Gonzalez, I'm handing you some papers.  If you please

14  take a look through those and look up when you're finished

15  looking.

16           Do you recognize those photographs?

17  A.  Yes.

18  Q.  What are they?

19  A.  Me, Jessica, Sabrina, Brielle in Target.

20           MR. GUTWILLIG:  May I approach again, your Honor?

21  Q.  Ms. Gonzalez, do you recognize that CD?

22  A.  Yes.

23  Q.  How do you recognize it?

24  A.  My initials are on it.

25  Q.  Have you reviewed the contents of that CD before your

J793KID8                        Goncalves – Direct

1   testimony today?

2   A.   Excuse me?

3   Q.   Have you reviewed what's on the CD before your testimony

4   today?

5   A.   Yeah.

6          MR. GUTWILLIG:  Your Honor, at this time the

7   government would offer Government Exhibit 1100A, 1101A, 1101B,

8   1102A, and 1103A through 1103L.

9          THE COURT:  Those are not.

10         MR. GUTWILLIG:  It's not in dispute.

11         THE COURT:  All right.

12         MR. GUTWILLIG:  Ms. Harney, can you please publish

13   Government Exhibit 1103D.

14  Q.   Do you recognize this photograph?

15  A.   Yes.

16  Q.   Can you describe who, if anyone, you see in it?

17  A.   Me, Jessica, Brielle, Sabrina.

18  Q.   Looking at the top-left corner, can you please read the

19  time stamp on it.

20  A.   Thursday, May 18, 2017, at 2:42 p.m.

21  Q.   Is this one of the photographs you looked at from the

22  Target?

23  A.   Yes.

24  Q.   That's where you went after you left the defendant's

25  apartment?

J793KID8                          Goncalves – Direct

1    A.  Yes.

2              MR. GUTWILLIG:  Ms. Harney, can you please pull up

3    what's been marked for identification as Government Exhibit 3A,

4    which I believe is not in dispute.

5    Q.  Ms. Gonzalez, do you recognize the person in this

6    photograph?

7    A.  Yes.

8    Q.  Who is it?

9    A.  Me.

10   Q.  What are you wearing in that?

11   A.  I'm wearing a gray Nike shirt.

12             MR. GUTWILLIG:  Ms. Harney, can you please go back to

13   1103D.

14   Q.  What are you wearing in this photograph?

15   A.  A gray Nike shirt.

16   Q.  If we can please pull up what's in evidence as Government

17   Exhibit 1103E.

18             What is this image?

19   A.  Me and Jessica.  Jessica's looking at the bathing suit.

20   Q.  And what were you all doing in the Target?

21   A.  We were stealing.

22   Q.  What were you stealing?

23   A.  Bathing suits and, you know, beach clothes.

24   Q.  Do you recognize yourself in this photograph?

25   A.  Yes.

J793KID8                        Goncalves – Direct

1   Q.  Is that you in the Nike shirt?

2   A.  Yes.

3   Q.  And do you recognize what's on your left arm there?

4   A.  Yes.

5   Q.  What is it?

6   A.  My tattoo.

7   Q.  You testified that was the tattoo you got when you were 16;

8   is that correct?

9   A.  Yes.

10  Q.  Can we please pull up what's in evidence as Government

11  Exhibit 1103L.

12          What is this image?

13  A.  Me, Jessica, Sabrina and Brielle.

14  Q.  Can you please read the time stamp on the top left.

15  A.  Thursday, May 18, 2017, at 2:53 p.m.

16  Q.  After you all were at the Target, where did you go next?

17  A.  To my best friend's house.

18  Q.  Where was your best friend?

19  A.  Manhattan.

20  Q.  Looking at this photo, Ms. Gonzalez, could you please

21  identify each individual you mentioned earlier by an article of

22  clothing they're wearing.

23  A.  The pink hat is Sabrina.  The girl with the dress, the

24  floral dress, that's Jessica.  I'm with the gray shirt, and

25  Brielle is the one with the pink shirt.

J793KID8                          Goncalves - Direct

1    Q.  Did you ever see the defendant again after that date?

2    A.  No.

3                MR. GUTWILLIG:  One moment, please, your Honor.

4                Ms. Harney, can you please pull back up Exhibit 1103L.

5    Q.  And the date and time stamp on the top-left corner.  I

6    believe you testified earlier it's May of 2017.  Is that

7    generally consistent with when you recall working for the

8    defendant?

9    A.  Yes.

10               MR. GUTWILLIG:  Also, your Honor, to the extent 3A was

11   not offered, I believe it's undisputed.  Nothing further.

12               THE COURT:  Thank you.  Mr. Margulis?

13               MS. MEDLEY:  Your Honor, we have one issue that we

14   need to address at sidebar before I begin my cross.

15               THE COURT:  What's the question?

16               MS. MEDLEY:  It involves a prior bad act.

17               THE COURT:  Is the government aware of this issue?

18               MR. GUTWILLIG:  Yes, we'd like to approach the

19   sidebar.

20               (Continued on next page)

21

22

23

24

25

J793KID8                    Goncalves - Direct

1              (At the sidebar)

2              MS. MEDLEY:  Your Honor, we were just made aware by

3    the government disclosed that this witness has two prior

4    arrests, and I think they were saying they would move to

5    preclude us from crossing her on them.  One of them we're not

6    going to bring up.  The other one we would like to cross her

7    on.  It's that she had possession of a stolen vehicle, which we

8    believe is a crime of falsity and goes to credibility.  And

9    also goes to an incentive to please the government by accusing

10   our client.

11             THE COURT:  The question is whether that bad act bears

12   on credibility.

13             MS. MEDLEY:  Yes.

14             THE COURT:  I don't understand the second.  Why would

15   it have to do with pleasing the government?

16             MS. MEDLEY:  Well, we opened on why people might not

17   be credible with their motivations would be for testifying the

18   way they're testifying.  And if she has this somewhat recent

19   arrest for something, we would say that it could potentially be

20   a motivation.

21             THE COURT:  I think there is a big gap there between

22   the fact that she had a recent arrest and pleasing the

23   government here.  I don't see the connection.

24             MS. MEDLEY:  Well, at the very least, your Honor, it

25   is still a crime in falsity, so we would want to be able to ask

1    about it.  But we would ask one or two questions, but we

2    wouldn't harp on it very long.

3              MR. GUTWILLIG:  I think as we mentioned, the

4    government was seeking an unsealing application.  We gave these

5    records to the defense when we received them before

6    Ms. Goncalves went on.  It is an arrest from October of 2017

7    that involves -- I believe it's grand larceny and theft of a

8    car.  The government's position is it that does not bear on her

9    character for truthfulness.  It was resolved I believe with a

10   fine.  And in any event, it's irrelevant to the crimes that

11   we're talking about here and the conduct that Ms. Gonzalez has

12   testified to.  And it's also a juvenile adjudication.

13             THE COURT:  All right.  I'm going to deny the

14   application.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     CROSS-EXAMINATION

3     BY MS. MEDLEY:

4     Q.  Hello, Ms. Goncalves.  We've never met before; is that

5     right?

6     A.  No.

7     Q.  I just have a few questions for you.  So, you testified

8     that the first time you met my client, he came to pick you up

9     in a vehicle at Hawthorne; is that right?

10    A.  Yes.

11    Q.  Could you describe that vehicle?

12    A.  It was a black four-door car.

13    Q.  When you say car, do you mean sedan?

14    A.  A four-door car.  A regular car.

15    Q.  A regular car, not an SUV?

16    A.  No.

17    Q.  Approximately when was this?

18    A.  This was around May in 2017.

19    Q.  Do you remember if it was the beginning of the month or the

20    middle of the month or the end of the month?

21    A.  It was in the middle of the month.

22    Q.  Middle of the month?  Okay.  And you said that Jessica is

23    the one who told you about Mr. Kidd.  Is that right?

24    A.  Yes.

25    Q.  And Jessica invited you to come meet Mr. Kidd?

J793KID8                          Goncalves - Cross

1   A.  Yes.

2   Q.  And then when you arrived at Mr. Kidd's apartment, Jessica

3   took photos of you; is that right?

4   A.  Yes.

5   Q.  And did Jessica tell what you those photos would be for?

6   A.  Yes.

7   Q.  What did she say they were for?

8               MR. GUTWILLIG:  Objection.

9               THE COURT:  Sustained.

10  Q.  Does Jessica go by any other names, if you know?

11  A.  Diamond.

12  Q.  Is that how she introduced herself to you?

13  A.  Yeah.

14  Q.  And then at some point you testified it became clear that

15  Jessica was engaging in prostitution; is that right?

16  A.  Yes.

17  Q.  Did you know before you went with Jessica to Mr. Kidd's

18  apartment that she engaged in prostitution?

19  A.  I heard about it, that she was.  But I didn't believe it.

20  Q.  You didn't believe it but you heard from other people?

21  A.  Yes.

22  Q.  Where did you hear that?

23              MR. GUTWILLIG:  Objection.

24              THE COURT:  Overruled.

25              MS. MEDLEY:  It's not for the truth, your Honor.  Oh.

J793KID8                          Goncalves - Cross

1    Q.  If you can go ahead and answer.

2    A.  Can you repeat the question?

3    Q.  I'm sorry?

4    A.  Can you repeat the question.

5           THE COURT:  The reporter will read back the question.

6           (The record was read)

7    A.  I heard it from other girls.

8    Q.  At Hawthorne?

9    A.  Yes.

10   Q.  Were you aware of any sort of Facebook group or online chat

11   that girls at Hawthorne would use to talk about prostitution?

12   A.  No.

13   Q.  Do you recall telling government agents that Jessica wanted

14   to make money off of you?

15   A.  No.

16   Q.  Do you recall telling government agents that Jessica tried

17   to get all the Hawthorne girls into prostitution?

18           MR. GUTWILLIG:  Objection, your Honor.

19           THE COURT:  Sustained.

20   Q.  Did Jessica ever refer to anyone else by the name Red?

21   A.  Yeah.

22   Q.  Who is that individual?

23   A.  It was some other guy.

24   Q.  Some other guy?  Did you know him?

25   A.  No.

1   Q.  Did you ever meet him?

2   A.  Yeah.

3   Q.  You've met him?

4   A.  Yes.

5   Q.  Does he also live in Brooklyn?

6   A.  No.

7   Q.  Where does he live?

8   A.  In Queens.

9   Q.  How many times did you meet him?

10  A.  One time.

11  Q.  Do you know if he was also involved in prostitution?

12  A.  Yeah.

13  Q.  How was he involved?

14          MR. GUTWILLIG:  Objection.

15          THE COURT:  Sustained.

16  Q.  What you're saying is there are two pimps that Jessica knew

17  named Red.  Is that right?

18          MR. GUTWILLIG:  Objection.

19          THE COURT:  Sustained.

20  Q.  There are two individuals that Jessica knew named Red?

21          MR. GUTWILLIG:  Objection.

22          THE COURT:  Sustained.

23          MS. MEDLEY:  Your Honor, can you explain the basis?

24          THE COURT:  If you want to ask what Jessica knew or

25  who she knew, bring Jessica in.  This is all hearsay.

J793KID8                        Goncalves – Cross

1   Q.  Were there two individuals that you knew as Red?

2   A.  I knew one by Chris and one by Red, but, yeah.

3   Q.  And you are saying you knew Mr. Kidd by the name Chris?

4   A.  Yes.

5   Q.  Were you aware that Mr. Kidd had a YouTube channel?

6   A.  No.

7   Q.  When you met Mr. Kidd, did you tell him your age?

8   A.  No.

9   Q.  Did you tell him that you were over 18?

10  A.  No.

11  Q.  Did you ever hear Jessica tell him that you were over 18?

12          MR. GUTWILLIG:  Objection.

13          THE COURT:  Sustained.

14  Q.  You mentioned that Jessica also goes by the name Diamond.

15  Is that right?

16  A.  Yes.

17  Q.  How do you know which is her real name, Jessica or Diamond?

18  A.  The staff had called her Jessica.

19  Q.  And that's the only basis you have for that knowledge?

20  A.  Excuse me?

21  Q.  That's the only way that you know that her name is Jessica?

22  A.  Yeah.

23  Q.  Based on the Hawthorne staff calling her Jessica?

24  A.  Yeah.

25  Q.  I think on direct you testified about Jessica's age.  Is

1  that right?

2  A.  Excuse me?

3  Q.  You testified about how old Jessica was; is that right?

4  A.  Yeah.

5  Q.  How old was she when she went with you to see Mr. Kidd?

6  A.  She told me she was 16 years old.

7  Q.  Did you hear her tell that to Mr. Kidd?

8          MR. GUTWILLIG:  Objection.

9          THE COURT:  Sustained.

10 Q.  Do you know Jessica's full name?

11 A.  Jessica Bonilla.

12 Q.  How do you know her full name?

13 A.  We used to live in Hawthorne.  Everybody was close to each

14 other, so we knew everybody's full name.

15 Q.  You heard it from staff using it at Hawthorne?

16 A.  Yes.

17 Q.  You never saw her birth certificate?

18 A.  Yes, I did.

19 Q.  You did see her birth certificate?

20 A.  Yes.

21 Q.  When did you see her birth certificate?

22 A.  We would sign up for summer youth and she showed it.

23 Q.  When was that?

24 A.  This was back in 2016.

25 Q.  In 2016?

J793KID8                      Goncalves − Cross

1              MS. MEDLEY:  One moment, please.

2              (Pause)

3              MS. MEDLEY:  Just one more minute.

4              Nothing further, your Honor.  Thank you so much.

5              THE WITNESS:  You're welcome.

6              MR. GUTWILLIG:  No redirect, your Honor.

7              THE COURT:  All right.  Thank you, you may step down,

8    you are excused.

9              THE WITNESS:  Thank you.

10             (Witness excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J793KID8

1          THE COURT:  It is a few minutes before 5 so we're

2     going to adjourn for the day at this point and resume tomorrow

3     at 9.

4          As I indicated this morning and yesterday, it is

5     critical that you all be here on time so that we don't lose any

6     more from delay.  At this point, we are running behind the

7     schedule that the Court had hoped to follow in part because the

8     witnesses testifying took much longer than had been

9     anticipated.

10         In order to make up, I'm going to ask you to be

11    prepared to stay tomorrow until 6.  We may or may not need it.

12    We'll gauge that depending on what happens with the witnesses

13    who testify tomorrow.  But, if we continue to lag, we may need

14    the extra time, with the permission of the court reporters.

15         Thank you.  As you go home today, please bear in mind

16    the instructions I've given.  Do not discuss the case with

17    anyone on the outside or have any contact of any kind with

18    anyone involved in the case or review any material relating to

19    the case.  If any of these things occur, you're directed to

20    inform the Court immediately and not discuss it with your

21    fellow jurors.

22         Thank you.  Have a good evening.

23         (Jury excused)

24         THE COURT:  Government, could we go over the line up

25    for tomorrow.

J793KID8

1          MR. GUTWILLIG:  Yes, your Honor.  And the government

2     takes on board the Court's concern about time.  We have a

3     number of witnesses.  We may be able to call them all tomorrow.

4     We'll go through them by name.

5          One is Special Agent Kris Serra, who we expect will

6     take approximately 20 to 30 minutes.  Porsche Brown, also from

7     the FBI.  Sabrina Misere.  Porsche will be approximately an

8     hour.  Sabrina Misere, approximately half an hour on direct.

9     Dana McLeod, approximately an hour on direct.  Dr. Sharon

10    Cooper, approximately an hour on direct.  And Arielle Palopolo,

11    approximately 45 minutes on direct.  At some point the

12    government would seek to admit several of the YouTube videos

13    that we discussed previously.

14          THE COURT:  Who was after Dr. Cooper?

15          MR. GUTWILLIG:  Arielle Palopolo.

16          THE COURT:  And she also is an hour?

17          MR. GUTWILLIG:  Approximately 45 minutes to an hour

18    direct, your Honor.  And just to be clear, your Honor, this is

19    the entirety of the rest of our witnesses for this case.

20          THE COURT:  For this day?

21          MR. GUTWILLIG:  These are all of the witnesses that we

22    have left to call.  They may all fit tomorrow.

23          THE COURT:  Well, that's encouraging.  All right.

24          Any questions from defense?

25          MR. MARGULIS-OHNUMA:  There is one item, which is if

J793KID8

they're playing the YouTube videos tomorrow, I guess our

application would be that they should be precluded because

they're more prejudicial than probative.

I'll be perfectly blunt.  They make my client look

like a real jerk on YouTube.  I don't see any purpose beyond

that.  This is not a real knowledge and intent kind of issue

here.  I ask they be precluded for 404(b) purposes.

Failing that, my back up -- I have two back ups --

would be that whatever episode they play, whatever excerpt they

play, they play the whole episode for completeness so we get

the whole thing understood in context.  If they are going to

play a few minutes where he looks like a super jerk, then we

should play the whole thing when he only looks like a regular

jerk.

The third application would be, if not for that, we've

identified certain snippets that we think should be added for

completeness if the Court rejects our application to play the

whole episodes.  The episodes are about an hour each.  They're

mostly banter between him and a couple other guys talking about

distasteful topics.  The final two do contain footage with one

of the alleged victims, his wife, Dana McLeod.  So that one I

can see the relevance of a little bit more.  But again, I think

if we're going to play a snippet, we should play the whole

episode.

THE COURT:  Government?

J793KID8

1           MS. TARLOW:  Yes, your Honor.  The YouTube videos are
2     relevant to the government's case.  There are witnesses who we
3     believe will testify that they were aware of the podcasts, that
4     the defendant made them aware of it, asked if they watched the
5     podcast.  So the message that he's communicating is directly
6     relevant to the victim witnesses' psychology and understanding
7     of who he is and what he may do.  On the podcasts we expect
8     that we'll play, he discusses hitting women, that he does not
9     want any dominant women in his life, he only wants submissive
10    women.  There is also several YouTube videos in which one of
11    the victims is present.  We may want to admit that video to
12    show the relationship of the two of them on the video.

13          We have done a job of trying to hone down what videos
14    we want to admit so they're not cumulative, and that each video
15    represents a different point that we are trying to make.

16          To the defense's argument that the entirety of the
17    videos should be admitted, we think that would be a waste of
18    the jurors' time.  We have reviewed the additional portions
19    that defense would like to admit, and, for the most part, I
20    think perhaps all of them we are willing to add those
21    additional portions of the transcript.  But don't think that
22    under Rule 106, the rule of completeness, that the entirety of
23    the video needs to be admitted when the entirety of the video
24    is not relevant.

25          THE COURT:  How many videos are you talking about and

J793KID8

1      what is the total length of what you have now that you would

2      want to play for the jury?

3              MS. TARLOW:  Your Honor, it should be approximately

4      five or six videos and perhaps a similar number of minutes.

5              THE COURT:  Five or six minutes total?

6              MS. TARLOW:  Maybe seven or eight minutes.  They're

7      very short clips, your Honor.  Some of the clips are a matter

8      of 30 seconds.

9              THE COURT:  Mr. Margulis?

10             MR. MARGULIS-OHNUMA:  I would request that the Court

11     review those in advance looking for the prohibited character

12     inference.  The thing about hitting women, I mean, what that

13     is, is classic character evidence.  So he has a character he

14     likes hitting women, so he must have hit women on this

15     occasion.  That's what they are trying to prove.  It is a

16     prohibited character reference.  It's not probative for any

17     legitimate Rule 404(b) purpose.  They never gave us notice

18     of -- notice about the purpose.

19             I don't think any of the witnesses have said that

20     they've seen this snippet or the particular snippets that the

21     government is offering.  And they're horrible.  They're very,

22     very prejudicial.  The government doesn't need them, frankly,

23     based on today.  They don't add anything to the case, except to

24     make him look like a jerk.  To make him look like a -- to bring

25     out the prohibited character inference.

J793KID8

1          As we heard this morning, the defendant is likely to

2     testify.  I can certainly see them using them in impeachment if

3     he tries to deny anything that's said on them as a prior

4     inconsistent statement.  But putting them in the case in chief

5     is just character assassination.  With all other stuff we heard

6     today, it's really unnecessary and cumulative.

7          THE COURT:  Yes.  Ms. Tarlow.

8          MS. TARLOW:  If I may.  These are the defendant's own

9     admissions and there will be testimony that he told some of the

10     women about the podcast, that he asked them if they watched it,

11     and he therefore was clearly trying to communicate his message,

12     which included using violence, which included talking about how

13     pimps should be ruthless.  We think that is incredibly relevant

14     to this case.

15          THE COURT:  All right.  Thank you.  The government

16     should examine the exhibit and to see to what extent you can

17     streamline it to remove anything that's excessively

18     prejudicial.  Conceivably, if you make them available, the

19     Court will make sure to review them beforehand, see whether

20     there may be some material in it that may be unnecessary,

21     cumulative, or excessively prejudicial.

22          I do not see, Mr. Margulis-Ohnuma, having the jury sit

23     through hours of these snippets.  I think that that would be

24     even more prejudicial than having the government streamline to

25     those portions that are relevant.  All right.

J793KID8

1              MR. MARGULIS-OHNUMA:  I think that's a good solution,

2    your Honor.  I agree, and consent to that.

3              THE COURT:  Anything else?

4              MR. GUTWILLIG:  Nothing further from the government,

5    your Honor.

6              THE COURT:  Thank you.  Have a good day.

7              (Adjourned until July 10, 2019, at 9 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2    Examination of:                              Page

3     KAIRA BROWN

4    Direct By Ms. Bracewell  . . . . . . . . . . 112

5    Cross By Mr. Margulis-Ohnuma . . . . . . . . 168

6    Redirect By Ms. Bracewell  . . . . . . . . . 187

7    Recross By Mr. Margulis-Ohnuma . . . . . . . 187

8    ERIK JUHANI UITTO

9    Direct By Mr. Gutwillig  . . . . . . . . . . 204

10   Cross By Mr. Margulis-Ohnuma . . . . . . . . 231

11   Redirect By Mr. Gutwillig  . . . . . . . . . 245

12   Recross By Mr. Margulis-Ohnuma . . . . . . . 248

13   JUDAH BURK

14   Direct By Ms. Bracewell  . . . . . . . . . . 252

15   Cross By Mr. Margulis-Ohnuma . . . . . . . . 267

16   AISHA GONCALVES

17   Direct By Mr. Gutwillig  . . . . . . . . . . 274

18   Cross By Ms. Medley  . . . . . . . . . . . . 304

19

20

21

22

23

24

25

```
1                        GOVERNMENT EXHIBITS

2    Exhibit No.                                    Received

3     701    . . . . . . . . . . . . . . . . . . 113

4     1, 2, 2A, 3, 3A, 6, 7   . . . . . . . . . . 114

5     100 to 115, 117, 150 to 162, 200 to 256   . . 114

6     500 to 522, 600 to 604, 700 to 703   . . . . 114

7     1000, 1001, redacted 1002   . . . . . . . . 114

8     1100 through 1103L   . . . . . . . . . . . 114

9     1212 to 1222 . . . . . . . . . . . . . . . 135

10    1223 through 1225   . . . . . . . . . . . . 138

11   1204 through 1206  . . . . . . . . . . . . . 140

12    1207    . . . . . . . . . . . . . . . . . . 144

13    450, 450A, 450B and 450C  . . . . . . . . . 215

14    500    . . . . . . . . . . . . . . . . . . 230

15    601    . . . . . . . . . . . . . . . . . . 230

16    604    . . . . . . . . . . . . . . . . . . 231

17    4    . . . . . . . . . . . . . . . . . . . 282

18

19

20

21

22

23

24

25
```