J7A3KID1

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                         18 CR 872 (VM)

 5  LLOYD KIDD,

 6              Defendant.

 7  ------------------------------x

 8                                    New York, N.Y.
                                      July 10, 2019
 9                                    9:00 a.m.

10

    Before:
11
                    HON. VICTOR MARRERO,
12
                                      District Judge
13

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    MOLLIE BRACEWELL
17  ELINOR TARLOW
    JACOB GUTWILLIG
18  SAGAR RAVI
         Assistant United States Attorneys
19
    ZACHARY MARGULIS-OHNUMA
20  VICTORIA MEDLEY
         Attorneys for Defendant
21
    ALSO PRESENT:  USAO Paralegal Specialist Hannah Harney
22  Defense Paralegal Specialist Sophia Lattanzio
    Special Agent Brian G. Gander, FBI
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

J7A3KID1

                    (In open court; jury not present)

          THE COURT:  I understand the jury is all here so I'd

like to get started as quickly as possible.  There are a couple

of matters that I want to call to your attention that won't

need to be resolved, but at some point during the course --

          MR. MARGULIS-OHNUMA:  Judge, I'm sorry.  I didn't hear

that.

          THE COURT:  I said there are a couple of matters that

I want to address.  We don't need to resolve them now, but at

some point before the end of morning session.

          One is that you may recall that the defense asked the

Court to clarify that Ms. Gonzalez was not Victim-2, in order

to make sure the jury understands who is who.  But, we did not

identify who Victim-1 is, and I assume that there's going to be

a number 3 and 4.

          So in the interest of parallel treatment, I think that

it would be useful for the jury to similarly understand who the

other victims are.

          Two, Agent Uitto testified about the reconstruction of

that summary.  It is my intent to call to the jury's attention

that the document that was admitted from which he testified in

part is a demonstrative under the rules, and is admitted for

that purpose as an aid to the jury but not as a document of

evidence in and of itself.  The evidence is not that summary of

demonstrative.  The evidence is the testimony of the witness,

J7A3KID1

Agent Uitto, and what he understood that data, having himself

extracted it from the original documents, presumably.  Again, I

will prepare an instruction to that effect.

        Third, I had an opportunity to view the YouTube

excerpts that the government made available.  Just a few

reactions.  One, I believe it's too long and unnecessary, it's

cumulative.  It contains discussion that is totally irrelevant

to what's involved here.  Just as an example, dialogue or

discussion among more than one person concerning skin

complexion.  That's just one example.  Whether or not Caribbean

and southern women are better or not.  Again, totally

irrelevant discussion.

        Third, I'm concerned that some of the clips involve

expression of views not from the defendant, but from third

parties, and to the extent that those third parties have views

that are expressed in the video, I believe that it could be

prejudicial, to the extent the jury attributes what these third

parties say, the opinions they may have, extreme as they may

be, to the defendant.  I think that also is a concern the

government should address.

        So, overall, the government should find a way of

reducing the YouTube tapes to a manageable size or length, and

deleting all of the material that I believe can be either

cumulative or excessively prejudicial.

        All right.  Is there anything that the parties may

J7A3KID1

1    wish to address at this point quickly before the jury comes in?

2              MR. GUTWILLIG:  Yes, your Honor.  On the summary

3    charts, just for clarification, is your Honor's intent to admit

4    the reconstructed advertisements themselves as summary charts

5    and the spreadsheets as demonstratives?  Just to be clear --

6              THE COURT:  My understanding is that both would be

7    admitted, but the reconstructive page, web page is what is the

8    demonstrative.  The spreadsheets is the data that the agent

9    extracted from the documents that he had access to, and

10   therefore, that is what is the evidence.  Not the

11   demonstrative -- not the summary page itself.

12             The summary page is an aid to the jury for them to

13   understand how the web page may have looked and what content it

14   had, and it is the content that the agent pulled from the pages

15   based on the data that he had that is the evidence, as I

16   understand it.

17             MR. GUTWILLIG:  So your Honor, the government's

18   position would be that the reconstructed advertisements

19   themselves are summary charts under Federal Rule of Evidence

20   1006, and not demonstratives.  They pulled from the underlying

21   data which your Honor observed is the spreadsheet, and also

22   from additional underlying data and spreadsheets that Mr. Uitto

23   testified to.

24             THE COURT:  Bear in mind, Mr. Gutwillig, that the

25   agent did not have the original documents.  He extracted or

J7A3KID1

1   extrapolated from the data that was obtained from whether

2   Google or Pinger whatever.  But there was no document itself

3   that he looked at that contained those web pages.

4           MR. GUTWILLIG:  To be clear, the Google and Pinger

5   documents are separate.  They are not related to the

6   reconstructed advertisements.  The reconstructed advertisements

7   came wholly from the underlying data from the Backpage servers.

8   And those are separate and apart from the subscriber

9   information for Google and Pinger.

10          THE COURT:  The question is whether the agent had

11  access to the actual Backpage documents or did he reconstruct

12  the material, the data from the servers.

13          MR. GUTWILLIG:  He had access to the actual Backpage

14  data which is on the servers.  That data forms the basis for

15  what appeared as advertisements.  So the data itself is the

16  underlying material.  It is the Backpage data from the Backpage

17  servers.  It includes the text of the advertisement, the images

18  of the advertisement, all of the other information.  From that

19  information, which was provided in whole to the defense, and

20  they were given notice and the opportunity to review that.

21  From that information, the summary charts were created.

22          The summary charts in the government's view would be

23  the reconstructed advertisements, for lack of a better term.

24          So, your Honor, I think in the government's pretrial

25  motions we'd also note that these kind of reconstructed

J7A3KID1

advertisements were admitted in a previous trial, 18 CR 874, in

front of Judge Rakoff.  And the idea is the underlying data,

because these advertisements no longer exist in the form that

they were on Backpage, only the servers exist.  But the servers

contain all of the underlying data which is what I believe

Mr. Uitto testified to.  And from that data, he's able to

reconstruct a summary chart of what an advertisement may have

looked like, or at least that includes the underlying data, if

it is not the exact format in which it would have appeared.

         THE COURT:  All right.  Let me review what you just

said.  And as I said, we're not going to resolve this issue

now.  I just want to call to your attention that it is

something I was concerned about which may need some

clarification.

         MR. GUTWILLIG:  Yes, your Honor.

         THE COURT:  All right.  Can you bring the jury in now.

Who is the government's first witness, Mr. Serra?

         MR. GUTWILLIG:  Dr. Sharon Cooper, your Honor.

         MR. MARGULIS-OHNUMA:  We discussed the 3500 for

Dr. Sharon Cooper.  We had a long list of witnesses, as I

recall Dr. Cooper was at the end of it, so I may need a five or

10 minute recess before cross.

         (Jury present)

         THE COURT:  Good morning, welcome back, and thank you

for being ready on time.

J7A3KID1                     Cooper - Direct

1          Mr. Margulis, you had a point you were raising before

2     that you had to express?

3          MR. MARGULIS-OHNUMA:  Just I may need a recess because

4     I didn't expect this witness to be going now.  And I just

5     received the 3500 material related to her testimony.  So I am

6     just going to request that we have a short recess after this

7     witness's direct examination.

8          THE COURT:  That's fine.  All right.  Government?

9          Let me call something to the jurors' attention that's

10    been brought to the Court's attention by the parties, that some

11    of the jurors have been using the public restrooms rather than

12    the ones in the jury room.  That could create difficulties in

13    the event there may be representatives of the parties or

14    counsel or others involved in the case and, conceivably,

15    inadvertent contact or communication.  So I would urge you, to

16    the extent possible, to use the restrooms in the jury room.

17         MR. GUTWILLIG:  Your Honor, the government calls

18    Dr. Sharon Cooper.

19     SHARON COOPER,

20         called as a witness by the Government,

21         having been duly sworn, testified as follows:

22    DIRECT EXAMINATION

23    BY MR. GUTWILLIG:

24    Q.  Good morning, Dr. Cooper.

25    A.  Good morning.

J7A3KID1                        Cooper - Direct

1   Q.   What is your occupation?

2   A.   I'm a developmental and forensic pediatrician.

3   Q.   What do you do as a development and forensic pediatrician?

4   A.   As a developmentalist, I see children who have any kind of

5   developmental problems, whether ADHD, autism, learning

6   disabilities, and children who have been victims of crime and

7   have subsequent mental health disorders that are interfering

8   with their ability to go to school or to be functional.

9          As a forensic pediatrician, I work in the area of

10  child maltreatment.  So I see patients who have been physically

11  abused, sexually abused, children who have been neglected, and

12  children who have been sexually exploited as well as

13  adolescents who have been sexually exploited.

14  Q.   In that capacity, do you conduct physical examinations?

15  A.   Yes, I do.

16  Q.   Are you also able to diagnose medical conditions?

17  A.   Yes.  I make both medical diagnoses and mental health

18  diagnoses.

19  Q.   Dr. Cooper, do you have a particular area of expertise?

20  A.   Yes.  Child sexual exploitation is an area that I've been

21  working nationally and internationally since 1999.

22  Q.   Are you familiar with adult sexual exploitation?

23  A.   Yes, I am.

24  Q.   If you wouldn't mind, could you please tell us your

25  educational background.

J7A3KID1                        Cooper - Direct

A.   Certainly.  I receive my bachelor's degree from Fisk
University, and my doctorate of medicine from the Meharry
Medical College, both in Nashville, Tennessee.

            I then volunteered and joined the Army and did my
internship and residency at Tripler Army Medical Center in
Honolulu, Hawaii.  I then had several military assignments over
the next 20 years, which included, most importantly, becoming
appointed by the Surgeon General to be the child abuse
physician at all of the installations where I worked.  The last
one that I worked in was at Fort Bragg, North Carolina.  I was
the chief of pediatrics there.  Fort Bragg has the largest
pediatric population in the Army, more than 47,000 children
under the age of 17.  And I worked there in that capacity for
six years, finally becoming a deputy commander for clinical
services, which is equivalent to the chief of staff of a
hospital, until I retired in 1997.

            At that time, I was invited to join the faculty at the
University of North Carolina at Chapel Hill, and I continue to
have an adjunct professor appointment there, as well as at the
University of Health Sciences which is in Bethesda, Maryland,
which is a military medical school.

            And in addition to those particular clinical roles, I
began to have a role at the National Center for Missing and
Exploited Children in 2001, where I became an instructor for
the next 12 or 13 years of specialists who work in the area of

J7A3KID1                        Cooper - Direct

1   sex trafficking victimization, child pornography, or what we

2   now refer to as abusive images on the internet, cyber

3   enticement, and those types of exploitation.

4   Q.  Dr. Cooper, just for clarification purposes, when you say

5   "installation," what do you mean?

6   A.  I'm talking about military bases.

7   Q.  Dr. Cooper, are you board certified?

8   A.  Yes, I am, I'm board certified in pediatrician.

9   Q.  Are you a member of any professional organizations?

10  A.  Yes.  I sit on the boards of several organizations, but the

11  ones relevant to this particular topic are the National Center

12  for Missing and Exploited Children.  I've been a board member

13  there for about 10 years.  And I'm also on the board of Marie

14  Collins Foundation, which is a similar foundation, only in the

15  United Kingdom.  And I'm also in the international working

16  group at the Canadian Centre for Child Protection, which works

17  also in internet crimes against children.

18  Q.  Dr. Cooper, have you won any awards?

19  A.  Yes, I was fortunate enough to receive an award, a military

20  award that requires Congressional approval, after I served at

21  Fort Bragg.

22  Q.  Let's turn to your expertise in child exploitation.

23            THE COURT:  Mr. Margulis?

24            MR. MARGULIS-OHNUMA:  I am going to object to this

25  point.  We are not going to be challenging her qualifications

J7A3KID1                    Cooper - Direct

 1   to testify.  She's established it already, if you want to move
 2   this along.
 3             THE COURT:  Thank you.
 4   Q.  Dr. Cooper, now let's turn to your expertise in child
 5   exploitation and sex trafficking.  Is that the focus of your
 6   current employment?
 7   A.  About 40 percent of my work is in the area of child sexual
 8   exploitation, presently.  Over the last five to six years,
 9   child sex trafficking has been the primary topic that I've been
10   working in.
11   Q.  Just in general, what does your day-to-day look like in
12   your present occupation?
13   A.  I see patients clinically three days a week.  And then the
14   other two days of the week are usually spent on special
15   projects such as working in legal cases, sometimes evaluating
16   victims in North Carolina or in other parts of the United
17   States.  I also am a trainer, and so I spend a significant
18   amount of time staying abreast of the research as well as
19   writing.  I've authored two textbooks as well as a third book
20   that's not a textbook, and many chapters in other books that
21   are all focused --
22             MR. MARGULIS-OHNUMA:  Judge, I'm going to object as
23   non-responsive to the question.
24             THE COURT:  All right.  Sustained.
25             Mr. Gutwillig, let's reduce the amount of time on the

J7A3KID1                        Cooper - Direct

1    expertise of the witness, and let's focus on the issues of this

2    trial.

3              MR. GUTWILLIG:  Yes, your Honor.

4    Q.  Dr. Cooper, you testified that you interview victims.  Have

5    you interviewed both child and adult victims of sex

6    trafficking?

7    A.  Yes I have.

8    Q.  Approximately how many?

9    A.  I've seen approximately 120 victims.  About 20 percent of

10   them have been adult victims, the remainder have been

11   adolescents, primarily adolescent victims.

12   Q.  Have you testified in court before?

13   A.  Yes, I have.

14   Q.  Are you being paid for your time today?

15   A.  Yes.  At the government rate.

16             MR. GUTWILLIG:  Your Honor, at this time the

17   government would move to qualify Dr. Cooper as an expert.

18             THE COURT:  The defense has indicated no objection.

19             MR. MARGULIS-OHNUMA:  Yes, your Honor.

20             THE COURT:  All right.

21   Q.  Before we get started, Dr. Cooper, have you interviewed any

22   of the victims in this case?

23   A.  No, I have not.

24   Q.  Do you know who the victims are?

25   A.  No, I do not.

J7A3KID1                          Cooper - Direct

1    Q.  Have you interviewed the defendant?

2    A.  No, I have not.

3    Q.  So, to be clear, what we discuss today with respect to sex

4    trafficking, that isn't based on any personal knowledge of the

5    victims or the defendant in this case?

6    A.  No, it is not.

7    Q.  So Dr. Cooper, why are you here?

8    A.  I'm here to provide education for the jury and the judge.

9    This is not often a well-understood form of victimization.

10   Q.  So Dr. Cooper, we talked about your expertise relating to

11   both minor and adult victims of sex trafficking.

12           Focusing first on minors, are there particular factors

13   that make minors vulnerable to sex trafficking?

14   A.  Yes.  There are at least 10 different factors that are

15   associated with the vulnerability of children and youth who are

16   brought in to what is sometimes referred to as the life or the

17   game.

18           But the three top factors of vulnerabilities are age,

19   poverty, and family instability.  So children who are young,

20   children who have grown up in an area where there's a

21   significant amount of poverty, and family instability would be

22   the case of these children have been victims of any form of

23   child maltreatment, and have been in out of home care, such as

24   foster care or group home settings.

25   Q.  Dr. Cooper, is there one particular factor that indicates

1    the greatest vulnerability to sex trafficking among minors?

2    A.   Age is the most specific factor.  Because children, though

3    they may be physically relatively mature, are definitely, we

4    now know from research, not psychologically nor cognitively

5    mature.  The prefrontal cortex of the brain is not completely

6    mature until you're 25 years of age.  So understanding the

7    consequences of what may happen to you are not going to be a

8    skill for children when they are young.

9    Q.   Are minors with unstable living situations at higher risk

10   for sex trafficking?

11   A.   Absolutely.  Particularly if you have minors who run away

12   from home or are thrown away from home because of sexual

13   orientation or gender identity.  Once a child is homeless, they

14   have to very soon resort to any measures to try to survive.

15   Q.   So now focusing on adult victims of sex trafficking.  Are

16   there any particular factors that make an adult more vulnerable

17   to sex trafficking?

18   A.   Yes.  The literature tells us adult victims of sex

19   trafficking often have history of poverty, they also have a

20   history of some type of traumatic experiences in their lives.

21   They frequently will have disabilities that may or may not have

22   been addressed, learning disabilities, for example.  Or adults

23   who are foreign nationals and have fewer links to the country,

24   their country of origin or the country they are in.

25   Q.   So now discussing both minor and adult victims of sex

J7A3KID1                        Cooper - Direct

1    trafficking.

2    A.  Yes.

3    Q.  Is there a particular way or methods by which a sex

4    trafficker recruits victims?

5    A.  Yes.  There are different ways, but one of the most common

6    is going to be through being a nice guy.  Sometimes romance

7    will begin that relationship, or offering a victim what appears

8    to be legal employment are other means in which individuals

9    will begin the process of grooming a victim into the life of

10   sex trafficking victimization.

11   Q.  Dr. Cooper, you just mentioned the word "grooming."  Can

12   you please explain what that means?

13   A.  Yes.  Grooming refers to basically a fraudulent behavior,

14   where an individual will begin to talk to a victim, provide

15   things for them, make them feel that they're going to be safe

16   with that individual.  And most importantly, make promises to

17   them that they can give them a better life from the life that

18   they're in.  So, the victims will begin to feel safe with this

19   particular individual.  Though, often that is not going to end

20   up being the case.

21   Q.  Have you observed particular means, perhaps by social media

22   or online by which sex traffickers recruit?

23   A.  Yes, I would say within the last six to seven years we have

24   seen more and more online grooming.  Before, online grooming

25   was for the purpose of enticement in general, not for longterm

J7A3KID1                        Cooper - Direct

1   relationship, but just a one-time offline meeting.  But now, we
2   are seeing many more victims groomed in the online world.
3   Either on social media, via app, sometimes dating sites.  We
4   definitely see this as the more prevalent form of grooming than
5   we had seen before.
6   Q.  Dr. Cooper, are you familiar with the term "compliant
7   victim"?
8   A.  Yes, I am.
9   Q.  Could you please explain what that is?
10  A.  The term compliant victim came from an FBI behavioral
11  analyst named Ken Lanning, very renowned person from Quantico,
12  who told us in 1992 that there was a certain type of victim who
13  wasn't necessarily abducted and frightened, but instead was
14  groomed into belief that whatever's happening to them is a good
15  thing for them.  And so they become compliant with the
16  offender, and often do not recognize that they are in fact
17  victims.
18  Q.  Dr. Cooper, what role, if any, does sexual assault have in
19  recruitment and grooming in compliant victims?
20  A.  Sexual assault is extremely common in sex trafficking
21  victimization.  Particularly by the offender who first grooms
22  and recruits this child or adult to ultimately be under their
23  power and control.  The sexual assault is often very violent
24  and shocking to the victim who is not expecting that type of
25  encounter.  But it may be associated, in addition, to

J7A3KID1                        Cooper - Direct

1   videography or photography of that sexual assault, the purpose

2   of which is to use it as a form of blackmail to keep that

3   victim from leaving.

4   Q.  Dr. Cooper, you mentioned power and control.  How do sex

5   traffickers -- by what ways do they use those to control and

6   maintain victims?

7   A.  Power and control are the name of the game, so to speak.

8   These two dynamics, power and control, are what we see in the

9   intimate partner violence relationships.  The individuals will

10  often use the cycle of violence, where there's romance and warm

11  feelings and a sense of being in a safe place, until -- for

12  unknown reasons to the victim -- the offender begins to appear

13  agitated and then can become very violent towards the victim.

14  Then followed by a period of fake remorse on the part of the

15  offender, who reminds the victim that the violence was a result

16  of the victim's behavior.  And if the victim just gets it

17  together and follows the rules, everything will be fine.  But

18  generally speaking, particularly in sex trafficking

19  victimization, following the rules is not enough.  Generally

20  speaking, there's going to be continued violence, interwoven

21  with sometimes romance or sexual encounters that keeps the

22  victim off balance, unsure about the place that they hold in

23  the life of this scenario.

24  Q.  So I'd like to address a couple things you just mentioned.

25  You mentioned the term intimate partner violence.  Could you

1    please explain what that is.

2    A.   Yes, inmate partner violence or IPV is a term given to us

3    by the Centers for Disease Control and Prevention, the CDC.  It

4    entails several types of actions.  The most common is going to

5    be physical violence or battery, but it also includes sexual

6    assault, it frequently includes psychological abuse,

7    denigration, derogation, humiliation.  It includes isolation of

8    victims.  It also includes intimidation and threats, sometimes

9    to their families, very often to them, and social deprivation.

10   Usually victims are not allowed to interact with their normal

11   peers or family members.  They have to follow the rules that

12   are in place by the offender in an intimate partner violence

13   relationship.

14   Q.   Dr. Cooper, you mentioned rules.  Do sex traffickers

15   typically use rules to control victims?

16   A.   Yes.  In my experience, and my knowledge of the literature,

17   this is very common.  There are numerous types of rules.  For

18   example, victims are supposed to refer to the offender by

19   specific names, not necessarily their given names.  The victim

20   may not even know their real name.  They may only know them by

21   a street name, for example.  Another rule is that victims are

22   to be very subservient, meaning times they are not supposed to

23   look at the offender in the eye, or if the offender is in a

24   group of traffickers, it is very common that the victim must

25   appear very quiet and subservient.  If they accidently look up

J7A3KID1                        Cooper - Direct

1    and make eye contact with any one of the other traffickers,

2    that is referred to in the life as "choosing up."  The term for

3    that is "choosing up," which means that you now have identified

4    with somebody else.

5              MR. MARGULIS-OHNUMA:  Objection, your Honor.  None of

6    this is at issue in this case.

7              THE COURT:  Sustained.

8    Q.  Dr. Cooper, you mentioned group dynamics.  Can you please

9    explain, are you familiar with the term "social isolation"?

10   A.  Yes.

11   Q.  How does that relate to sex trafficking where there are

12   multiple victims?

13   A.  What offenders usually do is keep their victims together,

14   but not allow them to be out in the general public interacting

15   with other people who might present lifelines for them.  So,

16   they become socially isolated.  They know their rules, they

17   know who they can and cannot talk to, and who they can and

18   cannot call.

19   Q.  Do sex traffickers sometimes isolate victims from one

20   another?

21   A.  Yes, they do.  Sometimes this is a form of punishment.  If

22   they were to take a victim and make them feel as if they are an

23   outsider, as compared to the group that may be all going

24   somewhere, this victim may be on punishment, so to speak, and

25   is not allowed to interact with them.

J7A3KID1                          Cooper - Direct

1    Q.  You also mentioned I believe shaming and humiliation.  What

2    role does that play in controlling sex trafficking victims?

3    A.  I have evaluated numerous victims who have been victims of

4    shaming and humiliation.  It is a way to tear down the victim's

5    self-esteem to such a degree that they are going to become even

6    more compliant.

7              MR. MARGULIS-OHNUMA:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A.  That they are going to become more compliant to the demands

10   of the trafficker.

11   Q.  Is it the case, Dr. Cooper, if there are a group of

12   victims, rules or shaming one victim may send a signal to

13   others?

14   A.  Yes.  Not only does shaming of a victim within the view and

15   auditory reception of all the other victims that are part of

16   the group, the same is true for physical battery.  Physical

17   battery of one victim is often committed for the purpose of

18   intimidating everybody else in the group so that they will be

19   afraid to not break the rules.

20   Q.  Is it the case, Dr. Cooper, that all sex traffickers use

21   physical restraints like locked doors or something like that?

22   A.  No, that's not true at all.  The control is psychological,

23   and it is typically very effective, generally speaking.

24   Q.  So in a situation where there are no proverbial locks, what

25   is it that keeps a victim with a sex trafficker?

J7A3KID1                         Cooper - Direct

1  A.   The two things that will keep a victim compliant with the

2  sex trafficker is the wish and hope for a better life, so the

3  love and attention that the sex trafficker provides to them,

4  especially if they've had a lot of childhood adversities and

5  have been in and out of home care in conjunction with extreme

6  violence.   And the presence of these two alter egos almost are

7  what keeps victims unsure about if there is a better place for

8  them to be.   So they tend to remain in that setting.

9  Q.   Is it true that some victims may not leave because they

10 feel intimidated or forced to stay?

11 A.   Absolutely.   That's true.

12 Q.   Is it possible for a victim of sex trafficking not to view

13 oneself as a victim?

14 A.   Very often that is the case.   Because the trafficker

15 convinces them that they are living in a different life.

16 That's why I sometimes refer to it as "the life," and the

17 trafficker convinces the victim or victims that other people

18 would not understand, that you were made for this, and that you

19 are going to be a racehorse in this while you are with me, you

20 are going to make a lot of money.   These dynamics build the

21 self-esteem of the victim, but also convince them that other

22 people -- straight people, so to speak, is sometimes the term

23 that victims have used -- would not understand the life or the

24 game.

25 Q.   So is it possible for a victim, a sex trafficking victim

J7A3KID1                        Cooper - Direct

1   who have been subject to violence not to have felt forced?

2   A.   Absolutely.  In fact, they after a while become so

3   compliant that they expect others in the group to be treated in

4   a very violent and battered manner, because they may not have

5   been compliant in the smallest degree.  How they spoke to the

6   trafficker, how they addressed that individual, could be a

7   provocation for pretty significant violence.

8   Q.   Have you observed this phenomenon in your interviews of sex

9   trafficking victims?

10  A.   Very often.  I've seen victims who have multiple

11  fractures --

12          MR. MARGULIS-OHNUMA:  Objection.  Move to strike.

13          THE COURT:  Sustained.

14  Q.   Dr. Cooper, do victims ever minimize how they were forced

15  or to the extent to which they were forced or abused?

16  A.   Yes.  It is very common for them to minimize the abuse that

17  they've experienced.

18  Q.   Have you observed that in your own practice?

19  A.   Yes.  By taking patient histories and examining them.

20          MR. GUTWILLIG:  One moment, please, your Honor.

21  Q.   Dr. Cooper, in general, why is that victims minimize the

22  abuse as part of sex trafficking?

23  A.   Because many times victims are brainwashed to believe that

24  this is the pathway to a better life.  And even though it's a

25  fraudulent belief, it is a fraudulent message that has been

1   given to them over and over again by the trafficker, they

2   believe that this is the best that life is going to be for

3   them, and they're just hoping it will get even better.  That's

4   important to the trafficker.

5   Q.  In general, describing abuse or sex trafficking violence,

6   do victims typically explain it in a certain way that minimizes

7   the conduct?

8   A.  Yes.  They are often, they very, very often don't even

9   mention, or if I ask them directly what may have happened to

10  them from a domestic violence or IPV perspective, they will

11  speak of it in a very miniscule fashion as if, well, this is

12  what happens, I just got a punishment, sometimes they would

13  say.  And that wouldn't be the main reason they would be

14  approaching us for health care.

15  Q.  Dr. Cooper, you testified earlier that you don't know the

16  defendant and you haven't interviewed any of the victims in

17  this case.  What are your opinions that you have given here

18  today based on?

19  A.  They are based upon my knowledge of the literature, my

20  contributions to the literature, my own personal clinical

21  experience in general.

22          MR. GUTWILLIG:  One moment, please, your Honor.

23  Q.  Dr. Cooper, just turning back to you mentioned there are

24  rules that sex traffickers sometimes use.  Could you provide a

25  couple examples of that, please.

J7A3KID1                          Cooper - Direct

A.   Yes.  In the culture of pimping, the pimp plays a role of a
father, of a boyfriend, and sometimes of a spiritual leader
within the group.  And within those three roles, many of the
rules will be focused in that situation.

        So for example, the pimp as a father will often
require that victims referred to them in a manner that is
highly deferential and may also not ever speak his real name,
if they know his real name.  If they are intercepted in any
way, one of the rules is to always state that whatever has
happened to them is their own, is at their own action, not of
the action of anyone else.

        The role of the offender as a boyfriend will keep the
victims romantically attached in a goal of seeing themself
almost as married to the offender.  In fact, many times groups
of victims refer to the offender -- to themselves as
wife-in-laws.

        And then the role of the offender from a spiritual
perspective includes branding very often of victims so that
they feel owned by that particular --

        MR. MARGULIS-OHNUMA:  Objection.

        THE COURT:  Overruled.

A.   -- by that particular offender.  So, the spiritual control
is also another aspect of manipulation that we see.

Q.   Dr. Cooper, are there ever any rules about money and
control?

J7A3KID1                         Cooper - Direct

1    A.  Yes.  Usually victims have quotas of money that they have

2    to make every night, or every day.  And some offenders require

3    that even the money be presented to them in a certain way.  So

4    that the largest bills are on the outside of the money, so it

5    looks as if you're handing over even more money than in

6    actuality may be the case.

7              So there are definitely issues of financial quotas

8    that victims have to come through with.

9    Q.  Dr. Cooper, is debt ever used as a means control?

10   A.  Yes.  The literature speaks of debt bondage.  Where, for

11   example, a victim may have to make a certain amount of money,

12   and they may come back to that offender, and they may give the

13   offender either all the money or they may give the offender

14   half the money or a portion of the money.  But then, the

15   offender will remind them that they have to pay for the

16   transportation to get to where they had to perform sexual acts,

17   they have to pay for some aspect of where they're staying.

18   There will be additional debts that are going to be taken out

19   of the residual money that the victims may have made, such

20   that, in the end, the victim will end up owing the offender

21   almost always, and that's referred to as debt bondage.  It's

22   very well described in the literature.

23             MR. GUTWILLIG:  Thank you, Dr. Cooper.  No further

24   questions, your Honor.

25             THE COURT:  The defense has asked for a brief recess.

J7A3KID1                          Cooper – Direct

1   Mr. Margulis, how long do you think --

2              MR. MARGULIS-OHNUMA:  15 minutes, your Honor.

3              THE COURT:  We'll take a 15-minute recess.

4              (Recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J7ATKID2                                Cooper - Cross

1              (Jury present)

2              THE COURT:  Mr. Margulis.

3    CROSS-EXAMINATION

4    BY MR. MARGULIS-OHNUMA:

5    Q.  Good morning, Dr. Cooper, how are you today?

6    A.  I'm fine, thank you.

7    Q.  Have you and I ever met before?

8    A.  I don't think so.

9    Q.  And you are testifying for the prosecution in this case, is

10   that right?

11   A.  Yes.

12   Q.  And you are being paid for your testimony today, is that

13   right?

14   A.  Yes, whatever the government rate is.

15   Q.  How much is the government rate?

16   A.  I'm not sure.  I don't manage that in the office.

17   Q.  But you're not really doing this for the money, right?

18   A.  No.

19   Q.  You're doing it because you believe in helping the sex

20   trafficking victims, right?

21   A.  I do it because I believe that juries can -- some judges

22   are not well versed in this particular area.  It's not well

23   understood.

24   Q.  And you think it's important to put people in jail if

25   they're engaged in sex trafficking of others, right?

1    A.  I believe justice should be done on behalf of the

2    defendants.

3    Q.  People should be punished for that, right?

4    A.  If that's what the Court decides.

5    Q.  And you have testified, I think you told us before, 300

6    times, is that right?

7    A.  That's about right.

8    Q.  And how many of those times were for the prosecution?

9    A.  I would say 90 percent, 90 percent of the time I'm asked to

10   testify by a prosecutors, and so about maybe two or three

11   percent are I have been asked by defense attorneys.

12   Q.  So you actually have testified for the defense more than

13   ten times?

14   A.  No more than ten times.

15   Q.  You prepared for your testimony today with the prosecutors

16   a little bit, right?

17   A.  Yes.

18   Q.  And you talked to them about just one particular case that

19   you testified for the defense, right?

20   A.  Yes, it was a homicide case.

21   Q.  So in a sex trafficking case you certainly have never

22   testified for the defense, right?

23   A.  No, I have not.

24   Q.  So with respect to this particular case, what were you told

25   about this case?

J7ATKID2                           Cooper - Cross

1    A.  I was told that --

2             MR. GUTWILLIG:  Objection.

3             THE COURT:  Sustained.

4             MR. MARGULIS-OHNUMA:  Is it a hearsay objection?

5             THE COURT:  Yes.

6             MR. MARGULIS-OHNUMA:  I'm not offering it for its

7    truth, but I will try to get around it.

8             THE COURT:  All right.

9    BY MR. MARGULIS-OHNUMA:

10   Q.  So as you sit here today, you don't have any knowledge of

11   my client, Lloyd Kidd, right?

12   A.  No, I do not.

13   Q.  And the prosecutors didn't tell you anything about him,

14   right?

15   A.  No.

16   Q.  And they didn't show you any documents related to this

17   case, right?

18   A.  Oh, no, not at all.

19   Q.  They didn't show you any pictures related to this case?

20   A.  No.

21   Q.  Any videos related to this case, right?

22   A.  No.

23   Q.  So you're basically acting on a clean slate, right?

24   A.  That's correct.

25   Q.  They didn't ask you -- well, they asked you questions about

J7ATKID2                          Cooper - Cross

1   particular issues though, when you were preparing, that they

2   might want you to testify about, is that fair to say?

3   A.   I think that could be a fair assessment, yes.

4   Q.   And the things that you prepared for is actually what you

5   ended up testifying about in your direct, right?

6   A.   Yes, that's correct.

7   Q.   So to get to the substance of your testimony, is it a fair

8   statement -- I'm going to talk about just adult prostitution

9   for a moment --  Let me go for a second.

10         You said about 20 percent of your work has been with

11   adult victims of sex trafficking, is that right?

12   A.   Yes.

13   Q.   And when you're talking about victims of sex trafficking,

14   you're talking -- adults, you're talking about people who have

15   somehow been coerced, like forced into prostitution, right?

16   A.   Individuals who are either being controlled by force, fraud

17   or coercion.   Fraud is very often the case.

18   Q.   You're not talking about people who voluntarily went out

19   and became prostitutes, right?

20   A.   No, I'm not speaking of prostitution.   Prostitution is the

21   exchange of sex between an individual -- two individuals.

22   Q.   You answered my question.

23   A.   I need to define prostitution so I can be clear, if I'm

24   allowed to do so.

25   Q.   Certainly, go ahead.

J7ATKID2                          Cooper - Cross

1    A.  Prostitution is the exchange of sex between two consenting

2    adults; first of all, have to be adults, and either for money,

3    drugs, influence, et cetera.  Whenever there's third party

4    control that's sex trafficking.  That's the difference between

5    prostitution and sex trafficking, and that's very important

6    difference to understand.

7    Q.  But some prostitution is not sex trafficking, correct?

8    A.  If it's prostitution, it's not sex trafficking, you're

9    correct.

10   Q.  So if a woman is working as a prostitute and is not

11   controlled by a third party, then she's not a sex trafficking

12   victim, correct?

13   A.  That's correct.

14   Q.  By the way, do you have an opinion upon whether that kind

15   of prostitution should be legal?

16   A.  I don't have an opinion.

17   Q.  And now sometimes there's situations where prostitutes may

18   work with other individuals but not be controlled by those

19   individuals, isn't that a fair statement?

20   A.  The only circumstance where I have seen that has been the

21   time working with -- usually only other time that other

22   individuals are involved where sex trafficking is not taking

23   place are vendors, vendors who are selling them clothing,

24   clothing they would wear at strip clubs, things of that nature.

25   That's a working-with relationship, but it's not a relationship

J7ATKID2                    Cooper - Cross

1   with an individual that has contact with money except what
2   they're being paid for goods that individuals are purchasing.
3   Q.  What about if a prostitute asks someone else to post an ad
4   for her, that doesn't necessarily imply control, does it?
5   A.  No, not necessarily.
6   Q.  What about if a prostitute rents a room in an apartment to
7   work out of, that doesn't imply she's controlled by the
8   landlord, does it?
9   A.  It really depends upon whether or not the landlord is
10  accepting money for that apartment for her work, then there is
11  a concern about that type of relationship.
12  Q.  So granted there's a concern, but would you agree that that
13  doesn't necessarily imply control?
14  A.  No, it doesn't necessarily imply control.
15  Q.  Now moving on to -- now I'm going to talk more specifically
16  about sex trafficking victims and underage prostitutes.
17          And have you seen situations where one -- let's focus
18  on underage victims of sex trafficking for a moment.  Have you
19  seen situations where one underage victim of sex trafficking is
20  working for multiple traffickers at the same time?
21  A.  Sometimes I have seen that only in cases of gang members
22  who were the traffickers.  In situations like that, some minors
23  will have a primary trafficker in the gang, but other gang
24  members can coerce that victim to perform sexual acts for
25  money, but not otherwise.

J7ATKID2                              Cooper - Cross

1   Q.  So setting aside the gang situation, if a person is

2   working -- if a person is working -- no there's a fine legal

3   distinction because I'm talking about underage people.

4   A.  Those are minors.

5   Q.  Minors, but minors also could be subject to force, fraud or

6   coercion separately, right?

7   A.  They can be.  They can.

8   Q.  So have you ever seen situations -- sorry, withdrawn.

9            If an individual victim is able to go on any given day

10   and work for a different pimp, is she -- does that imply to you

11   that she's not being sex trafficking, that's she's not being

12   subject to force, fraud or coercion?

13            MR. GUTWILLIG:  Objection.

14            THE COURT:  Sustained.

15   Q.  Have you seen situations where victims of sex trafficking

16   will accuse one person in order to protect another person who

17   is actually trafficking them?

18            MR. GUTWILLIG:  Objection.

19            THE COURT:  Overruled.

20   A.  I apologize, I need a little further clarification.

21   Accused one person, do you mean another victim that is under

22   control of the trafficker?

23   Q.  Or another trafficker or another adult male in their life

24   or anyone.  Withdrawn.

25            Does that make sense now?

J7ATKID2                         Cooper - Cross

1   A.  I will try to answer that question as clearly as I can.  In

2   my experience and knowledge of the literature, only those

3   victims who have been under the control of organized criminal

4   behavior, such as organized crime, have I seen or read about

5   multiple offenders who are directing victims to make certain

6   amounts of money, et cetera.  Certainly you do have organized

7   crime kind of enterprises where victims are exploited in that

8   manner, but otherwise no.

9   Q.  But my question was about accusations.  So I think you

10  described for us a very tight controlling relationship between

11  sex traffickers and their victims, is that right?

12  A.  I didn't refer to it as tight control, I referred to it as

13  psychological control.

14  Q.  It's a psychologically controlling relationship, right?

15  A.  Yes.

16  Q.  In certain situations the victim in that situation will do

17  things to protect the trafficker, right?

18  A.  Often that's true.

19  Q.  And one of the things that they will sometimes do is make

20  accusations against other individuals, isn't that fair to say?

21  A.  Primarily they -- I have not seen victims who made

22  accusations against others.  I have primarily seen victims who

23  deny the trafficker is in the position of power and control

24  over them.  I have not seen them frequently accuse someone else

25  of being a trafficker of them.

J7ATKID2                    Cooper - Cross

1    Q.  You qualify that with "frequently."  Maybe not frequently,
2    but it is something that happens, would that be fair to say?
3    A.  I haven't had that experience nor have I really seen it in
4    the literature.
5    Q.  In your experience, do victims of sex trafficking start by
6    answering recruitment ads on occasion?
7    A.  Sometimes that can occur, yes.
8    Q.  Would you agree with me that more frequently if someone is
9    proactively answering a recruitment ad, that they're less
10   likely or not necessarily asking to be forced or coerced or
11   defrauded, isn't that fair to say?
12   A.  Well, let me respond to that question in this way:  The
13   recruitment ads that I'm familiar with that victims have
14   responded to have primarily been exotic dancer ads.  And these
15   are often college students who are trying to make money for
16   their tuition, and so they think that they are going to just
17   dance or strip in a club, but they do not know or anticipate
18   that they may ultimately be coerced to have sexual contact with
19   multiple buyers or not.
20           MR. MARGULIS-OHNUMA:  Could we bring up, please,
21   Ms. Harney, Government 411.
22   Q.  If you could review that and look up when you're done.
23   A.  Yes, I see it.
24   Q.  Have you had a chance to read it?
25   A.  I was just -- yes.

J7ATKID2                          Cooper - Cross

1    Q.   Would you agree with me that that appears to be a

2    recruitment ad for prostitution?

3    A.   Yes, it does.

4              THE COURT:  Mr. Margulis, this is not admitted.

5              MR. MARGULIS-OHNUMA:  It is, your Honor.

6              THE COURT:  It is not on the list that I have.  If it

7    is, then --

8              Government clarify this?

9              MR. GUTWILLIG:  Yes, your Honor, I believe this one of

10   the exhibit admitted with Mr. Uitto's testimony.

11             THE COURT:  All right.

12   BY MR. MARGULIS-OHNUMA:

13   Q.   If you go to the third line of the text, on left in the

14   middle there's a sentence that starts, "In order to work for

15   me."  Could you read that into the record?

16   A.   In order to work for me, you must be 18 years old or older.

17   Q.   So would you agree with me that this is not an ad seeking

18   to recruit underage victims, right?

19   A.   No, it's requesting people who are 18 years of age or

20   older.

21             MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

22   Thank you very much.

23             THE COURT:  Mr. Gutwillig.

24             MR. GUTWILLIG:  Yes, your Honor, thank you.

25             Ms. Harney, please leave up Government Exhibit 411.

J7ATKID2                        Cooper - Redirect

1   REDIRECT EXAMINATION

2   BY MR. GUTWILLIG:

3   Q.  Dr. Cooper, have you ever seen this ad before?

4   A.  No, I have not.

5   Q.  So just looking at it, in your expert opinion you reviewed

6   it, can you explain if any techniques of recruitment are used

7   in this ad?

8   A.  This is the kind of ad that you frequently see on BackPage

9   and other online classifieds.  And we now know very clearly

10  from online classifieds what is being advertised on that

11  classified is not necessarily going to be the actual individual

12  that will be potentially coerced to have sexual contact with an

13  individual.  It opens the door because it has a telephone

14  number for an individual to call, and often the call is going

15  to be either someone to call in or call out, meaning a call in

16  is a person calling is willing to come to a location where a

17  victim who may be a trafficking victim is going to be available

18  to them, or the call out will be a person perhaps calling from

19  a hotel saying I want this victim to be brought to me.

20  Q.  And Dr. Cooper, how do you interpret -- I direct you to the

21  text that says, "Hustle 24-7 or Slave 9-5," how would you

22  interpret that?

23  A.  Hustle, the term "hustle" refers to sex trafficking victims

24  or prostitution, if the individual is selling themselves.  24-7

25  means around the clock, any time you want that person, or

1    slave, 9 to 5 is indicative of other types of sexual acts, such

2    as the individual, the buyer, who may be into S and M or other

3    types of sexual acts and can have access to a person to satisfy

4    their sexual fantasies.

5    Q.  Dr. Cooper, to be clear, you testified that you have not

6    seen this ad previously, right?

7    A.  No, I have not.

8    Q.  So you have no way to know whether the portion you read

9    into the record about the age is correct?

10   A.  That's correct.

11   Q.  Dr. Cooper, we talked a little bit about recruitment on

12   cross-examination.  Can someone who starts to work willingly

13   later be sex trafficked?

14   A.  Yes, very much so.  Very often if an adult victim is

15   recruited by a trafficker and is presented with a model of this

16   is a working relationship that we're going to have, 50/50, et

17   cetera, very often over time -- and sometimes it's a very short

18   time -- the victim will have to start providing more and more

19   of the money to the trafficker, either within the context of

20   debt bondage and agreed-upon monies or from the very beginning.

21   Q.  And turning back to age, Dr. Cooper, in your experience

22   could sex traffickers intentionally misrepresent the age of

23   victims?

24   A.  Very much so.  Because sex traffickers recognize that the

25   consequences of trafficking a minor are much higher than the

1    consequences of trafficking an adult, they frequently will

2    really present a minor victim as if he or she, usually she, is

3    an adult.

4                MR. GUTWILLIG:  One moment, please, your Honor.

5                (Pause)

6    Q.  Dr. Cooper, a few questions on recruitment.  On

7    cross-examination defense counsel spoke to you about the

8    distinction between prosecution and sex trafficking.  Would

9    responding to an ad like this mean that someone cannot be sex

10   trafficked?

11   A.  No, it does not mean they could not be a sex traffic

12   victim.  In fact, responding to an ad like this would be a very

13   high risk behavior because you really don't know who this

14   person is who has this ad, and making yourself available to

15   that individual might make you at great risk to be a sex

16   trafficking victim.

17   Q.  And Dr. Cooper, looking at this, it says you must be

18   willing to listen.  How do you interpret that?

19   A.  That is our clue that the individual who wants to -- I will

20   use the word "hire" in quotation marks -- who wants to hire an

21   individual is already going to have to follow the rules.

22   Q.  Those are the rules we discussed earlier?

23   A.  Yes, that is correct.

24                MR. GUTWILLIG:  Nothing further, your Honor.

25                THE COURT:  Thank you.

```
 1              MR. MARGULIS-OHNUMA:  Very briefly, your Honor.

 2              Could we leave the exhibit up?

 3    RECROSS EXAMINATION

 4    BY MR. MARGULIS-OHNUMA:

 5    Q.  Just Dr. Cooper, I ask you to look at the Hustle 24-7 or

 6    Slave 9 to 5 image in that ad.  Is a possible interpretation

 7    that the "Hustle 24-7" means living a life of prostitution

 8    while "Slave 9 to 5" refers to -- I forget the word you used,

 9    but more of a straight or conventional lifestyle?

10    A.  No, I said the "Slave 9 to 5" could mean that you are going

11    to be a victim of -- potential victim of buyers who have

12    specific types of sexual proclivities is how I interpret "Slave

13    9 to 5."

14    Q.  Why would someone put that on a recruitment ad?

15    A.  Because there are adults who are dominatrixes.  There are

16    plenty of people who have different types of sexual fetishes

17    that they're willing to fulfill for persons who so desire.

18    Q.  Now you're talking about prostitutes who are willing to do

19    that or women who are willing to do that?

20    A.  That's correct.

21              MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

22              THE COURT:  Thank you, you may step down.  You're

23    excused.

24              MS. TARLOW:  The government calls Porsche Brown, your

25    Honor.
```

J7ATKID2                          P. Brown - Direct

```
 1              THE COURT:  Keep in mind what the Court indicated
 2    earlier about who the witnesses are and whether they're part of
 3    the individual mentioned in the indictment.  Is this one such?
 4              MS. TARLOW:  No, your Honor, this is an individual who
 5    is employed by the FBI.
 6              THE COURT:  All right.
 7     PORSCHE BROWN,
 8          called as a witness by the Government,
 9          having been duly sworn, testified as follows:
10    DIRECT EXAMINATION
11    BY MS. TARLOW:
12    Q.  Good morning, Ms. Brown.
13    A.  Good morning.
14    Q.  Where do you work?
15    A.  I work for the FBI.
16    Q.  And what is your title at the FBI?
17    A.  I'm an information technology specialist forensic examiner.
18    Q.  Can you remember to try to keep your voice up?
19    A.  Okay.
20    Q.  How long have you had that position?
21    A.  Since 2008.
22    Q.  And what are some of your duties and responsibilities in
23    that role?
24    A.  I preserve digital evidence and examine it.
25    Q.  And what constitutes preserving digital evidence?
```

J7ATKID2                         P. Brown - Direct

1   A.   I make sure that the copies that I make or the images I

2   make are exact copies of originals and I verify.

3   Q.   Does that include extracting data from particular devices?

4   A.   Yes, I also extract data.

5   Q.   What is your educational background, Ms. Brown?

6   A.   I have a bachelor's of science in bioinformatics and a

7   bachelor's of science in biology.

8   Q.   What is bioinformatics, Ms. Brown?

9   A.   Informatics is computer science using computers systems

10  solving biological problems.

11  Q.   Have you received any training in the analysis of

12  electronic evidence and forensic examination?

13  A.   Yes, I received training with the FBI.

14  Q.   Can you describe some of that training?

15  A.   I became a certified computer forensic examiner.  I took

16  courses with the FBI for approximately a year, and I also did

17  continuing education courses every year.

18  Q.   Did those courses include how to extract electronic

19  evidence from devices?

20  A.   Yes.

21  Q.   Does that include extractions from cell phones?

22  A.   Yes, it does.

23  Q.   Computers?

24  A.   Yes.

25  Q.   Hard drives?

J7ATKID2                        P. Brown - Direct

1   A.  Yes.

2   Q.  Can you describe what is an extraction?

3   A.  An extraction is pulling files from original -- copies of

4   original evidence or their original evidence.

5   Q.  How often do you deal with extractions?

6   A.  I do it every day.

7   Q.  Have you performed your own extractions?

8   A.  Yes.

9   Q.  Approximately how many?

10  A.  Over a hundred.

11  Q.  Have you examined extractions prepared by others?

12  A.  Yes.

13  Q.  Approximately how many?

14  A.  Many, over a hundred.

15  Q.  Generally who provides you with the devices for which you

16  perform your extractions?

17  A.  Usually the case agent or the person who submits the

18  request for help.

19  Q.  When you receive those electronic devices, are those

20  devices identified in any particular way?

21  A.  Yes, they're identified with unique bar codes and also a

22  unique 1B number.

23  Q.  How is that information transmitted to you?

24  A.  I receive a form that has unique identifiers such as the

25  make, model, serial number, and the description of the item

J7ATKID2                          P. Brown - Direct

1   with the evidence and the chain of custody.

2   Q.  Can you please walk us through the steps when you perform

3   an extraction.

4   A.  The first thing I do is a physical examination of the

5   actual device that I receive, and I record the make, model and

6   serial number and give it a unique identifier for the internal

7   use in the lab.  And then I use CART approved -- Computer

8   Analysis Response Team approved tools, which are software, and

9   I hook the device up to my computer and I use these approved

10  tools to extract data from the device.

11  Q.  Is the computer analysis response team a team within the

12  FBI?

13  A.  Yes, it is.

14  Q.  When you extract data from electronic devices, can that

15  data be altered in any way?

16  A.  I verify that the data extractions are copies of the

17  original, and so that ensures that the data is not altered.

18  Q.  And how do you verify?

19  A.  I use something called an MD5 hash value.  This hash value

20  is basically an mathematical algorithm run across each file to

21  uniquely identify it.

22  Q.  Have you analyzed certain forensic images for electronic

23  devices as part of your work in this case?

24  A.  Yes.

25  Q.  Were you otherwise involved at all in the investigation of

J7ATKID2                         P. Brown - Direct

1    this case?

2    A.  No.

3    Q.  What types of electronic devices were you asked to examine

4    in this case?

5    A.  I received two computers, about three -- I believe three

6    external hard drives and several cell phones.

7    Q.  And approximately how many devices in total?

8    A.  There was approximately twelve.

9    Q.  Were those devices assigned particular 1B numbers?

10   A.  Yes.

11   Q.  Did you perform extractions of those devices?

12   A.  Yes, I did.

13   Q.  Was that done using the same method that you just testified

14   about?

15   A.  Yes.

16   Q.  Turning your attention to what is marked as Government

17   Exhibit 1200.

18            MS. TARLOW:  If you could pull it up for the defense

19   and the Court.

20   Q.  Ms. Brown, do you recognize this?

21   A.  Yes.

22   Q.  What is it?

23   A.  This is a report for the SIM card data extraction that I

24   did.

25   Q.  An extraction you did on one of the devices you just

J7ATKID2                        P. Brown - Direct

1    testified about?

2    A.  Yes.

3    Q.  Which do you remember which device this extraction came

4    from?

5    A.  This came from 1B1.

6    Q.  And do you know what type of device 1B1 is?

7    A.  1B1 was an Apple iPhone.

8              MS. TARLOW:  Your Honor, the government offers

9    Government Exhibit 1200.

10             MR. MARGULIS-OHNUMA:  No objection.

11             MS. TARLOW:  May we publish?

12             THE COURT:  Yes.

13             (Government's Exhibit 1200 received in evidence)

14   Q.  Directing your attention back to Government Exhibit 1200,

15   you testified this is SIM data?

16   A.  Yes.

17   Q.  What information is contained in this report?

18   A.  It contains a Sim card subscriber identity and phone

19   number.

20   Q.  What is the phone number associated with this SIM data?

21   A.  It's 1-718.600.7216.

22   Q.  And you testified that this same SIM data was found on the

23   1B1 device?

24   A.  Yes.

25   Q.  Now directing your attention to Government Exhibits 1201,

J7ATKID2                          P. Brown - Direct

1    1202, 1203, 1204, 1205, and 1206, as well as Government

2    Exhibit 1207, Ms. Brown do you recognize these government

3    exhibits?

4    A.  Yes.

5    Q.  And where were they extracted from?

6    A.  They were extracted from one of the devices I examined, I

7    believe 1B3.

8    Q.  Do you remember what device 1B3 is?

9    A.  I don't recall at the top of my head.  If I could have my

10   memory refreshed, please?

11            MS. TARLOW:  May I approach, your Honor?

12            THE COURT:  Yes.

13   Q.  Ms. Brown, I handed you what is marked 3511-08.

14   A.  Can you repeat that?

15            THE COURT:  Reporter, read back the question.

16            (Record read)

17   A.  Yes.

18   Q.  And what is it?  What type of device is 1B3?

19   A.  1B3 is a two terabyte Western Digital USB labeled "CK Time

20   Machine."

21            MS. TARLOW:  Your Honor, the government offers 1201

22   through 1203.

23            THE COURT:  Mr. Margulis?

24            MR. MARGULIS-OHNUMA:  No objection, your Honor.

25            THE COURT:  Admitted without objection.

1              (Government's Exhibits 1201 through 1203 received in

2    evidence)

3    Q.  Ms. Brown, in performing the extractions and review of the

4    devices, do you find the photographs depicted in Government

5    Exhibits 1204, 1205 and 1206 on any other devices for which you

6    performed an extraction?

7    A.  Yes.

8    Q.  Turning your attention to Government Exhibit 1230, 1235,

9    1239 and 1345, do these all depict the same photograph that is

10   shown in Government Exhibit 1204?

11   A.  Yes.

12   Q.  How do you know that?

13   A.  They have the same MD5 hash value and also upon visual

14   inspection they look the same.

15   Q.  And did you extract Government Exhibit 1230, 1235, 1239,

16   and 1345 from particular places associated with this case?

17   A.  Yes.

18   Q.  Which device was Government Exhibit 1230 extracted from, do

19   you recall?

20   A.  No.

21              MS. TARLOW:  Your Honor, may I approach?

22              THE COURT:  Yes.

23   Q.  Ms. Brown, does that refresh your recollection as to which

24   device Government Exhibit 1230 was extracted from?

25   A.  Yes.

J7ATKID2                        P. Brown - Direct

1    Q.  What device was that?

2    A.  1230 was extracted from 1B4.

3    Q.  And which device was Government Exhibit 1235 extracted

4    from?

5    A.  1B5.

6    Q.  Which device was Government Exhibit 1230 extracted from?

7            Sorry, 1239 extracted from?

8    A.  Extracted from 1B9.

9    Q.  And Government Exhibit 1345?

10   A.  Exhibit 1345 was extracted from 1B14.

11           MS. TARLOW:  Your Honor, the government offers 1230,

12   1235, 1239 and 1345.

13           MR. MARGULIS-OHNUMA:  I have a cumulativeness

14   objection.

15           THE COURT:  Overruled.

16           (Government's Exhibits 1230, 1235, 1239 and 1345

17   received in evidence)

18           MS. TARLOW:  May we publish Government Exhibit 1204,

19   1230, 1235, 1239 and 1345.

20           Could we publish next Government Exhibit 1235, 1239,

21   and 1345.

22           Next please publish Government Exhibit 1205.

23   BY MS. TARLOW:

24   Q.  Ms. Brown, did you find the same image depicted in

25   Government Exhibit 1205 in other devices?

J7ATKID2                        P. Brown - Direct

1   A.  Yes.

2   Q.  Turning your attention to Government Exhibit 1231, 1236,

3   1240 and 1346, do these all depict the same photograph as was

4   shown in Government Exhibit 1205?

5   A.  Yes.

6   Q.  And how do you know that?

7   A.  Because they have the same MD5 hash value and also visually

8   look the same.

9   Q.  You testified these were photographs all extracted with

10  devices associated with this case?

11  A.  Yes.

12  Q.  Which device was Government Exhibit 1231 extracted from?

13  A.  1231 was extracted from 1B4.

14  Q.  Which device was Government Exhibit 1236 extracted from?

15  A.  1236 was extracted from 1B5.

16  Q.  Which device was Government Exhibit 1240 extracted from?

17  A.  1240 was extracted from 1B9.

18  Q.  And which device of the Government Exhibit 1346 extracted

19  from?

20  A.  1346 was extracted from 1B14.

21          MS. TARLOW:  Your Honor, the government offers

22  Government Exhibit 1231, 1236, 1240 and 1346.

23          THE COURT:  Ms. Margulis?

24          MR. MARGULIS-OHNUMA:  No objection.

25          THE COURT:  Admitted without objection.

1          (Government's Exhibits 1231, 1236, 1240 and 1346

2     received in evidence)

3          MS. TARLOW:  Ms. Harney, may we please publish

4     Government Exhibit 1206.

5     Q.  Ms. Brown, did you find this image on any of the other

6     devices which you provided extractions for?

7     A.  Yes.

8          MS. TARLOW:  Ms. Harney, if we could take that exhibit

9     down.

10    Q.  Ms. Brown, turning your attention to Government

11    Exhibit 1232, 1237, 1241 and 1346, do these all depict the same

12    photographs as what is shown in Government Exhibit 1206?

13    A.  Yes.

14    Q.  How do you know that?

15    A.  They have the same MD5 hash value and also are visually the

16    same, they look visually the same.

17    Q.  Which device was Government Exhibit 1232 extracted from?

18    A.  1232 was extracted from 1B4.

19    Q.  How about Government Exhibit 1237?

20    A.  1237 was extracted from 1B5.

21    Q.  And Government Exhibit 1241?

22    A.  1241 was extracted from 1B9.

23    Q.  And which device was Government Exhibit 1347 extracted

24    from?

25    A.  1347 was extracted from 1B14.

J7ATKID2                    P. Brown - Direct

1             MS. TARLOW:  Your Honor, the government offers

2    Government Exhibit 1232, 1237, 1241 and 1347.

3             MR. MARGULIS-OHNUMA:  Same cumulativeness objection,

4    your Honor.

5             THE COURT:  I will admit this one, but I don't believe

6    there's any point in continuing with seeing same line of

7    exhibits.  It is become becoming cumulative.

8             MS. TARLOW:  Yes, your Honor.

9             (Government's Exhibits 1232, 1237, 1241 and 1347

10   received in evidence)

11   Q.  Ms. Brown, did you perform an examination of the metadata

12   associated with the government exhibits that you just testified

13   about?

14   A.  Yes.

15            MS. TARLOW:  May I approach, your Honor?

16            THE COURT:  Yes.

17   Q.  Mr. Brown, turning your attention to what has been marked

18   as Government Exhibits 1204M through 1206M, 1230M through

19   1232M, 1235M through 1237M, 1345M through 1347M, do you

20   recognize these?

21   A.  Yes.

22   Q.  What are they?

23   A.  These are copies of the report I generated for the exif

24   data of pictures.

25   Q.  How were they generated?

J7ATKID2                        P. Brown - Direct

1    A.  These were generated with the software tool that I use to

2    extract out the exif data from the photo.

3    Q.  What is the exif data?

4    A.  Exif data is metadata about a photo stored by a device on

5    the photo.

6    Q.  Could you describe some general categories of what is

7    metadata?

8    A.  Some things that are metadata are the created date, the

9    access date, modified dates, the file size, and things like

10   that, data about the picture or the original item.

11   Q.  If an image is transferred from one device to another, does

12   the exif data change?

13   A.  No, it is embedded with the picture.  When the picture is

14   taken, when you copy the picture, that data is copied with the

15   picture.

16   Q.  Your Honor, the government offers Government Exhibit 1204M

17   through 1206M, 1230M through 1232M, 1235M through 1237M and

18   1345M through 1347M.

19           MR. MARGULIS-OHNUMA:  No objection.

20           THE COURT:  Admitted without objection.

21           (Government's Exhibits 1204M through 1206M, 1230M

22   through 1232M, 1235M through 1237M and 1345M through 1347M

23   received in evidence)

24           MS. TARLOW:  May we publish Government Exhibit 1204M.

25   Q.  Turning your attention to this exhibit, which device is

J7ATKID2                          P. Brown - Direct

1    this report associated with?

2    A.  It's associated with 1B3.

3    Q.  Which file on that device was this report generated for?

4    A.  IMG_20170201_233247.

5    Q.  How do you know?

6    A.  Because when I generated the report there was the file with

7    the identity IB3, which was the item it came from, to the file

8    name.

9    Q.  Were you reading from the header listed on the top of this

10   report?

11   A.  I'm reading from this where it says 1B3 and exif

12   1204-image.

13   Q.  Is that listed on the top of the report?

14   A.  Yes, it is.

15   Q.  Did you write that information on the top of this report on

16   any other exhibits I just mentioned?

17   A.  No.

18   Q.  Have you verified it is accurate?

19   A.  Yes.

20   Q.  Is the information you just described written on the header

21   of 1204M true for each of headers on the other government

22   exhibits I just showed you?

23   A.  Yes.

24   Q.  Turning your attention to the portion of Government

25   Exhibit 1204M that states exif.image.make, what does that field

J7ATKID2                         P. Brown - Direct

1   refer to generally?

2   A.   It refers to the make of the device that took the picture.

3   Q.   Is that also true for the other reports that you generated

4   for images?

5   A.   Yes.

6   Q.   What is written on that line for 1204M?

7   A.   It says ZTE.

8   Q.   What is your understanding of what that refers to?

9   A.   ZTE makes cell phones.

10  Q.   Turning your attention on Government Exhibit 1204M to

11  portion of this report that states exif.photo.date time

12  original, what does that field refer to generally?

13  A.   This refers to the date that the photo was taken, that the

14  device recorded for the date the photo was taken.

15  Q.   Is that accurate even if the photo is transferred to

16  another device, would that remain the same?

17  A.   Yes, that will remain the same.

18  Q.   Does the same thing apply for that term exif.photo.date

19  time original listed in the other reports you generated for

20  these images?

21  A.   Yes.

22  Q.   And turning your attention back to 1204M, what is written

23  on that line?

24  A.   It says 20170201233247.

25  Q.   In performing the extractions and review of the devices for

J7ATKID2                         P. Brown - Direct

1  this case, did you find the video in Government Exhibit 1207 on

2  any other devices for which you performed an extraction?

3  A.  Yes.

4  Q.  Turning your attention to Government Exhibit 1233, 1234,

5  1242 and 1348, do these all refer to -- depict the same exhibit

6  in Government Exhibit 1207?

7  A.  Yes.

8  Q.  And how do you know?

9  A.  Because the MD5 hash values were the same, and also

10 visually look the same.

11 Q.  Did you extract the these videos from devices in this case?

12 A.  Yes.

13 Q.  Which device was Government Exhibit 1233 extracted from?

14 A.  1233 was extracted from 1B4.

15 Q.  Government Exhibit 1234?

16 A.  1234 was extracted from 1B5.

17 Q.  1242?

18 A.  1242 was extracted from 1B9.

19 Q.  And Government Exhibit 1348?

20 A.  134 was extracted from 1B14.

21 Q.  Have you generated reports regarding the metadata for these

22 videos?

23 A.  Yes.

24 Q.  How did you generate those reports?

25 A.  I generated the report using the forensic tool that I used.

J7ATKID2                        P. Brown - Direct

```
 1   Q.  Can you describe a little bit about what that process

 2   consists of?

 3   A.  When I process the actual original image, then my tool

 4   basically pulls out all the different metadata for each file.

 5               MS. TARLOW:  May I approach, your Honor?

 6               THE COURT:  Yes.

 7               MS. TARLOW:  Your Honor, the government offers

 8   Government Exhibits 1233, 1234, 1242 and 1348.

 9               MR. MARGULIS-OHNUMA:  Cumulativeness objection, your

10   Honor.

11               THE COURT:  Overruled.

12               (Government's Exhibits 1233, 1234, 1242 and 1348

13   received in evidence)

14   Q.  Ms. Brown, turning your attention back to the exhibits that

15   are before you now, what are these?

16   A.  This is a copy of the report that I generated for the

17   metadata for this video.

18   Q.  When you say "this video," are you referring to the video

19   on several different devices?

20   A.  Yes.

21               MS. TARLOW:  The government offers 1233M, 1234M, 1242M

22   and 1348M.

23               MR. MARGULIS-OHNUMA:  No objection.

24               THE COURT:  Admitted without objection.

25               (Government's Exhibits 1233M, 1234M, 1242M and 1348M
```

J7ATKID2                          P. Brown - Direct

 1  received in evidence)

 2              MS. BRACEWELL:  May we publish Government

 3  Exhibit 1233M.

 4              THE COURT:  Yes.

 5  Q.  Ms. Brown, turning your attention to this exhibit, can you

 6  please describe what is the source device?

 7  A.  The source device is 1B4.  1B4 is a disk image, disk zero

 8  image underscore DMG dot, then a slash nav HD.

 9  Q.  Turning your attention to the second row, which is the

10  title name, generally what kind of information is listed on

11  this field?

12  A.  This is the name of the file.

13  Q.  And directing your attention to the row below, which is

14  labeled path, generally what kind of information is listed in

15  that field?

16  A.  This is the location on the drive where this file was

17  located.

18  Q.  Turning your attention to what is listed as the hash MD5,

19  is this the hash MD5 you were referring to earlier?

20  A.  Yes.

21  Q.  With respect to Government Exhibit 1234, 1242 and 1348, the

22  fields on those reports, do they all indicate the same types of

23  information?

24  A.  They do.

25  Q.  Ms. Brown, now directing your attention to Government

J7ATKID2                              P. Brown - Direct

1   Exhibits 1208 through 1226, Ms. Brown, do you recognize these

2   exhibits?

3   A.  Yes.

4   Q.  Were these also extracted from the devices that you

5   performed extractions for?

6   A.  Yes.

7   Q.  Did you extract what is labeled Government Exhibits 1208

8   from a particular device?

9   A.  Yes.

10  Q.  What device was that?

11  A.  These were extracted from 1B4.

12  Q.  What type of device is 1B4?

13  A.  1B4 is the Apple iMac.

14          MS. TARLOW:  Your Honor, the government admits

15  Government Exhibit 1208 through 1211 and 1226.

16          MR. MARGULIS-OHNUMA:  No objection.

17          THE COURT:  Admitted without objection.

18          (Government's Exhibits 1208 through 1211 and 1226

19  received evidence)

20  Q.  Ms. Brown, now directing your attention to what is marked

21  for identification as Government Exhibit 1252, 1257 through

22  1258 and 1260 through 1261.  Do you recognize these?

23  A.  Yes.

24          (Continued on next page)

25

J7A3KID3                        P. Brown - Direct

1   Q.  Did you extract this data from a particular device?

2   A.  Yes.

3   Q.  Which device?

4   A.  1B-12.

5          MS. TARLOW:  The government offers Government Exhibits

6   1252, 1257 through 1258, 1260 through 1261.

7          MR. MARGULIS-OHNUMA:  I need a moment, your Honor.

8   I'm sorry.  No objection, your Honor.

9          THE COURT:  Admitted without objection.

10         (Government's Exhibit 1252, 1257 through 1258, 1260

11  through 1261 received in evidence)

12         MS. TARLOW:  Your Honor, may we publish Government

13  Exhibit 1257?

14         THE COURT:  Yes.

15  Q.  Ms. Brown, what does this exhibit show?

16  A.  This shows a report that I extracted from the item.

17  Q.  What type of data does consist of?

18  A.  It contains SMS messages.

19  Q.  Do these messages indicate they were sent to other devices?

20  A.  Yes.  In the "to" column, where it says "to," it was sent

21  to those phone numbers.

22  Q.  Now turning your attention to Government Exhibit 1258,

23  Ms. Harney if you can publish for the jury.

24         Ms. Brown, what type of data does this show?

25  A.  This shows contacts.

1   Q.  Directing your attention to the first column, what type of

2   information is contained there?

3   A.  It has the contact name.

4   Q.  Directing your attention to the third column.  Are there

5   phone numbers listed in that column?

6   A.  Yes.  Under "entries," the phone numbers are listed.

7   Q.  For the first row, what is the name that is listed?

8   A.  The name says Lloyd.

9   Q.  What is the phone number that's listed?

10  A.  Phone number that's listed is 718-600-7216.

11  Q.  Turning your attention to the fifth row, what is the name

12  that is listed?

13  A.  The name that's listed is Red.

14  Q.  What is the phone number that is listed?

15  A.  The phone number is 347-815-9064.

16  Q.  Ms. Brown, directing your attention to Government Exhibits

17  1262 through 1283.

18          MR. MARGULIS-OHNUMA:  Judge, we have no objection, the

19  parties will stipulate that these images are admissible.

20          THE COURT:  All right.

21          MS. TARLOW:  May I have one moment, your Honor.  The

22  government offers Government Exhibits 1262 to 1283.

23          MR. MARGULIS-OHNUMA:  No objection.

24          THE COURT:  Admitted without objection.

25          (Government's Exhibit 1262 through 1283 received in

J7A3KID3                        P. Brown - Direct

1   evidence)

2   Q.  Ms. Brown, what device were those Government Exhibits

3   obtained from?

4   A.  1B-13.

5   Q.  Ms. Brown, I'm now showing you Government Exhibit 1285,

6   1286, and 1287.

7           MS. TARLOW:  The government offers Government Exhibits

8   1285 through 1287, and 1290 through 1292.

9           MR. MARGULIS-OHNUMA:  No objection, your Honor.

10          THE COURT:  Admitted without objection.

11          (Government's Exhibit 1285 through 1287, 1290 through

12  1292 received in evidence)

13          MS. TARLOW:  May we publish Government Exhibit 1292?

14          THE COURT:  Yes.

15  Q.  Ms. Brown, what is this Government Exhibit 1292?  What does

16  it depict?

17  A.  This is a report of the web history extracted from the

18  device.

19  Q.  What is the number of next to "web history"?

20  A.  838.

21  Q.  Can you just read the first title on row three, column B?

22  A.  Backpage.com.

23  Q.  Looking at the columns in row two, what does last visited

24  date refer to?

25  A.  That's the date recorded for the last visited date of that

J7A3KID3                          P. Brown - Direct

1    website.

2    Q.  And what does the column H "deleted" refer to?

3    A.  This entry -- this was deleted, actually recovered and it

4    was deleted.  It was marked for deletion.

5            MS. TARLOW:  May I have one moment, your Honor.

6    Q.  Ms. Brown, now directing your attention to Government

7    Exhibit 1294, 1298 through 1305, 1350, 1353, 1355, and 1356,

8    1361 through 1370, and Government Exhibit 1372.

9            Ms. Brown, do you recognize these?

10   A.  Yes, I do.

11   Q.  Did you extract them from a particular device?

12   A.  Yes, they were -- I recognize them as things that were

13   extracted from the devices.

14   Q.  What device was that?

15   A.  They were from various devices.

16   Q.  Which devices were they from?

17           Government Exhibit 1294, which device was that from?

18   A.  1294 was extracted from 1B-14.

19   Q.  And Government Exhibit 1298 through 1305, what device was

20   that extracted from?

21   A.  Those were extracted from 1B-14.

22   Q.  And Government Exhibit 1350, 1353, 1355 through 56, 1361

23   through 13 -- I'm sorry.  Strike that.

24           Government Exhibit 1350, 1353, 1355, what device were

25   those extracted from?

J7A3KID3                          P. Brown – Direct

1   A.   Those were extracted from 1B–15.

2   Q.   And Government Exhibits 1356, 1361 through 1369, what were

3   those extracted from?

4   A.   Those were extracted from 1B–17.

5   Q.   And Government Exhibit 1370 and 1372, what device were

6   those extracted from?

7   A.   Those were extracted from 1B–19.

8           MS. TARLOW:   The government admits Government Exhibit

9   1294, 1298 through 1305, 1390, 1353, 1355 through 56, 1361

10  through 1370, and 1372.

11          MR. MARGULIS-OHNUMA:   One moment, your Honor.   Judge,

12  we object on prejudice and cumulative grounds, 1372 as well as

13  1364 and 1369.

14          MS. TARLOW:   Your Honor, may we have a sidebar?

15          THE COURT:   Yes.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

J7A3KID3                       P. Brown - Direct

1          (At the sidebar)

2          MS. TARLOW:  Your Honor, first of all, we apologize

3    for the length that this is taking.  In part we're doing this

4    because we don't have a stipulation so we have to authenticate

5    all of the devices.

6          THE COURT:  All right.

7          MR. MARGULIS-OHNUMA:  So let's start with 1372.

8    That's a recording we haven't heard.  I've heard it before.  It

9    is another one where he acts like an ass.  It's just

10   prejudicial, it doesn't prove anything.  It's certainly

11   authenticated through this witness, but there's no reason to

12   admit it.  That's 1372.  If you'd like to hear it, I have it

13   teed up right here.  It's 24 seconds.  It's not that it's not

14   authenticated.  It is irrelevant and prejudicial.

15         MS. TARLOW:  We can authenticate it now.  Our position

16   is it is not prejudicial.  But we can later introduce it

17   through another witness to show its relevance.

18         THE COURT:  What is your objection?  Authentication?

19         MR. MARGULIS-OHNUMA:  No, I have no objection to the

20   authentication.

21         THE COURT:  It's prejudice?

22         MR. MARGULIS-OHNUMA:  Prejudice, yes.

23         THE COURT:  Yes.

24         MR. MARGULIS-OHNUMA:  So then with respect to -- and I

25   have no objection to all the others except 1364 through 1369

1   are more pictures of him standing there.  They're cumulative.

2   I don't think they need to be in.  1363 is also a picture of

3   him standing there.  It's just too much.

4              THE COURT:  All right.  I agree to some extent,

5   Ms. Tarlow, that you don't need 10 pictures of him standing

6   there.

7              MS. TARLOW:  Understood.  The basis for why we wanted

8   to admit more than one or two is to show it's his phone.

9              THE COURT:  So you do one or two, but not 10.

10             MR. MARGULIS-OHNUMA:  I'll withdraw to 1364.  So I'm

11   only, so let's go through 1361 through 1364 and then -- so

12   we're letting in two.  So that would be without objection,

13   okay.

14             MS. TARLOW:  Your Honor, we would just inquire whether

15   or not defense counsel is disputing ownership of the phone, and

16   therefore we need these photographs to prove that it's not

17   simply someone sent photographs to another phone of him and

18   they're saved on there.  The volume is therefore indicative of

19   his ownership.

20             THE COURT:  Are they all from the same phone?

21             MS. TARLOW:  Yes, your Honor.

22             THE COURT:  It was his phone?

23             MS. TARLOW:  Is the government's contention.

24             THE COURT:  Is there any dispute that it is he

25   depicted in the photograph?

J7A3KID3                      P. Brown - Direct

1            MR. MARGULIS-OHNUMA:  No.  It is him in the photos.

2      Whose phone it is, I'm not sure I'm ready to concede.

3            MS. TARLOW:  The argument is the volume actually is

4      relevant to proving --

5            MR. MARGULIS-OHNUMA:  I'll withdraw the objection.

6      I'll withdraw the objection.  No problem.

7            THE COURT:  In that case, again, we don't need to put

8      every single one of those pictures on the screen.

9            MS. TARLOW:  That is not our intention.

10           THE COURT:  We're down to 1372 as to whether or not

11     it's prejudicial.

12           MS. TARLOW:  We would just authenticate it at this

13     time, and ask that you reserve to determine whether or not it

14     is relevant or should be admitted.

15           MR. MARGULIS-OHNUMA:  There is no objection to

16     authentication.

17           THE COURT:  Let not publish it until I take a look at

18     it.

19           (Continued on next page)

20

21

22

23

24

25

J7A3KID3                          P. Brown - Direct

<table>
<tr><td>1</td><td>(In open court)</td></tr>
</table>

1              (In open court)

2              MS. TARLOW:  The government offers Government Exhibit

3    1294, 1298 through 1305, 1350, 1353, 1355 and 1356 and 1361

4    through 1370.

5              MR. MARGULIS-OHNUMA:  No objection to those, your

6    Honor.

7              THE COURT:  Admitted without objection.

8              (Government's Exhibit 1294, 1298 through 1305, 1350,

9    1353 received in evidence)

10             (Government's Exhibit 1355, 1356, 1361 through 1370

11   received in evidence)

12             MS. TARLOW:  May we publish Government Exhibit 1353?

13             THE COURT:  Yes.

14   Q.  Ms. Brown, what type of data is shown in this exhibit?

15   A.  This is an extraction report which contains e-mail.

16   Q.  Can you please read the time stamp that is in the second

17   column.

18   A.  It's 3/5/2017, 9:20:25 p.m. UTC.

19   Q.  Directing your attention to the column, that the header for

20   which is "other."  Can you please read what account is listed.

21   A.  Yes.  It's Keyonnadoll@gmail.com.

22   Q.  Continuing reading, what is listed after the word

23   "snippet," what does that state?

24   A.  It says, "Hi, Lloyd Kidd.  Your payment from Visa-7734 is

25   declined.  To keep your Sideline."

J7A3KID3                        P. Brown - Cross

1    Q.   Now turning your attention to Government Exhibit 1355.

2    What kind of data does this exhibit contain?

3    A.   This contains user accounts.

4    Q.   What is listed under the column entitled "user name"?

5    A.   It's Keyonnadoll@gmail.com.

6    Q.   Now, Ms. Brown, turning your attention to what is marked as

7    Government Exhibit 1362.  What kind of information is listed in

8    this exhibit?

9    A.   Contacts.

10   Q.   What is the first row, what information is in -- excuse me

11   the first -- the second column labeled "contact"?

12   A.   I see "contacts" and it has the name in there.

13   Q.   And the row, the column that is labeled "entries."  What

14   type of information is listed there?

15   A.   Phone numbers.

16   Q.   Ms. Brown, turning your attention back to Government

17   Exhibits 1285 through 1287 and 1290 through 1292.  What devices

18   did those come from?

19   A.   Those came from 1B-13.

20           MS. TARLOW:  May I have one moment, your Honor.

21   Nothing further, your Honor.

22           THE COURT:  Mr. Margulis.

23           MR. MARGULIS-OHNUMA:  Yes, your Honor.  Just briefly.

24   CROSS-EXAMINATION

25   BY MR. MARGULIS-OHNUMA:

J7A3KID3                    P. Brown - Cross

1   Q.  Good afternoon, Ms. Brown.  How are you?

2   A.  Well.  How are you?

3   Q.  Well.  We've met before, right?

4   A.  I think I've seen you before.

5   Q.  Yeah.  So, you were the analyst assigned to this case,

6   right?

7   A.  I'm the card examiner assigned, yes.

8   Q.  And this case involved 22 electronic devices, right?

9   A.  Yes, it involved several I believe.  I'm not sure if it was

10  22, but it was several.

11  Q.  Do you have your notes in front of you, might refresh your

12  recollection?

13  A.  Yes.  I don't have an exact number that -- I received 20 to

14  examine.

15  Q.  You received 22?

16  A.  20 I believe.

17  Q.  You received only 20?

18  A.  I believe, yes.

19  Q.  It was your job to go through all of them, right?

20  A.  Yes.

21  Q.  And was it was a huge amount of data all together, right?

22  A.  Yes.

23  Q.  Terabytes of data, right?

24  A.  Yes.

25  Q.  Explain to us what's a terabyte?

J7A3KID3                         P. Brown - Cross

1   A.   A terabyte just measures the amount of data.   It's very

2   large.

3   Q.   Okay.   Hundreds of thousands or millions of pages of text,

4   right?

5   A.   Yeah, terabyte is a lot.   It's probably the Library of

6   Congress, everything in there if it was text.

7   Q.   Okay.   And hundreds of thousands or millions even of

8   pictures possibly, right, is a terabyte?

9   A.   Yes.

10   Q.   What you found in terms of suspected child pornography

11   really boils down to the three images of female anatomy, and

12   one video, and those were duplicated.   But really those four

13   items we are talking about; is that right?

14   A.   I didn't identify any items.   The case agent identified the

15   items of interest.

16   Q.   So the case agent reviewed it also?

17   A.   The case agent is the person that reviewed it.   I

18   provided -- I did all the extractions and provided everything

19   so that he could review it to find out what is relevant,

20   because I have no idea.

21   Q.   So you just took out and analyzed what he pointed out to

22   you, right?

23   A.   He marked everything that was of interest, and I generated

24   a report of those.

25   Q.   With respect to, you said that there was a ZTE phone that

J7A3KID3                        P. Brown - Redirect

1   was indicated in some of the metadata as being a phone used to

2   take some of the pictures; is that right?

3   A.  Yes.

4   Q.  That particular ZTE phone was not recovered to your

5   knowledge, right?

6   A.  No.

7   Q.  There was a different ZTE phone that was recovered, but

8   that was a different phone, right?

9   A.  Yes.

10  Q.  So, no one -- withdrawn.

11          As far as you know, the FBI does not have the phone

12  that was used to take those images; is that correct?

13  A.  Yes, no one's told me they had any other phones.

14  Q.  And then, I think you showed us some time stamps in the

15  metadata; is that right?

16  A.  Yes.

17  Q.  So, you don't know either way whether those time stamps are

18  reliable or not, right?

19  A.  No.

20          MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

21          MS. TARLOW:  May I?

22          THE COURT:  Ms. Tarlow.

23  REDIRECT EXAMINATION

24  BY MS. TARLOW:

25  Q.  Ms. Brown, the time stamps about which you testified, those

J7A3KID3                          Palopolo - Direct

 1    were time stamps that were extracted from the devices that you

 2    performed extractions for?

 3    A.  Yes.

 4          MS. TARLOW:  Nothing further, your Honor.

 5          THE COURT:  Thank you.  You are excused.  You may step

 6    down.

 7          (Witness excused)

 8          THE COURT:  Government, next witness?

 9          MS. BRACEWELL:  The government calls Ms. Arielle

10    Palopolo.  For purposes of clarification, this is Victim-4 in

11    the indictment.

12     ARIELA PALOPOLO,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MS. BRACEWELL:

17    Q.  Good morning, Ms. Palopolo.

18    A.  Good morning.

19    Q.  If you don't mind just positioning the microphone if you

20    can close to you.

21          How old are you today?

22    A.  I'm 41.

23          MR. MARGULIS-OHNUMA:  I couldn't hear.

24          THE WITNESS:  I'm 41.

25    Q.  You might need to pull it up a little bit as well.

1              How old are you?

2   A.  I'm 41.

3   Q.  Where were you born?

4   A.  South America.

5   Q.  When did you move to the United States?

6   A.  I was about four years old.

7   Q.  How far did you go in school?

8   A.  I didn't finish college.

9   Q.  How old were you approximately when you stopped going to

10  school?

11  A.  29.

12  Q.  Do you have any children?

13  A.  I have a seven-year-old daughter.

14  Q.  With whom does your daughter live?

15  A.  With her father.

16  Q.  How often do you see her?

17  A.  Once a week if not more, when I can.

18  Q.  Are you currently employed?

19  A.  No, ma'am.

20  Q.  Directing your attention to around October of 2018.  Did

21  you have sex for money at that time?

22  A.  Yes, ma'am.

23  Q.  Did you work for anyone at that time?

24  A.  Yes, ma'am.

25  Q.  Who did you work for?

J7A3KID3                         Palopolo - Direct

1    A.   Red.

2    Q.   Until approximately when did you work for Red?

3    A.   Until the raid.

4    Q.   Approximately when was the raid you're referring to?

5    A.   December 12, around 5 a.m.

6    Q.   To be clear, you're referring to December 12, 2018?

7    A.   Yes, ma'am.

8    Q.   What other names did you use for Red?

9    A.   Chris, Gerard, but mostly Red.

10   Q.   At the time you were working for him, did you know him to

11   have any other names besides those?

12   A.   No, ma'am.

13   Q.   Looking around the courtroom today, do you recognize Red?

14   A.   Yes.

15   Q.   If you could please identify Red by pointing out where he

16   is, describing where he is, and describing an item of clothing

17   that he is wearing.

18   A.   He's seated in the second tier, he's wearing a white

19   collared shirt.

20           MS. BRACEWELL:   Your Honor, if the record could

21   reflect the witness has identified the defendant.

22           THE COURT:   Noted.

23   Q.   If I refer to Chris or Red as the defendant, will you

24   understand who I'm referring to?

25   A.   Yes, ma'am.

J7A3KID3                    Palopolo - Direct

1    Q.  So before we get into testimony, I think there is some

2    issues with the microphone.  I'll just ask you to project to

3    the best you can.

4    A.  Okay.

5    Q.  Let's talk about how you first met the defendant.

6    Approximately when did you first come into contact with him?

7    A.  I would say it was either about mid to late September, I'm

8    not exactly sure.

9    Q.  And that's of 2018?

10   A.  Yes, ma'am.

11   Q.  How did you first come into contact with the defendant?

12   A.  I had found an ad online, and I responded to it.

13   Q.  Can you describe what that advertisement looked like?

14   A.  It said that he was looking for girls who wanted to make a

15   lot of money.  That personal sessions with him were required.

16   That all parties was welcome.  He had pictures of females

17   holding up wads of cash in very well manicured hands, and he

18   had his number, and I texted him.

19   Q.  Where was that advertisement posted?

20   A.  On Backpage.com.

21   Q.  What is Backpage.com?

22   A.  It's a website.  It's used for entertainment, a lot of

23   people put up ads looking for different types of sexual trysts,

24   but also a lot of prostitution is advertised on there.

25   Q.  When you saw the reference to making money, what did you

1    understand that to be referring to?

2    A.  That it was having sex for money.

3    Q.  You mentioned that the advertisement had contact

4    information.  What kind of contact information was there?

5    A.  His cell phone number.

6    Q.  What had led you to Backpage.com that day?

7    A.  I had lost custody of my daughter, I didn't have any place

8    to live, and I didn't have any money.  I was completely

9    desperate.

10   Q.  Ms. Palopolo, what did you do after seeing the

11   advertisement?

12   A.  I texted him, and he responded.

13   Q.  You just referred to him, and that he responded.  Did the

14   person you speak with identify himself?

15   A.  Yes.  He referred to him as Red.

16   Q.  So you texted him.  Did you ever have any phone

17   conversation with Red?

18   A.  For a few minutes, mostly it was text.

19   Q.  Can you describe the phone conversation you had.

20   A.  Nothing.  He was pleasant.  He said for me to come meet him

21   the next day.  It was very short.

22   Q.  What, if anything, did he tell you about his business?

23   A.  He told me that he was in a new residence, that was a new

24   residence where the brothel was.  Mostly it was by text, and he

25   asked me to send him the pictures of me and I did so.

J7A3KID3                         Palopolo - Direct

1   Q.  Did the defendant say anything about what girls who were

2   working for him had to look like?

3   A.  No.

4   Q.  Did the defendant tell you anything about what his rules

5   were or what was to be expected of you?

6   A.  Basically that loyalty was key, that we had to be

7   trustworthy, and you know, we talked more in person.  So it

8   was, our communication through text, that first phone call was

9   very limited.

10  Q.  You mentioned earlier that there was a reference to

11  personal sessions?

12  A.  Yes, ma'am.

13  Q.  Was that something that was discussed in the conversation?

14  A.  Very, very briefly.  I mean, it was in the ad and he did

15  mention that.  But, that was, you know, talked more about when

16  we did finally meet.

17  Q.  Just can you explain what a personal session, what did you

18  understand that to mean?

19  A.  It means we had to have sex with him.

20  Q.  Did you tell the defendant anything about where you were

21  coming from?

22  A.  I told him I was coming from the Bronx.

23  Q.  Did you discuss meeting in person?

24  A.  Yes, ma'am.

25  Q.  Where did you discuss meeting?

1    A.  In Brooklyn.

2    Q.  Did you discuss how you would get there?

3    A.  Yes, I would get there by subway, and he was going to come

4    and pick me up from the train station.

5    Q.  And this communication that you've just been describing,

6    the text messages and the phone conversation.  Did that occur

7    while you were still in the Bronx or where were you located?

8    A.  I was still in the Bronx, yes.

9    Q.  Was the defendant -- did you communicate that to the

10   defendant where you were?

11   A.  Yes, he knew where I was coming from.

12          MS. BRACEWELL:  Ms. Harney, if we could publish what's

13   in evidence as Exhibit 1285.  If we could scroll down to the

14   row entitled Arielle.  Row 147.

15   Q.  Ms. Palopolo, directing your attention to this row, and

16   specifically to the column entitled "entries" that's

17   highlighted now.  Do you recognize that phone number?

18   A.  Yes.

19   Q.  Whose phone number is that?

20   A.  That was the phone number I had at that time.

21   Q.  Directing your attention to the column entitled "name."

22   Can you read what appears there?

23   A.  It says -- there is a dollar sign and it says Arielle.

24   Q.  The created date, the fifth column over.  Can you read the

25   date that appears there?

J7A3KID3                          Palopolo - Direct

1   A.  October 23, 2018.

2              MS. BRACEWELL:  Ms. Harney, if we could also publish

3   what's in evidence Government Exhibit 1290.

4   Q.  Ms. Palopolo, directing your attention to column C of row

5   four.  Could you read the text beginning with "You would be

6   escorting at my location."

7   A.  "You would be escorting at my location.  I'm located in a

8   very nice apartment in Brooklyn.  I would take pictures of you

9   and edit them.  I would also take care of posting and promoting

10  you.  The split is 50-50.  A lot of the clients in this area

11  like hair down there, so you if plan on shaving, don't.  Also,

12  you'll sometimes be working with other females and I would be

13  around to be security in case of emergency.  There will be a

14  personal session with me.  I provide most of the supplies you

15  need.  The only thing you need to bring is a pack of baby

16  wipes, a sexy outfit for taking pictures if you have one, and a

17  photo ID to verify your age.  Living arrangements can be made

18  for a select few.  I'm looking for consistent females that are

19  reliable.  Also, if you are not trustworthy or loyal, this

20  isn't for you.  Everybody makes good money here, so there's

21  never any need to steal or be sneaky.  Once I see how you are

22  doing with the in calls, I'd be open to doing out calls with

23  you out of town.  Submissive women only."

24  Q.  Ms. Palopolo, is that similar to the language that the

25  defendant used with you?

J7A3KID3                              Palopolo - Direct

1    A.  Yes.

2    Q.  Let me ask you a couple of questions about this text.  Did

3    the defendant ever discuss the attributes trustworthy and loyal

4    with you?

5    A.  Yes.

6    Q.  And generally what did he say?

7    A.  That we had to work as a team.  He had to be able to trust

8    us.  We had to be able to prove that we were loyal.  Basically,

9    that's it.

10   Q.  Is anything else, in this looking at this text, does

11   anything else refresh your recollection about what was said to

12   you in that first conversation?

13   A.  Basically, it's all the same.  The only thing that I don't

14   see here is that in the ad there was on Backpage it said all

15   party welcome.

16   Q.  Directing your attention to the grooming of your pubic

17   area.  Was that something that was described to you?

18   A.  Yes, absolutely.

19   Q.  You testified a moment ago that you discussed meeting the

20   defendant in Brooklyn.  Did that meeting take place?

21   A.  The next day.

22   Q.  How did you get to Brooklyn?

23   A.  I took the subway.

24   Q.  Where did you meet the defendant in person for the first

25   time?

1    A.  I got off at the stop which was Saratoga, and I called him

2    and let him know that I was there.  And he came and picked me

3    up from there.

4    Q.  How did he come to pick you up?

5    A.  In a vehicle.

6    Q.  Was anyone else in the car?

7    A.  No, ma'am.

8    Q.  Where did you go next?

9    A.  We went to the residence on Church Avenue.

10   Q.  During the drive, did you have a conversation with the

11   defendant?

12   A.  Yes, I did.

13   Q.  Did you tell the defendant anything about your background?

14   A.  I told him that, you know, I needed to make money.  That I

15   had a custody issue with my daughter, and that I needed to make

16   a certain amount of money so that I was able to regain custody

17   of her.

18   Q.  What, if anything, did he tell you about his business?

19   A.  He said -- he told me that this was a new location, that he

20   had been operating in a different residence in Brooklyn.  We

21   basically talked about, you know, not interacting with other

22   girls.

23       I explained to him my situation with the custody, and

24   he was understanding.  He told me he had had a similar

25   situation with another girl, and that, you know, he knew, he

J7A3KID3                    Palopolo - Direct

1    understood how it was.  And it was kind of short because then

2    we reached the residence and he parked the car.

3    Q.  You just mentioned he described not interacting with other

4    girls?

5    A.  Yes.  Because he said that it caused problems, jealousy, he

6    wanted to prevent any -- any of the girls from stealing from

7    each other.  So, he -- he was not going to deal with any type

8    of friendship that was going to go bad.  So, that was basically

9    the point he was trying to come across.

10   Q.  So, what directions did he give you with respect to

11   interacting with other girls?

12   A.  He asked me not to, he asked me to not socialize.  To, you

13   know, be sort of detached.

14   Q.  So you said he drove you to an apartment.

15   A.  Yes, ma'am.

16   Q.  Approximately what time did you get to the apartment?

17   A.  It was about noon.

18           MS. BRACEWELL:  Ms. Harney, can you please publish

19   what's in evidence as Government Exhibit -- if you could show

20   to the witness and counsel and the Court what's been marked for

21   identification as 254.

22           Your Honor, I understand this exhibit is not in

23   dispute.  We would offer it.  We would offer it at this time.

24           THE COURT:  All right.

25           MS. BRACEWELL:  May we publish as well?

1          THE COURT:  Yes.

2          (Government's Exhibit 254 received in evidence)

3    Q.  Ms. Palopolo, is this where the defendant drove you?

4    A.  Yes, ma'am.

5    Q.  Can you describe where in this photograph is the apartment?

6    A.  It would be on the side to the right.  That's where the

7    entry is to go up.  So you can't see it from this picture.

8    Q.  So just with reference to the awning, which building was

9    the defendant in?

10   A.  On the corner, right above the Golden Krust.

11   Q.  What floor was the apartment on?

12   A.  On the second floor.

13   Q.  So, after you arrived at the defendant's apartment, what

14   happened?

15   A.  He got lunch.  He got lunch for another young woman that

16   was there.  And I sat down and I smoke a cigarette until he was

17   done.  And he called me into the room.  And we spoke for a few

18   minutes.  And you know, he -- asked me to, you know, remove my

19   clothes and I had intimacy with him.

20   Q.  Prior to having sex, what did he discuss with you in those

21   few minutes you just referenced?

22   A.  Just going back to the, you know, the loyalty thing, the

23   being trustworthy.  That was an ongoing theme.

24   Q.  So, in referencing these attributes, what instructions, if

25   any, did he give you?

1   A.  Just basically, you know, keep it professional, don't

2   really get into any type of friendship with any of the girls,

3   and of course he said I was to avoid any type of petty

4   jealousy, any type of stealing.  That was about it.

5   Q.  Did he take any photographs of you?

6   A.  Yes.

7   Q.  When did he take those photographs on this afternoon?

8   A.  That day, he had explained to me that he would be promoting

9   us on the websites.  And I didn't have any sexy attire, so he

10  gave me a black baby doll to wear and then he took pictures of

11  me up against the wall.

12  Q.  Where were those photographs taken in the apartment?

13  A.  Right when you come in, there's like a little foyer that's

14  there.  Just a white wall.

15          MS. BRACEWELL:  Ms. Harney, if we can publish what's

16  in evidence as 1262 and 1266.

17  Q.  Ms. Palopolo, do you recognize these photographs?

18  A.  Yes.

19  Q.  Who is in this photographs?

20  A.  Me.

21  Q.  Who took the photographs?

22  A.  The defendant.

23  Q.  Do you recall when these photographs were taken?

24  A.  That day that I arrived at the residence.

25  Q.  How long after you arrived at the Church -- or at the

1    apartment you had been describing were these photographs taken?

2    A.  Maybe about an hour, an hour and a half.

3    Q.  What did you understand the photographs to be for?

4    A.  That he was using those photographs to promote us on

5    several websites.

6    Q.  How did you know that?

7    A.  He told me that.

8    Q.  Did you talk with the defendant about what editing, if any,

9    he would do on the photos?

10   A.  No, I really didn't.

11   Q.  Did you ask the defendant to blur the photos in any way?

12   A.  Yes, I did.  Because I have a daughter, and since there was

13   a custody dispute, the last thing I wanted was my face

14   published.  And he agreed.

15   Q.  How did he respond?

16   A.  How did he respond?

17   Q.  Yes.

18   A.  Yeah, he said that yes, he would absolutely do that.

19   Q.  Did you talk with the defendant about what information

20   would appear on the ads?

21   A.  Not really, no.

22   Q.  Did you talk with the defendant about what name you would

23   use?

24   A.  He actually, we just snowballed names, and I just said Mia.

25   And he said that's good.  We were on that.

1    Q.  What service were you being advertised for?

2    A.  Oral sex, regular sex, unprotected, threesomes, and that's

3    honestly all I remember right now.

4    Q.  Did you discuss with the defendant what services you would

5    be advertised for?

6    A.  No.

7    Q.  Did you see the advertisements once they were posted?

8    A.  No.  I actually one day just went and just found it on my

9    own.

10   Q.  Where were the advertisements posted?

11   A.  Backpage.  That's the one that I saw.

12   Q.  Can you describe what did you see on the advertisement that

13   you found?

14   A.  It had my -- my fake name and my picture, and it was a list

15   of, you know, oral sex or BBJ which would be unprotected oral

16   sex, regular sex, protected and unprotected.  And that's --

17   there was more, but I don't remember the rest honestly right

18   now.

19   Q.  And you said there were photographs on that advertisement?

20   A.  Yes.

21   Q.  Were your face included on those photographs?

22   A.  No, not at first.

23   Q.  You said not at first.  What happened after that?

24   A.  After a while, I wasn't getting the response because of the

25   fact that my face was blurred out.  So we had discussed it and

1    I said, okay, unblur it because, you know.

2    Q.  What had the defendant said in that conversation?

3    A.  He said okay.  He said he did think that was a good idea

4    because it would definitely attract more clients.

5    Q.  Who proposed unblurring your face in the first instance?

6    A.  He did.  Because like I said, I just wasn't getting the

7    responses that other girls were getting.

8    Q.  Did the defendant ever discuss with you particular services

9    like unprotected sex?

10   A.  Yes.

11   Q.  What did he say?

12   A.  He said that obviously you get paid more money.  And like I

13   said, I was completely desperate.  So, you know, I agreed.

14   Q.  Turning to that first day, did you meet any customers at

15   the defendant's apartment?

16   A.  Yes.  After a few hours, someone came in for oral sex.

17   Q.  How many customers in total did you meet that first day?

18   A.  It was not more than two.

19   Q.  How long did you remain at the defendant's apartment on

20   that first visit?

21   A.  About nine hours.

22          MS. BRACEWELL:  Ms. Harney, you can take these

23   photographs down.

24   Q.  Why did you leave on that first day?

25   A.  Finally after nine hours I was there, I was starving, I was

J7A3KID3                          Palopolo - Direct

1    tired.  And I said, you know, I said I have to go home.  I been

2    here all day and I really haven't made any money.  So that's

3    how it began.

4    Q.  What did the defendant say when you told him you were

5    tired?

6    A.  He said no.  He said you can't leave now, because I've got

7    so many people lined up for you.  And I'm just like, look, I

8    have to go.  I'm hungry.  I just, I just, I want to go home.

9    Q.  You had mentioned there was one other female in the home on

10   that first day?

11   A.  Yes, ma'am.

12   Q.  What, if anything, did you learn about her?

13   A.  That she was an ex-girlfriend of his.  That she was

14   pregnant and she needed to make money.  And --

15            MR. MARGULIS-OHNUMA:  Objection, your Honor.  Basis of

16   knowledge.  Move to strike.

17            THE COURT:  Sustained.

18            (Continued on next page)

19

20

21

22

23

24

25

J7ATKID4                      Palopolo - Direct

 1  BY MS. BRACEWELL:

 2  Q.  Did you interact with this other woman during the day that

 3  you were there?

 4  A.  Yes.

 5  Q.  Did the defendant have any reaction to your interacting

 6  with this female?

 7  A.  He didn't like it.

 8  Q.  And how did you know he didn't like it?

 9  A.  Because I could see it in his face.

10  Q.  And what did his face show you?

11  A.  That he was annoyed.

12  Q.  Did you have any discussion with the defendant about

13  interacting with this other female?

14  A.  Yes.  When I told him I was leaving he said to me, because

15  I had been interacting with her, that he couldn't trust me, I

16  wasn't trustworthy.  So I said fine, I'm leaving.

17  Q.  Did he tell you why he considered you not to be

18  trustworthy?

19  A.  I guess because I was interacting with her, that was

20  discouraged by him.

21  Q.  You said you worked for the defendant up until

22  December 2018?

23  A.  Yes, ma'am.

24  Q.  Did you return to the apartment?

25  A.  After the raid, no.

1   Q.  So let me ask you, after this first visit you have been

2   describing, did you return to apartment?

3   A.  Yes, I did.

4   Q.  And under what circumstances did you go back?

5   A.  I had spoke with him again, probably about maybe two days

6   later I went back.

7   Q.  And when you spoke with him about two days later, what

8   generally did he say?

9   A.  It was brief.  He said come back, because we could talk

10  about it, and like I said, I was completely desperate for

11  money, so I did go back, yes.

12  Q.  And at that time were you coming back from your apartment

13  in the Bronx?

14  A.  Yes, ma'am.

15  Q.  After that, how often were you at the defendant's

16  apartment?

17  A.  I was there a lot.  I would stay there sometimes two days a

18  at a time.  I would leave, I would come back, back and forth

19  like that.

20  Q.  Did there come a time when you moved into the defendant's

21  apartment?

22  A.  Yes, ma'am.

23  Q.  Approximately when did you move into the defendant's

24  apartment?

25  A.  It was sometime I would say early November.

J7ATKID4                        Palopolo - Direct

1    Q.  And why did you move into the defendant's apartment?

2    A.  The place I was living at I was having a lot of problems

3    there, being that I was never there, also it was becoming

4    increasingly suspicious and she was thinking something was

5    wrong, so I just ended up having to leave there.

6    Q.  While you were working for the defendant and not living

7    there, did you have discussions about what times you needed to

8    be available?

9    A.  He said I need to be available all the time, that obviously

10   sometimes you never knew who was going to come in, so it was

11   very key.  So I didn't have a job, that was my work.

12   Q.  When you, for example, were back in your apartment or back

13   in the Bronx, did you communicate with the defendant?

14   A.  Yeah, we would text back and forth.

15   Q.  What would he say if you needed to be available?

16   A.  He would say I want you to come here, I want you to come at

17   this time or that time, that was it.

18   Q.  Did he ever become angry that you weren't available?

19   A.  Not -- most of the time, no, because like I said, my

20   availability was wide open because I wasn't working.

21   Q.  When you were in the defendant's apartment, how often did

22   you have sex for money?

23   A.  Every day.

24   Q.  And approximately how many customers did you meet a day?

25   A.  It depended.  If it was Friday, Saturday, Sunday, those

1   were the money days.  Obviously there were more clients during

2   the weekend.  In the week it was a little more scarce, maybe

3   four or five a day on a regular day, like a weekday.

4   Q.  Who decided when you would meet with customers?

5   A.  The defendant did.

6   Q.  What hours did you have to meet customers?

7   A.  At any time.

8   Q.  And at times were you sleeping when a customer wanted to

9   see you?

10  A.  Yes.

11  Q.  Were you ever sick or tired when a customer came to see

12  you?

13  A.  Yes.

14  Q.  And what happened in that situation?  What did the

15  defendant say if you were sleeping?

16  A.  He would say get up, somebody is coming for 45 minutes,

17  somebody is coming if for an hour.  I would go take a shower

18  and do what I had to do.

19  Q.  Was there any specific occasions where you were sick, when

20  you were sick or tired and a customer came?

21  A.  A lot of times I was tired, but I mean I said beggars can't

22  be choosers, and I needed the money, so I pretty much did as I

23  was told.

24  Q.  Did you ever tell the defendant you were too sick to see a

25  customer?

1    A.  Yes, there was one time that I was extremely sick and I

2    wasn't feeling good, so I was going back and forth to the

3    bathroom, and he kept knocking on the door.  So I did end up

4    coming out.  He wanted to have sex with me.  I explained to him

5    that I really wasn't feeling good, I think I need to go to the

6    hospital, and he said well, okay, then I will take your ad

7    down.  So I had sex with him and then I was sick and I ended up

8    leaving.

9    Q.  Where did you go when you left?

10   A.  I went to the emergency room, and then I just end up going

11   into my mother's house.

12   Q.  Were you given instructions on what to do when customers

13   arrived?

14   A.  Yes, when were to bless them in, greet them at the door,

15   bring them in.  They would sit down, we would collect the

16   money.  He was in his room, I would knock on the door, he would

17   let me in.  I would give him the money, he would verify that it

18   was actual currency, he would set the timer, and then I would

19   go do my thing.

20   Q.  Who set the prices?

21   A.  He did, the defendant.

22   Q.  Did you have any input on prices that were to be charged

23   for the services?

24   A.  No, ma'am.

25   Q.  And were you given any instructions on when to give the

J7ATKID4                         Palopolo - Direct

1   defendant the money?

2   A.   Immediately.  As soon as the client got there, I was to get

3   the money and bring it to him.

4   Q.   Who gave you those instructions?

5   A.   The defendant.

6   Q.   What did the defendant do with money that you paid him?

7   A.   He had one of those pens that if the currency is not valid

8   it changes colors.  So he would make sure it was real, he would

9   take the timer, I would come out, service the client, the timer

10   would go off, he would knock on the door to let us know that

11   the time was up.

12   Q.   And after he marked on the currency with the pen you

13   described, did you see what he did with the money?

14   A.   He would put it in a white envelope.

15   Q.   And where would he put the white envelope?

16   A.   In the safe.

17   Q.   And what safe are you referring to?

18   A.   The safe that was in front of his bed.

19   Q.   Did you have a combination for that safe?

20   A.   No, ma'am.

21   Q.   When you first met with the defendant, did you discuss how

22   any money or proceeds would be divided?

23   A.   He said that because of the fact that editing the pictures

24   was costly, that it would be I believe 70/30 in the beginning.

25   Once he saw we were doing well, he would be able to let us

1   handle customers on our own and we would receive more money.

2   Q.  So just to be clear, because of the editing, what was the

3   breakdown supposed to be?

4   A.  It was 70/30.

5   Q.  How were you supposed to get that portion of money from

6   him?

7   A.  I would have to ask him for it.

8   Q.  And did you in fact receive 30 percent of the money?

9   A.  Yes, ma'am.

10  Q.  And for purposes of clarity, when you say the breakdown was

11  70 and 30, who received 70 percent?

12  A.  The defendant.

13  Q.  And who received 30 percent?

14  A.  I did.

15  Q.  So you said you were supposed to ask the defendant for

16  money?

17  A.  Yes, ma'am.

18  Q.  How did you get money, for example, for food?

19  A.  I would ask him.

20  Q.  How did the defendant respond when you asked for money?

21  A.  I would say I need money for food, and he would give me 20,

22  $25, so I could get something to eat.

23  Q.  Did he ever become angry when you asked for money?

24  A.  Yes.

25  Q.  Could you give an example of an instance in which he became

J7ATKID4                          Palopolo - Direct

1    angry?

2    A.   Yes.   One time I asked him for money, and he said hang on,

3    hang on a minute.   I asked him several more times, and he got

4    really upset, he said:   Listen, you little cunt, don't make me

5    slap the shit out of you.

6    Q.   On that occasion did you continue to ask for money?

7    A.   No.

8    Q.   Approximately when did this exchange happen?

9    A.   October, but I don't remember the date.

10   Q.   About how long had you known the defendant when this

11   happened?

12   A.   Not long, a few weeks.

13   Q.   You just mentioned a particular name that he used with you.

14   A.   Cunt.

15   Q.   Were there any other names that he used with you?

16   A.   Bitch on a few occasions, but that was about it.

17   Q.   And on this instance, how did you respond when the

18   defendant became angry?

19   A.   I just immediately fell silent.

20   Q.   Did the defendant become angry with you often?

21   A.   Yes.

22   Q.   And why did he become angry with you?

23   A.   He seemed to think that everything that went wrong in the

24   apartment was my fault.

25   Q.   And what kinds of things went wrong?

1    A.  He would accuse me of stealing juice from the refrigerator,

2    using his baby wipes, using body wash that belonged to the

3    other girls, things like that.

4    Q.  And what kinds of things did he say when he blamed you for

5    these things that had gone wrong?

6    A.  First he would try to get me to admit it, and I didn't do

7    it, I didn't touch it.  He just -- he wouldn't let up about it,

8    and I just got used to it.

9    Q.  In what manner would he confront you?

10   A.  He would say why did you take this, or I know you did this,

11   and I'm like no, I didn't.

12   Q.  Did he ever involve anyone else in these confrontations?

13   A.  Yes.  Whenever it was a situation, he would make it a point

14   to get the other girls involved, ask them what their opinion

15   was, what they thought about the situation.

16   Q.  And what would happen next?

17   A.  I was embarrassed.

18   Q.  You just mentioned other women.

19   A.  Yes.

20   Q.  While you were at the defendant's house, how many women did

21   you encounter there?

22   A.  Four.

23   Q.  And were those other women also working for the defendant?

24   A.  Yes.

25   Q.  And when you say "working," what kind of work were they

1  doing?

2  A.  Prostitution.

3  Q.  Did those women stay for periods of time at the defendant's

4  apartment?

5  A.  Yes, the other girl that was there most of the time I was

6  there, she slept in his room, so she was there all the time.

7  Q.  So you described a number of instances in which the

8  defendant became angry at you.  Over time, did you change your

9  behavior?

10  A.  Absolutely.

11  Q.  And what did you do?

12  A.  I yessed him to death.  I walked on eggshells.  I tried to

13  avoid any type of situation.

14  Q.  When you say you yessed him to death.  Could you explain

15  what you mean?

16  A.  Like you're doing this or not doing that, I would say yes,

17  yes, you're right, yes, of course, I'll change, I'll stop.

18  Q.  Did the the defendant ever hit you?

19  A.  No.

20  Q.  Did the defendant ever threaten to hit you?

21  A.  Yes.

22  Q.  Can you explain what happened?

23  A.  The first time that, like I say, when I asked for food and

24  he said no, don't make me slap the shit out of you, he came

25  towards me but he did not strike me.

J7ATKID4                          Palopolo - Direct

1   Q.  Were there any other occasions where he threatened to use

2   force?

3   A.  Yes.  There was an incident where he felt that I had an

4   attitude with one of the clients, and I tried to explain to him

5   that I didn't.  And he got into it, and at that point he said:

6   I don't want to have to hit you.

7   Q.  Can you describe the incident with the customer that

8   resulted in that reaction?

9   A.  It was an occasion where a client came, he did not have the

10  amount of money that was being asked, and I said if you don't

11  have the money, get your shit and leave.

12  Q.  So the customer had been in the house visiting you, is that

13  correct?

14  A.  Yeah, he had visited me, yes.

15  Q.  And under what circumstances did the customer leave?

16  A.  Because I asked him to leave.

17  Q.  And then what happened next?

18  A.  He came out of the room, he had the webcam in the living

19  room which was recording 24 hours a day, so he had it hooked up

20  to his phone so that he could see everything that was happening

21  in the living room.

22  Q.  Who had the webcam?

23  A.  The defendant.

24  Q.  Who was observing what the webcam recorded?

25  A.  The defendant.

1   Q.  So after the instance with the customer, you asked him to

2   leave, what happened with the webcam?

3   A.  He played back the video so that I could see what he was

4   seeing.

5   Q.  And what did he say in reviewing that footage with you?

6   A.  Well, we went back and forth a little while, and I

7   explained to him that yeah, I did ask him to leave because he

8   didn't have the money and I wasn't going to go back and forth

9   with the man all night.

10  Q.  What did he say to that, the defendant?

11  A.  The other girl that was there came out and sort of chimed

12  in, and I got really upset I started crying, and he said

13  Ariele, he said why don't you leave tonight, come back and

14  we'll try again tomorrow.

15  Q.  Were you living at the house at that time?

16  A.  Yes.

17  Q.  Did you have anywhere to go?

18  A.  No.

19  Q.  What time of day was this?

20  A.  It was about 9 o'clock at night.

21  Q.  And you had said earlier he said, "I don't want to have to

22  hit you."

23  A.  Yes, ma'am.

24  Q.  When did he say that?

25  A.  During that exchange we had.

J7ATKID4                          Palopolo - Direct

1   Q.  So did you ultimately leave the apartment?

2   A.  Yes, ma'am.

3   Q.  Did he give you any money before you left?

4   A.  No.  I had enough to get on the train.

5   Q.  You testified that you mentioned a custody issues involving

6   your daughter the first day you met the defendant in person.

7   Do you recall that testimony?

8   A.  Yes, ma'am.

9   Q.  Did you visit your daughter while you were living at the

10  defendant's apartment?

11  A.  Yes, ma'am.

12  Q.  How often?

13  A.  Every week, once a week, on Sundays.

14  Q.  And did the defendant give you money to see your daughter?

15  A.  Yes.

16  Q.  And how often did he give you money --

17  A.  Well --

18  Q.  -- to see your daughter?

19  A.  Every Sunday, because I was there to see when her.

20  Q.  Did you tell the defendant that you visited your daughter

21  on Sundays?

22  A.  Yes.

23  Q.  Did there come a time when the defendant brought up your

24  daughter?

25  A.  Yes.

J7ATKID4                        Palopolo - Direct

1    Q.  Can you describe what happened?

2    A.  Well, like I said, he was constantly abusing me in the

3    apartment.  There was an issue where he thought that I used a

4    body wash or something, and he is like, "Next time I will let

5    whatever girl beat you up," and that's what he said.

6    Q.  In the context of this communication, when did he bring up

7    your daughter?

8    A.  He said that if I go to the police, he would have six of

9    his boys testify in court that I am a known prostitute and that

10   I would never see my daughter again.

11   Q.  And can you just explain when this remark was made relative

12   to the body wash?

13   A.  It was during the incident about the body wash.

14   Q.  Did you actually believe the defendant would do that?

15   A.  Yes.

16   Q.  And what made you believe the defendant would go to the

17   police?

18   A.  He was very adamant about it, and he was extremely serious,

19   and I took his word for it.

20   Q.  Relative to meeting the defendant, when did this happen?

21   A.  This was also sometime in October, but I don't recall the

22   exact date.

23   Q.  How long had you known the defendant, approximately, when

24   this happened?

25   A.  Maybe a month and a half.

J7ATKID4                      Palopolo - Direct

1   Q.  And what did you do in response to this comment about your

2   daughter?

3   A.  Obviously I was very upset, but I just said okay, that's

4   how it was, so I accepted it.

5   Q.  Were there any other circumstances in which the defendant

6   mentioned outing you or making it known publicly that you were

7   a prostitute?

8   A.  No, that was about it.

9   Q.  Did he ever mention doing anything with the photographs

10  that he had taken of you?

11  A.  No.

12  Q.  Did he ever mention unblurring photographs or sharing

13  photographs with anyone?

14          MR. MARGULIS-OHNUMA:  Objection, asked and answered.

15          MS. BRACEWELL:  Your Honor, if we could have one

16  moment, please?

17          THE COURT:  Yes.

18          (Pause)

19  Q.  You said you saw clients every day, is that right?

20  A.  Yes, ma'am.

21  Q.  Why did you keep seeing clients after the defendant

22  threatened your daughter?

23  A.  One, I took it very seriously, I didn't know what he would

24  do with what pictures.  I didn't know if he would get people to

25  testify in court.  Two, I didn't have any place to live, and I

1  was getting money from him, so where was I going to go?  Nobody

2  knew where I was.  I couldn't explain it.

3  Q.  A moment ago you mentioned that the defendant gave you

4  money for food.

5  A.  Mm-hmm.

6  Q.  And you mentioned that he gave you money for your daughter.

7  Do you recall that?

8  A.  Yes.

9  Q.  Did he give you money on any other occasions?

10  A.  If I asked, because I smoke cigarettes, because I have

11  anxiety, so he would give me money for cigarettes or little

12  things, but most of time it was for food.

13  Q.  Did you have any money to leave, for example?

14  A.  Yeah, I would -- the money I would get I would use that for

15  subway fare.

16  Q.  Did you have money to get an apartment, for example, to

17  leave and get another apartment?

18  A.  No.

19  Q.  While you worked for the defendant, did you have to have

20  sex with him?

21  A.  Yes.

22  Q.  Approximately how many times during the period that you

23  worked for him?

24  A.  I don't know, maybe seven or eight times.

25  Q.  On average, how many times a week?

J7ATKID4                          Palopolo - Direct

1  A.  Maybe once.  He left me alone most of the time because I

2  was not his preference.

3  Q.  What do you mean you weren't his preference?

4  A.  I was more petite.

5          MR. MARGULIS-OHNUMA:  Objection.

6          THE COURT:  Sustained.

7  Q.  Did you ever -- did the defendant ever initiate sex with

8  you while you were sleeping?

9  A.  No.

10         MR. MARGULIS-OHNUMA:  Objection.

11         THE COURT:  Overruled.

12 A.  No, he would wake me.

13 Q.  He would wake you up?

14 A.  He would wake me.

15 Q.  Did the defendant use a condom when he had sex with you?

16 A.  No.

17 Q.  Were you allowed to stay in the defendant's apartment by

18 yourself?

19 A.  No.

20 Q.  And how did the defendant communicate that?

21 A.  He let us know if he had something to do for a few hours,

22 that we would have to go somewhere.  And when he was returning

23 he would let us know so that we could be on our way and come

24 back.

25 Q.  And why weren't you allowed to stay in the apartment by

J7ATKID4                        Palopolo - Direct

1   yourself?

2   A.  He didn't trust anyone, so he didn't trust the situation or

3   us being there by ourselves.

4   Q.  And what did you have to do when the defendant left the

5   residence?

6   A.  I would go somewhere sometimes.  When he had to do

7   something, he dropped me off at sort of a shopping area, I

8   remember one time, and I waited there until he was done.  He

9   communicated that to me, and he would come and pick me up.

10  Q.  Did you observe any firearms in the apartment?

11  A.  No, I didn't.

12  Q.  Did you come to believe he had firearms?

13  A.  Yes.

14  Q.  What led you to believe he had firearms?

15  A.  One day, being that I was in the room next to him, I heard

16  like a clicking sound, and then after a while it came to me

17  that it was a firearm, but I never actually saw it.

18  Q.  Just to be clear, the clicking was distinctive to you?

19  A.  Yes.

20  Q.  And you recognized the clicking?

21  A.  Yes.

22          MR. MARGULIS-OHNUMA:  Objection to leading, your

23  Honor.

24          THE COURT:  Sustained.

25  Q.  What was distinctive about the clicking?

J7ATKID4                          Palopolo - Direct

1  A.  It's just a very particular sound.  If you hear it, you

2  would know.

3  Q.  And what did you know from hearing this clicking sound?

4  A.  It sounded like someone loading a pistol or playing with

5  it.

6  Q.  So you mentioned earlier the defendant took photographs of

7  you on the first day.  Did he take photographs of you on any

8  other occasions?

9  A.  Yes.

10  Q.  And in general, what other cameras did you see in the

11  apartment?

12  A.  The camera that he used, and obviously displayed most

13  prominently was the white webcam.  It was attached to the

14  computer.

15  Q.  And did you ever learn whether that webcam was recording?

16  A.  Yes.

17  Q.  And you mentioned earlier that the defendant had recorded

18  you with a customer.  Do you recall that?

19  A.  Yes.

20  Q.  Did the defendant record you with any other customers?

21  A.  Yeah, the camera was on 24 hours a day because he said it

22  was for security purposes.

23  Q.  And what did you -- for security purposes, what did you

24  understand that to mean?

25  A.  Just to make sure this nothing happened to us and so he

1    would be able to see exactly what was going on in the living

2    room.

3    Q.  Did you -- was the defendant -- did you ever learn whether

4    the defendant was recording at other times when there weren't

5    customers?

6    A.  It was always on.

7    Q.  And how did that make you feel?

8    A.  Like I got used to it and I didn't think about it.

9    Q.  Did you ever come to believe there was recording going on

10   in the other rooms?

11           MR. MARGULIS-OHNUMA:  Objection to the leading.

12           THE COURT:  Sustained.

13           MS. BRACEWELL:  Your Honor, if I could have one

14   moment.

15           THE COURT:  Yes.

16           (Pause)

17           THE COURT:  Ms. Bracewell, we're coming up on the

18   lunch hour.  How much longer do you think?

19           MS. BRACEWELL:  Two minutes.

20           THE COURT:  All right.

21   Q.  Other than the webcam, did you see any other recording

22   devices?

23   A.  I did see another camera but I don't know whether it was

24   attached to anything or what he was using it for.  The one that

25   I mostly saw was the webcam because it was all right there and

J7ATKID4

1      it was right there in the living room.  There was no way not

2      to.  You couldn't avoid it.

3                  MS. BRACEWELL:  Nothing further, your Honor.

4                  THE COURT:  Thank you.  We're going to break for lunch

5      at this point for one hour.  I remind you again do not discuss

6      anything about the case with anyone from the outside or have

7      any contact of any kind with anyone involved the trial.  If any

8      of these things occur, you are directed to inform the Court

9      immediately and not to discuss it with the other jurors.

10                 Thank you, we'll see you in an hour.

11                 MR. MARGULIS-OHNUMA:  There's a couple of little

12     things before the witness is excused, without the jury.

13                 THE COURT:  Sure.

14                 (Jury not present)

15                 MS. BRACEWELL:  Your Honor, to the extent that we're

16     discussing legal issues, we ask the witness to be excused.

17                 THE COURT:  Please sit down.

18                 Mr. Margulis, what is the nature of your question?

19                 MR. MARGULIS-OHNUMA:  If the witness could be advised

20     she's now on cross-examination and is not allowed to talk to

21     anyone about her testimony until we're done.

22                 THE WITNESS:  I understand.

23                 THE COURT:  All right.  You understand?

24                 THE WITNESS:  I understand.

25                 THE COURT:  Thank you.  Anything else?

J7ATKID4

1          MR. MARGULIS-OHNUMA:  Yes.

2          MS. MEDLEY:  Once she leaves we have one other issue.

3     It's about a subpoena.

4          THE COURT:  I signed the document this morning.

5          MS. MEDLEY:  There's another issue with that witness

6     that we need to discuss.

7          MR. MARGULIS-OHNUMA:  The witness can be excused.

8          THE COURT:  You can step down.

9          (Witness not present)

10          THE COURT:  Ms. Medley?

11          MS. MEDLEY:  Your Honor, as you know, you signed the

12     subpoena for the Good Shepherd witness.  We have been in

13     contact with them because of the last minute nature of getting

14     the documents and being able to subpoena them.  The custodian

15     is only available tomorrow.  I did tell the government if they

16     don't close their case today we may have to call her out of

17     order.  They said they would think about it.  They weren't sure

18     if they would consent.  I am bringing to the Court's attention

19     this witness is only available tomorrow.  If the government

20     does not conclude its case today, we ask that we be able to

21     call this person out of order.

22          MS. BRACEWELL:  Your Honor, we only have three

23     witnesses remaining.  I think that we will certainly close

24     tomorrow and expect the defendant to be able to call their

25     first witness.

J7ATKID4

 1          THE COURT:  All right.  On my list we have Kris Serra,

 2    Sabrina, Ms. McLeod and the conclusion of Ms. Popola.  Is there

 3    anyone else?

 4          MS. TARLOW:  Not from the government, your Honor.

 5          MS. MEDLEY:  We're speaking with the witness during

 6    the lunch break to nail down the specific time, but it's my

 7    understanding she's only available in the morning around

 8    10:00 a.m.

 9          THE COURT:  What is the name of this witness?

10          MS. MEDLEY:  She's been in communication with our

11    other associate.  I'm not sure the name of the custodian.

12          THE COURT:  Can you give us any indication of the

13    nature of her testimony?

14          MS. MEDLEY:  Yes, she will be used authenticate the

15    ACS records for Ms. Kaira Brown that were marked for

16    identification but haven't been admitted yet.

17          THE COURT:  Are these records business records of the

18    facility?

19          MS. MEDLEY:  Yes, and they were produced to us by the

20    government.

21          THE COURT:  Why do we need to authenticate them?  Why

22    can't the parties stipulate to their authenticity?

23          MS. MEDLEY:  The government said they would not

24    stipulate to them.

25          MS. BRACEWELL:  To be clear, we don't believe they

J7ATKID4

1    qualify as business records as indicated in the ACS chart.  The

2    information was recorded at some length past, so the comings

3    and goings of any particular student are recorded weeks later.

4    And our understanding is there's a real question of reliability

5    with the records, so we don't think they can be admitted, they

6    don't speak for themselves without having a witness to speak to

7    and qualify the reliability of the records.

8              MS. MEDLEY:  So we're happy to bring in the witness,

9    but she has limited availability.

10             THE COURT:  So we'll plan to hear the witness sometime

11   tomorrow.  I think with three remaining witnesses, given the

12   length and time that the government indicated they would take,

13   it's likely that it will occupy the balance of the afternoon.

14             Thank you.

15             MS. MEDLEY:  Thank you, your Honor.

16             (Luncheon recess taken)

17             (Continued on next page)

18

19

20

21

22

23

24

25

                              AFTERNOON SESSION

                                 (1:30 p.m.)

              (Jury present)

              THE COURT:  Welcome back.  We're going to resume the

cross-examination of the witness.

              Mr. Margulis.

              MR. MARGULIS-OHNUMA:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. MARGULIS-OHNUMA:

Q.  Good afternoon, Ms. Palopolo.

A.  Good afternoon.

Q.  I will ask you some questions.  Could you promise me if you

don't understand one of my questions you will have me repeat it

or let me know that you don't understand?

A.  Yes, sir.

Q.  So you won't answer any questions that you don't

understand?

A.  Yes, sir.

Q.  Remind us, ma'am, how old are you?

A.  41.

Q.  41?

A.  Yes, sir.

Q.  So start with what I think you referred to as the raid on

December 12, 2018.  Had you slept over at Mr. Kidd's apartment

the night before that?

1  A.  Yeah, because it was between 5:00 or 6:00 in the morning

2  when it happened, so yeah, I was in the bedroom with another

3  one of the girls.

4  Q.  And how were you alerted to it?

5  A.  Because I heard "FBI," and then they came in.  They came to

6  the room, took us out.

7  Q.  Sorry, they came to the room and what?

8  A.  Removed us from the room, me and the other girl that were

9  there.

10  Q.  When you said the other girl, is was a girl named Dana,

11  right?

12  A.  I don't remember her name, to be honest, I only met her on

13  a few occasions.

14  Q.  Was she from Guyana?

15  A.  I don't know.

16  Q.  Do you know someone who was staying there named Toya?

17  A.  Yes.

18  Q.  And was that one of the people that was there on the

19  morning of the raid?

20  A.  Yes.  Well, she had her own room in back.  I was in the

21  adjoining room with another girl that I don't remember her name

22  because I only met her a few times.

23  Q.  But Toya was -- sorry, Toya was there on the morning of the

24  raid, right?

25  A.  Yeah, she was in her room.

1   Q.  And she was there the whole time that you were working,

2   right?

3   A.  In and out, not the whole time.

4   Q.  But you knew her over the last couple of months, is that

5   fair to say?

6   A.  I would say -- I wouldn't say I knew her, I interacted her

7   because of the situation I was in, but I wouldn't say I knew

8   her.

9   Q.  That was Mr. Kidd's wife, right?

10  A.  I don't know.

11  Q.  You never spoke to either her or Mr. Kidd about whether

12  they were married?

13  A.  No.

14  Q.  What was your relationship like with Toya?

15  A.  Polite.  I mean I didn't really know her.  She worked a

16  lot, so when she would come, it would usually be at night when

17  she would come through, because she worked in a salon.

18  Q.  She worked in a salon during the day?

19  A.  I believe, yes.

20  Q.  Is it fair to say from what you observed that Toya was

21  close to Mr. Kidd?

22  A.  She was friendly with him, I don't know about close.

23  Q.  You never saw Mr. Kidd mistreat Toya in any way, did you?

24  A.  No.

25  Q.  And by the way, in the couple of months that you were

J7ATKID4                          Palopolo - Cross

1   there, you never saw any girls who were under 18, did you?

2   A.  I don't know what their ages were.  I assume they were

3   above 18.

4   Q.  And the ad you answered said only people over 18 should

5   respond, isn't that right?

6   A.  No, I don't remember that, so I can't say it did.

7   Q.  You don't remember that either way?

8   A.  No.

9   Q.  You didn't see anyone that was obviously under 18, right?

10  A.  I don't know what "obvious" means, because I don't know if

11  they're 18 either.

12  Q.  So at the raid you met a police officer named Rose

13  Muckenthaler, is that right?

14  A.  Yes, sir.

15  Q.  And let's go back to before the raid.  Sorry, forgive me

16  for skipping around.

17          Before the raid I think you told us there was a webcam

18  in the apartment, right?

19  A.  Yeah, it was the right to next to computer.

20  Q.  And I think you told us that you could see on Red's phone

21  the footage from the webcam?

22  A.  I couldn't see it, Red could see it.

23  Q.  But sometimes he would show it to you, right?

24  A.  If there was a situation that he needed to show it to me,

25  yes, he would.

J7ATKID4                       Palopolo - Cross

1    Q.  Let's pull up Exhibit 1, the physical exhibit.

2           MR. MARGULIS-OHNUMA:  Your Honor, this is -- may I

3    approach the witness?

4           THE COURT:  Yes.

5           MR. MARGULIS-OHNUMA:  I will hand the witness what's

6    previously admitted into evidence as Government Exhibit 162.

7    Q.  That's an apple iPhone, have a look at that.

8    A.  Sure.

9    Q.  Does that appear to be the same as the phone that Lloyd had

10   that he -- sorry, Red had that he used to show you the footage?

11   A.  I can't confirm.  I don't remember.

12   Q.  I can't hear you.

13   A.  I can't confirm because I don't remember.

14   Q.  You don't remember what his phone looked like or you're not

15   sure that's the same one?

16   A.  I don't remember what the phone looked like at all.

17   Q.  You have no idea what it looked like?

18   A.  It was a phone, but I don't remember the color, the model.

19   I don't remember, no.

20   Q.  So the phone I handed you, you don't know either way

21   whether that's --

22           THE COURT:  Asked and answered.

23           MR. MARGULIS-OHNUMA:  I'll take it back.  Thank you.

24   Q.  I think you told us during your direct testimony on a few

25   occasions that you felt you had -- you didn't leave because you

J7ATKID4                          Palopolo - Cross

1    felt you had nowhere else to go, is that right?

2    A.   Yes.

3    Q.   But your mother lives in the Bronx, right?

4    A.   No.

5    Q.   Where does your mother live?

6    A.   She lived in Queens at that point.

7    Q.   Sorry.  And why couldn't you go to your mother's house in

8    Queens?

9    A.   My mother is very, very sick, she has a lot of health

10   problems, and I wasn't trying to put any further burden on her.

11   Q.   But you had lived with her previously though, right?

12   A.   Yes, I have, mm-hmm.

13   Q.   Now you said when you first started working with Mr. Kidd

14   that you had texted him back and forth?

15   A.   Yes.

16   Q.   Do you have those texts?

17   A.   No.

18   Q.   The texts that we looked at on your direct testimony, that

19   was not one of the actual texts, right?

20   A.   If it was an actual text on the phone, it was a text that I

21   sent, yes.

22   Q.   You remember word for word that was a text that you sent?

23   A.   No, I don't remember word for word.  That was months ago.

24   Q.   That wasn't from your phone -- withdrawn.  That wasn't

25   something that you handed over to the government, was it?

1    A.  I didn't have the phone at that point because my phone got

2    destroyed.  My daughter had dropped it.

3           MR. MARGULIS-OHNUMA:  Ms. Harney, please pull up

4    Government Exhibit 214 in evidence.

5    Q.  Can you see that, Ms. Palopolo?

6    A.  Yes.

7    Q.  And that's the desk with the computer in the living room,

8    right?

9    A.  Yes.

10   Q.  But it normally wasn't kept so messy, was it?

11   A.  No.

12   Q.  And normally the -- withdrawn.

13           The surveillance camera that you mentioned, is that

14   seen in the picture?

15   A.  Yes.

16   Q.  Can you point it out to the jury, please?

17           I think if you touch the screen.  I'm not sure if it's

18   on.  I guess not.

19           THE COURT:  Describe for us where it is in the

20   picture.

21           THE WITNESS:  It's behind the monitor laying face up.

22   Q.  Now normally that would be pointed out so you could see a

23   view of the room, right?

24   A.  Yes, sir.

25           MR. MARGULIS-OHNUMA:  Thank you.  You can take that

J7ATKID4                          Palopolo - Cross

1    down, please.

2    Q.  You told us about some disputes with Mr. Kidd where you

3    felt he got rather threatening, right?

4    A.  Yes.

5    Q.  And those disputes were related to disputes over who was

6    using other people's stuff, basically, is that right?

7    A.  It was basically when he was annoyed with me.

8    Q.  But it didn't have anything to do with whether or not you

9    wanted to work more or work less, did it?

10   A.  No.

11   Q.  In fact, in general, you wanted to work more when you were

12   working there, isn't that right, so you could make more money?

13   A.  I needed to work more, yes.

14   Q.  And there wasn't really enough traffic or enough business,

15   was there?

16   A.  There was business when there was business.  Friday,

17   Saturdays and Sundays there was more of a flow because people

18   got paid and they wanted to spend money, so usually on the

19   weekends there was just more.

20   Q.  So I want to ask about you said you heard a clicking sound

21   coming from his room?

22   A.  Yeah, one time, yes.

23   Q.  And I think you gave an opinion it might have been from a

24   firearm, right?

25   A.  Yes.

J7ATKID4                         Palopolo - Cross

1    Q.   How do you know what a clicking sound of a firearm sounds

2    like?

3    A.   Because I have been around firearms before.

4    Q.   In what context?

5    A.   My stepfather was law enforcement.

6    Q.   What kind of gun makes that sound?

7    A.   I don't know.

8    Q.   You never saw a gun in the house, right?

9    A.   No.

10   Q.   He never threatened you with a gun, right?

11   A.   No, sir.

12   Q.   And he never threatened Toya with a gun, right?

13   A.   I don't know what he threatened her with.

14   Q.   Let me withdraw that question and ask it in a better way.

15   You never saw him threaten anyone else with a gun, did you?

16   A.   No.

17   Q.   And that include Toya?

18   A.   I never saw him, period, in the house with a gun.

19   Q.   Just a few more questions Ms. Palopolo.

20        So the day of the search you met a police officer

21   named Rose Muckenthaler, is that right?

22   A.   Yes, sir.

23   Q.   Forgive me if I asked that already.  From then until today

24   or until this week, you kept in touch with Officer

25   Muckenthaler, is that right?

J7ATKID4                      Palopolo - Cross

1   A.  Yes, sir.

2   Q.  Is she a detective?

3   A.  Yes, sir.

4   Q.  And you formed a pretty close relationship, is that right?

5   A.  We are friends now, yes.

6   Q.  And actually she -- withdrawn.

7           You told us a little bit about you having trouble with

8   custody with the father, a dispute about the custody of your

9   child with the father of your child, is that right?

10  A.  Yes, sir.

11  Q.  And you got some help from Detective Muckenthaler on that,

12  right?

13  A.  Yes, she assisted me.  She gave me advice when I needed it,

14  yes.

15  Q.  And she actually reached out to the father of your daughter

16  on at least one or two occasions, right?

17  A.  Yes.

18  Q.  And as a result of that, you really want to help the

19  government today, don't you?

20  A.  I really want to do what I can do to tell the truth and

21  speak clearly.

22  Q.  And you would like Mr. Kidd to go to jail, wouldn't you?

23  A.  I would like him to get what he deserves according to

24  judicial system, yes.

25  Q.  Well, you would like -- just a moment, please.

J7ATKID4                           Palopolo - Redirect

1          You would actually like him to get a lot more than

2   what he deserves from the judicial system, wouldn't you?

3   A.  No.

4   Q.  Didn't you send a text message to Officer Muckenthaler

5   saying:  Nighty, nighty, Red.  Keep your butt hole tight

6   because big Tyrone going to come see you in your cell.

7          Didn't you send that text to Officer Muckenthaler?

8   A.  Absolutely.

9   Q.  Right.  Because you want him to get raped in prison.

10  That's really what you're saying to Ms. Muckenthaler.

11          MS. BRACEWELL:  Objection, your Honor.

12          THE COURT:  Sustained.

13          MR. MARGULIS-OHNUMA:  Nothing further, Judge.

14  REDIRECT EXAMINATION

15  BY MS. BRACEWELL:

16  Q.  Good afternoon, Ms. Palopolo.

17  A.  Good afternoon.

18  Q.  On direct you testified about the defendant calling you an

19  annoying cunt.

20  A.  Yes.

21  Q.  That was in response to asking for money, correct?

22  A.  Yes, ma'am.

23  Q.  And that was money you earned for performing sex acts,

24  correct?

25          MR. MARGULIS-OHNUMA:  Objection, scope.

1          MS. BRACEWELL:  It goes to the nature of the threats

2     not being exclusively related to, as he put it --

3          THE COURT:  Overruled.

4     Q.  So going back to my question, that particular argument was

5     in regards to the money you made performing commercial sex

6     acts, correct?

7     A.  Yes, ma'am.

8     Q.  And did you need to work more in part because the defendant

9     kept most of your money?

10    A.  Yes.

11    Q.  And on the day of the arrest, approximately how long had

12    you been working for the defendant?

13    A.  Maybe a little over two months.

14    Q.  And on that day, how much money did you have in your

15    possession, approximately?

16    A.  Maybe four or five dollars, because he did keep everything

17    in an envelope for safekeeping.

18    Q.  And because of threats like the one you described, did you

19    become frightened of the defendant?

20    A.  Yes.

21    Q.  And did you change your conduct because you were afraid?

22    A.  Yes.

23    Q.  And when the defendant threatened your daughter's custody,

24    for example, were you afraid of him because of that?

25         MR. MARGULIS-OHNUMA:  Objection, leading, your Honor.

J7ATKID4                      Palopolo - Redirect

1          THE COURT:  Sustained.

2    Q.  Because of the defendant's threats -- strike that.

3          And how did you feel after the defendant threatened

4    you?

5    A.  I felt like I was walking on eggshells and I had to be

6    really careful about what I said or did.

7    Q.  And what effect did it have on your reaction to customers?

8    Did it affect how you interacted with customers or how often

9    you had to meet customers?

10   A.  Yeah, because I had to take my attitude to be more

11   friendly, more courteous.

12   Q.  What specifically made you feel more courteous, as you

13   said?

14   A.  Particularly after the incident where he had played back

15   the video of me being rude, I know I made more of an effort to

16   be more welcoming.

17   Q.  And did you continue to work for the defendant after the

18   defendant threatened your daughter?

19   A.  Yes.

20   Q.  And why is that?

21   A.  I didn't have any money, I didn't have any place to live,

22   and I really didn't have any options.

23          MS. BRACEWELL:  Nothing further.

24          MR. MARGULIS-OHNUMA:  Just a couple more, your Honor.

25   RECROSS EXAMINATION

J7ATKID4                          Palopolo - Recross

1   BY MR. MARGULIS-OHNUMA:

2   Q.  I'm sorry, I might have misunderstood, but did you say that

3   the defendant threatened your daughter?

4   A.  He said that if I went to the police that he would have six

5   of his friends testify in court of law that I was a prostitute

6   and that I wouldn't see my daughter again.

7   Q.  He never threatened your daughter, right?

8   A.  No.

9   Q.  And again, maybe I misunderstood, but --

10          Give me one second.

11          (Pause)

12  Q.  You told us about your financial situation a little bit.

13  The way you split the money from your earnings changed over

14  time, is that right?

15  A.  No.

16  Q.  It was always 70/30?

17  A.  Yes.

18  Q.  But when you were talking on direct I think you talked

19  about asking for money for food sometimes.

20  A.  Yes.

21  Q.  Was that out of your 30 percent or was that money you would

22  ask for in addition to that?

23  A.  No, that was from my 30 percent.

24  Q.  Now you -- and you said you, at the time of the arrest, you

25  didn't have any money on you, right?

J7ATKID4                          Palopolo - Recross

1   A.   Maybe a few dollars on me.

2   Q.   There were a number of occasions where the defendant asked

3   you to leave during this time period, is that right?

4   A.   Yes.

5            MS. BRACEWELL:  Objection to scope.

6            THE COURT:  Sustained.

7            MR. MARGULIS-OHNUMA:  Nothing further, Judge, thanks.

8            MS. BRACEWELL:  One brief redirect.

9            (Continued on next page)

1    REDIRECT EXAMINATION

2    BY MS. BRACEWELL:

3    Q.   Defense counsel asked you about the threat to your

4    daughter's custody.  Do you recall that?

5    A.   Hmm-hmm.

6    Q.   And that the defendant said that if you go to the police,

7    he would -- what was it that he said?

8    A.   He would have six of his boys testify in court that I was a

9    prostitute and I would not see my daughter again.

10   Q.   What did you understand he would mean when he said if you

11   go to the police?

12   A.   That if I tried to expose the situation in any way.  When

13   that incident happened with the body wash, when he said he

14   would allow one of the girls to beat me up.  If they beat me up

15   and I would try to go to the police in any way, that would be

16   the consequence of my actions.

17   Q.   When you said expose the situation, what situation are you

18   referring to?

19            MR. MARGULIS-OHNUMA:  Objection, scope.

20            THE COURT:  Sustained.

21            MS. BRACEWELL:  Nothing further.

22            THE COURT:  You are excused.  You may step down.

23            THE WITNESS:  Thank you, your Honor.

24            (Witness excused)

25            THE COURT:  Government next witness.

1            MS. TARLOW:  Yes, your Honor.  The government calls

2    Dana McLeod.  Your Honor, Ms. McLeod is Victim-3 in the

3    indictment.

4            THE COURT:  All right.  Thank you.

5     DANA LEONTEN McLEOD,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. TARLOW:

10   Q.  Good afternoon, Ms. McLeod.

11   A.  Good afternoon.

12   Q.  How old are you?

13   A.  33 years of age.

14   Q.  How far did you go in school?

15   A.  Secondary school.

16   Q.  How old were you when you stopped attending school?

17   A.  Approximately age of 16.

18   Q.  Where were you born?

19   A.  Georgetown, Guyana.

20   Q.  Approximately when did you first come to the United States?

21   A.  Around 2011, around 2012.

22   Q.  While you were living in Guyana, what kind of work,

23   generally, did you do?

24   A.  I was a cosmetologist.

25   Q.  Are you currently living in the United States?

1   A.   Yes.

2   Q.   Are you currently employed?

3   A.   I am now.

4   Q.   Generally, what kind of work do you now do?

5   A.   Cosmetology.

6   Q.   Have you also previously engaged in having sex for money?

7   A.   I did.

8   Q.   When did you start doing that?

9   A.   Around 2017, in the month of February.

10  Q.   When did you stop?

11  A.   Around the month of December 2018.

12  Q.   During that period, approximately how many customers did

13  you see?

14  A.   Like about 200.

15  Q.   Did you work for anyone during that time?

16  A.   Yes.

17  Q.   Who did you work for?

18  A.   Red.

19  Q.   What other names, if any, did you know him by?

20  A.   Chris, Lloyd Christopher Kidd.

21  Q.   Ms. McLeod, looking around the courtroom today, do you see

22  Red in the courtroom?

23  A.   Yes.

24  Q.   Can you please identify him by describing an article of

25  clothing that he's wearing?

1   A.  He's in the white jersey over there.

2           MS. TARLOW:  Your Honor, let the record reflect that

3   the witness has identified the defendant.

4           THE COURT:  Noted.

5   Q.  Ms. McLeod, as I ask you questions, I am going to refer to

6   Red as the defendant.  Do you understand?

7   A.  Yes.

8   Q.  So, let's talk about how you first met the defendant.

9   Approximately when did you first meet him?

10  A.  In the year of 2017, the same month of February, I was on

11  Pitkin doing some shopping.  And I met the defendant Red.

12  Q.  What borough is Pitkin?

13  A.  Brooklyn.

14  Q.  Were you living in the United States at that time?

15  A.  I was visiting my family.

16  Q.  Where were you staying?

17  A.  On Rockaway Avenue.

18  Q.  Is that also in Brooklyn?

19  A.  Yes.

20  Q.  What happened after you met the defendant?

21  A.  When I met the defendant, we exchanged number.  And when I

22  went home, he text, and I went over to his apartment.  And we

23  discussed about what I like doing, what he like doing.  And one

24  thing led to another, and we end up having sex.

25  Q.  When did you go to his apartment?  How long after you first

1   met him?

2   A.   The next day.

3   Q.   Do you know the address of that apartment that you went to?

4   A.   Yes.

5   Q.   What is it?

6   A.   2458 Nostrand Avenue.

7   Q.   In what borough is that?

8   A.   Brooklyn.

9   Q.   So I'm going to refer to that apartment as the Nostrand

10  Avenue apartment.

11  A.   Okay.

12       MS. TARLOW:   Ms. Harney, can you please publish what

13  is already in evidence as Government Exhibit 253.

14  Q.   Ms. McLeod, what's shown in this photograph?

15  A.   That is where the apartment is located.

16  Q.   The defendant's apartment?

17  A.   Yes.

18  Q.   Using Government Exhibit 253, can you describe where the

19  building is located.

20  A.   The building door is right under where it says the dry

21  cleaner laundry.   The door next to the dry cleaner on the

22  right.

23  Q.   You said when you first met the defendant, you had a

24  conversation about yourself?

25  A.   Yes.

J7a3kid5                          McLeod - Direct

1    Q.  What in particular did you say to him?

2    A.  I told him I'm a -- what kind of job I do, my age, name.

3    He told me about himself, that he liked singing, and other

4    stuff.

5    Q.  Did you tell him where you were from?

6    A.  Yes.

7    Q.  What, if anything, did he state about what he did for a

8    living?

9    A.  He never state what he did for a living.

10   Q.  What happened in his apartment the first time that you went

11   there?

12   A.  The first time I went over there, we had a conversation

13   about ourself.  And we end up having sex.

14   Q.  Did he ask you to perform a particular sex act?

15   A.  Yes.

16   Q.  What was that sex act?

17               MR. MARGULIS-OHNUMA:  Objection, your Honor.

18               THE COURT:  Sustained.

19               MS. TARLOW:  Your Honor, may we have a sidebar?

20               THE COURT:  No.

21   Q.  How did you respond when he asked you about that sex act?

22   A.  I told him that back where I'm from, that is not something

23   we would do to a guy.

24   Q.  And did you engage in that sex act on that day?

25   A.  The next day, when I went back to his apartment, he brought

1    it up again.  And I end up doing.

2    Q.  Did there come a time when you observed anyone other than

3    the defendant at the Nostrand Avenue apartment?

4    A.  Yes.

5    Q.  Who did you observe?

6    A.  So, upon the fourth visit, when I went over to the

7    apartment, there were like about four to five young women over

8    there at that apartment.

9    Q.  Did you later learn any of their names?

10   A.  Yes.

11   Q.  Whose names did you learn?

12   A.  Pearlene.

13   Q.  How long after you had met the defendant did that happen?

14   A.  Like about three days after -- I met him, let's say today,

15   I went over to his apartment like three days in a row, and

16   skipped two, like about -- like a week or so.

17   Q.  Did you speak with the defendant about those other women?

18   A.  When I went over to the apartment, and the women was over

19   there, he took me in his bedroom, and he was like this is what

20   I do for a living, have girls doing prostitution work.  If I

21   want to get into it.  I was like no, I have my business back

22   home, I'm a cosmetologist.  And I just --

23           MR. MARGULIS-OHNUMA:  I am not the hearing answer.

24   Q.  Ms. McLeod, after you told him --

25           THE COURT:  Ms. McLeod, can you repeat your answer.

J7a3kid5                    McLeod - Direct

1           THE WITNESS:  He took me in his bedroom, and he was,

2    like, this is what I do for a living.  I have girls doing

3    prostitution work.  If I want -- if I want to get into it.  I

4    was like no, I have my business back home.  That is not

5    something that I will want to get into.

6    Q.  What did he do after you said that?

7    A.  Took out his phone and he showed me a video with me and him

8    having sexual intercourse.

9    Q.  In that video, were you performing that particular sex act?

10   A.  I was, yeah.

11   Q.  Was your face showing in video?

12   A.  Yes.

13   Q.  Did you know that he was videotaping you when you performed

14   that sex act?

15   A.  I had no idea.

16   Q.  What, if anything, did he say after he showed you the

17   video?

18   A.  When he showed me the video, my mind went straight back

19   home.  Because I was saying that -- if anybody should see this,

20   it would be a disgrace and a shame.  And I started crying.  And

21   look up to him, he had a smirk on his face.  He was like, if

22   you don't want to do it, I'm going to put it on Pornhub.

23   Q.  Did you know what Pornhub was at the time?

24   A.  Back then, no.

25   Q.  Do you know what Pornhub is now?

J7a3kid5                         McLeod – Direct

1    A.  Yes.

2    Q.  What is it?

3    A.  A site where you can upload sexual videos.

4    Q.  What did you then agree to do?

5    A.  I agreed to do prostitution.

6    Q.  Where did this conversation take place?

7    A.  In Red room.

8    Q.  Was the door of the bedroom locked at that time?

9    A.  Yes.

10   Q.  Had he locked it?

11   A.  Yes.

12   Q.  After you had that conversation with the defendant, what

13   happened?

14   A.  He went into the room, the room that is attached to his,

15   and he brought over some like bras and panties and kind of this

16   sexy outfit for me to try on.  But none didn't fit me.

17   Q.  Did he take photographs of you?

18   A.  He did.

19   Q.  And what, if anything, were you wearing in those

20   photographs?

21   A.  I was wearing a fine strap black dress.

22   Q.  Where did he take the photographs?

23   A.  In his room.

24   Q.  Did he give you any instructions on how to pose?

25   A.  Yes.  Yes.

J7a3kid5                           McLeod - Direct

1   Q.   What, if anything, did he then do with those photographs?

2   A.   After finish posing and taking the photo, I was back into

3   the living room, where other girls was sitting on the couch and

4   he uploaded onto -- some site that I now know is Backpage.

5   Q.   Did you know what Backpage was at the time?

6   A.   Back then, no.

7   Q.   Did you later learn?

8   A.   Yes.

9   Q.   How did you later learn?

10   A.   One of my friends, she had come and told me that there was

11   some photo on Backpage, and this is what the site represented.

12   I didn't know if it was prostitution work, if it was selling

13   something.  That's how I learned about it.

14   Q.   Before he posted the photograph, what, if anything, did he

15   say about what he would do to conceal your identity?

16   A.   He said he would blur out my face so my face wouldn't show,

17   just my body.

18   Q.   Did you in fact see if he had done that to your photograph?

19   A.   No, I didn't see.

20           MS. TARLOW:  Ms. Harney, if you can publish what's

21   already in evidence as Government Exhibit 404.

22   Q.   Ms. McLeod, directing your attention directing your

23   attention to the photographs on your screen that are labeled

24   with the name "Juicy."  Do you recognize these photographs?

25   A.   Yes.  Yes.

1   Q.   Who is shown in these photographs?

2   A.   Me.

3   Q.   Who took these photographs?

4   A.   Red.

5   Q.   Approximately when did he take them?

6   A.   That's the fourth visit when I went over to the apartment.

7   Q.   When he first took photographs of you?

8   A.   Yeah.

9   Q.   How do you know that?

10  A.   Because I was there.  And these photographs of me.

11  Q.   Ms. McLeod, can you read what the date is listed on

12  Government Exhibit 404 next to the word "posted"?

13  A.   2/17/2017.

14  Q.   Was that the same month you met the defendant?

15  A.   Yes.

16  Q.   Do you remember the exact date when you met him?

17  A.   No.

18  Q.   Can you also look at the first row of photographs in this

19  advertisement.

20  A.   Yes.

21  Q.   What is the name written on those photographs?

22  A.   Pearlene.

23  Q.   Do you recognize the individual in these photographs?

24  A.   Yes.

25  Q.   Is that the same individual who you referred to earlier as

J7a3kid5                          McLeod - Direct

1    being in the defendant's apartment?

2    A.   Yes.

3    Q.   Did she also work for the defendant?

4    A.   Yes.

5    Q.   After he posted you in advertisements online, did you then

6    see customers?

7    A.   I did.

8    Q.   Approximately how long was that after he had shown you the

9    video of the two of you having sex?

10   A.   Like, approximately, like about four to five hours after.

11   Q.   Did you want to see customers at that time?

12   A.   No.

13   Q.   Why did you see them?

14   A.   Because I was forced to see.  If I don't do it, I was going

15   to be blackmailed.  So, I felt that I had to do it.

16   Q.   To be clear, how did you think you would be blackmailed?

17   A.   By uploading the video with me and him.

18   Q.   Posting it online?

19   A.   Yeah.

20   Q.   How many customers did you see on that first day?

21   A.   Like about two or three.

22   Q.   Did you receive money from those clients?

23   A.   The -- yes.  The money -- I received the money, and I had

24   to take it to him in his room.

25   Q.   So you testified that you continued to engage in commercial

J7a3kid5                        McLeod - Direct

1    sex acts for the defendant until December 2018.  Do you recall

2    that testimony?

3    A.  Yes.

4    Q.  Let's talk about what that work consisted of.  Did he

5    continue to post you in advertisements for commercial sex?

6    A.  He did.

7    Q.  What websites did he advertise you on?

8    A.  On Backpage and Craigslist.

9    Q.  What name did he use for you in the advertisements?

10   A.  Peaches and Rhonda.

11   Q.  How did the defendant post those advertisements?

12   A.  You mean how?  Can you --

13   Q.  What devices did he use to post those advertisements?

14   A.  He would use his phone, and attach it into his computer to

15   upload the photos.

16   Q.  Where was that computer located?

17   A.  In the living room in the Nostrand apartment.

18   Q.  Were there photographs in those advertisements?

19   A.  Yes.

20   Q.  How do you know?

21   A.  Because I see him upload photograph of me on the site.

22   Q.  Who took those photographs that he uploaded?

23   A.  Red.

24   Q.  What instructions, if any, did he give to you when he

25   photographed you?

J7a3kid5                          McLeod - Direct

1    A.  He would telling me that to suck in my tummy, put my hand

2    in a certain way, put my head in a certain way.  Because he was

3    saying that I was too fat.

4    Q.  Where would he take those photographs?

5    A.  It would be sometime in his room, sometime in the other

6    room, sometime in the living room.

7          MS. TARLOW:  Ms. Harney, if you could please publish

8    what's already in evidence as Government Exhibit 416.

9    Q.  Ms. McLeod, directing your attention to the photographs on

10   your screen that are labeled with the name "Peaches."  Do you

11   recognize these photographs?

12   A.  Yes.

13   Q.  Who is shown in them?

14   A.  Me.

15   Q.  Who took those photographs?

16   A.  Red.

17   Q.  What's your understanding of why your face is not shown

18   here?

19   A.  He blurred out my face to put it on the ad.

20   Q.  What, if anything, did he say about why he might unblur

21   your face?

22   A.  If me and him would get into an argument, he would unblur

23   my face on the photos.

24   Q.  Can you please read the date next to the word "posted" on

25   the upper-right-hand side of this exhibit.

J7a3kid5                         McLeod - Direct

1    A.   10/6/2017.

2    Q.   Directing your attention to the text in the middle of this

3    exhibit.  Who wrote that text?

4    A.   Red.

5    Q.   How do you know that?

6    A.   Because these were the words that he used to use to post.

7    Q.   Would you ever see him writing text on his computer?

8    A.   Yeah.

9    Q.   Again referring to that text, what is your understanding of

10   what "fetishes are extra" means?

11   A.   So, fetishes is like some people like the feet to be

12   sucked, some people like when you urine on them, some people

13   like back door, BBJs.  That is the term as a fetish.  If

14   clients come for that, they will have to pay extra.

15   Q.   You just testified about a BBJ.  What is a BBJ?

16   A.   When you -- sucking a penis without no condom.

17   Q.   What is a brown shower that's referred to in this

18   advertisement?

19   A.   When you poop on somebody.

20   Q.   Were there particular times when the defendant would

21   advertise you for these types of fetishes?

22   A.   Yes.

23   Q.   When would that happen?

24   A.   When me and him get into an argument, he would write up I'm

25   doing back door, I am unprotected sex, BBJs, and so forth.

J7a3kid5                        McLeod - Direct

1    Q.  What does back door mean?

2    A.  When you're using your -- you know.  Anal sex.

3    Q.  Did customers engage in these types of sex acts with you?

4    A.  Yes.

5    Q.  Did you have any say in whether or not you had to perform

6    those acts?

7    A.  No.

8    Q.  Why not?

9    A.  Because if you tell him that you don't want to do it, it

10   will just piss him off and he would start blowing.  And from

11   when he start blowing, you know, well, you don't want to get

12   into it deep.  Because he might hit you.

13   Q.  Did you tell him whether you wanted to engage in those sex

14   acts?

15   A.  Yes.

16   Q.  What did you say?

17   A.  I told him that I don't, I don't want to do unprotected

18   sex.  And he was like, well, you don't have a choice.  It's

19   more money.

20   Q.  Did he still post advertisements for those types of acts?

21   A.  Yes.

22          MS. TARLOW:  Ms. Harney, if you could can you please

23   publish what's already in evidence as Government Exhibit 419.

24   Q.  Ms. McLeod, directing your attention to the photographs on

25   your screen that are labeled with the name Peaches.  Do you

J7a3kid5                         McLeod – Direct

1   recognize these photographs?

2   A.   Yes.

3   Q.   Who do they show?

4   A.   Me.

5   Q.   Who took these photographs?

6   A.   Red.

7   Q.   What is the date listed next to "posted"?

8   A.   11/20/2017.

9   Q.   Now turning your attention to the first row of photographs

10  that are labeled as Scarlett.  Do you recognize that

11  individual?

12  A.   Yes.

13  Q.   Do you know her by any other name?

14  A.   No.

15  Q.   Did she also work for the defendant?

16  A.   Yes.

17  Q.   Did you ever observe Scarlett and the defendant fighting?

18  A.   Yeah, they were in a verbal argument about him wanting her

19  to do something and she didn't want to do it.

20  Q.   What kind of thing?

21  A.   A sex act that she didn't want to do.  And she end up

22  leaving.

23        MS. TARLOW:   I'm sorry.  If we can take this

24  advertisement down, please.

25  Q.   Who communicated with the customers?

J7a3kid5                          McLeod - Direct

1    A.  Sometime it would be me, and sometime it will be Red.

2    Q.  When you communicated with them, how would you do so?

3    A.  When I communicate with the clients, I just use to keep it

4    short, and that's it.  He would come and look at the phone and

5    say, well, you don't know how to text, you got to know how to

6    text the client to get them to come over at the apartment.  And

7    he would use like yes, hon; yes, babes; yes, love.

8    Q.  Did you use a particular text messaging application?

9    A.  Yeah.  He would, like, write out like the services that you

10   do.  And he would send it to my phone so when clients text my

11   phone, I would ask are you a cop?  And once they say no, then I

12   would text that information to them.

13   Q.  Did he also communicate with customers using your text

14   messaging account?

15   A.  Yes.

16   Q.  Who set the prices for the customers?

17   A.  Red.

18   Q.  What were the prices?

19   A.  To do a short stay cover, it was 60 for short stay.  100

20   for half an hour.  And 160 for an hour.  Uncovered it would be

21   100 for short, 160 for half, and 260 for hour.

22   Q.  What is a short stay?

23   A.  15 minutes.

24   Q.  Did you have any input on what those prices were?

25   A.  No.

J7a3kid5                      McLeod – Direct

1          MS. TARLOW:  Ms. Harney, if you could please put up

2    what's marked as Government Exhibit 1252.

3    Q.  Ms. McLeod, directing your attention to this exhibit.  And

4    the names listed on the chats, who is Fluffyboo367?

5    A.  Me.

6    Q.  Who is Tony Mack?

7    A.  A client.

8    Q.  So I'll read the chats that are sent by Tony Mack, if you

9    read the chats sent by Fluffyboo367.  If you begin with the

10   first.

11   A.  "Hey."

12   Q.  "Are you available?"

13   A.  "Yes."

14   Q.  "Who am I speaking with?"

15   A.  "Peaches."

16   Q.  "It's mad of y'all linked to this number.  I was gonna pull

17   up, just want to make sure it's the right person."

18   A.  "Peaches."

19   Q.  "No Tiny or Keisha, I done seen you a few times Peaches."

20   A.  "They not here."

21   Q.  "Only you, I seen you nuff times already.  Was just trying

22   to see someone new for a change."

23   A.  "Yes, it's only me here."

24   Q.  Pausing for a moment, Ms. McLeod.

25          Turning your attention back to when the user

J7a3kid5                          McLeod – Direct

1    identified as Tony Mack states "It's mad of y'all linked to

2    this number."  What was your understanding of what he meant?

3                MR. MARGULIS-OHNUMA:  Objection.

4                THE COURT:  Overruled.

5    Q.  You can answer, Ms. McLeod.

6    A.  So, what Red did, Red posts an ad with me and some of the

7    girls that work for him on Backpage.  So the client was saying

8    that he saw me -- I saw him like five time already for the

9    week.  So he didn't want to see me again, he wanted to see

10   somebody new.  But none of the girls was there at that time.

11   It was just me.

12               MS. TARLOW:  Ms. Harney, we can pull down that

13   exhibit.

14   Q.  Ms. McLeod, on average, how many customers would you see

15   each day?

16   A.  If the day is busy, it would be like about eight or nine.

17   If it's slow, it would be like four or five.

18   Q.  And where did you meet customers?

19   A.  On Nostrand Avenue.

20   Q.  Did there come a time when you later met them at another

21   apartment?

22   A.  Yes.

23   Q.  Was that also the defendant's apartment?

24   A.  Yes.

25   Q.  Did you meet customers at any other locations, not in his

J7a3kid5                          McLeod - Direct

1    apartment?

2    A.   About two time, we went out to do out calls.

3    Q.   What is an out call?

4    A.   An out call is when somebody want me to go to them, to

5    their location.

6    Q.   For what?

7    A.   To do prostitution.

8    Q.   Where did you go on those two occasions?

9    A.   It was in the area of Brooklyn, but I can't remember

10   exactly where.  But it was in Brooklyn.

11   Q.   Who took you there?

12   A.   Red.

13   Q.   How did you get there?

14   A.   He drove.

15   Q.   So turning your attention back to when you engaged in

16   prostitution in the defendant's apartments.  What, if any,

17   steps did he tell you to take when a customer first arrived?

18   A.   So, when a client would text me and say that I'm here, you

19   would have to go into his room to let him know that a client is

20   downstairs, how much time the clients need.  And then after

21   that, you would go downstairs to get the client and bring them

22   upstairs to collect the money and take it into his room.

23   Q.   What would you then do next?

24   A.   Perform sex.

25   Q.   If you did not give the defendant the money before you

J7a3kid5                         McLeod - Direct

1    engaged in a sex act, what happened?

2    A.  Honestly, we -- me and the other girl that worked for him,

3    that was -- that was not even something that we would like say

4    we're not going to do that.  It's something we would have to

5    do.  Because it would have been a whole different thing with

6    him.  It would have pissed him off, and he would have probably

7    used force on us.

8    Q.  You said the other girl.  To be clear, were there several

9    other women who worked for him?

10   A.  Yes.

11   Q.  Where did the defendant then put that money after you gave

12   it to him?

13   A.  Sometimes he would put it in his wallet, or sometimes in

14   his safe.

15   Q.  Did you observe him putting money into a safe?

16   A.  Yes.

17           MS. TARLOW:  Ms. Harney, if you could please put up

18   what's already in evidence as Government Exhibit 216.

19   Q.  Ms. McLeod, what is this a photograph of?

20   A.  That's a photograph of the safe.

21           MS. TARLOW:  Ms. Harney, if you can just show for the

22   witness, counsel, and the Court what is marked as Government

23   Exhibit 227.

24   Q.  Ms. McLeod, do you recognize this?

25   A.  Yes.

J7a3kid5                        McLeod – Direct

1    Q.  What is it?

2    A.  It is an envelope with my name on it.

3    Q.  Did you ever see this envelope in the defendant's

4    apartment?

5    A.  Yes.

6    Q.  In what context?

7    A.  In the safe.

8    Q.  Whose handwriting is on this envelope?

9    A.  Red.

10          MS. TARLOW:  The government offers Government Exhibit

11   227.

12          MR. MARGULIS-OHNUMA:  Without objection, your Honor.

13          THE COURT:  Admitted without objection.

14          (Government's Exhibit 227 received in evidence)

15          MS. TARLOW:  May we publish to the jury?

16          THE COURT:  Yes.

17   Q.  Ms. McLeod, did you have access to that safe?

18   A.  No.

19   Q.  Did the defendant have any other safes?

20   A.  Yes.

21   Q.  How do you know that?

22   A.  'Cause on Nostrand apartment, he would go into the safe to

23   sell girls that would work for him weed from it.

24   Q.  Ms. McLeod, turning your attention back to the envelope for

25   one moment.  What did he use the envelope for?

J7a3kid5                        McLeod – Direct

1   A.   The envelope he would use to put the money from the

2   clients.

3   Q.   Where would he keep that envelope?

4   A.   In his safe.

5   Q.   So you testified that the defendant had other safes.

6   A.   Yes.

7   Q.   What did he keep in that safe?

8   A.   In the other safe he would –– I would see him going into it

9   to give other girls that would work for him weed from it.

10  Q.   Turning your attention back to the money that you earned.

11  How much of the money that you earned did you get in your

12  possession?

13  A.   Not a lot.

14  Q.   How much were you supposed to get?

15  A.   He would get 70 percent, I would get 30.  Or sometime he

16  would get 60, and I was supposed to get 40.

17  Q.   Did you in fact receive those amounts that you were told

18  you would get?

19  A.   At the beginning, I got some money when I first start.  But

20  after then, no.

21  Q.   Did you ever ask the defendant directly for the money that

22  you earned?

23  A.   Yes.

24  Q.   How often?

25  A.   Like about two to three times a week.

1    Q.  Did he ever deny giving you money?

2    A.  Yes.

3    Q.  Why was that?

4    A.  Because he would say that what I want to do with the money

5    is not of any importance.

6    Q.  Did you ever ask the defendant for money for food?

7    A.  Yes.

8    Q.  Would he give you that money?

9    A.  No.

10   Q.  What would he tell you to do?

11   A.  He would let one of the girl that work there, ask them to

12   buy me food.

13   Q.  Did the defendant ever use the portion of the money that

14   you had earned for himself?

15   A.  Yes.

16   Q.  For what kinds of things?

17   A.  He bought himself a computer, and he was doing this singing

18   stuff where he would pay for studio time from the money.

19   Q.  Who decided when you would meet with customers?

20   A.  Red.

21   Q.  During what hours did you have to meet with customers?

22   A.  The entire day.

23   Q.  At times, were you sleeping when a customer wanted to see

24   you?

25   A.  Yes.

1    Q.  When would that happen?

2    A.  Like when I would be sleeping, because when he fall asleep,

3    that would be the best time for me to fall asleep.  But if he

4    wake up and see me sleeping, he would shake me on the bed and

5    sometimes throw water into the bed to get me to get up and say,

6    oh, you're not answering texts.  Look how much call you're

7    missing.  You're not responding to the text.  Get up and

8    message back the clients or call them up and get them to come

9    over.

10   Q.  When you said that the best time for you to sleep was when

11   he was sleeping, why was that?

12   A.  Yeah, because he never want you -- you could never sleep.

13   He always wanted you to keep working all the time.

14   Q.  You testified earlier you told the defendant that you did

15   not want to engage in certain sex acts?

16   A.  No.

17   Q.  You testified earlier that you told the defendant you did

18   not want to engage in certain sex acts?

19   A.  Yeah, I don't want to do certain stuff, yeah.

20   Q.  If you refused, what would he do?

21   A.  He would be so angry and aggravated, that he would sometime

22   trick me and I just had to.

23   Q.  Would he do anything physical to you?

24   A.  One time he had went into the kitchen and threw a bowl of

25   yogurt on me.  Another time he would -- just a lot of stuff he

J7a3kid5                           McLeod - Direct

1    would do.

2    Q.  Can you describe, is there anything in particular he would

3    do to parts of your body?

4    A.  Meaning how?

5    Q.  Is there anything in particular that he did to your hands?

6              MR. MARGULIS-OHNUMA:  Objection to leading, your

7    Honor.

8              THE COURT:  Sustained.

9              MR. MARGULIS-OHNUMA:  Your Honor, could we take a

10   brief recess?

11             THE COURT:  No, we're not ready yet.

12             MR. MARGULIS-OHNUMA:  I'm sorry?

13             THE COURT:  Not ready yet for a recess.

14   Q.  Is there anything, any other physical things he would do to

15   you?

16   A.  Yeah.  When I refused to do certain stuff, he would take my

17   fingers and bend them back, like sometimes to do this would be

18   hard.

19   Q.  After he did those things to you, would you then engage in

20   those acts?

21   A.  Yes.

22   Q.  Did you also sometimes use condoms when you engaged in

23   commercial sex acts?

24   A.  Yes.

25   Q.  Where would you get those condoms from?

J7a3kid5                         McLeod - Direct

1    A.  If a client would come for a short stay, the condom would

2    be in the room which we would see clients in, in a drawer.  If

3    the client would come for hour, Red had a jar with some condom

4    he would keep under his bed for clients when they came over for

5    an hour.  We would use that.

6    Q.  What was your understanding of why some condoms were used

7    for a short stay and some for a longer stay?

8    A.  Because condoms he kept in his room, it didn't pop so

9    easily.  The ones that was in the room that we saw clients in,

10   it would bust often.

11   Q.  How often?

12   A.  Like about two to three times.

13   Q.  Two to three times total ever?

14   A.  No, not ever.  Like in a day, two to three times.

15   Q.  Why did he make you use those thinner condoms?

16   A.  Because if a client came for a short stay, that was the

17   type of condom we got to use.  We can't use the condom that he

18   has under his bed.

19          MS. TARLOW:  Your Honor, the government offers

20   Government Exhibits 242 and 244, to which defense counsel does

21   not object.

22          MR. MARGULIS-OHNUMA:  No objection your Honor.

23          THE COURT:  Admitted without objection.

24          (Government's Exhibit 242, 244 received in evidence)

25          MS. TARLOW:  Ms. Harney, can you please pull up

1    Government Exhibit 242.

2    Q.   Ms. McLeod, where was this photograph taken?

3    A.   That's in the room that -- off the living room, there's a

4    door to get into the room that we saw a client in.  And his

5    room is attached.  This is the door.

6    Q.   What apartment was this door located in?

7    A.   2458 Nostrand Avenue.

8    Q.   What, if anything, in particular do you observe about this

9    photograph of the door?

10   A.   The holes in the door.

11   Q.   Do you know how the holes in this door were made?

12   A.   Yes.

13   Q.   How?

14   A.   One of the girl that message me and told me that my photo

15   was on Backpage and my face was showing.  And I went into his

16   room and I was arguing with him, like, how could you put my

17   photo up there with my face and everything showing.  And we got

18   into a heated argument, and he pulled a cuff, and I move and

19   the door end up getting the cuff.

20   Q.   Ms. McLeod, can you speak into your microphone a little bit

21   more.

22   A.   Yes.

23   Q.   You testified that you and the defendant got into a fight.

24   A.   Yes.

25   Q.   And can you just rephrase again what the defendant did

J7a3kid5                          McLeod - Direct

1   during that fight?

2   A.   He pulled two cuff, and I move and his hand hit the door.

3   Q.   Did the defendant keep any weapons in the apartment?

4   A.   Yes.

5   Q.   Did you ever see the defendant with a firearm?

6   A.   Yes.

7   Q.   Where was the firearm when you observed it?

8   A.   He brought it up in his hand, showing me that this is to

9   protect me and the other girls that worked for him.

10  Q.   Did you believe him when he said that?

11  A.   No.

12  Q.   What did that firearm look like?

13  A.   I don't remember.  The color was black, but to say who kind

14  of gun it was, not sure.

15  Q.   Did the defendant have a baseball bat in the apartment?

16  A.   He did.

17  Q.   Where would he leave that bat?

18  A.   It would be lean up facing up to the side of his bed in his

19  room.

20  Q.   What did you see, if anything, the defendant do with that

21  bat?

22  A.   One of the girls working for him, and they got into an

23  argument, and he had run her out of the apartment with a

24  baseball bat.

25  Q.   Did you ever see the defendant use force with anyone else?

J7a3kid5                          McLeod - Direct

1    A.   Yes.

2    Q.   Who?

3    A.   One of the girl that worked for him.

4    Q.   What was her name?

5    A.   Keyonna.

6    Q.   Who was Keyonna?

7    A.   Keyonna was one of the girl that worked for him.

8    Q.   What kind of force did he use?

9    A.   So, a client had came over to the apartment to see Keyonna,

10   and something he told her to do and he didn't she didn't do it.

11   So when the client leave, Keyonna was asking him Are you

12   scared?  And he got upset.  And he had slapped her and she fell

13   to the ground.

14   Q.   Where did he slap her?  What part of her body?

15   A.   In her face.

16   Q.   Did the defendant ever force you to have sex with him?

17   A.   Yeah.

18   Q.   How often?

19   A.   All the time.  If I would, like, say that I don't want to

20   do it, oh, we're not going to do this today.  You are going to

21   do what I say to do.  And I would end up sexing with him.

22   Q.   You would end up having sex with him?

23   A.   Yeah.

24            Can I have a tissue, please?

25            THE COURT:  Ms. Tarlow, how much more do you expect

J7a3kid5                          McLeod - Direct

1    with the witness?

2              MS. TARLOW:  Approximately 15 to 20 minutes, your

3    Honor.

4              THE COURT:  Let's finish in 15.

5              MS. TARLOW:  Yes, your Honor.

6    Q.  Would the defendant use a condom when he would have sex

7    with you?

8    A.  No.

9    Q.  Directing your attention to what has already been admitted

10   as Government Exhibit 244.  Where was this photograph taken?

11   A.  That's the bathroom door in the Nostrand apartment.

12   Q.  What, if anything, do you observe about this photograph?

13   A.  The hole in the door.

14   Q.  Do you remember how the hole in the door was made?

15   A.  Yeah.

16   Q.  How was it made?

17   A.  So, what happened was, I used to go into the bathroom to

18   take my shower, but I never used to lock the door and he would

19   come in the bathroom and turn it to have sex with him.  And

20   when I know this we started doing, I would start locking the

21   door.  So one time he had come to open the door, and it was

22   locked.  And he got aggravated and start knocking on the door.

23   Q.  You testified earlier that the defendant took a video of

24   the two of you having sex.  Do you recall that?

25   A.  Yes.

J7a3kid5                    McLeod - Direct

1   Q.  Did you ever see cameras in his apartment?

2   A.  The first time when I go over at his apartment, when we had

3   sex, I didn't see no camera over there.

4   Q.  Do you know if he ever recorded you or anyone else in the

5   apartment?

6   A.  Meaning how?  Like, later down in like 2017, he had went

7   and hired a camera and he had it in the apartment on Nostrand

8   Avenue.

9   Q.  Did he ever tell you why he had cameras?

10  A.  To my understanding, one of the girl had came over there

11  and stole his laptop, and after then he had put the camera

12  there.

13  Q.  During the period that you worked for the defendant,

14  approximately how many other women worked for him?

15  A.  Like about 50 to 60 women.

16          MR. MARGULIS-OHNUMA:  I didn't hear the answer.

17          THE WITNESS:  Like about 50 to 60 women.

18  Q.  During the period that you worked for the defendant, did

19  you ever leave the United States?

20  A.  Yes.

21  Q.  Approximately how many times?

22  A.  Twice.  Approximately twice.

23  Q.  Why did you leave?

24  A.  Because if I didn't leave, my visa would have been expired.

25  I had six months to stay in the country.

J7a3kid5                          McLeod - Direct

1   Q.  Before you left on those occasions, what, if anything, did

2   you discuss with the defendant about going back to Guyana?

3   A.  He would discuss with me when I need to come back.  That

4   when I go to Guyana, don't take long, because I already know

5   what's up.  And I will go to Guyana and return.

6   Q.  What do you mean by you would already know what's up?

7   A.  I -- meaning that he have this video, and if I didn't

8   return, what would happen.

9   Q.  While you were in Guyana, would you continue to speak with

10  the defendant?

11  A.  Yes.

12  Q.  What, if anything, would he say to you?

13  A.  One time, he told me that I'm disloyal because the time I

14  was to come back had passed.  That I'm disloyal and I need to

15  come back.  And if I don't come back, I already know what is

16  up.

17  Q.  Each time that you went to Guyana, did you return to the

18  United States?

19  A.  Yes.

20  Q.  Why did you do that?

21  A.  Because I felt that I had to come back, because I didn't

22  want this video to get out.  Because what was on there was --

23  wasn't something that I wouldn't want anybody to know me to

24  see.

25  Q.  When you would return to the United States, would you

J7a3kid5                        McLeod - Direct

1    continue to engage in prostitution for the defendant?

2    A.   Yes.

3    Q.   While you were in the United States, were there times when

4    you would leave the defendant's apartment to visit family?

5    A.   Yes, I did.

6    Q.   Where would you go?

7    A.   Albany.

8    Q.   Why would you go to Albany?

9    A.   My family's up there.  Some of my family is up there.

10   Q.   How many times when you were working for the defendant did

11   you go there?

12   A.   About 10.

13   Q.   How would you get there?

14   A.   I would pay the bus fare to go, and my aunt would pay the

15   bus fare for me to come back.

16   Q.   Where would you take the bus from?

17   A.   Port Authority.

18   Q.   What, if anything, would the defendant tell you when you

19   would go to Albany?

20   A.   Well, from the beginning, before I leave the apartment and

21   when I reach Albany, I can't stay more than two to three days.

22   I got to come back to work.

23   Q.   When you say "work," what do you mean by that?

24   A.   To do prostitution.

25   Q.   Did there come a time when you and the defendant got

J7a3kid5                          McLeod - Direct

1    married?

2    A.   Yes.

3    Q.   Why did you marry him?

4    A.   Honestly, I had feelings for Red.  I thought that I could

5    have changed him, get him to change from doing what he had me

6    and the girls doing.  But, it didn't happen.  And I was -- this

7    was somebody that I was scared of.

8    Q.   Were there any other reasons why you married him?

9    A.   Yeah.

10   Q.   Why was that?

11   A.   To get status for the United States.

12   Q.   Approximately when was that?

13   A.   When?

14   Q.   When did you marry him?

15   A.   2018, the 27th February.

16   Q.   What was your understanding of why he wanted to marry you?

17   A.   He was saying that he don't have no family.  His -- he and

18   his mother and his father don't agree.  And I was the only

19   person that has been there, don't care how he would mistreat

20   me.  I would be there for him, stuff like that.

21   Q.   Did you become a U.S. citizen based on your marriage to the

22   defendant?

23   A.   No.

24   Q.   After you were married, did the defendant continue posting

25   you online for sex?

J7a3kid5                        McLeod - Direct

1    A.  Yes.

2    Q.  How long after you were married?

3    A.  Like about six or seven hours after.

4    Q.  Did you want to engage in prostitution then?

5    A.  No.

6    Q.  Switching topics, Ms. McLeod.  You testified earlier that

7    the defendant recorded things in a studio; is that right?

8    A.  Yes.

9    Q.  Did you ever go with him to any studio?

10   A.  I did.

11   Q.  And what, if anything, happened when you went with him to

12   that studio?

13   A.  So, he had asked me to be on one of his podcast show.  I

14   told him that I don't want to be on camera.  He was like, oh,

15   you don't have a choice.  You're going to be there on Saturday.

16   So I went, and when I was on the show, he was making fun,

17   because back -- couple years back I was like tone my skin, and

18   on the show that is what he told me to discuss.

19   Q.  You said tone your skin?

20   A.  Yeah, I used to bleach my skin.

21   Q.  Did you discuss that topic on the podcast?

22   A.  Yeah.

23   Q.  What, if anything, else would he say about this podcast to

24   you on other occasions?

25   A.  To share his podcast videos.

1    Q.   Did he ask you if you watched them?

2    A.   Yeah.

3    Q.   Ms. McLeod, directing your attention to September 2018.

4    Did you return to the United States from Guyana at that time?

5    A.   I did.

6    Q.   When you returned, where was the defendant living?

7    A.   2460 Nostrand Avenue.

8    Q.   Did he later move?

9    A.   Yes.

10   Q.   Where to?

11   A.   9529 Church Avenue.

12          MS. TARLOW:  Ms. Harney, if we can pull up what's

13   already in evidence as Government Exhibit 294.

14   Q.   Ms. McLeod, using this exhibit, can you please describe

15   where the defendant lived in this photograph.

16   A.   Yes.  The defendant lived in the top of the apartment.

17   Q.   Which building?

18   A.   The building where the Golden Krust sign is to the bottom.

19   He lived at the top.

20   Q.   When you returned from Guyana, when did you say, if

21   anything, to the defendant about prostitution?

22   A.   I told him that I don't want to do prostitution work

23   anymore.

24   Q.   To be clear, had you previously told him that you wanted to

25   engage in prostitution?

J7a3kid5                          McLeod - Direct

1    A.  I never -- if I told him that I want to be engaged?

2    Q.  Have you ever told him, did you ever tell him that?

3    A.  Told him what?

4    Q.  That you wanted to engage in prostitution?

5    A.  No.

6    Q.  When you told him you did not want to at that time, what

7    did he respond?

8    A.  He was like, that is not the arrangement.

9    Q.  What did you then do?

10   A.  I started seeing clients the same day.

11   Q.  The same day as when?

12   A.  When I returned from there.

13   Q.  How many hours a day did you see customers then?

14   A.  The whole day.

15   Q.  Did you try to sleep during that period?

16   A.  I did.

17   Q.  What would the defendant do?

18   A.  If he come and saw me sleeping, he would shake me out of

19   the bed.  You're missing calls, you're missing texts.  Call the

20   clients back.

21        MS. TARLOW:  Ms. Harney, if we can pull up what's

22   already in evidence as Government Exhibit 200.

23   Q.  Ms. McLeod, what is this room?

24   A.  That's the room on the Church apartment that we would see

25   clients in.

1    Q.  Ms. McLeod, did you later get another form of employment?

2    A.  Yes.

3    Q.  What was that?

4    A.  A cosmetologist doing nails.

5    Q.  Approximately when was that?

6    A.  Like about when I came, I worked like about for two weeks.

7    Approximately two weeks, and then I had gone to Rockaway to

8    visit a woman that I called my aunt to help her do her laundry.

9    We were pushing the cart over to the laundromat, and I look

10   over the road and I saw a sign that says "nail tech wanted."

11   And I turned to her and I was like I want to go in there for

12   them to hire me.  And she was like, go in and see.  And I went,

13   and I got the job.

14   Q.  Ms. McLeod, you said you work for two weeks.  What kind of

15   work were you referring to?

16   A.  Prostitution.

17   Q.  That was for the defendant?

18   A.  Yes.

19   Q.  What, if anything, was the defendant's reaction to your

20   getting that job at the nail salon?

21   A.  He was upset.  He was so upset.  Because he knew that I'm

22   not going to be there during the day to work.  And he knowing

23   that, he was like, okay, got the job?  Well, then you're going

24   to work in the nights.

25   Q.  Did you work at night?

1   A.  I did.

2   Q.  Why did you continue working then?

3   A.  Why did I continue working?  Because I felt that I had to.

4   Q.  What, if anything, happened to your earnings from the job

5   at the nail salon?

6   A.  So when I would get paid, he would always come up with

7   something that he need to buy that he think it's important, and

8   I got to give him money for it.

9            MS. TARLOW:  Ms. Harney, if we can pull up what's

10  already in evidence as Government Exhibit 1286.

11           THE COURT:  Three-minute warning.

12           MS. TARLOW:  Yes, your Honor.

13  Q.  Ms. McLeod, can you please read the month and year listed

14  here?

15  A.  The month and the year?  12/9/2018.

16  Q.  Turning your attention to the chat which is in green.  Who

17  sent those messages?

18  A.  Red.

19  Q.  What is the e-mail address listed?

20  A.  ChrisKidd9@gmail.com.

21  Q.  And the chats that are in blue, who sent those messages?

22  A.  Me.

23  Q.  Turning your attention to page four of these chats.  I'll

24  read the messages that are in green.  If you could please read

25  the messages that are in blue.

"The internet, light, and gas bill are due.  Keep that in mind."

A.   "I been asking you how much is the gas bill and how much exactly was the lighting bill, and you never gave me a answer."

Q.   "But I did give you an estimate and you still know those were the bills that were due.  Anyway, 300 should cover everything."

A.   "Just leave all the bills out.  Because when we spoke you said the bill are not due on the same day, and you never told me it was due.  All you told me that your phone bill is due on the 13th.  For you to now say I know the bill is due is crazy.  I keep asking you how much was the gas bill.  You never answer.  You said you was going to get back to me.  And you never did."

Q.   "I just got them in the mail yesterday."

         If we could pause for one moment there, Ms. McLeod.  What was your understanding of why the defendant said the internet, light, and gas bill are all due, keep that in mind?

A.   So after I told him I don't want to do prostitution work anymore, he came up with this thing whereby I had to pay all the bills for the apartment.  And still have to work in the night.

Q.   When you were living in that Church Avenue apartment with the defendant, did you meet someone name Arielle?

A.   I did.

Q.   Did you observe the defendant interact with Arielle?

J7a3kid5                          McLeod - Direct

1    A.  Yes.

2    Q.  How generally did he treat her?

3    A.  He had never liked Arielle.  Sometime it used to break my

4    heart the way he treat her.

5             MR. MARGULIS-OHNUMA:  Objection.

6             THE COURT:  Sustained.

7    Q.  What, if anything, did you observe about how he would treat

8    her?

9    A.  He would treat her real terrible.  Like sometimes I would

10   cook, all of the girls would eat, and Arielle cannot get no

11   food.  And I would ask him why.

12   Q.  Did there come a time when you threatened to go to the

13   police?

14   A.  I did.

15   Q.  Why on that particular occasion did you threaten to go to

16   the police?

17   A.  Because I got so fed up, and so much, I was dealing with so

18   much thoughts.  It's either I go to the police or I commit

19   suicide.  Because I just had enough.

20   Q.  Did you say that to the defendant?

21   A.  Yeah.

22   Q.  How did he respond?

23   A.  He was like nobody's going to understand what you're saying

24   because you can't talk properly.

25   Q.  Generally, how would you describe the nature of your

J7a3kid5                          McLeod – Direct

1   relationship with the defendant while you worked for him?

2              MR. MARGULIS-OHNUMA:  Objection.

3              THE COURT:  Overruled.

4   A.  Can I answer?

5   Q.  You can answer.

6   A.  Our relationship was a total wreck.  It was like if I was a

7   maid, a slave, the cooking, cleaning, he would spit chunks of

8   coal in the sink and I would clean it now.  Go back to it and

9   it's coal again.  It was -- our relationship was -- was a mess.

10  Q.  Directing your attention to the day of the defendant's

11  arrest.  Where were you on that day?

12  A.  I was at the apartment on Church Avenue.

13  Q.  When he was arrested, how did you feel?

14  A.  That was the best day of my life, physically, because I

15  know I won't have to do prostitution work anymore.  Mentally, I

16  still had to deal with all of the stuff that he told me.  I'm

17  fat, once a whore, always a whore.  I would never be nothing

18  good.  All of these thoughts.  My peace of mind was, and it

19  still is, don't have it to this day.

20             MS. TARLOW:  May I have one moment, your Honor?

21             (Continued on next page)

22

23

24

25

J7ATKID6                        McLeod - Direct

1   BY MS. TARLOW:

2   Q.  Ms. McLeod, turning your attention back to when you

3   testified that you would visit your aunt --

4   A.  Yes.

5   Q.  -- how often did you visit her during the period you worked

6   for the defendant?

7   A.  In Albany?

8   Q.  Yes.

9   A.  Ten times.

10  Q.  And you testified that you took a bus to get there?

11  A.  Yes.

12  Q.  And the bus left from Port Authority?

13          MR. MARGULIS-OHNUMA:  Objection to leading, your

14  Honor.

15          THE COURT:  Sustained.

16  Q.  Was the defendant -- what, if anything, did you tell the

17  defendant about where you were going?

18  A.  I told him I was going to my aunt.

19  Q.  When you were there, what, if anything, would you discuss

20  with him?

21          MR. MARGULIS-OHNUMA:  Objection.

22          THE COURT:  Asked and answered.

23  Q.  When you returned from your aunt's home in Albany, why did

24  you come back?

25  A.  I know that when I -- the video of me and that photos, I

J7ATKID6                         McLeod - Direct

1    was scared.

2              THE COURT:  Sorry, this is asked and answered as well.

3    This is getting cumulative.

4    Q.  Where did you come back to when you came back from Albany?

5              THE COURT:  Asked and answered.

6              MS. TARLOW:  Nothing further, your Honor.

7              THE COURT:  Thank you.  We'll take a 15-minute break

8    at this point.

9              (Recess taken)

10             (Jury not present)

11             MS. TARLOW:  Your Honor, before we bring in the jury,

12   may we ask very limited additional questions of the witness

13   which we believe, although your Honor stated were asked and

14   answered, we think are slightly different questions.

15             THE COURT:  I'm sorry, I don't --

16             MS. TARLOW:  Your Honor, when the witness

17   Ms. McLeodMcLeod was on the stand, we were asking her certain

18   questions about her travel to and from Albany.

19             THE COURT:  Yes.

20             MS. TARLOW:  There's one particular question that I

21   think was not asked and answered that we would like to ask her.

22             THE COURT:  And what is that?

23             MS. TARLOW:  Where did she come back to when she left

24   from Albany when she was visiting her aunt.

25             THE COURT:  I think she said numerous times she came

J7ATKID6                          McLeod - Direct

1    back to Brooklyn.

2                MS. TARLOW:  Your Honor, I believe she testified that

3    left from a bus station in Port Authority when she was leaving

4    to go to Albany, but did not testify to where the -- how she

5    traveled back from Albany and where she arrived after she got

6    off the bus.

7                THE COURT:  Well, the bus arrives at Port Authority.

8    I don't think there's service directly from Brooklyn to Albany.

9                MS. TARLOW:  That's our understanding as well, but we

10   prefer if we could ask that question of the witness to make

11   sure it is absolutely clear on the record.

12               THE COURT:  All right.

13               MS. TARLOW:  Thank you, your Honor.

14               MR. MARGULIS-OHNUMA:  Just that one question, right?

15               THE COURT:  Yes.

16               MR. MARGULIS-OHNUMA:  Thank you.

17               (Continued on next page)

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Thank you.  Before we proceed let me give

3     the jurors the status, since I indicated yesterday that we had

4     fallen behind the schedule that I had I had contemplated.  But

5     with the extraordinary cooperation of both parties, the

6     government and the defendant, we have made substantial progress

7     today, so that I do not believe it will be necessary to go

8     beyond 5:00 today.

9            The government had one question for clarification of

10    the witness.

11            MS. TARLOW:  Thank you, your Honor.

12    BY MS. TARLOW:

13    Q.  When you would return from your aunt's home in Albany, how

14    did you get to the defendant's apartment?

15    A.  I would take the train from Port Authority back to the

16    apartment.

17    Q.  Is Port Authority in Manhattan?

18    A.  Yes.

19            MS. TARLOW:  Thank you, your Honor.

20            THE COURT:  Mr. Margulis.

21            MR. MARGULIS-OHNUMA:  Thank you, your Honor.

22    CROSS-EXAMINATION

23    BY MR. MARGULIS-OHNUMA:

24    Q.  Good afternoon, Ms. McLeod, how are you?

25    A.  Good afternoon.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J79TKID6                          McLeod - Cross

1    Q.  I'm going to be asking some questions today, and if I

2    ask -- if there's any question that you don't understand, don't

3    answer it.  Let me know that you don't understand it and I will

4    try to rephrase it.  Is that okay?

5    A.  Okay.

6    Q.  Mr. Kidd is your husband, is that right?

7    A.  Yes.

8    Q.  And you told us today that you met him in Brooklyn, right?

9    A.  I did.

10   Q.  What did you tell us about where in Brooklyn you met him?

11   A.  On Pitkin.

12   Q.  What exactly is Pitkin?

13   A.  It's Rockaway Avenue and Pitkin.  It's a street.

14   Q.  So did you meet him in some sort of establishment?

15   A.  No, I was doing some shopping, walking on the pave, and he

16   drove up with his car.

17   Q.  Sorry?

18   A.  He drove up in his car and he was like hey, I think you're

19   very pretty, and we exchanged numbers from there.

20   Q.  So you were just walking down the street on Pitkin?

21   A.  Yeah, doing shopping.

22   Q.  And you were just visiting New York City from Guyana, is

23   that correct?

24   A.  I was visiting my family and I was here buying stuff for my

25   son back home.

1   Q.  So your job was back home in Guyana, is that right?

2   A.  Correct.

3   Q.  And you had your own business back there?

4   A.  I did.

5   Q.  And how long had you been in the United States when you met

6   Mr. Kidd?

7   A.  Approximately three months.

8   Q.  So you were visiting your family for three months in the

9   United States?

10  A.  Yes.

11  Q.  And where were you staying for those three months?

12  A.  On Rockaway Avenue.

13  Q.  At what, at someone's house?

14  A.  It's a lady, my friend mother who I comment on.

15  Q.  So you're staying with her for three months?

16  A.  Yes.

17  Q.  You weren't working in the United States, right?

18  A.  No.

19  Q.  You weren't earning any money in the United States?

20  A.  I came with money to do my shopping.

21  Q.  But by the time you met Mr. Kidd you still had money left?

22  A.  I did.

23  Q.  You were shopping for those three months, is that right, or

24  were you doing other things during that time?

25  A.  I was shopping, sometimes my aunt would take me to visit

J79TKID6                         McLeod - Cross

1    places to see different -- like Atlantic City and those kind of

2    stuff.

3    Q.  And someone else was running the salon back home while you

4    were here for three months?

5    A.  Yes.

6    Q.  Now you're familiar with Utica Avenue in Brooklyn, right?

7    A.  If I'm familiar with Utica Avenue?

8    Q.  Yes.

9    A.  Like now?

10   Q.  Yes.

11   A.  Presently?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And that's not anywhere near Pitkin Avenue, right?

15   A.  On a bus it would be like about 35 minutes.

16   Q.  35 minutes away?

17   A.  Approximately.

18   Q.  Now you -- at some point, we'll get back to this, but in

19   this spring you started meeting with the government, with the

20   FBI and the prosecutors, is that right?

21   A.  Yes.

22   Q.  And at the end of April you had a meeting with them, is

23   that right?

24   A.  I can't remember if it's at the end of April or May, but --

25   Q.  You did have some meetings with them?

J79TKID6                         McLeod - Cross

1    A.  Yes.

2    Q.  You actually had a lawyer with you for those meetings,

3    right?

4    A.  Yes.

5    Q.  And at the meeting you were asked -- sorry, at the meeting

6    near the end of April you were asked where you met Lloyd Kidd,

7    and you told the government you met him on Utica Avenue, not

8    Pitkin, isn't that right?

9    A.  That is not true.

10   Q.  Let me see if I can refresh your recollection with that.

11   I'm going to show you what's marked, I guess marked as Defense

12   Exhibit B, which is 3503-001.?

13           MS. TARLOW:  Objection, your Honor.

14           MR. MARGULIS-OHNUMA:  To refresh her recollection.

15           MS. TARLOW:  Your Honor, I don't believe the witness

16   testified that she didn't remember that.  She said it didn't

17   happen.  She didn't state that --

18           THE COURT:  Overruled.  Show her the document, see if

19   it refreshes her recollection.  If does not, that's the end of

20   it.

21           MR. MARGULIS-OHNUMA:  If I may approach, your Honor.

22           THE COURT:  Yes.

23   BY MR. MARGULIS-OHNUMA:

24   Q.  So have a look at that and see if it refreshes your

25   recollection to what you told the FBI.

J79TKID6                        McLeod - Cross

1    A.  I can't remember saying on Utica.  I never met Red on

2    Utica.

3    Q.  And you never told anyone that you met Red on Utica?

4    A.  I can't remember saying that.

5    Q.  And you definitely know the difference between Utica and

6    Pitkin, right?

7    A.  I do.

8    Q.  And then how long after you met did you get in touch with

9    Red again?

10   A.  So when I met him on Utica, I went home, we messaged each

11   other, he called me, and the next day I was over at his

12   apartment.

13   Q.  Did you just say you met him on Utica?

14   A.  I never said on Utica, I said on Pitkin.

15   Q.  I thought I just heard Utica.  Forgive me if I'm wrong.

16   A.  I never said Utica.

17   Q.  So the next day you met him at his apartment, right?

18   A.  Yes.

19   Q.  And you had sex with him on that first day, right?

20   A.  I did.

21   Q.  And he -- there came a time later where he showed you a

22   video of this sex, right?

23   A.  Yes.

24   Q.  How long between when you had sex and when he showed you

25   the video?

 1   A.  Like a week after.

 2   Q.  And during that week you didn't engage in any commercial

 3   sex acts, was that your testimony?

 4   A.  That's my testimony, yes.

 5   Q.  Did you go back -- after you had sex with him that day, did

 6   you go back to your aunt's house?

 7   A.  I did.

 8   Q.  You did go back?

 9   A.  Yes.

10   Q.  And you stayed there -- sorry, when is the next time you

11   saw him then after that?

12   A.  The following day.

13   Q.  And the following day where did you meet him?

14   A.  At his apartment.

15   Q.  And did you engage in any commercial sex acts that day?

16   A.  No, me and him have sexual intercourse.

17   Q.  But this was just for you, this was a friendly or romantic

18   relationship at that point, is that right?

19   A.  Could you break it out for me?

20   Q.  As of that point, before he showed you the video, what was

21   the nature of your relationship with him?

22   A.  We was I would say dating, trying to get to know each

23   other.

24   Q.  And the dates all occurred at his apartment, right?

25   A.  Yes.

J79TKID6                          McLeod - Cross

1  Q.  Now that day, that second day after you first met him, or

2  the second time you saw him at his apartment, there were no

3  other women there, is that correct?

4  A.  No.

5  Q.  And the first time you saw him the day after you met him

6  there were no other women in his apartment, is that correct?

7  A.  No.

8  Q.  So what's the next time after that second time that you saw

9  him?

10  A.  The following day.  We met three days in a row.

11  Q.  And on all of those three days there with are no other

12  women in his apartment, correct?

13  A.  There wasn't, no.

14  Q.  What time of day did you meet him?

15  A.  What time of the day?

16  Q.  The middle of the day, the evening?

17  A.  At his apartment?

18  Q.  Right.

19  A.  Like in the evening.

20  Q.  Each time was in the evening?

21  A.  I can't remember if each time was in the evening, but one

22  or two times was in the evening.

23  Q.  And what days of the week were those?

24  A.  I can't remember.

25  Q.  Were they weekends or were they during the week?

J79TKID6                         McLeod - Cross

1    A.  Honestly, I cannot recall.

2    Q.  You were on vacation for three months so you didn't have to

3    be anywhere during the weekday, is that right?

4    A.  Meaning how?

5    Q.  Well, you didn't have to be at a job Monday through Friday

6    9:00 to 5:00, right?

7    A.  No.

8    Q.  So it didn't really make a difference whether it was

9    weekend or weekday, right?

10   A.  I can't remember if it was a weekday or weekend.

11   Q.  So then after those three days where you saw him three days

12   in a row, when is the next time you saw him after that?

13   A.  After the three days that we met in a row like two days

14   after I didn't see him, and the next day he messaged me to come

15   over to his apartment.

16   Q.  Now let's talk about that.  Was that the first time that

17   you ever messaged with him?

18   A.  No.

19   Q.  So during this whole time period did you have text messages

20   with him?

21   A.  We met on Pitkin and went home, we messaged and called each

22   other, yes.

23   Q.  Do you have those text messages?

24   A.  No.

25   Q.  Do you have the same phone, the phone that the text

J79TKID6                          McLeod - Cross

1   messages were on?

2   A.  No.

3   Q.  So on that fourth time then that he reached out to you, did

4   you go to his apartment?

5   A.  I did.

6   Q.  Do you recall whether that was a weekday or weekend?

7   A.  I can't recall.

8   Q.  So what happened that fourth day when you went to the

9   apartment?

10  A.  When I went over to his apartment there was like about four

11  to five young women there.

12  Q.  So you had been to his apartment three times already?

13  A.  Yes.

14  Q.  And this was the first time that you ever saw other women

15  there, is that correct?

16  A.  Correct.

17  Q.  And were there any men there?

18  A.  No.

19  Q.  So there was no commercial sex acts going on that fourth

20  time, were there?

21  A.  I wouldn't be able to say.  At the time that I get to the

22  apartment there were four to five young women over there, that

23  is when he took me in his room and he asked me -- he was

24  telling me this is what I do, if I wanted to get into it.

25  Q.  And your testimony is that you told him no, is that right?

J79TKID6                           McLeod - Cross

1    A.  I did.

2    Q.  And I think was that the same day that he showed you the

3    tape you told us about, the video you told us about?

4    A.  When I told him no, yeah.

5    Q.  It was the same day?

6    A.  What was the same day.

7    Q.  The day that you first went there and saw other women

8    there?

9    A.  Yes.

10   Q.  And he showed that to you on his regular phone, right?

11   A.  Yeah, on his phone.

12   Q.  It was an iPhone?

13   A.  Honestly, at that time, my mind wasn't on what type of

14   phone it was, my mind just went straight back home to like if

15   this video only get out, I'm done with it.

16   Q.  So from that day onward you started working as a

17   prostitute?

18   A.  After he showed me the video I start crying --

19   Q.  Okay, if you could answer my questions.  You're saying

20   from -- let me rephrase.  I'm saying you started working as a

21   prostitute that very same day, is that correct?

22   A.  Yes.

23   Q.  So have you ever seen that video again since then?

24   A.  No.

25   Q.  In any of your meetings with the government did you look at

J79TKID6                      McLeod - Cross

1    any pictures or any videos?

2    A.  Pictures in what manner?

3    Q.  I'm asking if whenever you met with the government did they

4    show you any material at all?

5    A.  Photos?

6    Q.  Anything, I'm asking.

7    A.  Yeah, photos and video of the podcast that I was on.

8    Q.  But the video you're talking about they have never shown

9    you, right?

10   A.  No.

11   Q.  You have no idea where that video is now, right?

12   A.  No.

13   Q.  So tell me whether your family in New York -- you said you

14   had an aunt in -- a close friend of the family you consider an

15   aunt in Rockaway, is that right?

16   A.  Yes.

17   Q.  And well, let's start with her.  What's her name?  Give me

18   the first name.

19   A.  Hannah.

20   Q.  So how often in the -- sorry, this is February 2017 when

21   you first met, right?

22   A.  Yes.

23   Q.  By the way, do you have the plane ticket from when you came

24   to the United States?

25   A.  No.

J79TKID6                        McLeod – Cross

1   Q.  But do you know the exact date when you came to United

2   States from your passport or something else?

3   A.  From my passport I can tell.

4   Q.  Do you have that with you?

5   A.  On me?

6   Q.  Do you have it with you so you could tell the date that you

7   came?

8   A.  Yes.

9   Q.  Could we have a look at that, please?

10  A.  My attorney have my bag.

11          MR. MARGULIS-OHNUMA:  Judge, may the attorney approach

12  the bag with the witness?

13          THE COURT:  Yes.  Mr. Margulis how is this relevant or

14  material?

15          MR. MARGULIS-OHNUMA:  I mean --

16          THE COURT:  Unless we're talking about impeachment.

17          MR. MARGULIS-OHNUMA:  I guess I would rather be heard

18  at sidebar if you would like.

19          THE COURT:  I am going to be watching to see what

20  connection there is to testimony on trial.

21          MR. MARGULIS-OHNUMA:  I want to nail down the

22  timeline, your Honor, so that we'll be able to refute it.

23          Can she approach with the bag so she could take a look

24  at the passport and give the date?

25          THE COURT:  Yes.

J79TKID6                          McLeod - Cross

1          MR. MARGULIS-OHNUMA:  Your Honor, could I mark it for

2    identification Defense Exhibit C?  We'll give it back to

3    witness, of course.

4          THE COURT:  Is this your attorney?

5          THE WITNESS:  Yes.

6          MS. TARLOW:  Your Honor, the government would object

7    to marking it as an exhibit and admitting it.  To the extent

8    it's needed to refresh the witness's testimony, the government

9    doesn't object, but admitting it as an exhibit, the government

10   doesn't see any basis.

11         MR. MARGULIS-OHNUMA:  I was going to mark it for

12   identification and offer it.

13         THE COURT:  If you're just going to identify it.

14         MR. MARGULIS-OHNUMA:  Your Honor, with your

15   permission, I will mark it first.

16         THE COURT:  All right.

17         MR. MARGULIS-OHNUMA:  Defense Exhibit C for the

18   record.

19         THE COURT:  Let's clarify it's not for the record,

20   it's for identification.

21         MR. MARGULIS-OHNUMA:  For identification, sorry.

22   BY MR. MARGULIS-OHNUMA:

23   Q.  So Defense Exhibit C is your passport, is that correct?

24   A.  Yes.

25   Q.  And is that -- does that reflect accurately when you first

J79TKID6                           McLeod - Cross

1    entered the -- when you entered the United States on this trip

2    when you met Mr. Kidd?

3    A.  Yes.

4    Q.  What's the date?

5    A.  October 19, 2016.

6              MR. MARGULIS-OHNUMA:  Your Honor, I offer Defendant's

7    Exhibit C into evidence.

8              MS. TARLOW:  Objection, your Honor.

9              THE COURT:  Overruled.

10             (Defendant's Exhibit C received in evidence)

11             MR. MARGULIS-OHNUMA:  Thank you, your Honor.

12   Q.  Would you agree with me that you left the United States on

13   April 18, 2017, after looking at that?

14   A.  Could you --

15             MR. MARGULIS-OHNUMA:  I'll see if I can get the ELMO

16   on.  This is in evidence, I will publish it.

17             THE COURT:  All right.

18   Q.  So that's your Guyanese passport, is that correct?

19   A.  Correct.

20   Q.  And I'm flipping to the page you pointed out to me, and

21   would you agree you were admitted on October 19, 2016, as I'm

22   indicating, is that correct?

23   A.  Correct.

24   Q.  And then you left again on April 18, 2017, is that right?

25   A.  I didn't leave the exact date, I think it was four to five

J79TKID6                          McLeod - Cross

1    days before.

2    Q.  Do you want to look at the -- do you want to look at the

3    screen where I'm pointing?

4    A.  Yeah.

5    Q.  So isn't that right, that's the date that you left the

6    United States?

7    A.  I didn't leave on the 18th of April, I leave at about four

8    to five days before.

9    Q.  Can you explain why the difference on the stamp of the

10   passport?

11   A.  Could you put it back on?

12   Q.  Sure.

13   A.  So what is showing here, April 18, 2017, that is what

14   immigration stamp in my passport, that was up to the date I had

15   to leave America.

16   Q.  That was your -- that was the last date you were allowed to

17   stay?

18   A.  Correct.

19   Q.  And your recollection is that you actually left earlier

20   than that?

21   A.  Yes.

22   Q.  Okay.  And then let me give you this, you will do it better

23   than I will.

24          When did you come back to the United States then?

25   A.  It's right here.

J79TKID6                          McLeod - Cross

1    Q.  Can you tell us the date?

2    A.  September 11, 2017.

3    Q.  I think the jury can't hear.

4    A.  September 11, 2017.

5    Q.  So from April of 2017 until September of 2017 you were in

6    Guyana, right?

7    A.  Correct.

8    Q.  And then you came back in September of 2017, right?

9    A.  Yes.

10   Q.  And then how long were you in the United States before you

11   left again?

12   A.  I leave on the 8th of March, the thing is around the 8th of

13   March 2018.

14   Q.  Do you want to look in the passport and see if you can find

15   that date?

16   A.  So it says that the date -- don't show the date that I was

17   to leave, which was on March 10, 2018, but I left before.

18   Q.  That's your recollection is that you left earlier?

19   A.  Yes.

20   Q.  And then is there another stamp showing when you were

21   readmitted after March 2018?

22   A.  Yes.

23   Q.  Can you show us that?

24   A.  September 23rd, 2018.

25   Q.  And then you have been in the United States since

J79TKID6                         McLeod - Cross

1    September 23rd, 2018, is that correct?

2    A.  Correct.

3    Q.  So I'm going to display.  Am I correct, September 11, 2017

4    you were admitted, is that right?

5    A.  Yes.

6    Q.  And then the March 10 date, that is when your visa expired,

7    so you had to return a few days before that, correct?

8    A.  Correct.

9    Q.  And then you came back on September 23rd, 2018.  Am I

10   pointing to that correctly?

11   A.  Here, yeah.

12   Q.  Sorry?

13   A.  Correct, yeah.

14   Q.  Thank you.  So I guess we'll take a picture of this and

15   give it back to you.

16          MR. MARGULIS-OHNUMA:  Is that okay, your Honor?

17          THE COURT:  Well, there's no reason to have this

18   document in the record.  We can make copies of whatever has

19   been entered in the record.

20          MR. MARGULIS-OHNUMA:  Yes, your Honor.

21   Q.  So let's talk again.  The first trip when you say you met

22   Mr. Kidd in February of 2017, you had your aunt's in Rockaway,

23   you also had relatives in Albany?

24   A.  I do.

25   Q.  And you still have relatives in Albany?

J79TKID6                          McLeod - Cross

1    A.  I do.

2    Q.  And then you have relatives in New Jersey, is that right?

3    A.  I have a friend that live in New Jersey.

4    Q.  And sometimes when you were -- even when you were staying

5    with Mr. Kidd you would go visit your friend in New Jersey, is

6    that right?

7    A.  Correct.

8    Q.  Now after he showed you that video, did there come a time

9    when you actually moved in with him to that apartment?

10   A.  Yes.

11   Q.  And when was that?

12   A.  After he shown me the video and I agreed to prostitution, I

13   saw clients around the same, like about 12:00 -- approximately

14   12:00 midnight into the next day I went.

15   Q.  Was that the same day as he showed you the video?

16   A.  The nighttime, at night into the next day I saw about two

17   to three clients in the morning time.  When the sun was up I

18   went back to my aunt's house on Rockaway, and later in the day

19   I went back over, and from then I was living with him.

20   Q.  Did you have some belongings at your aunt's house?

21   A.  Yes.

22   Q.  Did you bring those belongings with you to Mr. Kidd's

23   house?

24   A.  A few, yes.

25   Q.  You moved in with him, right?

J79TKID6                           McLeod - Cross

1    A.  Correct.

2    Q.  Now at some point did you have a friend or a cousin in New

3    York named Max?

4    A.  A friend.

5    Q.  And where did he live?

6    A.  On Montgomery.

7    Q.  How far was that from Mr. Kidd's house?

8    A.  About 15 minutes away.

9    Q.  15 or 50?

10   A.  15 minutes away.

11   Q.  By car, right?

12   A.  On a bus.

13   Q.  And sometimes Mr. Kidd would drop you off in his Jeep over

14   as Max's house, right?

15   A.  No, when Red would tell me -- because sometimes when I

16   refused to do what he tell me to do he would tell me to move

17   out late hours in the night, and I would call Max and Max would

18   say well, you can come over here for the night.

19   Q.  And then you would go to Max's house when that would

20   happen, correct?

21   A.  Correct.

22   Q.  Was that before or after you were married to Mr. Kidd?

23   A.  It run before and after.

24   Q.  How many times did that happen that you would go stay over

25   at Max's house when you had a disagreement with Mr. Kidd?

J79TKID6                          McLeod - Cross

1    A.  Like about five or six times.

2    Q.  And how many times did you visit your -- sorry, from when

3    you moved into Mr. Kidd's to when the raid happened, how many

4    times did you visit your relatives in Albany?  How frequently,

5    let's say, every week, every month?

6    A.  So when I came back this last time I went to Albany around

7    November for Thanksgiving.

8    Q.  Okay.  And did you visit Albany a few other times, too?

9    A.  After when I come down, no, I didn't.

10   Q.  What about your aunt's in Brooklyn, how often did you visit

11   her?

12           THE COURT:  May I have a sidebar, please?

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J79TKID6                          McLeod - Cross

1          (At sidebar)

2          THE COURT:  Mr. Margulis, I have been trying to follow

3     whatever thread there may be in your theory.

4          MR. MARGULIS-OHNUMA:  Let me give it to you.

5          THE COURT:  I don't see it.  This case is not about

6     her travels to her aunt's or Albany or Far Rockaway, it's what

7     happened with the defendant.

8          MR. MARGULIS-OHNUMA:  Right.  And according to

9     Dr. Cooper, the defendant -- or by implication, the defendant

10    employed social isolation in order to control her, which is

11    false in this case because she wasn't socially isolated.  She

12    had numerous contacts.  And I'm entitled, I think, Mr. Kidd is

13    entitled to lay those out for the jury to see that the

14    government's theory about the case about social isolation at

15    least is not true.  So I understand your concern, I will try to

16    move it along quicker.

17         THE COURT:  Please do, because remember this is not

18    just about social isolation, it's about blackmail.

19         MR. MARGULIS-OHNUMA:  Let me refute the point.

20         (Continued on next page)

21

22

23

24

25

1           (In open court)

2    BY MR. MARGULIS-OHNUMA:

3    Q.  So fair to say, Ms. McLeod, that when you were living with

4    Mr. Kidd you maintained contact with friends and family in New

5    York, right?

6    A.  I did.

7    Q.  And you never told any of them what you were doing, right?

8    A.  No.

9    Q.  You never complained about Mr. Kidd to any of them, did

10   you?

11   A.  No, I was ashamed to complain.

12   Q.  Did you -- what did you tell them about where you were

13   living?

14   A.  I told them that I was doing a live-in job.

15   Q.  Doing what?

16   A.  Living in, like caring for the elderly.

17   Q.  You lied to your friends and family, right?

18   A.  Yeah.

19   Q.  For a period over two years, right?

20   A.  About where I was staying, yeah.

21   Q.  And then there came a time when you married Mr. Kidd,

22   right?

23   A.  I did.

24   Q.  And you wanted to stay in the United States, didn't you?

25   A.  I didn't marry Red just to stay in the United States.

J79TKID6                         McLeod - Cross

1  Q.  That wasn't my question.  My question is whether or not at

2  the time that you married him, you wanted to stay in the United

3  States or did you want to go move back to Guyana?

4  A.  I cannot answer a yes or no to a question when it's

5  complicated for me.  So there is more details that I guess I

6  know.

7  Q.  I'm trying to be clear.  I'm not asking why you married

8  Mr. Kidd, I'm asking whether or not you wanted to stay in the

9  United States, but please answer that as best you can.

10 A.  If I wanted to stay in the United States?

11 Q.  Yes.

12 A.  At that time, no, because I was coming back and forth.

13 Q.  You were what?

14 A.  I was traveling back and forth.

15 Q.  But is it fair to say that one reason that you married

16 Mr. Kidd was that you wanted to -- that you liked being able --

17 that it might be a path to citizenship to be able to come and

18 back freely?

19 A.  There's other details to that.

20 Q.  Tell us.

21 A.  One other reason, I did have feelings for Red, but I was

22 scared of Red.  Yes, I wanted to be a citizen of the United

23 States, and I actually thought that I could change him, get him

24 out of prostituting me and other girls, but that never

25 happened.

1    Q.  But you were hoping that that would happen, right?

2    A.  To get him to change, yes.

3    Q.  Yeah.

4    A.  Yeah.

5    Q.  You were hoping you could change Red, right?

6    A.  Correct.

7    Q.  That his way of treating you would change if you got

8    married, right?

9    A.  Correct.

10   Q.  And I think you did say in there that you also did want to

11   become a citizen, right?

12   A.  Correct.

13   Q.  And you actually told him around the time that you got

14   married that you expected to be coming into some money which

15   you would share with him, isn't that right?

16   A.  I can't remember nothing like that.

17   Q.  Isn't it a fact your grandfather died or you were told that

18   your grandfather in Guyana died and would leave you some money

19   around the time of the marriage?

20   A.  I don't even know my grandfather.  Both on my mother and

21   father's side, I don't know them.

22   Q.  Did you have the impression you were coming into money at

23   some time?

24   A.  From where?

25   Q.  I'm asking you.

J79TKID6                         McLeod - Cross

1    A.  No.

2    Q.  Isn't it a fact that you told Red you would give him

3    $30,000 if he would marry you?

4    A.  That's a lie.

5    Q.  Let's talk about the other women you say you saw in the

6    apartment at the time you were there.  First of all, you

7    mentioned someone named Pearlene, right?

8    A.  Yes.

9    Q.  Did you know at the time how old she was?

10   A.  No.

11   Q.  Did she come there before or after you met Red in

12   February 2017?

13   A.  When I and Red went to the apartment for the visit,

14   Pearlene was wandering in and out of there.

15   Q.  She was there already?

16   A.  Yes.

17   Q.  And you didn't suspect she was underage at that time,

18   right?

19   A.  To me she looked young, but she was busty in size.

20   Q.  There were many women who came and went over the following

21   year and a half and two years you were there, right?

22   A.  Correct.

23   Q.  And one of them was Ariele, is that what you said?

24   A.  Correct.

25   Q.  And tell us, what was your relationship like with Ariele?

J79TKID6                              McLeod - Cross

```
 1    A.  Me and her had a good relationship.  One time -- she would
 2    tell me stuff.  One time Red had her money keeping and she was
 3    hungry and wanted something to eat, and I was getting ready to
 4    go to work at the nail salon.  And she came into the kitchen
 5    and she was like:  Toya, I just approached Red for money to buy
 6    something to eat, and he didn't want to give me.  And in my
 7    mind I was like:  I'm going through the same thing.
 8    Q.  Did you ever complain to Ariele that Red was mistreating
 9    you?
10              MS. TARLOW:  Objection.
11              MR. MARGULIS-OHNUMA:  Not for the truth, your Honor.
12              THE COURT:  Overruled.
13    A.  Ariele know what took place in the apartment.
14              Can I go into some details?
15    Q.  I will ask the questions.  Try to answer the question, and
16    then the government will get a chance to ask follow-up
17    questions if they need to.  I'm sorry, I know it's a strange
18    situation.
19              But if Ariele -- withdrawn.
20              Did Ariele ever see Red mistreating you?
21              MS. TARLOW:  Objection.
22              THE COURT:  Sustained.
23    Q.  Was Ariele actually present when Red did any of the things
24    that you accused him of?
25    A.  I knew Ariele when we move on to the Church apartment, and
```

J79TKID6                         McLeod - Cross

1    there were some incidents whereby he used to abuse me verbally
2    when Ariele was there.  One time when a client was coming
3    from -- and Ariele was there, he was cussing me out.
4    Q.  When he was mistreating you, is that fair to say?
5    A.  Yes.
6    Q.  Let's talk briefly about the time you were away in Guyana.
7    So it was -- I don't think I could do the math, but you were
8    away during the period from February 2017 until December of
9    2018.  You were actually in Guyana for six or eight months of
10   that, is that right?
11   A.  Approximately like six to -- five to six or seven months.
12   Q.  Is it your testimony that you stayed in touch with Red on a
13   daily basis during that five to six months?
14   A.  Yes.
15   Q.  And do you have any of those texts?
16   A.  No.
17   Q.  Do you have any records of any of those phone calls?
18   A.  No.
19   Q.  What phone number did you use for those calls for your
20   number?
21   A.  Honestly, I can't remember.
22   Q.  Do you know what number did Red use during that period?
23   A.  It was a 718 number.
24   Q.  Was it more than once a day or every day?
25   A.  Just once a day.

1   Q.  And it was after the first trip and before the second trip

2   that you got married, is that right?

3   A.  So I went home in 2017, before Easter, came back down in

4   the year, and then in 2018 we got married.

5   Q.  And then you went home again after that?

6   A.  After we got married?

7   Q.  Yes.

8   A.  Yes.

9   Q.  I can't remember if you testified to this on direct, but

10  there was a camera in the apartment, a video camera?

11  A.  Which apartment?

12  Q.  Well, let's start with Norstrand Avenue.

13  A.  In the living room, yes.

14  Q.  And then there was also one in the Church Street apartment,

15  right?

16  A.  Yes.

17  Q.  And you actually had access to that camera, right?

18  A.  No.

19  Q.  You couldn't use the camera?

20  A.  No.

21  Q.  You were aware that he had a show that he would publish, or

22  a podcast on YouTube, is that right?

23  A.  Correct.

24  Q.  And did you ever watch it?

25  A.  Honestly, not really.

J79TKID6                          McLeod - Cross

1    Q.  But then you were on two episodes of it, is that right?

2    A.  I was on what?

3    Q.  You appeared on the show on two separate episodes, is that

4    right?

5    A.  That is not true, on one episode.

6    Q.  You don't recall being on two episodes?

7    A.  No, one episode.

8    Q.  Did you actually watch that episode?

9    A.  Yeah, I watch a piece of it.

10   Q.  He was kind of rude to you on the show, right?

11   A.  He was.

12   Q.  But you deny going on a separate, second show?

13   A.  I didn't.

14   Q.  Is it possible -- withdrawn.  You only went to go film the

15   show once, right?

16   A.  Once.

17   Q.  Do you know whether it might have been broken down into two

18   separate episodes, though, if you know either way?

19   A.  I can't remember.

20   Q.  How long were you on camera on the day you went to go shoot

21   it?

22   A.  I think it was a little more than an hour or less, I'm not

23   sure.

24   Q.  As an alleged victim of sex trafficking, you are a

25   candidate for special treatment with immigration, isn't that

J79TKID6                              McLeod - Cross

1    right?

2    A.  Special treatment meaning how?

3    Q.  Well, there's a program called "continuing presence" that

4    you have applied for, right?

5    A.  Yes.

6    Q.  That will let you stay here for a year, right?

7    A.  Honestly, I'm not sure how it works.

8    Q.  But --

9    A.  I just know that the application is in.

10   Q.  Let me back up for a second.  You got a lawyer when you

11   started talking to the government because you were afraid you

12   might be in a little bit of trouble, right?

13   A.  Correct.

14   Q.  And that lawyer also helped you -- without telling me

15   anything that the lawyer told you, but that lawyer helped you

16   to try to get this continuing presence application, is that

17   right?

18   A.  I can't remember.

19   Q.  And the government and the FBI agents told you that if you

20   testify, if you cooperate with them, they would help you get

21   the continuing presence?

22   A.  That is not true.  I'm just here to tell my story and what

23   happened to me.

24   Q.  Well, is it true -- you did some texting back and forth

25   with FBI agents, is that correct?

J79TKID6                          McLeod - Cross

1    A.   Yes.

2    Q.   In particular with a Laura Riso, is that right?

3    A.   Yes.

4    Q.   And isn't it a fact that on June 13 of 2019, Laura Riso

5    sent you a text telling you she's waiting for the documents to

6    mail in your continued presence application, is that right?

7    A.   I can't remember the date exactly, but --

8    Q.   Let me mark Defense Exhibit D, see if that can help you

9    remember.

10            MR. MARGULIS-OHNUMA:  May I approach, your Honor?

11            THE COURT:  Yes.

12   Q.   Does that refresh your recollection as of June 13th of this

13   year, you were in discussions with the FBI to help you get this

14   immigration benefit, is that fair to say?

15   A.   Correct.

16   Q.   And then a couple of weeks after that you testified in a

17   hearing in court here, right?

18   A.   If I testified?

19   Q.   Yes.

20   A.   Correct.

21   Q.   And in the hearing isn't it a fact that you were asked the

22   following question and gave the following answer.  I will read

23   that into the record.

24            MS. TARLOW:  Objection, your Honor.

25            MR. MARGULIS-OHNUMA:  It's a prior inconsistent

 1    statement, your Honor, under oath.

 2              Judge, we need a ruling on the objection.

 3              THE COURT:  What's the objection?

 4              MS. TARLOW:  Your Honor, it doesn't appear to be

 5    inconsistent with the testimony.

 6              THE COURT:  I will have to take a look at that.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Where's the statement?

3          MR. MARGULIS-OHNUMA:  The statement is –– so I just

4     established that she's hoping to get this continued presence

5     program two weeks before the hearing, at the hearing she said,

6     inconsistent with that, she was hoping for some sort of

7     immigration status by cooperating with the government in this

8     case, and her answer was:  I don't know anything what you're

9     talking about.

10         So she denied seeking an immigration benefit at the

11    hearing, falsely denied it.

12         THE COURT:  I think that my understanding of what you

13    just read is she says she doesn't know what you're talking

14    about concerning cooperation with the government.

15         MR. MARGULIS-OHNUMA:  So I had a follow up:  You're

16    not hoping for any kind of benefit from testifying?  No.

17         THE COURT:  I don't see the inconsistency.

18         MR. MARGULIS-OHNUMA:  Here she said she's hoping to

19    get continued presence, but I didn't know because it hadn't

20    been turned over in time for the hearing.  So at the hearing I

21    couldn't impeach her with it, so the lie stood at the hearing.

22         Now she said:  Oh, yeah, well, continued presence,

23    there's the text, yes, I am seeking that.  So I'm seeking to

24    impeach her with her prior false statement at the hearing, and

25    I followed up and it drew an objection, you sustained the

J79TKID6                          McLeod - Cross

1    objection.  Because I made the record that she wasn't hoping

2    for an immigration benefit.

3              MS. TARLOW:  Your Honor, we made a disclosure before

4    the hearing that she was seeking CP.

5              MR. MARGULIS-OHNUMA:  I don't think so.

6              MS. BRACEWELL:  Yes, we did.

7              MR. MARGULIS-OHNUMA:  I must have been overwhelmed

8    with the other discovery then, because I missed it.

9              MS. TARLOW:  It's our position that her testimony

10   today was that she is not testifying in order to gain status or

11   CP, she's testified she told her story and told the truth.

12   It's not inconsistent with the prior statement.

13             THE COURT:  Objection sustained.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J79TKID6                           McLeod – Cross

1              (In open court)

2              MR. MARGULIS-OHNUMA:  May I have one moment, your

3    Honor?

4              (Pause)

5    BY MR. MARGULIS-OHNUMA:

6    Q.  So currently you have overstayed your visa, right?

7    A.  I did.

8    Q.  So you are not currently in the country legally, is that

9    correct?

10   A.  Correct.

11   Q.  Now after Mr. Kidd was arrested, you continued to stay in

12   touch with him for a few months, right?

13   A.  Yes.

14   Q.  And then you ended up getting a lawyer, right?

15   A.  Correct.

16

17

18

19

20

21

22

23

24

25

J7A3KID7                          McLeod - Redirect

1    Q.  Then you stopped being in contact with him, right?

2    A.  Correct.

3    Q.  As of today, you're still married to him, correct?

4    A.  Correct.

5          MR. MARGULIS-OHNUMA:  No further questions, your

6    Honor.

7          THE COURT:  Ms. Tarlow.

8    REDIRECT EXAMINATION

9    BY MS. TARLOW:

10   Q.  You testified on cross-examination --

11         THE COURT:  Excuse me for a moment.  Yes.

12         MS. TARLOW:  Thank you, your Honor.

13   Q.  You testified on cross-examination that you would visit

14   family and a friend named Alex when you lived with the

15   defendant?

16   A.  What?

17   Q.  You visited with family members as well as a friend named

18   Max?

19   A.  Yes.

20   Q.  Were you directed by the defendant to come back to

21   prostitute for him?

22         MR. MARGULIS-OHNUMA:  Objection.  Leading.

23         THE COURT:  Sustained.

24   Q.  What, if anything, would the defendant say to you when you

25   would go to your family or to your friend named Max?

1   A.  So when I would go over to Max house, and he see a certain

2   time I'm not back at the apartment, he would message me and

3   tell me when are you coming back.

4   Q.  What, if anything, would he say to you when you were Albany

5   visiting your aunt?

6   A.  Well, from since before I even leave to go to Albany, he

7   would already discuss, well, these are the days and you got to

8   come back.

9   Q.  When you were in Albany, would he also tell you to come

10  back?

11  A.  Yes.

12  Q.  Why are you testifying today, Ms. McLeod?

13          MR. MARGULIS-OHNUMA:  Objection.

14          THE COURT:  Overruled.

15  Q.  You may answer.

16  A.  Honestly, it was like if I was in a prison, the feds

17  came --

18          MR. MARGULIS-OHNUMA:  Objection.

19          THE COURT:  Sustained.

20          MR. MARGULIS-OHNUMA:  Non-responsive.

21          THE COURT:  Sustained.

22  Q.  Ms. McLeod, are you getting any benefit by testifying for

23  today?

24  A.  No.

25  Q.  Are you receiving any benefit regarding your citizenship

J7A3KID7                        McLeod - Recross

1   because you are testifying today?

2   A.  No.

3           MS. TARLOW:  Nothing further.

4           MR. MARGULIS-OHNUMA:  Quick followup.

5   RECROSS EXAMINATION

6   BY MR. MARGULIS-OHNUMA:

7   Q.  Just a couple of followup questions.  There was a question

8   about your visits to Max just now.  Is that right?

9   A.  Yes.

10  Q.  Isn't it true you were romantically involved with him?

11          MS. TARLOW:  Objection, your Honor.

12          THE COURT:  Sustained.

13  Q.  There was a question about what benefit you are getting

14  from testifying today.  Whether or not you're getting a benefit

15  from the actual testimony, isn't it true that the program you

16  are in for continued presence is only if you claim to be a

17  victim of sex trafficking, right?

18  A.  That is not true.  I am not aware of that.

19  Q.  Why do you get to have the continued presence program?

20  A.  Honestly, I have no idea why.  Me trying to give an

21  answer --

22  Q.  You only claimed to be a victim of sex trafficking several

23  months after the arrest; isn't that right?

24  A.  I was in trafficking from the beginning.  At that point who

25  do I tell my story to?  Who do I tell what is going on?  What

1    is this guy have me doing.  Who?

2    Q.  You want Lloyd Kidd to go to jail; is that right?

3    A.  I don't want Lloyd Kidd to go to jail.  He know what he was

4    doing.  And if his action is this consequences, then there's

5    nothing I can do.  I don't pass judgment.

6              MR. MARGULIS-OHNUMA:  Nothing further, Judge.  Thank

7    you.

8              THE COURT:  Thank you.  You are excused and may step

9    down.

10             THE WITNESS:  Thank you.

11             (Witness excused)

12             THE COURT:  Ms. Tarlow.

13             MS. TARLOW:  The government calls Sabrina Misere.  She

14   is not a victim who is charged in the indictment, but she will

15   be testifying about Victim-2 in the indictment.

16    SABRINA MISERE,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MS. TARLOW:

21   Q.  Good afternoon, Sabrina.  How old are you today?

22   A.  18, turning 19.

23   Q.  What month and year were you born in?

24   A.  July 2000.

25   Q.  With you where were you born?

1    A.   Haiti.

2    Q.   Where did you grow up?

3    A.   Brooklyn, back and forth.

4    Q.   Back and forth where?

5    A.   Brooklyn, Westchester, and stuff like that, placements.

6              MS. TARLOW:  Your Honor, the government offers

7    Government Exhibit 2A which the defendant has indicated he does

8    not object to.

9              THE COURT:  Admitted without objection.

10             (Government's Exhibit 2A received in evidence)

11             MS. TARLOW:  May we publish?

12             THE COURT:  Yes.

13   Q.   Sabrina, who is shown in this photograph?

14   A.   What happened?

15   Q.   Is there a photograph that's on your screen?

16   A.   Yeah.

17   Q.   Who is shown in that photograph?

18   A.   Me.

19   Q.   Approximately how old were you when that photograph was

20   taken?

21   A.   I was like, this was 2017, Christmastime.  Right before

22   Christmas.

23   Q.   So approximately how old were you?

24   A.   I was 17.

25   Q.   Sabrina, if you can remember to keep your voice up and

J7A3KID7                        Misere - Direct

1    speak into the microphone.

2              Directing your attention to May 2017.  Where were you

3    living at that time?

4    A.  Hawthorne Cedar Knolls.

5    Q.  What is Hawthorne Cedar Knolls?

6    A.  It's a placement, co-ed, for girls and boys in foster care

7    and stuff.

8    Q.  Where is Hawthorne located?

9    A.  Westchester County; Hawthorne, New York.

10   Q.  How many years approximately have you been in foster care?

11   A.  Since 2013.  I was 12 and a half.

12   Q.  Prior to entering foster care, who did you live with?

13   A.  Mom.

14   Q.  Sabrina, turning your attention back to May of 2017.  Did

15   you have sex in exchange for money then?

16   A.  Yeah.

17   Q.  How old were you at that time?

18   A.  Like 16, and a couple of months.

19   Q.  Who, if anyone, did you work for during that time?

20   A.  Chris Kidd.

21   Q.  Would you recognize Chris if you saw him again?

22   A.  Yeah.

23   Q.  Looking around the courtroom today, do you see Chris?  And

24   if you do, can you please identify an article of clothing that

25   he's wearing?

1    A.   No.   Only Chris I know have hair at the time.

2    Q.   Sabrina, could you stand up and take a look.

3              MR. MARGULIS-OHNUMA:   The witness answered the

4    question, your Honor.

5              MS. TARLOW:   She answered -- if she could stand.

6              THE COURT:   She can stand up and look around.

7    Q.   Do you see anyone who you could identify as Chris?

8    A.   The only Chris Kidd I know have hair.

9              MS. TARLOW:   Okay.   The government offers what is

10   marked as Government Exhibit 1, which is already in evidence.

11             May I publish?

12             THE COURT:   Yes.

13   Q.   Sabrina, do you recognize who that is?

14   A.   Yeah.

15   Q.   Who is that?

16   A.   That's him.

17   Q.   Who is the him?

18   A.   Chris Kidd.

19   Q.   Let's talk about how you met Chris.   I'll be referring to

20   Chris as the defendant.   Do you understand that?

21   A.   Yeah.

22   Q.   Approximately when did you first meet the defendant?

23   A.   It was around like May, in the nighttime.   Very late.

24   Q.   What year was that?

25   A.   2017.

J7A3KID7                        Misere - Direct

1   Q.  Where did you meet him?

2   A.  At his house.

3   Q.  Where was his house located?

4   A.  It was around like in Brooklyn, New York.

5           MS. TARLOW:  Ms. Harney, can you please pull up what's

6   already in evidence as Government Exhibit 253.

7   Q.  Sabrina, what does this photograph show?

8   A.  That's the apartment where he lives at.  And the laundromat

9   next door to it and stuff.

10  Q.  Who else was in his apartment on the day that you went

11  there?

12  A.  Me, Jessica, Aisha, and Brielle.

13  Q.  How did you know Aisha, Jessica, and Brielle?

14  A.  We all was resident in Hawthorne Cedar Knolls.

15  Q.  What's Jessica's last name?

16  A.  Bonilla.

17          MS. TARLOW:  Ms. Harney, can you pull up what's

18  already in evidence as Government Exhibit 4.

19  Q.  Sabrina, do you recognize the individual in this

20  photograph?

21  A.  Jessica.

22          MS. TARLOW:  Ms. Harney, please pull up what's already

23  in evidence as Government Exhibit 3.

24  Q.  Do you recognize who is in this photograph?

25  A.  That's Aisha.

1         MS. TARLOW:  The government offers Government Exhibit

2    5.

3         I'm sorry.  Could you please show the witness

4    Government Exhibit 5.

5    Q.  Do you recognize this photograph?

6    A.  Yeah.

7    Q.  Who is it?

8    A.  Brielle.

9    Q.  How do you know?

10   A.  Her face, and it is no different from how she look now and

11   before.

12        MS. TARLOW:  The government offers Government Exhibit

13   5.

14        MR. MARGULIS-OHNUMA:  No objection.

15        THE COURT:  Admitted without objection.

16        (Government's Exhibit 5 received in evidence)

17        MS. TARLOW:  May we publish?

18        THE COURT:  Yes.

19        MS. TARLOW:  The government also offers what's marked

20   as Government Exhibit 3.

21        MR. MARGULIS-OHNUMA:  No objection.  I think it's

22   already in evidence but no objection.

23        THE COURT:  All right.

24        (Government's Exhibit 3 received in evidence)

25   Q.  At the time you went to the defendant's apartment, did you

J7A3KID7                         Misere - Direct

1    know Jessica's age?

2    A.  No.  No one really knew her age.

3    Q.  What was Aisha's age?

4    A.  Aisha was the same age as me, 16 turning 17.

5    Q.  What was Brielle's age?

6    A.  Brielle was most likely 15 turning 16.

7            MS. TARLOW:  The government offers Government Exhibit

8    700.  It's not disputed.

9            THE COURT:  All right.

10           (Government's Exhibit 700 received in evidence)

11   Q.  Sabrina, can you read what is listed as the first name?

12           MR. MARGULIS-OHNUMA:  Objection, Judge.  The document

13   speaks for itself.  This witness has no knowledge of it.  It's

14   someone else's birth certificate.

15           THE COURT:  Can you lay the foundation?

16           MS. TARLOW:  Your Honor, we would highlight the

17   relevant portions.  The witness could just read the document

18   that's already in evidence.

19           THE COURT:  All right.

20   Q.  Sabrina, if you could read the name that is listed?

21   A.  Jessica Lee Bonilla.

22   Q.  What is the date of child's birth that is listed?

23   A.  March 18, 2003.

24           MS. TARLOW:  Please take that down.

25   Q.  Turning your attention back to when you went to the

1   defendant's apartment.  What happened when you first arrived?

2   A.  Jessica went to speak to him while me and Aisha and Brielle

3   waited in the living room.  And then after, we was called one

4   by one in the room.

5   Q.  Who called you into the room?

6   A.  Chris Kidd.

7   Q.  In what room?

8   A.  In his bedroom.

9   Q.  Did you go into his bedroom?

10  A.  Yeah.

11  Q.  What happened when you went into his bedroom?

12  A.  We went in there, and we had sex, and then he explained to

13  me the procedure.  That like the reason why Jessica brought us

14  there --

15          MR. MARGULIS-OHNUMA:  I didn't hear the answer.  Could

16  you speak up?

17  A.  We went in there and had sex, and he spoke to me and

18  explain to me the reason why Jessica brought us there.

19  Q.  And when you had sex, did he use a condom?

20  A.  No.

21  Q.  What did you understand was the reason why you had sex with

22  the defendant?

23  A.  That we was going to have to work for money, sleep with

24  guys and stuff, and he was going to take pictures of us.

25  Q.  Why did you first have to have sex with him?

J7A3KID7                        Misere - Direct

1    A.  Huh?

2    Q.  Was there a reason why you first had to have sex before you

3    could see the customers?

4    A.  Because not every girl's vagina qualified for the job.

5    Q.  Who told you that?

6    A.  Chris Kidd.

7    Q.  Did he call other girls into his room?

8    A.  He called all of us one by one.

9    Q.  You testified that after you had sex with the defendant, he

10   explained the procedures to you?

11   A.  Yeah.

12   Q.  What did he do?

13   A.  He took a picture of us, and then he explained to me that

14   when I get a customer, he will let me know the job.  The

15   procedures of every job, and that we had to check the ID to see

16   if they cops or not.

17   Q.  When he took those photographs of you, what were you

18   wearing?

19   A.  Nothing.

20   Q.  What did he do with those photographs?

21   A.  He put them up on Backpage.

22   Q.  How do you know that?

23   A.  Because he -- his computer is right there in the room, and

24   we saw it, and he informed us that's what was going to happen.

25   Q.  Did he post any photographs of the other girls you were

1    with?

2    A.   Yeah.

3    Q.   What, if anything, did he say about concealing your

4    identity in those photographs?

5    A.   He could blur your face up.  If you don't have anything,

6    tattoo or something, he could create one.

7    Q.   Sabrina, directing your attention to what is already in

8    evidence as Government Exhibit 421.  Do you recognize the

9    individual in the photographs on the right-hand side labeled

10   Domo?

11   A.   Yes.

12   Q.   Who is that?

13   A.   Jessica.

14   Q.   How do you recognize her?

15   A.   That's how we all take pictures, regular pictures, and also

16   her hair is no different and her body shape and you can see her

17   face from the side.

18   Q.   Can you please read what is listed as the created date, if

19   we can highlight.

20   A.   May 18, 2017.  0:39.

21   Q.   Sabrina, directing your attention to what is already in

22   evidence as Government Exhibit 422.  Do you recognize the

23   individual in the photographs on the right-hand side labeled

24   Lizzy?

25   A.   Yes.

1   Q.  Who is that?

2   A.  Aisha.

3   Q.  Is that the same Aisha who you testified about earlier?

4   A.  Yes.

5   Q.  What is listed as the created date on Government Exhibit

6   422?

7   A.  May 18, 2017, 5:58.

8   Q.  After the defendant -- can we please take that down.

9           After the defendant posted photographs of you and your

10  friends, what did he say would happen next?

11  A.  We would get customers and he'll let us know.

12  Q.  Who did he say would communicate with the customers?

13  A.  Him.  He had the number and stuff.

14  Q.  Did you discuss the prices with the defendant?

15  A.  He told us the prices for each jobs and stuff like that.

16  Q.  Did you see any clients?

17  A.  Yes.

18  Q.  How many?

19  A.  Approximately one or two that I can remember.

20  Q.  Where did you see them?

21  A.  In the living room.

22  Q.  Approximately how much time passed when you observed him

23  posting your photograph online, and when you saw clients?

24  A.  Approximately an hour or two.

25  Q.  Did any of your other friends see clients for sex?

J7A3KID7                        Misere - Direct

1   A.  Yes.

2   Q.  How about Jessica?

3   A.  Yes.

4   Q.  And approximately how many customers?

5   A.  Five, maybe that I can remember.  Maybe more, maybe less.

6   Q.  How do you know that?

7   A.  When a client would come for a specific girl, you couldn't

8   be out there if it's not your client.  We would most likely go

9   in the bedroom and wait until they done with the client.

10  Q.  Did that happen when Jessica was seeing clients?

11  A.  That happened with everyone when they seeing a client.

12  Q.  Did there come a time when you left his apartment?

13  A.  Yes.

14  Q.  Why did you leave?

15  A.  Well, Jessica kind got in a jealous rage.  I guess he told

16  Jessica he like me, and Jessica was upset and she said we're

17  leaving.

18  Q.  Where did you go next?

19  A.  We walked to Target on Junction.

20  Q.  Who was with you at that time?

21  A.  Me, Jessica, Aisha, and Brielle.

22          MS. TARLOW:  Ms. Harney, can we show counsel, the

23  witness and the Court what's marked as Government Exhibit 255.

24  I'm sorry Government Exhibit 251.

25  Q.  Sabrina, do you recognize this?

J7A3KID7                      Misere - Direct

1    A.  Yes.

2    Q.  What is it?

3    A.  That's the walking distance from the house to Target.

4    Q.  Whose house?

5    A.  Chris Kidd's.

6              MS. TARLOW:  The government offers Government Exhibit

7    251.

8              MR. MARGULIS-OHNUMA:  No objection.

9              THE COURT:  Admitted without objection.

10             (Government's Exhibit 251 received in evidence)

11             MS. TARLOW:  Ms. Harney, if we can pull up what's

12   already in evidence as Government Exhibit 250.

13   Q.  Sabrina, do you recognize this photograph?

14   A.  Yes.

15   Q.  What is it?

16   A.  That's the Target on Junction.

17   Q.  What happened while you were in this Target?

18   A.  We went to Target, and to steal clothes and stuff with

19   Jessica and Brielle, and then we ended -- I ended up getting

20   caught because I had the bag while Jessica and Aisha went to

21   purchase the stuff, and me and Brielle was walking out the

22   store, and he grabbed me and I end up getting arrested that

23   day.

24   Q.  Sabrina, I'm now showing you what has been marked as

25   Government Exhibit 1103L which is already in evidence.

J7A3KID7                      Misere - Direct

1              MS. TARLOW:  So we're just showing this to defense

2     counsel, the Court and the witness.

3     Q.  Who are the individuals in this photograph?

4     A.  Jessica in the floral dress, Brielle in the pink shirt, I

5     in the pink hat, Aisha in the gray Nike shirt.

6              MS. TARLOW:  May we publish this?  It's already in

7     evidence.

8              MR. MARGULIS-OHNUMA:  Sorry.  That was my mistake,

9     Judge.

10    Q.  Can you please describe who, based on an article of

11    clothing, is each individual you just testified about?

12    A.  Aisha, gray Nike shirt.  Jessica, pink flowery dress.

13    Brielle with the pink shirt, and I'm in the pink hat.

14    Q.  Now, turning your attention to Government Exhibit 1103F.

15    Who does this show?

16    A.  Me with the pink hat, Jessica in the corner with the blonde

17    hair, and Brielle with the pink shirt.

18    Q.  Now turning your attention to Government Exhibit 1103G.

19    Who is shown in this photograph?

20              THE COURT:  Ms. Tarlow, I think this is cumulative.

21              MS. TARLOW:  Yes, your Honor.

22    Q.  How long after you left the defendant's apartment did you

23    go to the Target?

24    A.  We walked straight to Target right after we left.

25    Q.  Did you ever see the defendant in person after you went to

1  his apartment?

2  A.  No.  After we left, no.

3          MS. TARLOW:  Your Honor, the government also offers

4  Government Exhibit 250 which is not in dispute.

5          THE COURT:  All right.

6          (Government's Exhibit 250 received in evidence)

7          MS. TARLOW:  No further questions.

8          THE COURT:  Mr. Margulis?

9          MR. MARGULIS-OHNUMA:  This is Ms. Medley's witness.

10  Just -- it's 20 to 5.  We are thinking perhaps we can start the

11  cross tomorrow.

12          THE COURT:  There's no reason why you shouldn't be

13  able to do it in 20 minutes, is there?

14          MR. MARGULIS-OHNUMA:  Okay.

15  CROSS-EXAMINATION

16  BY MS. MEDLEY:

17  Q.  Hello, Sabrina.

18  A.  Hi.

19  Q.  We've never met before today, right?

20  A.  No.

21  Q.  So, can you tell me how -- what day you first met Mr. Kidd?

22  A.  May 2017.  I know it was the middle of May.

23  Q.  The middle of May?

24  A.  Yes.

25  Q.  And tell me how you got -- tell me about how you got to the

1   apartment that day, to see him that day.

2   A.  Well, all four of us headed away from Hawthorne Cedar

3   Knolls.  We didn't have permission to leave.  We was runaways

4   at the time.  Jessica said let's go somewhere.  We originally

5   did not go to Chris Kidd house at first.  We went to someone

6   else's house, which I didn't really know.  I didn't speak to

7   him.  I was just there sitting down, and Jessica kind of got

8   mad because the guy that was there was her boyfriend, and he

9   was there with another girl.  And she was just like we're

10   leaving, and she's going to figure out somewhere else for us to

11   go that night.

12        We walked toward Eastern Parkway near the Brooklyn

13   Museum and we sat there for a while.  And she came to us and

14   was like, I have somewhere for us to stay that night.  So we

15   all pretty much following behind Jessica where to go.

16   Q.  So, you didn't take a Metro-North train to 125th Street?

17   A.  We had to take the Metro-North in order to come down from

18   upstate, Westchester County, to New York.  You have to take the

19   Metro-North train station.  But when we took the Metro-North,

20   we had to go back towards Pleasantville to get back on the

21   Metro-North to go past Hawthorne to escape the staff members.

22   Q.  But, did you then take the subway from the train station to

23   get to Brooklyn?

24   A.  Yes.

25   Q.  So Mr. Kidd didn't pick you up in his car?

J7A3KID7                         Misere - Cross

1    A.   No.

2    Q.   He didn't pick you up in a black four-door sedan?

3    A.   No.

4    Q.   At the Metro-North station?

5    A.   No.

6    Q.   And you went to another location first?

7    A.   Yes.

8    Q.   And Jessica is the one who brought you there?

9    A.   Yes.

10   Q.   Jessica?

11   A.   To both locations.

12   Q.   Jessica Bonilla?

13   A.   Yes.

14   Q.   Did she go by another name that you know of?

15   A.   At the time she told us to call her Diamond, and none of us

16   knew her real age.  We all thought she was 16.  That's the age

17   she gave us.

18   Q.   So Jessica or Diamond brought you to Mr. Kidd's apartment?

19   A.   Yes.  I never met him until that day.

20   Q.   That was the first time you met Mr. Kidd, right?

21   A.   Yes.

22   Q.   Did Jessica tell you before you went to Mr. Kidd's

23   apartment why she was bringing you there?

24   A.   She didn't inform none of us, actually.

25   Q.   When she introduced you to Mr. Kidd, did she tell him how

J7A3KID7                      Misere - Cross

1   old you were?

2   A.  She didn't tell him how old none of us was.

3   Q.  Did she tell you to tell him how old you were?

4   A.  Yes.

5           MS. TARLOW:  Objection.

6           THE COURT:  Sustained.

7   Q.  Did you tell Mr. Kidd how old you were?

8   A.  Eventually, yes.

9   Q.  When you first met Mr. Kidd, how old did you tell him you

10  were?

11  A.  The age Jessica gave me, which was 18.

12  Q.  Did you tell Mr. Kidd that you had come from Hawthorne?

13  A.  Can you repeat that?

14  Q.  Did you tell Mr. Kidd that you had come from Hawthorne?

15  A.  No.

16  Q.  When you arrived, did Jessica already know Mr. Kidd?

17  A.  Yes.

18  Q.  She was familiar with him?

19  A.  Yes.

20  Q.  They were friendly?

21  A.  Yes.

22  Q.  Did you know before you arrived at the apartment that

23  Jessica had engaged in prostitution?

24          MS. TARLOW:  Objection.

25          THE COURT:  Overruled.

J7A3KID7                          Misere - Cross

1    Q.  You can answer.

2    A.  Oh.  Yeah, I did.  But, I never knew she would take me

3    personally.

4    Q.  You never knew what?

5    A.  I did know she did it, but I didn't think she would take me

6    personally or any of us.

7    Q.  So you never saw her recruiting girls from Hawthorne?

8    A.  I've heard, but I've never seen with my eyes.

9    Q.  You heard that from other people at Hawthorne?

10   A.  Yes.

11   Q.  Were your aware of any sort of Facebook chat room related

12   to prostitution with girls at Hawthorne?

13   A.  Not --

14           MS. TARLOW:  Objection.

15           MS. MEDLEY:  I am just asking her awareness.

16   A.  No, I do not.

17   Q.  I just want to talk about when you left Mr. Kidd's

18   apartment briefly.  You said that you walked to the Target.

19   Right?

20   A.  Yes.

21   Q.  And it was about a 10-minute walk you said?

22   A.  Yes.

23   Q.  So you didn't take a bus there?

24   A.  No.

25   Q.  It wasn't a 30-minute bus ride away, right?

J7A3KID7                        Misere - Cross

1    A.  No.

2            MS. MEDLEY:  If I could have one moment.

3    Q.  So when you began your testimony, the government asked you

4    to try to identify the defendant in the courtroom; is that

5    right?

6    A.  Yes.

7    Q.  And you weren't able to identify him in the courtroom.

8    Right?

9    A.  No.

10   Q.  And then the government showed you an exhibit.

11           MS. MEDLEY:  Can we pull up, Ms. Harney, GX 1.

12   Q.  This is the exhibit that you said, this exhibit is the

13   person that you knew as Red.  Is that right?

14   A.  Yes.

15   Q.  Had you seen this photo before?

16   A.  No.  Today is the first date.

17           MS. MEDLEY:  Just one moment, your Honor.

18           MR. MARGULIS-OHNUMA:  Sorry, we just need to confer

19   about an ambiguity about some of the discovery.

20           THE COURT:  All right.

21           (Counsel conferring)

22           MS. MEDLEY:  I beg the Court's indulgence for just

23   another moment.

24           (Pause)

25           MS. MEDLEY:  Sorry for the delay.

```
 1              (Pause)

 2              MR. MARGULIS-OHNUMA:  Sorry, we're getting close.

 3              (Counsel conferring)

 4              THE COURT:  The clock is ticking.  We have another

 5     five minutes.

 6              LAW CLERK:  The witness is asking for a bathroom

 7     break.

 8              THE COURT:  Two minutes.

 9              (Witness not present)

10              MS. MEDLEY:  Your Honor, we have no further questions

11     for this witness.

12              THE COURT:  All right.

13              MS. TARLOW:  We have just one question on redirect.

14              (Witness present)

15     REDIRECT EXAMINATION

16     BY MS. TARLOW:

17     Q.  Sabrina, what did the defendant look like when you met him?

18     A.  He was chubby, long hair that was approximately down to

19     here.  Above his elbow.

20     Q.  I'm sorry?

21     A.  He was kind of chubby, and long hair, approximately right

22     above his elbow.  Long black hair.

23     Q.  You testified that you only saw the defendant on one

24     occasion; is that right?

25     A.  Yes.
```

J7A3KID7

1        MS. TARLOW:  Thank you, your Honor.  Nothing further.

2        THE COURT:  Thank you.  You may step down.  You are

3   excused.

4        (Witness excused)

5        THE COURT:  All right, we made it exactly on time.

6   5 o'clock.  Thank you for your patience and indulgence.  We

7   will resume tomorrow.  Given the amount of progress that we

8   made today, I'm going to ask that you return tomorrow at 9:30.

9   Thank you.

10        As you go home today, please again remember the

11   instructions that I've given before.  Do not discuss anything

12   about the case among yourselves or with anyone on the outside

13   or have any contact with anyone involved in case.  If any of

14   these things occur, you're directed to inform me immediately

15   and not discuss it with your fellow jurors.

16        Thank you.  Have a good evening.

17        (Jury excused)

18        THE COURT:  Thank you.  Be seated.  Let's go over what

19   remains tomorrow.  On my list I have Kris Serra, and the

20   YouTube videos.  Is there anything else?

21        MS. TARLOW:  Your Honor, just a few additional

22   exhibits that we would offer, including the defendant's birth

23   certificate.  But no further witnesses.

24        THE COURT:  All right.  Thank you.  And

25   Mr. Margulis-Ohnuma, you said you have one witness who is

J7A3KID7

1    coming for the purpose of authentication.  Is that still on?

2              MR. MARGULIS-OHNUMA:  Yes, that's correct, so she's

3    prepared to come.  Her strong preference would be to come at

4    10 a.m.  I told her to be on standby for 9 a.m.  I think with a

5    9:30 start, if she's here at 10.  She has an appointment at 9.

6    So I can tell her to be here at 10 a.m.  If we run over, you

7    may have to speak to her about the importance of returning.

8              THE COURT:  Government, how long do you expect with

9    Mr. Serra or Ms. Serra?

10             MS. TARLOW:  Approximately 20 to 30 minutes.

11             THE COURT:  That's just enough.  And has the

12   government done anything more about the YouTube issue that I

13   raised this morning?

14             MS. TARLOW:  Yes, your Honor, we have.  We've narrowed

15   down the universe of videos and portions of those videos that

16   we intend to offer.  Approximately four videos.

17             THE COURT:  And what is the universe in terms of time?

18             MS. TARLOW:  Approximately three to four minutes.

19             THE COURT:  Can you forward those to the Court so we

20   can review them?

21             MS. TARLOW:  Yes, your Honor.  We have new transcripts

22   that we'll provide the Court.

23             THE COURT:  Anything else from the government at this

24   point?

25             MR. GUTWILLIG:  We wanted to raise and ask whether

J7A3KID7

1    your Honor has reached a determination regarding the

2    reconstructed Backpage ads.

3          THE COURT:  I'm still mulling that over.  I'll be

4    looking at Judge Rakoff's case that you cited.

5          MR. GUTWILLIG:  Yes.  And your Honor, also the

6    government would note that in its motions in limine brief, the

7    point regarding the Backpage reconstructions as summary charts.

8    I believe your Honor's order referenced that in the motions in

9    limine.

10          THE COURT:  We did.

11          MR. GUTWILLIG:  We would be happy to submit any --

12          THE COURT:  I don't think we need anything more.  It's

13    one thing to assess issues based on paper, and it is another to

14    see it based on live testimony.  So that's the reason for my

15    reexamining the question.  All right.

16          Mr. Margulis-Ohnuma, do you have anything else from

17    the defendant?

18          MR. MARGULIS-OHNUMA:  Two things, your Honor.  I'm

19    sorry, I'm trying to remember.

20          With Ms. Palopolo, there was a square prior

21    inconsistent statement that I would like to prove up

22    extrinsically, since she denied it, as to whether she met the

23    defendant at Utica or at -- sorry, with Dana McLeod.  Pitkin or

24    Utica.  We can certainly do it by stipulation if the

25    government's amenable.  If not, I would have to call, I'm now

J7A3KID7

giving oral Touhy notice, I'd have to call the agent who took

the statement where she said Utica and now she said Pitkin.

I'm sure we can do it by stipulation, but they may need a

little encouragement.

MS. TARLOW:  We don't understand what the relevance is

of that point.

MR. MARGULIS-OHNUMA:  It is a prior inconsistent

statement.

THE COURT:  It's maybe inconsistent to some extent,

but she also said on the stand that, at one point she said

Utica, the other one she said Pitkin.

MR. MARGULIS-OHNUMA:  Then she corrected herself and

said Pitkin.  She denied saying Utica.  It is very important to

our case because the circumstances of their meeting --

THE COURT:  You really think this case will turn on

whether she was truthful in saying Pitkin rather than Utica?

MR. MARGULIS-OHNUMA:  I think when you tell a lie,

it's sometimes hard to keep the lie straight and that's what I

need to demonstrate.  She's gotten away with saying, no, I

never told the government that, my story's been consistent.  So

I need the agent or a stipulation, which would be the right way

to do it, just saying she told the government agents Utica.

THE COURT:  You think that's a lie rather than some

honest mistake at the time?

MR. MARGULIS-OHNUMA:  I think, look, I anticipate, I

J7A3KID7

1    could be wrong about this. I anticipate testimony on the

2    defense case saying they met via Backpage ad, not shopping.  So

3    I expect, and I don't know, I am not committing to this until I

4    have testimony for it.  But I expect that there will be -- that

5    there will be a hot dispute, a live factual dispute that has to

6    be resolved based on credibility about whether they actually

7    met on the street or whether she answered a Backpage ad.

8         So if that's the case, the fact that she dissembles

9    and couldn't get her story straight from when she spoke to the

10   FBI to when she testified in court, and actually went back and

11   forth in court, is evidence that she was making that up.  So

12   yeah, I do think this is an important dispute.

13        I also, I think, I'm sorry, I just think this is a

14   traditional area where a simple stipulation saying, you know, I

15   forget the name of the agent, but the name of the agent, if

16   called to testify, would say that Dana McLeod on the date of

17   the meeting said that she -- and then we'll quote the report.

18   It is in a typed report, so it's nice and clean.

19        THE COURT:  If you believe the parties can work this

20   out by stipulation, make an effort to do so.  If you do not,

21   then we'll revisit the question as to whether this is

22   sufficiently material that requires extrinsic evidence.

23        MR. MARGULIS-OHNUMA:  They're not going to stipulate

24   unless you ask them to.

25        THE COURT:  I am asking them to sit down with you.

J7A3KID7

1          MR. MARGULIS-OHNUMA:  I'm sorry.

2          THE COURT:  I am asking the government and you to sit

3     down and see whether there may be a way of resolving the matter

4     by stipulation.  If you cannot, then we'll discuss it again

5     tomorrow.

6          MR. MARGULIS-OHNUMA:  Okay.  So then the other live

7     issue is that we have delivered Touhy notice formally as the

8     government asked for, for Agent Gander's testimony.  I think --

9     and I'm prepared now that the government's case has largely

10    come in, to give further detail about what we want Agent Gander

11    to testify about.

12          If I could do that orally and not have to submit

13    another letter, the government would be okay with that, we

14    could just get it done right now, and if you need to rule, you

15    can rule.

16          THE COURT:  Ms. Tarlow?

17          MS. BRACEWELL:  Your Honor, we would request, even if

18    the defense wants to put it on the record orally, which would

19    be very helpful, we would also request a written statement of

20    the testimony.  It is also for agency approval so we can pass

21    it on to the necessary person at the FBI to approve sign off of

22    any testimony from their agents.

23          THE COURT:  Thank you.

24          MR. MARGULIS-OHNUMA:  Respectfully, the Constitution

25    trumps those regulations.  We have a right to put on a case.

J7A3KID7

1    Insisting on formal Touhy notice is really a novel -- are we

2    going to leave the jury out for a couple days while the agency

3    makes up their mind?

4              MS. BRACEWELL:  Just to push back, Touhy has been

5    upheld.  It is not in doubt that the regulations require a

6    written summary of the statement.  We gave them notice on

7    Sunday, hours after they provided their Touhy notice, of what

8    was inadequate about it.  We asked them to supplement it and

9    explained how it could be supplemented.

10             We are not trying to interfere with their ability to

11   put on a defense, but they need to comply with the regulations.

12             MR. MARGULIS-OHNUMA:  There is no question that Touhy

13   is good law.  It is just that the Southern District of New York

14   United States attorney's office typical policy is to waive the

15   right, because they don't want to inconvenience courts and

16   juries to insist on this in order to protect the Constitutional

17   rights of the defendant.  So, yeah, we'll put in a letter.

18   That's fine.  But I think that Agent Gander should be prepared

19   to testify tomorrow at about 10:30 a.m.  So if there is really

20   going to be a decision, a meaningful decision by the FBI at the

21   levels required before 10:30 a.m., then sure, we'll put in a

22   letter, if that will be helpful to Ms. Bracewell.

23             THE COURT:  Why don't we begin with the first step of

24   you to give a proffer of what you are seeking from the agent.

25             MR. MARGULIS-OHNUMA:  So, this morning, Ms. Brown, the

J7A3KID7

analyst, testified that while she had reviewed the devices as a

general matter, she was told what was relevant by Agent Gander.

So what I would like to do is have Agent Gander testify about

the scope of his review of those 22 devices.  He is the person

that looked at all of them.  To put in context the material

that's been pulled out, based on the universe of devices.  By

the way, many of which we haven't received yet.  We put in

another request this morning.  But, at least we can inform the

jury via Agent Gander about the universe of it.

          By the way, again, the government has been in

possession of these devices for nine months.  They've had every

opportunity, I'm sure Agent Gander has been extremely diligent

and there was a thorough search.  I would like to bring that

out so the jury knows that the scope of what was looked at.

          THE COURT:  All right.  Thank you.  Ms. Bracewell.

          MS. BRACEWELL:  Yes, as I'm sure will be ultimately

instructed to the jury, the government's investigation is not

on trial.  How Agent Gander identified relevant information is

really beside the point.  It is a distraction to the jury.

          Also, just to clarify the record, we have been in

possession of the items, the seized devices since the

defendant's arrest on December 12.  But the search warrant was

obtained on March 22 of this past year.  And as I'm sure your

Honor remembers, it took us several months to get into the

devices.

J7A3KID7

1    So we've been in possession of the content since late

2    May and early June for most of the devices.  And as recently as

3    several weeks ago have been obtaining additional content.

4    So we've been endeavoring to make it available to the

5    defense as rapidly as our IT and everyone else is able to do

6    so.  And as we put on the record numerous times, the trial date

7    was the defendant's choice.

8    So just to make very clear the status of discovery,

9    we've turned over everything we have.  We got an e-mail moments

10   before the trial day began about certain items they don't yet

11   have.  We'll endeavor to resolve any inconsistencies with what

12   they have and what we've provided.

13            MR. MARGULIS-OHNUMA:  So the remedy for the

14   government's delay until May to get the search warrant --

15   March, I'm sorry.  To get the search warrant is Agent Gander is

16   the only one who has seen it all.  And he'll testify in a

17   general matter, it will be about 10 minutes of testimony about

18   what all is in there besides the stuff they've highlighted.

19   That's all we're looking for.

20            THE COURT:  Yes, Ms. Bracewell.

21            MS. BRACEWELL:  Yes.  So I think, again, I don't know

22   what the universe of data on the devices, what relevance that

23   has to the evidence, the relevant evidence of the defendant's

24   guilt.  So, having an agent testify about his process of

25   executing the search warrant is really irrelevant to the jury.

J7A3KID7

1   I don't see who how it goes to anything but the government's

2   investigation methods.  And we already heard from Porsche Brown

3   that she has pulled these specific items and exhibits from the

4   devices that are in evidence.  So the authentication of

5   relevant evidence is the only portion that's relevant to the --

6         THE COURT:  Thank you.  If you can work out a

7   stipulation by Mr. Margulis-Ohnuma, you're indicating that

8   you're going to prepare the Touhy letter.  So, prepare that.

9   And then we'll revisit the issues on where you are first thing

10  in the morning.  The jury was called for 9:30, so we should

11  meet here at 9 o'clock so we can go over the open items.  All

12  right?

13        MR. MARGULIS-OHNUMA:  Just if I have one moment, your

14  Honor.  Nothing further, your Honor.  Thank you very much.

15        THE COURT:  Just one other reminder,

16  Mr. Margulis-Ohnuma, that you and your client at the beginning

17  of the trial acknowledged that you do not have, or you have not

18  seen all of the evidence in this case.  You have not had a

19  chance to review everything that the government has given you.

20  And you chose to proceed, notwithstanding.

21        MR. MARGULIS-OHNUMA:  Correct.  And --

22        THE COURT:  This is part of where it's coming home to

23  roost.

24        MR. MARGULIS-OHNUMA:  I agree.  But I think Agent

25  Gander is sitting in the courtroom, he is available, and he can

J7A3KID7

1    remedy the problem with that just by giving us the scope of

2    what was seized.

3             THE COURT:  That assumes that there's a problem, and I

4    am not persuaded there's a problem.

5             MR. MARGULIS-OHNUMA:  He is the case agent.  I don't

6    know.  All of a sudden they start not calling case agents.  Up

7    to a couple years ago, they would always call the case agent.

8             THE COURT:  That's the government's strategic choice

9    in the same way you make strategic choices for your client.

10   Thank you.

11            MR. MARGULIS-OHNUMA:  Thank you.

12            (Adjourned until July 11, 2019 at 9 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     SHARON COOPER

4    Direct By Mr. Gutwillig . . . . . . . . . . 326

5    Cross By Mr. Margulis-Ohnuma . . . . . . . . 346

6    Redirect By Mr. Gutwillig . . . . . . . . . 356

7    Recross By Mr. Margulis-Ohnuma . . . . . . . 359

8    PORSCHE BROWN

9    Direct By Ms. Tarlow . . . . . . . . . . . . 360

10   Cross By Mr. Margulis-Ohnuma . . . . . . . . 388

11   Redirect By Ms. Tarlow . . . . . . . . . . . 391

12    ARIELA PALOPOLO

13   Direct By Ms. Bracewell . . . . . . . . . . 392

14   Cross By Mr. Margulis-Ohnuma . . . . . . . . 433

15   Redirect By Ms. Bracewell . . . . . . . . . 443

16   Recross By Mr. Margulis-Ohnuma . . . . . . . 446

17   Redirect By Ms. Bracewell . . . . . . . . . 448

18    DANA LEONTEN McLEOD

19   Direct By Ms. Tarlow . . . . . . . . . . . . 449

20   Cross By Mr. Margulis-Ohnuma . . . . . . . . 495

21   Redirect By Ms. Tarlow . . . . . . . . . . . 531

22   Recross By Mr. Margulis-Ohnuma . . . . . . . 533

23

24

25

```
1    SABRINA MISERE

2    Direct By Ms. Tarlow . . . . . . . . . . . . 534

3    Cross By Ms. Medley  . . . . . . . . . . . . 548

4    Redirect By Ms. Tarlow . . . . . . . . . . . 554

5

6                      GOVERNMENT EXHIBITS

7    Exhibit No.                             Received

8     1200   . . . . . . . . . . . . . . . . . . 365

9     1201 through 1203  . . . . . . . . . . . . 367

10    1230, 1235, 1239 and 1345  . . . . . . . . 368

11    1231, 1236, 1240 and 1346  . . . . . . . . 370

12    1232, 1237, 1241 and 1347  . . . . . . . . 371

13    1204M through 1206M, 1230M through  . . . . 372

14          1232M, 1235M through 1237M and

15          1345M through 1347M

16    1233, 1234, 1242 and 1348  . . . . . . . . 376

17    1233M, 1234M, 1242M and 1348M  . . . . . . 376

18    1208 through 1211 and 1226  . . . . . . . . 378

19    1252, 1257 through 1258, 1260 through 1261  379

20    1262 through 1283  . . . . . . . . . . . . 380

21    1285 through 1287, 1290 through 1292   . . . 381

22    1294, 1298 through 1305, 1350, 1353  . . . . 387

23    1355, 1356, 1361 through 1370  . . . . . . 387

24    254  . . . . . . . . . . . . . . . . . . . 403

25    227  . . . . . . . . . . . . . . . . . . . 470
```

1   242, 244   . . . . . . . . . . . . . . . . . 475

2   2A   . . . . . . . . . . . . . . . . . . . 535

3   5   . . . . . . . . . . . . . . . . . . . . 539

4   3   . . . . . . . . . . . . . . . . . . . . 539

5   700   . . . . . . . . . . . . . . . . . . 540

6   251   . . . . . . . . . . . . . . . . . . 546

7   250   . . . . . . . . . . . . . . . . . . 548

8

9                         DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11   C   . . . . . . . . . . . . . . . . . . . 509

12

13

14

15

16

17

18

19

20

21

22

23

24

25