J7BTKID1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        18 CR 872 (VM)

5   LLOYD KIDD,

6              Defendant.

7   ------------------------------x

8                                   New York, N.Y.
                                    July 11, 2019
9                                   9:00 a.m.

10

    Before:
11
                     HON. VICTOR MARRERO,
12
                                         District Judge
13

14                      APPEARANCES

15  GEOFFREY S. BERMAN
        United States Attorney for the
16      Southern District of New York
    MOLLIE BRACEWELL
17  ELINOR TARLOW
    JACOB GUTWILLIG
18  SAGAR RAVI
        Assistant United States Attorneys
19
    ZACHARY MARGULIS-OHNUMA
20  VICTORIA MEDLEY
        Attorneys for Defendant
21
    ALSO PRESENT:  USAO Paralegal Specialist Hannah Harney
22  Defense Paralegal Specialist Sophia Lattanzio
    Special Agent Brian G. Gander, FBI
23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

J7BTKID1

1          (Jury not present)

2          THE COURT:  Good morning.  We have a number of open

3   items from yesterday I would like to address before the jury is

4   called in.  In addition, we've prepared a draft of the jury

5   instructions, which I will distribute probably this morning.

6   My view of where matters stand is that we should be able to

7   conclude the evidentiary portion of the case sometime this

8   morning and that would leave the afternoon to go over the

9   instructions at least once, possibly twice.

10          Now we could do two things, we could adjourn after the

11  evidentiary portion and give you a little bit of time to review

12  the instructions in a general way, so at least you know it's

13  there, to the extent it may bear on your closing arguments, and

14  then proceed to closing arguments towards the latter part of

15  the day.  I'm sure that you're cringing at that.

16          Alternatively, we could send the jury home after the

17  evidentiary portion and tell them to come back tomorrow morning

18  first thing, have the closing arguments first thing in the

19  morning and then proceed to the jury instructions towards the

20  middle of the morning, but the way I see it, there's no reason

21  why this case should prolong much longer than today.

22          Now in terms of what's left open, we had the YouTube

23  clips, which the Court reviewed, and I'm satisfied that the

24  edits that the government made address in substantial ways the

25  concerns that I had with the earlier version.

J7BTKID1

1        We also had an exhibit audio clip 1272, which I have

2    listened to, and my question to the government on that score is

3    what is the context for that particular clip?  Where does it

4    come in?  Is it part of the YouTube evidence and offered for

5    the same purpose, or is it tied to something somewhere else in

6    the trial?

7        MS. BRACEWELL:  Yes, your Honor, so the audio, the

8    particular audio file that's marked 1372 was found on one of

9    the defendant's devices, actually on several of the devices.

10   It's not, as we understand it, content from the YouTube channel

11   or related to that, as it precedes it in date, it's from the

12   fall of 2013.

13       In our view it's relevant because of the defense is

14   argument --

15       THE COURT:  Sorry, fall of 2013?

16       MS. BRACEWELL:  '13, that's correct.

17       In our view it's relevant because of the defense

18   argument that the Chris Kidd persona is fictional, and that his

19   view of women and views he articulates on the YouTube videos is

20   somehow separate and apart from his daily life and the views

21   which he sort of operates on a daily basis.  So this

22   apart-from-YouTube content, as we understand it, precedes it,

23   is relevant so that we can understand how the defendant

24   interacted with women, and it corroborates what we heard from

25   the victims.  It's consistent with what they said about how

J7BTKID1

1    they were treated by the defendant.

2              THE COURT:  Mr. Margulis.

3              MR. MARGULIS-OHNUMA:  Judge, briefly.  So it's a

4    random thing they found in his apartment.  I don't know where

5    they're getting the 2013 date from, I don't think there's

6    evidence to that effect, I don't think we had that metadata

7    offered with respect to it, but I'm taking them at their word.

8              Even so, we don't know what it is.  It's something

9    they found on his computer.  We don't know if he's standing in

10   a room practicing for YouTube or something else.  It's more

11   character assassination and doesn't add anything to their case.

12   It's just prejudicial.  There's no reason to have it.

13             THE COURT:  All right.  I am going to allow the

14   YouTube clips as edited and the 1372 audio statement as well,

15   but it would need to be put in some kind of context,

16   Ms. Bracewell.

17             MS. BRACEWELL:  Understood, your Honor.

18             THE COURT:  Now we also have the other question that

19   has been turning over this case, which is the summary charts.

20   I had occasion to review the debate or dispute before Judge

21   Rakoff on the same issue.  I found it remarkable, and believe

22   it or not, Judge Rakoff and I did not consult on this matter

23   before I raised the issues, but I was curious that Judge Rakoff

24   has the same reactions and the same concerns about the summary

25   chart that I raise.  I am aware that ultimately he agreed to

J7BTKID1

1    allow it, although he did not put on the record any formal

2    analysis or formal ruling.  There may be some possible

3    differences between the circumstances in the charts that were

4    before Judge Rakoff and those that are here that might

5    conceivably lead to a different result.

6          In order to address those remaining concerns, what I

7    am going to do is have further discussion with the parties

8    after the jury is out, after the jury goes home today,

9    probably, and see if we can elaborate and clarify and answer

10   some of the remaining questions that I have.  It may be

11   possible or it may be necessary to call the FBI agent back, as

12   in fact occurred when Judge Rakoff considered this issue, in

13   order to have the Court pose the questions that continue to

14   remain open.

15         THE COURT:  Is Agent Uitto available, if necessary?

16         MS. BRACEWELL:  Your Honor, Agent Uitto is based in

17   Idaho.  We could check and see where he is now.  Our

18   understanding is he traveled back.  He might be available

19   telephonically if the Court has questions that don't require

20   him to take the stand, but we can find that out this morning.

21         THE COURT:  Why don't you find out.

22         So that is my agenda for this morning.  Do the parties

23   have any questions or issues that they wish to raise?

24         MR. MARGULIS-OHNUMA:  The defense last night, after

25   our discussion after Court, sent two versions of a proposed

J7BTKID1

1 stipulation regarding the prior inconsistent statement of Dana

2 McLeod.  There was some back and forth.  I don't know where the

3 government came out, if they would agree to the stipulation or

4 not, but if not, I ask that they be heard on it.

5    THE COURT:  Ms. Bracewell?

6    MS. BRACEWELL:  As discussed last night, our position

7 on the stipulation is that the inconsistency that defense

8 counsel has identified is simply not material.  In the event

9 that the Court disagrees, we would be willing to stipulate.  We

10 did want to add to the stipulation certain prior consistent

11 statements made by Ms. McLeod, but other than that, we have no

12 objection in principle to stipulating.

13    MR. MARGULIS-OHNUMA:  There's no basis for a prior

14 consistent statement unless you have shown a charge of recent

15 fabrication or improper motive, and I'm not sure what that

16 would be.

17    MS. BRACEWELL:  I think the implication is she

18 misrepresented her testimony here, and that the fact that she

19 made prior consistent statements that she met him on Pitkin

20 rather than Utica is corroborative of the fact this might be an

21 innocent mistake.

22    MR. MARGULIS-OHNUMA:  I have no problem with that

23 then.

24    THE COURT:  Work that out.

25    MR. MARGULIS-OHNUMA:  Well, I think we need a ruling,

J7BTKID1

1   because they are saying they won't stipulate unless you force

2   them to.

3           MS. BRACEWELL:  To be clear, that's not what we're

4   saying.  We will stipulate if it's determined to be material.

5           MR. MARGULIS-OHNUMA:  So we need a determination.

6   We're at loggerheads over this, if it's material or not.

7           THE COURT:  If you're asking me to rule on whether

8   that alleged inconsistency is material, my view and ruling will

9   be that it's not material, especially because of the fact that

10  the witness was here and at one point she said Utica.  You may

11  remember this precisely, it's in the record, and she was then

12  confronted.

13          I was going to point out to her that she said Utica,

14  and then she basically said no, I didn't say Utica, I said

15  Pitkin.  And later in the same testimony, when she was asked

16  again where was it, she said Pitkin.  So in that space of a few

17  sentences she was on both sides of the issue.  To me, it's not

18  inconceivable that she could have made a mistake and had Utica

19  in mind at the time that the interview took place with the FBI,

20  in the same way that she made a mistake here, and was not even

21  aware that she made a mistake.  And then without being aware

22  she had made a mistake -- well, when called to the fact that

23  she had said Utica, she said no, I didn't say Utica.  To me,

24  that's evidence of confusion, not evidence of someone lying.

25          MR. MARGULIS-OHNUMA:  So they can argue that.  The

J7BTKID1

1    evidence of the lying is that weeks ago she said Utica without

2    any back and forth.  Without any changing herself, she said

3    Utica.

4             THE COURT:  Mr. Margulis-Ohnuma, you're taking the FBI

5    notes of an interview as if it were what happened here under

6    oath subject to cross-examination.  How do we know that the FBI

7    heard her correctly?

8             MR. MARGULIS-OHNUMA:  That's what I would like to call

9    the witness to testify to, but I'm willing to stipulate to keep

10   it simple.  So the point is that she's gotten confused about

11   what lie to tell over a period of time, and I want to argue

12   that.  As the record is now --

13            THE COURT:  Sorry, Mr. Margulis-Ohnuma, to interrupt,

14   but I think you're over-characterizing what happened.  I think

15   it was probably confusion, mistake.  I do not think it's

16   material.  So you want my ruling on whether it's material,

17   that's what it would be.

18            On the other hand, if you wish to stipulate to

19   something that responds to your concern, I'm willing to

20   consider a stipulation.

21            MR. MARGULIS-OHNUMA:  Again, I can't stipulate unless

22   the government will, and if you rule it's not material, it's

23   not material.

24            THE COURT:  The government said they're prepared to

25   stipulate to something.  Let's see when you can work out with

J7BTKID1

1     them.

2              MR. MARGULIS-OHNUMA:  Maybe you could clarify.  I

3     think they said that they won't unless the materiality ruling

4     goes my way, which it hasn't.

5              (Pause)

6              MR. MARGULIS-OHNUMA:  Counsel informs me she's happy

7     to discuss it.

8              MS. BRACEWELL:  We'll discuss if there --

9              THE COURT:  Let's see if you can come up with some

10    form of stipulation.

11             MS. BRACEWELL:  Your Honor, we have answer incident to

12    bring to your attention.  This relates to the discussion on

13    Monday morning of improper contact with the witnesses in

14    violation of the protective order.

15             We learned earlier this morning that the defense

16    investigator also contacted Ms. Palopolo's husband or the

17    father of her child on Sunday.  We just learned about it this

18    morning.  We're still gathering information.  From reviewing

19    the confidential materials that were produced on July 5th, we

20    understand that this phone number was included in those items,

21    the phone number for Ms. Palopolo's baby's father.

22             He received a message from the defense investigator,

23    returned the phone call.  We understand he spoke to a female

24    that was at the number that had been left for him.  In the

25    course of that communication it was disclosed to him that

J7BTKID1

1    Ms. Palopolo was involved in a trafficking or prostitution

2    case.  And so we just learned about it, but we bring to your

3    attention that we view this as a separate violation of the

4    protective order that transpired on Sunday.

5            This contact, too, it be clear, all took place on

6    Sunday.  As we get additional information, we're trying to

7    speak to him, we'll, of course, update the Court.

8            THE COURT:  Mr. Margulis-Ohnuma?

9            MR. MARGULIS-OHNUMA:  Because this is the first I'm

10   hearing of the government's complaint about our investigation,

11   I haven't researched it.

12           The call that she's talking about was an attorney call

13   with Ms. Palopolo's husband and the private investigator on the

14   line.  I don't know, as we sit here today, where we got the

15   contact information from.  I thought we had dug that up

16   ourselves, but I'm not sure.  It was not in the same -- we did

17   examine the communications with respect to the numbers for the

18   two victims, and that was what we discussed before, it wasn't

19   in that communication, but we would have to figure out where it

20   was.

21           In any case, the assertion that we disclosed her

22   involvement in the case I think is immaterial in the sense

23   that -- I think Ms. Medley discussed that with him in terms of

24   giving him context of why we were interested in interviewing

25   him.  And he was well aware of it, because there's a long line

J7BTKID1

1    of text messages that Ms. Palopolo forwarded to the government

2    where she's kind of showing off about how she's involved in the

3    biggest takedown of pimps in ten years in New York or something

4    like that.  So we weren't telling him anything new, we were

5    telling him what our role was.

6          I don't think this is something that requires further

7    attention of the Court or the parties.  Now that the evidence

8    is in, and if we decided to use Mr. -- we're not using the

9    individual's statements to us, and we didn't use them in

10    cross-examining Ms. Palopolo.

11          I am happy to talk to the government about what

12    happened, there's not this issue anymore of revealing defense

13    strategy.

14          THE COURT:  Well, I wish you would, Mr. Margulis,

15    because there is a concern, given the timing, given who the

16    witnesses were, and reaching out to third parties, disclosing

17    or discussing information that is of a personal nature at some

18    point begins to walk towards the line of interfering with

19    witnesses.  So I think you should be very careful to the extent

20    that Mr. Lassalle is still out there pounding evidence.

21          MS. MEDLEY:  Your Honor, I want to speak briefly on

22    this because I was on the call.  It was an attorney call.  We

23    had our investigator on the line because I was interviewing

24    someone who we were considering to be a witness at the time, so

25    I was following up on his investigation.

J7BTKID1

1          I didn't disclose that she was involved in this case.

2     She had already previously disclosed that.  I asked him if he

3     was aware if she was involved in this case.  And I had to ask

4     him if she was aware of when Ms. Palopolo was living with

5     Mr. Kidd, if Ms. Palopolo ever said that Mr. Kidd was violent

6     towards her.  These were really important questions that we had

7     to ask at the time.  So I really don't think any improper

8     occurred.

9          And as far as the timing is concerned, the government

10     didn't disclose a lot of this information to us until July 5.

11     So the fact that we're contacting these people right before

12     they're testifying is because we had no ability to do so before

13     then.

14          THE COURT:  All right.  Ms. Bracewell?

15          MS. BRACEWELL:  Yes, we would ask if the call were

16     recorded, and if it were, if it could be disclosed.

17          Our understanding, and we're happy to hand up a page

18     of the 3500, the confidential information that included

19     Ms. Palopolo's ex-boyfriend's information, says, and I'm

20     quoting, "Okay, please don't tell him I'm a hooker though."

21          As I think the 3500 and her testimony made very clear,

22     he was not aware of the nature of her work, and making a

23     disclosure or having a discussion with him on the eve of trial

24     about the fact that she was involved in prostitution, when

25     there is information that she's in an ongoing custody dispute

J7BTKID1

1     that is also apparent on the face of the 3500, is just of

2     tremendous concern.

3               I'm not saying this has to be addressed today in the

4     middle of the trial, and obviously we would like to gather more

5     information, but to the extent there's a recording of that

6     call, we ask for it to be disclosed to us but also to the

7     Court, because I think the nature of that communication of is

8     critical importance.

9               THE COURT:  Ms. Medley, was that call recorded?

10              MS. MEDLEY:  I'm not aware if it was or not.

11              THE COURT:  Find out from Mr. Lassalle.  Is

12     Mr. Lassalle the one who recorded the previous conversation,

13     the one that we had earlier in the week?

14              MS. MEDLEY:  Yes, your Honor, but that was a call with

15     just him and another person, this was a call with me and --

16              THE COURT:  Who initiated the call?

17              MS. MEDLEY:  I initiated the call.

18              THE COURT:  Would Mr. Lassalle have had the ability --

19     were you with Mr. Lassalle at the time that the call was

20     initiated?

21              MS. MEDLEY:  No, I called Mr. Lassalle to get him on

22     the line so he could take the notes, and then I called the

23     potential witness.

24              THE COURT:  Would he have had the ability to record

25     the call from where he was from the phone that he was reached

J7BTKID1

1     at?

2              MS. MEDLEY:  He may have.  Again, I'm not aware.  I'm

3     happy to ask him.

4              THE COURT:  Why don't you find out.

5              MS. MEDLEY:  Yes, your Honor.

6              THE COURT:  Anything else?

7              Let's bring out the jury.

8              (Jury present)

9              THE COURT:  Good morning.  Thank you.  Welcome back.

10    I appreciate that you're all here on exactly the designated

11    time.  Thank you.

12             Before we begin let me give you the sense of where we

13    are now on the schedule.  If all goes well, it is possible that

14    the evidentiary portions of the case will be concluded probably

15    by the lunch hour today.  If that comes about, I will probably

16    adjourn the trial at that time, you can go home.  I will then

17    probably resume tomorrow morning.

18             Again if all goes well, we resume with the two sides

19    presenting their closing arguments.  That will probably take

20    the first hour and a half or so of the morning, then I will go

21    directly into the presentation of the jury instructions.  That

22    will probably take somewhere around two hours.  And on that

23    schedule, you would get the case for your deliberations

24    starting sometime tomorrow around the lunch hour.

25             So I will keep you posted if any material differences

J7BTKID1                          Serra - Direct

1    come up with that schedule.

2              Government, next witness?

3              MR. GUTWILLIG:  Your Honor, briefly, before calling a

4    witness, the government would like to offer a handful of

5    exhibits and not publish that we believe are not in the

6    dispute.

7              THE COURT:  All right.

8              MR. GUTWILLIG:  Government Exhibit 8, Government

9    Exhibit 703, and Government Exhibit 505.

10             THE COURT:  Those are admitted without objection.

11             (Government's Exhibits 8, 703 and 505 received in

12   evidence)

13             MR. GUTWILLIG:  And the government calls Special Agent

14   Kris Serra.

15    KRISTOPHER SERRA,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. GUTWILLIG:

20   Q.  Good morning, Special Agent Serra.

21   A.  Good morning, sir.

22   Q.  Where do you work?

23   A.  I work at the Federal Bureau of Investigation, the FBI.

24   Q.  What is your title?

25   A.  I am a special agent.

1  Q.  How long have you been a special agent with the FBI?

2  A.  I have been a special agent since January of 2015.

3  Q.  Prior to that where did you work?

4  A.  I worked as an FBI analyst for the cyber division, and

5  prior to that I worked with the United States Secret Service.

6  Q.  Are you assigned to any particular unit with the FBI?

7  A.  I am.

8  Q.  And what unit is that?

9  A.  I'm assigned to the violent crimes against children

10  section.

11  Q.  And just briefly, could you please describe the types of

12  cases you typically handle?

13  A.  Of course, we deal with cases involving primarily child

14  pornography or sexual interactions with minors.

15  Q.  Special Agent Serra, in the course of your duties have you

16  participated in the execution of search warrants?

17  A.  I have.

18  Q.  And just approximately how many?

19  A.  I would say a few dozen.

20  Q.  Agent Serra, directing your attention to December 12 of

21  2018, were you involved in an arrest that day?

22  A.  I was.

23  Q.  Of whom?

24  A.  Of Mr. Kidd.

25  Q.  Do you see Mr. Kidd in the courtroom?

J7BTKID1                          Serra - Direct

1    A.  Yes.

2    Q.  And where was Mr. Kidd arrested?

3    A.  In his residence.

4    Q.  And what was your role in the arrest?

5    A.  In the arrest I was part of the entry team.

6    Q.  And just backing up for a moment, where was Mr. Kidd

7    arrested?

8    A.  I do not recall his residence.

9    Q.  Is there something that would refresh your recollection?

10   A.  Yes, any reports from that day would refresh it.

11          MR. GUTWILLIG:  Your Honor, may I approach?

12          THE COURT:  Yes.

13   Q.  Have you had a chance to review what I just handed you?

14   A.  I have.

15   Q.  Does that refresh your recollection of where Mr. Kidd was

16   arrested?

17   A.  I recall -- I thought you meant within his residence.  I

18   remember the address.

19   Q.  What is the address?

20   A.  9529 Church Avenue, Apartment C2A in Brooklyn, New York.

21   Q.  And you mentioned you were part of the entry team, is that

22   correct?

23   A.  That's correct.

24   Q.  What were your responsibilities as part of the entry team?

25   A.  My responsibility is just to go into the house and search

1   rooms making sure there's no people or weapons or anything that

2   is going to hurt us while we're effecting the arrest.

3   Q.  And did you identify any people during the arrest?

4   A.  I did.

5   Q.  And who, if anyone, did you identifying?

6   A.  We identified a woman in a room who identified herself as

7   the wife of the defendant.

8   Q.  Agent Serra, did you participate in the search that day?

9   A.  I did.

10  Q.  And what did you search?

11  A.  Two safes within the apartment.

12  Q.  Where were the safes located within the defendant's

13  apartment?

14  A.  They were located in what appeared to be the defendant's

15  bedroom.

16  Q.  Did you search those safes pursuant to a search warrant?

17  A.  I did.

18  Q.  And what was your role with respect to the search of the

19  safes?

20  A.  I was officially the search team leader.

21  Q.  And what are the responsibilities of a search team leader?

22  A.  A search team leader assigns roles in the search, we handle

23  the administrative paperwork such as the evidence, logging who

24  was present at the search warrant, we collect everything, and

25  then we memorialize it within a report.

J7BTKID1                        Serra - Direct

1    Q.  Have you received training with respect to evidence

2    collection?

3    A.  Yes.

4    Q.  Did other law enforcement officials assist you in searching

5    the safes?

6    A.  They did.

7    Q.  But as team leader, you're responsible for the search, is

8    that correct?

9    A.  That's correct.

10   Q.  Agent Serra, as part of that search did you or other

11   members of law enforcement who assisted with the search also

12   take pictures of the contents of the safe?

13   A.  Yes.

14        MR. GUTWILLIG:  May I approach, your Honor?

15        THE COURT:  Yes.

16   Q.  Agent Serra, I'm handing you what is marked for

17   identification as Government Exhibits 220, 222 through 241.

18   Would you please take a moment and flip through and look up

19   when you're finished.

20        And Agent Serra, do you recognize the contents of what

21   I just handed you?

22   A.  I do.

23   Q.  And what are they?

24   A.  These are items that were retrieved from the safe.

25   Q.  Are those photographs fair and accurate representations of

J7BTKID1                         Serra - Direct

1    the items that were seized from the safe?

2    A.  Yes, they are.

3              MR. GUTWILLIG:  Your Honor, at this time the

4    government offers Government Exhibit 220, Government

5    Exhibit 222 through 226, and 228 through 241.  My understanding

6    is these are not in dispute.

7              THE COURT:  Received.

8              (Government's Exhibits 220, 222 through 226 and 228

9    through 241 received in evidence)

10   BY MR. GUTWILLIG:

11   Q.  Agent Serra, generally what types of items were seized?

12   A.  Generally digital evidence, so envelopes, money, what

13   appeared to be marijuana, BB guns, a weapon.

14   Q.  When you say a "weapon," what do you mean?

15   A.  A gun, a revolver.

16   Q.  In preparation for your testimony today, did you review

17   each of the items that were seized from the safe?

18   A.  I did.

19   Q.  And did you confirm that those were in fact the items

20   seized from the safe?

21   A.  Yes, I did.

22             MR. GUTWILLIG:  May I approach, your Honor?

23             THE COURT:  Yes.

24   Q.  Agent Serra, I just handed you exhibits that are marked for

25   identification as Government Exhibit 100, 100A, 101, 102 -- 100

1    through Government Exhibit 114, and Government Exhibits 117 and

2    118.  Would you please familiarize yourself with the contents

3    of those and look up when you had a chance?

4    A.  Yes.  May I stand?

5    Q.  Yes.

6              Have you had a chance to review the contents?

7    A.  Yes.

8    Q.  Are those the items that were seized from the safes?

9    A.  Yes.

10   Q.  And are they generally in the same condition in which they

11   were seized from the safes?

12   A.  Yes.

13             MR. GUTWILLIG:  Your Honor, at this time the

14   government offers Government Exhibits 100 through 115 -- 100

15   through 114, 117 and 118.  I understand that Government

16   Exhibits 105 through 114 and 117 are not in dispute.

17             THE COURT:  All right.

18             MR. GUTWILLIG:  With respect to Government

19   Exhibit 100, 101, 102 and 103 and 104, I understand those are

20   in dispute.

21             MR. MARGULIS-OHNUMA:  I think the Court resolved the

22   dispute.

23             THE COURT:  All right.

24             (Government's Exhibits 100 through 114, 117 and 118

25   received in evidence)

J7BTKID1                          Serra - Direct

1    Q.  Special Agent Serra, could you please remove what's marked

2    as Government Exhibit 112.

3    A.  Yes.

4    Q.  Could you please remove it from the bag.

5           Do you recognize that item?

6    A.  I do.

7    Q.  And what is it?

8    A.  There is an external hard drive.

9    Q.  Could you please -- external hard drive you seized from one

10   of the safes, correct?

11   A.  Correct.

12   Q.  Could you please turn to the back and read the manufacturer

13   on the hard drive?

14   A.  It reads:  Product of Malaysia.

15   Q.  Thank you.

16          MR. GUTWILLIG:  Ms. Harney, could you please publish

17   what's in evidence as Government Exhibit 230.

18   Q.  Agent Serra, could you please describe what's depicted in

19   the photo?

20   A.  What's depicted is four what appear to be guns, I believe

21   and them to be BB guns, and two packages, one of which

22   containing a green leafy substance.

23   Q.  And were these items that were seized from the safe?

24   A.  Yes.

25   Q.  And Special Agent Serra, could you please grab Government

J7BTKID1                        Serra - Direct

1   Exhibit 117.

2   A.  Yes.

3   Q.  Agent Serra, I'm handing you what is in evidence as

4   Government Exhibit 117.  Could you please remove the contents

5   of that?

6           Please hold them up so you are jury could see.

7           What are those?

8   A.  These are envelopes with what appear to be names written on

9   them.

10  Q.  Hold them up.

11          Those were seized from the safe, is that correct?

12  A.  That is correct.

13          MR. GUTWILLIG:  May I approach, your Honor?

14          THE COURT:  Yes.

15  Q.  Agent Serra, I handed you one of the envelopes that's in

16  evidence as Government Exhibit 117.  Could you please read the

17  name on that envelope?

18  A.  Totya.

19  Q.  Could you please hold it up for the jury.

20          Agent Serra, could you please remove Government

21  Exhibit 118.  And could you please take that out of the bag.

22          Agent Serra, if you wouldn't mind leaving it in the

23  bag for now.  Sorry.  If you hold it up and display it to the

24  jury, please.

25          What is that?

J7BTKID1                         Serra - Cross

1    A.  This is the green leafy substance that appears to be

2    marijuana.

3    Q.  And Agent Serra, if you wouldn't mind taking out Government

4    Exhibit 100, please.  And I left some scissors up there for you

5    to open that exhibit.

6           Could you please describe the contents of Government

7    Exhibit 100.

8    A.  This is a revolver and some bullets and casings.

9    Q.  Could you please take out the revolver and show it to the

10   jury?

11   A.  Yes.

12   Q.  Please stand up and make sure everybody can get a look at

13   it.

14          Thank you very much.

15          MR. GUTWILLIG:  One moment, please, your Honor.

16          (Pause)

17          MR. GUTWILLIG:  No further questions, your Honor.

18          THE COURT:  Mr. Margulis-Ohnuma.

19          MR. MARGULIS-OHNUMA:  Thank you, your Honor, just a

20   few.

21   CROSS-EXAMINATION

22   BY MR. MARGULIS-OHNUMA:

23   Q.  Good morning, Agent Serra.  Have you and I ever met before?

24   A.  I don't believe so.  Good morning.

25   Q.  So on December 12, 2018, that was the day you executed the

1    search warrant on the safes, right?

2    A.  Yes.

3    Q.  And what did the search warrant authorize you to do?

4    A.  Authorized us to collect evidence within these two safes.

5    Q.  And did it authorize you to break into the safes?

6    A.  I believe so, yes.

7    Q.  Is that what you did?

8    A.  Yes.

9    Q.  And there were two safes, right?

10   A.  Correct.

11   Q.  Where were they collected from?

12   A.  They were left in place when we executed the search.  They

13   were inside of a bedroom.

14   Q.  But to be clear, the search warrant you executed didn't

15   give you permission to go into the apartment, it just gave you

16   permission to get into the safes, right?

17              MR. GUTWILLIG:  Objection.

18              THE COURT:  Sustained.

19   Q.  So they were left -- the two safes were left in place when

20   you got the search warrant, right?

21   A.  They were in place.  We got the search warrant.  We had to

22   manipulate them to get into them, though.

23   Q.  So let's talk about where they were found.  One safe was

24   found in what appeared to be the defendant's bedroom, is that

25   right?

J7BTKID1                              Serra - Cross

1    A.  Yes.

2    Q.  And that was the larger of the two safes?

3    A.  Yes.

4    Q.  And do you know, where is that safe now?

5    A.  I am not sure.

6    Q.  And the items you just showed us, which were the ones that

7    were found this that safe, the larger safe?

8    A.  The revolver -- may I reference my report?

9    Q.  Sure, no problem.

10   A.  So the external hard drive was found in the larger safe,

11   what I remember to be the larger safe.

12   Q.  Could you give us the exhibit number or the number on the

13   bottom of the page there that you're looking at?

14   A.  I'm looking at the evidence collected item log.

15          MR. MARGULIS-OHNUMA:  Let's mark that as Defense

16   Exhibit -- let's mark that and we'll move it into evidence.

17          THE COURT:  Mr. Margulis-Ohnuma, what are you

18   referring to?

19          MR. MARGULIS-OHNUMA:  The evidence collection log that

20   the officer is reading from.

21          THE COURT:  Is that not already in evidence?

22          MR. MARGULIS-OHNUMA:  I'm told it's not.

23          THE COURT:  Mr. Gutwillig?

24          MR. GUTWILLIG:  Your Honor, it's not in evidence.  The

25   government used it to refresh the witness's recollection, but

J7BTKID1                          Serra - Cross

1    at this point there's no basis to offer it.

2              MR. MARGULIS-OHNUMA:  Are you objecting to me offering

3    it?

4              MR. GUTWILLIG:  We don't have a problem with offering

5    it.

6              THE COURT:  Admitted without objection.

7              MR. MARGULIS-OHNUMA:  What I will do is grab the

8    original, put it up on the ELMO, and we can all follow along.

9              Your Honor, if I may approach, make sure I'm looking

10   at the right thing?

11             THE COURT:  Yes.

12             MR. MARGULIS-OHNUMA:  I'm going to mark it as Defense

13   Exhibit J, your Honor.

14             Was it received into evidence?

15             THE COURT:  Yes.

16             (Defendant's Exhibit J received in evidence)

17   Q.  Agent Serra, is this the same thing you're looking at?

18   A.  Yes.

19   Q.  Everything on that first page came from which of the two

20   safes?

21   A.  Everything on this page came from the safe that was located

22   in the bedroom.  Safe two, bedroom.

23   Q.  That included the hard drive, right?

24   A.  Yes.

25   Q.  The cool pad, right?

J7BTKID1                           Serra - Cross

1    A.  Yes.

2    Q.  The iPod in a black case, right?

3    A.  Yes.

4    Q.  The Samsung phone, right?

5    A.  Yes.

6    Q.  The Kyocera phone, right?

7    A.  Yes.

8    Q.  Another black iPod, right?

9    A.  Yes.

10   Q.  Another Kyocera phone?

11   A.  Correct.

12   Q.  Another Samsung phone, is that correct?

13   A.  Correct.

14   Q.  And a Blackberry phone?

15   A.  Correct.

16   Q.  Now I'll put up page 2 of the log.

17            Also from that larger safe there were the envelopes.

18   I think you showed us one of them, is that right?

19   A.  Yes.

20   Q.  What was the name on the envelope you showed us again?

21   A.  The name was Totya.

22   Q.  That's one of the envelopes seized from safe two, right?

23   A.  Yes.

24   Q.  The safe in the defendant's bedroom, right?

25   A.  Correct.

J7BTKID1                              Serra - Cross

1   Q.  Then there were some letters found, is that right?

2   A.  Yes.

3   Q.  And something you described as contracts with girls?

4   A.  Correct.

5   Q.  You didn't show the us those, did you?

6   A.  I did not.

7   Q.  And then the firearm that you did show us, that's number 13

8   on the log, right?

9   A.  Yes.

10  Q.  And the bullets, some money, and a certificate of marriage,

11  is that right?

12  A.  Yes.

13  Q.  Do you have that certificate of marriage?

14  A.  I'm not sure if it's up here.

15           MR. MARGULIS-OHNUMA:  I think it's -- if we could pull

16  out Government Exhibit 115, which I think is in the evidence

17  cart, if I could do that.

18           It's at the witness stand.

19  Q.  Do you see that in front of you, Agent Serra?

20  A.  Let me take a look.

21           I have it, sir.

22           MR. MARGULIS-OHNUMA:  I would like to mark that, if I

23  may, your Honor, as Defense Exhibit K?

24           THE COURT:  Yes.

25           MR. MARGULIS-OHNUMA:  Do you guys mind if we do it on

J7BTKID1                         Serra - Cross

1    the actual copy?

2             Let's do it on the bag because it looks like there's

3    another item there.

4             Your Honor, I move Defendant's Exhibit K into

5    evidence.

6             THE COURT:  Government?

7             MR. GUTWILLIG:  No objection.

8             THE COURT:  Admitted without objection.

9             (Defendant's Exhibit K received in evidence)

10            MR. MARGULIS-OHNUMA:  I'll publish to the jury, your

11   Honor?

12            THE COURT:  Yes.

13   BY MR. MARGULIS-OHNUMA:

14   Q.  So Agent Serra, could you tell us does the marriage

15   certificate indicate who married who?  Can you see that there?

16   A.  Yes.

17   Q.  And what are the names?

18   A.  Dana Leonteen McLeod and Lloyd C. Kidd.

19   Q.  And does it say the date of the marriage?

20   A.  Yes.

21   Q.  What's that?

22   A.  February 27, 2018.

23   Q.  Thank you.  I'm going to return the originals to the bag.

24            Now going back to the list of evidence that you

25   seized, that was everything from the bedroom safe, right?

J7BTKID1

1    A.  Yes.

2    Q.  So the only things that you found in the other -- the

3    smaller safe was the leafy green substance that was suspected

4    marijuana and the four BB guns, is that right?

5    A.  Correct.

6    Q.  And those four BB guns are not -- I don't think that you

7    referred them to weapons, they're not actually firearms,

8    correct?

9    A.  Correct.

10            MR. MARGULIS-OHNUMA:  Nothing further, your Honor,

11   thank you very much.

12            MR. GUTWILLIG:  Nothing further from the government,

13   your Honor.

14            THE COURT:  All right.  Thank you.  You may step down,

15   you're excused.

16            THE WITNESS:  Thank you, sir.

17            THE COURT:  The government's next witness?

18            MR. GUTWILLIG:  Your Honor, at this point the

19   government has no additional witnesses.  We seek to publish to

20   the jury YouTube videos and some additional evidence at this

21   point.

22            THE COURT:  Before we do that, counsel, please

23   approach.

24

25

J7BTKID1

1              (At sidebar)

2              THE COURT:  You may recall that we had questions when

3      one of the witnesses came up as to whether or not that witness

4      was Victim-2, and we put on the record that that witness was

5      not Victim-2.  Where is Victim-2?  This jury is probably, as I

6      am, wondering:  Who is Victim-2?

7              MR. MARGULIS-OHNUMA:  As are we.

8              MR. GUTWILLIG:  Your Honor, Victim-2 has been

9      identified as a Jessica Bonilla by Aisha Goncalves and by

10     Sabrina Misere.  The government does not intend to call

11     Victim-2, which we flagged for defense counsel prior to trial.

12             THE COURT:  In that event the jury has got to be told,

13     because you basically left a big hole there.  You said it was

14     not number -- it was not some of the others, and I think

15     yesterday you identified who was Victim-3, but you still have a

16     hole as to who is Victim-2.  Do you want to explain that?

17             MR. GUTWILLIG:  We can identify Victim-2.

18             MR. MARGULIS-OHNUMA:  I'm a little concerned with the

19     government explaining that.  I think it's probably better if it

20     comes from -- I mean what do you -- what statement do you

21     propose making?

22             MR. GUTWILLIG:  Either the government --

23             THE COURT:  I could ask the government as to who is

24     Victim-2, or you just work out a statement.

25             MR. MARGULIS-OHNUMA:  It seems to me that would be

J7BTKID1

1    more appropriate as part of the instructions to clarify the

2    indictment, when you're reading the indictment give the names

3    of the indictment, at that point -- it's something we struggled

4    with all along.

5         THE COURT:  Since the government said there are no

6    more witnesses and I have this question, I can simply pose it

7    to the government:  Who is Victim-2 --

8         MR. MARGULIS-OHNUMA:  That's fine.

9         THE COURT:  -- and refer back to fact that we had that

10   discussion earlier.

11        MR. GUTWILLIG:  I don't think that we ever identified

12   Victim-1 either, because it came up after that.  So perhaps we

13   should identify Victim -- maybe at this point we should clarify

14   each of the victims, and we can respond, if your Honor would

15   like.

16        One additional note while we're at the sidebar is the

17   government is also seeking to admit what's marked as Government

18   Exhibit 605, which are subscriber informations received from

19   T-Mobile I believe yesterday or whenever it was that we

20   produced to the defense, and the government would seek to

21   authenticate these pursuant to Federal Rule of Evidence 902.13.

22   We have the certification from T-Mobile, and this is the -- I

23   believe it's the 7128 number -- sorry, 7216 number that has

24   previously been associated with the defendant, and we seek to

25   offer that based on that relevance.

J7BTKID1

1          THE COURT:  All right.

2          MR. MARGULIS-OHNUMA:  I hate to do this, but I don't

3     see the language required by the certification that this --

4     that these records were made -- I guess they're saying it's

5     made by a person, not the result of an electronic process.

6     This is not a proper 902.13 certification because it doesn't

7     make reference to the reliability of the electronic process.

8     We would object on that grounds and on the same grounds that we

9     objected to about the certifications.

10          MR. GUTWILLIG:  Alternatively the government would

11     offer them under 902.11 as domestic records.  They're

12     subscriber information from T-Mobile that have been certified.

13          THE COURT:  Then I will admit them as

14     self-authenticated under 902.13.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J7B3KID2

1          (In open court)

2          THE COURT:  Mr. Gutwillig, you indicated that the

3     government does not have any additional witnesses to call.

4          You recall earlier in the week we had questions

5     concerning who was Victim-2, and it was indicated at that time,

6     that the witness who was then testifying was not Victim-2.

7     During the course of yesterday's testimony, the government

8     identified who was Victim-3, and I'm sure that it must be a

9     question in the jury's mind, as it was in the Court, as to

10    exactly who were the various victims referred to in the

11    indictment.  And perhaps you can clarify that for us at this

12    point.

13         MR. GUTWILLIG:  Yes, your Honor.  If the Court would

14    allow.  Victim-1 in the indictment is Kaira Brown.  Victim-2 in

15    the indictment has not testified.  Victim-2 in the indictment

16    is Jessica Bonilla, who was identified by two witnesses who did

17    testify, Aisha Goncalves --

18         MR. MARGULIS-OHNUMA:  Objection.

19         THE COURT:  Overruled.

20         MR. GUTWILLIG:  Two witnesses who did testify, Aisha

21    Goncalves and Sabrina Misere.  Victim-3 is Dana McLeod who

22    testified yesterday, and Victim-4 is Arielle Palopolo who also

23    testified yesterday.

24         THE COURT:  Thank you.  Proceed.

25         MR. GUTWILLIG:  The government would seek to offer but

J7B3KID2

 1    not publish Government Exhibit 605.

 2              THE COURT:  Yes.

 3              (Government's Exhibit 605 received in evidence)

 4              MR. GUTWILLIG:  At this point, your Honor, the

 5    government would like to offer some YouTube videos, and I'd ask

 6    Ms. Harney to hand out transcript binders to the members of the

 7    jury.

 8              Your Honor, at this point, Ms. Harney, if you could

 9    please, your Honor, the government offers each of Government

10    Exhibits 301A, 301B, 301C, 303A, 303B, 303D, 305B, and 309A.

11              MR. MARGULIS-OHNUMA:  Objection previously stated,

12    your Honor.

13              THE COURT:  Admitted.  Objection noted.

14              (Government's Exhibit 301A, 301B, 301C, 303A, 303B,

15    303D, 305B, 309A received in evidence)

16              MR. GUTWILLIG:  Ms. Harney, if you could please

17    publish Government Exhibit 301A.  And directing the jury's

18    attention to the transcript at 301T in the binders.

19              MR. MARGULIS-OHNUMA:  Judge, could we give the

20    standard instruction about the transcripts not being evidence;

21    it is the tapes that are the evidence?

22              THE COURT:  Yes.  The Court will give instructions

23    when the case is over.  In those instructions, I will remind

24    you that whenever we have evidence that comes in as audio or

25    video, that the evidence is the actual audio or video, and not

J7B3KID2

1    any reproduction or transcript of it.  So to the extent that

2    there may be any discrepancy in your mind as to what may be in

3    the transcript, it is the actual audio or video that controls.

4              MR. GUTWILLIG:  Ms. Harney, could you please publish

5    Government Exhibit 301A.

6              (Video recording playing)

7              MR. GUTWILLIG:  Ms. Harney, if you could please

8    publish Government Exhibit 301B.

9              (Video recording playing)

10             MR. GUTWILLIG:  Ms. Harney, could you please publish

11   Government Exhibit 301C.

12             (Video recording playing)

13             MR. GUTWILLIG:  Directing the jury's attention to the

14   next set of transcripts, 303T.  Ms. Harney, if you could please

15   publish Government Exhibit 303A.

16             (Video recording playing)

17             MR. GUTWILLIG:  And Ms. Harney.  If you can please

18   publish Government Exhibit 303B.

19             (Video recording playing)

20             MR. GUTWILLIG:  Ms. Harney, if you could please

21   publish Government Exhibit 303D.

22             (Video recording playing)

23             MR. GUTWILLIG:  Directing the jury to the next

24   transcripts, marked 305T.  And Ms. Harney, if you can please

25   publish Government Exhibit 305B.

J7B3KID2

1          (Video recording playing)

2          MR. GUTWILLIG:  Directing the jury's attention to the

3    next transcript, 309T.  Ms. Harney, if you can please publish

4    Government Exhibit 309A.

5          (Video recording playing)

6          MS. BRACEWELL:  Your Honor, the government would offer

7    Government Exhibit 1372, which is a media file authenticated by

8    FBI IT Analyst Porsche Brown yesterday as a file recovered from

9    device 1B-19 seized from the defendant's apartment on

10   December 12, 2018.  The file name is 20130923 115031.m4a, and

11   we would at this time offer Government Exhibit 1372.

12         MR. MARGULIS-OHNUMA:  Objection as previously stated.

13         THE COURT:  Admitted.  Objection noted.

14         MS. BRACEWELL:  Ms. Harney if we can please publish

15   1372.

16         (Government's Exhibit 1372 received in evidence)

17         (Audio recording playing)

18         MS. BRACEWELL:  Your Honor, the government rests.

19         THE COURT:  The government has indicated that it

20   rests.  That means that the government is representing that it

21   has concluded the presentation of all the evidence that it is

22   putting forward in order to persuade you, the members of the

23   jury, that you should find that the government has met its

24   burden to prove the crimes charged beyond a reasonable doubt.

25   I will explain the meaning of all that in the final

J7B3KID2

1      instructions.

2              At this point, the defendant may, if the defendant

3      wishes, present any evidence that the defendant may wish.  Bear

4      in mind the instruction I gave you, which I will elaborate on

5      later on.  The defendant is not required to present any

6      evidence and his innocence remains until you, the jury, find

7      whether or not he is guilty beyond a reasonable doubt.

8              Mr. Margulis-Ohnuma.

9              MR. MARGULIS-OHNUMA:  Yes, your Honor.  Could we take

10     a brief recess?  We have a legal matter to address and I

11     believe we do have a witness who I believe is in the hallway.

12     I need to speak to her for a moment.

13             THE COURT:  How long do you think you would need for

14     that?

15             MR. MARGULIS-OHNUMA:  Five minutes to speak to her and

16     probably five minutes for the legal matter.

17             THE COURT:  All right.  We'll take a 10-minute recess.

18             MR. MARGULIS-OHNUMA:  Thank you, your Honor.

19             (Recess)

20             (In open court; jury not present)

21             THE COURT:  I will be e-mailing to the parties

22     momentarily a draft of the instructions that the Court proposes

23     to give.  And I would ask that, after the jury is sent home,

24     you review these and we'll schedule a time for a preliminary

25     review of them some time during the course of the afternoon.

J7B3KID2

1          Mr. Margulis-Ohnuma, you had a legal question you

2     wanted to raise.

3          MR. MARGULIS-OHNUMA:  Yes, I have an application, your

4     Honor.  Mr. Kidd moves to dismiss pursuant to all counts of the

5     indictment pursuant to Rule 29 on the ground that the

6     government has not adduced sufficient evidence for a reasonable

7     fact finder to conclude beyond a reasonable doubt that he's

8     guilty of any of the Counts One through Five of the indictment.

9          THE COURT:  Thank you.  The motion's denied.  The

10    Court finds that there is more than sufficient evidence on the

11    record, assuming a reasonable juror credits the credibility of

12    all the witnesses who have testified and all the evidentiary

13    material that has been entered into the record, in order to

14    find a verdict of guilty in this case beyond a reasonable

15    doubt.

16         MR. MARGULIS-OHNUMA:  Thank you.

17         Second, I've been, as we always are at this part of

18    the case, in discussions with Mr. Kidd about the pros and cons

19    of the defendant testifying.  I've explained to him very

20    carefully the presumption of innocence and his right to remain

21    silent.  And the potential consequences if he were to have

22    found to have testified falsely, including guidelines increases

23    and the potential for a separate perjury prosecution.

24         So, Mr. Kidd has assured me he understands all those

25    ramifications.  He has advised, as of this point, now that the

1    government has rested it's ripe, that he does plan to go

2    forward and exercise his Sixth Amendment right to testify on

3    his own behalf.

4            I wanted him to hear that in open court and I think it

5    is probably a good idea for the Court to allocute him to make

6    sure that those discussions have been sufficient for him to

7    make an informed decision.

8            THE COURT:  All right.  Thank you.  Are we at that

9    point now?

10           MR. MARGULIS-OHNUMA:  We have one very brief witness

11   first.  But I think before the next recess we would be.  So I

12   think it would be convenient to do it now.

13           MS. BRACEWELL:  And as a matter of housekeeping, we

14   wanted to put on the record, the parties conferred about the

15   portions of the YouTube videos that were going to be admitted

16   into evidence.  And certain portions that were just played for

17   the jury were included at the defendant's request for

18   completeness.  So we just wanted to make those additions clear

19   on the record.

20           So, for example, 301B was added at the defendant's

21   request.  303A was also added at the defendant's request.  And

22   the final lines of 303B, specifically lines 11 through 15, were

23   added at the defendant's request.  We disagreed about a

24   particular word included in the transcript, which we believe

25   the video was properly understood to say "two consenting, two

J7B3KID2

1    consenting" and then end there.  The defense request was that

2    the transcript include "two consenting, two consenting adults."

3         But with that minor disagreement in regards to the

4    transcript, which is not in evidence, we just wanted to make

5    clear what came in was a result of discussions between the

6    parties.

7         THE COURT:  All right.  Thank you.

8         MR. MARGULIS-OHNUMA:  In light of our objection

9    overall to admitting any of it.

10        THE COURT:  Subject to that.

11        Were the parties successful in developing a

12   stipulation to the other issue that we discussed this morning?

13        (Counsel conferring)

14        MR. MARGULIS-OHNUMA:  We're very close on the

15   stipulation, yes.  So, other than my request to allocute the

16   defendant on the issue of his testifying, we're ready to go

17   with our next witness.  Our first witness.

18        THE COURT:  Why don't you bring in that witness so we

19   don't keep the witness waiting.

20        MR. MARGULIS-OHNUMA:  Judge, if I may, there is one

21   exhibit I'll be using.  It is Defendant's Exhibit E.

22        (Jury present)

23        THE COURT:  Mr. Margulis-Ohnuma, the witness please

24   rise.

25        MR. MARGULIS-OHNUMA:  For the record, the defense

1    calls Miranda Yates.

2     MIRANDA YATES,

3          called as a witness by the Defendant,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. MARGULIS-OHNUMA:

7    Q.  Good morning, Ms. Yates, how are you today?

8    A.  Great.  Thank you.

9    Q.  Can you tell us please where do you work?

10   A.  I work at Good Shepherd Services.

11   Q.  What is Good Shepherd Services?

12   A.  It is a multiservice organization located in New York City.

13   Q.  Does Good Shepherd Services have something to do with the

14   New York City foster care system?

15   A.  Yes, it runs some child welfare programs.

16   Q.  Is one of the programs that's run by good shepherd services

17   the Marian Hall program?

18   A.  Yes, it is.

19   Q.  Can you just tell us briefly, what is the Marian Hall

20   program?

21   A.  The Marian Hall program is a community residential program

22   for teen-age girls who cannot live at home, and have been

23   referred by New York City's Administration for Children's

24   Services, ACS.

25   Q.  What are your responsibilities with respect to the Marian

1   Hall program as an officer at Good Shepherd Services?

2   A.   Sure.  I am an assistant executive director for strategy,

3   evaluation and learning.  So I oversee the centralized

4   department of program evaluation and planning.  So, my role

5   with regard to the Marian Hall is to help support in the

6   collection of data.

7   Q.   So is part of that ensuring that the records of the

8   organization are accurately kept?

9   A.   Sure.

10  Q.   Did there come a time when Good Shepherd received a

11  subpoena related to an individual named Kaira Brown?

12  A.   Yes.

13  Q.   Do you know Kaira Brown personally?

14  A.   No.

15  Q.   So, but based on the records of the organization, was Kaira

16  Brown a resident there at some point?

17  A.   Yes.

18  Q.   Did you provide our office with some documentation relating

19  to Kaira Brown?

20  A.   Yes.

21  Q.   So I think I put in front of you Defendant's Exhibit E for

22  identification.  Can you have a look at that?

23  A.   Yup, I see it.

24  Q.   Is that the document your organization provided to us?

25  A.   Yes.

1    Q.  Are the entries in that document records of regular --

2    sorry.  Do the entries in that document record regular activity

3    in the course of business?

4    A.  Yes.

5    Q.  Are the entries in that document -- is the accuracy of the

6    entries in the document important to maintain in your business?

7    A.  Yes.

8         MR. MARGULIS-OHNUMA:  Judge, at this time, the defense

9    moves to admit Defendant's Exhibit E.

10        MS. BRACEWELL:  Your Honor, we just request a brief

11   voir dire on that.

12        THE COURT:  Yes.

13   BY MS. BRACEWELL:

14   Q.  Ms. Yates, directing your attention to the date entered

15   column on the right-hand side of the page.  What does that

16   reflect?

17   A.  That reflects when the -- so, the document shows a series

18   of changes in status in terms of somebody being in the program,

19   so that reflects the date that that change in status occurred.

20   Q.  Directing your attention to the list of dates.  Is this

21   recording events that happened several weeks after the incident

22   described?

23   A.  That's when the date was entered into the system, yeah.

24   Q.  And just going down the list, there's a several week delay

25   on numerous occasions; is that correct?

1   A.  Yes.

2   Q.  For example, a three-week delay approximately on the first

3   one.  A month delay on the second entry.

4   A.  Hmm-hmm.

5           MS. BRACEWELL:  Your Honor, we would object to the

6   admissibility as a business record.

7           THE COURT:  Overruled.

8           (Defendant's Exhibit E received in evidence)

9           MR. MARGULIS-OHNUMA:  If we may publish that to the

10  jury.  Defense Exhibit E.  Thanks, Ms. Harney.

11  Q.  If we could just walk through this.  I'll show the jury the

12  whole document.  And then focus in.  It's very small type.

13          Ms. Yates, that's a report generated -- withdrawn.

14  Who does this report relate to?

15  A.  Can you clarify your question?

16  Q.  Does this report track the placement disruptions for a

17  particular individual?

18  A.  For Kaira Brown, yes.

19  Q.  Can you explain to us -- let's step back for a minute.

20          You're familiar with the practices at Marian Hall,

21  right?

22  A.  Some of them, yeah.

23  Q.  So, the report reflects a series of dates on the left-hand

24  side?

25  A.  Hmm-hmm.

J7B3KID2                          Yates - Direct

1    Q.  What did those dates mean?  When it says AWOL from

2    residence ended.  What does that mean, for example?

3    A.  That means that the participant came back into the program.

4    So they were in residence in the program.

5    Q.  What does it mean disruption started AWOL from residence?

6    A.  That means that it was noted that the person had been away

7    for at least 24 hours.

8    Q.  Whose responsibility is -- withdrawn.

9         Do the staff at Marian Hall keep track of where the

10   residents are?

11   A.  They do.  At the beginning of each shift, they'll, you

12   know, look at who is physically present, and they keep a log.

13   Also, they'll note if somebody leaves the building.  But it's,

14   you know, that's when they also walk around to see who is there

15   and who is not.

16   Q.  Is it part of the responsibility of Marian Hall as a foster

17   care provider to keep track of where the residents are at all

18   times?

19   A.  Yes.

20   Q.  So, if I could just call your attention to the entries from

21   February 2017.

22   A.  Hmm-hmm.

23         THE COURT:  Ms. Yates, rather than hmm-hmm, please say

24   yes or no.

25         THE WITNESS:  Okay.

1          THE COURT:  The reporter doesn't understand.

2          THE WITNESS:  Hmm-hmm, yes.

3    Q.  Starting with January 3, 2017 where it says placement

4    disruption AWOL from residence ended.  Do you see that?

5    A.  Yes.

6    Q.  So, again, can you tell us what does what mean in terms of

7    where Ms. Brown was at that time and date?

8    A.  It means that she had come back from -- and kind of checked

9    into the program.

10   Q.  And then, there's no record of her being AWOL any time from

11   then until February 4; is that correct?

12   A.  That's right.

13   Q.  And then could you just walk us through it.  Is there, when

14   is the next time she was AWOL after that?

15   A.  So, you started in January, you said it ended.  Then she

16   went AWOL again February 4, and then checked in again on the

17   13th.  And then another AWOL started on the 15th, and then she

18   came back in on March 6.  So --

19   Q.  And then let's do one more.

20   A.  So, again, noted as AWOL on March 8, and then came back in

21   on May 5.

22          MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

23          THE COURT:  Ms. Bracewell.

24   CROSS-EXAMINATION

25   BY MS. BRACEWELL:

1    Q.  Good morning, Ms. Yates.

2    A.  Good morning.

3    Q.  What kind of facility is Marian Hall at Good Shepherd?

4    A.  It's a 24/7 residential program.

5    Q.  What kinds of children live at Marian Hall?

6    A.  Teen-age girls who can't live with their families at home

7    and have been referred by New York City's Administration for

8    Children's Services.

9    Q.  What's the age range of the children at Marian Hall?

10   A.  15 up to 24.

11   Q.  So you mentioned a moment ago that you keep track of

12   children at all times.  Is that correct?

13   A.  Yeah, we try to.

14   Q.  Are you able to?

15   A.  No.

16   Q.  So, you described that your role includes data collection?

17   A.  Hmm-hmm, yes.

18   Q.  Can you explain who provides the underlying data that's

19   reflected here?

20   A.  For the underlying data that's reflected here, what happens

21   is the -- each young person works with a case manager.  And so

22   the case manager or the supervisor, if it was noted that an

23   AWOL had started, they would send a message to somebody in the

24   program planning staff, and that person would enter it into

25   this data system.

J7B3KID2                        Yates – Cross

1    Q.  So, the information is provided by the program staff?

2    A.  Yes.

3    Q.  And it's provided to your office?

4    A.  Yes.

5    Q.  And the information reflected on this document is entered

6    by your office?

7    A.  Yes.

8    Q.  And do you have any direct information as to the

9    correctness of any of the information they're providing?

10   A.  Not direct information.

11   Q.  Let's just take a step back.

12          What is an AWOL?  What does that mean?

13   A.  AWOL, we follow the definition that's provided to us by the

14   Administration for Children's Services, so that would be that

15   somebody has been absent from the program for at least 24

16   hours.

17          And it is unauthorized.  Sorry.

18   Q.  Say it again?

19   A.  Unauthorized absence from the program.

20   Q.  So, if a child is gone about 28 hours, would that be

21   logged?

22   A.  It might not be.

23   Q.  What about 30 hours?

24   A.  It should be.  But, again, it's unauthorized.  I mean, they

25   may be gone, but it may be an authorized, you know, leave or

J7B3KID2                          Yates - Cross

1   pass that they have.

2   Q.  So focusing your attention exclusively on unauthorized

3   absences.  If a student or child, rather, was gone

4   approximately 30 to 48 hours, would it always be recorded?

5   A.  Every effort would be made to record it.

6   Q.  Is it possible it's not recorded?

7   A.  Yes.

8   Q.  How quickly are AWOLs supposed to be reported to your

9   office?

10  A.  They're supposed to be reported every -- like within 24 to

11  48 hours.

12  Q.  What's the purpose of the AWOL reporting system?

13  A.  The purpose is to have a track record of, again, their

14  movements and status within the program.

15  Q.  When a child is AWOL, is there any kind of follow up that's

16  initiated by Marian Hall?

17  A.  Absolutely.

18  Q.  So, if an AWOL is reported a month later, what's the

19  ramifications for that?

20  A.  Well, I mean, there's a separation between this -- let me

21  think how to answer that.

22         So, the ramifications if they were reporting late to

23  us would be that's a performance issue.

24  Q.  A performance issue, what do you mean?

25  A.  Would be, that the staff person is having a problem with

1   timely documentation, from our perspective.

2   Q.  Directing your attention to this document that's in

3   evidence as Defense Exhibit E.

4   A.  Hmm-hmm, yes.

5   Q.  Was this child frequently absent?

6   A.  Yes.

7   Q.  And take a look at the data entered column.  You mentioned

8   a moment ago there are frequent delays in the data entry here?

9   A.  Yes.

10  Q.  So, directing your attention, for example, to the entry

11  about December 2, 2016.  Placement disruption started AWOL from

12  residence.  When was that entered?

13  A.  Which one?  It's hard -- oh, that's helpful.  Thank you.

14  So, so the one for December 2, right, looks like it was entered

15  a month late on January 3.

16  Q.  And the one right above from December 6, 2016, the

17  placement disruption AWOL from residence ended.  When was that

18  entered?

19  A.  That was also entered on January 3.

20  Q.  And going up to what you discussed with defense counsel

21  earlier.  The February 4, 2017 AWOL, when was that recorded?

22  A.  February 22.

23  Q.  And going up to the next entry, when was that recorded?

24  A.  February 23.

25  Q.  Would those be considered late entries?

J7B3KID2                    Yates - Cross

1    A.  Yes.

2    Q.  Do you have any doubt about the reliability of information

3    entered a month or weeks after the incident took place?

4    A.  Yes.

5    Q.  It's not best practice, is it, for the program staff to

6    enter the data a month after the AWOL transpired, is it?

7    A.  No.

8    Q.  Would you follow up on frequent late entries like this?

9    A.  Yes.

10   Q.  Just to be clear, you don't have any personal knowledge

11   about the correctness of those particular entries we just

12   looked at?

13   A.  No.

14   Q.  Are you aware of whether children at Marian Hall ever try

15   to leave the facility without being logged as absent?

16   A.  I'm not aware of that.

17   Q.  You are not aware of whether it happens or whether it

18   doesn't happen?

19   A.  I'm not aware one way or the other.

20   Q.  Just to go back to the point you made earlier that if it's

21   an absence for less than 24 hours, it's not logged.  Is that

22   correct?

23   A.  Yes.

24   Q.  So, for example, if a child was gone at around 11:45 p.m.

25   on February 1st, 2017, that wouldn't necessarily be logged as

J7B3KID2                      Yates - Redirect

1   an AWOL?

2   A.  Correct.

3        MS. BRACEWELL:  One moment, your Honor.

4   Q.  Do you know if Ms. Brown was authorized to leave at any

5   point?

6   A.  I don't.

7        MS. BRACEWELL:  Nothing further.

8        MR. MARGULIS-OHNUMA:  Some redirect, your Honor.

9   REDIRECT EXAMINATION

10  BY MR. MARGULIS-OHNUMA:

11  Q.  Just picking up on counsel's last question.  What would be

12  some of the reasons that a child would be authorized to leave?

13  A.  Again, I'm not a program staff person.  But I know that, in

14  general, somebody may be authorized to leave on a family pass,

15  you know.  Just kind of in service to the case plan.  It's not

16  uncommon for people to have authorized pass, to be gone for

17  several days, and that would not be reflected in this record.

18  Q.  Is it fair to say that the reasons that -- they -- that the

19  child would be authorized to leave in a way -- withdrawn.

20       When a child is authorized to leave, is there some

21  other adult that has to be responsible for them?

22  A.  I don't know.  I can't really speak to that.

23  Q.  You talked about the accuracy and the concern about the

24  late entries in Defense Exhibit E.  Just tell us again.  So,

25  what does the date entered reflect as compared to the date of

J7B3KID2                          Yates - Redirect

1    the incident?

2    A.  It reflects when my office, program evaluation, received

3    that information to then go ahead and enter it into the system.

4    Q.  You receive that information from Marian Hall staff; is

5    that correct?

6    A.  Yes.

7    Q.  Do Marian Hall staff keep their own underlying records to

8    support when these incidents took place?

9    A.  Yes.

10             MR. MARGULIS-OHNUMA:  Nothing further, your Honor.

11             MS. BRACEWELL:  Nothing further from the government.

12             THE COURT:  You may step down, you are excused.

13             (Witness excused)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J7B3KID2

1          MR. MARGULIS-OHNUMA:  Judge, we need to request a

2     brief recess to discuss a legal matter.

3          THE COURT:  All right.  Five-minutes recess?

4          MR. MARGULIS-OHNUMA:  Five minutes will be plenty,

5     yes.

6          THE COURT:  We'll recess for five minutes.  The jury

7     may go back to the jury room for five minutes.

8          (Jury excused)

9          THE COURT:  Mr. Margulis.

10          MR. MARGULIS-OHNUMA:  Just the logistics, the marshals

11     logistics of bringing Mr. Kidd up to the stand to testify.

12          THE MARSHAL:  We just, you know, generally speaking,

13     our main concern here is safety.  So we don't feel comfortable

14     just leaving him up there by himself in such close proximity I

15     yourself, your Honor, and other people.

16          So what we were thinking was right now, during this

17     brief recess, get someone else up there, who is either with the

18     marshals service or some other security personnel with a suit,

19     just to sit down, not one of us, therefore it will be no

20     perception that he's in custody.

21          THE COURT:  All right.  That's fine.  That's fairly

22     standard procedure in this court.

23          MR. MARGULIS-OHNUMA:  While we are waiting for that,

24     do you want to do the allocution with respect to the testimony?

25          THE COURT:  Yes.  Mr. Kidd, your attorney has

J7B3KID2

1    represented that you wish to testify in this case and that you

2    are doing so having had the advice of counsel who has advised

3    you not to testify.  Counsel also indicated that he informed

4    you of your rights in this matter.  Let me remind you of what

5    those rights are.

6           You have a Constitutional right to remain silent and

7    not incriminate yourself.  You also are presumed innocent, and

8    that presumption remains with you until the jury returns a

9    verdict.  You're not required to present any evidence, and, if

10   you choose not to, and if that is your choice, the fact that

11   you choose not to testify cannot be held against you.

12          If you do choose to testify, what you say may be used

13   against you by the government.  And if you testify falsely,

14   that may also subject you to prosecution for perjury or making

15   a false statement, which may subject you to an additional

16   punishment.

17          Aware of these risks and of your rights in this

18   connection, is it your choice to take the witness stand and

19   testify on your behalf?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  You're making this choice knowingly,

22   voluntarily, and of your own free will?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  You are doing so against the advice of

25   counsel?

J7B3KID2

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Thank you.

3              MR. MARGULIS-OHNUMA:  With that, we're ready to

4    proceed whenever the jury comes back and the marshal.

5              THE COURT:  Can we bring the jury back.  Do we have an

6    agent?

7              (Pause)

8              THE COURT:  Bring in the jury please.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J7B3KID2                          Kidd - Direct

1              (Jury present)

2              THE COURT:  Mr. Margulis.

3              MR. MARGULIS-OHNUMA:  The defense calls Lloyd Kidd to

4     the stand.

5              THE COURT:  Before Mr. Kidd begins his testimony, let

6     me remind the jury that I will give specific instructions

7     concerning a defendant who chooses to testify.  The defendant

8     has a Constitutional right to remain silent and not incriminate

9     himself.  In this case, Mr. Kidd has chosen, knowingly and

10    voluntarily, to waive that right.  I will give you applicable

11    instructions later on.

12     LLOYD KIDD,

13          called as a witness by the Defendant,

14          having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MR. MARGULIS-OHNUMA:

17    Q.  Good morning, Mr. Kidd.  How are you today?

18    A.  Not well, but hanging in there.

19    Q.  So --

20    A.  Actually, sir, counselor, before -- can I just speak to the

21    jury for a moment, please?  Just, please.

22    Q.  Yes.  Why don't you let me ask questions and we'll consider

23    go from there.  Okay?

24    A.  I would really like to address the jury, please, sir.

25    Q.  Okay.  Go ahead.

J7B3KID2                          Kidd - Direct

1   A.  I'm pretty sure people probably hate me by now with

2   everything that you've been hearing.  Lies against me.

3   Q.  Let me ask questions, Mr. Kidd.

4   A.  Please.  Because this whole -- I've listened to everybody

5   tell lies against me.

6   Q.  We'll make sure you have a chance at the end to add

7   anything that we didn't get to, okay?

8   A.  Sir.  I really would like to be heard.  Please.  With all

9   due respect.

10          Listen, everything is not always what it seems.  I

11  know people have their stereotypes, their prejudices.  I'm not

12  trying to pull a race card or anything like that.  This is --

13          MS. TARLOW:  Objection, your Honor.

14          THE COURT:  Sustained.

15  A.  All right.  I would like to start off by giving you guys a

16  little background history on this case.

17          MS. TARLOW:  Objection, your Honor.

18  A.  I think they need to know this is why I'm here.  This

19  article pertains to me personally.  And they haven't, the

20  prosecutor hasn't told these people what's been going on.

21          MS. TARLOW:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.  New York Times article.

24          MS. TARLOW:  Objection, your Honor.

25          THE COURT:  Sustained.  The New York Times article is

J7B3KID2                          Kidd - Direct

1   hearsay in this matter.

2          THE WITNESS:  Okay.  Well, how about from the Southern

3   District of New York.  Can I read this one?  Because this is

4   coming from the prosecution.

5          MS. TARLOW:  Objection, your Honor.

6          THE COURT:  Sustained.

7          THE WITNESS:  Sir, this is --

8          MR. MARGULIS-OHNUMA:  Your Honor, with respect, I

9   don't think he's offering it for the truth of the matter

10  asserted.

11         THE COURT:  He's offering a document that's not been

12  admitted into evidence, and which we have not seen a proffer

13  what its relevance is.

14         THE WITNESS:  It's based on my arrest with 18 other

15  people that I didn't know.  They tried to say sex trafficking.

16         MS. TARLOW:  Objection.

17         THE COURT:  Sustained.

18         THE WITNESS:  Your Honor, from the government's

19  website.

20         THE COURT:  It doesn't matter where it's from.  It's

21  hearsay at this point, and there's no basis, no foundation yet

22  for its introduction into the record.

23         Mr. Margulis, can you perhaps advise Mr. Kidd as to

24  why there's an objection and why the Court has sustained it.

25  A.  They arrested --

1   Q.  You can't show the article or talk about what's in the

2   article.  You can talk about your reactions.  So if you want to

3   go ahead and talk about what you experienced, that's fine.

4   A.  Okay.  No problem.

5   Q.  If you'll permit me, I'll ask you questions about that.  It

6   might make it a little bit quicker and more orderly and less

7   confusing.

8   A.  Can I give a summary of what happened even if I can't read

9   the article?  The jury has a right to know.

10  Q.  You can't say what's in the article.

11  A.  Okay.  Fine.  I was arrested with 18 other people that I've

12  never met before.  And it was said that we were in a sex

13  trafficking ring.

14          MS. TARLOW:  Objection.

15          THE COURT:  Sustained.

16          THE WITNESS:  This a high-profile case, your Honor.

17  This is why, this is why I'm here.  They trying to tie me into

18  Hawthorne Cedar Knolls.  This made the news.

19          MS. TARLOW:  Objection.

20  Q.  Let me ask some questions about your personal experience

21  and what you did and let's go from there, okay?

22  A.  All right.

23  Q.  First of all, did you sit through the trial?

24  A.  Excuse me?

25  Q.  Have you been here during the four days of trial and heard

J7B3KID2                          Kidd - Direct

1    the witness testimony?

2    A.  Yes, sir.

3    Q.  When was the first time you learned that you were being

4    accused by these four witnesses?

5    A.  Well, initially, it was two.  I was superseded twice for

6    refusing plea agreements.

7              MS. TARLOW:  Objection.

8              THE COURT:  Sustained.

9    Q.  When did you learn the identities of the people that were

10   accusing you?

11   A.  A week before trial.

12   Q.  Have you had -- withdrawn.

13             Let's talk about first about Kaira Brown.  Do you

14   recall her testimony?

15   A.  Yes, sir.

16   Q.  When did you -- withdrawn.

17             Have you ever met Kaira Brown before?

18   A.  Yes.

19   Q.  Tell us, when did you meet her?

20   A.  In April of 2017.

21   Q.  How old was she when you met her?

22   A.  18.

23   Q.  How do you know that?

24   A.  For the record, is it possible, this is something you guys

25   do have.  Is it possible you could pull up 902?

1          MR. MARGULIS-OHNUMA:  Is that in evidence?

2          THE WITNESS:  Yeah.

3          MR. MARGULIS-OHNUMA:  Is 902 in evidence?

4          MS. TARLOW:  No.

5     Q.  Mr. Kidd, tell us what happened.  902 is not in evidence.

6     A.  Okay.  The reason why 902 is important is because I want

7     the jury to understand, I'm into astrology, and you guys have

8     an advertisement of nothing related to prostitution where I'm

9     mentioning astrology from two, three years ago.  So a lot of

10    things I remember is off of people's birthdays.  As

11    unbelievable as it might sound, I've even done an episode about

12    it on my Chris Kidd's World podcast.

13          So a lot of times, when I first meet people, first

14    thing I want to know is their birthday and their sign, and that

15    sort of thing for compatibility reasons.

16    Q.  Let me stop you there, Mr. Kidd.  Do you know Kaira Brown's

17    birthday by heart?

18    A.  Yeah.

19    Q.  What is Kaira Brown's date of birth?

20    A.  March 22, 1999.

21    Q.  How did you learn Kaira Brown's date of birth?

22    A.  It was on her ID.

23    Q.  When did you see that ID?

24    A.  In April of 2017.

25    Q.  Was that an ID for the same person who testified in court?

J7B3KID2                           Kidd - Direct

1    A.  Yes, sir.

2    Q.  Okay.  So let's move on.  Actually, withdrawn.

3           You heard Ms. Brown testify about instances in which

4    you did various things to her to -- withdrawn.

5           What was your view of Ms. Brown's testimony?

6    A.  Yeah, she -- I mean, she was spoonfed what to say.  She

7    totally lied.  She lied about how long we've known each other.

8    She lied about events that took place.  She lied and said --

9    initially she said that we -- in her statement she said we met

10   in fall of 2014.  Then in the indictment --

11          MS. TARLOW:  Objection.

12          THE COURT:  Sustained.

13   A.  In the indictment, it is spring of 2015.

14   Q.  But, let me walk you through it a little more carefully.

15   A.  All right.

16   Q.  Did you ever wake her up in the middle of the night to make

17   her keep working?

18   A.  Absolutely not.

19   Q.  Did you ever choke her?

20   A.  No.

21   Q.  Did you ever lay hands on her in any way?

22   A.  Absolutely not.

23   Q.  Did you ever, well, did you ever refuse to give her money

24   that she felt belonged to her?

25   A.  No.

J7B3KID2                          Kidd - Direct

1   Q.  Did you ever yell at her or curse at her?

2   A.  Yeah, when I kicked her out.

3   Q.  What do you mean you kicked her out?

4   A.  I told her to leave.

5   Q.  What was the context of that?

6   A.  She was causing trouble.  She was like instigating with the

7   other girls, gossipping, and one of the girls was about to beat

8   her up.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J7BTKID3                        Kidd - Direct

1   BY MR. MARGULIS-OHNUMA:

2   Q.  How long did you -- how long did you know her for from when

3   you first met her in April?

4   A.  Maybe later -- last time I physically seen her was 2017.

5   We did communicate by a Kik app after, in 2018.  So last time

6   I've communicated with her was last year, but the last time I

7   actually seen her was 2017.

8   Q.  In that time you said you kicked her out.  How many times

9   did you kick her out?

10  A.  Two or three times, because it seemed like I kicked her out

11  and she would like text me like maybe weeks or months later:

12  Hey, I'm sorry, my bad, dah dah, can I come back?  And there

13  was a time where I actually went and picked her up because she

14  called me and gave me some sob story about how some pimp was

15  after her because she owed him $400 because apparently the way

16  he was doing --

17            MS. TARLOW:  Objection.

18            THE COURT:  Sustained.

19  Q.  So you said there came a time when you picked her up?

20  A.  Yes.

21  Q.  Had she been staying with you after April of 2017?

22  A.  After what?

23  Q.  Had she been sleeping over at your apartment after

24  April 17?

25  A.  Yeah, she would stay overnight sometimes.

J7BTKID3                    Kidd - Direct

```
 1   Q.  But there was a time that she left and you went to pick her
 2   up from somewhere else?
 3   A.  Yeah.
 4   Q.  Where did you pick her up from?
 5   A.  Queens.
 6   Q.  How far away from your house?
 7   A.  It was quite a drive.  Queens is like 30, 40 minutes,
 8   depending on traffic from where I was living.
 9   Q.  What was -- did she appear to be upset or distraught when
10   you picked her up?
11   A.  When she called me she was scared.  It was weird because we
12   hadn't spoken in like, I don't know, like -- it had been a
13   while since we spoken when she called me and she said --
14          MS. TARLOW:  Objection.
15          THE COURT:  Sustained.  Hearsay.
16   Q.  You can't say what she said, you can say what you did.
17   A.  Okay.  So I went to pick her up, her and another female who
18   was older, like in her 30s.  That's the same female that I said
19   was going to beat her up because she was causing trouble.
20   Q.  You went to go pick up both of them together?
21   A.  Yeah, from Queens.
22   Q.  And did they appear to be distraught or upset in any way?
23   A.  Yeah, she was.
24   Q.  What did you observe that led you to believe that they were
25   upset or distraught?
```

1   A.  Can I say?

2   Q.  You I can't say what they said, you can say what you saw or

3   what you heard.

4   A.  It's really what she was -- it's based on what she was

5   telling me, if I'm not allowed to say that.

6   Q.  Did you ever chase a woman out of your apartment with a

7   baseball bat?

8   A.  Absolutely not.

9   Q.  Did you have a baseball bat?

10  A.  Yeah.

11  Q.  What did you use it for?

12  A.  I did use it for protection, because sometimes when guys

13  would come see the girls they don't know that I was there, and

14  they might get rough with one of the girls, something like

15  that, if they called for help I would come out with a baseball

16  bat only in extreme situations, if the guy actually put his

17  hands or a female or something.

18  Q.  Let's go back, if we could.  As of 2014, Mr. Kidd, where

19  were you living?

20  A.  Up until -- I was living 33 East 28 Street until early

21  November, then 1423 Stanley Avenue where I was renting a room,

22  I had roommates.

23  Q.  Let me stop you there.  I'm going to hand you what's

24  previously been marked for identification as Defendant's

25  Exhibit F.

1           I'll hand up a copy to the witness, if I may?

2           THE COURT:  Yes.

3   Q.  Can you tell us what that is?

4   A.  That's my New York State driver's license.

5           MR. MARGULIS-OHNUMA:  We offer defense Exhibit F into

6   evidence, your Honor.

7           MS. TARLOW:  No objection, your Honor.

8           THE COURT:  Admitted without objection.

9           (Defendant's Exhibit F received in evidence)

10          MR. MARGULIS-OHNUMA:  So I will publish that on the

11  ELMO, if I may.

12  BY MR. MARGULIS-OHNUMA:

13  Q.  Is that the address you just told us?

14  A.  Where I lived before I moved to 1423 Stanley Avenue.

15  Q.  What was date you moved to Stanley Avenue?

16  A.  Either late -- like late October, early November.

17  Q.  October or early November of what year?

18  A.  2014.

19  Q.  When you lived at Stanley Avenue, did you receive mail

20  there?

21  A.  Yeah.

22  Q.  And did that include bank statements on occasion?

23  A.  Yeah.

24  Q.  I'm going to hand the witness who what has been marked for

25  identification as Defendant's Exhibit G.

J7BTKID3                         Kidd - Direct

1         Is that a piece of mail that you received while you

2    lived at Stanley Avenue?

3    A.  Yeah.

4    Q.  Tell us what it is briefly.

5    A.  It's a bank statement from Chase.  A summary deposit

6    account.

7    Q.  One page, right?

8    A.  Yeah.

9         MR. MARGULIS-OHNUMA:  We'll offer Defense G into

10   evidence, your Honor.

11        THE COURT:  Ms. Tarlow?

12        MS. TARLOW:  Objection, your Honor, it's hearsay.

13        MR. MARGULIS-OHNUMA:  It's a piece of mail that he

14   received at his apartment to Chase.  He just testified to that.

15        THE COURT:  We understand what it is, but first of

16   all, what is the relevance of this?

17        MR. MARGULIS-OHNUMA:  The relevance to establish his

18   address, your Honor.

19        THE COURT:  Is that address in dispute?

20        MR. MARGULIS-OHNUMA:  Well, when he moved there is

21   important to the case.  It's indicated on here -- it's not an

22   assertion of fact, it was something that was used by a business

23   to send him mail.  It's not hearsay.

24        THE COURT:  I'm still trying to understand the link

25   between where he resided in 2014 and the events.

J7BTKID3                         Kidd - Direct

1     MR. MARGULIS-OHNUMA:  We're getting to it.  The date

2  on the document is 2015, and we'll get to that.

3          Is it a relevance or hearsay objection?

4          THE COURT:  Really both, but I will give you a little

5  bit with of leeway, but let's see where it goes.

6          MR. MARGULIS-OHNUMA:  I don't -- I would like to offer

7  the evidence and --

8          THE COURT:  Subject to connection, right?

9          MR. MARGULIS-OHNUMA:  Sure.  May I publish it then?

10         THE COURT:  Yes.

11 Q.  Defense Exhibit G in evidence, subject to connection.

12         Mr. Kidd, what's the date on that document?

13 A.  December 10, 2015.

14 Q.  And what's the address indicated on that document?

15 A.  1423 Stanley Avenue, Apartment Third Floor, Brooklyn, New

16 York.

17 Q.  As of December 10 of 2015, did you actually live at 1423

18 Stanley Avenue?

19 A.  Yes.

20 Q.  When did you move out of the Stanley Avenue address?

21 A.  April 1st, 2016.

22         MR. MARGULIS-OHNUMA:  Do you want me to proffer the

23 relevance.

24         THE COURT:  Yes.

25         MR. MARGULIS-OHNUMA:  This contradicts the testimony

J7BTKID3                        Kidd - Direct

```
 1   of Kaira Brown that she went in the spring of 2015 and that's
 2   when she met Mr. Kidd.  So I'm offering --
 3            THE COURT:  To impeach a witness who has already
 4   testified.
 5            MR. MARGULIS-OHNUMA:  Yes, impeachment by
 6   contradiction.  I'm offering it to prove where he lived at that
 7   time, which is material to the case, your Honor.
 8            THE COURT:  Does the government have a view on this?
 9            MS. TARLOW:  Your Honor, the document itself does not
10   contradict Ms. Brown's testimony, even if it were to be
11   admitted as true.
12            THE COURT:  The Court will admit the document to
13   establish at least one residence that the defendant may have
14   had in December of 2015.  I am still waiting for the
15   connection.
16            MR. MARGULIS-OHNUMA:  For the connection to the case?
17            THE COURT:  Yes.
18            MR. MARGULIS-OHNUMA:  The connection to the case is
19   that the witness described incidents that happened earlier in
20   2015 at a different place.  He wasn't living there at that
21   time.
22            THE COURT:  Well, people can have more than one
23   residence.
24            MR. MARGULIS-OHNUMA:  That goes to weight, not
25   relevance, not admissibility.
```

1          THE COURT:  I will allow the document, but again, I'm

2     going to continue to see where this leads.

3          MR. MARGULIS-OHNUMA:  For now it's in evidence?

4          THE COURT:  Yes.

5          MR. MARGULIS-OHNUMA:  Thank you, your Honor.

6          (Defendant's Exhibit G received in evidence)

7     Q.  Sir, did there come a time when you left the Stanley Avenue

8     address?

9     A.  Yes.

10    Q.  And what was the date of that?

11    A.  April 1st, 2016.

12    Q.  And where did you move to?

13    A.  2458 Nostrand Avenue, Brooklyn, New York.

14    Q.  In connection with moving to Nostrand Avenue, did you enter

15    into a lease agreement?

16    A.  Yes.

17    Q.  I'm going to hand the defendant what's been previously

18    marked for identification as Defense Exhibit H.  It's two-page

19    document.

20          Sir, is that your lease for the Nostrand Avenue

21    apartment?

22    A.  Yes.  Lease and renewal, because I got it renewed for the

23    next year.

24          MR. MARGULIS-OHNUMA:  Your Honor, defense moves

25    Exhibit H into evidence.

J7BTKID3                        Kidd - Direct

1          MS. TARLOW:  We object, your Honor.

2          THE COURT:  Sustained.

3          MR. MARGULIS-OHNUMA:  What's the ground for the

4     objection?

5          THE COURT:  This is a hearsay document.  You have not

6     established --

7          MR. MARGULIS-OHNUMA:  I'm not offering it for the

8     truth of any matter asserted, I'm offering it as a legal

9     document that shows that he entered into a lease that started

10    on April 1st, 2016.

11         THE COURT:  Isn't that part of the truth of what's in

12    the document that you're trying to introduce?

13         MR. MARGULIS-OHNUMA:  It's not an assertion of fact,

14    it's the date -- may I have a moment to look up the exact

15    hearsay exception?

16         THE COURT:  If you're offering it for a limited

17    purpose, which is the date on that lease, again, that would --

18         MR. MARGULIS-OHNUMA:  That's all I'm offering it for.

19         THE COURT:  All right.

20         MS. TARLOW:  Your Honor, that is what we object to,

21    because it is being offered for the truth that is stated in the

22    lease agreement, that the defendant moved into the residence on

23    that date.

24         MR. MARGULIS-OHNUMA:  I'll have the correct rule in a

25    second, if you want to --

1          THE COURT:  Let's proceed.  Again, let's see where it

2    goes.

3          MR. MARGULIS-OHNUMA:  Sorry, is the document in

4    evidence or not in evidence?

5          THE COURT:  I will allow it subject to connection,

6    again.

7          MR. MARGULIS-OHNUMA:  But the only relevance is to

8    prove where he lived during the time period alleged in the

9    indictment.

10          MS. TARLOW:  And your Honor, that's the basis for our

11    objection is the purpose for admitting this document is to

12    prove that the defendant moved into the residence on a

13    particular date, and therefore it's being admitted for the

14    truth of the matter asserted.

15          MR. MARGULIS-OHNUMA:  If you give me a moment I will

16    find the exact hearsay exception.

17          THE COURT:  All right.

18          (Pause)

19          MR. MARGULIS-OHNUMA:  For example, under Federal Rule

20    of Evidence 803.14, records of documents that effect an

21    interest in property are an exception to the hearsay rule.

22          THE COURT:  Ms. Tarlow?

23          MS. TARLOW:  Your Honor, we don't believe this

24    document falls under that exception which requires that the

25    record of a document which purports to establish or effect an

J7BTKID3                          Kidd - Direct

1    interest in property if (A), the record is admitted to prove

2    the contents of the original recorded document or else its

3    signing, its delivery by each person who purports to have

4    signed it, (B) the record is kept in a public office, and (C) a

5    statutes authorizes the recording of documents of that kind in

6    the office.

7              MR. MARGULIS-OHNUMA:  You're right, I don't know that

8    the lease was recorded.

9              THE COURT:  That exemption does not apply here,

10   Mr. Margulis, so you still have not laid a foundation for how

11   this document comes in when you're seeking to essentially

12   refute the indictment.  To me that sounds like you're offering

13   it for its truth.

14             MR. MARGULIS-OHNUMA:  Let me check Rule 804.

15             Rather than waste the jury's time, I guess I request

16   permission to brief this and I will move on.

17             THE COURT:  All right.  Move on.

18             MR. MARGULIS-OHNUMA:  I do have another lease.

19   BY MR. MARGULIS-OHNUMA:

20   Q.  Sorry, Mr. Kidd, you told us you moved into Nostrand in

21   April 2016, is that correct?

22   A.  Yeah, April 1st.

23   Q.  And you signed a lease with the landlord that started that

24   day, is that correct?

25   A.  Yes.

J7BTKID3                    Kidd - Direct

1    Q.  Did you actually move in that day?

2    A.  Yeah.

3    Q.  So how long did you live in Nostrand, until when?

4    A.  Like two and a half years, so until October of 2018.

5    Q.  And where did you move to?

6    A.  9529 Church Avenue, Apartment 2A, Brooklyn New York, 112 --

7    I think 08 I think is the zip code.

8    Q.  And generally both the Nostrand address and the Church

9    address, were you operating some kind of business there?

10   A.  Yes, I was.

11   Q.  What was it?

12   A.  Well, basically I did have prostitution going on at my

13   house.  I would put up ads on BackPage at the time before it

14   got shut down for women that wanted to come make money.

15   Q.  What was the arrangement that you had with the women that

16   worked there?

17   A.  They come over, they would use one of the rooms to do

18   dates, we would split the money 50/50, I would spend money on

19   posts, I would edit their pictures, I would provide them with

20   condoms because I got tested, so like whenever I go to clinic I

21   get a bunch of condoms and stuff, and they had like baby wipes

22   that got a little costly.

23   Q.  Did you ever have anyone under 18 working out of either of

24   those locations?

25   A.  Absolutely not.

1    Q.  And how do you know?  How did you control that?

2    A.  I was very adamant about photo ID on every recruitment ad

3    that I put up it says no one -- you must be 18 or older, and

4    when they contacted me, like if someone would call me when I'm

5    trying to find out information on them, where are you from,

6    send the pictures of you, that sort of thing, I made it clear

7    that you had to bring photo ID when you came.  There was no

8    exceptions.

9    Q.  And you said something about the ads.  Which ads are you

10   talking about that reference the age of the person?

11   A.  The ads that they're referring to, recruitment ads.

12   Q.  And what specifically did those say about the age of the

13   person who was going to respond to it?

14   A.  You must be 18 or older.

15   Q.  How did you split the money with the women that worked out

16   of your apartment?

17   A.  50/50.

18   Q.  Did you ever -- if there was a disagreement with a woman

19   working there, what was your general practice and what steps

20   would you take?

21   A.  Any money that she -- that she earned I gave it to her and

22   she go.

23   Q.  Did you ever -- I think the witness's testimony is that you

24   punished them.  Did you ever punish any of the women that

25   worked for you?

1    A.   Absolutely not.  I'm not a pimp.

2    Q.   What do you mean when you say you're not a pimp?

3    A.   What the expert didn't point out yesterday is that for

4    starters, pimps don't do splits, pimps take all your money if

5    you're a prostitute.  There's no such thing as a pimp --

6              MS. TARLOW:  Objection.

7              THE COURT:  Overruled.

8    A.   Pimps don't do any type of split, it's whatever money the

9    woman is making it goes straight to the pimp and that's it.

10   They punish and put hands on women that get out of line, if

11   they're considered out of line, and there's a lot more to it.

12   What I had going on, we just trying to make money.

13             Did I want control over my household, yeah,

14   absolutely, whether you're male or female, because if it's my

15   apartment and I'm paying rent, I feel like what I say should

16   stand for something.  But as far as like the picture that they

17   were painting like I was just some egomaniac that just was

18   beating up on people and just being sadistic, like cruel and

19   abusive, I was never like that.  Most I did was raise my voice,

20   and usually it was telling somebody to leave.  Like I never

21   forced nobody to work, I never dealt with no minors.  Before I

22   put up the ads I made sure that every female that was in those

23   ads was comfortable with what I put up.  I asked them well, are

24   you comfortable with this, what don't you do, and I put it in

25   the ad.  So for these females to come and lie and say that I

1   forced them to -- I'm not trying to be nasty, but like do anal

2   and unprotected sex when the ads that the prosecutors have

3   shown clearly contradict that, you know, it's just -- it is

4   trying to paint me out to be a monster.

5   Q.  What about the ad that they showed you about the brown

6   showers, how do you explain that?

7   A.  Yeah, like there's clients that want fetishes.  I don't

8   necessarily agree with the type of fetishes that these guys are

9   into.  There's some women that are okay with doing these things

10  and some women that aren't.  Before I put up the ad I go

11  through the list and say okay, what are your dos and don'ts,

12  and I tell you there many be some guys -- forgive me, I'm not

13  trying to be nasty, I'm just explaining to you so you get a

14  better understanding.  So like, for instance, you have guys

15  that are into like dominatrix or humiliation or urination, that

16  sort of thing, and there's some women that they're okay with

17  doing these things and some women that --

18  Q.  Let me stop you.  Did you ever put up an ad like that when

19  the woman was not okay with doing that?

20  A.  No, absolutely not.

21  Q.  What about for Dana, did you hear testimony about that?

22  A.  Yeah.

23  Q.  Did you do what she said you did?

24  A.  No.

25  Q.  So if we may, let's go to Dana for a moment.

1    A.  All right.

2    Q.  How did you meet her?

3    A.  She responded to an ad on BackPage.

4    Q.  Did you meet her on Utica Avenue?

5    A.  No.

6    Q.  Did you meet her on Pinkit Avenue?

7    A.  Pitkin, no.

8                Basically what Dana --

9    Q.  Tell me about what -- she responded to the ad, what

10   happened?  What was the interaction you had with her?

11   A.  She responded to the ad like everybody else who I actually

12   have encountered, because some of the females I don't know, but

13   she responded to the ad, she wanted to make money.  She was

14   here on a visa from Guyana.  She wanted discretion, so she sent

15   me -- because one of the main things that I do is any woman

16   that responds to the ad I have them send me a picture, usually

17   a nude picture to make sure they're not the cops.  So she

18   didn't send me a face picture but she sent me some body shots.

19   I gave her the exact -- not the exact address because I used to

20   not give out the actual address, I told her Norstrand and

21   Avenue K.  She came over, I took pictures of her.  We did have

22   sex.  She started working, put up an ad for her.  She was very

23   adamant about being -- her face being blurred.

24   Q.  Let me stop you for a second.  When you had that sex that

25   first time, did you record her?

J7BTKID3                          Kidd - Direct

1   A.  Absolutely not, no.

2   Q.  Is there a video camera in your bedroom?

3   A.  No, in my living, but -- and I didn't have one at that

4   time.  I got that living room -- that camera for my living room

5   in like I think February of last year.

6   Q.  Did you show to Dana a video of her having sex with someone

7   else?

8   A.  No.

9   Q.  Go on from there.

10  A.  That whole story about I blackmailed her, she made it up.

11  Q.  Did she start working for you immediately?

12  A.  She started working the same night, yeah.

13  Q.  And did there come a time when you had a discussion with

14  her about marriage?

15  A.  Yeah.

16  Q.  When was that?

17  A.  December of 2017.

18  Q.  And what was the discussion?

19  A.  She -- because at this point she had been -- me and her had

20  gotten kind of close.  She left, went to Guyana in like I guess

21  April and then came back September 11 if I remember, because

22  she got the tickets extremely cheap.

23  Q.  That's 2017?

24  A.  Yeah, she got -- I picked her up from the airport and

25  everything, she stayed by me.  At this point she was living

J7BTKID3                    Kidd - Direct

1   with me.  She mentioned it the first time in like passing, like

2   how if she could -- if she could find somebody to marry her she

3   could become a citizen in the country, basically.  I knew where

4   she was going with it but I didn't really entertain it, and

5   then she brought it up again.  And at this time, her -- who she

6   said was her grandfather -- well, let me go back.

7         She had family in Brooklyn, she had an aunt that --

8   she had -- despite what she was trying to -- the picture she

9   was trying to paint, she has family all over, some that I

10  actually met myself.  So she had an aunt that lived I think on

11  Herkimer, I don't know I'm saying it right, but that I used to

12  go and get plates of -- trays of lo mein, chicken lo mein

13  because I like how she made it or whatever.  I would go meet

14  with her aunt or her aunt's boyfriend and pick up food from

15  them and it bring back.

16        According to her, her aunt's grandfather or aunt's

17  father or something to that effect, had died and left like a

18  large sum of money like $500,000 to be split among the

19  relatives, including Dana, and he had left $85,000 for Dana,

20  and she used that as incentive for me to marry her.  And I was

21  going to marry her for money.  I didn't get paid for marrying

22  her, but that was the original plan.  It turned out to be a

23  scam as far as her aunt, because the aunt ripped off the

24  family.  There was no will, her aunt basically --

25        MS. TARLOW:  Objection.

1          THE COURT:  Sustained.

2  Q.  So just going to her state of mind, she told you that she

3  had -- withdrawn.

4          Was it your understand that she expected to come into

5  some money?

6  A.  Yes.

7  Q.  Is that why you married her?

8  A.  Actually, no, that was -- initially I was going to marry

9  for money, but after it turned out not to be, she was pretty

10  hurt about that.

11  Q.  Tell us what happened.

12  A.  Okay.  So turned out -- can I say this?  There was no

13  money.  She had actually did end up losing money.

14  Q.  Did you end up marrying her anyway?

15  A.  Yeah, because I felt bad and I felt she was a decent person

16  so I married her anyway.

17  Q.  Was part of your motivation to marry her to help her get

18  her citizenship?

19  A.  That was the only reason, money to the side.

20  Q.  Did you ever bend back her fingers the way she described in

21  her direct?

22  A.  I never.

23          MS. TARLOW:  Objection, your Honor, leading.

24          THE COURT:  Overruled.

25  A.  I never put my hands on her.  I never put my hands on Dana.

1    Q.  Let's talk about Jessica Bonilla.  Do you know -- before

2    the trial started, before you learned the names of victims, did

3    you ever know that name?

4    A.  Didn't know her by that name.

5    Q.  Just the name?

6    A.  The name Jessica --

7    Q.  Did you know that name prior to trial?

8    A.  No.

9    Q.  But did you see the pictures here at the trial --

10   A.  Yeah.

11   Q.  -- associated with Ms. Bonilla?

12   A.  Yeah.

13   Q.  Did you know that person?

14   A.  Yeah.

15   Q.  How did you know her?

16   A.  We met not through BackPage like she claimed, but --

17   Q.  How did you meet?

18   A.  Well, one day I -- I used to play basketball in Brownsville

19   at the BRC, Brownsville Recreational Center.

20   Q.  And did you ever -- did she ever work out of your in-call

21   spot?

22   A.  No.

23   Q.  What about the BackPage pictures of her, did you -- how do

24   you explain those then?

25   A.  Well, pretty much I didn't meet her through BackPage.  What

1   happened I was coming from basketball, because I used to play

2   in the Brownsville Recreational Center on Monday nights and

3   Wednesday nights with my father.  And I was driving and saw her

4   outside of a building smoking a cigarette, and I pulled over to

5   talk to her basically saying I think you're cute, that sort of

6   thing.  We exchanged numbers, I think she even gave me her

7   Facebook and we kept in touch.  A few days later --

8   Q.  Let me stop you.  What name did you know her by?

9   A.  Diamond.

10  Q.  Go on.  What happened?

11  A.  When I pulled over to talk, she didn't come to me the same

12  day or whatever, but we were talking and we got into the whole

13  Zodiac thing, because, like I said, I'm really into that.

14  She's a Pisces and I said I'm a Virgo, that sort of thing.  I

15  made a joke about -- because she has I think at the time it was

16  one teardrop, tattoo of a teardrop on her face, and I made a

17  joke about her being a killer, and she was telling me about

18  her --

19          MS. TARLOW:  Objection.

20  A.  -- child's father.

21          THE COURT:  Sustained.

22  Q.  Let's go from there.  Just tell us how you explain the

23  BackPage ads.

24  A.  So she came over -- well, actually I picked her up, we hung

25  out a few times at my apartment.  At the time I did have other

1   females there, one in particular the first time she came, and I

2   lied and said that she was my cousin, because I didn't want

3   it -- because like when I meet females that I'm not sure are in

4   the life, so to speak, I don't come right out and say hey, this

5   is what I got going on.  I got to kind of feel them out first.

6   So the female --

7   Q.  Let's get to the BackPage ads.

8   A.  I'm getting to that.  So the female that I had over there,

9   I told her that was my cousin, which she wasn't, she was

10  actually a prostitute working.  And we went in my room and then

11  the next time she came over it was different females there.

12  And I came up with a story about a cousin and her friend or

13  something, and she said to me, she was like basically --

14          MS. TARLOW:  Objection.

15          THE COURT:  Sustained.

16  A.  It's ties into how --

17          MS. TARLOW:  Move to strike.

18          THE COURT:  Sustained.

19  A.  Okay.

20  Q.  Don't say what she said, say what happened.

21  A.  Basically, it was --

22  Q.  Your understanding is fine.

23  A.  My understanding was that at that point that she had -- she

24  was familiar with prostitution, and we had discussed -- I don't

25  know how I could explain.

J7BTKID3                          Kidd - Direct

1    Q.  Say it, and if they object, we'll figure out another way.

2    A.  So the plan was for us to work together.  I have in my, as

3    you see in -- I have a dresser in the other room used for

4    prostitution has a bunch of different outfits, lingerie and

5    stuff for different-sized females.

6              So she put on --

7    Q.  Let me stop you there.  Did you ever post an ad of Jessica

8    on BackPage?

9    A.  No.

10   Q.  Do you know how those pictures got onto BackPage?

11   A.  They didn't get on BackPage.

12   Q.  Do you know how those pictures were taken?

13   A.  As far as actual pictures?

14   Q.  The pictures that you saw from the BackPage ad.

15   A.  I took the pictures but I never put them on BackPage.

16   Q.  And did you save those pictures on a computer or some other

17   device?

18   A.  Yeah, which is how they reconstructed and put everything

19   back -- could I go on --

20   Q.  The pictures that you talk about, none of them show her

21   genitals, is that correct?

22   A.  No.

23   Q.  Is there something else that you wanted to say?

24   A.  Just to be clear, she did show me identification prior to

25   us taking -- I'm not going to lie and say when I first met her

J7BTKID3                          Kidd - Direct

1     that I saw her ID, no, but once the discussion about BackPage

2     and everything took place, I did see her ID before any pictures

3     were taken or anything like that.  The reason why that didn't

4     work out, as far as me posting her on BackPage and us making

5     money together, is because she is self-conscious about her

6     body, and she didn't like the pictures and she wanted to use

7     fake pictures.  And I don't really like to promote bait and

8     switch, that's why we ended up not doing anything with them.

9     Q.  You heard the testimony of Aisha Goncalves.  Do you

10    remember that?

11    A.  Yeah.

12    Q.  Have you ever seen that person before in your life?

13    A.  No.

14    Q.  You heard the testimony of Sabrina Misere.  Do you remember

15    that?

16    A.  Yeah.

17    Q.  Have you ever seen Sabrina Misere before in your life?

18    A.  No.

19    Q.  Have you ever picked either of them up in Manhattan?

20    A.  No.  And they also said Cedar Knolls.  Well, what's the

21    first one?

22    Q.  Did you ever pick either of them up at Hawthorne Cedar

23    Knolls?

24    A.  No.

25    Q.  Had you ever heard of Hawthorne Cedar Knolls before this

J7BTKID3                          Kidd - Direct

1    case?

2    A.  No.  And for the record, the prosecutor, they have my GPS

3    location records.

4            MS. TARLOW:  Objection.

5            THE COURT:  Sustained.

6    Q.  Did you get an opportunity to review some discovery in this

7    case that was provided to our office?

8    A.  Yeah.

9    Q.  And did that include GPS location records?

10           MS. TARLOW:  Objection.

11           THE COURT:  Sustained.

12           MR. MARGULIS-OHNUMA:  What's the objection?

13           THE COURT:  Sustained.

14           MR. MARGULIS-OHNUMA:  What kind --

15           THE COURT:  Nothing in the record here about GPS

16   records.  Proceed.

17   A.  Okay.  I never been to that place.  I didn't know about the

18   place until I read about it an article after I was arrested

19   with 18 other people.

20   Q.  Do you recall hearing testimony about at individual named

21   Brielle?  Did you hear that testimony?

22   A.  Yeah, I guess the third girl they alleged.

23   Q.  Do you know before you were -- before the trial had you

24   ever heard of that person?

25   A.  No.  I'm pretty sure I heard the name Brielle before, but

1    that specific person, no.

2    Q.  Let's talk about Ariele.  Did you ever threaten to send --

3    withdrawn.

4          Did you ever threaten her in any way?

5    A.  No, I asked her to leave multiple times and she refused.

6    Q.  Why did you ask her to leave?

7    A.  I didn't trust her, and she had what I call homeless

8    habits.  She was -- I'm trying to think of a way, I don't want

9    to sound like I'm trying to be degrading, but she did nasty

10   things.  Like I'm a neat freak, so I like -- especially if you

11   got clients coming back and forth all the time, if they feel

12   like the place is nasty they're not going to want to come back,

13   and I was like real adamant about keeping the place clean.  And

14   she left gross stuff, and also I didn't trust her.

15   Q.  On December 12, before your arrest, in the wee hours of the

16   morning, was the place neat and orderly?

17   A.  Yeah.

18   Q.  So the pictures that you saw, the messy parts of the

19   pictures you saw, was that how it was before you were arrested?

20          MS. TARLOW:  Objection.

21   A.  No, they went through my --

22          THE COURT:  Overruled.

23   A.  No, it wasn't.

24   Q.  The open drawers in the pictures, were those open before

25   you were arrested?

J7BTKID3                          Kidd - Direct

1   A.  No.  It was an illegal search.

2              MS. TARLOW:  Objection, your Honor, move to strike.

3              THE COURT:  Sustained.

4   Q.  So did you -- were you aware that Ariele was having a

5   custody issue with her husband over their daughter?

6   A.  Yeah.

7   Q.  And --

8   A.  Well, not husband, her child's father.  I don't think she's

9   married.

10  Q.  Did you ever threaten to expose her as a prostitute?

11  A.  No.

12  Q.  Did you ever do that to anybody?

13  A.  No.  My remedy, if you gave me a hard time and I couldn't

14  deal with it, you got to go.

15              And could I go on record about the initial issue of

16  why I asked Ariele to leave the first time?

17  Q.  Yeah, why did you ask Ariele leave the first time?

18  A.  It was a situation where a client came to see her, she

19  thought it was a cop and she wasn't sure, so instead of asking

20  him to leave, she told Janell, who was --

21              MS. TARLOW:  Objection.

22              THE COURT:  Sustained.

23  Q.  Don't tell us what she told Janell --

24  A.  Well --

25  Q.  -- tell us what you saw.

1    A.   Okay.  Ariele came into my room and I asked her what's

2    going on, because she was supposed to be seeing a client --

3            MS. TARLOW:  Objection.

4            MR. MARGULIS-OHNUMA:  He could say what he asked her.

5    A.   -- and another female ended up seeing the client.

6            MR. MARGULIS-OHNUMA:  One moment, your Honor.

7            (Pause)

8    Q.   Let's move on from there, Mr. Kidd.

9    A.   Could I go on record to say that every witness that was

10   supposed to testify on my behalf was threatened by the

11   government to not come?

12           MS. TARLOW:  Objection.

13           THE COURT:  Sustained.

14   Q.   You heard the YouTube videos earlier today, right?

15   A.   Yeah.

16   Q.   You heard that tape recording?

17   A.   Yeah.

18   Q.   Can you tell us -- let's start with the tape recording.

19   What was that?

20   A.   Everything they showed.

21   Q.   Let's talk about the tape recording.

22   A.   Yeah, that was -- I used to do something, this was on

23   iTunes, I had a segment called "What Pisses Me Off" where I

24   would bring up random topics of things that annoyed me.  And I

25   use humor -- like my podcast personality and that sort of

1    thing, I use humor as a way to deflect.  I say offensive

2    things, I say vulgar things, but there's a point at the end.

3              So yeah, do I get carried away sometimes?  Yeah, okay,

4    but shock value sometimes, yes, because I'm heavy on YouTube, I

5    have been heavy on YouTube since like 2009, 2010, and it's

6    about my videos getting clicks, getting views, that sort of

7    thing.  So yes, I do go over the top with stuff that I say, but

8    I also make a lot of valid points, too, and talk about real

9    issues, like I speak out against the "Me Too" movement, I speak

10   out against society promoting pedophilia.

11             MS. TARLOW:  Objection.

12   A.  I speak out against false rape allegations.

13             THE COURT:  Sustained.

14   Q.  Let's move on more specifically.  You saw some snippets

15   from YouTube this morning, right?

16   A.  Yeah.

17   Q.  Were those, in your view, taken out of context?

18   A.  Absolutely.  They just picked pieces that made me look like

19   a monster.

20             MS. TARLOW:  Objection.

21             THE COURT:  Sustained.

22   Q.  Is there something you would like to tell us about that

23   would put those in better context?

24   A.  Sure.  For instance, the last one that said to be pimp you

25   have to be aggressive, if they showed the full clip it would

J7BTKID3                          Kidd - Direct

1    have showed --

2                MS. TARLOW:  Objection.

3                THE COURT:  Sustained.

4    A.  -- why I couldn't be a pimp.

5                THE COURT:  Sustained.

6    Q.  Hang on.  What did it say -- remind me what it said.

7    A.  I was having a --

8                MS. TARLOW:  Objection.

9                MR. MARGULIS-OHNUMA:  I'm just asking him to remind

10   me.

11   A.  Could you play the clips?

12               MR. MARGULIS-OHNUMA:  Wait for the judge's ruling.

13               THE COURT:  Overruled.

14   A.  So the conversation we were talking about I don't remember

15   verbatim because it was long ago, but I know we were talking

16   about what it takes to be a pimp and I was saying why I

17   couldn't be a pimp because --

18               MS. TARLOW:  Objection.

19               THE COURT:  Sustained.

20   Q.  So calling your attention to Government Exhibit 309A in

21   evidence, which is the transcript, when you said you have to be

22   ruthless to be a pimp, is that right?

23   A.  Yes.

24   Q.  In your opinion as you sit here today, do you have to be

25   ruthless to be a pimp?

J7BTKID3                    Kidd - Direct

1    A.   Ruthless or aggressive?

2            MR. MARGULIS-OHNUMA:  I will read it, because it's in

3    evidence, your Honor.

4            THE COURT:  Yes.

5    Q.   You got to be ruthless like -- because you can't talk to

6    these hoes, you got to beat the shit out of them.  Do you

7    believe that?

8    A.   Did I say that or did -- could you be clear who said that?

9    Q.   It says Kidd.

10   A.   Would you read the whole thing?

11   Q.   You got to be ruthless like -- because you can't talk to

12   these hoes, voiceovers, you got to beat the shit out of them.

13           Do you believe, as you sit here today, you got to beat

14   the shit out of hoes?

15   A.   No.

16   Q.   Why did you say that on YouTube?

17   A.   What I was saying is -- once again it was taken out of

18   context.  I was saying why I couldn't be a pimp, because in

19   order to be a successful pimp, these are the things you have to

20   do, and I don't have the heart to do that.

21           It's in the video.  They won't show that.

22           MS. TARLOW:  Objection.

23           THE COURT:  Sustained.

24   A.   I was breaking down -- I was breaking down the psychology.

25   I was saying that a lot of females that have pimps and like

 1   pimp and hoe type relationships have been like molested and

 2   been abused, and they're used to basically brutality.  So if

 3   they come across a guy that is not treating them way, this is

 4   what they have been used to, then you're not going to get a

 5   good, like, response.

 6   Q.  Were you trying to say that you treat women that way?

 7   A.  Absolutely not, no.

 8   Q.  Were you condoning treatment of women that way?

 9   A.  No.

10   Q.  Do you know what I mean by "condoning?"

11   A.  Yeah, like advocating, saying it's okay.

12   Q.  Were you doing that?

13   A.  No.

14          MR. MARGULIS-OHNUMA:  Judge, may I consult with my

15   client for a moment?

16          THE COURT:  Yes.

17          (Pause)

18          THE WITNESS:  Also, could you do me a favor?  I don't

19   know if you're allowed to do this, as far as the BackPage ads,

20   I wanted to point out some things starting from 400 to like.

21          MR. MARGULIS-OHNUMA:  We'll pull those up.

22          Ms. Harney, could I ask you to pull up some exhibits

23   for Mr. Kidd?

24   Q.  Was there a specific ad you wanted to look at?

25   A.  I wanted to go through them.

1    Q.  Every one?

2    A.  Yeah.

3           MR. MARGULIS-OHNUMA:  We'll have to do this in a way

4    where the audience can't see.  I have the unredacted.  Do you

5    have the redacted 400?

6           I'm displaying Government Exhibit 400, the child

7    pornography pictures.

8           THE WITNESS:  So the ad itself in like the text seems

9    accurate.  Of course that isn't accurate, but I don't want the

10   jury to take my word for it, I would like to show a pattern of

11   inconsistency.

12   BY MR. MARGULIS-OHNUMA:

13   Q.  Let's be clear what you're talking about.  Are you saying

14   the creation date is not accurate?

15   A.  Yeah.

16   Q.  When was this ad created?

17   A.  Sometime in April or late April.

18   Q.  Can you put up the next one?

19   A.  Sure.

20   Q.  Calling your attention to Government Exhibit 401 in

21   evidence.

22   A.  So what I would like to point out, see the title for the

23   jury, if you pay very close attention to the title and

24   description, whenever I'm promoting more than one female, you

25   know, like list the females' names and like a description of

1  them in the post.  And as you could see as far as the pictures

2  has their own -- they have their own names and numbers.

3          And also this wasn't posted around this time either,

4  and I don't believe that the females that are -- well, this is

5  the ad, not the posting time, but if you go to the next ad,

6  please.

7  Q.  Could I ask you a question about what you just said?

8  A.  Yeah.

9  Q.  When you say referring about the phone number, are you

10 talking about the phone numbers in the pictures?

11 A.  Yeah.

12 Q.  I'm indicating on the upper right Pearlene, whose phone

13 number is that?

14 A.  Hers, whatever number she is using for whatever app.

15 Q.  What about the one for Milan, whose is that?

16 A.  They were all their phone numbers.

17 Q.  So I will go to the next one, Government Exhibit 402 in

18 evidence.

19 A.  You can go to the next one, it's pretty much the same.

20 Q.  Let me ask you though, for the record, is the date on that

21 ad accurate?

22 A.  No.

23 Q.  When was that ad posted?

24 A.  Any ads that had Pearlene, Kaira Brown, in it, they're

25 trying to make it seem like February.  I didn't know her in

J7BTKID3                        Kidd - Direct

1    February, so if it's not from April -- late April on of 2017,

2    then it's not real, but if you go to --

3    Q.  I will go to 403.

4    A.  Yeah, 403.  To give an example of the type of -- okay, so

5    you see here how -- you see how in the other ads it was

6    promoting multiple females in the description?

7    Q.  Yes.

8    A.  But you see here how it's promoting multiple females, well,

9    actually multiple pictures of different females but only

10   promoting one female.  Like the title says, no bait and switch

11   ever, let's play, baby, it was promoting Dana.  But then you

12   see like it has like two or three other females in there, but

13   the description doesn't say anything about the other females,

14   it just says about Dana or as Peaches.

15   Q.  Let's break that down a little.  You're indicating the text

16   of the ad indicates just Peaches, is that right?

17   A.  Yes.

18   Q.  And are you saying -- did you ever post an ad with the text

19   says Peaches but the photo said other individuals?

20   A.  No.

21   Q.  You never did that?

22   A.  No, the ad -- that's why I wanted you to show the other

23   ones first, just to show consistency.

24   Q.  Is this an accurate reconstruction of an ad that you

25   actually posted?

1    A.  No.

2    Q.  Were any of the reconstructions, Government Exhibits 400 to

3    421, accurate?

4    A.  No, because even the first two that were shown, the dates

5    are off.

6            But I would like if you could put more on.

7    Q.  Yeah, I will go through them all.

8            So Government Exhibit 404, what did you want to point

9    out about that?

10   A.  For instance here, once again, there's three different

11   females, three different females getting promoted on this as

12   far as the pictures, but if you look at the text, it's only

13   promoting Pearlene.  The date is off as well, but you see in

14   the pictures there's clearly three different females.

15   Q.  Did you post this ad in February 2017?

16   A.  No.

17   Q.  Do you know when this ad was posted, if at all?

18   A.  Like I said, it had to be April or later pertaining to the

19   Pearlene, because I didn't know her in February of 2017.

20   Q.  Government Exhibit 405 in evidence.

21   A.  Also Dana didn't either, so just to put that on record.

22   Q.  Sorry, Dana didn't what?

23   A.  Dana didn't know -- I met Dana --

24           MS. TARLOW:  Objection.

25           THE COURT:  Overruled.

1    A.   I met Dana in February of 2017.  I didn't know Pearlene in

2    February of 2017, I met her in April, and Dana was out of the

3    country by the time that I had met Pearlene.  So they seem like

4    they're trying to put them together to make it seem like

5    they're both victims in the case, and they don't know each

6    other at the time.

7    Q.   Let's go to Government Exhibit 405.  Is there anything that

8    you would like to point out about that?

9    A.   Just to show consistency.  Once again you see one female in

10   the pictures and you see it's promoting one female.  And

11   contrary to what Dana said yesterday, it's not promoting

12   unprotected sex, it says everything covered at all times; by

13   "covered" means with a condom.

14        I'm not sure if this one says anything about no back

15   door, but I know that there's other ads that definitely said

16   back door, meaning anal.  I'm not trying to be nasty, but those

17   are like terms -- like BackPage terms.  There are other ads

18   that I have showed, because once again before I put up any ad

19   of any female I went through and say hey, what do you want me

20   to put and promote?  And they told me, and I put it.  And also

21   you see that her face is blurred out in pictures.

22   Q.   So who is in this ad?

23   A.   Dana.

24   Q.   Is there anything else that you wanted to point out about

25   this ad?

1    A.  No.

2    Q.  Government Exhibit 406.

3    A.  You can go to the next one.

4    Q.  Let me ask, did your ads include the entry where it says no

5    pimps?

6    A.  Yeah.

7    Q.  Why did you include that?

8    A.  Because you had pimps that would -- same reason that I

9    ended up putting it on my recruitment ads is because you had

10   pimps that would come up with different tactics of trying to

11   get females, like sneaky stuff, and it always became a problem.

12   For instance, one time one guy text not Dana but another female

13   saying that -- he was pretending to be --

14           MS. TARLOW:  Objection.

15           THE COURT:  Sustained.

16   A.  -- a client.  Okay.

17           THE COURT:  Mr. Margulis-Ohnuma, this is becoming

18   cumulative.

19   A.  If you could --

20   Q.  This is one of the recruiting ads.

21           MR. MARGULIS-OHNUMA:  Let me consult with my client?

22           THE COURT:  You don't need to go through 22 of these

23   if you're making the same point.

24           (Pause)

25           (Continued on next page)

1         MR. MARGULIS-OHNUMA:  I'm displaying what's in

2    evidence as Government Exhibit 409.

3    Q.   Is there something you wanted to point out about that?

4    A.   Okay, so this ad seems about right.  As far as the posting,

5    because as I said before, I met Kaira -- I'm sorry, I'm used to

6    calling her Pearlene.  I met her late April.  What I've been

7    consistent with this before you guys even showed me the ads, I

8    was telling that you I met her late April, early May.  This is

9    around the time.  And I remember, because the young lady with

10   the, well, the dark skinned, the slim female in the picture.

11   That, she's sisters with Kadeisha, who is the one in the

12   middle.  And she wanted to work, but I told her sister that she

13   couldn't until she was 18.  Because her birthday is late April.

14        MS. TARLOW:  Objection.

15        THE COURT:  Sustained.

16   A.   So I just saying, just letting you know how I remember.

17   All right.  If you go to the next one.

18   Q.   Let me see if I can walk you through it.

19   A.   All right.

20   Q.   Do you know the other two individuals posted here?

21   A.   Yes.

22   Q.   Do you know the date that you posted the person on the far

23   right of the ad, roughly the date?

24   A.   Oh, it was because her birthday is late April.  So she

25   came, like, as soon as she turn 18.  Like a few days after she

1   turned 18.

2   Q.  That was in April of 2017?

3   A.  Yeah.

4   Q.  So going to Government Exhibit 417 in evidence.  Is there

5   something you wanted to point out on that one?

6   A.  Okay.  So, once again, it's promoting two females, and

7   it's, oh, but also, you know, to point out once again, the no

8   uncovered service.  So basically, to contradict what Dana was

9   saying that I was making her have unprotected sex with clients

10  and all this other stuff she was saying, that wasn't true.  I

11  always promoted that there was -- that she wasn't doing that.

12  And this ad has another female in it that's not being promoted.

13  But if you can go to the next page.

14  Q.  Government Exhibit 416.  Is this an accurate representation

15  of an ad you put up?

16  A.  No.  Because it's promoting three females, and the

17  advertisement there's two, actually.

18  Q.  Is Dana depicted in any of the pictures on this ad?

19  A.  Yeah, Peaches.

20  Q.  Did you ever actually put up an ad with her with the

21  fetishes listed here?

22  A.  Yeah.  And also, the stuff that she would do and that she

23  wouldn't do.  And also, if you -- oh.  If you look on going up

24  the sixth line where it says -- after it says everything safe.

25  It says no back door.

J7B3KID4                          Kidd - Direct

1    Q.  Okay.

2    A.  No, meaning -- that meant no anal.

3    Q.  Did that mean no anal sex?

4    A.  Yes.

5    Q.  What about the brown shower.  Did you advertise her as

6    being willing to do that?

7    A.  Yeah, because she said she would do it.  She actually has

8    done it before.  But I asked her first.  I didn't just like put

9    it out there.  Like, anything before I put it up, I said what

10   would you do, what wouldn't you do.

11   Q.  She said she was willing to do that?

12          MS. TARLOW:  Objection, your Honor.

13          THE COURT:  Sustained.

14   A.  Yeah.

15   Q.  Did clients pay more for that?

16   A.  Yes.

17   Q.  When clients paid more for that, did Dana share in that

18   extra money?

19   A.  Everything was 50-50.  So whatever --

20   Q.  I'm putting up Government Exhibit 421 in evidence.  Was

21   there something about that ad you wanted to explain to us?

22   A.  Yeah.  So, for instance, this has, this ad that they're

23   trying to say I -- for starters created and posted, I want to

24   point something out about how Backpage works.  Or worked.

25   Because it was shut down now.  The way Backpage goes --

1              MS. TARLOW:  Objection, your Honor.

2    Q.  Is this based on your personal experience?

3    A.  Yes.

4    Q.  You can go ahead.

5    A.  The way Backpage worked is that you either put up an ad or

6    you didn't.  There was no such thing as saving like draft ads.

7    So, whatever day it was created is the same day that it was

8    posted.  As soon as it was created, it was posted.  There was

9    no created file, May 18 and then posted May 21.  Like, because

10   you had to pay to post on Backpage.

11   Q.  Okay.

12   A.  In this, in this picture, these pictures basically, what

13   happened is this.  In my folder in my computer, I had a -- I

14   had a folder labeled "posts" for pictures that I took of

15   females.  Didn't necessarily mean that they were on Backpage,

16   that they got posted.  They were potential pictures.  And the

17   way that I go about editing pictures on Backpage.  There's two

18   programs I use.  I used BeFunky and I use I think Ribbet.  So,

19   some pictures, so like I'll take some pictures and I'll edit

20   them first using one program, to let's say put the phone

21   numbers on.  And then after, I'll go to the next program to

22   like do the finishing touches or blurring out the face or

23   certain effects, because both programs don't have the same

24   effects.  The main thing with me was blurring out the female's

25   faces.

1          In my computer, I had a folder with all these

2     pictures.  What happened, with reconstruct these ads, whoever

3     reconstruct these ads took pictures from my folder in my

4     computer, and mixed in with Backpage pictures, because these

5     pictures I never posted.

6          MS. TARLOW:  Objection.

7          THE COURT:  Sustained.

8     Q.  Hang on.  So, let me see if we can break that down.  You

9     don't know how these ads were put together besides what you

10    heard in court, right?

11    A.  Right.

12    Q.  But, are you saying that some of these items were only on

13    your computer and were never posted?

14    A.  Yes.

15    Q.  So, but because you never posted them, do you know why they

16    would have been in -- do you have any reason to believe that

17    they would have been in the Backpage archive?

18    A.  Not in the Backpage archive.  But, okay.  Well, for

19    starters --

20    Q.  Let me ask you.  Is there anywhere else in the entire world

21    that the pictures here could have come from, besides your

22    computer, based on your personal knowledge?

23    A.  No.

24    Q.  Which pictures in particular are you talking about on

25    government exhibit --

1  A.  The ones that say Domo, I never posted those and that's why

2  you see she's not being promoted in the ad.  It says Vonna.

3  Q.  Did you prepare those?

4  A.  Did I -- what do you mean?

5  Q.  The pictures that say Domo, did you prepare them?

6  A.  Yeah, I did.

7  Q.  By the process you just explained?

8  A.  Yeah, but I never posted them.

9  Q.  Did you ever go to the internet and put those up on

10 Backpage?

11 A.  No.

12 Q.  Why not?

13 A.  Because she's self-conscious about her body.  Thank God,

14 thank God.  She's self-conscious --

15          MS. TARLOW:  Objection.

16          THE COURT:  Sustained.

17          MR. MARGULIS-OHNUMA:  About her --

18          THE COURT:  Yes.

19 A.  Okay.  Well.

20 Q.  When you said thank God.  What did you mean?  What do you

21 mean thank God?

22 A.  Because they're claiming that she was 14.  Which I know

23 wasn't true, but she is -- they're claiming she's 14.  So if I

24 had posted those pictures, then --

25 Q.  But you are saying you never did post them?

J7B3KID4                          Kidd - Direct

1   A.  No, I didn't.

2   Q.  And you never caused her to engage in any kind of sexual

3   activity, right?

4   A.  No.

5   Q.  In the text of the ad itself, is there reference to any

6   other name besides Vonna?

7   A.  No.

8   Q.  Who is Vonna?

9   A.  Kadeisha Brown.  Who --

10  Q.  How old was Kadeisha Brown in May of 2017?

11  A.  21.  This ad, for the record, this is the same female that

12  the witness, Aisha I think, Aisha, the Hispanic girl, claimed

13  to be, one of the alleged minors that I don't know if you

14  remember where she was, where she was coached into pointing

15  out --

16  Q.  Let's stop there.  Let's stop there.

17  A.  Okay.

18  Q.  But --

19  A.  All right.  That's Kadeisha Brown.

20          THE COURT:  Mr. Margulis, keeping an eye on the clock,

21  what is your estimate of how much longer you are going to need?

22          MR. MARGULIS-OHNUMA:  Let me consult with my client.

23          THE COURT:  Yes.

24          (Defendant conferring with his counsel)

25          MR. MARGULIS-OHNUMA:  Judge, we just have three more

1   pictures to go through.

2            THE COURT:  Sorry.  Three more pictures and that's it

3   or three more pictures plus?

4            MR. MARGULIS-OHNUMA:  I mean, I think the defendant

5   might have a few more words to say at the end, but that's all I

6   have left to lead him through.

7            THE COURT:  Move it quickly, please.

8            MR. MARGULIS-OHNUMA:  Yes, your Honor.

9   Q.  Government Exhibit 413 in evidence.  What do you want to

10  point out about that, Mr. Kidd?

11  A.  Okay.  So, to prove my point about what I was saying a few

12  moments ago.  The pictures okay, so, if you look on the second

13  row, okay.  The sixth picture on the second row.  Okay.  You'll

14  see it is a picture of -- that's Dana, that's Dana, and her

15  face is showing in the picture.

16  Q.  Did you ever post that picture with her face showing?

17  A.  No.  She would have killed me.  She was very adamant about

18  not having -- having her face shown because of her family and

19  her boyfriend and stuff like that.

20  Q.  I'm pointing to another picture near the bottom of the

21  page.

22  A.  Yeah.

23  Q.  Is that the same picture?

24  A.  The same exact picture but with her face blurred.

25  Q.  Which one did you actually send to Backpage servers?

1   A.  The one with her face blurred.

2   Q.  Did you ever send an ad to Backpage that had dozens of

3   pictures like this?

4   A.  No.  You can't even post that many pictures on one ad on

5   Backpage.

6   Q.  Was there anything else about this Government Exhibit 413

7   you wanted to point out?

8   A.  Well, yeah.  I was pointing out that in -- you can't put,

9   you can't look -- once again, it is only promoting one female.

10  You can't put this many pictures on one Backpage ad.  And I

11  think that's very important for everybody to know.  And if you

12  see the females, with majority of these females their faces

13  showing.  That's not the versions of the photos I actually

14  posted on Backpage.  The only way these could have been gotten

15  was from my computer.

16  Q.  So moving on to Government Exhibit 422 in evidence.  What

17  did you want to point out about that, sir?

18  A.  Yeah.  The young lady Aisha, she claimed that the, that the

19  Lizzy ad was hers.  That's not, that's not her.

20  Q.  Do you know who that is?

21  A.  If I'm not mistaken, I think it might be Louisa.

22  Q.  How old is Louisa?

23  A.  Louisa is probably like 22, 23 now.

24  Q.  But, just to remind us, Aisha Goncalves who testified,

25  you've never seen her before, right?

1    A.  Yeah.

2    Q.  Did you ever take a picture of her?

3    A.  No, I don't know her.

4    Q.  Did you ever post a picture of her on Backpage?

5    A.  No, she didn't even say that picture was her until --

6              MS. TARLOW:  Objection.

7              THE COURT:  Sustained.

8    Q.  So, moving to Government Exhibit 419 in evidence.  What did

9    you want to point out about that?

10   A.  Yeah.  Once again, this is where it says Scarlett.  That's

11   Jessica Bonilla, a/k/a Diamond.  If you notice in the text,

12   there's nothing promoting Scarlett.  These pictures were never

13   posted on Backpage.  They were, so, they shouldn't be, they

14   shouldn't be on any ad.  So on this reconstructed ad, the only

15   way they could have gotten these pictures is from my computer.

16   Q.  Okay.  Government Exhibit 415.  I'll call your attention to

17   where it says "hustle 24/7 or slave 9-5."

18   A.  Yeah.

19   Q.  What were you intending to convey by that?

20   A.  Basically make a lot of money.  A lot of fast money as

21   opposed to working a regular job.  It seemed catchy, so I just

22   put it there.

23             MR. MARGULIS-OHNUMA:  I don't have more questions, but

24   I think if you would like to say something else to the jury,

25   now is the time.

J7B3KID4                        Kidd - Direct

1              THE WITNESS:  Yeah.  As I said earlier, you know,

2    despite everything that these females have said about me, some

3    of these females I don't even know.  This case is way bigger

4    than what you guys might think.

5              MS. TARLOW:  Objection.

6              THE WITNESS:  And this case started because a group of

7    females were arrested and cooperated --

8              MS. TARLOW:  Objection.

9              THE COURT:  Sustained, sustained, sustained.

10             THE WITNESS:  Excuse me, your Honor.

11             THE COURT:  Sustained.

12             MR. MARGULIS-OHNUMA:  Anything you want to say based

13   on your personal perceptions that you know personally?

14             THE WITNESS:  This has been confirmed.  This has been

15   confirmed.

16             MR. MARGULIS-OHNUMA:  Don't.  That's not in evidence.

17   Did you want to say something about yourself or your conduct

18   with respect to these charges?

19             THE WITNESS:  Yeah.  That nothing about this case has

20   been fair.  I've been in prison for the last eight months.

21             MS. TARLOW:  Objection.

22             THE COURT:  Sustained.

23             THE WITNESS:  Am I allowed to read any inconsistencies

24   with the warrants?

25             THE COURT:  No.

1            THE WITNESS:  You know, I've been labeled as a child

2    molester, rapist.

3            MS. TARLOW:  Objection.

4            THE COURT:  Sustained.

5            THE WITNESS:  I didn't do any of this.  I had, okay,

6    what I'm pretty sure I can say.  I may have had prostitution

7    going on.  Consensual with adults.  This other stuff that I am

8    being accused of is madness.  And I was very upfront about

9    any -- before any female came over, I was very upfront about

10   what was going to happen.  What to expect.  I never like

11   forced -- all these stories are crazy.  Like these stories make

12   me sound like an animal.  The clips, the YouTube clips that

13   were made were edited clips to make me sound like a misogynist.

14           MS. TARLOW:  Objection.

15           THE COURT:  Sustained.

16           THE WITNESS:  I said wild things on my show.  Chris

17   Kidd's World.  I do.  But, I have boundaries.  I also advocate

18   against a lot of stuff I am being accused of.

19           MS. TARLOW:  Objection.

20           THE COURT:  Sustained.

21   Q.  Relative to what you advocate about.  Do you have opinions

22   on the treatment of women that are inconsistent --

23           MS. TARLOW:  Objection.

24   Q.  -- with the YouTube videos if I can finish the question?

25           THE COURT:  Overruled.

J7B3KID4                          Kidd - Direct

```
 1   A.  Yeah.  I mean, do I believe that prostitution should be
 2   legal?  Yes.  I do.  Do I believe that sex trafficking should
 3   be legal?  Absolutely not.  I don't advocate sex tracking.
 4            MS. TARLOW:  Objection.
 5   Q.  Did you engage in sex trafficking?
 6   A.  No, never.  Never.  There's a fine line, I mean, well,
 7   actually not even a fine line.  But I understand the
 8   difference.  Even though I didn't know what was referred to as
 9   sex trafficking, I knew that it's one thing to promote
10   prostitution, but to deal with minors and to force is a big
11   difference, and I would never do that.
12            MR. MARGULIS-OHNUMA:  Nothing further, your Honor.
13            THE COURT:  All right.  Thank you.  We're going to
14   break at this point.  We'll return at the 2 o'clock.  As you go
15   out to lunch, bear in mind the caution I've given many times.
16   Do not discuss this case among yourselves or with anyone else
17   on the outside or anyone involved in the case.  If any of these
18   things should occur, you're directed to inform me immediately
19   and not discuss it with your fellow jurors.
20            (Jury excused)
21            (Continued on next page)
22
23
24
25
```

J7B3KID4

1        THE COURT:  You may step down.  Government, what is

2    your best estimate of amount of time for cross-examination?

3        MS. TARLOW:  Approximately 30 to 45 minutes.

4        THE COURT:  All right.  Coming back to the issue we

5    left open this morning concerning the agent who was going to

6    Idaho.

7        MR. MARGULIS-OHNUMA:  I think we have a stipulation.

8    Right?  I think we had agreed.  Oh, I'm sorry.

9        THE COURT:  A different issue.

10       MR. GUTWILLIG:  Yes, your Honor.  We've reached out to

11   Agent Uitto.  He is in Idaho.  It will take him approximately

12   12 hours to get here.  He's looking at flight options.  I

13   understand that he may have a childcare obligation this

14   evening.

15       If there is any way that the government can proffer or

16   answer the Court's questions or make Mr. Uitto available by

17   phone, we are also happy to do that.

18       THE COURT:  Let me just ask a couple of basic

19   questions concerning the government's theory of the evidence

20   you presented and the summary.

21       Is it your contention that there is a correlation

22   between each of the photos and text and the dates in the

23   Backpage ads reconstructed by the agent, and the spreadsheets

24   that were prepared containing the data that the agent took from

25   the servers?

J7B3KID4

1          MR. GUTWILLIG:  Yes, that's correct, your Honor.

2          THE COURT:  Let me phrase it another way.  Is it your

3     theory that the data that the agent extracted from the servers,

4     which contained the dates when the Backpage ads were allegedly

5     produced and the other information, that that is all derived

6     from or extracted from the spreadsheets?

7          MR. GUTWILLIG:  Yes, your Honor.  To clarify on the

8     spreadsheets.  When you say all of that information derived.

9     It's the spreadsheets which are in evidence at 450A, and also

10    the additional underlying data.  There's additional

11    spreadsheets reflecting image locations and file paths and

12    things like that.

13         So when you say spreadsheets, the answer to your

14    question is yes, all of the data from the reconstructed ads is

15    from the Backpage servers, is from spreadsheet and image files

16    from those servers.

17         MR. MARGULIS-OHNUMA:  Just to be clear though, only

18    450A is the only spreadsheet in evidence.

19         THE COURT:  That was my next question.  My

20    understanding is you put in evidence only one of the

21    spreadsheets, not all of them.

22         MR. GUTWILLIG:  That's correct, your Honor.  The

23    government's position is that the government extracted from the

24    Backpage servers a voluminous amount of data, and the

25    government created summary charts from that data for the

J7B3KID4

purpose of admitting them at this trial, which was the

government's pretrial position, putting together the summary

charts and putting those in.

        As your Honor alluded to earlier, in trial in front of

Judge Rakoff, the reconstructions were admitted I believe

before the underlying data, they were admitted as summary

charts.  So, the reconstructions, the government's position is

that those are summary charts, they are not demonstratives,

because not all of the underlying data is in evidence.

        And the purpose of the government putting together the

reconstructed ads was to -- as set forth in the government's

papers, the spreadsheets and images are very complicated and

complex.  The idea was putting together the summary charts so

that the information was in one place, from the underlying

data.

        THE COURT:  All right.  Thank you.  Mr. Margulis, any

other observations on this issue?  We've heard your arguments.

        MR. MARGULIS-OHNUMA:  Yeah, I think you've heard my

arguments.  I mean basically, I think the government had their

chance, well, I don't know, you admitted them already.  If

we're revisiting that, great, because I don't think this should

be admissible.  A big part of that reason is the photos are not

in evidence.  And I don't think, I objected to the authenticity

of the photos, for this witness to authenticate them.  Which he

couldn't do except via hearsay.

J7B3KID4

1          We now have a good faith, we have now evidence on both

2     sides regarding that, based on Mr. Kidd's testimony, that those

3     photos were never uploaded but could have only come from his

4     own computers.

5          So I would renew my -- I would make a motion to strike

6     those from the evidence.

7          THE COURT:  Mr. Gutwillig.

8          MR. GUTWILLIG:  Your Honor, the government sought

9     clarification on this issue prior to the trial, precisely for

10    this reason.  Because these spreadsheets are voluminous and

11    very difficult to decipher for the jury.  And Federal Rule of

12    Evidence 1006 allows the government to put in summary charts.

13    Were these charts not going to be admitted as summary charts,

14    perhaps the government would and could have put in through

15    Agent Uitto all of the underlying data.

16          However, in the government's view, all of that

17    underlying data is basically indecipherable without someone to

18    explain it and to assemble it, which was the reason for the

19    summary charts and the reason not to admit all of the

20    voluminous records underlying them, which the government could

21    have done, and I believe is not required by the rule admitting

22    these summary charts.

23          THE COURT:  Mr. Gutwillig, just one question.

24    Mr. Kidd alleges in his testimony that some of the photos were

25    in his devices, but that he did not post them to Backpage.  Is

J7B3KID4

1    there any way in which any of those photos could have appeared

2    in this summary, even though they were not posted by Mr. Kidd?

3          MR. GUTWILLIG:  Your Honor, it would be impossible for

4    any photograph not on the Backpage servers to have appeared in

5    the reconstructed ads.

6          THE COURT:  So the government's view is that each of

7    those photographs that are in the exhibits has corresponding

8    metadata in the summary Excel spreadsheets that would confirm

9    the information in the summary?

10         MR. GUTWILLIG:  Each of the underlying -- each of the

11   images has corresponding metadata in the voluminous underlying

12   records which were produced and provided to defense counsel,

13   which were received from the Backpage servers.

14         But, fundamentally, your Honor, the idea that someone

15   took images from the defendant's computer and transported them

16   into these reconstructions is impossible.  Because all of the

17   images came from the Backpage servers.  Everything in the

18   reconstructions, all of the data, all of the pictures, all of

19   the text, came from the Backpage servers.

20         THE COURT:  Your theory is that the information in the

21   Backpage servers came from Mr. Kidd's devices.

22         MR. GUTWILLIG:  Our contention, your Honor, is that

23   Mr. Kidd, through his user accounts associated with his e-mail

24   addresses, for reasons the government has I believe proved,

25   that these ads were posted by Mr. Kidd.  And that they were

J7B3KID4

posted on Backpage, because the only way that the government

could have gotten them from the Backpage servers is if they

existed there.

THE COURT:  Thank you.  Based on this discussion and

the Court's further examination of the material and arguments

made, I'm going to reaffirm the ruling that I made earlier,

that the summaries will be allowed in evidence.

Let me also add that, as I said earlier, I had an

occasion to read very carefully the case before Judge Rakoff

and Judge Rakoff's ruling, and overall, although I still

believe it poses a close call, on balance I would lean in favor

of admitting them as summaries.  Thank you.

(Recess)

(Continued on next page)

AFTERNOON SESSION

2:00 p.m.

(In open court; jury not present)

THE COURT:  Mr. Margulis, you rose for something?

MR. MARGULIS-OHNUMA:  Thank you.  Just before the jury

comes out.  I've been discussing this with the government.  I

neglected to offer an exhibit that I had sent to them last

night.  There's a map with the various locations where Mr. Kidd

lived during the time of the alleged conduct.  They've agreed,

whether it is within the scope or not, to let me bring that in

on redirect, so they can go ahead with their cross.  As long as

J7B3KID4

1    that's okay with the Court, we'll deal with it that way.  Is

2    that okay?

3              THE COURT:  Let's proceed.

4              MS. TARLOW:  Yes, your Honor.

5              THE COURT:  You may proceed.  Bring in the jury.

6              (Jury present)

7              THE COURT:  We'll proceed with the government's

8    cross-examination of the witness.  Ms. Tarlow.

9              MS. TARLOW:  Thank you, your Honor.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MS. TARLOW:

3   Q.  Good afternoon, Mr. Kidd.

4   A.  Good afternoon.

5   Q.  You've gone by a lot of different names; is that right?

6   A.  A few, yes.

7   Q.  Lloyd Kidd, right?

8   A.  Yeah.

9   Q.  Chris Kidd?

10  A.  Yeah.

11  Q.  Gerard Agard?

12  A.  Not really, but yeah.

13  Q.  And you've also gone by the nickname Red, right?

14  A.  Yeah.

15  Q.  Mr. Kidd, you made money by having others engage in

16  prostitution; isn't that right?

17          MR. MARGULIS-OHNUMA:  Objection.

18          THE COURT:  Overruled.

19  A.  Okay.

20  Q.  It's a yes or no.

21  A.  Yes.

22          Wait.  By having others -- meaning I'm forcing them?

23  Q.  You made money by having others engage in prostitution;

24  isn't that right?

25          MR. MARGULIS-OHNUMA:  Objection.

J7B3KID4                          Kidd – Cross

1    A.  Oh, no.

2              THE COURT:  Overruled.

3    A.  I do not.

4    Q.  Mr. Kidd, didn't you just testify on direct examination

5    that you had women come to your apartment and they engaged in

6    prostitution there?

7    A.  Yeah, voluntarily.

8    Q.  And that you had a 50-50 cut in proceeds with them?

9    A.  Yes.

10   Q.  Do you make money by having others engage in prostitution

11   for you?

12             MR. MARGULIS-OHNUMA:  Objection.  Asked and answered.

13             THE COURT:  Overruled.

14   A.  Do you mean by force or do you mean by them willing?

15   Q.  You made money, women came to your apartment, and they

16   engaged in prostitution, and you made money off of that, right?

17   A.  Yes, yes.

18   Q.  And those women and girls, they would see customers in your

19   living room?

20   A.  Right.  Just women, no girls.

21   Q.  They would see customers in your living room?

22   A.  Yes.

23   Q.  And they would see customers in bedrooms in your apartment,

24   right?

25   A.  Yes.

J7B3KID4                          Kidd - Cross

1    Q.  You had a lot of women and girls work in your apartment,

2    right?

3    A.  Just women, no girls.

4    Q.  You had a lot of women work in your apartment; isn't that

5    right?

6    A.  Yes.

7    Q.  More than 10?

8    A.  Yeah.

9    Q.  More than 50?

10            More than 100?

11   A.  No, no.

12            MR. MARGULIS-OHNUMA:  Objection.

13            THE COURT:  Sustained.

14   Q.  Approximately how many?

15   A.  Between 50 to like 70 or something like that.

16   Q.  Some of those individuals who worked for you as

17   prostitutes, they also lived in your apartment, right?

18   A.  A few times, yeah.

19   Q.  They weren't just working there, right, they live there as

20   well?

21   A.  Yeah.

22   Q.  They slept there?

23   A.  Yeah.

24   Q.  Because they were working 24/7, around the clock, right?

25   A.  No.

1   Q.  Did you set their hours, Mr. Kidd?

2   A.  Actually, no.

3   Q.  But they would work all hours of the day and night; is that

4   right?

5   A.  They would work when they could.  But it wasn't like, even

6   though I put on the ads open 24/7, I never forced anybody or

7   woke anybody up.

8   Q.  Mr. Kidd, your testimony is you put up an ad saying they

9   would work 24/7 right?

10          MR. MARGULIS-OHNUMA:  I'd like counsel to let the

11  witness finish his answers.

12          THE COURT:  Overruled.

13  Q.  You may answer.

14  A.  Oh, no.  Meaning it was available 24/7, like my spot was

15  available 24/7.  Not that you had to be available to work 24

16  hours of the day.

17  Q.  But, according to your ads, customers could call and see

18  prostitutes 24/7, right?

19  A.  No.  That wasn't according to my ad.

20  Q.  If a customer called at night, and wanted to see an

21  individual, would they be able to see an individual at your

22  apartment?

23  A.  If she was up.  I think you're confusing the ads, by the

24  way.  The ad that says 24/7 is the ad says --

25          THE COURT:  Mr. Kidd, there's no question on the

1    table.  Wait for a question.

2            THE WITNESS:  All right.

3    Q.  Mr. Kidd, you recruited some of these women to work for

4    you; isn't that right?

5    A.  Any women that worked, because they responded to the ad.

6    Q.  So turning your attention to Government Exhibit 410.  This

7    is your ad that you said on direct examination you posted this

8    ad online?

9    A.  Yeah.

10   Q.  So that's your phone number, right, the 347-815-9064?

11   A.  Yes.

12   Q.  That is your e-mail address, redchaos826@gmail.com?

13   A.  Yeah.

14   Q.  You posted this advertisement?

15   A.  I did.

16   Q.  This advertisement says "24/7, stay humble, hustle hard,"

17   right?

18   A.  That's in regards to the females saying -- it was just to

19   get their attention.  But this wasn't for clients.  That's why

20   I said no men, like as far as response.

21   Q.  Mr. Kidd, I'm not asking you to interpret the ad.  I am

22   just asking if that's what it says on the ad.

23   A.  Yeah.

24   Q.  You also posted ads using an account Keyonnadoll@gmail.com,

25   right?

1    A.  Yeah.

2    Q.  You used that account to post ads online?

3    A.  Yeah.

4    Q.  And you promised these individuals you recruited that they

5    were going to make money, right, in your apartment?

6    A.  Yeah.

7    Q.  You told them they had to be loyal, right?  They had to be

8    trustworthy?

9    A.  Yeah.

10   Q.  They needed to be submissive if they were going to work for

11   you, right?

12   A.  Yeah.

13   Q.  And the girls who worked out of your apartment, you posted

14   them online for sex on Backpage, right?

15   A.  Women, no girls.

16   Q.  You posted women online for sex on Backpage, right?

17   A.  Yes.

18   Q.  Craigslist?

19   A.  A few times, yeah, but mostly Backpage.

20   Q.  Bedpage?

21   A.  Mostly Backpage.

22   Q.  I understand, Mr. Kidd.  You also posted them on Bedpage?

23   A.  Yes.

24   Q.  You took photos of those women to include them in

25   advertisements?

J7B3KID4                          Kidd - Cross

1    A.  Yeah.

2    Q.  You told them how to pose?

3    A.  Sometimes.

4    Q.  You told them what to wear?

5    A.  No, not really.

6    Q.  You testified on direct, Mr. Kidd, isn't it right, that you

7    have lingerie for them to wear?

8    A.  Yes, for the women that didn't have clothes that they were

9    comfortable in.  But some women had their own clothes that they

10   felt comfortable in.

11   Q.  On some occasions you'd tell them what to wear?

12   A.  On some occasions if they didn't have anything to wear that

13   looked presentable.

14   Q.  Sometimes you told them to pose naked, right?

15   A.  A few, there were a few times, yeah.

16   Q.  Because you knew that certain poses would generate more

17   customers, right?

18   A.  Yeah.

19   Q.  And you knew that sometimes, if they weren't wearing

20   clothing, it would generate more customers for them, right?

21   A.  Yeah.

22   Q.  And you told them on occasion to show their genitals,

23   right?

24   A.  Yeah.  Well, the Backpage would allow it, but then after a

25   while you couldn't show nudity, so that stopped.  So I blurred

1    it out.

2    Q.  For a period of time you did.

3    A.  Actually, not showing their actual genitals.  Most of the

4    time it was blurred out.  But there probably were a few times

5    where it did show, yeah.

6    Q.  You directed sometimes to play with themselves?

7    A.  Yeah.

8    Q.  Because you knew what types of photos were going to

9    generate the most business, right?

10   A.  Yeah.

11   Q.  And you also knew what types of sex acts were going to make

12   you and them more money?

13   A.  Yeah.

14   Q.  And how to attract more customers when it was a slow day?

15   A.  Sometimes, yeah.

16   Q.  So you post things like backdoor services?

17   A.  Yeah, but only for women that were okay with that.  Like, I

18   didn't post things without the woman's knowledge or consent to

19   what I was posting.

20   Q.  Mr. Kidd, you would post other fetishes; isn't that right?

21   A.  Yeah.

22   Q.  You wrote the text in all those advertisements, correct?

23   A.  I did.

24   Q.  The text that was advertising certain sexual services?

25   A.  Yeah.

J7B3KID4                          Kidd - Cross

```
1    Q.  You knew what worked, what got customers in the door,
2    right?
3    A.  Yeah.
4    Q.  You knew exactly what to write to make sure you got the
5    most amount of money?
6    A.  No.  I went over it.  Before I posted any ad, I went over
7    it with the female I was posting for to make sure she was okay
8    with it, which is why -- and the ads you have are consistent
9    with that.
10   Q.  Mr. Kidd, you posted you said over 50 women, right?
11   A.  Probably.
12   Q.  Just now?
13   A.  Well, I don't know if I actually posted them, because some
14   of them used to have their own Backpage account.
15            Yeah, okay, fine.
16   Q.  And your testimony today is that you consulted with each
17   and every one of those 50 individuals before you posted any ad
18   of any of them?
19   A.  Absolutely.
20   Q.  And you posted them for all sorts of services, right?
21   A.  Yeah.
22   Q.  When the customers would -- when the girls who you
23   recruited would come to your apartment --
24            MR. MARGULIS-OHNUMA:  Objection.  Mischaracterized the
25   testimony.
```

J7B3KID4                         Kidd - Cross

1          THE COURT:  Overruled.

2     Q.  When the girls would come to your apartment who you had

3     recruited, you'd have sex with them, right?

4     A.  A lot of times, yeah.  Not always, but there were a lot of

5     times.

6     Q.  And sometimes you paid them for that sex?

7     A.  I mean, I've paid for prostitutes before, but not while I

8     was doing this, no.

9     Q.  So you didn't pay them for the sex when they would come

10    over before you would actually prostitute them?

11    A.  No.

12    Q.  You did that because you wanted to test them out, right,

13    before they would see customers?

14         MR. MARGULIS-OHNUMA:  Objection.

15         THE COURT:  Overruled.

16    A.  If I was attracted to them, you know, we talk and -- I

17    don't know how to really --

18    Q.  You wanted to make sure they were going to make you the

19    most money, and you wanted to see what kind of services they

20    would provide, right?

21    A.  No.  That's a line that pimps use to try to justify them

22    having sex as opposed to just saying, hey, I'm sexually

23    attracted to you, let's do this.  They try to use that, oh, I

24    want to make sure you are not a cop.

25              No.  If it was a woman that I found attractive, we'd

J7B3KID4                    Kidd - Cross

1     talk, feel each other out, and a lot of the times she'd want to

2     have sex.  It was a consensual thing.  It wasn't like anything

3     forced.

4     Q.  You also had rules for these girls and women who engaged in

5     prostitution in your apartment, right?

6     A.  I had rules for my house.

7     Q.  You told them they could only have sex in certain locations

8     in your apartment, right?

9     A.  Yeah, I wasn't going to have anybody have sex in my bed.

10    Q.  Depending on how long a customer was coming to see those

11    girls, they could have sex in the living room, right?

12    A.  Yeah, so like if a customer was --

13    Q.  Mr. Kidd, just a yes or no question.

14    A.  Oh, okay.  Yes.

15    Q.  If they were coming for a longer period of time, they also

16    could have sex just in a particular bedroom, right?

17    A.  Say that one more time?

18    Q.  If customers were coming for a longer period of time, they

19    were supposed to have sex in a different room, not in the

20    living room?

21    A.  Yeah, if they asked.

22    Q.  They had to use certain condoms, types of condoms,

23    depending how long the customer was there?

24    A.  No.  That's not true.  That's not true.

25    Q.  Mr. Kidd, you kept a stash of condoms under your bed,

J7B3KID4                          Kidd - Cross

1   right?

2   A.  For my own personal use.

3   Q.  There were also condoms that were in a bedroom where some

4   of the girls stayed, right?

5   A.  Yeah.

6   Q.  Those condoms were different, right?

7   A.  No, it was just that -- not trying to be funny or anything,

8   but I use a certain type of condom, Kyng, which is like a

9   knockoff version of Magnum.  I get it from a clinic.  And those

10  are hard to come across.  So I had those in the jar under my

11  bed.

12          And I told the females only if the customer really --

13  how do I say this.  Those condoms are harder to come across,

14  especially for free.  And sometimes women would use those

15  condoms for guys that didn't necessarily -- that it wasn't

16  necessary for them to use those condoms.  And so that's why I

17  kept them under my bed, and said if the guy actually needs this

18  kind of condom, just let me know.  I put a few in the drawer,

19  but most of them I kept in the jar under my bed.

20  Q.  There is a particular type of customer they were only

21  allowed to use those condoms for?

22  A.  It's a size thing.  I am not trying to be vulgar.

23  Q.  There was a particular type of customer that the girls

24  could use those condoms for?

25          MR. MARGULIS-OHNUMA:  Objection, asked and answered.

1       THE COURT:  Sustained.

2    Q.  When a client called the individuals who worked for you,

3    they had to answer promptly, that customer, right?  They had to

4    see them right away?

5    A.  I mean, if they were up, I mean, if they're there to make

6    money, then yes, I guess that would make sense.

7    Q.  Otherwise they would lose business, right?

8    A.  Yeah, but I wasn't an animal about it.

9    Q.  You wanted to make money, right?  You wanted them to see as

10   many customers as they could?

11   A.  We all wanted to make money.

12   Q.  So, even if it was at night, if they were awake, you wanted

13   them to see customers so you could make more money?

14   A.  Within reason.

15   Q.  Even if they weren't feeling great?

16   A.  No.  Absolutely not.

17       Plenty of times when women have been on their monthly

18   and they couldn't work, and all right, no problem.  Sometimes

19   they would go home, they didn't want to be around other people

20   while they were on their monthly.  I never made anybody work or

21   force anybody.  No.

22   Q.  But you would make money for every date that they would

23   have, right?

24   A.  Yeah.

25   Q.  So you wanted to have them go on as many dates as possible

J7B3KID4                     Kidd - Cross

1   so they could make as much money and you could make as much

2   money as possible?

3   A.   Within reason.

4   Q.   Why would you want to make any less money?

5   A.   I'm not saying I wanted to make less money.  But if a

6   woman's on her period and she's uncomfortable, a woman's sick,

7   I am not going to say, hey, I don't care about that, go make

8   money.

9            That's what pimps do.  I'm not a pimp.

10  Q.   Mr. Kidd, you wanted them to move into your apartment

11  because you wanted them to be able to see customers at any time

12  to make more money, right?

13  A.   Actually, some of the women that -- Arielle specifically, I

14  didn't want her to move in my apartment.  The only reason why I

15  even dealt with her as long as I did was because I was afraid,

16  after repeatedly trying to kick her out, that she would get one

17  of her anxiety attacks, and go and tell the police what was

18  going on and turn it into something else.

19           So, in a way, you know, I didn't want her to move in.

20  Q.   Okay.  So Mr. Kidd, I want to run through some of the

21  things that happened when women would be working at your

22  apartment.

23  A.   Okay.

24  Q.   They were supposed to collect the money before they

25  actually engaged in the sex acts with the client, right?

1   A.   Yeah.

2   Q.   That was something you told them to do, right?

3   A.   And also to make sure that the guy had -- to make sure he

4   wasn't a cop.  If they felt he was a cop, just to ask him to

5   leave.

6   Q.   As soon as they got that money, they would take that money

7   and they would give it to you, right?

8   A.   Yeah.

9   Q.   And you told, again, you told them they could do that,

10  right?

11  A.   Okay.

12  Q.   That's a yes?

13  A.   Yes.

14  Q.   And you would then take that money and you would put it in

15  your bank account?

16  A.   No.

17  Q.   Would you put it in your safes?

18  A.   No.  First I would take -- I had a counterfeit marker

19  because there have been times when I wasn't doing that, where

20  the client were giving some of these women fake money that

21  looked real, and they found out by going to a store and trying

22  to buy something that in fact it was fake.  That's why I got

23  the counterfeit markers.

24  Q.   You check to make sure the money is real?

25  A.   Yeah.

J7B3KID4                          Kidd - Cross

1   Q.  You would put it away for safekeeping?

2   A.  Yeah, I would put money in -- whoever the woman was that

3   made the money, I would put the money in her envelope and put

4   it in my safe.

5   Q.  No one else had access to that safe, right?  No one knew

6   the combination to that safe?

7   A.  Right.

8   Q.  You said that you had envelopes with the girls' names on

9   it?

10  A.  Yeah.

11  Q.  You would put their money in there?

12  A.  Yeah.

13  Q.  You would put envelopes in the safe.  And then you would

14  decide how much money the girl would get back after the date

15  was done?

16  A.  No.

17  Q.  Sometimes they would have to ask you for that money in the

18  envelopes, right?

19  A.  I mean, if it's in somebody's safe and they don't have the

20  combination to it, yeah.  But not in the way you're trying --

21  Q.  The girls who lived in the apartment with you, they would

22  have to pay for certain things in the apartment, right?

23  A.  Well, if you're referring to Dana, that was after --

24  Q.  I'm not specifying.  I'm just saying generally, Mr. Kidd,

25  the girls --

J7B3KID4                        Kidd - Cross

1    A.   No.   They didn't have to pay for anything.   Sometimes,

2    like, if I went out, I would call, hey, you guys hungry, I'd

3    pick up something to eat.   If one of them went out, "I am going

4    to McDonald's," you know.   So it was that kind of relationship.

5              (Continued on next page)

J7BTKID5                          Kidd - Cross

1    BY MS. TARLOW:

2    Q.  They would purchase things like cooking supplies for the

3    apartment, right?

4    A.  Actually some of them just went and bought stuff on their

5    own to pretty up the apartment, because most of my furniture is

6    black, so they would get stuff on their own.  It wasn't asking

7    me to bring anything.  There was a give and take in the

8    relationship.

9    Q.  That was from money that you gave them from the safe?

10   A.  Yeah.

11   Q.  And you didn't just earn your money by having girls engage

12   in prostitution in your apartment, right?

13   A.  No, I had other things going on.

14   Q.  You earned money in other ways, right?

15   A.  Right.

16   Q.  You earned money by driving girls to certain locations,

17   right?

18   A.  No, I earned money by doing a car service.

19   Q.  And that included driving girls to certain locations,

20   right?

21   A.  Not prostitutes, no.

22   Q.  I'm not asking about prostitution, I'm saying you earned

23   money by driving girls to other locations, right?

24   A.  But you're specifically saying "girls" so it would seem

25   like prostitution.  If you say "people," then yeah.

1    Q.  You remember when Dana testified yesterday, right?

2    A.  Yeah.

3    Q.  You heard her say that you drove her to locations for

4    prostitution, is that right?

5    A.  Yeah.

6    Q.  Is your testimony that she was lying about that?

7    A.  One day.  One day.

8    Q.  One day?

9    A.  One day we tried it and that was like two back to back

10   events that were bad and we never did it again.  It was a

11   blizzard and she suggested it was slow so we should try

12   outcalls, and it was hell -- excuse me, it was bad, so we never

13   did it again.

14   Q.  And Mr. Kidd, you testified that there were many

15   individuals who engaged in prostitution in your apartment?

16   A.  Yeah.

17   Q.  You testified on direct that you knew how old all of those

18   girls were?

19   A.  Yeah.

20   Q.  You knew Kaira's age?

21   A.  Yeah.

22   Q.  You asked for all of their identifications?

23   A.  Yeah.

24   Q.  And that included Jessica, right?

25   A.  Yes.

J7BTKID5                      Kidd – Cross

1    Q.  You knew how old Jessica was?

2    A.  Yeah.

3    Q.  You take a lot of pictures and you keep those pictures

4    organized on all your electronic devices, right?

5    A.  Yeah.

6    Q.  You testified that you organize your photographs of girls

7    for advertisements in a folder labeled "posts?"

8    A.  Yeah.

9    Q.  But you didn't make a record of all those photographs of

10   the identifications of those individuals, right?

11             MR. MARGULIS-OHNUMA:  Objection.

12             THE COURT:  Overruled.

13   A.  No, I didn't.

14   Q.  It was that important to you and you didn't make any record

15   of it?

16             MR. MARGULIS-OHNUMA:  Objection, argumentative.

17             THE COURT:  Overruled.

18   A.  Could you repeat the question?

19   Q.  It was that important to you and you didn't make any record

20   of it?

21             MR. MARGULIS-OHNUMA:  Objection.

22             THE COURT:  Overruled.

23   A.  I didn't make a record of it, no, I didn't.

24   Q.  I'm showing you now, Mr. Kidd, Government Exhibit 700.

25   Whose name is that?

1    A.  Jessica Bonilla.

2    Q.  What's her age listed there?

3    A.  Listed as -- I guess she's 16 now, she will be 16 now.

4    Q.  What's the date of birth there?

5    A.  March 18, 2003.

6    Q.  I show you Government Exhibit 701.  Whose name is that?

7    A.  Kaira Felicity Erica Brown.

8    Q.  And what is her date of birth?

9    A.  March 22, 1999.

10   Q.  Government Exhibit 702.  Whose name is that?

11   A.  Aisha Trinity.

12   Q.  And what is her date of birth?

13   A.  October 16, 2000.

14   Q.  And you knew Kaira's age, right?

15   A.  Yes.

16   Q.  You knew Jessica's age?

17   A.  Yeah.

18   Q.  You prostituted girls who were minors?

19   A.  Well, for starters, as I said before, as far as Jessica is

20   concerned, we didn't actually do anything as far as any

21   prostitution.  And as far as Kaira is concerned, yeah, she did

22   prostitute but she wasn't a minor when I met her.

23   Q.  Let's talk about Kaira a little bit.

24   A.  Okay.

25   Q.  You said that you met Kaira in April 2017, is that correct?

J7BTKID5                          Kidd - Cross

1   A.  Yeah.

2   Q.  And you knew her by a few different names, right?

3   A.  I knew her as Pearlene.

4   Q.  You later gave her the name Nikki?

5   A.  No, I didn't give her -- that was a name that she chose.  I

6   don't know if -- she liked different names.  I didn't give her

7   that name.

8   Q.  But you posted her under the names both Nikki and Pearlene?

9   A.  Yeah.

10  Q.  And you posted her online for prostitution?

11  A.  Yes.

12  Q.  You posted her online and you made money based on those

13  advertisements, right?

14  A.  Yeah.

15  Q.  And your testimony today is that you never met her before

16  April 2017?

17  A.  Yeah.

18  Q.  You had never taken any photograph of her before that date,

19  you never taken a video of her before that date?

20  A.  No.

21  Q.  But you did post advertisements of her?

22  A.  Yes.

23  Q.  And turning your attention to Government Exhibit 400, you

24  posted that ad, right?

25  A.  Yeah, but not this ad, because the dates are wrong.  And in

J7BTKID5                          Kidd - Cross

1   fact can I point something out?  This picture at the bottom,

2   the bottom right-hand corner is inconsistent with the others

3   because there's no name or number on it, which goes to my point

4   earlier that you guys took this from my folder on my computer

5   and put it on the ad.

6   Q.  The photo, though, that is a photo of an individual who is

7   naked, there's one photo that says the name Pearlene, right?

8   A.  Yeah.

9   Q.  And you did post that ad, you posted that photograph in an

10  ad, right?

11  A.  I'm pretty sure I did, this top one.

12  Q.  And turning your attention to Government Exhibit 401, do

13  you see the photos that are labeled Pearlene?

14  A.  Yeah.

15  Q.  And you posted those photos and advertisements, right?

16          And that was for Kaira?

17  A.  Well, Kaira is Pearlene.  Kaira and Pearlene are the same

18  person.

19  Q.  And Government Exhibit 402, same thing, you posted those

20  photographs of Pearlene, right?

21  A.  Well, just for the record, for this ad and the one that you

22  just showed me, like I said, I'm not agreeing with the dates,

23  but yeah, as far as the actual ad.

24  Q.  And for this ad and all the other ads, you also wrote that

25  text, right?

J7BTKID5                              Kidd - Cross

1    A.  Yeah.

2    Q.  In the ad?

3    A.  Yeah.

4    Q.  So your testimony today is just that the date of this

5    exhibit and the one that I showed you is inaccurate but

6    everything else is accurate?

7              MR. MARGULIS-OHNUMA:  Objection, mischaracterizes.

8              THE COURT:  Sustained.

9    Q.  Your testimony is just that the date is inaccurate in this

10   ad?

11   A.  For these specifically, yeah, but for the others there's

12   other things in the way that are definitely wrong with it.

13   Q.  Mr. Kidd, you had a lot of electronic devices in your

14   apartment on the day of your arrest, right?

15   A.  Yeah.

16   Q.  You had an Apple iPhone on the day of your arrest?

17   A.  Mm-hmm.

18   Q.  And an Apple computer?

19   A.  Yeah.

20   Q.  A lot of hard drives?

21   A.  Yeah.

22   Q.  You previously had what's called a ZTE device, right?

23       It's a brand of a phone.

24   A.  I haven't had an Android in years.

25   Q.  But did you have a phone manufactured by ZTE?

J7BTKID5                          Kidd - Cross

1   A.  Years ago.  The old one I gave to Dana.

2   Q.  So taking a look at Government Exhibit 605, page 18, that's

3   your name next to account name, right, Mr. Kidd?

4   A.  Yeah.

5   Q.  And the phone model that's listed is a ZTE, phone, correct?

6   A.  Yeah, okay.

7   Q.  And the activation date says December 9, 2016?

8   A.  I have MetroPCS, not T-Mobile, so I'm not really sure.

9   Q.  I'm asking you to read --

10  A.  But it says T-Mobile and I have MetroPCS.

11          MR. MARGULIS-OHNUMA:  Judge, I would like to take a

12  recess.  The witness has never seen these before.  They were

13  apparently produced 48 hours ago.

14          MS. TARLOW:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Mr. Kidd, you took photographs of Kaira on your phone,

17  right?

18  A.  Yeah.

19  Q.  And those included the naked photographs that we just

20  showed you in Government Exhibit 400?

21  A.  Some of the pictures I took from my phone, some from hers,

22  because I guess she liked the effects better or something.

23  Q.  And when you took those photographs, you knew she was

24  naked, right?

25          You knew she wasn't wearing clothes?

J7BTKID5                        Kidd - Cross

1    A.   Yes.

2    Q.   These were photographs that were found on your computers

3    and your hard drives, isn't that right?

4    A.   Yes.

5    Q.   And if we could pull up Government Exhibit 1204 just for

6    the witness, jury, Court and defense counsel.

7            That's one of the images that you took of her, right?

8    A.   More than likely.

9    Q.   Yes or no.

10   A.   Yes, yes.

11   Q.   And that image was created in February 2017, isn't that

12   correct?

13   A.   No.

14   Q.   So turning your attention to Government Exhibit 1204M,

15   Mr. Kidd, can you just read for the record what is next to

16   image date and time.

17   A.   2017, I'm assuming February 1, 2017, 23:32:47.

18   Q.   Now Mr. Kidd, showing you what was marked as Government

19   Exhibit 1207, just for Mr. Kidd, Court and counsel and the

20   jury.

21            That was also a video that you took, right?  That's

22   your testimony?

23   A.   I don't want to lie, if I took -- I know I have taken

24   pictures of her nude, but I don't know if I recorded that

25   video.  I don't remember.

J7BTKID5                         Kidd - Cross

1    Q.  Your testimony is that you did not take that video?

2    A.  My testimony is that I don't remember if I took that video.

3    It's possible, but I don't remember.

4    Q.  That video was found on your computers and your hard

5    drives, right?

6            MR. MARGULIS-OHNUMA:  Objection.

7            THE COURT:  Overruled.

8    A.  Yeah.  I didn't say I have never seen the video before, you

9    asked me if I took the video.  She could have taken it herself.

10   Q.  And now looking at Government Exhibit 1233M, could you

11   please read what is listed next to date created?

12   A.  February 2nd.

13   Q.  What year, Mr. Kidd?

14   A.  2017.

15   Q.  And Mr. Kidd, if you could also just read what is listed

16   next to the path name.

17   A.  Chris Kidd videos XXX, my collection.  Yeah, my collection,

18   which I know that's a lie because I wouldn't put that video in

19   that folder, I would put it in a post folder.  And the date is

20   a day off from the pictures.  Why would I take a picture of her

21   and then the next day record a video?

22   Q.  Mr. Kidd, you testified on direct examination -- sorry,

23   going back one second, Mr. Kidd, this video is part of your

24   collection, though?

25   A.  No.

1   Q.  Well, it's listed on your device as --

2   A.  I'm aware of what it says, but I wouldn't have put that in

3   my collection.  That is something for BackPage.  So clearly it

4   was moved.  If you guys really did find it there, clearly

5   someone moved it there.

6   Q.  So is your testimony today that the government moved these

7   videos into this folder?

8   A.  You guys have done way more than that, but yeah.

9   Q.  You testified, though, to those photographs and the naked

10  photographs of Kaira, those were for BackPage, right?

11  A.  Yeah.

12  Q.  They were advertisements posted online?

13  A.  Yeah.  Except for that one that didn't have the number on

14  it.  If it didn't have the number or name it then it wasn't

15  supposed to be posted, so that's how I know it wasn't on that.

16  Q.  Your testimony on direct examination was that you never met

17  Aisha, right?

18  A.  Right.

19  Q.  You never met Sabrina?

20  A.  Right.

21  Q.  You were here in court, though, when Aisha identified you,

22  right?

23  A.  Yeah.

24  Q.  And you were here in court when Sabrina identified a

25  photograph of you?

J7BTKID5                          Kidd - Cross

1    A.  She didn't identify me.

2    Q.  She identified a photograph of you, is that right?

3    A.  Yeah, but she still didn't know who I was when I was

4    sitting in front of her.

5    Q.  But your testimony is that you never met them once in your

6    life?

7    A.  Right.

8    Q.  But you had met Jessica previously?

9    A.  Yeah.

10   Q.  And that was on multiple occasions?

11   A.  Yeah.

12   Q.  She had been to your apartment before you met Aisha,

13   Sabrina and Brielle?

14   A.  I had never met Aisha, Sabrina and Brielle.

15   Q.  She had gone to your apartment?

16          MR. MARGULIS-OHNUMA:  Objection.

17          THE COURT:  Overruled.

18   A.  Could you ask the question again?

19   Q.  She had gone into your apartment, Jessica?

20   A.  Yes.

21   Q.  When she came to your apartment, you testified on direct,

22   she actually engaged in prostitution, right?

23   A.  Initially, no.

24   Q.  Initially she did not come to your apartment to engage in

25   prostitution?

1    A.  Meaning that wasn't -- that was something that we spoke

2    about.  That wasn't the initial purpose.  I picked her up for

3    personal -- to hang out, whatever, at my apartment, and then

4    the conversation came up and then it turned to that.  But

5    initially it wasn't -- that wasn't like hey, come over.

6    Q.  So at some point in your apartment the two of you discussed

7    her engaging in prostitution?

8    A.  Yeah.

9    Q.  And then you took photographs of her?

10   A.  Yeah, after I saw her ID.

11   Q.  Okay.  So after you saw her identification you saw how old

12   she was, then you took photographs of her?

13   A.  Yes.

14   Q.  And you saved those photographs on your devices?

15   A.  Yeah.

16   Q.  You had an arrangement with her about where she was going

17   to perform that prostitution work?

18   A.  Yeah, but it never panned out.

19   Q.  And your testimony is that despite taking those photographs

20   and despite saving them, you ended up not posting them online,

21   right?

22   A.  Right.

23   Q.  Turning your attention to Government Exhibit 421, the

24   right-hand side of the photograph Domo, Mr. Kidd, you testified

25   those are photographs you took of Jessica, right?

J7BTKID5                        Kidd - Cross

1   A.  Yeah.

2   Q.  But you didn't post them online?

3   A.  Right.  And this ad kind of proves that.  It doesn't

4   mention her anywhere in this ad.

5   Q.  Mr. Kidd, you testified earlier that your -- you posted

6   ads, though, using the redchaos826@gmail.com?

7          MR. MARGULIS-OHNUMA:  Objection, that mischaracterizes

8   the testimony.

9          THE COURT:  Clarify, Ms. Tarlow.

10  Q.  Mr. Kidd, you posted ads using several accounts, including

11  an email account redchaos826@gmail.com?

12  A.  Yeah.

13         MR. MARGULIS-OHNUMA:  Objection, compound.

14         THE COURT:  Rephrase the question.

15  Q.  Mr. Kidd, you posted advertisements online using an account

16  redchaos826@gmail.com?

17  A.  Yes.

18  Q.  And you were the only one with access to that account,

19  right?

20  A.  Could you repeat the question?

21  Q.  You were the one who had access to that account, right?

22  A.  I don't know, probably.

23  Q.  Turning your attention back to Exhibit 421, you said that

24  you did post Vonna, right?

25  A.  Yes.

J7BTKID5                          Kidd - Cross

1   Q.   And you did post her on this particular date?

2   A.   I don't remember.

3   Q.   Around this particular time?

4   A.   You know what, the way that you guys have been

5   reconstructing these ads, it's kind of hard to -- a lot of

6   these aren't accurate.

7   Q.   Turning your attention to Government Exhibit 419, you

8   testified that you also took those photographs which are

9   labeled as Scarlet, right?

10  A.   Yes.

11  Q.   But you didn't post those online either?

12  A.   Right.

13  Q.   But you did post of the photographs of Peaches?

14  A.   Yeah, this ad is consistent with that, because it's on

15  Peaches, it's not promoting Scarlet, it's only promoting

16  Peaches.

17  Q.   Turning your attention to Government Exhibit 1103L, can you

18  just read the date on the upper left-hand corner conditioner?

19  A.   Thursday, May 18, 2017.

20  Q.   Is that approximately around the same date that you took

21  the photographs of Jessica?

22  A.   I doubt it.

23  Q.   That's a yes or no question.

24  A.   No.

25  Q.   And now looking at Government Exhibit 422, your testimony

J7BTKID5                          Kidd - Cross

1    on direct examination is that the individual labeled as Lizzy,

2    that's not Aisha, is that right?

3    A.   Correct.

4    Q.   But you had never previously met Aisha, right?

5    A.   Right.

6    Q.   So you're based that testimony on seeing her that one time

7    in court?

8    A.   I'm basing that off of knowing that I never met her and

9    that this is somebody else.  I know who this is, and it's not.

10   Q.   Can you read what the created date is on this ad?

11   A.   May 18, 2017.

12   Q.   And now putting Government Exhibit 702 side by side, can

13   you read the birth date again?

14   A.   October 16, 2000.

15   Q.   And so on what is listed as the created date on this ad,

16   Aisha was a minor at that time, right?

17              MR. MARGULIS-OHNUMA:  Objection.

18              THE COURT:  Overruled.

19   A.   Yeah, I didn't know.

20   Q.   You testified a little bit on direct examination about a

21   woman named Ariele?

22   A.   Yeah.  Wait a minute, didn't Aisha say she had a tattoo on

23   her hand when she was 16?

24   Q.   I didn't ask you that question.

25              THE COURT:  Mr. Kidd that's not the question.

J7BTKID5                          Kidd - Cross

1   Q.  Mr. Kidd, you testified on direct examination about a woman

2   named Ariele, right?

3   A.  Yeah.

4   Q.  And you knew she didn't have much money, right, when she

5   came to work for you?

6   A.  Right.

7   Q.  You knew that she wanted to make sure she would get custody

8   of her daughter?

9   A.  She mentioned something about having custody issues with

10  her daughter, but that wasn't -- that was, from my

11  understanding, because she had some drug problems in the past

12  or something like that, so they didn't want to give her custody

13  of her daughter.

14  Q.  But you knew, Mr. Kidd, that she wanted to make sure she

15  would get custody of her daughter?

16  A.  Yes.

17  Q.  And she moved in with you at a certain point?

18  A.  Yeah.

19  Q.  And you said on direct examination that you did not like

20  some of her habits in the house, right?

21  A.  Right.

22  Q.  You wanted to control everything that went on in the house?

23  A.  Yeah.

24  Q.  And sometimes she would disobey those rules how things

25  should be kept in the house?

A.   More than that, that was just tip of the iceberg.  I didn't

trust her.  I didn't like her energy.

Q.   You would get in a lot of fights with her?

A.   Not fights.

Q.   You said you didn't trust her, right?

A.   Right.  I asked her to leave several times and she didn't.

She cried.

Q.   And you got upset about that, right?

A.   Yeah, she cried:  I want to make some money.  And cried and

cried and cried in front of people, like meaning other females.

And then Dana at one point said:  Oh, maybe you should let her

stay, give her another chance.

         I knew she was trouble from the day she got there,

which is why I wanted her away from me.  But I was put between

a rock and a hard place, and I said this to her, I said you:

Are the type that if, God forbid, the police come, you will lie

and say that I made you do something.

         No, no, no, I'm not like that, I want to make money.

         Sure enough, a raid comes and pressure starts getting

put, all the sudden I forced her.  So I called it.  But I was

between a rock and a hard place because she seemed like the

type that if I made her leave and was adamant about that she

would go to cops and say:  Guess what's going on over there?

That's the only reason I allowed her to stay.

         I couldn't stand her, and made sure my interactions

1   with her were most of the time in the living room where my

2   camera was set up so that she couldn't say:  Oh, he did this or

3   he did that.

4          That living room camera that you guys don't want to

5   the hand over the footage that recorded everything, and I'm

6   sure if there was any events of me beating her or what you're

7   trying to accuse me of, you would have put that footage out

8   there.  I'm not stupid.  I didn't do nothing to that woman.

9   Q.  Mr. Kidd, so you did -- you had a web camera you kept in

10  your apartment?

11  A.  Yeah, the one you guys turned over when the feds raided my

12  house.

13  Q.  It's yes or no question.

14  A.  Yes.

15  Q.  And you would record things that would go on in the

16  apartment?

17  A.   It would record everything that happened in that vicinity.

18  Q.  And that meant you recorded when they were having sex with

19  customers?

20  A.  Yeah, that was recorded, too.  They were aware of that.

21  That happened before they were engaged.  If the customer was

22  uncomfortable with it and said something to them about it, they

23  would go and turn the camera, do the date, and when the guy

24  left, turn the camera back.

25  Q.  You recorded them when they were having sex with you?

J7BTKID5                       Kidd - Cross

1   A.  No, because I didn't really have sex in my living room.

2   Q.  Mr. Kidd, that recorded anything they were doing in the

3   loving room, right?

4   A.  Anything that happened with anybody in the living room.

5   Q.  And you could -- you had access to that your phone, right?

6   A.  Yeah.

7   Q.  You could watch them when they were in living room being

8   recorded, right?

9   A.  I could, yeah, but they were also aware of that.

10  Q.  Yeah, they knew that you were recording them at all times,

11  right?

12  A.  Not specifically them, I was recording everything that was

13  going on in the living room.

14  Q.  And so you said that Ariele would upset you a lot, right?

15  A.  Yeah.

16  Q.  She would do things to make you angry, right?

17  A.  Okay, yes.

18  Q.  Sometimes smoke in the workplace, you didn't like where she

19  would smoke her cigarettes?

20  A.  No, she was smoking in the hallway and I told her that was

21  an issue because there's neighbors across the hall and you

22  can't just do that, there's no -- go smoke in front of

23  building.

24  Q.  And sometimes she would ask you for money for things that

25  you didn't want to give her money for?

A.  No, that's not true.  Actually when I kicked her out the

first time I gave her whatever money I owed her, I gave her

money from her envelope, and every money she earned I gave it

to her and told her to go about her business.

Q.  But she didn't have access to this money because you kept

it in the safe?

A.  Yeah.

Q.  And when she would do anything wrong, you made a point of

it, right?

        MR. MARGULIS-OHNUMA:  Objection.

        THE COURT:  Rephrase the question.

Q.  When she would do something wrong, you told her, right?

A.  Okay, yeah.

Q.  And sometimes you would tell her in front of all the other

women who worked for you, right?

A.  If I was -- sometimes I would like to get a second opinion

to make sure I wasn't overreacting about something, but not

like anything embarrassing her or humiliating her.  Or

sometimes she would deny doing things that I know that she did,

so I would ask other women that were there if they did it.  So

it wasn't like how she was trying to make it seem.

        Like, for instance, one time there was a situation

where -- she was a pathological liar.  There was a situation

where there was -- I'm not trying to be nasty, there was a

bloody pad in the bathroom.  She was the only one that was on

J7BTKID5                          Kidd - Cross

1  her menstrual --

2             MR. MARGULIS-OHNUMA:  Judge, may I consult with my

3  client for a moment?

4             THE COURT:  Yes.

5             (Pause)

6  Q.  You can proceed.

7  A.  It was a situation where there was a bloody pad in the

8  bathroom next to the toilet and she was the only one that was

9  on her period, and she denied it being hers.  And she would do

10 stuff like that, it was gross, and she was lying.  And then

11 when you confronted her about the lies, she would have like

12 these fake anxiety attacks, and it was just annoying.  That's

13 why I wanted her gone.

14 Q.  So you were describing, Mr. Kidd, some instances in which

15 some of the individuals who worked for you as prostitutes

16 annoyed you, right?

17 A.  Okay.

18 Q.  Yes or no.

19 A.  Yes.

20 Q.  And sometimes it would be about stupid stuff, right?

21 A.  I mean, honestly speaking, I had a very high tolerance

22 level, so for me to like get aggravated with somebody and/or

23 curse or kick them out means that they had to be pushing.

24 Q.  And sometimes it was about more serious things though,

25 right?

J7BTKID5                          Kidd – Cross

1   A.  Yeah.

2   Q.  And sometimes when it was more serious you would threaten

3   to use violence with them?

4   A.  Never.

5   Q.  You might lunge at them?

6   A.  Never.

7   Q.  You might make a motion as if you were going to hit them?

8   A.  Never.

9   Q.  But said you did keep a baseball bat at your home?

10  A.  Yes.

11  Q.  Did you keep firearms in your home?

12          MR. MARGULIS-OHNUMA:  Objection.  I need to consult

13  with him before he answers.

14          I direct him not to answer then.

15          THE COURT:  Ms. Tarlow?

16          MS. TARLOW:  Your Honor, this is cross-examination.

17          THE COURT:  Find another way of rephrasing that

18  question.

19  Q.  Did you keep any weapons in your apartment, Mr. Kidd?

20  A.  Yes, I did.

21  Q.  And those include firearms, Mr. Kidd?

22          MR. MARGULIS-OHNUMA:  Objection.

23          THE COURT:  Asked and answered.

24          MS. TARLOW:  Your Honor, may we have a brief sidebar?

25          THE COURT:  No, let's move on.

J7BTKID5                          Kidd - Cross

1   Q.  Mr. Kidd, you've had sex with women when they didn't want
2   to sometimes, right?
3          MR. MARGULIS-OHNUMA:  Objection.
4          THE COURT:  Overruled.
5   A.  Never.
6   Q.  Your view, though, is that women are for the sexual
7   pleasure of men, right?
8   A.  I'm sure I said that jokingly, but not like rape.  I don't
9   support rape in any way, shape or form.
10  Q.  Women should be taken advantage of for their bodies?
11  A.  I don't believe that, no.
12  Q.  For sex?
13  A.  No.
14  Q.  But you took advantage of the women who we heard about
15  today, right?
16         MR. MARGULIS-OHNUMA:  Objection to the form of the
17  question.
18         THE COURT:  Sustained as to form.
19  Q.  You sold the women who took the stand for sex, right?
20         MR. MARGULIS-OHNUMA:  Objection.
21         THE COURT:  Overruled.
22  A.  No.
23  Q.  Your testimony today is you did not sell the women who took
24  the stand for sex?
25         MR. MARGULIS-OHNUMA:  Objection.

J7BTKID5                        Kidd - Cross

1   A.  They responded to an ad.  I never turned anybody out.  Any

2   female that ever worked as a prostitute has, A, been 18 or

3   older, and B, she was already doing it.

4   Q.  But some of the women who took the stand over the last few

5   days, you made money when they engaged in prostitution, right?

6   A.  Yeah.

7   Q.  And you threatened some of those women and girls when they

8   didn't comply with your rules?

9          MR. MARGULIS-OHNUMA:  Objection.

10          THE COURT:  Overruled.

11  A.  No, I asked them to leave or I'd tell them to leave.

12  Q.  When they didn't do what you said, you would threaten them?

13  A.  Define "threaten."  You mean like saying you're going to

14  have to leave or threaten acts of violence?

15  Q.  Threaten with verbal abuse, physical abuse.

16  A.  No.

17          MS. TARLOW:  Your Honor, we would like to play what is

18  already in evidence Government Exhibit 1372.

19          (Audio recording played)

20  Q.  Mr. Kidd, that was your voice?

21  A.  Yeah.  Are you going to play the full --

22          MS. TARLOW:  No further questions.

23  A.  I was clearly being sarcastic.  Are you kidding me?

24          THE COURT:  Mr. Margulis, how much longer do you think

25  you will need on redirect?

1             MR. MARGULIS-OHNUMA:  I have a few questions on

2    redirect, yes.

3             THE COURT:  Okay, few questions.

4    REDIRECT EXAMINATION

5    BY MR. MARGULIS-OHNUMA:

6    Q.  Mr. Kidd, I want to show you what is marked as Defendant's

7    Exhibit L and I for identification.

8             MR. MARGULIS-OHNUMA:  If I may approach, your Honor?

9             THE COURT:  Yes.

10            Has the government seen these?

11            MR. MARGULIS-OHNUMA:  Yes.

12   Q.  Just generally, can you describe what those exhibits are?

13   A.  Places that I have lived.

14   Q.  And does that -- does Defendant's Exhibit I accurately

15   reflect, to the best of your recollection, the dates that you

16   lived and the various locations -- withdrawn.

17            Is it a map?

18   A.  Yeah, Google map.

19   Q.  Showing places that you said -- showing places that you

20   lived?

21   A.  Yeah.

22   Q.  And does Defendant's Exhibit I accurately reflect the dates

23   and the locations of where you lived that we talked about in

24   your direct testimony?

25   A.  Yeah it's pretty accurate.

J7BTKID5                         Kidd - Redirect

1              MR. MARGULIS-OHNUMA:  Your Honor, I would offer --

2    Q.  Sorry, Defendant's Exhibit L is just a blow up of I, a

3    close up -- sorry, pulling out, an overview of I, is that

4    correct?

5    A.  Sorry again?

6    Q.  If you look at L, that's the same information that's on I,

7    is that correct?

8    A.  Yeah.

9              MR. MARGULIS-OHNUMA:  Your Honor, I offer Defendant's

10   Exhibit I and L into evidence.

11             MS. TARLOW:  No objection, your Honor.

12             THE COURT:  Admitted without objection.

13             (Defendant's Exhibits L and I received in evidence)

14             MR. MARGULIS-OHNUMA:  I will publish them briefly.

15   Q.  So that's.

16             MR. MARGULIS-OHNUMA:  If he touches the screen, does

17   it work?

18             Let me see if I could do it.

19   Q.  The first place, up until -- withdrawn.

20             In 2015, where did you live?

21   A.  I lived at 1423 Stanley Avenue, Apartment 3.

22   Q.  Is that the one over here near the airport?

23   A.  Yeah, close to Howard Beach.

24             THE COURT:  Mr. Margulis, first, you already brought

25   this evidence in the direct, second, to what extent is this

1    beyond the scope of the cross?

2            MR. MARGULIS-OHNUMA:  Two more questions on this.

3            THE COURT:  This is asked and answered when he

4    testified on direct.

5            MR. MARGULIS-OHNUMA:  I want to show the relationship

6    between the two addresses, that's all.

7            THE COURT:  What is the bearing of the relationship to

8    this action?

9            MR. MARGULIS-OHNUMA:  Well, I will give you that in my

10   closing, but basically it's where the alleged victims say he

11   went, and where he actually lived at the time is a long way

12   away.

13           THE COURT:  You already have the information on the

14   record.  If you want to ask one last question, I will allow it.

15           MR. MARGULIS-OHNUMA:  Okay.

16   BY MR. MARGULIS-OHNUMA:

17   Q.  So from the place on Stanley Avenue until the place you

18   moved to on Nostrand, about how far is that?

19   A.   The place on Nostrand was the place -- 1423 Stanley Avenue

20   was borderline Queens, so driving is maybe like 25 minutes,

21   maybe half an hour to drive.

22   Q.   Thank you.  You told us during cross-examination that you

23   looked at identification for the person you knew as Diamond,

24   right?

25   A.   Yeah.

1    Q.   Did you ever know that her real last name was Bonilla?

2    A.   I don't remember.

3    Q.   What was the ID that you looked at?

4    A.   Some type of New York -- might have been a benefit card or

5    non-driver's -- what do you call a non-driver's license, when

6    it's just a state ID.

7    Q.   Was it a photo ID?

8    A.   Yeah.

9    Q.   And how old did it say she was?

10   A.   18.

11   Q.   The government just played Government Exhibit 1372 for the

12   jury.  Did you hear that, the tape at the end?

13           Did you hear when they played that at the end of the

14   cross-examination?

15   A.   Yeah.

16   Q.   What were you trying to express on that tape?

17   A.   As I said before, this could be confirmed by anybody that's

18   on iTunes, before I had my show I started off with segment

19   calls "What Pisses Me Off" where I would go on rants.  It was

20   similar to Family Guy's Peter Griffin's "What Grinds My Gears,"

21   and I say a lot of sarcastic stuff and outrageous stuff, but it

22   usually ends up getting to the point.  That clip specifically,

23   I think it might have been -- I don't want to lie about -- but

24   I know it had to do with that.  And I was clearly joking

25   around, like I wasn't serious, I was --

1   Q.  Did you believe those things that you said on that clip?

2   A.  No.

3         MR. MARGULIS-OHNUMA:  Judge, I don't have additional

4   questions, but if I may consult with the client for one moment.

5         (Pause)

6         MR. MARGULIS-OHNUMA:  Just a couple more questions,

7   your Honor.

8   Q.  You were asked on cross about the camera that you kept in

9   your home.  Do you remember that?

10  A.  Right.

11  Q.  So what would happen to the footage on that camera?

12  A.  Basically the way the camera works, it's a motion -- I got

13  it from Amazon, it's a motion, what you call -- basically it

14  records movement within the vicinity.  So let's say it's put

15  right here, anything that happens, any type of movement,

16  whether it's cat walking across or a human, it records that and

17  saves any type of movement.  And the video files are really

18  small.  That way you're able to keep a bunch of data.  So

19  basically if nothing is going on, if there's no type of

20  movement, it won't record anything, but once people like start

21  walking around or anything like that, it records.

22  Q.  Then where would -- where, if anywhere, would the data be

23  stored or the videos be stored?

24  A.  My phone, because there's app, it's an app for Amazon

25  cloud, something to that effect.  Because like I said, I got it

1   through Amazon, so it would be stored there.

2   Q.  Do you know if it would be stored locally on your phone or

3   in the cloud?

4   A.  I think both.  I know definitely to the phone, but I don't

5   know -- I know definitely to my phone.

6   Q.  I hand you what's already in evidence as Government

7   Exhibit 1, which is an Apple iPhone.  Is that your phone that

8   you're talking about?

9          Does it appear to be?

10  A.  Yeah, it appears to be.

11         MR. MARGULIS-OHNUMA:  So again, your Honor, I don't

12  have further questions.

13  Q.  But Mr. Kidd, is there something else that you wanted to

14  tell this jury based on your personal knowledge?

15  A.  Yeah, my podcast "Chris Kidd's World" is taken out of

16  context.

17         MS. TARLOW:  Objection.

18         THE COURT:  Sustained.

19  Q.  Is there something specific about the snippets that we

20  heard that was inaccurate or inconsistent with your views?

21  A.  Yeah.

22         MS. TARLOW:  Objection.

23         THE COURT:  Sustained.

24  Q.  Aside from the podcasts or the YouTube videos, is there

25  anything else that you wanted to tell this jury?

J7BTKID5

A.   That Jessica Bonilla is working for these people.

          MS. TARLOW:  Objection.

          THE COURT:  Sustained.

Q.   Based on personal knowledge.

A.   This is my personal knowledge --

          THE COURT:  Sustained.

A.   -- she was arrested --

Q.   Again let me give you one more chance.  Is there anything,
based on your personal knowledge, that you would like to tell
the jury?

A.   Those ads, reconstructed ads, aren't accurate.  A lot of
those pictures that are on those ads, the only way they could
have the gotten those pictures from my computer, a lot of those
pictures I didn't post on it BackPage, and the text in the ads
is consistent.

Q.   Mr. Kidd, did you commit any crimes you're accused of?

A.   Absolutely not.

          THE COURT:  Thank you.  You are excused.  You may step
down.

          Sorry Ms. Tarlow, does the government have any
recross?

          MS. TARLOW:  No, your Honor.

          THE COURT:  You may step down.

          Mr. Margulis.

          MR. MARGULIS-OHNUMA:  Judge, at this point the defense

J7BTKID5

1    has a stipulation I would like to read into the record.  It's

2    agreed in evidence, so I would like to put it on the ELMO as

3    I'm reading it.

4                   THE COURT:  Yes.

5                   MR. MARGULIS-OHNUMA:  It is hereby stipulated and

6    agreed by and between the parties that, on April 25, 2019, Dana

7    McLeod, who is referred to in the indictment as Victim-3, met

8    with government agents, including FBI Special Agent Maguire,

9    the notes taken by Special Agent Maguire during the meeting

10   state that the defendant, Lloyd Kidd, made contact with

11   Ms. McLeod when she was shopping on Utica Avenue in Brooklyn.

12                  It is further hereby stipulated and agreed between the

13   parties that this stipulation may be received in evidence,

14   signed by counsel for both sides.

15                  With that, your Honor, the defense rests.

16                  THE COURT:  Thank you.  The defense has indicated that

17   it rests.  Again, it means that the defendant has completed the

18   presentation of the evidence that defendant sought to put on

19   the record.  At this point, both sides having rested, the Court

20   will close the record on the evidentiary portion of the action.

21                  MS. TARLOW:  Your Honor, may we have a brief sidebar?

22                  THE COURT:  On this question?

23                  MS. TARLOW:  Yes, your Honor.

24                  THE COURT:  All right.

25                  (At sidebar)

J7BTKID5

1      MS. BRACEWELL:  Your Honor --

2      THE COURT:  Do you have rebuttal?

3      MS. BRACEWELL:  We have the possibility of a very

4  short rebuttal case.  We would offer a single exhibit,

5  potentially in the morning.  We're trying to obtain a 911 call

6  that was made by Kaira Brown in late February of 2017.  It's

7  directly responsive to the testimony the defendant just gave

8  that he did not know Kaira Brown before April 2017.  So we have

9  an agent trying to obtain the recording right now, and we would

10  very succinctly offer that into evidence, and then that would

11  be the extent of our case.

12      MR. MARGULIS-OHNUMA:  Your Honor, may I be heard?

13      I asked the government specifically when Kaira Brown

14  was testifying -- I'm sure you will recall, Ms. Bracewell --

15  whether they were planning to use the 911 call, because we did

16  have a transcript of it already that we were put on notice of

17  but we didn't have the call.  And I would have asked Ms. Brown

18  about it.  So if they're going to -- I don't think they should

19  be permitted to reopen their case when they already waived

20  their right do to this, also when they don't even know if they

21  will have the evidence by tomorrow.

22      Secondly, if they do, I would ask to recall Ms. Brown,

23  because I would have to question her about it then.  And this

24  is a side show, it's not necessary.  The evidence is closed,

25  it's not real rebuttal.

J7BTKID5

1          MS. BRACEWELL:  We wouldn't be reopening our case,

2     obviously it would be rebuttal.  It's directly responsive to

3     the testimony the defendant gave.  We did not intend to elicit

4     it in her direct testimony, but until he put the timeline in

5     dispute and denied knowing her at all before April of 2017,

6     this has made that evidence incredibly persuasive on the point.

7          THE COURT:  Mr. Margulis, your client chose to take

8     the stand.  Having done that, he reopens the record for any

9     rebuttal that the government may not have contemplated before.

10    They may not have known at the time that this issue first came

11    up that your client was going to take the stand and make

12    statements that may have been directly contradictory to the 911

13    call.  So I don't see this as reopening the government's case,

14    I see it as proper rebuttal.

15         MR. MARGULIS-OHNUMA:  I understand.  Then I ask to

16    recall Ms. Brown to ask her about the tape, which is what I was

17    planning to do on her cross-examination but I was persuaded not

18    to because the government, I thought, committed they were not

19    going to use it.

20         MS. BRACEWELL:  Defense counsel asked us if we

21    intended to use the call on her direct.  We did not, and as you

22    recall, we did not use the call or ask her about it.  He was

23    more than welcome to go into it.  He chose not to because, I'm

24    sure, as this call will make clear, she called 911 on his

25    client.  So that was a strategic decision, and now that his

J7BTKID5

1   client has put in question the timeline, it's totally relevant

2   and probative evidence to respond to it.

3          THE COURT:  I don't think there's any problem with

4   relevance.

5          MR. MARGULIS-OHNUMA:  I understand that.

6          THE COURT:  The proper procedure is rebuttal.

7          MR. MARGULIS-OHNUMA:  But they don't have the

8   evidence, as I understand it.

9          THE COURT:  They're trying to seek it.

10          MR. MARGULIS-OHNUMA:  How long are we going to give

11   them?

12          MS. BRACEWELL:  The agent is currently at the Brooklyn

13   NYPD record center trying to obtain the call.  We understanding

14   she should have it shortly.  We expect to have it within an

15   hour, hopefully, and we'll provide it to the defense.

16          THE COURT:  Mr. Margulis, you knew about -- the

17   government told you previously about this call.

18          MR. MARGULIS-OHNUMA:  They have provided a lot of --

19   not a sprint sheet, there was a summary of it I think from the

20   sprint sheet on the complaint report.  And the issue, just so

21   you're aware, is that the summary of it says:  Unknown if

22   females are underage.

23          So I was thinking I might use it, since it seemed to

24   show no one was complaining anyone was underage at the time.

25   They told me they weren't going to use it so I didn't bring it

J7BTKID5

1      up based on their representation they weren't going to use it.

2      If they told me they would bring it in without Ms. Brown, I

3      would have brought it up with Ms. Brown to see what she said.

4      That's why I would like to recall Ms. Brown if they're

5      permitted.

6              THE COURT:  Before you recall Ms. Brown, let's suppose

7      for the moment that the call says that Ms. Brown made the 911

8      call, made that call and said what she said, and the only

9      relevant portion is the question of how old she was, right?

10              MS. BRACEWELL:  Yeah, the date of the call.

11              THE COURT:  The date of the call.  What more is there

12      that you would need to have her come back here for?

13              MR. MARGULIS-OHNUMA:  I haven't had much time to think

14      about this, but let me think about it for a moment.

15              THE COURT:  If you think about it for a moment you see

16      the sideshow would be you bringing her back here to say yes, I

17      made that call.

18              MR. MARGULIS-OHNUMA:  How are we doing the voice

19      identification?

20              MS. BRACEWELL:  We need to find out if in the call she

21      identifies herself.  When we have the call we'll know precisely

22      how we're presenting it.

23              THE COURT:  Let's see how it plays out.

24              MR. MARGULIS-OHNUMA:  I want to reserve the right.

25              THE COURT:  Absolutely.

J7BTKID5

1          MS. BRACEWELL:  To be clear, we are not going to

2     getting into a substantial rebuttal case, we'll be introducing

3     the call, the date of the call, to show that she knew him prior

4     to April 2017, as he alleges.  So it's a very narrow rebuttal

5     case on chronology.  It's not appropriate to bring her back to

6     get back into the substance.

7          THE COURT:  I could also see the possibility, if the

8     party work cooperatively, of a stipulation that a call was made

9     on that date by this person and work something out to indicate

10    that that's a matter of fact, the call was made on that date by

11    this person.

12         MR. MARGULIS-OHNUMA:  I don't see, given my client's

13    testimony, how he would be able to stipulate to that.  I have

14    the client I have, your Honor.

15         THE COURT:  Well, your client is the one who said he

16    didn't know her before.

17         MR. MARGULIS-OHNUMA:  So he won't stipulate now she

18    made a call from his apartment two months earlier.  How could

19    he?

20         THE COURT:  Think about it and we'll revisit the issue

21    in the morning.

22         MS. BRACEWELL:  Thank you.

23         MR. MARGULIS-OHNUMA:  Judge, for the record I move

24    under Rule 29 again to dismiss on the grounds that no

25    reasonable fact finder could find that the elements of each

J7BTKID5

1    crime has been proven beyond a reasonable doubt.

2             THE COURT:  The Court reaffirms its earlier ruling on

3    this matter and denies the motion.

4             MR. MARGULIS-OHNUMA:  Thank you, your Honor.

5             (In open court)

6             THE COURT:  Let me, for the benefit of the jury,

7    advise something I said earlier about closing the evidentiary

8    portion of the hearing.  The government has requested that we

9    keep the record open for the purposes of their seeking an item

10   of evidence for rebuttal purposes.  For that purpose, I will

11   allow the government until tomorrow morning to see if in fact

12   they're able to produce that evidence, and if the evidence is

13   pertinent, we may reopen the evidentiary portion for that

14   matter alone.  It will not take more than a few minutes or

15   should not take more than a few minutes.

16            In terms of where we are, since there is no further

17   evidence being presented this afternoon, I'm going to adjourn

18   the trial until tomorrow morning at 9:15.  At 9:15, again, if

19   the schedule holds, the parties will begin their closing

20   arguments, each side will have roughly 40 to 45 minutes on that

21   schedule.  We should be able to conclude the closing arguments

22   by about 11 o'clock.  At around 11:15 the Court would then give

23   the instructions, it should take about an hour and a half, so

24   that you would be ready to deliberate beginning at around

25   12:45.

J7BTKID5

1              So you're excused for the evening.  As you go home

2     this day, having heard the bulk of the arguments, the evidence,

3     do not discuss anything that you heard or have seen in the

4     courtroom, don't discuss it with anyone on the outside or read

5     any account.  If any of these things occur, you are directed to

6     inform the Court immediately.  Do not discuss it with your

7     fellow jurors.

8              Thank you.  Have a good evening.

9              (Jury not present)

10             THE COURT:  Let's see if there's anything else that we

11    can do productively at this time.  I indicated earlier that I

12    had circulated a draft of the jury instructions.  I don't

13    expect that you will have mastered every part of it by this

14    point, but perhaps in the next hour or so you may be able to

15    get a first read and be able to have a charge conference in

16    about an hour and go over some of your larger, what I call

17    global issues, and then we'll make whatever modifications may

18    need to be made and come back tomorrow morning.  We will

19    probably need to start earlier in order to be able to make the

20    9:15 time that I gave the jury and give us time for any last

21    minute modifications that may need to be made.

22             So why don't we reconvene here at 4:30, it's now

23    roughly 3:30, and be prepared to give us at least your big

24    picture thoughts on the draft.

25             Anything else?

J7BTKID5

1          MS. TARLOW:  Not from the government.

2          MR. MARGULIS-OHNUMA:  Not from the defense.  Thank you

3    very much, your Honor.

4          THE COURT:  Thank you.

5          (Recess taken)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury not present)

2            THE COURT:  It's my practice to review the draft

3    instructions first on what I call global issues, meaning

4    questions and issues that the draft presents, either because an

5    instruction that you think should be there is not, or one that

6    is there and you believe it is not an accurate reflection of

7    the law, or one that you believe should be added in the form in

8    which you propose.

9            After we go through those global comments, we'll come

10   back and hear any other kinds of responses you may have,

11   grammatical, typographical, or otherwise.

12           One general comment about these charging conferences.

13   I told this to my clerks.  I'm always amazed, at every charging

14   conference I've ever had, regardless of the issue at trial, the

15   parties' proposals are so diametric and their attitude is one

16   of such advocacy that it is as if the issue in question has

17   never been tried in this court or anywhere else in the United

18   States.

19           My view on these instructions is that, in fact, these

20   issues have been tried many, many times, there are probably

21   multiple instructions on any one particular issue, and I don't

22   believe that necessarily any one instruction is better than

23   another.  And consequently, I tend, at least on the general

24   instructions, to follow the draft that I've used in the past.

25   And on substantive issues, my approach is that if there is

1    major dispute about what the instruction should be, I tend to

2    favor using the Sand treatise as a default, unless there is

3    some controlling language in Second Circuit precedent to let me

4    either modify or expand upon or change what's in the Sand

5    treatise.

6            With that, I invite your comments.  Government first,

7    and then the defense.

8            MS. TARLOW:  Yes, your Honor.  With respect to the

9    government's global comments.

10           THE COURT:  Yes.

11           MS. TARLOW:  The government would request that the

12   request number four in its proposed jury instructions be added,

13   which refers to multiple counts.

14           THE COURT:  That was your number four?

15           MS. TARLOW:  Yes, your Honor.

16           THE COURT:  All right.  Again, that's fairly standard

17   language on these cases that do involve more than one charge.

18           Mr. Margulis, do you have any objection to the

19   addition of government's charge number four?

20           MR. MARGULIS-OHNUMA:  If I may have a moment to pull

21   it up, Judge.  I agree that it's -- no.  No objection.

22           THE COURT:  We'll find an appropriate place to add the

23   text.  One thought may be on page 24, just before the summary

24   of the indictment.  But, we'll add that somewhere.

25           Ms. Tarlow.

1           MS. TARLOW:  Yes, your Honor.  With respect to request

2      number 34 in the government's proposed request to charge, we

3      would also ask that be added.

4           MR. MARGULIS-OHNUMA:  What's that on?

5           MS. TARLOW:  That concerns the use of recordings, text

6      messages, and e-mails.  On page 47.

7           MR. MARGULIS-OHNUMA:  I don't see that in the version

8      of the --

9           THE COURT:  You're saying that you propose that we did

10     not include that and you think it should be included?

11          MS. TARLOW:  Yes, your Honor.

12          THE COURT:  All right.  Mr. Margulis, do you have any

13     comments?

14          MR. MARGULIS-OHNUMA:  I just don't have it.

15          (Counsel conferring)

16          THE COURT:  That, too, is a fairly standard

17     instruction in cases involving different types of recordings.

18          MR. MARGULIS-OHNUMA:  Yeah, I have no objection to

19     that, your Honor.

20          THE COURT:  Ms. Tarlow, next.

21          MS. TARLOW:  And then finally, your Honor, with

22     respect to the victim identification, the government would

23     propose that we identify in the first instance the victims by

24     name, so it is clear to the jurors who the victim number refers

25     to.

J7B3KID6                        Charge Conference

1          THE COURT:  That was done on the record.

2          MR. MARGULIS-OHNUMA:  I would request that every time

3    there's a mention of Victim-1, you -- a victim number, you also

4    provide the name.  So Victim-1 also known as Kaira Brown,

5    everywhere.  There's no need -- I think it is important to

6    remind them.  It's hard to keep track of the numbers, and that

7    was just to shield the identity prior to trial, and there is no

8    need for that.

9          THE COURT:  Do you have any objection to that?

10         MS. TARLOW:  No, your Honor.

11         THE COURT:  Anything else, Ms. Tarlow?

12         MS. TARLOW:  Your Honor, we would also request what

13   was identified as request number 32 -- I'm sorry, your Honor.

14   We would request the proposed instruction request number 33,

15   which is charts and summaries.

16         MR. MARGULIS-OHNUMA:  Hang on.  Can we have one

17   moment?  I'm so sorry.  I didn't hear what you're saying.  I've

18   got to focus on my client for a moment.

19         (Defendant conferring with his counsel)

20         MR. MARGULIS-OHNUMA:  I'm sorry.  Could you say what

21   you said again, Ms. Tarlow?  I apologize.

22         MS. TARLOW:  We would also request that what is

23   identified as request number 33 in our proposed request to

24   charge, which concerns charts and summaries admitted as

25   evidence, that that be added.

1          MR. MARGULIS-OHNUMA:  I'm clearly looking at the wrong

2     document.  So let me find the right one.

3          (Counsel conferring)

4          MR. MARGULIS-OHNUMA:  We have no objection to that,

5     your Honor.

6          MS. TARLOW:  Then in the same vein, your Honor, on

7     page 11, the last full paragraph states, referring to charts,

8     and they are not direct, independent evidence, and they are

9     admitted into evidence as aids to you.

10         We would ask that language be modified to reflect that

11    the charts and summaries were admitted as evidence.

12         MR. MARGULIS-OHNUMA:  Sorry, I think it is a little

13    unclear whether -- forgive me if I'm forgetting.  Did your

14    Honor rule whether the Backpage reconstructions were actually

15    admitted into evidence or were demonstratives?

16         THE COURT:  I ruled that they were summaries admitted

17    into evidence.

18         MR. MARGULIS-OHNUMA:  Yes.

19         THE COURT:  So we have to modify page 11, the last

20    full paragraph.

21         MR. MARGULIS-OHNUMA:  Right.  So that would have to be

22    omitted.

23         THE COURT:  Not omitted.  Modified.

24         MR. MARGULIS-OHNUMA:  Yes.

25         THE COURT:  Ms. Tarlow.

1          MS. TARLOW:  We do have a few substantive changes to

2     specific requests to charge.  Would you like me to go through

3     those now?

4          THE COURT:  Yes.

5          MS. TARLOW:  Yes?

6          THE COURT:  Additional instructions?

7          MS. TARLOW:  No additional instructions, just

8     substantive changes to instructions that are in the jury

9     instructions.

10          THE COURT:  Before we do that, let me give

11    Mr. Margulis-Ohnuma an opportunity to give us his global

12    changes.  Global comments.

13          MR. MARGULIS-OHNUMA:  So, I had none to any of the

14    instructions prior to the substantive instructions.  I haven't

15    finished through past the substantive instructions, so I think,

16    up to the point we've reached now, we're in agreement.  But I

17    just want to reserve until I have a chance to look at the -- I

18    guess there's two or three at the end that are global, and I

19    have not looked at those yet.

20          THE COURT:  When you say at the end, meaning?

21          MR. MARGULIS-OHNUMA:  Hang on.  Well, I haven't, so I

22    haven't looked yet at the last ones, requests number 23

23    regarding time, offense, the venue instruction.

24          THE COURT:  Those are fairly routine.

25          MR. MARGULIS-OHNUMA:  I would just like to reserve the

1  right to raise any objections.  I don't have any at this point.

2          THE COURT:  You always have the right to raise

3  objections.

4          MR. MARGULIS-OHNUMA:  I don't have any at this point.

5  To be perfectly honest, I only made it halfway through the

6  instructions.  But I'm prepared to --

7          THE COURT:  All right.  Then let's turn back to the

8  government.

9          Ms. Tarlow, you have some comments on the substance?

10         MS. TARLOW:  Yes, your Honor.  On page 18, request

11  number 29.  The government would request that the sentence

12  starting with "specifically," be amended to say, "Specifically,

13  you have heard testimony about evidence seized in connection

14  with certain lawful searches conduct by law enforcement

15  officers."

16         MR. MARGULIS-OHNUMA:  I don't think that's necessary.

17         THE COURT:  I believe that there was another

18  instruction in which I indicated that there were searches in

19  this case, and that those searches were lawful.

20         MS. TARLOW:  Your Honor, if it is included, we missed

21  that.  We did not see that instruction.  If we could just

22  confirm that's contained.

23         THE COURT:  We'll look for that, because that is

24  fairly standard as well.

25         Next?

1    　　　　MS. TARLOW:  On page 24, under request number three,

2    summary of indictment.  With respect to Count One, the

3    indictment charges that in or about from the spring of 2015 to

4    February 2017 -- excuse me.  It's in about the spring of 2015

5    up to and including at least in or about February 2017.

6    　　　　MR. MARGULIS-OHNUMA:  Is that the summary?

7    　　　　MS. TARLOW:  Yes, request number three, page 24, Count

8    One of the indictment.

9    　　　　MR. MARGULIS-OHNUMA:  I think the government is

10   correct about that.

11   　　　　THE COURT:  So you're proposing that after the spring

12   of 2015.

13   　　　　MS. TARLOW:  So just it would reflect the language in

14   the indictment, which states that in or about from the spring

15   of 2015, up to and including at least in or about

16   February 2017.

17   　　　　THE COURT:  Next?

18   　　　　MS. TARLOW:  On page 27, the paragraph that begins

19   with "and/or that Mr. Kidd knew."  We would request that after

20   the word "coercion," your Honor insert "or any combination of

21   such means," which is the language of the statute.

22   　　　　MR. MARGULIS-OHNUMA:  Your Honor, I think it's plenty

23   confusing as it is.  And you say that later on in describing

24   the element in more detail.  This is just a summary.  That

25   would only make it more confusing and cumbersome, and I don't

1    think it's necessary.

2              THE COURT:  Ms. Tarlow, what's your reaction to that

3    comment?

4              MS. TARLOW:  It's part of the statute and the charged

5    conduct.  We think to leave it out is more confusing.

6              MR. MARGULIS-OHNUMA:  It's not reading the -- at that

7    point we're not reading the statute.  We're giving a quick

8    summary so the jury can get the overview of it.

9              MS. TARLOW:  It provides a summary, your Honor, of the

10   elements.

11             MR. MARGULIS-OHNUMA:  But not the complete elements,

12   so later on you give the complete elements and you add the

13   and/or.

14             MS. TARLOW:  Your Honor, it seems slightly confusing

15   to not include it in one place and to include it --

16             THE COURT:  I agree.  To the extent the statutory

17   statutes are known to be confusing, but if it is language from

18   the statute, there is no reason to leave it out.

19             MR. MARGULIS-OHNUMA:  Respectfully, this is not

20   reading the statute.  It is --

21             THE COURT:  It is an element from the statute.  And I

22   agree that to leave it out but then later on to put it in,

23   might be confusing to the jury.

24             MR. MARGULIS-OHNUMA:  Okay.  I withdraw the objection,

25   your Honor.

 1              THE COURT:  Okay.  Next?

 2              MS. TARLOW:  On page 24, the paragraph that begins

 3    with "the government may prove."  The government would --

 4              THE COURT:  What page?  24?

 5              MS. TARLOW:  Excuse me, your Honor.  Page 34.

 6              THE COURT:  Oh.  34.  Which paragraph?  Second

 7    paragraph?

 8              MS. TARLOW:  The second full paragraph.  Starting with

 9    the government --

10              THE COURT:  Yes.  What's your comment?

11              MS. TARLOW:  So the government, as is explained in the

12    next paragraph, the government may prove that element in three

13    ways in the alternative.  And the government's concern is that

14    paragraph that begins "when the government may prove that

15    Mr. Kidd knew," makes it sound -- it merges those three

16    different ways that it can prove that element.

17              And so we would ask that the language of the statute

18    is tracked either by deleting that paragraph or by amending it,

19    and I can provide language amending it.

20              THE COURT:  What is your specific proposal for

21    amendment?

22              MS. TARLOW:  "The government need not prove that

23    Mr. Kidd knew or recklessly disregarded that Victim-1 was under

24    the age of 18 if the government proves beyond a reasonable

25    doubt that Mr. Kidd had a reasonable opportunity to observe

1   Victim-1."

2          THE COURT:  All right.  Mr. Margulis, do you have any

3   objection to that modification?

4          MR. MARGULIS-OHNUMA:  Yes, I do.  The current language

5   is from Sand, and I think it is much easier to follow.  And I

6   would endorse the current language from Sand.  And also, the

7   formulation the government suggests a lowering of the burden of

8   proof on the government saying they need not prove something.

9   Whereas the Sand formulation, and your Honor's formulation,

10  gives them an alternative way to prove the essential element

11  beyond a reasonable doubt, which is more consistent with the

12  law.

13         THE COURT:  Ms. Tarlow?

14         MS. TARLOW:  Your Honor, that language that I read

15  tracks the language in the statute in 1591(c).

16         THE COURT:  Hand up your draft.  I'll take a look at

17  it.

18         This is one instance in which there were sharp

19  differences between the submissions of the parties, and

20  consistent with my comment earlier, I included the default

21  provision using the Sand language.  But again, I'll look at

22  what the government now proposes, and see if this is one place

23  where modification may be called for.

24         MR. MARGULIS-OHNUMA:  So if we're staying with that, I

25  have a comment, I think the first comment I come to is on that

1    same provision or just before it.  Can I address it now?

2              THE COURT:  Yes, you may.

3              MR. MARGULIS-OHNUMA:  So, the issue is that with

4    respect to the paragraph before that, I think this is squarely

5    in issue in this case, is whether if there is a determination

6    that he advertised, then reckless disregard is insufficient.

7    So, it seems to me, given that, that there has to be jury

8    unanimity with respect to whether or not he advertised, which

9    is not called for now, as a means not an element in the way the

10   instruction's worded now.

11             But I think we somehow have to convey to the jury that

12   if you -- that the reckless disregard language only applies if

13   you are unanimous and that the means by which the statute was

14   violated is something other than advertise.

15             THE COURT:  Ms. Tarlow, does the government have any

16   comment on that?

17             MS. TARLOW:  Your Honor, we think that the jury

18   instruction makes clear that if the determination is that is

19   the way that Mr. Kidd violated the statute by advertising, that

20   a different standard applies.

21             MR. MARGULIS-OHNUMA:  Right.  It does make that clear,

22   but it doesn't make clear -- the issue of unanimity is left

23   ambiguous the way it's formulated now.

24             THE COURT:  Do you have any authority for your

25   proposition?

1              MR. MARGULIS-OHNUMA:  I do not, your Honor.

2              THE COURT:  All right.  I'll examine that comment and

3     we'll see whether it is appropriate.

4              One thing we should take into account is to what

5     extent highlighting the standard of proof in that particular

6     instance may raise questions about a similar treatment of other

7     of the elements.  Just a off-top-of-my-head comment for the

8     moment.

9              Go ahead, next, Ms. Tarlow.

10             MS. TARLOW:  Your Honor, would you like us to pass up

11    our request?

12             THE COURT:  Yes.

13             MR. MARGULIS-OHNUMA:  What are you passing up?

14             MS. TARLOW:  Your Honor, in the page that I'm about to

15    pass up.  We also noted a proposed change that in the next

16    paragraph that starts with "So the government may prove this

17    element by proof" and we inserted "regarding age beyond a

18    reasonable doubt."

19             THE COURT:  All right.  Hand it up.  Next.

20             MS. TARLOW:  Page 36, the portion of the first

21    paragraph that starts with "Abuse or threatened abuse of law or

22    legal process includes threats to send a person to jail."  We

23    request that be removed since it is not relevant to -- we would

24    request we delete the specific mention of "to send a person to

25    jail," since that is not alleged in this case.

1          MR. MARGULIS-OHNUMA:  I agree.  I join in that

2     application.

3          THE COURT:  Agreed.

4          MR. MARGULIS-OHNUMA:  Including the deportation

5     language.

6          THE COURT:  Yes.  Next.

7          MS. TARLOW:  The next, the last sentence of the next

8     full paragraph which starts with "a threat of serious harm must

9     be sufficient."  The government would request that that portion

10    be removed.

11         MR. MARGULIS-OHNUMA:  I'm sorry.  Where are you?

12         MS. TARLOW:  The last sentence of the first full

13    paragraph on page 36.  Which starts with "a threat of serious

14    harm must be sufficient."

15         MR. MARGULIS-OHNUMA:  No.  That's an important

16    paragraph.  That should stay.  I believe that's from Sand.

17         THE COURT:  All right.  Ms. Tarlow, I'll take a look

18    at that.

19         MS. TARLOW:  Yes, your Honor.

20         THE COURT:  If it's from Sand, and there's a dispute

21    about it, my inclination would be to go with the Sand version.

22         MS. TARLOW:  Yes, your Honor.  Our basis for our

23    requesting its removal is on page 35, we think that the

24    instruction is clear as to what serious harm must constitute

25    and its effect on an individual.  And "completely overcome the

1   will of an ordinary person" is just not terminology that we

2   proposed in our instructions or that we have seen support for.

3            THE COURT:  All right.  We'll examine that.  Next?

4            MS. TARLOW:  Page 37, the last paragraph beginning

5   with "also the fact that a person may have initially."  We

6   would request again that at the end of the clause "through the

7   use of force, fraud or coercion," that your Honor add "or

8   combination of such means."

9            MR. MARGULIS-OHNUMA:  I have no objection there.

10           THE COURT:  All right.

11           MS. TARLOW:  And then we have the same request on page

12  42, in the paragraph that begins with "second."  And page 41,

13  with the paragraph that also begins with "second."

14           THE COURT:  That's the second, second element?

15           MS. TARLOW:  Yes, your Honor.

16           THE COURT:  So 41 and you also said 42?

17           MS. TARLOW:  Yes, your Honor.

18           THE COURT:  Next?

19           MS. TARLOW:  With respect to the Court's charge

20  regarding the production of child pornography on page 44 and

21  46, the instructions as they stand describe that the visual

22  depiction was produced using materials that had been mailed or

23  transported in or affecting interstate or foreign commerce.

24  The government requests that be amended to reflect that the

25  visual depiction could be stored or copied on materials that

1   had been mailed or transported in or affecting interstate or

2   foreign commerce.

3          And we have cases which we can provide to your Honor

4   supporting that the element can be satisfied in that manner.

5          THE COURT:  Hand up the precise language of your

6   proposal.

7          MS. TARLOW:  Yes, your Honor.

8          MR. MARGULIS-OHNUMA:  Can I respond to that one?

9          THE COURT:  Yes.

10          MR. MARGULIS-OHNUMA:  I mean, so, that's, that

11   language that the government is proposing is not in the statute

12   and is not in Sand.  Ms. Tarlow did share with me the authority

13   for it.  It seems to me it really goes to a question more of

14   sufficiency than of a correct instruction.  I think the

15   instruction should stick with the statute and with Sand, and I

16   would object to it as expanding the reach of the statute beyond

17   what's applicable.

18          THE COURT:  Hand up the proposal and the authority

19   that it's based on, and we'll take a look at it.

20          MS. TARLOW:  Yes, your Honor.  Should I do it now?  We

21   only have one remaining comment on the instructions.

22          THE COURT:  All right.  Hand up the other one now.

23          MS. TARLOW:  Yes, your Honor.

24          THE COURT:  Thank you.  We'll examine this language

25   and the next and the authority.

1          Ms. Tarlow, you said had you one more?

2          MS. TARLOW:  Yes, your Honor.  With respect to the

3     last point we raised, although we proposed some language,

4     additional language that could be used, it is a device used to

5     produce, including storing or copying, travel in interstate

6     commerce.

7          THE COURT:  Yes.

8          MS. TARLOW:  The final --

9          MR. RAVI:  Just on that one point, your Honor.  Just

10    to address defense counsel's concern, one other possible way of

11    addressing it may be to define "producing" as to including

12    storage or copying.  And that's something I think the Second

13    Circuit case law does do.  So that's another way of potentially

14    addressing the issue without going beyond the scope of the

15    statute as defense counsel has suggested.

16         THE COURT:  Thank you.

17         MR. MARGULIS-OHNUMA:  I don't think "producing"

18    includes storing or copying.  If not, every possessor who

19    stored or copied child porn would be subject to a 15-year

20    mandatory minimum.

21         MR. RAVI:  The elements of the statute make clear the

22    production has to be by the defendant.  But I think the Court

23    can consider it after looking at the case law.

24         THE COURT:  Thank you.  Next comment?

25         MS. TARLOW:  On page 48, the second full paragraph.

1    We would request that that just be broken out in some manner

2    from the venue charge, or perhaps be included in some other

3    place.  It struck us as just being a little bit out of order.

4              THE COURT:  Again, restate exactly what you're

5    proposing?  I did not follow it.  What page are you on?  48.

6              MS. TARLOW:  Page 48.  We don't feel strongly about

7    this but we wanted to raise coming after the venue point, it

8    struck us as a little bit of an odd placement, and maybe

9    slightly confusing to the jury.

10             THE COURT:  You're talking about the paragraph proving

11   identity?

12             MS. TARLOW:  Yes, your Honor.

13             THE COURT:  You're not arguing with the language;

14   you're arguing with whether it fits there.

15             MS. TARLOW:  Yes, your Honor.

16             THE COURT:  Do you have a proposal for an alternative

17   location?

18             MR. RAVI:  I think the issue with the identity, your

19   Honor, it is I think technically covered by all the other

20   elements of the offenses, it is not really an additional

21   element to prove identity.  Of course, the government has to

22   prove that it was Mr. Kidd who committed each of the acts of

23   the elements in each count beyond a reasonable doubt.  I'm not

24   sure if by making it an almost a separate element of all of the

25   counts, I think it might be a little bit confusing.  So, the

1    government queries whether it's necessary, or we're happy to

2    have an instruction kind of at the beginning that of course the

3    government has to prove that it was Mr. Kidd who committed the

4    acts alleged in the indictment beyond a reasonable doubt.

5              THE COURT:  All right.

6              MR. MARGULIS-OHNUMA:  I think it is a welcome

7    instruction.  I think it is necessary.  And if they want to

8    move it somewhere else, I don't think it matters where.  But I

9    think it is essential.

10             THE COURT:  All right.  We'll look to see where it

11   might fit more appropriately.

12             MR. RAVI:  Then, your Honor, I think there are a

13   couple of typos we have left.

14             THE COURT:  Give those to the clerk.

15             MR. RAVI:  Okay.

16             MR. MARGULIS-OHNUMA:  I have a few that I've fully

17   considered, and then one that I just caught.  So let me find

18   the first one.

19             So there's some language on page 36 to 37 about a

20   climate of fear being sufficient to prove the force fraud or

21   coercion element.  I'm not sure where that's coming from.  It's

22   not in Sand and I think it should be omitted.  So that would be

23   the last incomplete sentence on page 36, through the first full

24   paragraph on page 37, is this whole thing about a climate of

25   fear.

J7B3KID6                    Charge Conference

1      THE COURT:  Mr. Margulis, what exactly is your concern

2   with the phrasing of climate of fear?

3      MR. MARGULIS-OHNUMA:  I think it reduces and confuses

4   the standard of proof.  They have to show force, fraud or

5   coercion, and the government's free to argue there was a

6   climate of fear that amounted to force, fraud or coercion, but

7   I'm not sure -- it is a vague formulation in the first place.

8   I mean, I'm not sure what it means to be in a climate of fear.

9   One person's climate of fear could be another person's

10  something else.  It is not in Sand.  And it is not, I don't

11  think it's an accurate statement of the law that it is enough

12  that there is a climate of fear.  Maybe they've cited authority

13  for it.  I don't see it here.

14      Especially in light of the expert testimony, I mean,

15  this really, it really muddies the level of proof that they

16  need to adduce to show the force, fraud or coercion.

17      THE COURT:  Anything else?  I'll take a look whether

18  there may be some alternative phrasing for the concept of

19  climate of fear.

20      MS. TARLOW:  I would note that was included in the

21  parties' joint proposed request to charge on page 17 and 18,

22  and direct your Honor's attention to the case law we cited on

23  page 19 through 20.

24      MR. MARGULIS-OHNUMA:  I'm sorry I missed it the first

25  time around.

1          THE COURT:  Okay.

2          MR. MARGULIS-OHNUMA:  Let me just have a moment.

3          So, sorry, going back though, on page 29, there's

4     this -- the venture prong, profiting from a venture that I

5     think is meant to reach people who are passive investors in sex

6     trafficking schemes.  Which there's just no evidence here for a

7     venture.  And Mr. Kidd, I think all agree that Mr. Kidd worked

8     alone by himself.  Actually, we were not allowed to bring in

9     evidence regarding other alleged pimps.  And so I think we

10    should omit that first full paragraph and the second paragraph

11    on page 29, going down to the second full paragraph on page 30.

12    Which is the language, it is a prong that if it had evidentiary

13    support for venture certainly would be included, but just under

14    the circumstances the evidence came in here, there is no

15    venture.

16          MS. TARLOW:  Your Honor, the government set forth

17    facts that would support a venture, including other individuals

18    who, victims who participated in the acts, the sex acts.  We

19    think that the evidence supports requiring that type of charge,

20    particularly given the defense that the defendant may assert.

21          THE COURT:  All right.  This is an issue which I

22    looked at closely, because I know that the parties had

23    disagreed.  And I examined the case law, there is a Ninth

24    Circuit case which specifically says that a venture can be the

25    individual who acts as -- I know that Mr. Kidd doesn't like the

1    word "pimp" -- but that individual who has a relationship with

2    the prostitute and they both share in the proceeds.  I think

3    it's fair to say that they're doing it for business, to earn

4    money, profits.  It's not a matter of a one-sided relationship.

5    They both benefit from the acts, and to that extent, I cannot

6    see why that would not satisfy the definition of a venture.

7    We'll give you the citation to the Ninth Circuit case if you

8    are interested.  Mr. Margulis?

9              MR. MARGULIS-OHNUMA:  Okay.  So the only, the last one

10   I'm prepared to address now would be reference to a conspiracy

11   in the instruction on venue.  There is no allegation of a

12   conspiracy.  So that should change, well --

13             THE COURT:  What page are you on?

14             MR. MARGULIS-OHNUMA:  Sorry.  Page 47.  The

15   instruction on venue.  First of all, there's some interesting

16   scholarship in the Sand instruction I think we provided about

17   the virtues of instructing a jury to find venue beyond a

18   reasonable doubt, even though, technically, the statute is by a

19   preponderance.  And I would support that, and ask that it be

20   instructed it had to be found beyond a reasonable doubt.  But

21   more importantly --

22             THE COURT:  Would you ask me, Mr. Margulis,

23   essentially to overrule the Second Circuit?

24             MR. MARGULIS-OHNUMA:  Well, I would ask you to go with

25   the Sand recommendation in an abundance of caution.

1      THE COURT:  I don't think that Sand trumps the Second

2    Circuit.

3      MR. MARGULIS-OHNUMA:  No.  It's really an abundance of

4    caution.  Especially where it is --

5      THE COURT:  Caution is when the Second Circuit has

6    explicitly held that in this case venue is proved by a

7    preponderance.  We can give you citations.

8      MR. MARGULIS-OHNUMA:  Okay.  Well, I won't belabor

9    that, your Honor.

10      THE COURT:  I believe the latest case we saw is 2017.

11      MR. MARGULIS-OHNUMA:  So, the other issue with the

12    venue statute, sorry, the venue instruction is that it

13    references an act in furtherance of the conspiracy.  There is

14    no conspiracy alleged, so I would ask to change to "any act in

15    furtherance of the offense."

16      THE COURT:  All right.  I agree with that.

17    Ms. Tarlow?

18      MS. TARLOW:  No objection as long as it's plural.  "Of

19    the offenses."

20      MR. MARGULIS-OHNUMA:  I have to admit there's a pretty

21    big chunk of the instructions I haven't looked at yet.  But,

22    perhaps I could -- I hate to do this to myself.  I guess the

23    easiest thing is to probably send in a letter if there is

24    anything else I think requires attention.

25      THE COURT:  All right.  Mr. Margulis, if you have any

1    other comments, you can e-mail them some time this evening.

2              We will reconvene tomorrow at 8:30 in order to give us

3    enough time for you to consider the revisions that I will make,

4    and send to you, also by e-mail tonight.  And then for us to

5    make any last-minute modifications, if any, and be ready with

6    the jury again at 9:15.

7              I call to your attention the language on page 17

8    regarding the defendant's testimony choosing to testify.  I

9    want to make sure that there's no disagreement on the phrasing

10   of that instruction.

11             MR. MARGULIS-OHNUMA:  No.  I mean, that's standard

12   from Sand, and I have no objection to it.

13             MS. TARLOW:  That's fine with the government, your

14   Honor.

15             THE COURT:  All right.  Thank you.

16             MS. TARLOW:  Your Honor, one final point with respect

17   to the verdict form.

18             THE COURT:  Yes.  I distributed the proposed verdict

19   sheet.

20             MS. TARLOW:  And I think the parties are in agreement

21   that with respect to Count One, there will need to be for the

22   jury the option to convict of either the (b)(1) and/or the

23   (b)(2).  So the special verdict form will need to make that

24   clear.

25             THE COURT:  All right.

J7B3KID6                          Charge Conference

1          MR. MARGULIS-OHNUMA:  The punishment is different

2     depending on which prong they convict under.

3          THE COURT:  Do you have a specific proposal or should

4     we just --

5          MS. TARLOW:  The parties can talk about it and provide

6     the Court.

7          THE COURT:  If you have a specific proposal, submit it

8     as well.

9          MS. TARLOW:  Thank you, your Honor.

10          THE COURT:  Anything else?

11          MS. TARLOW:  Not from the government.

12          THE COURT:  Thank you.  Have a good evening.

13          MR. RAVI:  Thank you, your honor.

14          MR. MARGULIS-OHNUMA:  Thank you, Judge.

15          (Adjourned until July 12, 2019, at 8:30 a.m.)

16

17

18

19

20

21

22

23

24

25

```
                    INDEX OF EXAMINATION
Examination of:                                  Page
 KRISTOPHER SERRA
Direct By Mr. Gutwillig . . . . . . . . . . 583
Cross By Mr. Margulis-Ohnuma . . . . . . . . 592
 MIRANDA YATES
Direct By Mr. Margulis-Ohnuma  . . . . . . . 611
Cross By Ms. Bracewell . . . . . . . . . . . 616
Redirect By Mr. Margulis-Ohnuma  . . . . . . 622
 LLOYD KIDD
Direct By Mr. Margulis-Ohnuma  . . . . . . . 627
Cross By Ms. Tarlow  . . . . . . . . . . . . 693
Redirect By Mr. Margulis-Ohnuma  . . . . . . 735
                    GOVERNMENT EXHIBITS
Exhibit No.                                 Received
 8, 703 and 505  . . . . . . . . . . . . . . 583
 220, 222 through 226 and 228 through  . . . 588
         241
 100 through 114, 117 and 118  . . . . . . . 589
 605  . . . . . . . . . . . . . . . . . . . 604
 301A, 301B, 301C, 303A, 303B, 303D, 305B, 309A604
 1372  . . . . . . . . . . . . . . . . . . . 606
                    DEFENDANT EXHIBITS
Exhibit No.                                 Received
 J  . . . . . . . . . . . . . . . . . . . . 595
```

1   K   . . . . . . . . . . . . . . . . . . 598
2   E   . . . . . . . . . . . . . . . . . . 614
3   F   . . . . . . . . . . . . . . . . . . 638
4   G   . . . . . . . . . . . . . . . . . . 642
5   L and I   . . . . . . . . . . . . . . . 736

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25