J7C3KID1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                     18 CR 872 (VM)

LLOYD KIDD,

           Defendant.

------------------------------x

                             New York, N.Y.
                             July 12, 2019
                             8:30 a.m.

Before:

               HON. VICTOR MARRERO,

                        District Judge

                 APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MOLLIE BRACEWELL
ELINOR TARLOW
JACOB GUTWILLIG
SAGAR RAVI
     Assistant United States Attorneys

ZACHARY MARGULIS-OHNUMA
VICTORIA MEDLEY
     Attorneys for Defendant

ALSO PRESENT:  USAO Paralegal Specialist Hannah Harney
Defense Paralegal Specialist Sophia Lattanzio
Special Agent Brian G. Gander, FBI

J7C3KID1

1          (In open court; jury not present)

2          THE COURT:  Good morning, be seated.  We distributed

3    the draft of the jury instructions incorporating the edits,

4    comments, that we discussed last night or evening.  We also

5    received an e-mail from defendant making some additional

6    comments as we asked them to do in writing.  And perhaps we can

7    first go over the revised draft in blackline, and then go over

8    the comments that the defendant submitted, and then we have one

9    open item from yesterday, which is the question of the 911 call

10   and how we want to resolve that.

11         First, looking at the blackline version of the draft

12   instructions, are there any additional comments that the

13   parties may wish to make?  Focus in some instances on language

14   which appears in bracket in the alternative so we can determine

15   which of those formulations the parties can agree to, or, if

16   not, I'll make a ruling.

17         Government?

18         MS. TARLOW:  Yes, your Honor.  The government would

19   request that the bracketed language -- the government requests

20   that the original language be included.  If the Court is not

21   inclined to include the original language of "climate of fear,"

22   then that the Court include the bracketed language.

23         THE COURT:  I gave that a lot of thought.  My view in

24   making the proposed change is that the phrase "climate of fear"

25   is a little bit cliche-ish, frankly, and what people are

J7C3KID1

1    concerned with is not the climate, and but it's feelings and

2    sense.  And that's why I'm suggesting reasonable feelings of

3    fear or a reasonable person.

4              MR. MARGULIS-OHNUMA:  Can you point me to which page?

5    I just was able to pull it up.

6              MR. RAVI:  38 and 39 of the blackline.

7              THE COURT:  That's on page 37, 38 of the blackline

8    version.  My view was that the sentence on page 38 that begins

9    with "a threat of serious harm and" is deleted there.

10   Essentially, is a repetition of what's on 37.  So I tried to

11   find what language in 38 is not included and what isn't in 37

12   in the definition of serious harm.  And in terms of what's

13   material, the one phrase that I thought might be important to

14   include on 37 is what's underlined there as in kind or degree.

15   But the rest of the language, really, is repetitive.

16             MR. MARGULIS-OHNUMA:  Sorry.  Kind or degree is on

17   which page?

18             THE COURT:  On 37.  And you will see that it is also

19   included in the sentence that's crossed out on 38, where the

20   phrase in kind or degree.

21             MR. MARGULIS-OHNUMA:  I'm concerned I'm looking at the

22   wrong version.

23             THE COURT:  You're looking at the blackline version

24   that we distributed?

25             MR. MARGULIS-OHNUMA:  Yes.

J7C3KID1

|    |    |
|----|----|
| 1  | THE COURT:  If you look at page 37 of the blackline, |
| 2  | the second full paragraph. |
| 3  | MR. MARGULIS-OHNUMA:  I see it on page 36.  I guess |
| 4  | the -- sorry, your Honor.  Thanks. |
| 5  | I have no objection to the new language "in kind or |
| 6  | degree."  But I agree that the option omitting the other |
| 7  | language is preferrable and avoids repetition.  I think the |
| 8  | government will make their point about the climate of fear in |
| 9  | closing, without having to repeat it multiple times in the |
| 10 | instruction. |
| 11 | THE COURT:  Anything else, government? |
| 12 | MS. TARLOW:  Your Honor, we think it is an appropriate |
| 13 | instruction to give.  We've given many cases that support that |
| 14 | kind of instruction to describe the context in which the |
| 15 | individual was engaging in sex trafficking, and we think it is |
| 16 | relevant to do it here. |
| 17 | THE COURT:  Let's move on then.  Next?  Government, do |
| 18 | you have any other comments? |
| 19 | MS. TARLOW:  No, your Honor. |
| 20 | THE COURT:  In that case, why don't we get the |
| 21 | government's comments to Mr. Margulis-Ohnuma's e-mail which |
| 22 | contain four points. |
| 23 | First point. |
| 24 | MS. TARLOW:  Yes, your Honor.  We think that that |
| 25 | instruction is not necessary.  That section deals with the age |

J7C3KID1

1    of the victim, and we think it abundantly clear in that section

2    that the victim must be under 18.  So, it is repetitive and

3    unnecessary to include that additional portion of that

4    sentence.

5            THE COURT:  Mr. Margulis-Ohnuma?

6            MR. MARGULIS-OHNUMA:  Again, my page number is messed

7    up so I want to make sure I'm looking at the same thing.

8    Although this should be consistent with what's on my computer.

9            THE COURT:  Your message reads at page 35.3.

10           MR. MARGULIS-OHNUMA:  Yes.  Which is actually in the

11   instructions I was just handed by the government is on page 36.

12   Right?  Is that right, Ms. Tarlow?  Just before request number

13   11?  Is that right?  What we're talking about?

14           So the issue there is, it sounds like, based on

15   reading one, two, three, it is sufficient if he had a

16   reasonable opportunity to observe her, whether or not her age

17   was under 18.  So I think the additional language is necessary

18   to make that clear.  And you note the -- the instruction as

19   they exist note the age in the other two prongs.  It sounds

20   like if he had -- which it's a ridiculous reading but it is a

21   literal reading.  But if we're noting in the age in the other

22   two prongs, it seems like it should also be an reasonable

23   opportunity to observe prong.

24           THE COURT:  Ms. Tarlow?

25           MS. TARLOW:  Your Honor, we don't think it's

J7C3KID1

1    necessary, but if your Honor is inclined to include that, we

2    won't object.

3         THE COURT:  Why don't we accept that change.  Next,

4    Mr. Margulis-Ohnuma, you made reference in your comment to 37,

5    page 37 and 38, that's exactly the point that we just discussed

6    and I'm inclined to leave the draft with the language that the

7    Court has suggested adding and deleting the sentence on 38, and

8    using the reasonable feelings of fear instead of a climate of

9    fear.  So, that's agreed that the blackline version of pages 37

10   and 38 is what the Court will go with.

11        Your third comment says that at 38 request delete the

12   paragraph starting with "also."  What's your proposal there?

13   What is your rationale?  I assume that's the paragraph that

14   says "Also the fact that a person may have initially

15   acquiesced."  Is that the language you're suggesting?

16        MR. MARGULIS-OHNUMA:  Yes, it's that paragraph to the

17   end of the instruction.  I feel like the conversion of a

18   defense theory instruction.  Sort of like, okay, this is what

19   the government's going to argue.  But it is really not

20   necessary to be in the instructions.  They're going to say,

21   everything was hunky-dory at the beginning and then Mr. Kidd

22   became violent with people.  So, it's not a defense that it

23   was -- that he was nice to them at the beginning or didn't

24   force them at the beginning, and I think that really goes to

25   their argument.  I don't think it's necessary in the

J7C3KID1

 1     instruction.  Of course, if the jury has questions about that

 2     we could respond.  But, it almost tracks the language of the

 3     government's expert in talking about the different ways that a

 4     victim can be lured and then forced into prostitution.  I would

 5     just object to it.  It's really awfully one sided.

 6         MS. TARLOW:  Yes, your Honor.  We think this is an

 7     important instruction to give.  It is relevant to this case.

 8     There are victims in this case who we expect defense to argue

 9     may have initially agreed to engage in sex trafficking, and

10     later, as the government alleges, was forced into sex

11     trafficking.  It's supported by pattern criminal jury

12     instructions in the 11th Circuit and has been given in other

13     similar cases in this district.  Including United States v.

14     Purcell, 18 CR 81.

15         THE COURT:  Thank you.  I'm going to reject this

16     proposal.  I agree that it is an aspect of the dispute in this

17     case, and the jury is entitled to have the evidence in the case

18     reflected in -- and theories of the government and the defense

19     reflected in the instructions.  Yes.

20         MR. MARGULIS-OHNUMA:  Your Honor, I would preserve my

21     objection, but then request if it is staying in in any case, to

22     balance it with a sentence at the end stating that However, if

23     you find that any of the -- or, the alleged victims in Counts

24     One, Three, or Four merely worked for Mr. Kidd as prostitutes,

25     without finding that they were forced to do so by use of -- or

J7C3KID1

1    that they were caused to do so by use of force, fraud or

2    coercion, then you must acquit Mr. Kidd.

3              THE COURT:  Ms. Tarlow.

4              MS. TARLOW:  Your Honor, I think there's several

5    problems with that.  The first is it is abundantly clear in the

6    Court's instructions that force, fraud or coercion or a

7    combination of such means is required for a conviction on

8    Counts Three, Four, and one way in which there can be

9    conviction on Count One is also unnecessarily confusing, since

10   there can be conviction on Count One in a different manner, if

11   the jury finds that the victim was underage.

12             THE COURT:  Thank you.  Mr. Margulis-Ohnuma, I think

13   that your proposal is getting too far into granular explication

14   of facts, and I think that it is not necessary.

15             MR. MARGULIS-OHNUMA:  Your Honor, just to be clear, I

16   don't mean to belabor it.

17             THE COURT:  You've reserved your objection on that so

18   let's not belabor the point.

19             MR. MARGULIS-OHNUMA:  Yes, Judge.

20             THE COURT:  I'm agreeing it is not appropriate to make

21   that change.  Your next comment says on page 45, requests that

22   we add -- and you have a paragraph that's in bold there.

23   Government?

24             MS. TARLOW:  Yes, your Honor.  We would object to this

25   addition.  It has only been used in the Ninth Circuit on

J7C3KID1

certain occasions.  It has been rejected in several other

circuits, including the First Circuit, Seventh Circuit, Sixth

Circuit, Eleventh Circuit, Eighth Circuit and Fourth Circuit.

And we don't think it would be an appropriate instruction here.

THE COURT:  Mr. Margulis, any response to that?

MR. MARGULIS-OHNUMA:  Yes.  I mean, my response is

that Ms. Tarlow, as ever, is extremely well-versed on the law

and I don't disagree with her characterization of it.  It is an

open question in the Second Circuit.  Circuit courts -- I think

it's given from time to time in the district courts here.

At the same time, I think this case, the facts of this

case, really tee it up in that we have presented evidence that

Mr. Kidd had a reasonable belief that everyone -- that

Ms. Brown was over 18.  A jury absolutely could find that.  So,

under those circumstances, I think the cautious road for the

Court really is to just give the instruction.  And I think it

is a correct characterization of the law, given the First

Amendment and the Ninth Circuit reasoning that I cited in the

e-mail.

THE COURT:  Ms. Tarlow, you made reference to district

courts in this circuit which have rejected this language?  Or

are there some that also have accepted it?

MS. TARLOW:  To be clear, I was referring to

circuit -- other circuits that have rejected this language.

And we have not found any district courts in this circuit,

J7C3KID1

1    although, to be candid with your Honor, we have not spent

2    significant time researching this.  This was not an instruction

3    that was requested by the defense originally.  And if your

4    Honor would like more briefing on the matter, we could provide

5    that.

6           THE COURT:  See if you can find any further research

7    on the matter.

8           MR. MARGULIS-OHNUMA:  Judge, I'll cut to the chase.  I

9    think I may have misspoken.  What I meant to say -- I think I

10   said the opposite of what I meant.  This pro defense

11   instruction I don't think has been given.  I think I would know

12   about it if it had been given in the district courts.  So I

13   think it's, I think they may be able to find authority

14   rejecting it.  I feel like it would have been on me to find it

15   if it had actually been endorsed by one of the Second Circuit

16   district courts, and I'm not aware of that, and we did look.

17          THE COURT:  All right.  If you looked and you did not

18   find it, it is likely that the government also will not find

19   it, then I would be inclined to go with the overwhelming

20   authority in other circuits that has rejected this.  All right.

21   That takes care of the instructions.

22          Let's now move to the other open issue.  I'm sorry.

23   Before we do that.

24          MR. MARGULIS-OHNUMA:  Judge, I'm sorry.  Can I just

25   preserve the record.  I recently learned that -- or maybe I can

J7C3KID1

1    do this wholesale.  I recently learned that if you don't raise

2    an objection to a jury instruction at the Rule 30 conference,

3    which this is, then the government is arguing it's been waived

4    in another case of mine.  So what I would like to do is ask if

5    the Court could accept my -- I'd like to preserve all of the

6    written and oral objections that I've made up to this point.

7    Can we just do that or else I'll try to reconstruct them.

8            THE COURT:  You may.  Bear in mind also that it is my

9    practice, after giving the instructions to the jury, to have a

10   sidebar in which I pose the question to you whether you have

11   any further comments or objections to the instructions as read.

12   So that will be your last clear chance to reserve whatever you

13   may have.

14           MR. MARGULIS-OHNUMA:  Thank you, Judge.

15           THE COURT:  And I will acknowledge that you have

16   submitted objections during the course of the trial and at the

17   conferences, so whatever you have articulated on the record is

18   part of what you reserved.  All right.

19           MR. MARGULIS-OHNUMA:  Thank you.

20           THE COURT:  The verdict form, I have received the

21   modifications that the parties proposed, and I'll adopt those

22   into the final verdict form.

23           So let us now turn to the issue we reserved yesterday

24   concerning the government's rebuttal evidence by means of the

25   911 call.  Ms. Tarlow.

J7C3KID1

1          MS. TARLOW:  Yes, your Honor.  We do not intend to put

2     on a rebuttal case.

3          THE COURT:  All right.  So, the record then remains

4     now closed or the evidentiary portion of the case.

5          MR. MARGULIS-OHNUMA:  Judge, actually, there was one

6     exhibit, there was a stipulation that I neglected to offer into

7     evidence.  I did read it into evidence.  It was Defense Exhibit

8     M.  If I could just offer that into evidence at this time.  It

9     was the stipulation about the prior inconsistent statement.

10          THE COURT:  There was a stipulation concerning the

11     notes of the FBI agent.

12          MR. MARGULIS-OHNUMA:  Correct.

13          THE COURT:  My understanding was that the stipulation

14     was read and accepted as stipulated.

15          MR. MARGULIS-OHNUMA:  Right.  And it was, at the

16     bottom of it said it could be accepted as an exhibit in

17     evidence.  So I'm just offering the stipulation itself which is

18     signed into evidence, so I can use it in closing.

19          THE COURT:  All right.  I think by definition

20     stipulations that are accepted are part of the evidence, so yes

21     it will be accepted admitted.

22          (Defendant's Exhibit M received in evidence)

23          THE COURT:  Is there anything else?

24          MS. TARLOW:  Not from the government.

25          THE COURT:  Mr. Margulis-Ohnuma?

J7C3KID1

1          MR. MARGULIS-OHNUMA:  Not from the defense.

2          THE COURT:  We told the jury 9:15.  So, we will go and

3    develop the final version of the instructions that the Court

4    will read when the jury comes back in about 15 minutes.  Thank

5    you.

6          (Recess)

7          (In open court; jury not present)

8          THE COURT:  Bring in the jury, please.

9          MR. GUTWILLIG:  Your Honor, may we move the podium?

10         THE COURT:  Yes.

11         (Jury present)

12         THE COURT:  Good morning.  Thank you very much for

13   your cooperation in being here on time.

14         At the close of the proceedings yesterday, I mentioned

15   that there might be one evidentiary issue for which I

16   maintained the record open.  That matter has been resolved, so

17   the evidentiary record is now complete.  And we move into the

18   next phase of the trial, which is the parties' closing

19   arguments.

20         I will give you the same instructions I've already

21   alluded to a number of times.  The closing arguments of the

22   parties are not evidence.  Anything that the parties may say in

23   their closing arguments that refer to matters of law you should

24   disregard.  The law is only that which I will give you after

25   the parties are done with their closing arguments.  The closing

1    arguments are intended to give you the parties' version of what

2    they think the evidence has established or not established, and

3    again, are not to be considered by you as evidence in the case.

4         The procedure is that the government, which has the

5    burden of proof, goes first.  The defendant may, if he chooses,

6    make closing arguments.  And if the defendant does make closing

7    arguments, the government then has the last opportunity for

8    rebuttal statement.

9         Government?

10        Each side has requested about 45 minutes for closing

11   arguments.

12        MR. GUTWILLIG:  "Let me tell you something.  One of

13   the reasons why chicks even feel comfortable do doing shit like

14   this, is they've never really been fucked up by a man.  This is

15   my thing.  I said, chicks like that, all they need is one good

16   lashing.  Just one.  Like full strength.  You want to act like

17   a man, you need to get your ass beat one good time, full force.

18   You'll be all right.  You'll be straight after that."

19        Those are the defendant's words.  Those are his words.

20   What else did the defendant say?  That he knew Kaira, that he

21   prostituted her.  Kaira, a 16-year-old girl.  That he took

22   pictures of Jessica, the ones that you saw in the Backpage ads

23   that the defendant posted, selling her for sex.  The one taken

24   when she was 14 years old.  That he prostituted Dana and

25   Arielle, along with more than 50 other women and girls.  His

J7C3KID1                    Summation - Mr. Gutwillig

1    words, the defendant's words.  Lloyd Kidd's words.

2           More important than his words, the victims' words.

3    The ones that described how the defendant abused them,

4    assaulted them, humiliated them, and controlled them.  The

5    victims who lived in Chris Kidd's world.  The ones who lived

6    through it.

7           You've seen and heard a lot of evidence over the past

8    few days.  That evidence overwhelmingly proves the defendant's

9    guilt of all five counts charged in the indictment.

10          The evidence includes advertisements for sex that the

11   defendant posted on Backpage.com, vulgar, graphic

12   advertisements selling the victims for sex, the contents of the

13   more than 20 electronic devices seized from the the defendant's

14   apartment, including photos and videos of Kaira -- then just

15   17, naked and engaging in sexual acts.

16          The defendant locked away in his safes guns, drugs,

17   even the envelopes he used to keep the money his victims made

18   for having sex.

19          You've also seen independent records corroborating all

20   this.  Photographs, phone and e-mail records, birth

21   certificates, videos.  They all corroborate, they all back up

22   what you've heard about the defendant's sex trafficking

23   business.

24          Most importantly, you heard from the victims

25   themselves, from Kaira, from Aisha, from Sabrina, from Arielle,

J7C3KID1                    Summation - Mr. Gutwillig

1    and from Dana.  You saw their raw emotion.  You saw their

2    courage, you saw them tell their stories.  They walked in here,

3    they took the stand, and they told you about traumatic events

4    in their lives, about difficult and embarrassing details of

5    their past.  The raw, unvarnished truth about what happened to

6    them.  How the defendant prostituted some of them when they

7    were minors, how he prostituted some of them through force,

8    through coercion.

9           The evidence you've seen and heard in this trial is

10   overwhelming.  It proves that the defendant was a violent,

11   coercive, prolific, pimp.  That he targeted vulnerable women

12   and girls, and that he prized one characteristic above all

13   else:  Submissiveness, obedience, compliance, compliance with

14   his demands.  Physical force, choking, grabbing, sexual

15   violence, forcing himself on victims while they were asleep,

16   and threats.  Taking away one's child, blackmail through a sex

17   tape.

18          This wasn't by happenstance.  It was an M.O.  It was

19   his pattern.  Recruit, humiliate, control.  The rules were

20   clear.  That's how the defendant ran his sex trafficking

21   business.  And today, I'm going to walk through the evidence

22   that proves his guilt beyond a reasonable doubt.

23          This summation is the government's opportunity to

24   explain how all the evidence fits together.  How the proof in

25   this case is clear and consistent, and how it proves beyond a

J7C3KID1                    Summation - Mr. Gutwillig

1    reasonable doubt that the defendant is guilty.

2              Let me begin by taking a few minutes to review the

3    charges.  Because that's what you're being asked to decide

4    today.  In brief, the defendant's been charged with sex

5    trafficking of minor girls and women, including by force,

6    fraud, or coercion, to cause them to engage in sex acts.  He's

7    also been charged with producing child pornography.

8              Count One, Two, Three and Four deal with sex

9    trafficking.  Count Five deals with the production of child

10   pornography.

11             After the attorneys are finished here today, Judge

12   Marrero will instruct you on the law that's applicable to each

13   of those counts.  What Judge Marrero says controls.  This

14   overview is just meant to help you understand how the evidence

15   satisfies each element of each count beyond a reasonable doubt.

16             Count One charges the defendant both with sex

17   trafficking of a minor and sex trafficking by force, fraud or

18   coercion of Kaira.  You may find the defendant guilty on either

19   of both of the charges in Count One.  I expect that Judge

20   Marrero will instruct you that the defendant can be guilty of

21   sex trafficking if he took any of the following actions with

22   respect to someone whose engaged in commercial sex:  Recruited,

23   enticed, harbored, transported, provided, advertised, obtained,

24   maintained.  That is an incredibly broad list, and the

25   defendant engaged in many -- if not most -- of these actions

J7C3KID1                    Summation - Mr. Gutwillig

with respect to the women and girls he prostituted.

Now, Judge Marrero will instruct you on the law.  But
at the outset, two things to keep in mind about sex trafficking
of a minor, which is applicable to counts One -- Kaira -- and
Count Two -- Jessica.

First, as I expect Judge Marrero will instruct you,
the defendant need not have knowledge that the victim is a
minor.  It is sufficient that the defendant recklessly
disregarded that the victim was a minor, or, that the defendant
had a reasonable opportunity to observe the victim.  Basically,
the defendant had a chance to see them.

Second, as I expect Judge Marrero will instruct you,
consent is not a defense to this crime.  Period.  End of story.
A minor cannot consent to prostitution.  A minor cannot consent
to being sexually exploited.

As I mentioned, Count One -- Kaira -- also charges the
defendant with sex trafficking by force, fraud or coercion.
That's the same charge in Count Three -- Dana -- and Count
Four -- Arielle.

As I expect Judge Marrero will instruct you, the
difference for this charge is that instead of or in addition to
being a minor, the government must prove that the defendant
used force, threats of force, fraud, or coercion, or a
combination of those things, to engage in sex trafficking.
Basically what it sounds like.  However, as I expect Judge

J7C3KID1                      Summation - Mr. Gutwillig

Marrero will instruct you, coercion can mean any of the
following:  Threats of serious harm to, or physical restraint
against, any person, any scheme, plan or pattern intended to
cause a person to believe that failure to perform a sex act
would result in serious harm to, or physical restraint against,
any person, or the abuse or threatened abuse of law or legal
process.

          Finally, Count Five charges defendant with inducement
of a minor -- Kaira -- to engage in explicitly sexual conduct
for the purpose of producing a visual depiction of that
conduct.

          Many of the facts in this case are not in dispute.
The evidence leaves the defendant no choice.  His testimony
yesterday leaves him no choice.  There can be no question that
the defendant was a pimp.  Defense counsel conceded that in her
opening statement.  And that was before the defendant took the
stand himself and testified that he prostituted upward of 50
women and girls.

          Also not in dispute, that the defendant recruited
women and girls to engage in prostitution for his benefit.
That he specifically targeted submissive victims.  Those were
the kind of women he wanted to recruit, because he wanted to be
in control.

          That the defendant took naked pornographic pictures of
Kaira, that he saved them on his devices, that he posted them

J7C3KID1                    Summation - Mr. Gutwillig

1    in his advertisement.

2           That Jessica was going to engage in prostitution.

3    Jessica was a minor then, and she is a minor today as we stand

4    here.  Not in dispute.  That he took photographs of her to

5    advertise her for sex.  He told you his phone number.

6    347-815-9064.  His e-mail addresses, redchaos826@gmail.com.

7    Keyonnadoll@gmail.com.  He told you it was his words on the

8    ads.  Each of the advertisements you saw was posted by one of

9    those two e-mail addresses, e-mail addresses that the defendant

10   said were his.

11          Also not in dispute, that the defendant prostituted

12   Dana and Arielle.  That he would take their money, put it in

13   envelopes, and lock it away in safes that only he had access

14   to.

15          There is also no question about the interstate

16   commerce element from both the sex trafficking charges, One,

17   Two, Three and Four, and the child pornography charge, Count

18   Five.  You heard extensive testimony about use of phones,

19   computers, Backpage.com that the defendant used to run his

20   prostitution business.  You learned that the devices on which

21   he stored his child pornography, the images and the video of

22   Kaira, were on devices made outside the United States, which,

23   of course, had to cross interstate lines to get here.

24          There are really only two things in dispute.  Two

25   things that you, as a jury, have to decide.  One, whether Kaira

1   and Jessica were minors when the defendant sold them for sex.

2   And two, whether the defendant, in trafficking Kaira, Dana, and

3   Arielle, which he admits, used force, threats of force, fraud,

4   or coercion.  And the answer to those questions, the only

5   answer supported by the evidence in this case, is a resounding

6   yes.  A clear yes.

7          Let's talk about why.

8          Let's talk about Kaira.  There are three separate

9   charges relating to Kaira.  Two in Count One, one in Count

10  Five.  Sex trafficking of a minor, sex trafficking by force,

11  threats, fraud or coercion, and production of child

12  pornography.

13         Let's make one thing clear:  The defendant recruited

14  Kaira from a group home.  He had sex with her, he took pictures

15  of her, he posted advertisements of her.  You've seen them.

16  Kaira identified the defendant's apartment on Nostrand Avenue,

17  and she told you that she saw five customers on the first day.

18         The defendant doesn't dispute this.  He disputes two

19  things.  That Kaira was a minor when he prostituted her, and

20  that he used force, fraud or coercion doing it.

21         Let's start with the first.  Kaira was born on

22  March 22, 1999.  Here's her birth certificate.  The defendant

23  posted her on Backpage, sold her for sex under the name

24  Pearlene.  Let's look at those ads.  Let's look at the time

25  stamps on them, the creation date.  Government Exhibit 400,

J7C3KID1                   Summation - Mr. Gutwillig

February 2, 2017; 401, February 13, 2017; 402, February 13,
2017.  I can keep going.  These advertisements were created in
February.  Kaira was 17.  She didn't turn 18 until March of
2017.

          A word on the Backpage data.  As Forensic Examiner
Uitto testified, about a year ago the website Backpage.com was
taken down and the servers seized by the FBI.  We spent a fair
amount of time on spreadsheets, the object ID, creation date,
last modified date, posting date, metadata, IP addresses.
Here's the point.  The Backpage data, the data, it's from the
Backpage servers.  It's the same data you heard Mr. Uitto
testify made up the reconstructed advertisements.  Everything
on those reconstructions, every picture, every piece of text,
comes from the Backpage servers preserved in evidence by the
FBI.  Preserved in evidence by the FBI in Pocatello, Idaho.
Any suggestion to the contrary is flatout impossible.  Any
suggestion that the government manipulated this data, tweaked
it to sink Mr. Kidd is absurd.

          And those servers, the pictures and descriptions the
defendant posted on Backpage selling Kaira and his other
victims, here they are.  This ad Kaira, that one of Jessica.
One of Dana.  These ads and everything in them, including the
dates they were created, posted, came from the Backpage
servers, completely independent of what was seized from the
defendant's apartment, which I'll get into later.

1          Again, there is no question that the defendant posted

2     these advertisements.  You watched him on the stand yesterday

3     as he gave the play by play.  And on those servers, pictures

4     and the descriptions the defendant posted on Backpage selling

5     Kaira and his other victims.

6          Again, these ads, the ones with Kaira, the defendant

7     posted them in February of 2017.  She was 17 years old.  You

8     want to know what else was created February of 2017?  The child

9     pornography of Kaira.  The defendant told you that he took the

10    pictures, the video was stored on his computer and his hard

11    drives.  Just read the file path.  Users Lloyd Kidd.  Documents

12    Chris Kidd videos XXX my collection vid 20170201.

13         He put the video in "my collection."  He described it

14    as XXX.  The metadata from that video, the graphic video of

15    17-year-old Kaira touching her genitals at the defendant's

16    direction, shows it was created on February 1, 2017.  Again,

17    Kaira was still a minor.

18         (Video recording playing)

19         MR. GUTWILLIG:  Of course there were pictures too.

20    Pictures that were taken in February of 2017.  Pictures that

21    were taken before her 18th birthday.

22         Where did the government find these images?  On the

23    devices in the defendant's apartment.  It wasn't just one.  It

24    was on his computer, on another computer, on his hard drives.

25    Five devices.  Not just one.  This wasn't an accident.  Just

J7C3KID1                    Summation - Mr. Gutwillig

1   look at the file name.  One device would be enough.  You have

2   one, two, three, four, five.  All seized from the defendant's

3   apartment.  The data on five different devices, each belonging

4   to the defendant.  It's not wrong.

5           THE COURT:  Mr. Gutwillig, will you take down the

6   exhibit.

7           MR. GUTWILLIG:  Yes, your Honor.

8           THE COURT:  The exhibit on the screen.

9           MR. GUTWILLIG:  But he didn't just keep these images

10  on the computer, his hard drives, his phone.  Defendant posted

11  child pornography on the internet.  It wasn't a secret.  He

12  used these images of Kaira, just 17 years old, to advertise her

13  for sex.

14          And what's the creation date on that ad again?

15  February 2, 2017.  The day after he took the photos.

16          Ladies and gentlemen, that's three independent sources

17  of evidence that all tell you one thing:  That the defendant

18  had already met and prostituted Kaira before February of 2017,

19  when she was a minor.  The images and video of child

20  pornography on five different devices in the defendant's

21  apartment, the ones sitting right there, they all have a

22  creation date of February 1, 2017.  The Backpage ads from the

23  Backpage servers, February 2, 2017.

24          And of course, you have the testimony of Kaira.  She

25  told you in detail how she was prostituted by the defendant

J7C3KID1              Summation - Mr. Gutwillig

when she was 16 years old.  Do you remember what she said?
It's right there in front of you.  I was like yeah, I'm 16.
And the defendant was like, you're lying.  And he kind of left
the conversation after that.

These three independent, entirely consistent pieces of
evidence, provide devastating proof that the defendant made
sexually explicit images and a video of Kaira when she was a
minor.

It proves more than that.  This wasn't just an
explicit picture taken a month before her 18th birthday.  The
defendant was prostituting her when she was 16 years old and
coming from a group home to do it.  And by the way, Dana
testified she saw Pearlene -- Kaira -- at the defendant's
apartment when Dana met the defendant in February 2017.  The
same Dana who left for Guyana in April 2017.  The only evidence
to the contrary is the defendant's uncorroborated word that he
met Kaira in April of 2017, right after she turned 18.  Pretty
convenient, and also proveably false.

The only reliable evidence, a massive amount of it,
shows clearly that is not true.  All that proves beyond a
reasonable doubt that the defendant engaged in sex trafficking
of a minor, Kaira.  The evidence in this case, the evidence I
just walked through, shows that.

The evidence also shows that the defendant sex
trafficked Kaira by force, threats of force, fraud, and

J7C3KID1                    Summation - Mr. Gutwillig

1    coercion.  The defendant told you that he -- I'm sorry.  The

2    defendant told you that he sexually assaulted her.  That

3    sometimes he wouldn't even ask.  Kaira said sometimes, she

4    would just wake up, and he would be behind me, trying to

5    penetrate me.

6           Remember the defendant's own words from the fake

7    YouTube video where he was playing a part.

8           (Video playing)

9           MR. GUTWILLIG:  "Keep your eyes open so it's not

10   weird."  Defendant's own words.  That's control, coercion,

11   through sexual assault.  Kaira's testimony is entirely

12   consistent with the defendant's own words.  The only character

13   that Chris Kidd was playing in the YouTube videos was himself.

14   There was not a difference between that world and the real one.

15   It was the same.

16          Kaira also told you that the defendant choked her,

17   because she didn't give him money from a customer before having

18   sex with the customer.  Because she didn't follow the

19   defendant's rules.  Think about that.  He choked her because

20   she didn't give him the money first.  The defendant's money

21   that he took from this minor victim for having sex.  And after

22   he got the money, after he choked her, she had to finish with

23   the customer anyway.

24          It does not get any clearer than that.  Choking

25   someone is using force against them.  Choking someone is a

J7C3KID1                    Summation - Mr. Gutwillig

1    coercive tactic against them.  The defendant used force, he

2    used coercion, against Kaira.  That's Kaira, a 16-year-old

3    runaway from a group home.  Defendant had sex with her,

4    unprotected, took explicit photos and videos of her, posted

5    them online, sold her for sex, and when she didn't give him the

6    money before she had sex for him, he choked her.

7           There is no doubt that, with respect to Kaira, the

8    defendant engaged in sex trafficking of a minor and sex

9    trafficking by force, threats of force, fraud, or coercion.  It

10   does not get any clearer.  We can stop there.  We could stop

11   right there, after one victim, and the defendant would be

12   guilty.  He would be guilty of both charges in Count One and of

13   Count Five.  But there's more.

14          Count Two is sex traffic of a minor.  Jessica.  For

15   this count, the only thing that's in dispute is whether the

16   defendant prostituted Jessica.  Whether she engaged in sex for

17   money on his behalf.  We don't even need to get into whether

18   Jessica was a minor at the time the defendant prostituted her

19   in 2017, because she is a minor as we sit here today.

20          The defendant knew this person.  He knew her.  He told

21   you that.  So did Aisha, so did Sabrina.  Her birthday,

22   March 18, 2003.  She is 17 years old today.

23          Before we go any further, let's just make one thing

24   clear.  Jessica, Aisha, Sabrina, and another girl who was with

25   them, Brielle, they all came from a foster care home in

J7C3KID1              Summation - Mr. Gutwillig

1    Westchester.  That's where they came from.  That's where they

2    came from to work for the defendant, and that's where they

3    returned, just like Kaira came from a group home in Manhattan.

4              Here's how you know that the defendant prostituted

5    Jessica.  The defendant told you that he took these pictures of

6    Jessica.  Here they are.  He identified them in the Backpage ad

7    that he posted.  He told you that Jessica was Domo.

8              Who else identified Jessica in the advertisement

9    posted by the defendant?  Aisha and Sabrina, because they were

10   there too.  Aisha testified that the defendant -- Aisha

11   identified the defendant sitting in court.  She pointed him

12   out.

13             And Sabrina, Sabrina testified that she didn't

14   recognize the defendant in the courtroom, because the defendant

15   had hair when she knew him.  "The only Chris I know have hair

16   at the time."  Think about the honesty of that answer.  You saw

17   Sabrina.  She is a child.  She knew the defendant with hair,

18   and that's what she said.  As soon as she saw the picture of

19   the defendant with hair, she recognized him.  Sabrina answered

20   that question in the most literal way possible.  She answered

21   truthfully.  And her testimony about Jessica, it also had the

22   ring of truth.  Sabrina told you that Jessica saw customers for

23   sex while she was at the defendant's apartment.  On the basis

24   of Sabrina's testimony alone, the defendant is guilty of Count

25   Two.  But you have Aisha's testimony as well.  Aisha testified

J7C3KID1                    Summation - Mr. Gutwillig

1    about two separate occasions where Jessica was advertised by

2    the defendant on Backpage, had sex with a customer, and that

3    Aisha saw with her own eyes Jessica give the money to the

4    defendant.

5            The testimony on this point is entirely clear.  At

6    bottom, Sabrina and Aisha told you the same story, that the

7    defendant prostituted the still underaged Jessica for money,

8    that he advertised Jessica, and that she had sex with customers

9    in his apartment.

10           Doing any of those things, at a time when Jessica was

11   under 18 -- which she is today -- any of those things, is a

12   violation of the law.

13           Aisha and Sabrina were consistent with one another in

14   other ways as well.  They also were consistent with the

15   defendant's own words.  Aisha described when she went from her

16   group home to the defendant's apartment in Brooklyn, that the

17   defendant brought her into his room, grabbed her wrist, and had

18   sex with her without a condom, and then he took pictures.  It's

19   the same story Sabrina told.  The same story the defendant told

20   publicly in his recruiting ads.  "A personal session with me."

21   The defendant told you on the witness stand that the personal

22   session that happened when he was physically attracted to a

23   woman or girl who was coming to work for him.  That these

24   sessions were consensual.

25           But on this point, Aisha told you a very different

J7C3KID1                    Summation - Mr. Gutwillig

1    story.  So did Sabrina.  Why did she have to have sex with the
2    defendant before she was allowed to see customers for him?
3    "Because not every girl's vagina is qualified for the job."
4    Who told her that?  The defendant.
5         You have Aisha and Sabrina's testimony.  That
6    testimony is not just consistent with one another, it's
7    consistent with the internal records.  The advertisements with
8    Jessica, Domo; and Aisha, Lizzy.  They were created on May 18,
9    2017.  Both of them.  That data came straight from the Backpage
10   servers.  Defendant also told you that himself.  And Aisha and
11   Sabrina told you that after leaving the defendant's apartment,
12   they went to Target.  That they went to the Target on Flatbush
13   Avenue in Brooklyn, a half mile from the defendant's apartment.
14   You have their testimony on this point.  You also have the
15   video surveillance from Target.  Look at the time stamp on the
16   top left of the slide.  It was taken on May 18, 2017, at
17   approximately 3 p.m.  It was taken later the day the
18   advertisements with Jessica and Aisha were posted by the
19   defendant.  The same day.  It's not a coincidence.
20        Aisha's testimony corroborates Sabrina's testimony.
21   Sabrina's testimony corroborates Aisha's testimony.  And the
22   defendant's testimony that he took those pictures, posted those
23   advertisements, it corroborates them both.  And you've got the
24   Target records to boot.
25        In Target, on that photograph, both Sabrina and Aisha

 1   identified Jessica wearing the floral dress in the picture in

 2   front of you.  They also identified Aisha, Sabrina and Brielle.

 3   Aisha and Sabrina used almost exactly same words in their

 4   testimony.  They weren't coordinated.

 5          To sum it all up, Jessica was a minor in 2017 because

 6   she's still a minor.  Aisha's testimony proves that beyond a

 7   reasonable doubt, that the defendant sold Jessica for sex.  So

 8   does Sabrina's testimony.  The video surveillance from Target

 9   is just icing on the cake.  There is no question that the

10   defendant is guilty of Count Two.

11          Then you have Counts Three and Four.  Three, Dana;

12   Four, Arielle.  That the defendant prostituted Dana and Arielle

13   is not in question.  The only issue in dispute is whether he

14   used force, threats of force, fraud, or coercion in causing

15   them to engage in commercial sex acts.  It is beyond clear that

16   he did.  And before I walk through the testimony, before the

17   proof that that happened, just pause for a minute.

18          You saw Dana and Arielle on the stand, right over

19   there.  Did it look like they wanted to be here?  Did it sound

20   like Arielle wanted to talk about how she started working for

21   the defendant because she was afraid of losing her daughter?

22   Did it sound like Dana wanted to talk about a sex tape that the

23   defendant recorded in secret with a particular sex act that she

24   was so scared, so ashamed for people to see, that she started

25   working for the defendant as a prostitute?

1          You saw their raw emotion, the anger, the shame, the

2     vulnerability, the frustration, the feelings of helplessness

3     and powerlessness, in some instances minimizing the conduct, in

4     some instances describing it like it happened to someone else.

5     Like an out-of-body experience.  All things Dr. Cooper

6     explained.  Find victims, intimate partner violence, social

7     isolation, the cycle of violence.  What you saw were two

8     textbook examples of sex trafficking by force, fraud, or

9     coercion.

10         Did it strike you that they were here just to tell

11    lies to get the defendant?  To make up a cascade of untruths in

12    order to put him in prison?  Of course not.  That is not at all

13    what their testimony is about.

14         Those witnesses opened up, they told you about some of

15    their most intimate, most embarrassing, most difficult

16    experiences in their lives.  And that's why their testimony has

17    the ring of truth.

18         Let's talk about Arielle.  Why did Arielle go to work

19    for the defendant?  "I mean, I said beggars can't be choosers.

20    And I needed the money, so I pretty much did as I was told."

21    She was completely desperate when she walked in the door.  She

22    had lost custody of her daughter, she didn't have a place to

23    live, and she didn't have any money.  Just like Kaira, just

24    like Jessica, Aisha, Sabrina, Brielle.

25         It wasn't a coincidence that Arielle was desperate.

J7C3KID1                    Summation - Mr. Gutwillig

It was a pattern.  And Arielle's testimony conflicts with the defendant's testimony that all these women and girls just brazenly walked into his apartment so they could earn money. That they also willingly started working for him so they could get paid.

        These women were in difficult circumstances, unthinkable circumstances.  Often desperate, and the defendant took advantage of that vulnerability.

        Arielle told you about working for the defendant.  She saw customers at any time of the day or night.  Sometimes she was sleeping when customers wanted to see her.  Sometimes she was sick or tired.  This is exactly the type of vulnerable victim that Dr. Cooper, the sex trafficking expert, talked about.  She had nowhere to go, no choice.  The defendant had her exactly where he wanted her.  She told you about threats. That asking for money from the defendant, money she had earned from sex trafficking on her behalf, resulted in a vicious rebuke.  "Listen, you little cunt, don't make me slap the shit out of you."

        (Continue on next page)

1          MR. GUTWILLIG:  That's what she said.  That's what he

2     told her.

3          Ariele told you about her fear of violence.  She

4     mentioned a distinctive clicking sound.  By the way, Dana told

5     you she saw a gun in the defendant's apartment, too.  You have

6     Dana's testimony, you have Ariele's testimony.  You know what

7     else you have?  You have the gun seized from the defendant's

8     apartment, the one that was seized from the safe that only he

9     had access to.

10          Of course you have the threat about what Ariele feared

11     most:  Losing her daughter.  The defendant knew this from the

12     very beginning.  He used it so that Ariele would work for him.

13     He explained it.  He exploited it.  He said -- Ariele said,

14     Ariele testified to this, he said that if I go to the police,

15     he would have six of his boys testify in court that I'm a known

16     prostitute and that I would never see my daughter again.  He

17     took her worst nightmare, her greatest vulnerability and used

18     it to threaten her, to force her, to coerce her to engage in

19     prostitution on his behalf.  As I expect Judge Marrero will

20     instruct you, abuse or threatened abuse of legal process is a

21     means of coercion for the purpose of sex trafficking.

22          Then there's Dana, the defendant's wife, the wife who

23     he sold for sex hours after they got married.

24          There's the envelope.  This is the envelope he used to

25     keep the money that she earned from sex.  Like the gun, kept it

J7CTKID2                    Summation - Mr. Gutwillig

1   locked away in a safe.  And how did the defendant get Dana to

2   work for him?  Blackmail.  Another vulnerable victim.  This one

3   from a foreign country.  Romanced by the defendant, another

4   technique sex traffickers use to recruit victims, just like

5   Dr. Cooper told you.

6         He secretly videotaped her.  He videotaped her doing a

7   particular sex act, one that was not described in court, one

8   that the defendant showed Dana that he threatened to upload to

9   the internet for everyone to see if she didn't do what he

10  wanted:  To engage in sex for the defendant's benefit; all

11  kinds of sex, BJs, bare blowjobs, oral sex without a condom,

12  back door, anal sex and brown showers, which I won't even

13  describe.

14        You saw Dana.  She was clear that she never wanted to

15  do any of those acts.  Dana testified that when the defendant

16  advertised her, he advertised her for those acts as a

17  punishment.  "When me and him get into an argument, he would

18  write up I'm doing back door, I'm doing unprotected sex, BBJs

19  and so forth."

20        And if she didn't want to engage in prostitution at

21  all, the defendant had her paying his bills, internet, light,

22  gas, his bills, in imaginary debt for not engaging in

23  prostitution for the defendant, or not getting him money for

24  sex.  She was forced into it, and she was forced to continue.

25  And this is entirely consistent with Dr. Cooper's testimony.

1    She explained the concept of debt bondage, how pimps like the

2    defendant use that technique to control victims, that in the

3    end, the victim will end up owing the defendant, almost always,

4    almost always working off imaginary debt, always forcing the

5    victim to come back to the pimp, to the defendant.

6            This advertisement makes clear, the one in front of

7    you, this advertisement makes clear that the defendant followed

8    through on his threat, that he posted pictures of Dana

9    advertising her for sex with her face unblurred, perfectly

10   consistent with his testimony.

11           There's physical evidence backing this up.  When Dana

12   and the defendant got into an argument about the defendant

13   unblurring her face in the advertisements, he literally punched

14   holes in the door as part of the fight.

15           The defendant claimed that he never posted these

16   pictures with Dana's face unblurred.  He would have you believe

17   that even though he took those pictures, as he admits, he never

18   posted them to BackPage.  That is simply impossible.  Every

19   piece of data, picture, text, IP address, creation date,

20   posting date, everything came from the BackPage servers

21   maintained by the FBI, including the photos of Dana with her

22   face unblurred.

23           Of course, there was physical violence, like when the

24   defendant would bend back Dana's fingers so hard she could

25   barely close her hand, like when he would shake her awake so

she could meet her customers, throw water on her to wake her

up, then he would force her to have sex with them.

You have seen and heard a lot of evidence, testimony

from the victims, from Kaira, from Aisha, from Sabrina, from

Ariele, from Dana, envelopes with the girl's names on them, the

gun, advertisements the defendant posted on BackPage, the

graphic descriptions of sex, graphic descriptions of what the

defendant was selling the girls to do.

What you have seen and heard, that is Chris Kidd's

world, the real one, the world where Chris -- the world Chris

crated was not a YouTube channel, it was a world where he sold

women and girls for sex, where he choked Kaira because she had

sex with a customer before giving the defendant the money,

where he brought four minor girls from foster care, including

Jessica, Sabrina and Aisha, to his apartment to sell them for

sex one at a time, two at a time, unprotected sex.  The

strangers could take their pick after, of course, the defendant

tried them out first.

He threatened Ariele that she would never see here

daughter again, and he secretly recorded a graphic sex tape to

force Dana into working for prosecution for him.  This was

Chris Kidd's world.  This was his world.  This was the

defendant's world, the one that he created in the real world, a

world of fear, intimidation, and violence.  It was a world

where you did what he said.

J7CTKID2                    Summation - Mr. Gutwillig

1          It was exactly as he described it.  In the defendant's

2     own words:  I'm located at a very nice apartment in Brooklyn.

3     I would take pictures of you and edit them.  I would also take

4     care of posting you and promoted you.  There would be a

5     personal session with me.  Once I see how you do with in calls,

6     I would be open to do any out calls with you out of town.

7     Submissive women only.

8          You know what the defendant thinks a man is?  He

9     thinks it's a ruthless pimp.  Serious female.  You heard the

10    defendant say it himself in a public YouTube video for anyone

11    to see.  I don't deal with dominant women.  I'm dominant.  If

12    you're not going to submit to me, then fuck you.  That's what

13    he said.

14         You know how he saw these women and girls, just

15    listen.

16         (Audio recording played)

17         MR. GUTWILLIG:  From group homes, from foster care,

18    desperate to support a child, blackmail, the defendant targeted

19    these women and girls because they were vulnerable.  But the

20    defendant, he underestimated them, because they walked in here

21    and they told you what happened.  They told you their stories,

22    and that, that is what this case is about.  Their resilience,

23    their courage, their stories, the evidence corroborates these

24    stories, the defendant's own words corroborate these stories.

25         Hold Lloyd Kidd accountable.  Reach the only verdict

1    that is consistent with the evidence, the truth, and the law,

2    that the defendant is guilty.

3              THE COURT:  Thank you.  Mr. Margulis.

4              MR. MARGULIS-OHNUMA:  Judge, we need a minute or two

5    to set up the technology, and I request a bathroom break if we

6    could take five minutes.

7              THE COURT:  All right, five-minute break.

8              (Recess taken)

9              THE COURT:  Thank you, be seated.  Welcome back.

10             Mr. Margulis.

11             MR. MARGULIS-OHNUMA:  Thank you, your Honor.  May it

12   please the Court, my worthy adversaries, my esteemed,

13   colleagues, and most of all you, ladies and gentlemen of the

14   jury.  I want to repeat one or two things Ms. Medley said at

15   the beginning of this case, which is we know you all kept an

16   open mind.  Some of this evidence is very difficult to look at

17   and get your head around, and that what we're here for is to

18   make sure that Lloyd Kidd gets a fair trial, which in our

19   system means the government has to prove every element of every

20   count beyond a reasonable doubt.  And that's the most important

21   thing that we ask you to keep in mind as you go and deliberate

22   in the jury room.

23             So how does this case begin?  It begins with an

24   investigation what was referred to by the witnesses as a raid

25   on Church Avenue.  And in that raid the agents involved, their

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    team, gathered each and every conceivable electronic device you

2    can imagine, not only from the apartment itself, but from the

3    safes that they found in the apartment.

4            So what we have in front of you -- and I have taken

5    some of this stuff out and I will try not to belabor it, but we

6    have two computers, one that was in the closet, one that was at

7    the desk, it was in the pictures, dozens or almost two dozen

8    electronic devices in all, hard drives, back up drives, phones,

9    SIM cards, you saw it all as it came out.  And that's really

10   the government's key corroboration for their claims.  That's

11   where they found things that they say back up what the

12   witnesses are saying.

13           We heard Mr. Kidd's words at the very beginning of

14   Mr. Gutwillig's summation, and I certainly don't blame him for

15   starting with them.  I think we all cringed when we heard those

16   words.  Those words are ugly.  But we also heard a tape that

17   was found, a 2013 tape that was found on one of the devices.

18   Also ugly words.  As Ms. Medley told you at the beginning,

19   words not of a man, but of a persona, a caricature himself.

20           What we heard on the witness stand, I very

21   respectfully submit, from Mr. Kidd was the truth, who was he

22   really is and how he really treats people.  And how do you know

23   that?  Well, you know that because he admitted almost

24   everything, didn't he?  And the government picked up on that.

25   He admitted to running an in call spot.  He admitted to posting

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    ads of women on BackPage.  He didn't have to admit to any of

2    that.  He had a right to remain silent and you couldn't have

3    used that against him.  But no, he took the stand and he told

4    you.  The government, why they didn't they get into it?  They

5    had all kinds of electronic links showing it was him who posted

6    the BackPage ads, that his phone number was used, his email was

7    used.  Okay, yeah, no problem, I did all that.  But then he

8    went on to describe truthfully what he knew and how he treated

9    the women involved.

10          So moving on in the story, at the day of the raid they

11   got not only all of these items, but they found Dana and Ariele

12   and another person who is an adult person in the apartment.

13   And then after that, Dana and Ariele became depicted themselves

14   as victims.  They weren't underage.  No one underage was found

15   there, and the accusations came up later.

16          So what don't we have?  We don't have other kinds of

17   investigations.  And the judge will -- investigate techniques.

18   The judge will instruct you that they're not required to employ

19   any particular investigative technique, but in this case

20   wouldn't you like to hear wiretaps?  Wouldn't you like to see

21   the text messages used to recruit -- allegedly used to recruit

22   underage girls?  Wouldn't you like to have calls that the

23   victims might have made to defendant?  Wouldn't you like to

24   hear testimony from alleged accomplices or have some

25   surveillance?  Wouldn't you like to see credit cards or bank

1    records that corroborate?  None of that is present in this

2    case.

3            As far as surveillance -- and I think I may get back

4    to this, but the women who were present when he was arrested

5    testified that there was a camera in Mr. Kidd's living room.

6    That camera would have depicted most of the conduct under

7    discussion when everything happened in Brooklyn.  And the

8    camera they said also fed onto his cell phone.  I will not try

9    to take it out, it's Government Exhibit I think 100.  It's his

10   actual cell phone, they got his cell phone.  Wouldn't you

11   expect to see some content on there that would be

12   corroborative?  And it's not there.

13           Let me go -- and my slide looks a lot like

14   Mr. Gutwilig's, because he's a very good lawyer.  Let's walk

15   quickly through the five counts.

16           Count One stands alone, because with respect to Kaira

17   Brown you have to find unanimously either that she was a minor

18   who was caused to be engaged in commercial sex acts, or that

19   force, fraud or coercion was used to cause her to engage in

20   commercial sex acts.  And you have to be unanimous on which of

21   those two, and the judge will explain that to you, but you have

22   to all agree which of those two or both apply.

23           With respect to Jessica Bonilla, and just to be clear,

24   we have not heard from Jessica Bonilla.  That's I think the

25   main person in the investigation you would want to hear from in

1      this situation.  I'll talk a little bit about that in a moment.

2      With respect to Jessica Bonilla, she's not -- there's no

3      accusation of force, fraud or coercion, as there with respect

4      to other alleged victims.  It's strictly whether -- and our

5      contention is that she was not actually used in any commercial

6      sex acts and there's no proof of that.

7              So with respect to Count Three and four, they have to

8      prove beyond a reasonable doubt that force, fraud or coercion

9      was used to cause those individuals -- to cause Dana McLeod and

10     to cause Ariele Palopolo to engage in commercial sex acts.

11             And with respect to Count Five, it goes back to the

12     production of child pornography and when those images were

13     actually taken.

14             So this is just to summarize the points that are in

15     dispute.  So with respect to One, Three and Four, those are the

16     counts that require force.  You have to ask yourselves, did the

17     force, fraud or coercion cause a commercial sex act that the

18     victim would not have done otherwise that was done against her

19     will?  That's what you really have to look at.

20             THE COURT:  So, for example, when Ariele says I was

21     desperate, I needed money so I came to the home, and then gets

22     in a dispute over someone's soap, and even accepting her

23     testimony as true, and is hit or mistreated because there was a

24     dispute over soap or threatened because there was dispute over

25     soap, is that causing her to engage in a commercial sex act?

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    There has to be a causal nexus.  As you review the testimony, I

2    want you to look very carefully whether there is causation

3    there beyond a reasonable doubt.  And that applies to all of

4    Counts One, Two, Three and Four.

5         For Count Two, I think again the government

6    characterized it accurately, our defense, which is that

7    Jessica -- he never actually went through with respect to

8    Jessica Bonilla, that he knew as Diamond, that he never

9    actually posted it.  We'll get to the BackPage data in a

10   moment.  With respect to Kaira, our contention is there's no

11   proof beyond a reasonable doubt that they met prior to April of

12   2018 when she was 18 at the time.

13        So if you are to find Mr. Kidd guilty of any one of

14   those counts, you next have to look at whether -- and the judge

15   will instruct you on this, whether -- and I agree, of course,

16   with Mr. Gutwillig that what the judge says is controlling on

17   the law.  This is what I expect him to tell you:  I expect him

18   to tell you that for all the counts you have to find an act in

19   furtherance of the crime happened here in the Southern District

20   of New York, Manhattan or Westchester, not in Brooklyn.  And

21   part of the issue here is that these are Brooklyn crimes.  I

22   don't think there's any evidence in this record that says that

23   Mr. Kidd did anything in the Southern District of New York

24   that's credible evidence.

25        So if you find, for example, that when the three girls

1    came, if you find that that actually happened and they took the

2    train and the subway to Brooklyn, and they arrive in Brooklyn,

3    and that's when the crime takes place, as opposed to him going

4    and picking them up, then the government has not proved by a

5    about preponderance of the evidence that an act in furtherance

6    of the crime took place in this district, in the Southern

7    District.  And yeah, it's a legal technical defense, and you

8    can hate Mr. Kidd all you want, but if the crime actually

9    happened in Brooklyn, the government is required to bring the

10   case in Brooklyn.

11           So with respect to Counts One and Five we're on,

12   Government Exhibit 400 of course is their strongest evidence.

13   Government Exhibit 400 is an exhibit that was made up by Erik

14   Uitto.  He took the 40 terabytes of data in BackPage, that's

15   what he told us, and he picked and chose and found stuff that

16   he, in his opinion as a law enforcement agent, not as a person

17   from BackPage, went together based on what he saw.

18           I'm going to try, I don't know if I can succeed, in

19   showing you Government Exhibit 450A, which is supposed to tie

20   these things together and be the basis for these exhibits.

21           So before I get into that, though, we know that Kaira

22   Brown came to Mr. Kidd, which he admitted, not at the time that

23   the BackPage ads were made or at the time stamps on the videos,

24   because she was not -- her locations at those times were known.

25   And how do we know that?  We know that from the witness from

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    the Good Shepherd Services who told us that when a child is in

2    foster care, their movements are tracked.

3              She was 17 in February, she was still in foster care

4    in April, and her movements are tracked, so they're responsible

5    for knowing where she is.  She's AWOL at certain times, and

6    what I have done is try to line up the times and show them

7    against the reconstructions of Government Exhibit 400 on the

8    lower right of your screen.

9              I will talk more in a minute about the unreliability

10   of these dates, because I don't think any of the dates are

11   particularly reliable in any case, but here we have a square

12   conflict.

13             So Government Exhibit 450 is a compact disk.  I want

14   to make sure you understand.  I won't pull it out, but it's a

15   compact disk, and it has on it a huge Excel spreadsheet which

16   you have never seen.  You have seen snippets that they have

17   pulled to show you the basis for their conclusion, but I urge

18   you to ask for a laptop and look at the whole thing.

19             I will try to show it on my laptop.  There are many

20   columns that Agent Uitto just does not know what they are

21   because he's not the BackPage IT specialist, he's a law

22   enforcement officer who grabbed the data and tried to interpret

23   it, but it's just an interpretation.

24             So there are several dates, creation date, modified

25   date, last edit user, if you look at -- I had it written down,

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    if you look at Government Exhibit 400, I think, if you look at

2    this creation date of 2/2, it's line 10.  As you go across --

3    and this is a copy, by the way, from the CD.  You should look

4    at the actual CD because we all know computers can be fudged,

5    dates change all the time so easily, but I urge you to look at

6    the actual CD that is actually in evidence.

7          If we go across here, there's numerous dates for

8    different things, creation date, last modified date, expiration

9    date, sponsor release date, sponsor expiration date, and more.

10   As you can see for some of them, it looks like the data got

11   corrupted where dates are not lining up in the right columns on

12   the spreadsheet.  You will have to look at that on the

13   Government Exhibit 450A.

14         In any event, in terms of Pearlene, if you look back

15   and forth with where she was -- sorry, Kaira Brown, if you look

16   back and forth where she was by records left by the foster care

17   agency, and I transposed them on my own reconstruction there,

18   so feel free check to it, but you will see as of the creation

19   date listed in the BackPage data, she wasn't AWOL, she was at

20   Marion Hall where she was supposed to be.  She didn't go AWOL

21   until the next day -- sorry, two days later, until February 4,

22   2017 at 3:11 p.m.  This was supposed to have been created two

23   days earlier, so how could it have been created if the foster

24   care agency was keeping track of her movements?

25         After February 4th we don't know where she was or what

1     she was doing, and there's a number of dates and there's a

2     little bit of overlap, but it seems to be the posting date and

3     not the creation date, if you look at this reconstruction, that

4     the data -- and you have to go back to line 10, I think it was,

5     of Government Exhibit 450A.  So it's tricky, but there's a lot

6     that these reconstructions could say that the government's

7     reconstructions aren't telling you, and one of them is that

8     Kaira Brown was not in Brooklyn on February 2nd, 2017.

9              So let's talk about when and where she was.  The

10    government -- the testimony was, and the government's

11    contention is that she kind of worked on and off for Mr. Kidd

12    over a two-year period from 2015 to 2017.  That's just

13    blatantly false.  How do we know?  She testified that she only

14    worked out of -- sorry, my colleague points out another anomaly

15    in the data I'm just going to show you, I apologize for

16    skipping around.

17             So because we don't have somebody from BackPage, we

18    don't know what these dates mean.  We don't know why expiration

19    date would be later than the posting date, for example.  If it

20    is what it seems like, if it's expired already, how could it be

21    posted a day later on 2/12?  So look at that line 10 very

22    carefully and see if you think it's reliable.

23             So back to where I was the.  Kaira Brown testified

24    with absolute clarity that she only worked over this period out

25    of a spot on Nostrand and she started in the spring of 2015.

That's impossible because Mr. Kidd didn't have a spot on

Nostrand until April of 2016.  Mr. Kidd testified to that.

Again, he testified truthfully, and he was able to corroborate

it with a piece of mail that went to his house in his name on

Stanley Avenue at the end of 2015.  And that's that -- I'll

have to get the exhibit number for you, but it was that

Chase -- it was the letter from Chase which he offered into

evidence.  He didn't end up offering leases into evidence, but

he did testify that he moved to Norstrand only in 2016, so it's

impossible -- what Kaira Brown is saying is impossible because

his spot on Nostrand didn't even exist at the time that she

claims she worked there.

          And by the way, you can't confuse them.  This is a

schematic of the map.  If you look at the upper right, they're

way there by the airport, that's the Stanley address, it's

almost Queens, where the one in the bottom marked April 2016 is

Nostrand Avenue.  And I think Mr. Kidd testified it's about a

25-minute drive from one to the other.

          So that's Pearlene.  Let's talk a little bit about

Jessica Bonilla.  So the interesting thing about Jessica

Bonilla is she didn't testify.  They gave us a birth

certificate and had some testimony from some of her friends.

Is that really proof beyond a reasonable doubt that these

particular crimes happened?  Well, I think there's reasons she

didn't testify, that she have not have been a reliable witness

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    for reasons that her friends told us about in their testimony.

2           So for example, she used a fake name, and no one

3    actually knew how old she was.  We all thought she was 16,

4    Sabrina tells us, that's the age she gave us.

5           Does Jessica go by any other names that you know?

6           Diamond, that's how she introduced herself to us.

7           So she's lying to her friends about her age.  We found

8    a birth certificate from Virginia for a person named Jessica

9    Bonilla.  Without bringing her to court and finding out if

10   that's really her, or a relative, someone who really knows her,

11   as opposed to someone who has been in a group home with her for

12   a little while, is that proof beyond a reasonable doubt that we

13   have the right person?

14          It also appears from the girls' testimony that Jessica

15   was something of a ringleader of this group, that she was

16   recruiting people herself into prostitution.  That's what Aisha

17   Goncalves told you, that she was aware of that, and she brought

18   these girls, who are not the subject of Count Two, and that's

19   very important, that she brought them to engage in prostitution

20   at Mr. Kidd's place.

21          So even if you think that Mr. Kidd caused the other

22   girls who actually testified -- when I say "girls," I mean the

23   two minor victims, or they're not minors when they testified,

24   but minors when -- they allege they were minors at the time it

25   happened.  Even if you think he's guilty of that, those counts

1    aren't charged.  You can't find him guilty of Count Two unless

2    you believe that he caused Jessica Bonilla herself to engage in

3    commercial sex acts.  Again, that's a technical defense you

4    might not like very much, but there are some limits on the

5    government's power here that you swore to uphold.

6            So what about the BackPage ad for Jessica Bonilla?  As

7    I think the defendant pointed out to you, Mr. Kidd pointed out

8    to you when he was testifying, for the ad on the left,

9    Government Exhibit 421, the name that Jessica's friend told us

10   was her is Domo.  I'm not sure how you can tell that, but if I

11   recall correctly Mr. Kidd admitted it anyway that that was her.

12   He didn't have to admit that that was her, that it was a

13   picture that he took, but he did, because he was telling the

14   truth.

15           That date, the date posted -- and again, starting with

16   the ad on the left, the date posted is 5/21/2017, which is

17   three days after the target videos.  So you're posting an ad

18   with this person, but she has fled with her friends after her

19   friend got arrested at Target.  But so that makes no sense at

20   all.  The name of Domo does not appear in the ad.  It makes no

21   sense at all.  This BackPage data is totally unreliable.  You

22   cannot count on it.

23           Same thing with the one on the right, which is

24   Government Exhibit 419.  You see Scarlet, who the friends claim

25   was Jessica Bonilla.  By the way, did we ever see a photo ID

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1    for Jessica Bonilla?  Did we ever see a driver's license or a

2    benefits ID of any kind that would associate the name with the

3    face?  You really don't know who this person is, and we don't

4    know what age they are because that birth certificate doesn't

5    have any kind of unique identifier, it doesn't have a baby

6    footprint or something like that that could be traced to a

7    person 14 or 18 years later to see who that is and how old she

8    actually is.

9            The age given in the ad is 26 at the time.  That's the

10   age that's on the metadata.  We don't know what that means.  I

11   think I got into it a little with Mr. Uitto about where that

12   comes from, and he said it came from users.  I don't know how

13   to dispute that, but that's an assumption, he's not from

14   BackPage, and we don't know.

15           The point Mr. Kidd made on the stand, though, is in

16   this one the ad is for Peaches, who is Dana, actually, and

17   doesn't say anything about Scarlet, the other person advertised

18   there, who he knew as Diamond and who the government is now

19   telling you is Jessica Bonilla.

20           But I suggest to you that all of that amounts to

21   reasonable doubt as to the age and whether these ads were

22   actually posted for her by Mr. Kidd.

23           Here's a quote from the examiner about whether or not

24   these pictures were posted that corroborates what Mr. Kidd is

25   saying, which is that he took the pictures, he uploaded them

1  but he didn't post them because they decided not to go through

2  with it.  She didn't actually want to engage in -- she didn't

3  actually agree to engage in any -- I don't want to say "agree,"

4  she didn't actually do any commercial sex acts and the ads

5  weren't actually posted.

6           And the government has presented no evidence to refute

7  that or show they were actually posted.  No one has ever seen

8  an ad of Jessica.

9           As you sit here today, when did you get assigned to

10  case?

11           I have been doing extractions from the servers since

12  April, several months.

13           So as you sit here now -- I'm asking the analyst

14  Uitto -- as you sit here now, having prepared for several

15  months, you can't tell one way or the other whether any of

16  these pictures were actually ever posted, correct?

17           With the data in front of me, that's correct.

18           So moving on to the testimony of who are claimed to be

19  Jessica's two friends or Diamond's two friends, it's

20  inconsistent about how they got here and about what happened.

21  So Aisha Goncalves told us that when they call all came

22  together that she, Jessica and Sabrina went to 125th Street on

23  Metro-North and he picked them up from 125th Street.  I

24  suggest, respectfully, that's pretty convenient, right?

25  Because the government needs to show by preponderance of the

1   evidence an act that took place in Manhattan, and going to pick

2   them up would satisfy that if it were credible.  But it's not

3   credible, because Sabrina Misere contradicts it.

4           I'm not saying Aisha lied on purpose by saying that,

5   I'm saying it's not clear from this record sufficiently that

6   there was any act that took place in Manhattan.

7           So Sabrina's testimony on this is you didn't take a

8   Metro-North train to 125th Street?

9           We had to take Metro-North in order to come down from

10  upstate.  But then she goes on to say:  Did you take the subway

11  from the train station to get to Brooklyn?  Yes.  Nothing about

12  being picked up in Manhattan.

13          And this corroborates -- Sabrina corroborates

14  Mr. Kidd's testimony.  He says that he didn't pick her up, and

15  Sabrina was absolutely clear that he didn't pick them up in the

16  four-door sedan that was described by the other witness and

17  only by the other witness, because the other witnesses

18  described Mr. Kidd's car as a Jeep, if I recall correctly.

19          So the other thing is it's not clear that they were

20  describing the same location when they testified.  One place,

21  from Aisha's testimony was 30 minutes away from the Target

22  where Sabrina was arrested, 30 minutes by bus.  The other --

23  Sabrina's testimony was that it was a place ten minutes away

24  from Target by walking.  So we're talking about a real

25  disconnect as to where the location of the apartment they were

J7CTKID2                        Summation - Mr. Margulis-Ohnuma

1   would have been.  So there's contradictions about how they got

2   there and contradictions about where exactly it was.

3            Here's the reason for the confusion:  The reason for

4   the confusion is -- and I want to say this very delicately --

5   it appears from the record that these girls were victimized by

6   multiple individuals, and that there was another individual

7   named Red out in Brooklyn who may have victimized them, and

8   there's confusion over what is going on and what happened.

9            Did Jessica ever refer to anyone else by the name of

10  Red?

11            Yeah.

12            Who was that individual?

13            Some other guy.

14            Some other guy?  Did you know him?

15            No.

16            Did you ever meet him?

17            Yeah.

18            You met him?

19            Yes.

20            Does he also live in Brooklyn?

21            No.

22            Where does he live?

23            In Queens.

24            How many times did you meet him?

25            One time.

1          Do you know if he was also involved in prostitution?

2          Yeah.

3          So we have another person that goes by the name of Red

4     who is also involved in prostitution and who they have also met

5     outside of the facility they came from.

6          And then there's the identification of Chris, and I

7     think Mr. Gutwillig did a good job of explaining, if we look at

8     the testimony again.

9          Would you recognize Chris if you saw them again?

10          Yeah.

11          Looking around the courtroom, do you see Chris?  And

12     the answer was no.  The Chris I know have hair at the time.

13     And they press the point, she stood up and she still couldn't

14     identify him, she could identify him from that photograph

15     because there's confusion about Chris, Red, and other people

16     that were working in sex trafficking that they may have

17     interacted with.  So that's it for the two child victims.

18          Let me move on to the two adult victims, and they're

19     really a different -- present a different set of problems.

20     There, again, Mr. Kidd does not deny working with them out of

21     his in call spot in Brooklyn.  He denies mistreating them.  And

22     I would say that the government has not proven beyond a

23     reasonable doubt even if he mistreated them, or really more

24     importantly, did any mistreatment cause them to engage in

25     commercial sex work.  These were individuals who were engaging

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

in commercial sex work of their own free will, that they

weren't coerced and they weren't defrauded, and they certainly

weren't forced.  Let me get into why and what the support is

for that.

So one reason is that Dana is not a reliable witness,

and she's not a reliable witness in the same way that the

BackPage data isn't reliable, because she was away in Guyana

for a lot of this time period.  And according to -- and again,

I don't know if it's the BackPage data or Dana that's being

untruthful about this or inaccurate about this, but according

to the BackPage data, she -- Dana is away at the time that one

of the ads involving her was created.

Now here's a problem.  You're looking at

reconstructions, you have to go back and look at the

spreadsheet, and if the time were permitted I would have

prepared it for you in much more detail, but I can do it now

orally, and as you go and resolve questions, I hope you look at

Government Exhibit 450A in evidence, which is a disk with a

spreadsheet.

So the government's reconstruction said Government

Exhibit 413 has a posting time of October 22nd, 2017.  Well,

she came back on 9/11.  That makes sense, that's Dana and she's

there and they're doing it, they're posting her for commercial

sex work.  But if you look at the spreadsheet at the underlying

data, you will learn that there's a lot of other dates

1    associated with that ad.  Again, I will look real quick for the
2    line number.

3         If you look at line 16 of Government Exhibit 450A in
4    evidence, you will learn that there's a creation date of July
5    for this ad and that's squarely -- we have her passport, she
6    brought it to court, that is squarely within when she was in
7    Guyana, that she left the United States just before her visa
8    expired on April 18 of 2017 and she came back on a tragically
9    easy date to remember, September 11, 2017.

10        So in July she certainly wasn't engaging in commercial
11   sex work here.  Now do I know whether that's because the
12   BackPage data is unreliable or whether Dana is unreliable?  I
13   don't, and you don't have to resolve that.  What you do have to
14   do is determine whether there's a reasonable doubt as to any
15   element of the government's case.

16        One moment, your Honor.

17        (Pause)

18        MR. MARGULIS-OHNUMA:  Now what one could do is one
19   could create reconstructions that use the creation dates
20   instead of any of these other dates that are listed on this
21   spreadsheet.  And again, if you went to line 16, then that
22   would have put the creation date -- would have put it squarely
23   contradicted by the passport.  So they didn't do that.  They
24   used -- for this reconstruction they use the posting time,
25   which was in October, so they wouldn't have that contradiction.

J7CTKID2                    Summation - Mr. Margulis-Ohnuma

1           So again, talking about Dana a little more, there's a

2     few things to know about Dana.  First of all, they're lawfully

3     married.  They're still lawfully married.  Is it a great

4     marriage?  Doesn't seem like it.  No one is holding it up as

5     that.  Is it a little cynical?  Yes, it's a little bit cynical

6     on both sides.  He told us he wanted money out of the marriage.

7     And she tried not to tell us, but we know why she got married,

8     she got married because she would like to stay in the United

9     States, which makes sense, and her testimony disputing that

10    really doesn't make any sense at all.

11          There's also other unreliable testimony from Dana.

12    She had trouble getting her story straight about where they

13    met, and that's because she is lying about where they met.

14    They met because she wanted to willingly and voluntarily engage

15    in commercial sex work, so she answered one of those ads on

16    BackPage with the pictures of dollar bills saying look, you can

17    make money if you answer this ad.  That's what led her to Lloyd

18    Kidd.  She doesn't want to tell you that.  I don't know why,

19    probably because she is embarrassed and ashamed, and I

20    certainly don't blame her for that, but it does go to the

21    question of whether she was caused by Lloyd Kidd or bad things

22    Lloyd Kidd did to engage in commercial sex work.

23          So the problem with that is she doesn't have a story

24    that makes any sense at all for what she was doing.  And you

25    can look at her passport, we made a copy and we have it

1    available for you.  From October when she came to United States

2    until February when she met Lloyd Kidd she kind of said she was

3    hanging around with her aunts and gathering supplies for her

4    business in Guyana.  Does that make any sense, and it's a

5    three-month vacation away from her salon in Guyana?  It really

6    doesn't.  It really corroborates what Lloyd told you, that she

7    met him because she wanted to engage in commercial sex work

8    over BackPage, and she stayed with him because she wanted to

9    get married and she wanted to stay in the United States.

10           So she disassembled on this, meaning she couldn't get

11   her story straight.  She said -- I don't know why I struggle

12   with this, but she said she met him on Pitkin, he rolled up on

13   her, flattered her, and it was just romance.  Very far fetched.

14   Very far fetched.  And the proof is she couldn't get it right.

15   Even in court she said, "So when I met him on Utica," and then

16   she went back to Pitkin.  Pitkin and Utica aren't anywhere near

17   each other.  I didn't do a map, but they're not near each

18   other, and she was very clear she knew the difference between

19   the Pitkin and Utica.

20           Then we have the stipulation we read into the record

21   and signed by the government.  I didn't give you guys the

22   signed version, but that's Defense Exhibit M in evidence, and

23   the stipulation is that we agree that the notes of when Dana

24   met with the FBI she told them Utica, here she insisted on

25   Pitkin.  She can't get her story straight because she's not a

1    reliable witness because she has an interest in the outcome of

2    what is going to happen here.  So I'm asking that you accept

3    Mr. Kidd's version, which is that she responded on page 650 of

4    the transcript to an ad on BackPage and didn't meet on Utica or

5    Pitkin.

6            THE COURT:  Mr. Margulis, five minutes warning.

7            MR. MARGULIS-OHNUMA:  Thank you, your Honor.

8            So Dana's claims are untrue.  One way we know that is

9    she lived together with Ariele, the other person that was

10   present at the arrest.  They lived together when -- at the

11   apartment over the last six or eight weeks or couple of months.

12   And in all that time Ariele never saw Mr. Kidd mistreat Dana at

13   any time.

14           Her story is exaggerated.  I'm going to rush now, but

15   the purpose for that exaggeration is to get an immigration

16   benefit.  She couldn't get it through marriage, so she's

17   getting it through the continued presence program, which is

18   available only to victims of sex trafficking.  I'm not

19   quibbling with the program, what I'm quibbling with is her

20   credibility, that she is doing everything that she can to stay

21   in the United States.  I hope she is successful, but it

22   undermines -- it's the motivation for her to exaggerate these

23   claims, because it's not enough if you're engaging in

24   prostitution of your own free will, that's a crime in New York

25   State.  If you're a victim of sex trafficking, that's totally

1     different.  So she has a huge incentive there to not to lie

2     altogether, but to really exaggerate the acts that were

3     supposedly undertaken.

4            So let me get -- I'm going to finish with Ariele

5     Palopolo, and with Ariele it's a classic case of the government

6     charging conduct that does not rise to the level of causation,

7     of causing commercial sex acts, and I alluded to this before.

8     All of the disputes that Ms. Palopolo described and the

9     upsetting behavior that she described were about things other

10    than working.  She wanted to work more, and that testimony is

11    there.  I don't know if I made a slide on it, but she was very

12    clear that she wanted to work more, not less.  She didn't

13    allege that Mr. Kidd did anything to encourage or force her to

14    work more, to do more commercial sex acts.  The disputes, the

15    anger, the force, fraud and coercion was related to things

16    going on at the house, disputes over handling of people's

17    stuff.  And she admitted that at page 440 of the transcript.

18           So that's a lot of detail, there's a lot of stuff

19    here.  At the end of the day we're asking you to do something

20    that is really, really hard, seeing what you are seeing and

21    hearing what you heard.  His statements on YouTube are

22    repulsive to anyone, there's no question about that.  The

23    government was brilliant to read them into the record when they

24    began their argument.  But in America we don't punish people

25    for words alone, we punish people for acts and based on

J7CTKID2                    Rebuttal - Ms. Bracewell

1   evidence.  And a critical assessment of this evidence shows

2   that none of the counts rises to proof beyond a reasonable

3   doubt, and you must acquit Mr. Kidd.

4           Thank you very much.

5           THE COURT:  Ms. Bracewell.

6           MS. BRACEWELL:  Good morning, ladies and gentlemen.

7           Lloyd Kidd is facing a mountain of evidence.  Defense

8   counsel just spend his closing argument trying to distract you

9   from that evidence.

10          MR. MARGULIS-OHNUMA:  Objection.

11          THE COURT:  Overruled.

12          MS. BRACEWELL:  Because if you focus on the evidence,

13  if you consider the evidence without distraction, there could

14  be no reasonable doubt that the defendant is guilty.  The

15  evidence is consistent, it's corroborated, and it's

16  overwhelming.  Five different victims, five, that tell

17  remarkably similar accounts of the defendant's rules, his

18  procedures, his way of controlling the money, his way of

19  controlling the apartment, his way of controlling them.

20          Records from BackPage showing prostitution ads posted

21  by the defendant's accounts, accounts he admitted were his with

22  images of the victims, records from the defendant's phones and

23  computers and hard drives showing some of the same images of

24  the victims, the minor victims' birth certificates, even the

25  photographs of the walls of the Nostrand Avenue apartment

J7CTKID2                         Rebuttal – Ms. Bracewell

1    showing where Dana dodged out of the way of the defendant's

2    fist.

3                    (Continued on next page)

J7C3KID3                    Rebuttal - Ms. Bracewell

1          MS. BRACEWELL:  (Continuing) Defense counsel doesn't

2     want you to look too hard for this evidence.

3          THE COURT:  Mr. Kidd, please put your hand down.

4     You're distracting.

5          THE DEFENDANT:  Your Honor, this is very important.

6          THE COURT:  I will not listen to you.

7          Ms. Bracewell.

8          MS. BRACEWELL:  If you focus on the facts, if you

9     focus on the evidence, his client is done.  So defense counsel

10     is trying to cloud your view --

11          MR. MARGULIS-OHNUMA:  Objection.

12          THE COURT:  Overruled.

13          MS. BRACEWELL:  They want you to focus instead on the

14     defendant's fictional YouTube persona and about why the victim

15     can't be trusted.  About the types of evidence that you have,

16     and the types of evidence that you don't have.  They want to

17     put the government on trial.  They want to talk about the

18     government raid.

19          These are distractions.  These are distractions from

20     the facts and the evidence.

21          The defendant's response to overwhelming evidence, you

22     heard it straight from him.  It is as simple as it is

23     audacious.  A conspiracy against him, witness after witness who

24     took the stand was lying.  Their testimony was false, their

25     records were doctored.

J7C3KID3                          Rebuttal - Ms. Bracewell

1            The defendant is arguing he was framed, that he is the

2       victim of some ongoing conspiracy, because there's no other

3       response to the mountain of evidence that you have seen

4       accumulating over the last week.

5            THE DEFENDANT:  You tampered with evidence, and he's

6       aware of it.  He saw the pictures.  He knows about it and

7       didn't point it out.

8            THE COURT:  Mr. Kidd, if you continue disrupting, I

9       may have to ask the marshals to take you out of the courtroom.

10           MS. BRACEWELL:  Let me make one thing first totally

11      clear.  The defendant has no burden.  As Judge Marrero has

12      already told you and will tell you again, the government has

13      the burden to prove beyond a reasonable doubt, and we've met

14      that burden here.  We embrace that burden.  But when the

15      defense makes arguments, you can and you should consider those

16      arguments.  You can consider whether they make any sense, and

17      here, I submit, they don't.

18           I'm not going to address this morning all of the

19      arguments that were just made.  I'm not going to address, for

20      example, whether there is any significance to whether Dana met

21      defendant on Utica or Pitkin.  I leave that in your hands.  But

22      I'm going to address the main arguments.

23           So let's start with the defendant's claim of

24      conspiracy against him.  The defendant took the stand and told

25      you the government fabricated evidence against him.  He told

J7C3KID3                    Rebuttal - Ms. Bracewell

you about falsified Backpage data, that the dates for certain

ads were wrong, and that certain photographs -- the

inconvenient photographs, for example, of Jessica Bonilla --

those were never posted.  The defendant insinuated that the

evidence from his own devices, those were also compromised.

Files were moved around, metadata was altered.

            But what does his claim of conspiracy require?  It

requires that the witnesses who testified in the government's

case, who you observed, perpetrated this conspiracy.  That

witness after witness, who got up on the stand, and took an

oath to tell the truth, then lied.  Witnesses like FBI Examiner

Erik Uitto who testified about the Backpage data that he

gathered while in Idaho.

            If you believe the defendant, Agent Uitto lied,

falsified the creation dates, and he actually got some of the

photos in the ads from the defendant's computers here in New

York, even though they were never posted on Backpage.

            Or FBI IT analyst Porsche Brown who performed the

extractions on hard drives in the computers, who described in

meticulous somewhat painstaking detail how she got the data

from each of the devices.  She testified about where the

multiple pornographic images and video of Kaira were recorded

and when they were recorded.  If you believe the defendant,

Ms. Brown also had to have moved data around carelessly and

taken the stand to lie about it.

J7C3KID3                    Rebuttal - Ms. Bracewell

1          MR. MARGULIS-OHNUMA:  Objection, your Honor.  It is

2     not rebuttal.

3          THE COURT:  Sustained.

4          MS. BRACEWELL:  But Uitto and Brown were law

5     enforcement witnesses.  They testified and introduced records.

6     They had a passing connection to this case.  Why would these

7     witnesses generate false reports and records?  When you

8     consider Erik Uitto and Porsche Brown's demeanor on the stand,

9     this is simply preposterous.

10         As defense counsel just acknowledged, Erik Uitto

11    didn't want to overstate his understanding of particular data

12    fields in his unwieldy charts.  A witness willing to falsify

13    data but careful to qualify what it means, that's just not

14    likely.

15         And defense counsel came back again and again to the

16    dates of the Backpage records, that we don't know what they

17    mean.  Even accepting that those records are not fully

18    explained, as Uitto himself admitted, some fields like "posting

19    date" or "creation date," we submit, are fairly

20    self-explanatory.

21         And setting aside the Backpage data altogether to the

22    side, consider the other corroborative evidence about when

23    those CP files were recorded.  Consider Kaira's testimony.

24    Consider Dana's testimony telling that you she met Pearlene in

25    February of 2017, when she met the defendant.  Consider the

 1    metadata from the five devices.  The five devices that

 2    Mr. Gutwillig set forth in front of you this morning.

 3              What is not corroborated is the ACS records.  That

 4    witness took the stand and told you that she actually was

 5    concerned about the quality of the date because of the delay in

 6    data entry.  It was a manual process, and the data was entered

 7    weeks after the AWOL actually occurred.  And, it could have

 8    been no absence was logged if Ms. Brown was gone for 24 hours

 9    or 28 hours, potentially 30 hours.  She couldn't say.

10              What she could say is that they could not keep track

11    of students all the time.

12              The defendant's conspiracy theory also has to expand

13    to the victims, as you heard.  Again, it's the only response to

14    their testimony.  Testimony that is remarkably consistent, and

15    is devastating to the defendant.

16              Consider that all of the five victims described

17    recognizable characteristics of the defendant.  Again and again

18    you heard the same script.  That what the defendant did

19    followed a pattern, an M.O.  The girls had to have a personal

20    session with the defendant after they arrived.  It was a

21    session of unprotected sex.  He suggested taking their

22    photographs soon thereafter.  He posted them, sometimes that

23    same day.  They met customers at any time of day and night.

24    They had to take the money from the customer first, and give it

25    to the defendant before anything else happened.  He decided how

J7C3KID3                    Rebuttal - Ms. Bracewell

1    much they got back, and when.

2           The details line up because the defendant's conduct

3    was consistent, and the victims were credible.

4           The defendant has no other response to the victims.

5    They have to be lying or wrong or mistaken or have ulterior

6    motives, because if they're telling the truth, it is over for

7    the defendant.

8           But again, why are all of these victims out to get the

9    defendant?  Did any of the victims look like they enjoyed

10   testifying?  Consider Kaira having to explain how she

11   recognized the birthmarks on her body around her vagina.  She

12   was physically uncomfortable.  Think about Arielle testifying

13   about how she went on Bedpage because she was in desperate

14   circumstances.  Think about Sabrina describing going back to

15   the defendant's bedroom to have sex with him because the

16   defendant told Sabrina not every girl's vagina is qualified for

17   the job.  Think about Dana having to describe the defendant's

18   secret recording of their having sex.  She didn't want to tell

19   you about it.  These are difficult topics, and their discomfort

20   was visible.  They could barely look at the defendant when they

21   were in that witness box.  You saw it.

22          Defense counsel just spent some time talking about how

23   Dana is testifying for immigration benefits.  Putting aside

24   whether that is persuasive or even true, and I ask you to

25   recall her testimony and demeanor, but he can't make any

J7C3KID3                    Rebuttal - Ms. Bracewell

equivalent argument as to Arielle, Aisha, Sabrina or Kaira.  It
was clear from watching that they endured testifying.  They did
not enjoy it.

So, ladies and gentlemen, you can and you should
scrutinize this claim of a conspiracy.  It is a desperate
defense when the evidence rules out everything else.

As you can tell, the defendant is calibrating his
defense to the options he has left.  The defendant sat through
each day of this trial.  He knows the evidence against him.
Most tellingly, perhaps, is his reactions to Aisha and
Sabrina's testimony who he claims he never met.  Never mind
that they both testified that they came with Jessica Bonilla,
who he does admit knowing.  Never mind that Aisha, Sabrina, and
Jessica were all on Target surveillance footage minutes after
he was at his house, and on the same day the Backpage ads were
created with both Jessica and Aisha's photos.

But for these three girls, who were minors at the
time, and their ages not seriously in dispute, the defense has
come up with a different calibrated defense.

No ads of Sabrina, no physical evidence to explain
away, so he never met her.  Ads that Aisha recognized of
herself but with an obscured face, so that is someone else.
For Jessica, the pictures are clear, it is unmistakable who
that is, so he knows her, but he never posted her.

And consider his response to Kaira.  Her identity is

J7C3KID3                        Rebuttal - Ms. Bracewell

1    undeniable in the photographs from the Backpage ads, from the

2    devices, the ads for Pearlene.  So he knows her, but he only

3    met her and prostituted her after he checked her ID and

4    determined she was 18, and specifically no sooner than

5    April 2017.  That's ridiculous.

6            Consider what this tells you.  The defendant is

7    working with whatever options he has left.  But listen as well

8    to the victims.  You heard Sabrina, you heard Aisha, you heard

9    Kaira.  Their testimony was credible, it was consistent, it was

10   corroborated.  It's the defendant's testimony, his version of

11   events, that simply makes no sense.

12           THE COURT:  Ms. Bracewell, you have two minutes.

13           MS. BRACEWELL:  So rather than focusing on what the

14   defendant did, defense counsel would like to refocus you on

15   what the victims did or didn't do.  The insinuation is the

16   victims can't be trusted because they first became involved

17   with the defendant, because they were recruited, because they

18   answered an ad.

19           They told you how they were recruited.  They were the

20   ones who admitted that they responded to the ads.  For example,

21   Arielle told you how she went to Bedpage and saw the ad and

22   responded to the ad and went to Brooklyn to meet the defendant.

23   Their testimony has the ring of truth, because they admit to

24   the desperate circumstances that led them to the defendant.

25   And these desperate circumstances made them vulnerable to the

J7C3KID3                    Rebuttal - Ms. Bracewell

1   force, to the threats, to the coercion that the defendant

2   inflicted upon them.

3          The defendant's variant to this is the causal nexus he

4   mentioned.  For example, they want to split the defendant's

5   actions from the environment that resulted from those actions.

6   For example, Arielle and this soap incident.  It's not about

7   soap.  It's about fear, and how that fear affected Arielle.

8   And pause here.  Do you think the defendant cared about the

9   soap?  No.  The defendant understood how to gain control.  How

10  a threat of physical force, how a threat against a child's

11  custody, would linger.  How it would affect her actions.

12         Let me move briefly to venue, because the defense has

13  questioned whether that's sufficient here.  Let me say first

14  that, as Judge Marrero will instruct you, the government must

15  meet its burden here by a preponderance of the evidence, by

16  showing that it is more likely than not that a relevant act

17  occurred in the Southern District of New York.  For each of

18  these counts, that's here.

19         Arielle was recruited from the Bronx.  She received

20  text messages and communicated with the defendant from the

21  Bronx.  For Dana, she was kept on a very tight leash.  She was

22  allowed to go to Albany, she testified traveling to Albany

23  through Manhattan, but she had to stay in touch with the

24  defendant the whole time, and at his direction he told her to

25  come back and keep working, so she did.  For Kaira, recruited

from Good Shepherd in Manhattan.  From Jessica Bonilla, who was

recruited from Hawthorne Cedar Knolls in Westchester.  Jessica

visited the defendant with Aisha on the first occasion, as you

heard from Aisha, and she came with three other friends,

including Aisha and Sabrina, on a second occasion.  Aisha told

you that he picked the girls up, the defendant picked the girls

up in his car from a location in the Southern District, and

from this train station to take them to the defendant's

apartment.

          Sabrina's recollection was different.  It was that

they left Hawthorne and took themselves to Brooklyn.  But

Sabrina also observed Jessica already knew the defendant when

she arrived.  The implication of Sabrina's testimony is clear.

Jessica was in touch with the defendant before they ever got to

Brooklyn.

          THE COURT:  Ms. Bracewell, please sum up.

          MS. BRACEWELL:  Yes.

          I'm about to sit down, but I want to leave you with

one final thought.  Despite what defense counsel says, this

case is about the five victims who took the stand.  It's about

the real women and real children who suffered here.  These are

women and girls who were preyed on by the defendant.  It's

about their stories and their courage in coming to tell you

what happened to them.

          When you consider the evidence and the law, there's

1    only one conclusion that is consistent with the evidence in the

2    case.  That the defendant is guilty.

3              THE COURT:  All right.  I thank you.  We'll take a

4    10-minute break.

5              (Recess)

6              (In open court; jury not present)

7              THE COURT:  Before we call in the jury, I'm going to

8    be moving to the next phase of the proceeding which is the

9    Court's charge to the jury.  These instructions are going to

10   take about one-and-a-half hours.  So, if you have other

11   business and need to leave prior to that, then leave now,

12   because we're going to be locking the doors and you will not be

13   able to get in and out once the doors are locked and the Court

14   is giving instructions.

15             Bring in the jury, please.

16             (Jury present)

17             THE COURT:  Ladies and gentlemen, before you begin

18   your deliberations, I am going to instruct you on the law.  You

19   most pay close attention, and I will be as clear as possible.

20             I take this opportunity to advise everyone in the

21   courtroom who does not need to be here to leave, because we're

22   going to be closing the courtroom during these court

23   instructions.

24             Let me note that these instructions will probably take

25   about an hour and a half.

J7C3KID3                    Charge

1          It has been obvious to me and to counsel that until

2      now you have been faithfully discharging your duty to listen

3      carefully and to observe each witness who testified.  Your

4      interest never wavered, and you have followed the testimony

5      with close attention.  I ask that you now give me that same

6      careful attention as I instruct you on the law.

7          Listening to these instructions may not be easy.  It

8      is important, however, that you listen carefully and

9      concentrate.  I ask you to be patient and to pay attention.

10         I will give you a copy or two of the instructions for

11     you to have in the jury room to consult, so you need not take

12     notes that might possibly distract you from what I am saying.

13     Just listen carefully and concentrate on that.

14         You have now heard all of the evidence in the case, as

15     well as the final arguments of the lawyers for the parties.

16         My duty at this point is to instruct you on the law.

17     It is your duty to accept these instructions of law, and apply

18     them to the facts as you determine them, just as it has been my

19     duty to preside over the trial and decide what testimony and

20     evidence is relevant under the law for your consideration.

21         On these legal matters, you must take the law as I

22     give it to you.  If any attorney has stated a legal principle

23     different from any that I state to you in these instructions,

24     it is my instructions that you must follow.  You must consider

25     the law only as I instruct you, and you must disregard any

1    contrary opinion of the relevant law that may be expressed by

2    anyone else, including members of your panel.

3            You are all instructed that if, by whatever means or

4    authority, you have either heard or formed a view of the law

5    relevant to this case different from what I describe in these

6    instructions, you are not to discuss it with your fellow jurors

7    during any part of the case or during your deliberations.  This

8    is very important.

9            You should not single out any one instruction as

10   definitively stating the law alone, but you must consider my

11   instructions as a whole when you retire to deliberate in the

12   jury room.

13           You must not -- any of you -- be concerned with the

14   wisdom of any rule of law that I state.  Regardless of any

15   opinion that you may have as to what the law may be or ought to

16   be, it would violate your sworn duty to base your verdict upon

17   any view of the law, other than that which I give you.

18           As members of the jury, you are the sole and exclusive

19   judges of the facts.  You pass judgment upon the evidence.  You

20   determine the credibility of the witnesses.  You resolve such

21   conflicts as there may be in the testimony.  You draw whatever

22   reasonable inferences you decide to draw from the facts as you

23   determine them.

24           I shall later discuss with you how to pass upon the

25   credibility or believability of the witnesses.

J7C3KID3                      Charge

In determining the facts, you must rely upon your own recollection of the evidence.  What the lawyers have said in their opening statements, or in their closing arguments, in their objections or in their questions is not evidence.

I will remind you that anything I may have said during trial or may say during these instructions with respect to a fact matter should not be taken in substitution for your own independent recollection.  What I say regarding any factual matter is not evidence.

The evidence before you consists of the answers given by the witnesses, the testimony they gave, as you recall it, and the exhibits that were received in evidence.  The evidence does not include the questions posed by the lawyers.  Only the answers are the evidence.  But you may not consider any answer that I directed you to disregard or that I directed be struck from the record.  Do not consider such answers.

In determining the facts, no one may invade your role as jurors.  In order for you to determine the facts, you must rely upon your own recollection of the evidence.  Any notes that were taken by jurors during the trial should be used only to refresh the recollection of the juror who took the notes.  In addition, notes that you may take may only be used to assist you, and are not to be considered a substitute for your recollection of the evidence in the case.  Keep in mind that just because you've written a note does not necessarily mean

1   that it is accurate.  Along the same lines, the fact that a

2   particular juror has taken notes does not entitle that juror's

3   views to any greater weight than the views of any other juror.

4   Again, you were not required to take notes, but if you did so,

5   you may not discuss or share your notes with anyone else before

6   or during your deliberations.  Notes are only for you alone.

7        I have not expressed nor have I intended to suggest

8   any opinion as to whether any witnesses are or are not worthy

9   of belief, what facts have or have not been established, or

10  what inference or inferences should be drawn from the evidence.

11  If any expression of mine has seemed to indicate an opinion

12  relating to any of these matters, I instruct you to disregard

13  it.  You are, I repeat, the exclusive and sole judges of the

14  questions of fact submitted to you, and of the credibility of

15  the witnesses.

16        Your authority, however, is not to be exercised

17  arbitrarily; it must be exercised with good judgment, sound

18  discretion, and in accordance with the rules of law which I

19  give you.

20        You are reminded that you took an oath to render

21  judgment impartially and fairly, and not to be swayed by

22  prejudice, sympathy, or fear, and to be guided solely by the

23  evidence in the case and the applicable law.  You must fulfill

24  your oath in order to reach a just and true verdict.

25        You are to perform the duty of finding the facts

without bias or prejudice as to any party.  You are to perform
your final duty in an attitude of complete fairness and
impartiality.

         The fact that the prosecution is brought in the name
of the United States of America entitles the government to no
greater consideration than that accorded to any other party to
a litigation.  By the same token, it is entitled to no less
consideration.  All parties, whether the government or
individuals, stand as equals before the bar of justice.

         Before I instruct you on the specific issues that you
must decide, I want to define for you the standard by which you
will decide whether the government has met its burden of proof
on a particular issue.  This is a criminal case, and as such,
the government has the burden of proving all the elements of
each of the charges against Mr. Kidd beyond a reasonable doubt.

         Although Mr. Kidd has been indicted, you must remember
that an indictment is only an accusation.  It is not evidence.
Mr. Kidd has pleaded not guilty to that indictment.

         As a result of Mr. Kidd's plea of not guilty, the
burden is on the government to prove guilt beyond a reasonable
doubt.  This burden never shifts to a defendant for the simple
reason that the law never imposes upon a defendant in a
criminal case the burden or duty of calling any witness or
producing any evidence.

         It is a cardinal principle of our justice system that

1   every person accused of a crime is presumed to be innocent,

2   unless and until his guilt is established beyond a reasonable

3   doubt.  The presumption is not a mere formality.  It is a

4   matter of the most important substance.

5          I therefore instruct you that Mr. Kidd is presumed by

6   you to be innocent throughout your deliberations until such

7   time, if ever, that you as a jury are satisfied that the

8   government has proven Mr. Kidd guilty beyond a reasonable

9   doubt.

10         Mr. Kidd began the trial here with a clean slate.

11  This presumption of innocence alone is sufficient to acquit a

12  defendant unless you as jurors are unanimously convinced beyond

13  a reasonable doubt of his guilt, after a careful and impartial

14  consideration of all of the evidence in the case.  A defendant

15  has the right to remain silent and never has the burden to

16  present any evidence or to prove that he or she is not guilty.

17  If the government fails to sustain its burden as to Mr. Kidd on

18  any count you are considering, you must find the defendant not

19  guilty on that count.

20         The presumption of innocence was with Mr. Kidd when

21  the trial began, and remains with him, even now as I speak to

22  you, and will continue with Mr. Kidd into your deliberations,

23  unless and until you are convinced that the government has

24  proven his guilt beyond a reasonable doubt.

25         I have said that the government must prove Mr. Kidd

J7C3KID3                        Charge

1    guilty beyond a reasonable doubt.  The question naturally is,

2    what is a reasonable doubt?  The words almost define

3    themselves.  It is a doubt based upon reason and common sense.

4    It is a doubt that a reasonable person has, after carefully

5    weighing all of the evidence.  It may arise from the evidence,

6    or lack of evidence, or the nature of the evidence.  It is a

7    doubt which would cause a reasonable person to hesitate to act

8    in a matter of importance in his or her life.  Proof beyond a

9    reasonable doubt must, therefore, be proof of such convincing

10   character that a reasonable person would not hesitate to rely

11   and act upon it in the most important of his or her life

12   affairs.  A reasonable doubt is not caprice or whim; it is not

13   a speculation or suspicion.  It is not an excuse to avoid the

14   performance of an unpleasant duty.  It is not sympathy.

15           In a criminal case, the burden is at all times upon

16   the government to prove guilt beyond a reasonable doubt.  The

17   law does not require that the government prove guilt beyond all

18   possible doubt; proof beyond a reasonable doubt is sufficient

19   to convict.  This burden never shifts to a defendant, which

20   means that it is always the government's burden to prove each

21   of the elements of the crime of each crime charged beyond a

22   reasonable doubt.

23           If, after a fair and impartial consideration of all of

24   the evidence, you are satisfied of the defendant's guilt beyond

25   a reasonable doubt, you must vote to convict the defendant.  On

J7C3KID3                    Charge

1    the other hand, if, after fair and impartial consideration of

2    all the evidence you have a reasonable doubt as to the guilt of

3    the defendant, it is your duty -- and you must -- acquit the

4    defendant.

5          In making your determination of the facts in this

6    case, your judgment must be applied only to that which is

7    properly in evidence.

8          I will now remind you of the preliminary instructions

9    that I gave you at the start of the trial, as to what you

10   should consider as evidence, from which you are to decide what

11   the facts are.  The evidence in this case consists of:

12         The sworn testimony of witnesses on both direct and

13   cross-examination, regardless of who called the witness; the

14   documents and exhibits which have been admitted into evidence;

15   and any facts to which all the lawyers have agreed or

16   stipulated.

17         Again, nothing else is evidence.  Not what the lawyers

18   said, not what I say, and not anything you heard outside the

19   courtroom.

20         As I previously instructed you, evidence is the

21   witnesses' answers to the questions put to them, not the

22   questions themselves.  Arguments of counsel, no matter how

23   passionate their appeal, are not evidence, although you may

24   give consideration to those arguments in making up your mind as

25   to what inferences to draw from the facts which are in

J7C3KID3                    Charge

1    evidence.  What the lawyers have said to you in their opening

2    statements and in their closing arguments, as I said earlier

3    and I stress again, is not evidence.  The closing arguments are

4    designed to present to you what the parties believe that the

5    evidence has shown, and what inferences they believe may be

6    drawn from that evidence.  If your recollection of the facts

7    differs from the lawyers' statements, it is your recollection

8    which controls.  Similarly, the lawyers' characterizations of

9    the witnesses' testimony and assessment of credibility, again,

10   as I stated earlier is not evidence.  Only your own evaluation

11   of the testimony and the credibility should influence your

12   deliberations.

13        You should only consider the exhibits that have been

14   admitted into evidence.  Exhibits marked for identification but

15   not admitted are not evidence, nor are materials brought forth

16   only to refresh the recollection of any witnesses.  You cannot

17   consider or speculate as to the content of any exhibit not

18   received in evidence.

19        Similarly, you are to disregard any testimony when I

20   have ordered that it be stricken.  As I indicated earlier, only

21   the the witnesses' answers are evidence, and you should not

22   consider a question as evidence.

23        From time to time, the Court has been called upon to

24   pass upon the admissibility of certain evidence, although I

25   have tried to do so, insofar as practicable, out of your

J7C3KID3                      Charge

hearing.  You should not be concerned with the reasons for any

such rulings, and you are not to draw any inferences from them.

Whether offered evidence is admissible is purely a question of

law in the province of the Court and outside of the province of

the jury.

          In admitting evidence to which an objection has been

made, the Court does not determine what weight should be given

to such evidence, nor does it pass on the credibility of the

evidence.  Of course, you are required to dismiss from your

mind completely any evidence which has been ruled out of the

case by the Court, and you must refrain from speculation or

conjecture or any guesswork about the nature or effect of any

discussions between the Court and counsel held out of your

hearing or presence.

          It is the duty of the attorneys on each side of the

case to object when the other side offers testimony or other

evidence which the attorneys believe is not properly

admissible.  Counsel also has the right and duty to ask the

Court to make rulings of law and to request conferences at the

sidebar out of the hearing of the jury.

          All those questions of law must be decided by the

Court.  You should not show any prejudice against an attorney

or his or her client because the attorney objected to the

admissibility of evidence, or asked for a conference out of the

hearing of the jury or asked the Court for a ruling of law.

J7C3KID3                    Charge

1      During the course of the trial, there were transcripts

2 shown to you in order to make the other evidence more

3 meaningful and to aid you in considering that evidence.  They

4 are not direct, independent evidence; they are transcripts of

5 the evidence, and they are admitted into evidence as aids to

6 you.

7      Now, some of the exhibits that were admitted into

8 evidence were in the form of charts and summaries.  For these

9 charts and summaries that were admitted into evidence, you

10 should consider them as you would any other evidence.

11      Recall also that in my preliminary instructions I

12 described two kinds of evidence:  Direct and circumstantial.

13      Direct evidence is when a witness testifies about

14 something he or she knows by virtue of his or her own senses --

15 something he or she has seen, felt, touched or heard.

16      Circumstantial evidence is evidence which tends to

17 prove a disputed fact by proof of other facts.  You infer from

18 the basis of reason and experience and common sense from one

19 established fact, the existence or non-existence of some other

20 fact.  If someone walked into the courtroom wearing a raincoat

21 covered with drops of water and carrying a wet umbrella, that

22 could be circumstantial evidence from which you could conclude

23 that it was raining outside.

24      Circumstantial evidence is of no less value than

25 direct evidence.  It is a general rule that the law makes no

J7C3KID3                    Charge

1    distinction between direct and circumstantial evidence, but

2    simply requires that, before convicting a defendant, the jury

3    must be satisfied of the defendant's guilt beyond a reasonable

4    doubt from all of the evidence in the case.

5         During the trial, you have heard me or the attorneys

6    use the term "inference."  Inferences are deductions or

7    conclusions from which you, the jury, may reach, using reason,

8    logic and common sense, based on the facts which have been

9    established by the evidence in the case.

10        You may draw from the facts that you find to have been

11   proved by such reasonable inferences as seem justified in light

12   of your experience.  However, you may not treat your power to

13   draw reasonable inferences as permission to indulge in

14   conjecture, speculation, or guesswork.  Every inference relied

15   upon by the jury should be based on the evidence or lack of

16   evidence in the case, and drawn on the basis of reason, logic,

17   and common experience.

18        If you conclude that other persons may have been

19   involved in the criminal acts charged in the indictment, you

20   may not draw any inference, favorable or unfavorable, towards

21   the government or Mr. Kidd, from the fact that such persons

22   were not named as defendants in this case, and you may not

23   speculate as to the reasons why other people are not on trial

24   before you now.  Those matters are wholly outside of your

25   concern, and have no bearing on your function as jurors in

1    deciding the case before you.

2            In this case, you have heard evidence in the form of a

3    stipulation of fact.  A stipulation of fact is an agreement

4    between the parties that a certain fact is true.  You must

5    regard such agreed facts as true.  However, it is for you to

6    determine what weight to give to those facts.

7            You also had an opportunity to observe the witnesses.

8    It is your duty to decide how believable each witness was in

9    his or her testimony.  You are the sole judges of the

10   credibility of each witness, and of the importance of his or

11   her testimony.

12           In determining where the truth lies, you should use

13   all of the tests of truthfulness that I mentioned to you

14   earlier -- those that you would use in determining matters of

15   importance to you in your everyday life.

16           You should consider the opportunity the witness had to

17   see, hear, and know the things about which they testified, the

18   accuracy of their memory, their candor or lack of candor, their

19   intelligence, the reasonableness and probability of its

20   corroboration or lack of corroboration with other believable

21   testimony and evidence.  You watched the witnesses.  Everything

22   a witness said or did on the witness stand counts in your

23   determination.  How did the witness appear?  What was the

24   witness's demeanor while testifying?  Often it is not what

25   people say, but how they say it, that moves us.

J7C3KID3                    Charge

1          When considering the credibility of each witness, you

2     may consider whether the witness is disposed to favor or

3     disfavor one party or another.  Bias, prejudice, or retaliatory

4     motive may affect a witness's perception or recollection of

5     events.  It is important to bear the motive of the witness in

6     mind when determining how much weight to give to his or her

7     testimony.

8          In evaluating the credibility of the witnesses, you

9     should take into account any evidence that any witness who

10    testified may benefit in some way from the outcome of the case.

11    Such an interest in the outcome creates a motive to testify

12    falsely, and may sway a witness's testimony in a way that

13    advances his or her interests.  Therefore, if you find that any

14    witness whose testimony you are considering may have an

15    interest in the outcome of the trial, then you should bear that

16    factor in mind when evaluating the credibility of his or her

17    testimony.  You should not disregard or disbelieve that

18    testimony simply because the witness has such an interest, but

19    if you accept it, you should do so with great care.

20         This is not to suggest that every witness who has an

21    interest in the outcome of a case will testify falsely.  It is

22    for you to decide to what extent, if at all, a witness's

23    interest has affected or colored his or her testimony.

24         Inconsistencies or discrepancies in the testimony of a

25    witness, or between the testimony of two different witnesses,

1    may or may not cause you to discredit such testimony.  Two or

2    more persons witnessing an incident or a transaction or

3    participating in the same conversation or meeting may see or

4    hear it differently.  Innocent failure of recollection is a

5    common experience.  In weighing the effect of a discrepancy,

6    always consider whether it pertains to a matter of importance

7    or an unimportant detail.  Ask yourselves whether the

8    discrepancy results from an innocent error, honest confusion,

9    or intentional falsehood, and that may depend on whether it has

10   to do with an important fact or with only a small detail.

11        After making your own judgment, you will give the

12   testimony of each witness such weight, if any, as you may think

13   it deserves.  You may accept or reject the testimony of any

14   witness in whole or in part.

15        In other words, what you must try to do in deciding

16   credibility is to size up a witness in light of his or her

17   demeanor, the explanations given, and all of the other evidence

18   or lack of evidence in the case.  Always remember that you

19   should use your common sense, your good judgment, and your life

20   experience.

21        The fact that one party called more witnesses and

22   introduced more evidence than the other party does not mean

23   that you should necessarily find the facts in favor of the side

24   offering the most witnesses.  By the same token, you do not

25   have to accept the testimony of any witness who has not been

J7C3KID3                    Charge

1   contradicted, if you find the witness not to be credible.  You

2   also have to decide which witness to believe and which facts

3   are true.  To do this, you must look at all of the evidence,

4   drawing upon your own common sense and personal experience.

5   After considering all of the evidence or lack of evidence, you

6   may decide that the party calling the most witnesses has not

7   persuaded you because you do not believe its witnesses, or

8   because you do not believe the fewer witnesses called by the

9   other side.

10          Keep in mind that the burden of proof is always on the

11  government, and a defendant is not required to call any

12  witnesses or offer any evidence, since Mr. Kidd is presumed to

13  be innocent.

14          You have heard the testimony of law enforcement

15  witnesses.  The fact that a witness may be employed by the

16  government does not mean that his or her testimony is

17  necessarily deserving of more or less consideration or greater

18  or lesser weight than that of any ordinary witness.

19          In this context, defense counsel is allowed to try to

20  attack the credibility of such witnesses on the ground that his

21  or her testimony may be colored by a personal or professional

22  interest in the outcome of the case.

23          It is your decision, after reviewing all of the

24  evidence, or lack of evidence, whether to accept the testimony

25  of the law enforcement or government employee witness, and to

1    give that testimony the weight, if any, you find it deserves.

2              In a criminal case, the defendant cannot be required

3    to testify, but if he chooses to testify, he is, of course,

4    permitted to take the witness stand on his own behalf.

5    Mr. Kidd testified at trial and was subject to

6    cross-examination.  You should examine and evaluate this

7    testimony just as you would the testimony of any witness.

8              You have heard references in this case, in the

9    arguments of counsel, to the fact that certain investigative

10   techniques were used by the government and certain other

11   investigative techniques were not.  Specifically, you heard

12   evidence and testimony about evidence seized in connection with

13   certain lawful searches conducted by law enforcement officers.

14   There is no legal requirement that the government prove its

15   case through any particular means.  While you are to consider

16   carefully the evidence adduced by the government, you are not

17   to speculate as to why they used the technique it did or why

18   they did not use other techniques.  The government is not on

19   trial, and law enforcement techniques are not your concern.

20   Your concern is to determine whether or not, on the evidence or

21   lack of evidence before you, Mr. Kidd's guilt has been proved

22   beyond a reasonable doubt.

23              (Continued on next page)

24

25

J7CTKID4                    Charge

1          THE COURT:  As it relates to the testimony of any

2     witness, let me emphasize that any issue of credibility need

3     not be decided in an all-or-nothing fashion.  Even if you find

4     that a witness testified falsely in one part, you still may

5     accept his or her testimony in other parts, or you may

6     disregard all of it.  This is a determination entirely for you,

7     the jury.

8          There are people whose names you have heard during the

9     course of the trial who did not appear here to testify.  I

10    instruct you that each party had an equal opportunity or lack

11    of opportunity to call any of these witnesses.  Therefore, you

12    should not draw any inference or reach any conclusions as to

13    what they may have or would have testified to had they been

14    called.  Their absence should not affect your judgment in any

15    way.

16         You should remember my instruction that the law does

17    not impose on a defendant in a criminal case the burden or duty

18    of calling any witnesses or producing any evidence.

19         You have heard during the trial that witnesses have

20    discussed the facts of the case and their testimony with

21    lawyers before the witnesses appeared in court.

22         Although you my consider that fact when you are

23    evaluating a witness's credibility, I instruct you that there

24    is nothing either unusual or improper about a witness meeting

25    with the lawyers before testifying so that the witness may be

1    aware of the subjects he or she will be questioned about, focus

2    on those subjects, and have the opportunity to review relevant

3    exhibits before being questioned about them.  Such consultation

4    helps to conserve your time and the Court's time.  In fact, it

5    would be unusual for a lawyer to call a witness without such

6    consultation.

7            Again, the weight that you give to fact or the nature

8    of the witness's representation for his or her testimony and

9    what inferences you draw from such preparation are matters

10   completely within your discretion.

11           You have heard testimony from what we call expert

12   witnesses.  In this case, Sharon Cooper.  An expert witness is

13   one who by education or experience has acquired learning or

14   experience in a science or specialized area of knowledge.  Such

15   a witness is permitted to give his or her opinions as to

16   relevant matters in which he or she professes to be an expert

17   and to give his or her reasons for his or her opinions.  Expert

18   testimony is presented to you on the theory that someone who is

19   experienced in the field can assist you in understanding the

20   evidence or in reaching an independent decision on the facts.

21           Now your role in judging credibility applies to the

22   expert witness as well to other witnesses.  You should consider

23   the expert opinion which was received in evidence in this case

24   and give the opinion as much or as little weight as you think

25   it deserves.  If you should decide that the opinion of the

expert was not based on sufficient education or experience or

sufficient data, or if you should conclude that the

trustworthiness or credibility of the expert is questionable

for any reason, or if the opinion of the expert was outweighed,

in your judgment, by other evidence in the case, then you might

disregard the opinion of the expert entirely or in part.

On the other hand, if you find the opinion of the

expert is based on sufficient data, education and experience,

and other evidence does not give you reason to doubt the expert

conclusions, you may be justified in placing greater reliance

on that expert's testimony.

You should not, however, accept a witness's testimony

merely because he or she is an expert.  Nor should you

substitute it for your own reason, judgment and common sense.

The determination of the facts in this case rests solely with

you.

Audio recordings, video recordings, text messages and

emails have been admitted into evidence.  I instruct you that

this evidence was obtained in a lawful manner and that no one's

rights were violated, and that the government's use of this

evidence is entirely lawful.

Therefore, regardless of any personal opinions

regarding the obtaining of such evidence, you must give this

evidence full consideration along with all the other evidence

in this case in determining whether the government has proved

J7CTKID4                    Charge

the defendant's guilt beyond a reasonable doubt.  What weight you give to these materials, if any, is completely within your discretion.

Your verdict must be based solely on the evidence developed at trial or the lack of evidence.  It would be improper for you to consider, in reaching your decision as to whether the government as sustained its burden of proof, any personal feelings that you may have about Mr. Kidd's race, religion, national origin, sex, or age.  Similarly, it would be improper for you to consider any personal feelings that you have about the race, religion, national origin, sex, or age of any other witness or anyone else involved in the case. Mr. Kidd is entitled to a trial free from prejudice, and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

It would be equally improper for you to allow any feelings you may have about the nature of the crimes charged to interfere with your decision-making process.

To repeat, your verdict must be based exclusively on the evidence or the lack of evidence in this case.

Under your oath as jurors, you are not to be swayed by sympathy.  You are to be guided solely by the evidence in the case.  And the crucial question that you must ask yourselves as you sift through the evidence is:  Has the government proven the guilt of Mr. Kidd beyond a reasonable doubt?

J7CTKID4                    Charge

1          It is for you alone to decide whether the government

2     has proved beyond a reasonable doubt that Mr. Kidd is guilty of

3     the crimes charged solely on the basis of the evidence and

4     subject to the law as I charge you.  It must be clear to you

5     now that once you let fear or prejudice or bias or sympathy

6     interfere with your thinking, there is a risk that you will not

7     arrive at a true and just verdict.

8          Therefore, if you should find that the government has

9     met its burden of proving Mr. Kidd's guilt beyond a reasonable

10    doubt, you should not hesitate because of any other reason to

11    render a verdict of guilty as to Mr. Kidd.  But on the other

12    hand, if you have a reasonable doubt as to Mr. Kidd's guilt,

13    you should not hesitate for any reason to find a verdict of not

14    guilty as to Mr. Kidd.

15         Under your oath as jurors, you cannot allow a

16    consideration of possible punishment that may be imposed upon

17    Mr. Kidd, if convicted, to influence you in any way or in any

18    sense to enter into your deliberations.  The duty of imposing

19    sentence is the Court's and the Court's alone.  Your function

20    is to weigh the evidence and to determine whether the

21    government has proved beyond a reasonable doubt that Mr. Kidd

22    is or is not guilty upon the basis of the evidence and the law.

23         Therefore, I instruct you not to consider punishment

24    or possible punishment in any way in your deliberations in this

25    case.

1          You are obliged under your oath as jurors to follow

2     the laws I instruct you, whether you agree or disagree with the

3     particular law in question.

4          With these instructions in mind, let us turn to the

5     charges against Mr. Kidd as contained in the indictment.  As I

6     instructed you at the outset of the case, the indictment is a

7     charge or accusation.  It is not evidence.  The indictment in

8     this case contains five counts.  In reaching a verdict,

9     however, you must bear in mind that you must consider each

10     count individually with respect to whether the government has

11     proven its case beyond a reasonable doubt.  Your verdict as to

12     Mr. Kidd on each count must be determined separately, solely on

13     the evidence, or lack of evidence presented against him without

14     regard to whether anyone else is guilty or not guilty.

15          Before you begin your deliberations, you will be

16     provided with a copy of the indictment to reference as

17     necessary.  You will also have a copy of these instructions.  I

18     will not read the entire indictment to you, as you will have it

19     during your deliberations here.  I will summarize each offense

20     charged in the indictment at the time that I explain in detail

21     the elements of the offense for you.

22          As I have indicated, the indictment contains five

23     counts.  Each count constitutes a separate offense or crime.

24     You must consider each count separately and determine whether

25     the government has carried its burden of proof with respect to

1    that count and Mr. Kidd.  I will provide you with a verdict

2    form, and you will need to report the results of your

3    deliberations on each count on the verdict form.  To do so, you

4    will need to keep track during your deliberations of which

5    charge you are considering and the legal elements applicable to

6    that charge.  The case against Mr. Kidd on each count stands or

7    falls upon the proof or lack of proof against Mr. Kidd, and

8    your verdict as to Mr. Kidd on any count should not control

9    your decision as to any other count.  No other considerations

10   are proper.

11           The government has brought five charges against

12   Mr. Kidd stated in Counts One through Five of the indictment.

13           For each count, the government has the burden of

14   proving identity beyond a reasonable doubt.  It is not

15   essential that the particular witness be free from doubt as to

16   the correctness of his or her identification of Mr. Kidd.

17   However, you, the jury, must be satisfied beyond a reasonable

18   doubt of the accuracy of the identification of that defendant

19   before you render a verdict of guilty.  If you are not

20   convinced beyond reasonable doubt that Mr. Kidd was the

21   person who committed the crime, you must find Mr. Kidd not

22   guilty of the particular charge.

23           Count One of the indictment charges that in or about

24   the spring of 2015, up to and including in or about

25   February 2017, Lloyd Kidd, also known as "Chris Kidd," "Gerard

J7CTKID4                    Charge

1    Agard," and "Red," the defendant, engaged in sex trafficking of

2    a minor victim identified as Victim-1 (Kaira Brown), by force,

3    threats of force, fraud, coercion, or a combination of such

4    means, in violation of Title 18, United States Code, Sections

5    1591(a), (b)(1), (b)(2), and 2.

6           Count Two of the indictment charges that, in or about

7    the summer of 2017, Lloyd Kidd, the defendant, engaged in sex

8    trafficking of another minor victim, identified as Victim-2

9    (Jessica Bonilla), in violation of Title 18, United States

10   Code, Sections 1591(a), (b)(2), and 2.

11          Count Three of the indictment charges that from in or

12   about February 2017, up to and including at least in or about

13   December 2018, Lloyd Kidd, the defendant, engaged in sex

14   trafficking of an adult victim, identified as Victim-3 (Dana

15   McLeod), by force, threats of force, fraud, coercion or a

16   combination of such means, in violation of Title 18, United

17   States Code, Sections 1591(a), (b)(1) and 2.

18          Count Four of the indictment charges that from in or

19   about August 2018, up to and including at least in or about

20   December 2018, Lloyd Kidd, the defendant, engaged in sex

21   trafficking of another adult victim, identified as Victim-4

22   (Ariele Palopolo), by force, threats of force, fraud, coercion

23   or a combination of such means in violation of Title 18, United

24   States Code, Sections 1591(a), (b)(1), and 2.

25          Count Five of the indictment charges that, in or about

1  February 2017, Lloyd Kidd, the defendant, employed, used,

2  persuaded, induced, and enticed Victim-1 (Kaira Brown), who was

3  then a minor, to engage in sexually explicit conduct which

4  Mr. Kidd recorded in images and videos.

5          Now I'll go over each of the counts starting with

6  Count One.

7          Counts One through Four of the indictment charge the

8  defendant with sex trafficking in violation of Title 18, United

9  States Code, Section 1591, which provides, in pertinent part,

10 that:

11          "Whoever knowingly, in or affecting interstate

12 commerce, recruits, entices, harbors, transports, provides,

13 obtains, advertises, maintains, patronizes, or solicits by any

14 means a person; or benefits, financially or by receiving

15 anything of value, from participating in a venture which has

16 engaged in such an act, knowing or in reckless disregard of the

17 fact, that means of force, threats of force, fraud, coercion,

18 or any combination of such means will be used to cause the

19 person to engage in a commercial sex act, or that the person

20 has not attained the age of 18 years and will be caused to

21 engage in commercial sex act, is guilty of a federal crime."

22          To sustain its burden of proof with respect to the

23 charge of sex trafficking, as contained in Count One of the

24 indictment, the government must prove beyond a reasonable doubt

25 each of the following elements:

J7CTKID4                    Charge

First, that Mr. Kidd knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized or solicited Victim-1 (Kaira Brown);

Or that Mr. Kidd knowingly benefited, financially or be receiving anything of value, from participating in a venture that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized or solicited Victim-1 (Kaira Brown);

Second, that Mr. Kidd knew or recklessly disregarded the fact that Victim-1 (Kaira Brown) was under the age of 18 and would be caused to engage in a commercial sex act;

And/or that Mr. Kidd knew or recklessly disregarded the fact that force, fraud or coercion or any combination of such means would cause Victim-1 (Kaira Brown) to engage in a commercial sex act;

Third, Mr. Kidd's acts were in or affecting interstate or foreign commerce.

Now let us go separately and consider the three elements.

We will turn to first element that the government must establish beyond a reasonable doubt, that Mr. Kidd, (1) knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized or solicited Victim-1 (Kaira Brown) or, (2) knowingly benefited, financially or by receiving anything of value, from participating in a

J7CTKID4                    Charge

1    venture that recruited, enticed, harbored, transported,

2    provided, obtained, maintained, advertised, patronized, or

3    solicited a person.

4           Therefore, there are two different ways for the

5    government to satisfy the first element.  The first is by

6    proving that Mr. Kidd himself knowingly engaged in one of the

7    prohibited trafficking acts, that is, recruiting, enticing,

8    harboring, transporting, providing, obtaining, advertising,

9    maintaining, patronizing or soliciting a person.  The second

10   way is by proving that Mr. Kidd knowingly took part in a

11   venture that engaged in one of those trafficking activities and

12   benefited financially or by receiving a thing of value from the

13   venture.  The government does not have to prove that Mr. Kidd

14   violated the statute both ways.

15          With respect to your consideration of whether the

16   defendant himself knowingly recruited, enticed, harbored,

17   transported, provided, obtained, advertised, maintained,

18   patronized or solicited a person, I instruct you to use the

19   ordinary everyday definitions of these terms.  "Recruit" means

20   to seek to enroll.  "Entice" means to attract, induce, or lure

21   using hope or desire.  "Harbor" means to give or afford shelter

22   to, such as in a house or other place.  "Transport" means to

23   take or convey from one place to another.  "Provide" means to

24   furnish, supply or make available.  "Obtain" means to gain

25   possession of or acquire.  "Advertise" means to publicize.

1    "Patronize" means to visit or obtain services in exchange for

2    money.  "Solicit" means to seek out.  "Maintain" means to keep

3    in an existing state or support.  I instruct you, however, that

4    you may not consider conduct that occurred before May 29, 2015,

5    when determining whether the defendant advertised, solicited or

6    patronized another person.

7           The second or alternative way to prove the first

8    element of sex trafficking is for the government to show that

9    there was a venture that engaged in recruiting, enticing,

10   harboring, transporting, providing, obtaining, advertising,

11   maintaining, patronizing or soliciting a person, that Mr. Kidd

12   knowingly participated in some way in that venture and that

13   Mr. Kidd knowingly benefited financially or by receiving

14   anything of value from that venture.  Again, you may not

15   consider conduct that occurred before May 29, 2015, when

16   determining whether Mr. Kidd benefited from the venture that

17   engaged in advertising, soliciting or patronizing another

18   person.

19          In considering whether Mr. Kidd participated in such a

20   venture, I instruct you that a venture is defined as "any group

21   of two or more individuals associated in fact, whether or not

22   as a legal entity."  You may find that the defendant

23   participated in a venture prohibited by the sex trafficking law

24   if the defendant took part in that venture in any way.

25   Mr. Kidd may be, but need not be, one of the people who formed

J7CTKID4                    Charge

1      that venture.  Likewise, Mr. Kidd need not be an organizer or

2      main participant in the venture and need not have participated

3      in the length of the venture.  It is enough if Mr. Kidd took

4      some part in the venture for a period of time while the venture

5      was still ongoing, even if the part he played was minor, and

6      even if it was not related to the actual recruiting, enticing,

7      harboring, transporting, providing, obtaining, advertising,

8      maintaining, patronizing or soliciting of a person for

9      commercial sex.

10            To benefit, financially or by receiving anything of

11     value, from the venture, Mr. Kidd must receive some form of

12     profit or benefit, value or advantage, no matter how minor or

13     intangible from the venture.

14            Of course, if you find the defendant himself

15     recruited, enticed, harbored, transported, provided, obtained,

16     maintained, advertised, patronized or solicited a person, you

17     need not consider whether or not that defendant benefited from

18     doing so.

19            The question of whether a person acted with knowledge

20     is a question of fact for you to determine, like any other fact

21     question.  Direct proof of knowledge is not always available,

22     and such specific proof is not required.  In everyday affairs,

23     we commonly draw inferences and make judgments about the state

24     of mind of other people from their actions, and you can rely on

25     circumstantial evidence to determine that person's state of

mind.  The ultimate fact of whether a person knew something at

a particular time, although subjective, may be established by

circumstantial evidence based on that person's outward

manifestations, words, conduct, acts, and all the surrounding

circumstances disclosed by the evidence and the rational or

logical inferences that may be drawn from them.

         An act is done knowingly if it is done deliberately

and purposefully; that is, the actions of Mr. Kidd must have

been his conscious objective rather than the product of a

mistake or accident or mere negligence or some other innocent

reason.  Knowledge is a matter of inference from proven facts.

Science has not yet devised a manner of looking into a person's

mind and knowing what that person is thinking.  It is for you

to determine whether the government has established beyond a

reasonable doubt that the government has established beyond a

reasonable doubt that the requisite knowledge and intent on the

part of Mr. Kidd existed.

         The process of drawing inferences from circumstantial

evidence is no different from what people normally mean when

they say, "use your common sense."  Using your common sense

means that when you come to decide whether the defendant

possessed or lacked a particular intent, you do not have to

limit yourself to just what he said, but you also look at what

he did and what others did in relation to him, and, in general,

everything that occurred.

J7CTKID4                        Charge

1           In deciding whether or not the first element of the

2     sex trafficking statute has been satisfied, you need not all

3     agree that the government has proven the element the first way

4     or the second way.  Stated differently, you need not all agree

5     that the defendant actually recruited, enticed, harbored,

6     transported, provided, obtained, advertised, maintained,

7     patronized or solicited a person, or also all agree that the

8     defendant participated in a venture that did one of those

9     things and benefited thereby.  You need only agree that the

10    government has proven beyond a reasonable doubt that the

11    defendant did one or the other of those alternatives that I

12    have described to you.

13          We will now turn to the second element.

14          The second element of sex trafficking requires the

15    government to prove beyond a reasonable doubt that, (1)

16    Mr. Kidd knew, or recklessly disregarded that Victim-1 (Kaira

17    Brown) was under the age of 18 and would be caused to engage in

18    a commercial sex act or, (2) Mr. Kidd knew, or recklessly

19    disregarded, that force, fraud or coercion, or any combination

20    of such means, would be used to cause Victim-1 (Kaira Brown) to

21    engage in a commercial sex act.

22          With respect to Count One, the indictment alleges that

23    Mr. Kidd knew or recklessly disregarded one or both of these

24    facts, and you should consider and determine whether Mr. Kidd

25    knew or recklessly disregarded both of these facts.  Keep in

J7CTKID4                          Charge

1    mind, however, that you need not find that Mr. Kidd knew or

2    recklessly disregarded both of these facts, it is sufficient to

3    find that Mr. Kidd knew or recklessly disregarded either one of

4    these facts.

5           Although the finding that Mr. Kidd knew or recklessly

6    disregarded one of these facts is sufficient to satisfy this

7    element, I instruct you, the jury, that you must unanimously

8    agree on whether Mr. Kidd knew or recklessly disregarded one or

9    both of these facts.  If the government fails to prove beyond a

10   reasonable doubt that Mr. Kidd knew or recklessly disregarded

11   one of these facts, or if you cannot unanimously agree as to

12   which of the facts the indictment alleges the defendant knew or

13   recklessly disregarded, then you must find Mr. Kidd not guilty

14   as to Count One.

15          In determining whether Mr. Kidd knew or recklessly

16   disregarded that the victim was under the age of 18, please

17   apply the definition of "knowingly" previously provided to you.

18          The phrase "recklessly disregarded" means deliberate

19   indifference to facts that, if considered and weighed in a of

20   reasonable manner, indicate the highest probability that the

21   victim was under the age of 18.  In order to prove beyond a

22   reasonable doubt that Mr. Kidd recklessly disregarded the fact

23   that Victim-1 (Kaira Brown) was under 18 years of age, the

24   government must prove that Mr. Kidd deliberately closed his

25   eyes to what would otherwise are been obvious to him.  A

J7CTKID4                    Charge

1  person's reckless disregard of a particular fact may be shown

2  from a deliberate or intentional ignorance or deliberate or

3  intentional blindness to the existence of a fact.

4        I instruct you, however, that if you determine

5  Mr. Kidd "advertised" Victim-1 (Kaira Brown), you must find

6  that Mr. Kidd acted knowingly, or, in other words, that he knew

7  that Victim-1, Kaira Brown, advertised was under the age of 18.

8  For this means of violating the sex trafficking statute, and

9  for this means alone, reckless disregard is insufficient.

10       The government need not prove that Mr. Kidd knew or

11  recklessly disregarded that Victim-1 (Kaira Brown) was under

12  the age of 18 if the government proves beyond a reasonable

13  doubt that Mr. Kidd had a reasonable opportunity to observe

14  Victim-1 (Kaira Brown).

15       So the government must prove this element by proof

16  regarding age beyond a reasonable doubt of one of the

17  following:  First, that Mr. Kidd actually knew that Victim-1

18  (Kaira Brown) was under the age of 18; second, that Mr. Kidd

19  was in reckless disregard of the fact that Victim-1 (Kaira

20  Brown) was under the age of 18; or third, that Victim-1 (Kaira

21  Brown) was under 18 at the time of the alleged conduct, and

22  Mr. Kidd had a reasonable opportunity to observe Victim-1

23  (Kaira Brown).

24       In determining whether Mr. Kidd knew or recklessly

25  disregarded that force, fraud, or coercion or any combination

J7CTKID4                    Charge

1    of such means, were used with respect to Victim-1 (Kaira Brown)

2    I instruct you to apply the following definitions:

3            I instruct to you apply the definitions of "knowingly"

4    and "recklessly disregarded" that I have previously provided to

5    you.

6            The term "force" means any form of power, violence, or

7    physical pressure directed against another person.

8            The term "fraud" means that the defendant knowingly

9    made a misstatement or omission of a material fact to entice

10   the victim.  A material fact is one that would reasonably be

11   expected to be of concern to a reasonable person in relying

12   upon the representation or statement in making a decision.

13           The term "coercion" has three meanings.  It means that

14   any threat of serious harm to or physical restraint against any

15   person; or any scheme, plan, or pattern intended to cause a

16   person to believe that failure to perform an act would result

17   in serious harm or to physical restraint against any person; or

18   any abuse or threatened abuse of law or the legal process.

19           The term "serious harm" includes threats of any harm,

20   whether physical or nonphysical, including psychological,

21   financial, or reputational harm, that is sufficiently serious

22   in kind or degree under all of the surrounding circumstances to

23   compel a reasonable person of the same background and in the

24   same situation as the trafficked person to perform or continue

25   to perform commercial sexual activity in order to avoid

J7CTKID4                              Charge

1    incurring that harm.

2             "Abuse or threatened abuse of law or legal process"

3    means the use or threatened use of a law or legal process,

4    whether administrative, civil or criminal, in a manner or for

5    any purpose for which the law was not designed, in order to

6    exert pressure on another person to cause that person to take

7    some action or refrain from taking some action.  "Abuse or

8    threatened abuse of law or legal process" includes threats that

9    are sufficient, under all the surrounding circumstances, to

10   compel or coerce a person to perform a commercial sex act that

11   she would not have otherwise been willing to perform.

12            If you find that any of these prohibited means was

13   used, or any combination of these means, you must then

14   determine whether such use was sufficient to cause Victim-1

15   (Kaira Brown) to engage in commercial sex against her will.  In

16   making that determination, you may consider the cumulative

17   effect of the conduct of the defendant on Victim-1 (Kaira

18   Brown) as well as Victim-1's (Kaira Brown's) particular station

19   in life, physical and mental condition, age, education,

20   training, experience, and intelligence.

21            To prove sex trafficking, the government does not need

22   to link any specific commercial sex act to any particular

23   threat made, or any particular action taken, or any particular

24   act of fraud or deception on the part of the defendant.  If the

25   defendant's use of threats, force, fraud or coercion or any

J7CTKID4                        Charge

1    combination thereof was sufficient to give rise to reasonable

2    feelings of fear that would compel a reasonable person in

3    Victim-1's (Kaira Brown's) situation to comply with the

4    defendant's demands in light of the totality of the defendant's

5    conduct, the surrounding circumstances, and any vulnerabilities

6    of Victim-1 (Kaira Brown), then you likewise may find that the

7    second element has been met.

8           You may also consider whether Mr. Kidd's conduct gave

9    rise to reasonable feelings of fear that overcame the will of

10   Victim-1 (Kaira Brown).  Such reasonable feelings of fear may

11   arise not only from the defendant's threats and other acts

12   directed at Victim-1 (Kaira Brown) herself, but also from

13   conduct directed at others that Victim-1 (Kaira Brown) is aware

14   of.

15          The government also need not prove physical restraint,

16   such as the use of chains, barbed wire, locked doors, in order

17   to establish the offense of sex trafficking.  The fact that

18   Victim-1 (Kaira Brown) may have had an opportunity to escape is

19   irrelevant if the defendant placed her in fear of leaving or

20   created circumstance such that she did not reasonably believe

21   she could leave.  A victim is under no affirmative duty to try

22   to escape.

23          Also, the fact that a person may have initially

24   acquiesced or agreed to perform a commercial sex act does not

25   preclude a finding that the person was later compelled to

J7CTKID4                    Charge

engage in prostitution through the use of force, fraud or

coercion, or a combination of such means.  For example, if a

victim willingly engaged in an act of prostitution then later

wanted to withdraw but was compelled to continue to perform

acts of prostitution through force, fraud or coercion, then you

may find that her later of acts of prostitution were compelled

by force, fraud or coercion.

Finally, whether a person is paid or able to keep some

of her earnings is not determinative of the question of whether

that person has been compelled to engage in sex trafficking.

In other words, if a person is compelled to engage in a

commercial sex act through force, fraud or coercion, such

service is involuntary even if she is paid or compensated for

the work.

A "commercial sex act" is any sex act on account of

which anything of value is given to or received by any person.

It is not required that Victim-1 (Kaira Brown)

actually performed a commercial sex act as long as the

government has proved that the defendant recruited, enticed,

harbored, transported, provided, obtained, maintained,

advertised, patronized or solicited the victim for the purpose

of engaging in commercial sex acts.

It is also not relevant whether or not a minor victim

was a willing participant in performing commercial sex acts.

Consent by a minor is not a defense to the charge in Count One

J7CTKID4                        Charge

of the indictment.

          To satisfy the third and final element of the crime of
sex trafficking, the government must prove beyond a reasonable
doubt that Mr. Kidd's sex trafficking activities were in
interstate commerce or affected interstate commerce.  The
government need not prove both that the activities were in
interstate commerce and affected interstate commerce.

          The term "interstate commerce" means the movement of
property from one state to another state.  The term "state"
includes a state of the United States and the District of
Columbia.  Interstate commerce simply means the movement of
goods, services, money, and individuals between any two or more
states or between one state and the District of Columbia.

          To satisfy this element, the government must prove
that Mr. Kidd's conduct affected interstate commerce in any
way, no matter how minimal.  In determining whether Mr. Kidd's
conduct affected interstate commerce, you may consider whether
Mr. Kidd used means, instrumentalities or facilities of
interstate commerce.  A facility of interstate commerce is some
thing, tool or device that is involved in interstate commerce.
Cell phones and the internet are both means, facilities, or
instrumentalities of interstate commerce.

          Interstate commerce includes the transportation of an
individual across state lines by car and such transportation is
in interstate commerce.

J7CTKID4                          Charge

1      It is not necessary for the government to prove that

2  Mr. Kidd knew his conduct was in or affecting interstate

3  commerce.

4      If you find beyond a reasonable doubt that Mr. Kidd's

5  recruitment, enticement, harboring, transportation, providing,

6  obtaining, advertising, maintaining, patronizing, soliciting of

7  a person for the purpose of engaging in commercial sex acts was

8  economic in nature and involved the crossing of state lines, or

9  was economic in nature and otherwise affected the flow of money

10  to any degree, however minimal, you may find that the

11  interstate commerce requirement of the offense of sex

12  trafficking of a minor has been satisfied.

13      I further instruct you that to find this element has

14  been proved beyond a reasonable doubt, it is not necessary for

15  you to find that any interstate travel occurred.  Proof of

16  actual travel is not required.

17      To find Mr. Kidd guilty of Count Two, you must find

18  that the government has proven each of the following elements

19  beyond a reasonable doubt:

20      First, that Mr. Kidd knowingly recruited, enticed

21  harbored, transported, provided, obtained, advertised,

22  maintained, patronized or solicited Victim-2 (Jessica Bonilla);

23      Or that Mr. Kidd knowingly benefited, financially or

24  by receiving anything of value, from participating in a venture

25  that recruited, enticed, harbored, transported, provided,

1    obtained, advertised, maintained, patronized or solicited

2    Victim-2 (Jessica Bonilla);

3              Second, that Mr. Kidd knew or recklessly disregarded

4    the fact that Victim-2 (Jessica Bonilla) was under the age of

5    18 and would be caused to engage in a commercial sex act;

6              Third, Mr. Kidd's acts were in or affecting interstate

7    or foreign commerce.

8              The instructions that I previously gave to you for

9    each of those elements for Count One also apply to Count Two.

10             To find Mr. Kidd guilty of Count Three, you must find

11   that the government has proved each of the following elements

12   beyond a reasonable doubt:

13             First, that Mr. Kidd knowingly recruited, endorsed,

14   harbored, transported, provided, obtained, advertised,

15   maintained, patronized or solicited Victim-3 (Dana McLeod);

16             Or that Mr. Kidd knowingly benefited, financially or

17   by receiving anything of value, from participating in a venture

18   that recruited, enticed, harbored, transported, provided,

19   obtained, advertised, maintained, patronized or solicited

20   Victim-3 (Dana McLeod);

21             Second, that Mr. Kidd knew or recklessly disregarded

22   the fact that force, fraud, or coercion, or any combination of

23   such means, and Victim-3 (Dana McLeod) would be caused to

24   engage in a commercial sex act;

25             And third, Mr. Kidd's acts were in or affecting

J7CTKID4                    Charge

1    interstate or foreign commerce.

2            The instructions that I previously gave to you for

3    each of these elements for Count One and Two also apply to

4    Count Three.

5            To find Mr. Kidd guilty of Count Four, you must find

6    that the government has proven each of the following elements

7    beyond a reasonable doubt:

8            First, that Mr. Kidd knowingly recruited, enticed,

9    harbored, transported, provided, obtained, advertised,

10   maintained, patronized or solicited Victim-4 (Ariele Palopolo);

11           Or Mr. Kidd knowingly benefited, financially or by

12   receiving anything of value, from participating in a venture

13   that recruited, enticed, harbored, transported, provided,

14   obtained, advertised, maintained, patronized or solicited

15   Victim-4 (Ariele Palopolo);

16           Second, that Mr. Kidd knew or recklessly disregarded

17   the fact that force, fraud, or coercion, or any combination of

18   such means, and Victim-4 (Ariele Palopolo) would be caused to

19   engage in a commercial sex act;

20           Third, Mr. Kidd's acts were in or affecting interstate

21   or foreign commerce.

22           The instructions I gave you with regards to each of

23   these elements for Count One and Count Two and Three also apply

24   to Count Four.

25           Turning lastly to Count Five of the indictment, it

1   charges Mr. Kidd with the crime of employing, using, persuading

2   inducing, enticing, or coercing a minor, Victim-1 (Kaira

3   Brown), to engage in sexually explicit conduct for the purpose

4   of producing child pornography.

5          The indictment charges Mr. Kidd with violating Section

6   2251(a) of Title 18, United States Code.  That section provides

7   in relevant part, that:

8          "Any person who employs, uses, persuades, induces,

9   entices, or coerces any minor to engage in any sexually

10   explicit conduct for the purpose of producing any visual

11   depiction of such conduct or for the purpose of transmitting a

12   live visual depiction of such conduct, shall be guilty of a

13   crime if such person knows or has reason to know that such

14   visual depiction will be transported or transmitted in or

15   affecting interstate or foreign commerce or mailed, if that

16   that visual depiction was produced or transmitted using

17   materials that have been mailed, shipped, or transported in or

18   affecting interstate or foreign commerce by any means,

19   including by computer, or if such visual depiction has actually

20   been transported or transmitted in or affecting interstate or

21   foreign commerce or mailed."

22          In order to prove Mr. Kidd guilty of using a minor to

23   produce child pornography, the government must prove each of

24   the following elements beyond a reasonable doubt:

25          First, that Victim-1 (Kaira Brown) was under the age

1   of 18;

2          Second, that Mr. Kidd used, employed, persuaded,

3   induced, enticed or coerced Victim-1 (Kaira Brown) to take part

4   in sexually explicit conduct for the purpose of producing or

5   transmitting a visual depiction of that conduct; and

6          Third, that the visual depiction was produced or

7   transmitted using materials that had been mailed or transported

8   in or affecting interstate or foreign commerce.

9          The Court will now address each element separately.

10         The first element that the government must prove

11  beyond a reasonable doubt is that Victim-1 (Kaira Brown) was

12  less than 18 years old at the time of the acts alleged in the

13  indictment.

14         The government does not have to prove that Mr. Kidd

15  knew that Victim-1 (Kaira Brown) was less than 18 years old.

16         The second element that the government must prove

17  beyond a reasonable doubt is that the defendant used, employed,

18  persuaded, induced, enticed, coerced Victim-1 (Kaira Brown) to

19  take part in sexually explicit conduct for the purpose of

20  producing or transmitting a visual depiction of that conduct.

21         A "visual depiction" includes any photograph, film,

22  video, or picture, including undeveloped film and videotape,

23  and data stored on computer disk or by electronic means that is

24  capable of conversion into a visual image.

25         "Sexually explicit conduct" means actual or simulated

J7CTKID4                         Charge

1    sexual intercourse, including genital-genital, oral-genital,

2    anal-genital, or oral-anal, whether between persons of the same

3    or opposite sex; bestiality; masturbation; sadistic or

4    masochistic abuse; or lascivious exhibition of the genitals or

5    pubic area of any person.

6            The term "lascivious exhibition" means a depiction

7    that displays or brings to view to attract notice to the

8    genitals or pubic area of children in order to excite

9    lustfulness or sexual stimulation in the viewer.  Not every

10   exposure of the genitals or pubic area constitutes a lascivious

11   exhibition.  In deciding whether the government has proved that

12   a particular visual depiction constitutes a lascivious

13   exhibition, you should consider the following questions:

14           Whether the focal point of visual depiction is on the

15   child's genitals or pubic area or whether there is some other

16   focal area.

17           Whether the setting of the visual depiction makes it

18   appear to be sexually suggestive, for example, in a place or

19   pose generally associated with sexual activity.

20           Whether the child is displayed in an unnatural pose or

21   in inappropriate attire, considering the age of the child.

22           Whether the child is fully or partially clothed or

23   nude, although nudity is not in and of itself lascivious.

24           Whether the visual depiction suggests sexual coyness

25   or a willingness to engage in sexual activity.

And whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

It is not required that a particular visual depiction involve all of these factors to be a lascivious exhibition. The importance that you give to any one factor is up to you to decide.

The third element that the government must prove beyond a reasonable doubt is that the visual depiction was produced using materials that had been mailed or transported or transmitted in or affecting interstate commerce.

Simply stated, the phrase "transported in interstate or foreign commerce" means that the materials used to produce the visual depiction had previously moved from one state to another or between the United States and another country. Here, the government alleges that a device used to produce or transmit the photographs and video in question were manufactured in another country. I instruct you that if you find that the device on which the visual depiction was produced or transmitted was manufactured outside of New York State, that is sufficient to satisfy this element. The government does not have to prove that the defendant personally transported the phone across a state line, or that the defendant knew that the phone had previously crossed a state line.

As we have proceeded through the indictment, you have noticed that it refers to various dates. I instruct you that

it does not matter if a specific event is alleged to have

occurred on or about a certain date or month but the testimony

indicates what in fact it was on a different date or month.

The law requires only a substantial similarity between the

dates and months alleged in the indictment and the dates and

months established by the evidence.

       Now in addition to dealing with the elements of Counts

One through Five, you must also consider the issue of venue as

to Counts One through Five, namely, whether any act in

furtherance of the unlawful activity occurred within the

Southern District of New York.  The Southern District of New

York encompasses the following counties:  New York county, that

is Manhattan, the Bronx, Westchester, Rockland, Putnam,

Dutchess, Orange and Sullivan Counties.  Anything that occurs

in any of those places occurs in the Southern District of New

York.

       I should note that on this issue and this issue alone,

the government need not prove venue beyond a reasonable doubt,

but only by a mere preponderance of the evidence.  A

"preponderance of the evidence" means that the government must

prove that it is more likely than not that any fact in

furtherance of the offenses occurred in the Southern District

of New York.  Thus, the government has satisfied its venue

obligations if you conclude that it is more likely than not

that any act in furtherance of a crimes with which Mr. Kidd is

charged occurred within this district.

If you find that the government has failed to prove this venue requirement, then you must acquit Mr. Kidd.

I have now outlined for you the rules of law applicable to the case and the processes by which you weigh the evidence and determine the facts. The most important part of the case, members of the jury, is the part that you are now as jurors about to play as you deliberate on the issues of fact. I know that you will try the issues that have been presented to you according to the oath that you have taken as jurors. In that oath you promised that you would well and truly try the issues in this case and render a true and just verdict.

In a few minutes you will retire to the jury room for your deliberations. In this courtroom it is customary for Juror Number 1, the juror seated in the chair closest to the judge's bench, to be the foreperson. In this case, that is Ms. Susan Herzog. So that your deliberations may proceed in an orderly fashion, you must have a foreperson, but, of course, her voice is entitled to no greater weight than any other juror. The foreperson has no greater voice or authority than any other juror. The foreperson will send out notes when the jury has reached a verdict, and she will notify the court security officer that the jury has reached a verdict.

The government, to prevail, must prove all of the essential elements by proof beyond a reasonable doubt, as

J7CTKID4                    Charge

 1    already explained in these instructions.  If it succeeds, your

 2    verdict should be guilty; if it fails, it should be not guilty

 3    in.  To report a verdict, you must be unanimous.

 4              Your function is to weigh the evidence in the case and

 5    determine whether or not Mr. Kidd is guilty solely on the basis

 6    of such evidence.

 7              Each juror is entitled to his or her opinion; each

 8    should, however, exchange views with his or her follow jurors.

 9    That is the very purpose of jury deliberations:  To discuss and

10    consider the evidence, to listen to arguments of fellow jurors,

11    to present your individual views, to consult with one another,

12    and to reach an agreement based solely and wholly on the

13    evidence, if you can do so without violence to your individual

14    judgment.

15              Each of you must decide the case for yourself, after

16    consideration with your fellow jurors, of the evidence in the

17    case.  But, in the course of your deliberations, you should not

18    hesitate to reexamine your views and change an opinion if you

19    are convinced that it is erroneous.

20              If, after careful consideration of all of the evidence

21    and the arguments of your fellow jurors you entertain a

22    conscientious view that differs from that of others, you are

23    not to yield your conviction simply because you are

24    outnumbered.

25              Your final vote must reflect your conscientious

J7CTKID4                        Charge

1    conviction as to how the issues should be decided.  Your

2    verdict, whether guilty or not guilty, must be unanimous.

3            When you are in the jury room, listen to each other

4    and discuss the evidence and issues in the case among

5    yourselves.  It is the duty of each of you as jurors to consult

6    with one another and to deliberate with a view to reaching an

7    agreement on a verdict if you could do so without violating

8    your individual judgment and your conscience.  Every juror

9    should be heard.  No one juror should hold center stage in the

10   jury room, and no one juror should control or monopolize the

11   deliberations.  To reach a verdict, all of you must agree, but

12   you must not surrender your honest convictions for the mere

13   purpose of returning a verdict or solely because of the opinion

14   of other jurors.

15           I will give you a verdict form to be filled out by the

16   jury.  No inference is to be drawn from the way the verdict

17   form is worded as to what the answer should be.  The questions

18   are not to be taken as any indication that I have an opinion as

19   to how they should be answered.

20           (Continued on next page)

21

22

23

24

25

J7C3KID5                    Charge

THE COURT:  (Continuing) Before the jury attempts to answer any question, you are to read the entire verdict form and make sure that every person understands each question. Before you answer the questions, you should deliberate in the jury room and discuss the evidence that relates to the questions you must answer.  When you have considered the questions thoroughly, and the evidence that relates to those questions, then record your answers on the verdict form I will give you.  Remember, all answers must be agreed upon by all of you.

Now, ladies and gentlemen, you are about to go into the jury room and begin your deliberations.  All of the exhibits will be given to you at the start of the deliberations.  If you want any testimony read back to you, you may also request that.  Please remember that while we do have a daily written transcript available, if you do for testimony to be read back to you, the reporter must search through his or her notes, and the lawyers must agree on that portion or those portions of the testimony that may be called for, and if they disagree, I must then resolve those disagreements.  That can be time consuming, so please try to be as specific as you possibly can be in requesting portions of the testimony, if you do so.

Your requests for testimony -- in fact, any communication with the Court -- should be made in to me in writing, signed by the foreperson, and given to one of the

J7C3KID5                          Charge

1     court security officers.  In any event, do not tell me or

2     anyone else how the jury stands on any issue until after a

3     verdict is reached.

4             When you make a request and the foreperson signs it,

5     please indicate the date and time on the note.  I will provide

6     you with form communication sheets on which the foreperson

7     should make all communications with the Court.

8             I will be sending a copy of the indictment into the

9     jury room for you to have during your deliberations.  You may

10    use it to read the crimes with which Mr. Kidd is charged with

11    committing.  Again, I remind you that the indictment is merely

12    an accusation, and is not to be used by you as proof of any of

13    the conduct charged.

14            Finally, and I say this not because I think it is

15    necessary, but because it is the custom in this courtroom.  You

16    should treat each other with courtesy and respect during your

17    deliberations.

18            After you have reached a verdict, your foreperson will

19    fill in the verdict form that will be given to you, sign and

20    date it, and advise the court security officer at the door that

21    you are ready to return to the courtroom.

22            If you are divided, do not report how the vote stands,

23    and if you have reached a verdict, do not report what it is

24    until you are asked in open court.

25            I will stress that you should be in agreement with the

J7C3KID5                    Charge

1    verdict that is announced in court.  Once your verdict is

2    announced by your foreperson in open court and officially

3    recorded, it cannot ordinarily be revoked.

4            Remember that your verdict must be rendered without

5    favor, fear, and without sympathy or prejudice.

6            I thank you for your attention and attentiveness.

7    Counsel, please approach.

8            (At the sidebar)

9            THE COURT:  Are there any additional objections to the

10   instructions as read or any corrections that you may wish to

11   call to the Court's attention?

12           MS. TARLOW:  The only comment that the government had,

13   your Honor, is that your Honor read exactly what was written in

14   the jury instruction, but we would request one substitution of

15   a word, which is on page 47, "transported the device across

16   state lines," as opposed to "the phone" or that "the defendant

17   knew that the device had previously crossed state lines."

18           THE COURT:  All right.

19           MR. MARGULIS-OHNUMA:  I have no particular view on

20   that.

21           THE COURT:  All right.  Do you have any additional

22   objections?

23           MR. MARGULIS-OHNUMA:  No.

24           THE COURT:  To the instruction as read?

25           MR. MARGULIS-OHNUMA:  I do not.

J7C3KID5                        Charge

1          THE COURT:  The Court notes that Mr. Margulis had

2    previously made other objections, they're on the record, and

3    that he has preserved them.

4          MR. MARGULIS-OHNUMA:  Thank you, your Honor.

5          THE COURT:  All right.

6          (In open court)

7          THE COURT:  I'm going to make one word correction in

8    one of the instructions I gave, relating to the phrase

9    "transported in interstate or foreign commerce," which I gave

10   in connection with Count Five.

11          I instructed that if you find that a device that is in

12   question on which the visual depiction was produced or

13   transported was manufactured outside of New York State, that is

14   sufficient to satisfy this element.  I indicated that the

15   government does not have to prove that the defendant personally

16   transported.

17          When I gave you the instructions, I used the word

18   "phone."  The proper word is "device" across the state line or

19   that the defendant knew that the device had been previously

20   crossed, had previously crossed a state line.

21          The clerk will swear in the court security officer.

22          (Court security officer sworn)

23          THE COURT:  All right.  Before I ask the court

24   security officer to escort the jury into the jury room, let me

25   suggest one thing.  You may wish, after you had sufficient

J7C3KID5                        Charge

1    opportunity to have your lunch and get organized, consider what

2    your schedule of deliberations would be, at least initially

3    today, so that we make sure that all of the parties and counsel

4    are present when you're ready to adjourn, if you are able to

5    determine what time you may be adjourning.  I recognize that

6    depends on a whole lot of factors, but at some point during

7    your deliberations, if you conclude that you are going to be

8    adjourning for the day, say at 5 p.m., it would be useful for

9    you to send a note to that effect so we can then know when to

10   call you back into the courtroom.

11              Another item of business, you may recall that I told

12   you at the time that you were impaneled that two of the jurors

13   were designated as alternates.  In this case, they were

14   Mr. Santos and Mr. Hoberman.  You are excused at this time.

15   You may pick up your belongings and take them with you.  Let me

16   thank you for your participation in the process.  I recognize

17   that it might be somewhat disappointing.  But, nonetheless,

18   your having been part of this process is of great value to the

19   process and the system of justice, and the Court appreciates

20   it.

21              (Alternate jurors excused)

22              THE COURT:  You may escort the jury into the jury

23   room.

24              (Jury begins deliberations.  Time noted 1:10 p.m.)

25              THE COURT:  Thank you.  Would counsel please approach

J7C3KID5                          Charge

1    into the robing room.  Counsel only.

2                (Discussion off the record in the robing room)

3                (Recess pending verdict)

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J7CTKID6

1     THE COURT:  The Court received a note from the jury

2     posing a question.  The Court will mark this note as Court

3     Exhibit Number 1 dated July 12 at 1:50 p.m.

4     The note reads:  Venue question, "What is the

5     definition of any 'act in furtherance,' and by whom?  Is it

6     sufficient if the 'victim' communicated from the Southern

7     District?"

8     Have the parties had an opportunity to review the note

9     and have any comments on an appropriate response?

10     MS. BRACEWELL:  Yes, your Honor, we had an opportunity

11     to review the note and found a couple of cases, Second Circuit

12     cases on point.  We conferred very briefly with defense counsel

13     about what an appropriate instruction would look like, drawing

14     from this language in *U.S. v. Svoboda*.  We're happy to confer a

15     few more minutes and see if we can arrive at a mutually

16     agreeable response, or I could hand up the case.

17     THE COURT:  Why don't you do both, hand up a version.

18     (Pause)

19     MR. MARGULIS-OHNUMA:  I think we have something.

20     MS. BRACEWELL:  Do you want us to read it into the

21     record or hand it up?

22     THE COURT:  Hand it up first.

23     MS. BRACEWELL:  The parties would propose the

24     following response:

25     Venue is proper in the Southern District of New York

J7CTKID6

where, (1) the defendant knowingly or intentionally causes an

act in furtherance of the charged offense, or (2) it is

foreseeable that such an act would occur in the Southern

District of New York.

       A victim's communication from the Southern District of

New York would be sufficient if, as stated above, (1) the

defendant knowingly or intentionally caused such communication,

or, (2) it is foreseeable to the defendant that such

communication would occur, provided that such communication is

in furtherance of the charged offense.

       THE COURT:  All right.  I will just add a couple of

words in the second paragraph, a victim's communication from

the Southern District of New York would be sufficient, insert

"to satisfy the venue requirement," if, as stated above, et

cetera.

       Bring in the jury, please.

       (Jury present)

       THE COURT:  The Court has received a note sent today

at 1:50 through the foreperson.  The question is relating to

the venue instruction, and your question is what is the

definition of an act in furtherance and by whom?  Is it

sufficient if the victim communicated from the Southern

District?

       In response, I instruct you that venue is proper in

the Southern District of New York where, (1) the defendant

J7CTKID6

1    knowingly or intentionally causes an act in furtherance of the

2    charged offense, or (2) it is foreseeable that such an act

3    would occur.

4            A victim's communication from the Southern District of

5    New York would be sufficient to satisfy the venue requirement

6    if, as stated above, (1) the defendant knowingly or

7    intentionally caused such communication, or (2) it is

8    foreseeable to the defendant that such communication would

9    occur, provided that such communication is in furtherance of

10   the charged offense.

11           We hope that that clarification is useful.  You may

12   now return to your deliberations.

13           Let me ask the foreperson if there are any additional

14   notes, please use the note form.

15           THE FOREPERSON:  Could you transcribe that for us?

16           THE COURT:  You want the text of what I just read.

17           (Jury not present)

18           MR. MARGULIS-OHNUMA:  The parties have no objection if

19   the court reporter could send it back.  We offer it.

20           (Recess taken)

21           THE COURT:  The Court received two notes from the jury

22   through the foreperson, the first dated July 12 the 4:05 p.m.,

23   and we marked Court Exhibit Number 3, and it says:  We need two

24   copies of Kaira's testimony.

25           The second, which we marked Court Exhibit Number 4,

J7CTKID6

reads:  Count Number One, page 34 -- I presume that means 34 of
the instructions -- with respect to the requirement about
"acting knowingly," is it limited solely to a finding of
"advertising," or would it apply to any finding under the first
alternative of the first element of Count One, e.g., recruited,
enticed, et cetera?

     Again this is dated July 12, there's no time on it.

     I should have added that we also have received Court
Exhibit Number 2 as marked from the jury indicating that
they're not going to finish today and they plan to break at
5:00 p.m.

     So let us briefly see whether the parties have had an
opportunity to review the testimony of Kaira and develop a
version that may be suitable to send to the jury probably on
Monday morning at this point.

     MS. TARLOW:  Yes, your Honor, we have.  The parties
have conferred and we have agreed upon redactions for
Ms. Brown's testimony.

     THE COURT:  All right.  Thank you.  And have you
examined the Exhibit Number 4 and have an understanding of what
the jury seeks?

     MS. TARLOW:  Your Honor, we have begun to examine it
and are discussing it amongst ourselves but have not yet
reached agreement on what language should be given to the jury.

     THE COURT:  All right.  Thank you.

J7CTKID6

1          I will call in the jury and discharge them for the

2    weekend and direct that they return on Monday at a time

3    designated by them.  When they do return on Monday, I will

4    direct them to report to the jury room and not come into the

5    courtroom, and we will then call them in and I will inform them

6    that we will have for them the testimony of Kaira, and that

7    we'll have an answer concerning the second request.

8          Any other questions?

9          Thank you.  I ask the security officer to send in the

10   jury.

11          (Jury present)

12          THE COURT:  Thank you.  I have received three notes

13   that you have sent out.  Court Exhibit Number 2 informed the

14   Court that you are not going to finish today and that you plan

15   to break by 5:00 p.m.

16          I have read the content of your second note, which I

17   will mark Court Exhibit 3 asking for the two copies of Kaira's

18   testimony.  We have gone through the transcript of that

19   testimony and we will have it ready for you on Monday morning

20   so that you will be able to resume your deliberations with that

21   on Monday morning.

22          I have also read to the parties your second request

23   marked now Court Exhibit Number 4 concerning the requirement

24   about acting knowingly.  We are developing a response for that,

25   and the best thing to do would be to have that for you, again,

J7CTKID6

1    early Monday morning.

2            Just a couple of housekeeping things.  When you come

3    back on Monday morning, first, have you determined a time when

4    you will be resuming?

5            JUROR:  It's up to us?

6            THE FOREPERSON:  What time would you like us?

7            THE COURT:  This is entirely up to you.

8            THE FOREPERSON:  9:30 sounds like a consensus.

9            THE COURT:  That's fine.  We will have a response on

10   that second request to you again when you return at 9:30.  When

11   you do come back on Monday, report directly to the jury room.

12   You need not come in to here.  I will call you in when we're

13   ready to provide the answers.

14           It's very important that you not have any

15   deliberations or discussion about the case until all of you are

16   present, for obvious reasons.

17           And lastly, as you go home for the weekend, having

18   begun your deliberations, this is not yet the time where you're

19   free to discuss anything about the case with anyone on the

20   outside or have any contact whatsoever concerning the case with

21   anyone.  And once again, if any of these things occur, you are

22   directed to inform me immediately and not discuss it with your

23   fellow jurors.

24           You're adjourned for the weekend.  We thank you for

25   your patience and indulgence up to this point, and we will see

J7CTKID6

1    you on Monday around 9:30.

2            (Jury not present)

3            THE COURT:  Thank you.  Do the parties having anything

4    else that you wish to discuss?

5            MS. TARLOW:  Not from the defendant, your Honor.

6            MR. MARGULIS-OHNUMA:  No, your Honor.

7            THE COURT:  Thank you.  Have a good weekend, and we'll

8    see you Monday morning.

9            MR. MARGULIS-OHNUMA:  9:30 for us, too?

10           THE COURT:  Since we still have to develop an answer

11   on that other question, perhaps we should meet around 9:15.

12           MR. MARGULIS-OHNUMA:  Yes, your Honor.

13           (Adjourned to July 15, 2019 at 9:15 a.m.)

14

15                        DEFENDANT EXHIBITS

16   Exhibit No.                              Received

17    M   . . . . . . . . . . . . . . . . . . 789

18

19

20

21

22

23

24

25