JABPKIDO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          18 CR 872 (VM)

5   LLOYD KIDD,

6                   Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           October 11, 2019
9                                          3:23 p.m.

10
    Before:
11
                        HON. VICTOR MARRERO,
12
                                           District Judge
13

14                         APPEARANCES

15
    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  JACOB GUTWILLIG
         Assistant United States Attorney
18
    FLORIAN MIEDEL
19       Attorney for Defendant

20

21

22

23

24

25

JABPKIDO

1            (In open court)

2            (Case called)

3            THE COURT:  Good afternoon.  Thank you.  Be seated.

4    This is a proceeding in the matter of the United States v.

5    Kidd.  It is docket number 18 CR 0872.

6            Counsel, please enter your appearances for the record.

7            MR. GUTWILLIG:  Good afternoon, your Honor.  Jacob

8    Gutwillig for the government.

9            MR. MIEDEL:  Good afternoon, your Honor.  Florian

10   Miedel for Mr. Kidd.

11           THE COURT:  Good afternoon.  The Court notes that the

12   defendant is present in the courtroom seated next to his

13   attorney.

14           The Court scheduled this proceeding following the jury

15   trial of the underlying matter in order to consider a request

16   by the defendant to submit a motion under rule 29 for a

17   directed verdict challenging the jury's conviction of the

18   defendant on one of the counts.

19           Mr. Miedel, are you ready to proceed?

20           MR. MIEDEL:  Yes, I am, your Honor.

21           THE COURT:  All right.  Let me ask how long a

22   presentation you anticipate?

23           MR. MIEDEL:  Your Honor, maybe 15 minutes?

24           THE COURT:  All right.

25           MR. MIEDEL:  If I may, I'll go to the podium.

JABPKIDO

```
 1            THE COURT:  Yes.

 2            MR. MIEDEL:  Your Honor, this is an oral argument in

 3   support of Mr. Kidd's rule 29 motion made at the end of the

 4   government's case and renewed again at the end of the entire

 5   trial.  The Court has asked, I think, for argument on the rule

 6   29 motion be made orally at this conference, as opposed to

 7   being briefed before the conference.  Therefore, I haven't

 8   briefed anything in advance; although, I think that this issue

 9   actually might benefit from briefing, but the Court can decide

10   that later.

11            I'm raising one issue, your Honor, for rule 29

12   purposes, which is that the evidence was legally insufficient,

13   as a matter of law, to allow the jury to conclude, as to Counts

14   One and Five, even by a preponderance of the evidence, that

15   venue for those counts existed in the Southern District of

16   New York.

17            I think we can all agree that the United States

18   Constitution and rule 18 of the Federal Rules of Criminal

19   Procedure require that in order to have venue, some part of the

20   crime of conviction must occur in the district, or it must have

21   occurred in this district, the Southern District.  Some part of

22   the crime of conviction, not that somebody in the case lived in

23   the Southern District or took the subway from the Southern

24   District or commuted from there but that part of the crime had

25   to take place there.
```

JABPKIDO

1          So I'd like to begin by discussing the conviction on

2     Count Five, which is the production of child pornography count,

3     the inducement of a minor to engage in explicit conduct.  The

4     indictment in this case makes clear that the images in question

5     were taken in February of 2017.  There was testimony at the

6     trial about images that may have been taken earlier, as early

7     as 2015, but this particular count only concerns the images

8     that were produced in February of 2017.

9          It is undisputed, your Honor, that the photos that

10    were the subject of Count Five were taken in Brooklyn.  So the

11    government's argument as to venue has to be that even though

12    the photos were taken in Brooklyn, Kaira Brown was induced or

13    enticed to participate in those photos while she was in

14    Manhattan.

15         Now, that argument, which I expect the government to

16    make, appears to be based on the Second Circuit's decision in

17    *United States v. Thompson*, from 2018.  That's 896 F.3d 155.

18    There, the court held that venue in the Eastern District, in

19    that case, was okay even though the picture at issue was taken

20    in the Southern District because the defendant had spent a lot

21    of time, quote, grooming the minor victim in the Eastern

22    District to eventually make it possible for her to participate

23    in taking the video that was the subject of the count in the

24    Southern District.

25         The grooming in Thompson, just briefly, was as

JABPKIDO

follows.  In Thompson, the defendant directed the minor victim

to engage in prostitution in Brooklyn for a period of years.

He advertised for her services in Brooklyn.  He had such

control over her that he even directed her Brooklyn-based

prostitution activities while he was in jail, and ultimately,

an image was found on his phone in The Bronx of -- that was

determined to be child pornography, and that video was made in

The Bronx.

So clearly, in the Thompson case, all of the criminal

conduct, related criminal conduct leading up to the creation of

the video, took place in the district where the trial ended up

taking place.  That was enough for the Second Circuit to

conclude that there was sufficient venue.

Now, Thompson, again, that's a case from 2018, relied

on two other circuit cases that had taken up this issue as

well, one was United States v. Engle, a Fourth Circuit case

from 2012, and that's at 676 F.3d 405.  In that case, venue was

challenged as being proper in Virginia because the defendant in

that case took a video of himself having sex with a minor in

Pennsylvania.

However, he repeatedly contacted the victim from

Virginia.  He sent her naked pictures of himself from Virginia

to get her to agree to have sex with him.  He engaged in

multiple sexually related conversations from Virginia to try to

convince her to have sex with him, and ultimately, the court

JABPKIDO

1    there decided that that was sufficient grooming from Virginia

2    to allow venue to be proper in Virginia.

3          The second case that the Second Circuit relied on in

4    Thompson was *United States v. Sullivan*, which is a Ninth

5    Circuit case from 2015, at 797 F.3d 623, and there venue was

6    challenged as being proper in the Northern District of

7    California.

8          In that case, the defendant met the minor girl in the

9    Northern District of California.  He spent weeks with her in

10   the Northern District.  He had sex multiple times with her in

11   the Northern District.  He took pictures of her in the Northern

12   District, but at some point, he traveled to the Eastern

13   District of California and took a video, which was the subject

14   of the count of conviction.  And not surprisingly, I think the

15   Ninth Circuit concluded that all of those criminal activities

16   that took place in the Northern District of California were

17   enough to generate venue in that district.

18         Now, the circumstances here are completely different

19   than in these cases that I've cited to you.  In this case,

20   there was no -- literally no criminal activity in the Southern

21   District of New York.  There was no sex with a minor.  There

22   was no prostitution.  There were no phone calls or texts of a

23   sexual nature.  There were no photos.  No videos.

24         The only thing on the record in this case was Kaira

25   Brown's testimony, in which she said that somewhere in 2015,

JABPKIDO

1    Lloyd Kidd contacted her by text in response to an

2    advertisement that had been put up on Backpage of her for

3    prostitution purposes.

4            He contacted her and, in the text, asked if she would

5    be willing to prostitute herself out of his house in exchange

6    for 50 percent share of the profits.  Incidentally, in that

7    text, he told her that she needed to be 18 years old in order

8    to do that.  There was that, and then on top of that, she

9    testified about some additional logistical calls that took

10   place over the next 18 to 24 months, where she would call him

11   from Manhattan and ask if she could come over or if the

12   apartment was available, or something like that.

13           Now, the government's theory has to be that Mr. Kidd

14   enticed Kaira Brown when she was in Manhattan in order to

15   participate in the child pornography that took place in 2017 in

16   Brooklyn.  But again, those pictures were taken 18 to 24 months

17   after the initial contact that she testified to in 2015.  And

18   during those 18 to 24 months, Kaira Brown testified that she

19   had sex with Mr. Kidd, she engaged in prostitution, she took

20   pictures, he took pictures of her.  Her pictures were posted on

21   Backpage, and all of those activities took place in Brooklyn.

22           Now, perhaps the argument can be made that all of

23   these activities, the sex, the prostitution, the pictures, all

24   were some kind of grooming that would eventually lead to the

25   pictures that were the subject of Count Five.  Sure, that

JABPKIDO

argument could be made, except that grooming took place in

Brooklyn.  It didn't take place in Manhattan.  And that's how

this case is fundamentally different from the Thompson case and

the other cases it relied on.

        Again, in those cases, significant criminal conduct,

related criminal conduct took place in the district where the

trial took place and led to the taking of videos in another

district.  Here, the opposite is true.  None of the alleged

other criminal conduct took place in the Southern District, the

prostitution, the other pictures, none of it.

        There were not even a series of messages of a sexual

nature or pictures sent to Kaira Brown in Manhattan, for

example, like there were in the Engle case, in an effort to

persuade her later, two years later, I guess, to take the 2017

pictures.

        Also, your Honor, merely commuting to your criminal

job does not provide venue.  There was testimony that during

the 18 to 24 months that Kaira Brown participated in these acts

in Brooklyn, that periodically she would return to Manhattan to

her group home.  But again, there was no testimony whatsoever

that while she was there, any conduct took place.

        As an example, if I run a boiler room in Brooklyn and

perpetrate a fraud from that boiler room but I live in

Manhattan and commute there every single day and don't engage

in any fraudulent conduct while I'm in Manhattan, that doesn't

JABPKIDO

1    confer venue on Manhattan in that case.  There has to be --

2    some piece of the crime has to happen there.

3            The government's theory, I think, on this seeks to

4    stretch the venue doctrine to beyond recognition.  The case

5    should have been brought in the Eastern District of New York.

6    It wasn't, and now the government has to live with that

7    decision.  But on the facts in this -- on the facts of this

8    record, of this trial record, there was no venue for this count

9    in the Southern District and, therefore, your Honor, Count Five

10   should be dismissed.

11           Now, as to Count One, the argument is similar,

12   although there are some differences in that case.  Sex

13   trafficking, the count that Mr. Kidd was convicted of in Count

14   One, 18 U.S.C. Section 1591, the relevant section of it

15   because, obviously, Mr. Kidd was acquitted of the coercion

16   aspect of that count, requires the defendant to solicit,

17   entice, recruit, among other things, to cause a person, who is

18   under 18, to engage in commercial sex acts while knowing or

19   recklessly disregarding the fact that the minor is 18.

20           Now, in that very first conversation that took place

21   in 2015, according to the testimony of Kaira Brown, as I

22   mentioned before, Mr. Kidd texted her in response to an ad that

23   she had up on Backpage and essentially offered her a chance to

24   work out of his home to continue the prostitution in exchange

25   for 50 percent of the profits.  Now, that testimony would

JABPKIDO

perhaps be legally sufficient to establish that he was

recruiting or soliciting her to engage in a commercial sex act.

        And she actually was in Manhattan at the time, and if

a federal crime in Count One were promoting prostitution or

something along -- something like that, venue would be proper,

but that is not the federal crime in Count One.  The federal

crime in Count One is sex trafficking, which requires that

Mr. Kidd knew or had reason to know or had time to observe

Kaira Brown sufficiently to know that she was under 18.  That

did not happen until weeks later or months later.

        What we know from the record is that in the initial

text message that he sent her, inviting her to prostitute out

of his apartment, he told her -- he made clear to her that she

had to be 18 years or older, and that's on the record in the

transcript on page 175.  There was, therefore, no basis for him

to know or even suspect or consciously disregard that she was

not 18 when she responded to that ad or responded to that text,

nor did she ever testify that she told him that she was younger

than 18 at that time.

        So when he texted and he spoke to her while she was in

Manhattan in that initial conversation, he was not committing a

federal crime.  No part of that, the crime that he was

convicted of, took place in that conversation.  It would only

have been a crime if he had known she was under 18.

        Now, again, venue requires at least some part of the

JABPKIDO

crime to be committed in the district where the prosecution

takes place, and he wasn't committing a crime when he induced

her.  And then, according to the record, over the course of the

next 18 months or so, every single act that forms the basis of

Count One took place in Brooklyn.  There was no sex in

Manhattan.  There was no prostitution in Manhattan.  There was

no sending of ads to her, for example, to verify their accuracy

in Manhattan.  There were no pictures taken for ads in

Manhattan.  None of it happened in Manhattan.

The fact that Kaira Brown occasionally went back to

her group home during this period does not bestow venue on the

Southern District, not without some other conduct that was part

of the crime.  During this period of time, subsequent to him

allegedly learning that she was under 18, Mr. Kidd did not

recruit her, entice her, harbor her, transport her, provide for

her, obtain, advertise, maintain, patronize or solicit her in

Manhattan, and that's what the statute requires.

Your Honor, there really isn't -- we'll see when the

government stands up, but I don't think there is a factual

dispute here.  The testimony is what it is.  But based on that

testimony, the legal conclusion has to be that the evidence was

legally insufficient for the jury to conclude that venue was

proper in the Southern District for both Count One and Count

Five.  Thank you.

THE COURT:  Thank you.

JABPKIDO

1          Mr. Gutwillig?

2          MR. GUTWILLIG:  Yes, your Honor.  As the Court

3     instructed the jury at trial with respect to Counts One and

4     Five, and the other counts, the government was required to

5     prove that any act in furtherance of the unlawful activity

6     occurred within the Southern District of New York.  Under

7     Second Circuit law, as your Honor instructed, the government

8     must only do that by a preponderance of the evidence.

9          I'll discuss both Counts One and Count Five in

10     response to the arguments made by defense counsel, but kind of

11     just as a threshold matter, directing the Court's attention

12     generally to pages 117 through 123 of the transcript, which

13     involves Kaira Brown's testimony, she testified, in sum and

14     substance, as defense counsel alluded to, that when the

15     defendant recruited her by text message, she told him that she

16     would be coming from a group home in Manhattan.  That's clearly

17     in the testimony.

18          She also testified that she traveled from Manhattan to

19     Brooklyn to meet the defendant and that she engaged in

20     prostitution for him shortly thereafter.  She testified that

21     she saw approximately five customers the first day.

22          With respect to the Count One, the statute is very

23     broad.  It says, section 1591:  Recruits, entices, harbors,

24     transports, provides, obtains, advertises, maintains,

25     patronizes or solicits.  Here, the defendant clearly recruited

JABPKIDO

Kaira Brown from the Southern District of New York in the text

message conversation.  Kaira Brown testified that they

discussed prostitution, they discussed the split of the

proceeds.

It can't realistically be argued that the defendant

had anything else in his mind at that time, given that she

engaged in prostitution almost immediately upon arriving.  I

would note, your Honor, that this theory of venue has been

accepted in case *United States v. Benjamin*, 18 CR 874.  At the

close of the evidence in that matter, defense counsel made a

motion pursuant to rule 29 to dismiss based on lack of venue,

and there, the theory of venue was that the defendant had

recruited the victim from the Southern District of New York by

Facebook communications.  The defendant thereafter traveled

from the Southern District of New York to Brooklyn -- or I'm

sorry, to Queens, rather, to meet the defendant, and then

shortly thereafter engaged in prostitution.  Very similar here.

And with respect to defense counsel's argument that it

is in some way important that the defendant indicated that the

victim needed to be 18 or didn't have a reasonable opportunity

to observe her until she arrived later that day, I think both

of those arguments are unavailing.

And the statute makes clear that any of these acts

with -- any of these acts of recruiting it's not necessary that

they occur contemporaneously with receiving money or observing

JABPKIDO

the victim.  He recruited her by text message from the Southern

District of New York.  She engaged in prostitution shortly

thereafter.

And with respect to the period, Kaira Brown testified

it was in the spring of 2015.  The videos and images that are

the subject of Count Five were made, or at least the metadata

on the creation offered at trial was in February of 2017.

During the intervening time, it wasn't the case that Kaira

Brown testified that she occasionally went back and forth.  She

testified that she, quote, very frequently went back and forth

to the defendant's apartment.  The shortest amount of time was

two days.  The longest amount of time was two weeks.

She testified also that the first time she went back

to Manhattan, she told the defendant she was going back to a

facility in Manhattan.  She's back and forth from Manhattan to

Brooklyn during the entirety of the time from when she was

first prostituted by the defendant to when she -- when videos

and images were made of her in February 2017 that were the

subject of Count Five.

Addressing specifically Count Five, the defense

counsel is correct that the government would cite to *United

States v. Thompson* and also *United States v. Sullivan* and

*United States v. Engle*.  I believe the citations are already in

the record, but *United States v. Thompson*, 896 F.3d 155.  And

the argument that there was more grooming in that case, or that

JABPKIDO

 1   there was no grooming in this case, I would submit is

 2   unavailing.

 3          The victim testified that she was recruited by the

 4   defendant in 2015.  The videos and images were not made until

 5   February of 2017.  During that time, as she testified, she

 6   frequently went back and forth from Manhattan to Brooklyn to

 7   work for the defendant.  During that time, she testified that

 8   he tried to force himself on her while she was sleeping, that

 9   he choked her on at least one occasion.

10          And any idea that those acts wouldn't be found to be

11   grooming, and understanding that defense counsel's argument is

12   that the grooming acts, quote, unquote, occurred in the Eastern

13   District of New York, he knew that she was going back and forth

14   and he continued this.  And any communications in the

15   recruiting back and forth from Manhattan to Brooklyn and the

16   specific knowledge that she was coming from Manhattan is enough

17   to sustain venue on both Counts One and Count Five.

18          And I would just also note that Thompson notes the

19   Second Circuit precedence supports a, quote, sweeping

20   conception of, quote, enticement to support venue, and it cites

21   to *United States v. Dorvee*, 616 F.3d 174, and *United States v.*

22   *Brand*, 467 F.3d 179.

23          So just to summarize, with respect to Count One, the

24   sex trafficking count, there can really be no dispute that the

25   defendant recruited the victim from the Southern District of

New York, and she shortly thereafter engaged in prostitution on

his behalf.  And over the next approximately 18 months to two

years continued to do so until he ultimately produced the child

pornography that was the subject of Count Five.

     And for all of those reasons, the government would

argue that venue is proper in the Southern District of New York

on both Counts One and Five.

     THE COURT:  Mr. Gutwillig, one question.  Is it your

understanding that when the defendant first contacted Kaira

Brown, he did so in response to her ad in Backpage?  Is that

correct?

     MR. GUTWILLIG:  I believe it is.  If your Honor would

give me a minute just to look at the transcript.

     THE COURT:  All right.

     MR. GUTWILLIG:  So the testimony was that:  "It was a

text message in response to a Backpage ad that was posted of

me."  So my understanding is that it was in response to a

Backpage ad.

     THE COURT:  So when the defendant contacted her,

presumably he knew that she was available because she had

advertised in Backpage to engage in prostitution?

     MR. GUTWILLIG:  Yes, your Honor.  The government would

agree with that.

     THE COURT:  And to the extent he was aware that she

was available and that he contacted her to come to Brooklyn, it

JABPKIDO

1   was presumably, again, for the purpose of furthering this

2   relationship that developed between them?

3           MR. GUTWILLIG:  And as showed by shortly thereafter,

4   she engaged in prostitution on his behalf almost the same day

5   she arrived and saw approximately five customers.

6           THE COURT:  All right.  Thank you.

7           Mr. Miedel, anything else?

8           MR. MIEDEL:  Yes, briefly, your Honor.

9           Just first of all, in response to your question.

10  There wasn't a relationship between them that he furthered by

11  contacting her.  He contacted her by one text.  She responded.

12  They had a phone call, and she came to Brooklyn.  And there's

13  no dispute about the purpose of that.  She came to work in

14  prostitution.

15          So again, for Count One, the argument is not that he

16  didn't seek to get her to come to Brooklyn to engage in

17  prostitution.  The argument is that that wasn't a crime at that

18  point.  It's only a crime if she was -- he knew that she was

19  under 18.  And so he could engage in all kinds of questionable

20  conduct, but it wasn't a crime and he wasn't there for -- no

21  part of the crime was, therefore, occurring in Manhattan at

22  that time until later.  And so, you know, that's the argument

23  for Count One.

24          For Count Five, the suggestion that one text two years

25  before the photograph in question in Count Five is taken is

JABPKIDO

enough to suggest that enticement took place to allow her, two

years later, to take that picture is crazy.

I mean, the reason she ended up taking the picture is

because over the course of 18 or 24 months, she engaged in

multiple acts of prostitution.  And there were pictures taken

during that period of time, there was a relationship, and all

those things, yes, that's true, but that all took place in

Brooklyn.  It had nothing to do with Manhattan.

And her testimony that she went back and forth, first

of all, she testified, this is on page 182 of the transcript,

that in February of 2017 -- she was asked:  "Question:  What

about during February of 2017, where were you spending the

nights?  Answer:  At the defendant's house."

It's sort of irrelevant, frankly, whether she was

going back and forth because there's no testimony whatsoever by

her or anybody else that anything, anything relating to the

crime took place while she was in Manhattan.  She was simply

coming back and forth over a period of time, but the conduct

that makes it the crime, especially the crime in Count Five,

took place in Brooklyn.

THE COURT:  The question, to some degree, Mr. Miedel,

is why she was coming back and forth, and to some extent, she

was coming back and forth because the defendant was reaching

out to her essentially asking her to come back.

MR. MIEDEL:  Well, I'm not sure that's the testimony.

JABPKIDO

```
1    I think the testimony is that she wanted to work.  She was a

2    prostitute, right?  She was a minor, yes, but she was a

3    prostitute.  She wanted to work, and she wanted to make money,

4    and so she would call him.  I think the testimony is, in fact,

5    she would call him sometimes to see if the place was open to

6    work out of, and then she would come.

7            So I'm not sure it's fair to characterize the

8    testimony is that each time that she was in Manhattan, he would

9    reach out to her and try to get her to come back.

10           THE COURT:  Not each time, Mr. Miedel.

11           MR. MIEDEL:  Or anytime really.

12           THE COURT:  I think that there was some testimony, as

13   well, that there were times in which they had disagreements or

14   fights or whatever, and then --

15           MR. MIEDEL:  That's true, and then --

16           THE COURT:  -- she moved out, went back to Manhattan,

17   and at that point, presumably, at least the evidence suggests,

18   that either she voluntarily came back or that the defendant

19   enticed her or recruited her to come back because they had a

20   business relationship.

21           MR. MIEDEL:  Yes, yes.  I think that one could maybe

22   probably infer that from the testimony, but that's not the

23   testimony itself.  There is no testimony about that.  There was

24   testimony about the fact that they had some disagreements and

25   she left, and in fact, at some point, she just packed her bags
```

JABPKIDO

1    and took off and never came back.

2          But in terms of how the relationship developed or took

3    place during this period of time, and whether he then reached

4    out to her while she was in Manhattan and tried to get her to

5    come back to continue her prostitution with him, there is no

6    testimony like that that I'm aware of.

7          THE COURT:  Well, you put your finger on the question.

8    If there isn't directly, the question is whether there are

9    reasonable inferences that a reasonable jury could draw from

10   those circumstances.  One of them might be that they had

11   disagreements, she came back and forth.  Sometimes when they

12   had disagreements, she may have come back because the defendant

13   reached out to her.

14          Mr. Gutwillig, anything else?

15          MR. GUTWILLIG:  Just briefly, your Honor, to respond

16   to a couple of points.  First is that there seems to be this

17   argument that the entire crime must have been committed in the

18   Southern District of New York, and the instruction is that any

19   act in furtherance of the unlawful activity occurred within the

20   Southern District of New York.

21          Secondly, this idea that the defendant had to know she

22   was 18 when he recruited her, is legally incorrect.  The

23   statute is very broad on that point.  As your Honor knows from

24   the jury notes and the subsequent conversation about it, it's

25   knowledge, should have known, reasonable opportunity to

JABPKIDO

```
1    observe.  That does not need to happen at the same time as the

2    recruitment.

3         And, frankly, I think the argument that she was a

4    prostitute, she was looking for work is ridiculous, and she was

5    a minor.  And the reason that this statute protects minors in

6    the way it does is because a minor cannot consent, which is a

7    point that we discussed at trial.

8         As your Honor suggested, the reasonable inference from

9    working in prostitution and being choked and any other number

10   of things is clearly that the victim went back and forth and

11   felt the need to go back and forth as part of the sex

12   trafficking, which led to the enticement to create the video

13   images.

14        THE COURT:  All right.  Thank you.  If there's nothing

15   else, I will close the hearing on this matter.

16        MR. MIEDEL:  I'm sorry, one more thing, just briefly.

17        Mr. Gutwillig just mentioned that, you know, there was

18   testimony about Mr. Kidd choking her and, therefore, causing --

19   you know, that goes to the coercion part of the charge, of

20   which he was acquitted.  So, obviously, we cannot even draw the

21   inference that the jury reasonably concluded that based on

22   those facts, he was somehow enticing her or, you know,

23   harboring her or whatever, because they acquitted him of that.

24        THE COURT:  As I understand that testimony,

25   Mr. Miedel, its relevance is not a question of whether there
```

JABPKIDO

1    was coercion, but whether there were circumstances that drove

2    her to leave the defendant's place of business, and then coming

3    back.  In coming back, a reasonable jury, under these

4    circumstances, could conclude that she came back because of

5    communications between them, the relationships that they had,

6    and the acts of enticement or recruitment that the defendant

7    made in order to allow her to come back.

8           In any event, I'm closing the hearing.  I've heard the

9    arguments.  Mr. Miedel, I am not persuaded that, under these

10   circumstances, a reasonable jury could legally find the

11   evidence insufficient to establish venue in the Southern

12   District of New York as to both to Counts One and Five.

13          I think that there is sufficient evidence on the

14   record from which a reasonable jury could make a legal finding

15   that venue was established, that the defendant solicited,

16   enticed or recruited Kaira Brown while he was in Brooklyn and

17   she was in Manhattan, to travel to Brooklyn for the purposes of

18   sex trafficking.

19          Is there anything else?  Thank you.

20          MR. MIEDEL:  Your Honor, one other thing.  Sentencing

21   in this matter is currently scheduled, I think, for

22   November 1st.  Especially with this hearing being pushed back a

23   couple of times sort of has snuck up on me, and I would ask the

24   Court's indulgence and ask for a continuance on the sentencing.

25          Part of it is also that I'm still in the process of

JABPKIDO

```
 1   investigating some facts about Mr. Kidd's background that I

 2   could use at sentencing and will need some additional time.

 3            THE COURT:  How much time would you need, Mr. Miedel?

 4            MR. MIEDEL:  Could we schedule it for early December?

 5            THE COURT:  Yes.  Let's look for a time in December.

 6            THE LAW CLERK:  2:00 on December 6th?

 7            MR. MIEDEL:  One moment, your Honor.  December 6th,

 8   you said?

 9            THE LAW CLERK:  Yes.

10            MR. MIEDEL:  Yes, that's fine.  Thank you.

11            THE COURT:  Is that good for the government?

12            MR. GUTWILLIG:  Yes, your Honor.

13            THE COURT:  Thank you.

14            (Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```